**SPECTOR GADON ROSEN VINCI P.C.**
By:    Alan B. Epstein (Pa. I.D. No. 02346)
       Adam A. Filbert (Pa. I.D. No. 330960)
1635 Market Street, 7th Floor
Philadelphia, PA  19103
(215) 241-8832 / (215) 531-9103 (Fax)
aepstein@sgrvlaw.com          *Attorneys for Plaintiff, Janet Monge*

*Filed and Attested by the Office of Judicial Records 20 MAY 2022 04:09 pm E. HAURIN*

| | |
|---|---|
| **JANET MONGE**<br>**106 Federal Street**<br>**Philadelphia, PA 19147**<br>                 **Plaintiff,**<br><br>          **v.**<br><br>**UNIVERSITY OF PENNSYLVANIA**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**AMY GUTMANN, WENDELL**<br>**PRITCHETT, KATHLEEN**<br>**MORRISON, DEBORAH THOMAS,**<br>**& CHRISTOPHER WOODS**<br>**in their individual capacities,**<br>**c/o University of Pennsylvania**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**PAUL MITCHELL**<br>**511 N. Broad St.**<br>**Philadelphia, PA 19123**<br>**and**<br>**c/o University of Pennsylvania**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**BILLY PENN**<br>**150 N. 6th St.** | **CIVIL ACTION**<br><br>**NO.**<br><br>**JURY TRIAL DEMANDED** |

Case ID: 220401655

Philadelphia, PA 19106

And

**MAYA KASUTTO,**
in her individual capacity,
c/o Billy Penn
150 N. 6th St.
Philadelphia, PA 19106

And

**THE PHILADELPHIA INQUIRER,
PBC**
801 Market Street, Suite 300
Philadelphia, PA  19107

And

**ABDUL ALIY MUHAMMAD &
JENICE ARMSTRONG**
in their individual capacities,
c/o The Philadelphia Inquirer,
PBC
801 Market Street, Suite 300
Philadelphia, PA 19107

And

**THE NEW YORKER**
1 World Trade Center
New York, NY  10007

And

**HEATHER ANN THOMPSON**
in her individual capacity,
c/o The New Yorker
1 World Trade Center
New York, NY  10007

And

**ESPN, INC. d/b/a ANDSCAPE**
545 Middle Street

Case ID: 220401655

Bristol, CT 06010

And

**NICOLE FROIO & LINN WASHINGTON**
in their individual capacities,
c/o ESPN, INC.
545 Middle Street
Bristol, CT 06010

And

**THE ASSOCIATION OF BLACK ANTHROPOLOGISTS**
2300 Clarendon Blvd., Suite 1301
Arlington, VA 22201

And

**THE SOCIETY OF BLACK ARCHAEOLOGISTS**
PO Box 3771
Santa Monica, CA 90409

And

**THE GUARDIAN MEDIA GROUP**
d/b/a THE GUARDIAN
61 Broadway
New York, NY 10006

And

**ED PILKINGTON**
in his individual capacity,
c/o The Guardian
61 Broadway
New York, NY 10006

And

**DAILY MAIL AND GENERAL TRUST, PLC d/b/a DAILY MAIL**

Case ID: 220401655

51 Astor Place
New York, NY 10003

And

**ADAM SCHRADER**
in his individual capacity,
c/o Daily Mail
51 Astor Place
New York, NY 10003

AND

**SLATE**
15 Metrotech Center, 8th Floor
Brooklyn, NY 11201

AND

**ELAIN AYERS**
in her individual capacity,
c/o SLATE
15 Metrotech Center, 8th Floor
Brooklyn, NY 11201

And

**NYP HOLDINGS, INC. d/b/a NEW
YORK POST**
1211 Avenue of the Americas
New York, NY 10036

And

**JACKSON O' BRYAN**
in his individual capacity,
c/o New York Post
1211 Avenue of the Americas
New York, NY 10036

And

**TEEN VOGUE**
1 World Trade Center

Case ID: 220401655

New York, NY 10007

And

**EZRA LERNER**
in his individual capacity,
c/o Teen Vogue
1 World Trade Center
New York, NY 10007

And

**HYPERALLERGIC MEDIA**
181 N. 11th Street, Suite 302
Brooklyn, NY 11211

And

**KINJAL DAVE & JAKE
NUSSBAUM**
in their individual capacities,
c/o Hyperallergic Media
181 N. 11th Street, Suite 302
Brooklyn, NY 11211

And

**SMITHSONIAN MAGAZINE**
600 Maryland Avenue,
Southwest Suite 6001
Washington, DC 20024

And

**NORA MCGREEVY**
in her individual capacity,
c/o Smithsonian Magazine
600 Maryland Avenue,
Southwest Suite 6001
Washington, DC 20024

And

**AL DIA NEWS**

Case ID: 220401655

**1835 Market Street, 4th Floor**
**Philadelphia, PA 19103**

**And**

**BRITTANY VALENTINE**
**in her individual capacity,**
**c/o Al Dia News**
**1835 Market Street, 4th Floor**
**Philadelphia, PA 19103**

**And**

**NEW YORK TIMES, CO.**
**620 8th Avenue**
**New York, NY 10018**

**And**

**Michael Levenson**
**in his individual capacity,**
**c/o New York Times, Co.**
**620 8th Avenue**
**New York, NY 10018**

**Defendants.**

## NOTICE TO DEFEND

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

**Philadelphia Bar Association Lawyer Referral**
**and Information Service**
**One Reading Center**
**Philadelphia, Pennsylvania 19107**

Case ID: 220401655

**(215) 238-6333**
**TTY (215) 451-6197**

## AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

**Asociacion De Licenciados De Filadelfia**
**Servicio De Referencia E Informacion Legal**
**One Reading Center**
**Filadelfia, Pennsylvania 19107**
**(215) 238-6333 / TTY (215) 451-6197**

Case ID: 220401655

**SPECTOR GADON ROSEN VINCI P.C.**
By:     Alan B. Epstein (Pa. I.D. No. 02346)
          Adam A. Filbert (Pa. I.D. No. 330960)
1635 Market Street, 7th Floor
Philadelphia, PA  19103
(215) 241-8832 / (215) 531-9103 (Fax)
aepstein@sgrvlaw.com          *Attorneys for Plaintiff, Janet Monge*

| | |
|---|---|
| **JANET MONGE**<br>**106 Federal Street**<br>**Philadelphia, PA 19147**<br>          **Plaintiff,**<br><br>          **v.**<br><br>**UNIVERSITY OF PENNSYLVANIA**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**AMY GUTMANN, WENDELL**<br>**PRITCHETT, KATHLEEN**<br>**MORRISON, DEBORAH THOMAS,**<br>**& CHRISTOPHER WOODS**<br>**in their individual capacities,**<br>**c/o University of Pennsylvania**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**PAUL MITCHELL**<br>**511 N. Broad St.**<br>**Philadelphia, PA 19123**<br>**and**<br>**c/o University of Pennsylvania**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**BILLY PENN**<br>**150 N. 6th St.** | **CIVIL ACTION**<br><br>**NO.**<br><br>**JURY TRIAL DEMANDED** |

Case ID: 220401655

Philadelphia, PA 19106

And

MAYA KASUTTO,
in her individual capacity,
c/o Billy Penn
150 N. 6th St.
Philadelphia, PA 19106

And

THE PHILADELPHIA INQUIRER,
PBC
801 Market Street, Suite 300
Philadelphia, PA  19107

And

ABDUL ALIY MUHAMMAD &
JENICE ARMSTRONG
in their individual capacities,
c/o The Philadelphia Inquirer,
PBC
801 Market Street, Suite 300
Philadelphia, PA 19107

And

THE NEW YORKER
1World Trade Center
New York, NY 10007

And

HEATHER ANN THOMPSON
in her individual capacity,
c/o The New Yorker
481 8th Avenue & 31st St,
New York, NY 10001

And

ESPN, INC. d/b/a ANDSCAPE
545 Middle Street

2

Case ID: 220401655

Bristol, CT 06010

And

**NICOLE FROIO & LINN
WASHINGTON**
in their individual capacities,
c/o ESPN, INC.
545 Middle Street
Bristol, CT 06010

And

**THE ASSOCIATION OF BLACK
ANTHROPOLOGISTS**
2300 Clarendon Blvd., Suite
1301
Arlington, VA 22201

And

**THE SOCIETY OF BLACK
ARCHAEOLOGISTS**
PO Box 3771
Santa Monica, CA 90409

And

**THE GUARDIAN MEDIA GROUP**
d/b/a THE GUARDIAN
61 Broadway
New York, NY 10006

And

**ED PILKINGTON**
in his individual capacity,
c/o The Guardian
61 Broadway
New York, NY 10006

And

**DAILY MAIL AND GENERAL
TRUST, PLC d/b/a DAILY MAIL**

3

Case ID: 220401655

51 Astor Place
New York, NY 10003

And

ADAM SCHRADER
in his individual capacity,
c/o Daily Mail
51 Astor Place
New York, NY 10003

AND

SLATE
15 Metrotech Center, 8th Floor
Brooklyn, NY 11201

AND

ELAIN AYERS
in her individual capacity,
c/o SLATE
15 Metrotech Center, 8th Floor
Brooklyn, NY 11201

And

NYP HOLDINGS, INC. d/b/a NEW
YORK POST
1211 Avenue of the Americas
New York, NY 10036

And

JACKSON O' BRYAN
in his individual capacity,
c/o New York Post
1211 Avenue of the Americas
New York, NY 10036

And

TEEN VOGUE
1 World Trade Center

4

Case ID: 220401655

New York, NY 10007

And

**EZRA LERNER**
**in his individual capacity,**
**c/o Teen Vogue**
**1 World Trade Center**
**New York, NY 10007**

And

**HYPERALLERGIC MEDIA**
**181 N. 11th Street, Suite 302**
**Brooklyn, NY 11211**

And

**KINJAL DAVE & JAKE**
**NUSSBAUM**
**in their individual capacities,**
**c/o Hyperallergic Media**
**181 N. 11th Street, Suite 302**
**Brooklyn, NY 11211**

And

**SMITHSONIAN MAGAZINE**
**600 Maryland Avenue,**
**Southwest Suite 6001**
**Washington, DC 20024**

And

**NORA MCGREEVY**
**in her individual capacity,**
**c/o Smithsonian Magazine**
**600 Maryland Avenue,**
**Southwest Suite 6001**
**Washington, DC 20024**

And

**AL DIA NEWS**

Case ID: 220401655

**1835 Market Street, 4th Floor**
**Philadelphia, PA 19103**

**And**

**BRITTANY VALENTINE**
**in her individual capacity,**
**c/o Al Dia News**
**1835 Market Street, 4th Floor**
**Philadelphia, PA 19103**

**And**

**NEW YORK TIMES, CO.**
**620 8th Avenue**
**New York, NY 10018**

**And**

**Michael Levenson**
**in his individual capacity,**
**c/o New York Times, Co.**
**620 8th Avenue**
**New York, NY 10018**

**Defendants.**

## COMPLAINT – CIVIL ACTION

Plaintiff Janet Monge ("Plaintiff" or "Dr. Monge"), by and through her undersigned attorneys, Alan B. Epstein, Esquire and Spector Gadon Rosen Vinci, P.C., hereby files this Complaint, and in support thereof, avers as follows:

### PRELIMINARY STATEMENT

1.    Janet Monge, Ph.D. ("Dr. Monge") has spent her entire career working for social justice by restoring personhood to unidentified human

6

Case ID: 220401655

remains. In fact, being able to bring the identity of those remains to light is one of Dr. Monge's most important aspects of her chosen field.

2.     As a curator for the Penn Museum, she was named "Best Museum Curator" by Philadelphia Magazine, and as a Professor and researcher in the Anthropology Department at the University of Pennsylvania, she has earned numerous awards for her teaching and scholarship.

3.     Further, as an expert consultant with the Philadelphia Medical Examiner's Office, the Philadelphia Defenders Association, and Federal Defender's association, she has volunteered to assist with several criminal cases involving unidentified human remains throughout her career.

4.     One of the most challenging cases in Dr. Monge's storied career was the matter involving the "Jane Doe" bone fragment remains removed by the City of Philadelphia from the site of the tragic 1985 bombing by the City, whose officials dropped an aerial explosive fire bomb on the home of its own citizens in one of the most horrific examples of excessive force found in American history; it killed eleven (11) persons (including five children) who were member of a group known as the MOVE family.

5.     Dr. Monge worked for 36 years to identify the person whose bone fragments were not properly identified as belonging to any member of the MOVE family, extensively researching and studying them, along with attempting to contact known MOVE family members multiple times in an effort to gain their cooperation so the remains could be conclusively identified.

Case ID: 220401655

6.      From the beginning of her engagement by the City of Philadelphia, which sought her aid as a world-renowned forensic anthropologist, Dr. Monge worked tirelessly to restore identity to the Jane Doe bone fragment remains, all while contextualizing the tragedy of the MOVE bombing in social and political arenas.

7.      However, in 2021, false, defamatory, and widely disseminated media reports about Dr. Monge's efforts made her the victim of vicious attacks on her personal and professional reputation initiated by a current doctoral candidate at the University of Pennsylvania, Paul Mitchell, with the help of his PhD advisor, Penn Anthropology professor Deborah Thomas, solely for their own unlawful purposes and in retaliation for Dr. Monge having reported the unprofessional conduct of Mr. Mitchell.

8.      To conduct the attack on Dr. Monge's character and reputation, Mr. Mitchell purposefully, and with full knowledge that he was falsifying information, went to his then-girlfriend Maya Kasutto, a writer for the Billy Penn 501(c)(3) news organization (a project of WHYY Philadelphia), to have her write an article containing malicious, sensationalized allegations of racial bias about the investigatory process undertaken by two respected antrhopologists, Alan Mann and Dr. Monge, based entirely on false and misleading statements and attacking Dr. Monge's well-deserved, excellent reputation worldwide as a forensic biological anthropologist.

9.      The defamatory statements about Dr. Monge in that Billy Penn article became even more widely disseminated through the actions of Defendant

Case ID: 220401655

Thomas who released email blasts to colleagues and others in furtherance of Defendant Mitchell's intentional actions to disparage Dr. Monge's reputation.

10.     Additionally, the contents of Billy Penn article, and all its defamatory misstatements, was then republished and embellished, in whole or in part, by several major media outlets, including those named Defendants herein, which resulted in great harm to Dr. Monge's reputation and employment as a professor and curator, and caused her great economic harm.

11.     Although Dr. Monge has never been found to have violated any professional, ethical, or legal standards in her handling of the remains, reports published in the media repeated the false and defamatory sentiments from the Billy Penn article, directly stating and implying that Dr. Monge's work was inappropriate, unethical, and inhumane.

12.     Moreover, the published statements falsely accused, directly or by innuendo, Dr. Monge of criminally violating the rights of one of the children who died in the bombing and resulting fire, even though the bone fragments properly provided to and retained by Dr. Monge were not related to the child identified in the defamatory reports.

13.     The damage done by those false and defamatory statements and articles was then amplified by the University of Pennsylvania, who made statements, both to its own faculty and to the public, that apologetically condemned the investigatory efforts of its employee although she had done nothing wrong.

Case ID: 220401655

14.     When these false statements were published, Defendants knew or should have known from reasonable investigation that the statements being made were false or would wrongly imply falsities about Dr. Monge, yet Defendants published them anyway for the purpose of gaining pageviews for its misplaced agendas, all starting with Defendant Kasutto's article written at Defendant Mitchell's suggested direction.

15.     As a result of these false and defamatory statements which have continued even after the filing of this action, Dr. Monge's reputation has been irreparably and wrongfully destroyed, she has been the victim of adverse employment actions, and she has received threatening emails and phone calls, including multiple death threats.

16.     As a result of the Defendants' individual and collective actions, Dr. Monge now seeks, through this lawsuit, to recover the severe economic and non-economic damages that have been caused by the malicious and outrageous continuing defamatory actions of the defendants.

## THE PARTIES

17.     Plaintiff, Janet Monge, is an adult individual residing at 106 Federal Street, Philadelphia, Pennsylvania 19147.

18.     Dr. Monge received her bachelor's degree in Anthropology from Pennsylvania State University, graduating magna cum laude, and her PhD from the University of Pennsylvania.

19.     Since 2011 and before her recent demotion caused by the actions of the defendants, she had been a Keeper and Associate Curator of collections

10

Case ID: 220401655

housed at the Penn Museum and a Lecturer and Adjunct Professor employed by the Department of Anthropology of the University of Pennsylvania.

20.     Prior to the vicious attack on her reputation, Dr. Monge was recognized as an expert and scholar in her field and holds teaching awards in all categories for which she has been eligible. She was named "Best Museum Curator" by Philadelphia Magazine in 2014.

21.     Dr. Monge has engaged in extensive research covering nearly the entire spectrum of biological anthropology and has volunteered her time as a forensic consultant for, *inter alia*, the Philadelphia Medical Examiner's Office, Philadelphia Defender's Association, and Federal Defender's Association.

22.     Defendant, University of Pennsylvania, is a privately held American Ivy League research university located in Philadelphia, Pennsylvania. Its Office of General Counsel is located at 2929 Walnut Street, Suite 400, Philadelphia, Pennsylvania 19104.

23.     The University of Pennsylvania operates the University of Pennsylvania Museum of Archaeology and Anthropology, commonly known as the "Penn Museum," which is located on its campus.

24.     At all times applicable to the averments in this Complaint, the University of Pennsylvania is and was Plaintiff's employer.

25.     Defendant, Amy Gutmann, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take action and make statements on its behalf. At all times applicable hereto, Gutmann was the President of the University of Pennsylvania.

11

Case ID: 220401655

26.     Defendant, Wendell Pritchett, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take action and make statements on its behalf. At all times applicable hereto, Pritchett was the Provost of the University of Pennsylvania.

27.     Defendant, Kathleen Morrison, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take actions and make statements on its behalf. At all times applicable hereto, Morrison was and is the Chair of the Anthropology Department at the University of Pennsylvania.

28.     Defendant, Deborah Thomas, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take actions and make statements on its behalf. At all times applicable hereto, Thomas was and is a Professor in the Anthropology Department at the University of Pennsylvania.

29.     Defendant, Christopher Woods, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take actions and make statements on its behalf. Appointed in 2021, Woods has, at all times applicable hereto, served as the Director of the Penn Museum.

30.     Defendant, Paul Mitchell, is an adult individual who, upon information and belief, resides at 511 N. Broad Street, Philadelphia, Pennsylvania 19123.

Case ID: 220401655

31.     Defendant, Billy Penn, is a membership 501(c)(3) media organization associated with and a program of WHYY Philadelphia, providing local Philadelphia news through the internet with its principal place of business located at 150 N. 6th Street, Philadelphia, Pennsylvania 19106.

32.     Defendant, Maya Kasutto, is an adult individual who, at all times applicable hereto, was employed by Billy Penn and authorized to take actions and make statements on its behalf. Upon information and belief, Kasutto is the current or former girlfriend of Defendant, Paul Mitchell.

33.     Defendant, Philadelphia Inquirer, is a Delaware Public Benefit Corporation with its principal place of business located at 801 Market Street, Suite 300, Philadelphia, Pennsylvania, 19107. It operates an internet-based news website as well as two newspapers serving the Philadelphia region.

34.     Defendant, Abdul Aliy-Muhammad, is an adult individual who, at all times applicable hereto, was employed by Philadelphia Inquirer and authorized to take actions and make statements on its behalf. He currently is the recipient with Jake Nussbaum of a grant sponsored by the University of Pennsylvania School of Arts and Sciences that will allow him to continue to disseminate misinformation regarding the actions of Dr. Monge and continue the defamatory attacks on Dr. Monge.

35.     Defendant, Jenice Armstrong, is an adult individual who, at all times applicable hereto, was employed by Philadelphia Inquirer and authorized to take actions and make statements on its behalf.

13

Case ID: 220401655

36.     Defendant, The New Yorker, is a business entity with its principal place of business located at 1 World Trade Center, New York, New York 10007. It is an American magazine published by Conde Nast providing news and commentary on politics, global affairs, business, technology, pop culture, and the arts. The New Yorker publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

37.     Defendant, Heather Ann Thompson, is an adult individual who, at all times applicable hereto, was employed by the New Yorker and authorized to take actions and make statements on its behalf.

38.     Defendant, ESPN, Inc., is a Connecticut corporation with its principal place of business located at 545 Middle Street, Bristol, Connecticut 06010. ESPN operates Andscape, a popular sports and pop culture website that seeks to explore the intersections of race, sports, and culture. Andscape publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

39.     Defendant, Nicole Froio, is an adult individual who, at all times applicable hereto, was employed by Andscape and authorized to take actions and make statements on its behalf.

40.     Defendant, Association of Black Anthropologists, is a business entity filed in the District of Columbia with its principal place of business located at 2300 Clarendon Boulevard, Suite 1301, Arlington, Virginia 22201. It is a national organization that aims to bring Black anthropologists together to create scholarship that links anthropological theory to struggles for social justice.

14

Case ID: 220401655

41.     Defendant, Society of Black Archaeologists, is a business entity with a corporate mailing address of PO Box 3771, Santa Monica, California 90409. It is an international organization of Black archaeologists advocating for the histories and material culture of global Black and African communities in archaeological research.

42.     Defendant, The Guardian Media Group, is a public limited company organized in England. It has a United States Headquarters and principal place of business located at 61 Broadway, New York, New York 10006. The Guardian Media Group owns and operates The Guardian, a British national daily newspaper with a United States news website and digital edition. The website and digital edition are accessible from anywhere in the United States, including Pennsylvania.

43.     Defendant, Ed Pilkington is an adult individual who, at all times applicable hereto, was employed by the Guardian and authorized to take actions and make statements on its behalf.

44.     Defendant, Daily Mail and General Trust, PLC, is a public limited company organized in England. It has a United States Headquarters and principal place of business located at 51 Astor Place, New York, New York 10003. Daily Mail and General Trust operates Daily Mail, a British middle-market daily newspaper with a news website. Daily Mail's website is accessible from anywhere in the United States, including Pennsylvania.

15

Case ID: 220401655

45.     Defendant, Adam Schrader, is an adult individual who, at all times applicable hereto, was employed by Daily Mail and authorized to take actions and make statements on its behalf.

46.     Defendant, Slate, is a Delaware corporate entity with its principal place of business located at 15 Metrotech Center, 8th Floor, Brooklyn, New York 11201. It is a progressive online magazine covering current affairs, politics, and culture in the United States. It publishes materials on its website, which is accessible anywhere in the United States, including Pennsylvania.

47.     Defendant, Elaine Ayers, is an adult individual who, at all times applicable hereto, was employed by Slate and authorized to take actions and make statements on its behalf.

48.     Defendant, NYP Holdings, Inc., is a Delaware corporation with its principal place of business located at 1211 Avenue of the Americas, New York, New York 10036. It operates the New York Post, a conservative daily tabloid newspaper published in New York City. The New York Post also has a digital edition and news website, which is accessible anywhere in the United States, including Pennsylvania.

49.     Defendant, Jackson O'Bryan, is an adult individual who, at all times applicable hereto, was employed by the New York Post and authorized to take actions and make statements on its behalf.

50.     Defendant, Teen Vogue, is a publisher with its principal place of business located at 1 World Trade Center, New York, New York 10007. It operates an American online publication targeting teenagers, and it offers information

Case ID: 220401655

about the latest entertainment and feature stories on current issues and events. Teen Vogue publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

51.     Defendant, Ezra Lerner, is an adult individual who, at all times applicable hereto, was employed by Teen Vogue and authorized to take actions and make statements on its behalf.

52.     Defendant, Hyperallergic Media, is a New York corporation with its principal place of business located at 181 North 11th Street, Suite 302, Brooklyn, New York 11211. It operates Hyperallergic, an online arts and current events magazine. Hyperallergic publishes articles on its website that are accessible from anywhere in the United States, including Pennsylvania.

53.     Defendant, Kinjal Dave, is an adult individual who, at all times applicable hereto, was employed by Hyperallergic and authorized to take actions and make statements on its behalf. Dave is also a doctoral student at the University of Pennsylvania's Annenberg School for Communications.

54.     Defendant, Jake Nussbaum, is an adult individual who, at all times applicable hereto, was employed by Hyperallergic and authorized to take actions and make statements on its behalf. Nussbaum is a Ph.D. candidate in anthropology at the University of Pennsylvania. He currently is the recipient with Abdul Aliy-Muhammad of a grant sponsored by the University of Pennsylvania School of Arts and Sciences that will allow him to continue disseminating misinformation regarding the actions of Dr. Monge and continue the defamatory attacks on Dr. Monge.

17

Case ID: 220401655

55.     Defendant, Smithsonian Magazine, is the official journal published by the Smithsonian Institution, a trust instrumentality of the United States. Its principal place of business is located at 600 Maryland Avenue, Washington, DC 20024. The Smithsonian Magazine publishes articles on its news website, which is accessible anywhere in the United States, including Pennsylvania.

56.     Defendant, Nora McGreevy, is an adult individual who, at all times applicable hereto, was employed by Smithsonian Magazine and authorized to take actions and make statements on its behalf.

57.     Defendant, Al Dia News, is a Pennsylvania corporation with its principal place of business located at 1835 Market Street, 4th Floor, Philadelphia, Pennsylvania 19103. It is a media company that focuses on the Latino experience in the United States. The articles posted on its website are accessible anywhere in the United States, including Pennsylvania.

58.     Defendant, Brittany Valentine, is an adult individual who, at all times applicable hereto, was employed by Al Día News and authorized to take actions and make statements on its behalf.

59.     Defendant, New York Times Co., is a New York corporation with its principal place of business located at 620 8th Avenue, New York, New York 10018. It operates one of the top American daily newspapers with a wide international audience. The New York Times publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

Case ID: 220401655

60.     Defendant, Michael Levenson, is an adult individual who, at all times applicable hereto, was employed by the New York Times and authorized to take actions and make statements on its behalf.

## JURISDICTION AND VENUE

61.     Subject matter jurisdiction over the Defendants with respect to these claims and causes of action is conferred upon this Court pursuant to 42 Pa.C.S. § 931 and 42 Pa.C.S.A. § 8341 *et seq.*

62.     This Court has personal jurisdiction over the Defendants under 42 Pa. C.S.A. § 5301, because the Defendants either live in Pennsylvania, are incorporated in Pennsylvania, or carry out a continuous and systematic part of their general business within this Commonwealth.

63.     Venue is proper in this Court pursuant to Pennsylvania Rule of Civil Procedure 1006(a), because Plaintiff resides in Philadelphia County, and the transactions and occurrences at issue, out of which the within causes of action arise, took place in Philadelphia County, causing the resulting harms suffered by Plaintiff there.

## FACTS

**A.     The MOVE Bombing Shocks Philadelphia, And Dr. Monge's Involvement With Bones Removed From The Bomb Site**

**1.     The MOVE Family**

64.     In 1972, Vincent Leaphart founded the "Christian Action Life Movement," an organization which later become known as the MOVE Organization.

19

Case ID: 220401655

65.     Leaphart adopted the name "John Africa" to pay homage to the continent, which he felt was the mother continent of all life. Since then, all MOVE members have changed their surname to "Africa."

66.     The MOVE organization considers itself "a family of strong, serious, deeply committed revolutionaries founded by a wise, perceptive, strategically minded Black man named John Africa."[1]

67.     The MOVE Commission Report published after the 1985 MOVE bombing described MOVE as "a small group of self-styled back-to-nature, anti-technology, anti-social advocates," and opined that MOVE "came to reject and to place themselves above the laws, customs, and social contracts of society" that "threatened violence to anyone who would attempt to enforce normal societal rules."[2]

68.     MOVE philosophies include a love of animals and the rejection of cooked and processed foods, which requires a diet of only raw meat, vegetables, and fruit. MOVE members rejected all modern technology and medicine, as well as normal societal norms. These practices were instituted at all of MOVE's properties, including its primary residence in Philadelphia and properties in Richmond, Virginia and Rochester, New York.

---

[1] On a Move, "About Move: Belief and Practice," (http://onamove.com/about/).

[2] *The Findings, Conclusions, and Recommendations of the Philadelphia Special Investigation Commission,* 59 Temp. L.Q. 339, 345 (1986) ("MOVE Commission Report").

Case ID: 220401655

69.     Throughout its existence, members of MOVE have seen themselves as the target of unwarranted and unlawful discrimination, harassment, and treatment by law enforcement, the courts, and other regulatory agencies.

## 2.     The MOVE Bombing

70.     In 1983, Philadelphia members of the MOVE organization began living at 6221 Osage Avenue, Philadelphia, Pennsylvania, in the predominantly Black neighborhood of Cobbs Creek.

71.     As tensions began to mount between MOVE and their neighbors, the other racial minority members of the Cobbs Creek neighborhood formed the "United Residents of the 6200 Block of Osage Avenue" to protest MOVE's presence in their neighborhood.

72.     Based upon this group's complaints and previous existing conflicts between MOVE and the police, Philadelphia Mayor Wilson Goode met with high-ranking members of the Philadelphia Police Department and District Attorney's Office to create a tactical plan regarding the MOVE organization.

73.     On May 12, 1985, after a Philadelphia Court of Common Pleas judge approved requests for search and arrest warrants for certain MOVE members, police evacuated the Osage Avenue neighborhood. Then, in the early morning hours of May 13, 1985, with the Osage Avenue block secured, the Police Commissioner announced over a bullhorn that four people inside 6221 Osage Avenue were named in arrest warrants, giving them fifteen minutes to surrender.

74.     When the MOVE members, responding over a loudspeaker, announced that they would not be surrendering, the police began untenably

21

Case ID: 220401655

firing high-pressured water, tear gas, and smoke projectiles at the front and rear of the house, ultimately firing over 10,000 rounds of live ammunition into the compound.

75.    At 3:45 PM, after the police made no progress in removing the MOVE members from their home, Philadelphia Mayor W. Wilson Goode, a City politician of African American descent, announced at a televised press conference that he planned to seize control of the MOVE house by "any means necessary."[3]

76.    Mayor Goode then approved the implementation of dropping an aerial bomb on the occupied property from a helicopter.

77.    Shortly thereafter, at 5:30 PM, police dropped the bomb on the MOVE house, causing the house to erupt in flames.

78.    After a brief discussion, the Police and Fire Commissioners decided to let the fire burn for several hours rather than extinguishing it, allowing the uncontrolled fire to spread to other houses on the block.

79.    By the time the Fire Department finally extinguished the fire at 11:41 p.m., it had destroyed six adjoining homes on Osage Avenue and Pine Street and caused severe damage to at least another 100 homes.

80.    Eleven (11) MOVE members were killed during the bombing, presumed to consist of six (6) adults and five (5) children.

81.    Shockingly, no one from Mayor Goode's administration responsible for the siege on the MOVE compound ever faced any consequences for the horrifying actions that took place on May 13.

---

[3] MOVE Commission Report, at 349.

Case ID: 220401655

### 3.    The City of Philadelphia's Processing of the MOVE Bomb Site

82.    After the fire was extinguished, attention turned to processing the MOVE bomb site and any evidence that remained.

83.    Unfortunately, the City's processing of the site was a complete debacle. Forensic analysis of the bomb site was already going to be a difficult task since the fire caused by the bombing, which reached temperatures more than 2,000 degrees Fahrenheit, reduced the bomb site and surrounding homes to debris, rubble, and dust. However, the difficulties were exacerbated by the inaction of the Philadelphia Medical Examiner's Office, whose representatives refused to go to the bomb site until after the first body was discovered well into the day after the bombing, May 14, 1985.

84.    By the time representatives from the Medical Examiner's Office arrived at the MOVE site, the City had, contrary to proper and standard crime scene procedures, already begun using cranes and other construction equipment to dig up debris and body parts, severely damaging the remains of the individuals who had died in the conflagration and comingling valuable evidence with the remains of the individuals who had died in the bombing and fire, with no identification of location or position at the scene.

85.    There was no systematic procedure for recording evidence, no proper control over the physical remains of the dead, and lateral x-rays and toxicology tests of the remains were not immediately taken.

Case ID: 220401655

86.     In sum, the City's initial forensic processing of the MOVE site was a complete failure, setting the stage for the severe difficulties in identifying certain remains removed from the site.

### 4.    Dr. Monge's Involvement In Analyzing Bones Removed From The MOVE Bomb Site And Disagreement Over The Identification of the Remains

87.     The aforesaid failures caused by the City's attempt to minimize its horrible murderous actions made it clear that forensic analysis of the MOVE bombing site would not be possible without outside help. Accordingly, Philadelphia's then Chief Medical Examiner, Dr. Marvin Aronson, invited Dr. Alan Mann, professor in the Department of Anthropology at the University of Pennsylvania with expertise in identifying small bone fragments, to assist with the investigation.

88.     Dr. Mann in turn invited his doctoral student and mentee, Dr. Monge, to assist him with his analysis of the disassociated bone fragments removed from the bomb site.

89.     None of the skeletal remains at the site were intact or complete, so Dr. Mann and Dr. Monge began by sorting recovered bone fragments based on age profiles.

90.     Upon examination, they concluded that a pelvis bone and proximal femur bone fragments did not conform to any of the ages of the individuals who were presumed to have been killed in the bombing and subsequent fire.

91.     Dr. Mann and Dr. Monge determined that the bones were from a young adult female, likely between the ages of 17 and 21.

24

Case ID: 220401655

92.     Since the oldest child known to be in the MOVE house was a 14-year-old girl named Katricia (Tree) Africa, these bones were considered unaffiliated with any of the known MOVE victims and thereafter referred to by them as Jane Doe.

93.     Sometime thereafter, the MOVE Commission, appointed to investigate the MOVE bombing and subsequent excavation, established its own outside pathology group led by a pathologist Dr. Ali Hameli, tasking the group with identifying the remains of the victims. The MOVE Commission's pathology group did not include Dr. Mann or Dr. Monge.

94.     In a flawed report without the full input of Drs. Mann and Monge, Dr. Hameli wrongly and unscientifically stated that the Jane Doe pelvis and femur fragments were associated with Katricia "Tree Africa" Dodson.

95.     After receiving the Commission's recommendation, Dr. Mann conducted a second investigation and issued a report reaffirming Dr. Monge's and his conclusion that the pelvis and proximal femur fragments could not have belonged to Katricia.

96.     Contrary to the Commission's erroneous conclusions, Drs. Mann and Monge's conclusions were confirmed by at least seven different forensic anthropologists.

97.     Thereafter, the Philadelphia Medical Examiner's Office, with the help of Dr. Mann and Dr. Monge, retained the responsibility and authority of identifying the unidentified human bone fragments.

25

Case ID: 220401655

98.   On December 14, 1985, the remains conclusively identified as belonging to Katricia Africa were buried after their release to Hankins Funeral Home.

99.   The pelvis and proximal femur bone fragments that could not be conclusively identified (the "unidentified fragments") were released to Dr. Mann for further investigation at his office at the Penn Museum.

### 5.   The Handling And Storage of The Unidentified Fragments Removed From The MOVE Bomb Site And Dr. Monge's First Attempt To Return The Unidentified Remains

100.   From 1986 to 2001, the bone fragments, which had still not been conclusively identified to any known individual, were stored in Dr. Mann's Office in the physical anthropology section of the Penn Museum in strict compliance with standard forensic best practices. All storage boxes were made from cardboard and lined with cotton fiber for absorbency, as the remains still had small areas of tissue attached, and then safely protected in bubble wrap to further protect them.

101.   In addition, the unidentified fragments were also kept in a secured and locked room, which was only accessible to curators of the Physical Anthropology section of the Penn Museum.

102.   In her effort to continue the investigation, in 1995, Dr. Monge sought out contact with Ramona Africa who had just been released from a long prison sentence suggesting that the unidentified fragments could be turned over to her as the MOVE family representative even though there was no conclusive evidence that the fragments were the remains of a MOVE family member. Ramona Africa

26

Case ID: 220401655

declined the suggestion and the fragments were returned to safe storage at the Museum.

103. From 1985 through 2001, the unidentified fragments remained stored in Dr. Mann's office at the Penn Museum and were not used for any teaching purposes.

### 6. Dr. Mann Leaves To Join Princeton's Anthropology Department, But The Unidentified Fragments Stay At Penn

104. In 2001, Dr. Mann left Penn to join the Anthropology Department at Princeton University as a full-time faculty member.

105. When he joined the department, he was the only biological anthropologist on the faculty, and he required teaching support to complete his duties. As such, Dr. Monge continued to assist Dr. Mann with his courses at Princeton University in the same way she did when he was at Penn.

106. When Dr. Mann left his position at the University of Pennsylvania, the unidentified bone fragments remained in safe storage at the Penn Museum due to Penn's superior facilities for forensic analysis and its access to a medical school that could provide CT scans and other testing technologies that could possibly assist in any further analysis.

107. At Penn, the remains stayed safely stored in the manner described above and were kept in the office or lab space Dr. Monge was provided to complete her work.

108. During the time period from 2001 to 2015 (when Dr. Mann retired), Dr. Monge brought the unidentified remains to Princeton's campus for further

27

Case ID: 220401655

investigation between two and five times, largely for the purpose of having other anthropologists, who were visiting Princeton, to review them.

109.  Such transfers to Princeton were conducted in strict accordance with chain of custody protocols and promptly returned to the Museum safe store afterwards.

### 7.    Monge's Renewed Attempts To Identify The Remains

110.  In 2014, after being moved to a new lab in the physical anthropology department at the Penn Museum, Dr. Monge began working with a geneticist from another leading research university on a number of research projects.

111.  At some point during their work together, the two discussed the possibility of using then just recently developed DNA analysis that permitted bone fragments to be identified with relatives.

112.  Because such an analysis required a DNA sample from a relative of Katricia to support that the fragment was from another older female, Dr. Monge again had hope that a renewed contact with Consuella Dodson, Katricia's mother, could aid in the securing of a DNA sample that would conclusively resolve that the fragments were from a yet unidentified and unrelated individual.

113.  After being contacted by Malcom Burnley, a local writer interested in writing an article about the MOVE tragedy and its aftermath, Dr. Monge enlisted him to help request from Consuella, who had then also been freed from her jail sentence, a DNA sample to dispel the notion that the fragments were not associated with Katricia.

Case ID: 220401655

114.  However, despite multiple efforts to communicate with Consuella, he was unable to have a meaningful conversation with her.

115.  Despite continued interest in solving the issues regarding the unidentified fragments, Dr. Monge determined the case to be "cold," and she accepted that it was unlikely she would ever be able to conclusively identify the source of the fragments.

116.  However, four years later, in December 2018, Burnley reached out to Dr. Monge again to see if she wanted to continue to explore the identification process.

117.  Although Dr. Monge had already considered the case "cold," she and Mr. Burnley continued to discuss the matter. That investigation came to a halt when they resolved that they not be able to secure any help from the MOVE family members.

118.  When these final efforts failed, Dr. Monge believed she gone down all of the possible paths towards identifying the remains, accepted that she would likely never come to a final conclusion on the remains' identity, and once again declared the case "cold."

###    8.    "Real Bones: Adventures in Forensic Anthropology," The Princeton Coursera Course

119.  Although Dr. Mann retired from the Princeton faculty in 2015, Dr. Monge remained as a visiting professor and lecturer.

120.  In 2017 and 2018, Dr. Monge began discussions regarding the creation of Massive Open Online Course ("MOOC") on Forensic Anthropology with Dr. Jeffrey Himpele, another Princeton professor, which would utilize videos

29

Case ID: 220401655

the two were planning to make and use in an upper-level anthropology course they were teaching together.

121. In 2019, after exhausting all avenues of identification and determining once again that the remains were a "cold" case, Dr. Monge discussed the use of the remains to address the difficulties of forensic anthropology in the field.

122. Ultimately, these discussions resulted in the production of a MOOC titled "Real Bones: Adventures in Forensic Anthropology," which was published on the Coursera online platform.

123. The streamed video Coursera classes are free but available only to those students who enroll in the course through the Coursera website.

124. "Real Bones: Adventures in Forensic Anthropology" was designed to be a multi-part course discussing forensic anthropology using real world examples, with an overall purpose of teaching how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains.

125. The course featured eleven sessions, with the first seven being recorded in a studio and the remaining four recorded at the Penn Museum in their lab facilities.

126. The first two classes, titled "Losing Personhood: MOVE A Case Study" and "Restoring Personhood" respectively, described the MOVE organization and discussed the history of the MOVE Bombing before explaining

Case ID: 220401655

the gross, inappropriate excavation of the bomb site and displaying slides of the unidentified fragments pulled from the wreckage.

127.   Other classes were titled "Tools of the Trade," "Bone: The Basics," "How Bones Grow and Develop," "Dental and Hand-Wrist Standards," "Aging Dentition," and "Gross Morphology."

128.   The one and only time the unidentified remains were displayed in the course occurred in the ninth class, titled "MOVE – An Analysis of the Remains."

129.   In that 14-minute class, Dr. Monge can be seen in the Penn Museum's lab with one of her students and the unidentified bone fragments comparing those fragments to other similar bone fragments and models for comparison and explaining how forensic techniques could be used to determine the age of the remains.

130.   At all times during the video, both Dr. Monge and her student properly, scientifically, and discretely handled the remains, utilizing rubber gloves to ensure that there would be no outside contamination.

131.   The two discussed the process they took in attempting to provide an age estimate of the person from whom the fragments originated and Dr. Monge explained that, despite her diligence, the source of the fragments has still not been identified.

132.   "Real Bones: Adventures in Forensic Anthropology" was published in August 2020 and available for almost a year without any controversy or complaint.

31

Case ID: 220401655

133. It was only after Paul Mitchell began his deliberate, retaliatory, and career enhancing smear campaign against Dr. Monge that the matter became a public controversy based upon false reporting that the course was shut down.

**B.     Monge Becomes Paul Mitchell's Mentor, Helps Bring Him Back To The University of Pennsylvania**

134. Dr. Monge first met Defendant, Paul Mitchell, when he came to the University of Pennsylvania as an undergraduate student in the Anthropology Department in 2009. Mr. Mitchell would later receive both his bachelor's degree (2013) and master's degree (2014) from the University of Pennsylvania.

135. Throughout his tenure at the University, Mr. Mitchell took several courses from Dr. Monge, and she was the advisor for his master's thesis.

136. After graduating from Penn with a master's degree, Mr. Mitchell was admitted to a doctoral program at the University of California at Berkeley.

137. Shortly after matriculating there, Mr. Mitchell was accused of professional misconduct relating to allegations of plagiarism in the production of a research paper.

138. After he was removed from Berkeley's Ph.D. program, Dr. Monge worked with Penn's Anthropology Department to allow Mitchell to transfer and earn his doctorate degree at Penn.

139. Upon returning to the University of Pennsylvania for his graduate studies, Mr. Mitchell's work at Penn became centered on the Samuel G. Morton Cranial Collection, a collection of almost one thousand skulls located at the Penn Museum, and he became concentrated on Samuel Morton's scientific methodology and the racial and social implications Morton's work.

32

Case ID: 220401655

140.   However, perhaps mirroring his improper actions at Berkely, Mr. Mitchell began engaging in misconduct including the defacing of Penn Museum lab books, tearing pages from the equipment used to catalogue entries for the lab's micro-CT scanner, and plagiarism.

141.   Mr. Mitchell would also improperly access the lab to show it to his friends and other students and inappropriately explore with them the bones and bone fragments stored at the lab.

142.   Especially troublesome was Mitchell's illegal duplication of the keys to Dr. Monge's office in Penn's lab facilities and to the adjacent storage space.

143.   Upon information and belief, Mitchell, with unfettered access to the lab facilities and the collections they stored, began bringing remains home and storing them in other locations, purloining DNA samples, and re-sorting forensic materials.

144.   Once discovered, Dr. Monge, as part of her duties at the Museum, reported all of these unlawful and disturbing activities to Penn Museum Security and Administrators, along with Dr. Kathleen Morrison, Chair of Penn's Anthropology Section.

145.   Her allegations became the subject of a confrontation with Mr. Mitchell in May of 2019, wherein Dr. Monge confronted him about his extensive misconduct.

146.   In response, Mr. Mitchell began screaming, throwing things, slamming his fist down on tables, and threatening Dr. Monge, who was terrified

Case ID: 220401655

by his comments and actions demonstrated in the presence of witnesses who were also present during the confrontation.

147.   In direct response to Mr. Mitchell's conduct that day, Dr. Monge filed a report with the Museum's administration.

148.   Thereafter, Dr. Monge changed the locks in the Museum and the Lab, and she denied Mr. Mitchell's further un-supervised access to the Physical Anthropology collections at the Penn Museum, giving rise to his revengeful false reporting relating to the bone fragments with the aid of Defendant Thomas.

### C.   A Mentee's Grudge, The Media Firestorm It Created, And The Dismantling of Dr. Monge's Reputation

149.   Mr. Mitchell's vengeful actions began in early April 2021 when Mitchell met with Christopher Woods, who had recently been hired as the Director of the Penn Museum, and accused, without any foundation, that Dr. Monge had mishandled the unidentified bone fragments and had engaged in other professional misconduct in reference to the issue of the MOVE bombing investigation.

150.   Mr. Mitchell expressed concerns over the Penn Museum's policies on the handling of remains, including the unidentified remains from the MOVE site, and he unfairly and defamatorily accused Dr. Monge of lacking professionalism in connection with the Coursera course.

151.   Fearing that his allegations against Dr. Monge would not bear the disciplinary result against her that he intended, he then instigated the first article regarding the unidentified bones by contacting his then girlfriend, Defendant Maya Kasutto, who was writing for Defendant Billy Penn, at the time.

Case ID: 220401655

152.   On April 21, 2021, an online article written by Maya Kasutto titled "Remains of Children Killed in MOVE Bombing Sat in a Box at Penn Museum for Decades" was published by Billy Penn on its website. A copy of that article is attached hereto as Exhibit "A."

153.   The article falsely asserted that the unidentified fragments were the remains of Katricia Africa and implied serious scientific misconduct by Dr. Monge in the retention and handling of the fragments, defaming Dr. Monge as a "chipper science teacher" and alleging that she improperly used the remains of a black girl as "props."

154.   Further pushing its false narrative about the unidentified bone fragments, the article clearly defamed Dr. Monge by insinuating a racist motive for the retention and investigation undertaken:

> "The absence of ethics, void of communication, and abdication of responsibility regarding these remains mirror the circumstances that led to the 1985 disaster."

155.   On the same day, the Philadelphia Inquirer published an article titled "Penn Owes Reparations for Previously Holding Remains of a MOVE Bombing Victim" by Abdul-Aliy Muhammad. A copy of that article is attached hereto as Exhibit "B."

156.   Like the Billy Penn article, this article also conclusively asserted that the unidentified bone fragments were the remains of two of the black children who died in the tragic bombing and fire, Katricia and Delisha Africa.

157.   It also stated that Dr. Monge "mishandled" the remains and called upon the Penn Museum and University of Pennsylvania to apologize for the

Case ID: 220401655

"unethical possession" of the remains, characterizing the handling of the bone fragments an "egregious act."

158.   Both of these published articles were initiated by Defendant Paul Mitchell, who did so based upon his own averred independent, but clearly flawed, research.

159.   On April 23, 2021, Mr. Mitchell prepared a paper on the handling and identity of the remains removed from the MOVE site, arguing that the remains are indisputably those of Katricia and Delisha Africa and condemning the handling of the remains.

160.   Mitchell widely distributed this paper to Penn employees, MOVE members, and several media outlets.

161.   That same day, three major media outlets picked up the story and published their own blatantly false, defamatory narratives.

(a)   The Daily Mail published an article on its website by Adam Schrader, titled "'They Are Juicy': Princeton Professor is Slammed for Disrespecting the Bones of a 14-year Old Black Girl Killed by a Bomb Dropped by Philadelphia Police in 1985 After Members of Her Commune Fired at Cops.'" A copy of this article is attached hereto as Exhibit "C." That article falsely avers that the remains were bones of a "black child killed in a 1985 police bombing." It further condemned Dr. Monge's use of the word "juicy" in the Coursera video, implying that such a word carries racial undertones when in fact it is an anthropological term of art indicating the preserved status of bones and bone fragments.

36

Case ID: 220401655

(b)     The Guardian published an article titled ""Bones of Black children killed in police bombing used in Ivy League anthropology course," by Ed Pilkington. A copy of this article is attached hereto as Exhibit "D." This article also falsely averred that the bone fragment remains are "almost certainly those of the older MOVE girls who died" and implied scientific impropriety and racist-fueled misconduct regarding Dr. Monge's actions and statements. It also took issue with Dr. Monge's use of the words "juicy" and "greasy," suggesting those words carry racial undertones when in fact they are anthropological terms of art.

(c)     On April 23, 2021, the New York Post published an article authored by Jackson O'Bryan titled "Remains of Black Teen Killed in Philadelphia Police Bombing Used in Online Class." A copy of this article is attached hereto as Exhibit "E." That article also implied a racist animus for Dr. Monge's actions and statements:

> "The bones of at least one black teenager killed in the 1985 police bombing in Philadelphia are being used as a 'case study' in an online anthropology course — taught by an Ivy League professor who called the remains 'juicy.'"

162.  Other media sources quickly followed, starting a flurry of news articles on widely accessible websites, all of which implying the bones are those of Katricia and Delisha Africa and condemning Dr. Monge for professional misconduct.

(a)     On April 24, 2021, the New York Times published the article "Decades After Police Bombing, Philadelphians 'Sickened' by Handling of Victim's Bones" by Michael Levenson. A copy of this article is attached hereto as Exhibit "F." The article falsely identified the bone fragments as the remains of Delisha

37

Case ID: 220401655

Africa and defamatorily suggested that the treatment of the remains showed "disrespect for Black life." The article further stated "that the remains had been kept in a cardboard box on a shelf" even though remains were stored at the Penn Museum following forensic best practices at all times.

(b) On April 26, 2021, the Smithsonian Magazine published an article written by Nora McGreevy titled "Museum Kept Bones of Black Children Killed in 1985 Police Bombing in Storage for Decades." A copy of this article is attached hereto as Exhibit "G." That article also implied that Dr. Monge acted unprofessionally and her actions were driven by a racist animus:

> "What's more, the remains appear to have been used as a "case study" in an online course presented by Princeton University and hosted on Coursera. Titled "Real Bones: Adventures in Forensic Anthropology," the class was recorded in 2019 and includes footage of Janet Monge, an adjunct professor in anthropology at the University of Pennsylvania and former student of Mann, picking up the bones and describing them in graphic detail. She makes no reference to the fact that the families of probable victims Tree and Delisha never provided consent for their daughters' bones to be used in this way, the Guardian notes."

The article also falsely asserts that the unidentified remains are those of Katricia and Delisha and it suggests that a failure to contact their families constituted professional misconduct on the part of Dr. Monge.

(c) On April 30, 2021, Defendant Slate published an article titled "The Grim Open Secret of College Bone Collections" and authored by Elaine Ayers. A copy of that article is attached hereto as Exhibit "H." That article states that Drs. Mann and Monge were driven by racially based animus: "the physical anthropology departments like the ones that employ Mann and Monge exist

38

Case ID: 220401655

today as uneasy reminders of many museums' and universities' racist and colonial foundations." The Slate article further states that the use of the terms "juicy" and "greasy" by Dr. Monge reflect "most recent example of an ongoing legacy of Black people's bodies used for academic research and pedagogy," suggesting those words carry racial undertones when in fact they are anthropological terms of art properly used in anthropological instructional context.

(d)     On May 3, 2021, Defendant Al Día News published the article "There Will Be No Justice For Penn and Princeton's Treatment of MOVE Victims" authored by Defendant Brittany Valentine. A copy of this article is attached hereto as Exhibit "I." In the article, Ms. Valentine falsely accuses Drs. Monge and Mann of professional misconduct, stating "[b]ombshell reports revealed the universities shuttled the remains back and forth, and used them in educational settings without ever contacting next of kin."

(e)     On May 7, 2021, Andscape, a popular website run by ESPN, published the article "The Scandal Over the MOVE Bombing Victims' Remains Is Part Of Anthropology's Racist History" authored by Defendant Nicole Froio. A copy of this article is attached hereto as Exhibit "J." The article blatantly suggests racist motivations for the investigatory actions of Dr. Monge:

> "The handling of the remains of the two MOVE bombing victims is certainly not, as Rouse noted, a "conspiracy." The reality is much worse. The theft of Tree's and Delisha's bones indicates that despite attempts to purge academia and anthropology of colonial logics, they are baked into the structure. It is clear that there is still a belief in the field of anthropology that the remains of Black people are scientific objects to be studied or stored away in boxes rather than laid to rest by their families."

Case ID: 220401655

Ms. Froio further alleges racist insensitivity by stating that "[i]n death, [Katricia and Delisha's] bones were used as objects of colonial plunder at academic institutions" and directly asserts that Dr. Monge's handling of the bone fragment remains was unethical, unprofessional, and racist.

(f)     On May 16, 2021, The New Yorker published the article "Saying Her Name" by Heather Ann Thompson. A copy of this article is attached hereto as Exhibit "K." That article also falsely implies that the actions of Dr. Monge were unlawfully racist, stating that "the idea that the museum was holding the bones of a Black Philadelphian who was alive as recently as 1985 in the same way that it has held the skulls of enslaved people, procured by grave-robbers, was beyond comprehension," and she directly contradicts the scientifically supported findings of Drs. Mann and Monge that the bone fragment remains were not that of Katricia: "The remains that Mann claimed had never been satisfactorily identified had, in fact, been found to belong to a teen-age girl who, along with her sister, died that day."

(g)     On May 18, 2021, the Philadelphia Inquirer published yet another article regarding the treatment of the remains, this time authored by Jenice Armstrong and titled "The Disrespectful Handling of the MOVE Victims' Remains by the City and Penn Merits More Investigation." A copy of this article is attached hereto as Exhibit "L." In the article, Armstrong falsely implies unlawful and unprofessional racially motivated actions by Dr. Monge:

> "This latest atrocity is beyond horrible. The MOVE victims'
> remains have been treated like laboratory specimens, passed
> from the University of Pennsylvania to Princeton University and
> then back to Penn. According to the Guardian, they were even

Case ID: 220401655

included in a now-deleted video promoting a class called "Real Bones: Adventures in Forensic Anthropology."

(h)     On May 26, 2021, Andscape published a second article. The article, written by Linn Washington, was titled ""Disrespect for the MOVE Families Is a Stain That Never Goes Away in Philadelphia." A copy of this article is attached hereto as Exhibit "M." That published piece article falsely states that Dr. Monge "mistreated" the unidentified remains of Katricia and Delisha Africa and further falsely asserts that Mr. Monge's actions were unprofessional and unlawful:

> "Although the scandal caused Princeton to cancel that online course, anthropologist Janet Monge retains her positions at the Penn Museum and on the university's faculty."

Ms. Washington then went on to suggest that Penn's failure to remove Dr. Monge from her position "renders the University of Penn's apology hollow."

(i)     On July 16, 2021, Teen Vogue published the article ""MOVE Bombing Remains Scandal Shows Enduring Racism in Anthropology" by Ezra Lerner. A copy of that article is attached hereto as Exhibit "N." That published writing suggests improper professional conduct by implication by stating that "the remains of at least one young girl — believed to possibly belong to Tree as well as Delisha Africa, victims of the police's 1985 bombing of the MOVE house in Philadelphia — had been improperly kept for decades by archaeologists Alan Mann and Janet Monge" and further defamatorily states that the handling of the remains was "unethical."

(j)     On October 31, 2021, Hyperallergic published the article ""How the Possession of Human Remains Led to a Public Reckoning at the Penn

Case ID: 220401655

Museum," authored by by Kinjal Dave and Jake Nussbaum. A copy of this article is attached hereto as Exhibit "O." Like its predecessors, the article details the aftermath of the media firestorm, but falsely blames Dr. Monge for a racially motivated investigation of the bone fragments, stating "Consuella did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching."

163. Each of the aforecited articles contain statements and/or implications that were false, and defendants either knew or should have known at the time of publication that they were false.

### D. Amplification of The Media Reports and Dr. Monge's Improper Demotion, Pay Cut, and Removal as a University Of Pennsylvania Faculty Member

164. Dr. Monge also found herself attacked by anthropology associations, the University of Pennsylvania, and other faculty members at the University.

165. Shortly after the attacks from the media began, Dr. Monge, who is a member of the American Black Anthropologists email list serve based upon anthropological work in Kenya, began seeing that Defendant Deborah Thomas, a fellow Penn faculty member, was sharing the disparaging media reports on the list serve in the hopes it would initiate more widespread outrage against Dr. Monge.

166. Beyond sharing the false and defamatory articles, Thomas also suggested herself that Dr. Monge improperly handled the remains, and stated that she was going to work with Mitchell to create a timeline and chain of custody narrative regarding the remains to be used to target Dr. Monge.

Case ID: 220401655

167. Those actions increased the visibility of the disparaging articles, severely injuring Dr. Monge's reputation in the anthropology community.

168. On April 26, 2021, a collective statement by the Association of Black Anthropologists (ABA), the Society of Black Archaeologists (SBA), and the Black in Bioanthropology Collective (BiBA) was released. A copy of this Statement is attached hereto as Exhibit "P." In the statement, the groups stated that they "condemn in the strongest possible language the University of Pennsylvania, Princeton University, Coursera, along with Professors Alan Mann and Janet Monge, for their horrific treatment of the remains of Tree and Delisha Africa, and for the unfathomable heartlessness and disrespect shown towards the Africa family."

169. The defamatory statements in the published release suggest unethical and illegal racially motivated animus, stating members of the group were "outraged by the stunning ethical indifference shown by all parties involved to both Tree and Delisha and to the Africa family, but also by the fact that these entities effectively monetized the remains of Black children murdered in a state terrorist attack – a fact made all the more painful given the heightened public awareness of brutal murders of Black children and youth by the police over the past few years." The statement further requested that Dr. Monge be removed from her position with the University of Pennsylvania.

170. That same day, Dr. Monge found herself locked out of her lab and all Physical Anthropology collection storage spaces.

43

171.   Two days later, Defendants Gutmann and Prickett authored an email to employees of the Penn Museum calling Dr. Monge's actions "insensitive, unprofessional, and unacceptable." A similar statement authored by them was sent to the full University Pennsylvania community.

172.   The Chair of Penn's Anthology Department, Dr. Kathleen Morrison, then advised Dr. Monge that she was being put on a "work pause" and would be removed from teaching any University classes.

173.   Approximately one week later, on May 4, 2021, she was informed that her scheduled summer programs at the Penn Museum and scheduled high school talks for Penn were also being cancelled.

174.   The following day, Dr. Monge found a call to action for her termination on the Penn Anthropology web page, further increasing her concern over her job.

175.   In August 2021, Dr. Monge discovered that she had been removed from Penn's Anthropology Department's webpage where it lists the current "Graduate Group and Affiliated Faculty" and shortly thereafter, she was informed that she would no longer be able to teach any of her current classes, be an adjunct professor, or even be an associate curator at the Penn Museum. Rather, she was being demoted to Museum Keeper.

176.   This demotion was affected with a salary cut of $50,000 per year for the following two years of her employment when she will have been deemed to retire.

Case ID: 220401655

177. To date, two separate independent investigations have been conducted on the handling of the unidentified remains from the MOVE bombing site, and neither report has found that Dr. Monge violated any professional, ethical, or legal standards, nor have they concluded that the bone fragments were those belonging to Katricia Africa.

178. Based entirely upon the false and defamatory statements discussed above, Dr. Monge's reputation has been irreparably and wrongfully destroyed, she has been the victim of adverse employment actions, and she has received threatening emails and phone calls, including multiple death threats. This must not be allowed to stand.

**COUNT I**
**DEFAMATION**
**PLAINTIFF VS. ALL DEFENDANTS**

179. The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint as though fully set forth herein.

180. The statements described above and contained in the articles identified above are entirely false insofar as they reflect upon Plaintiff's conduct, as well as her character and reputation.

181. Defendants knew or should have known that the statements described above and contained in the articles identified above were false when made, and Defendants published them either intentionally and maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly published.

Case ID: 220401655

182.   The false and defamatory statements described above and contained in the articles identified above were widely stated to others through published articles, published on the Defendants' websites and circulated among and read by tens of thousands of readers around the world.

183.   The false and defamatory statements described above and contained in the cited statements and articles identified above applied to the Plaintiff, were understood by the recipients of the statements to have a defamatory meaning and were understood or reasonably understood by the recipients of the statements as intended to be applied to the Plaintiff.

184.   The false and defamatory statements described above and contained in the cited statements and articles identified above constitute defamatory publications which are actionable per se and are libel per se, as they cast doubt on Dr. Monge's ability to perform in her chosen profession and suggest that Dr. Monge has committed a crime by violating the civil rights of a deceased bombing victim and her family based on race.

185.   The false and defamatory statements described above and contained in the cited statements and articles identify severely injured and caused special harm to Plaintiff in that they have (a) ruined her reputation; (b) exposed her to hatred, contempt, ridicule, and humiliation; (c) ascribed to her characteristics incompatible with the proper conduct of a professional anthropologist; and (d) injured her in the practice of her chosen field.

186.   As a direct and proximate result of the intentional, malicious, reckless, negligent, and/or careless statements contained in the articles

46

Case ID: 220401655

identified above, Plaintiff's reputation and esteem in the community have been adversely affected.

187.   As a further result of the aforementioned defamatory articles, third persons have been deterred from working with Plaintiff.

188.   As a result of the aforementioned defamatory articles, Plaintiff has sustained, and will sustain in the future, a loss of income and earning capacity.

189.   As a further result of the aforementioned defamatory articles, Plaintiff has sustained grave mental anguish, humiliation, and loss of her enjoyment of life.

190.   The publication of the false and defamatory statements contained in the cited statements and articles identified and described above have been and continue to be republished, and the plaintiff therefore demands presumed, compensatory, economic, and punitive damages for the harm flowing from any and all such republications of the false and defamatory statements in addition to damages for the harm flowing from their initial publication.

191.   The false and defamatory statements contained in the articles identified and described above are not subject to any recognized privilege, and/or to the extent that any privilege existed or could exist, the Defendants abused any such privilege.

192.   Due to the willful, wanton, intentional and malicious nature of the Defendants' conduct, Plaintiff also demands an award of punitive damages in an amount to be determined at trial.

Case ID: 220401655

WHEREFORE, Plaintiff Janet Monge respectfully requests that the Court enter judgment in her favor and against the Defendants, award the Plaintiff Janet Monge compensatory and punitive damages in an amount in excess of the statutory minimum for arbitration, and grant such other and further relief as this Court deems just and appropriate.

## COUNT II
## DEFAMATION BY IMPLICATION
## PLAINTIFF VS. ALL DEFENDANTS

193.  The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint as though fully set forth herein.

194.  The statements made by the defendants contained in the aforementioned articles constitute defamation by implication, in that their context was such that the reader was led to believe they were true

195.  The articles identified above maliciously, intentionally, recklessly, and falsely, by words, innuendo, inference, and manner in which they were presented, held Plaintiff out to public scorn and ridicule, attributed improper conduct to Plaintiff, and cast doubt on Plaintiff's ability to properly carry out the responsibilities of her job and chosen profession.

196.  The false and defamatory statements described above and contained in the articles identified were in no manner privileged nor did the articles constitute fair comment on matters of public concern or interest.

197.  The false and defamatory statements described above and contained in the articles identified were published with knowledge that said statements, innuendo, inference, and manner in which they were presented were false

Case ID: 220401655

and/or with reckless disregard for whether said material was false, said conduct constituting actual malice.

198.   The false and defamatory statements described above and contained in the articles identified contained distortions, misrepresentations, misstatements of fact, omissions of fact, and edited material designed to falsely imply misconduct on Plaintiff's part.

199.   The false and defamatory statements described above and contained in the articles identified were presented in a negligent manner without adequately investigating the underlying facts.

200.   The false and defamatory statements described above and contained in the articles identified were false, and defendants knew or should have known at the time of publication that they were false.

201.   The statements and implications set forth above constitute defamatory publications which are actionable per se, are libels per se, and were published with actual malice.

202.   The false and defamatory statements described above and contained in the articles identify severely injured and caused special harm to Plaintiff in that they have (a) ruined her reputation; (b) exposed her to hatred, contempt, ridicule, and humiliation; (c) ascribed to her characteristics incompatible with the proper conduct of a professional anthropologist; and (d) injured her in the practice of her chosen field.

203.   As a direct and proximate result of the intentional, malicious, reckless, negligent, and/or careless statements contained in the articles

Case ID: 220401655

identified above, Plaintiff's reputation and esteem in the community have been adversely affected.

204.   As a further result of the aforementioned defamatory statements and articles, third persons have been deterred from working with Plaintiff.

205.   As a result of the aforementioned defamatory statements and articles, Plaintiff has sustained, and will sustain in the future, a loss of income and earning capacity.

206.   As a further result of the aforementioned defamatory statements and articles, Plaintiff has sustained grave mental anguish, humiliation, and loss of her enjoyment of life.

207.   The publication of the false and defamatory statements and those contained in the articles identified and described above have been and continue to be republished, and the plaintiff therefore demands presumed, compensatory, economic, and punitive damages for the harm flowing from any and all such republications of the false and defamatory statements in addition to damages for the harm flowing from their initial publication.

208.   The false and defamatory statements  and those contained in the articles identified and described above are not subject to any recognized privilege, and/or to the extent that any privilege existed or could exist, the Defendants abused any such privilege.

209.   Due to the willful, wanton, intentional and malicious nature of the Defendants' conduct, Plaintiff also demands an award of punitive damages in an amount to be determined at trial.

Case ID: 220401655

WHEREFORE, Plaintiff Janet Monge respectfully requests that the Court enter judgment in her favor and against the Defendants, award the Plaintiff Janet Monge compensatory and punitive damages in an amount in excess of the statutory minimum for arbitration, and grant such other and further relief as this Court deems just and appropriate.

**COUNT III**
**FALSE LIGHT**
**PLAINTIFF VS. ALL DEFENDANTS**

210.   The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint.

211.   The aforementioned statements and articles, made and published without regard to their truth or falsity, also created false impressions by repeatedly, widely, and extensively publicizing information which stated or implied falsehoods about Plaintiff and placed her before the public in a false light of a kind highly offensive to a reasonable person.

212.   The statements were made public by Defendants, in that they were published in print and on websites accessible by the public at large and to so many persons that the matter must be regarded as public knowledge.

213.   The statements included major misrepresentations of the Plaintiff's character, conduct and activities, and are highly offensive to the Plaintiff, as they would be to any reasonable person.

214.   The misrepresentations contained in the statements are not of any legitimate public concern.

Case ID: 220401655

215.  The false statements were published by Defendants with the knowledge and/or reckless disregard for the false light in which the Plaintiff would be portrayed.

216.  The statements were published to the general public on websites accessible anywhere in the United States and throughout the world, and they are continuously available to the general public on Defendants' websites.

217.  As a result of these statements, the Plaintiff suffered severe harm to her interest in privacy, as well as significant damages in the form of severe monetary loss, economic and consequential damages discussed above, severe and irreparable impairment of her reputation and credibility in the community generally, and personal humiliation, mental anguish and mental suffering.

WHEREFORE, Plaintiff Janet Monge respectfully requests that the Court enter judgment in her favor and against the Defendants, award the Plaintiff Janet Monge compensatory and punitive damages in an amount in excess of the statutory minimum for arbitration, and grant such other and further relief as this Court deems just and appropriate.

### COUNT IV
### CIVIL AIDING AND ABETTING
### PLAINTIFF VS. ALL DEFENDANTS

218.  The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint.

219.  The behaviors in which the Defendants engaged aided and abetted the tortious misconduct of each of the other defendants by giving rise to false and defamatory information against Dr. Monge in a concerted effort to

Case ID: 220401655

accomplish the particular result of branding Mr. Monge as incompetent and a racist.

220. When each of the Defendants published their defamatory statements they knew or should have known through reasonable diligence that the conduct of each of them was tortious and provided substantial assistance and/or encouragement to engage in such tortious misconduct.

221. As a result of Defendants' conduct aiding and abetting the tortious misconduct of the other Defendants, Plaintiff has suffered and continues to suffer harm to her reputation, humiliation, severe emotional distress, and financial harm,

222. Defendants' conduct in aiding and abetting such tortious conduct was so reckless, wanton, willful, and malicious that Defendants should be punished by the assessment of punitive damages.

WHEREFORE, Plaintiff Janet Monge respectfully requests that the Court enter judgment in her favor and against the Defendants, award the Plaintiff Janet Monge compensatory and punitive damages in an amount in excess of the statutory minimum for arbitration, and grant such other and further relief as this Court deems just and appropriate.

Respectfully Submitted,
**SPECTOR GADON ROSEN VINCI P.C.**

By:/s/ *Alan Epstein*

Alan B. Epstein, Esquire
Adam Filbert, Esquire
*Attorneys for Plaintiff*

Dated: May 20, 2022

53

Case ID: 220401655

**VERIFICATION**

I, Janet Monge, am the Plaintiff in the above matter and am authorized to make this verification.  I verify that the facts set forth within the foregoing Complaint are true and correct to the best of my knowledge, information and belief.  This Verification is made subject to the penalties of 18 Pa. C.S.A. §4904

Dated: _20 May 2022_ 　　　　　　　　 _____
　　　　　　　　　　　　　　　　　　　　 JANET MONGE