# EXHIBIT A

**SPECTOR GADON ROSEN VINCI P.C.**
By:    Alan B. Epstein (Pa. I.D. No. 02346)
       Adam A. Filbert (Pa. I.D. No. 330960)
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8832 / (215) 531-9103 (Fax)
aepstein@sgrvlaw.com            *Attorneys for Plaintiff, Janet Monge*

*Filed and Attested by the Office of Judicial Records 22 JUN 2022 01:33 pm A. STAMATO*

| | |
|---|---|
| **JANET MONGE**<br>**106 Federal Street**<br>**Philadelphia, PA 19147**<br>**            Plaintiff,**<br><br>         **v.**<br><br>**UNIVERSITY OF PENNSYLVANIA**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**AMY GUTMANN, WENDELL**<br>**PRITCHETT, KATHLEEN**<br>**MORRISON, DEBORAH THOMAS,**<br>**& CHRISTOPHER WOODS**<br>**in their individual capacities,**<br>**c/o University of Pennsylvania**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**PAUL MITCHELL**<br>**511 N. Broad St.**<br>**Philadelphia, PA 19123**<br>**and**<br>**c/o University of Pennsylvania**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**BILLY PENN**<br>**150 N. 6th St.** | **CIVIL ACTION**<br><br>**NO. 220401655**<br><br>**JURY TRIAL DEMANDED** |

Philadelphia, PA 19106

And

**MAYA KASUTTO,**
**in her individual capacity,**
**c/o Billy Penn**
**150 N. 6th St.**
**Philadelphia, PA 19106**

And

**THE PHILADELPHIA INQUIRER,**
**PBC**
**801 Market Street, Suite 300**
**Philadelphia, PA 19107**

And

**ABDUL ALIY MUHAMMAD &**
**JENICE ARMSTRONG**
**in their individual capacities,**
**c/o The Philadelphia Inquirer,**
**PBC**
**801 Market Street, Suite 300**
**Philadelphia, PA 19107**

And

**THE NEW YORKER**
**1 World Trade Center**
**New York, NY 10007**

And

**HEATHER ANN THOMPSON**
**in her individual capacity,**
**c/o The New Yorker**
**1 World Trade Center**
**New York, NY  10007**

And

**ESPN, INC. d/b/a ANDSCAPE**
**545 Middle Street**

Case ID: 220401655

**Bristol, CT 06010**

**And**

**NICOLE FROIO & LINN
WASHINGTON**
**in their individual capacities,**
**c/o ESPN, INC.**
**545 Middle Street**
**Bristol, CT 06010**

**And**

**THE AMERICAN
ANTHROPOLOGICAL
ASSOCIATION**
**2300 Clarendon Blvd., Suite
1301**
**Arlington, VA 22201**

**And**

**THE SOCIETY OF BLACK
ARCHAEOLOGISTS**
**PO Box 3771**
**Santa Monica, CA 90409**

**And**

**THE GUARDIAN MEDIA GROUP**
**d/b/a THE GUARDIAN**
**61 Broadway**
**New York, NY 10006**

**And**

**ED PILKINGTON**
**in his individual capacity,**
**c/o The Guardian**
**61 Broadway**
**New York, NY 10006**

**And**

Case ID: 220401655

**DAILY MAIL AND GENERAL
TRUST, PLC d/b/a DAILY MAIL
51 Astor Place
New York, NY 10003**

**And**

**ADAM SCHRADER
in his individual capacity,
c/o Daily Mail
51 Astor Place
New York, NY 10003**

**AND**

**SLATE
15 Metrotech Center, 8th Floor
Brooklyn, NY 11201**

**AND**

**ELAIN AYERS
in her individual capacity,
c/o SLATE
15 Metrotech Center, 8th Floor
Brooklyn, NY 11201**

**And**

**NYP HOLDINGS, INC. d/b/a NEW
YORK POST
1211 Avenue of the Americas
New York, NY 10036**

**And**

**JACKSON O' BRYAN
in his individual capacity,
c/o New York Post
1211 Avenue of the Americas
New York, NY 10036**

**And**

4

Case ID: 220401655

**TEEN VOGUE**
1 World Trade Center
New York, NY 10007

And

**EZRA LERNER**
in his individual capacity,
c/o Teen Vogue
1 World Trade Center
New York, NY 10007

And

**HYPERALLERGIC MEDIA**
181 N. 11th Street, Suite 302
Brooklyn, NY 11211

And

**KINJAL DAVE & JAKE NUSSBAUM**
in their individual capacities,
c/o Hyperallergic Media
181 N. 11th Street, Suite 302
Brooklyn, NY 11211

And

**NORA MCGREEVY**
5826 N. Wayne Ave., Apt. 2
Chicago, IL 60660

And

**AL DIA NEWS**
1835 Market Street, 4th Floor
Philadelphia, PA 19103

And

**BRITTANY VALENTINE**
in her individual capacity,
c/o Al Dia News

Case ID: 220401655

| | |
|---|---|
| **1835 Market Street, 4th Floor**<br>**Philadelphia, PA 19103**<br><br>**And**<br><br>**NEW YORK TIMES, CO.**<br>**620 8th Avenue**<br>**New York, NY 10018**<br><br>**And**<br><br>**Michael Levenson**<br>**in his individual capacity,**<br>**c/o New York Times, Co.**<br>**620 8th Avenue**<br>**New York, NY 10018**<br><br><br>**Defendants.** | |

## NOTICE TO DEFEND

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

**Philadelphia Bar Association Lawyer Referral**
**and Information Service**
**One Reading Center**
**Philadelphia, Pennsylvania 19107**
**(215) 238-6333**
**TTY (215) 451-6197**

## AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus

Case ID: 220401655

objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decider a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

**Asociacion De Licenciados De Filadelfia**
**Servicio De Referencia E Informacion Legal**
**One Reading Center**
**Filadelfia, Pennsylvania 19107**
**(215) 238-6333 / TTY (215) 451-6197**

Case ID: 220401655

**SPECTOR GADON ROSEN VINCI P.C.**
By:   Alan B. Epstein (Pa. I.D. No. 02346)
      Adam A. Filbert (Pa. I.D. No. 330960)
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8832 / (215) 531-9103 (Fax)
aepstein@sgrvlaw.com       *Attorneys for Plaintiff, Janet Monge*

| | |
|---|---|
| **JANET MONGE**<br>**106 Federal Street**<br>**Philadelphia, PA 19147**<br>        **Plaintiff,**<br><br>    **v.**<br><br>**UNIVERSITY OF PENNSYLVANIA**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**AMY GUTMANN, WENDELL**<br>**PRITCHETT, KATHLEEN**<br>**MORRISON, DEBORAH THOMAS,**<br>**& CHRISTOPHER WOODS**<br>**in their individual capacities,**<br>**c/o University of Pennsylvania**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**PAUL MITCHELL**<br>**511 N. Broad St.**<br>**Philadelphia, PA 19123**<br>**and**<br>**c/o University of Pennsylvania**<br>**2929 Walnut Street, Suite 400**<br>**Philadelphia, PA 19104**<br><br>**And**<br><br>**BILLY PENN**<br>**150 N. 6th St.** | **CIVIL ACTION**<br><br>**NO. 220401655**<br><br>**JURY TRIAL DEMANDED** |

**Philadelphia, PA 19106**

**And**

**MAYA KASUTTO,**
**in her individual capacity,**
**c/o Billy Penn**
**150 N. 6th St.**
**Philadelphia, PA 19106**

**And**

**THE PHILADELPHIA INQUIRER,**
**PBC**
**801 Market Street, Suite 300**
**Philadelphia, PA  19107**

**And**

**ABDUL ALIY MUHAMMAD &**
**JENICE ARMSTRONG**
**in their individual capacities,**
**c/o The Philadelphia Inquirer,**
**PBC**
**801 Market Street, Suite 300**
**Philadelphia, PA 19107**

**And**

**THE NEW YORKER**
**1 World Trade Center**
**New York, NY 10007**

**And**

**HEATHER ANN THOMPSON**
**in her individual capacity,**
**c/o The New Yorker**
**481 8th Avenue & 31st St,**
**New York, NY 10001**

**And**

**ESPN, INC. d/b/a ANDSCAPE**
**545 Middle Street**

2

Case ID: 220401655

**Bristol, CT 06010**

**And**

**NICOLE FROIO & LINN
WASHINGTON**
**in their individual capacities,**
**c/o ESPN, INC.**
**545 Middle Street**
**Bristol, CT 06010**

**And**

**THE AMERICAN
ANTHROPOLOGICAL
ASSOCIATION**
**2300 Clarendon Blvd., Suite
1301**
**Arlington, VA 22201**

**And**

**THE SOCIETY OF BLACK
ARCHAEOLOGISTS**
**PO Box 3771**
**Santa Monica, CA 90409**

**And**

**THE GUARDIAN MEDIA GROUP**
**d/b/a THE GUARDIAN**
**61 Broadway**
**New York, NY 10006**

**And**

**ED PILKINGTON**
**in his individual capacity,**
**c/o The Guardian**
**61 Broadway**
**New York, NY 10006**

**And**

Case ID: 220401655

**DAILY MAIL AND GENERAL
TRUST, PLC d/b/a DAILY MAIL
51 Astor Place
New York, NY 10003**

**And**

**ADAM SCHRADER
in his individual capacity,
c/o Daily Mail
51 Astor Place
New York, NY 10003**

**AND**

**SLATE
15 Metrotech Center, 8th Floor
Brooklyn, NY 11201**

**AND**

**ELAIN AYERS
in her individual capacity,
c/o SLATE
15 Metrotech Center, 8th Floor
Brooklyn, NY 11201**

**And**

**NYP HOLDINGS, INC. d/b/a NEW
YORK POST
1211 Avenue of the Americas
New York, NY 10036**

**And**

**JACKSON O' BRYAN
in his individual capacity,
c/o New York Post
1211 Avenue of the Americas
New York, NY 10036**

**And**

4

Case ID: 220401655

**TEEN VOGUE**
**1 World Trade Center**
**New York, NY 10007**

**And**

**EZRA LERNER**
**in his individual capacity,**
**c/o Teen Vogue**
**1 World Trade Center**
**New York, NY 10007**

**And**

**HYPERALLERGIC MEDIA**
**181 N. 11th Street, Suite 302**
**Brooklyn, NY 11211**

**And**

**KINJAL DAVE & JAKE**
**NUSSBAUM**
**in their individual capacities,**
**c/o Hyperallergic Media**
**181 N. 11th Street, Suite 302**
**Brooklyn, NY 11211**

**And**

**NORA MCGREEVY**
**5826 N. Wayne Ave., Apt. 2**
**Chicago, IL 60660**

**And**

**AL DIA NEWS**
**1835 Market Street, 4th Floor**
**Philadelphia, PA 19103**

**And**

**BRITTANY VALENTINE**
**in her individual capacity,**
**c/o Al Dia News**

Case ID: 220401655

**1835 Market Street, 4th Floor**
**Philadelphia, PA 19103**

**And**

**NEW YORK TIMES, CO.**
**620 8th Avenue**
**New York, NY 10018**

**And**

**Michael Levenson**
**in his individual capacity,**
**c/o New York Times, Co.**
**620 8th Avenue**
**New York, NY 10018**

**Defendants.**

## AMENDED COMPLAINT – CIVIL ACTION

Plaintiff Janet Monge ("Plaintiff" or "Dr. Monge"), by and through her undersigned attorneys, Alan B. Epstein, Esquire and Spector Gadon Rosen Vinci, P.C., hereby files this Amended Complaint, and in support thereof, avers as follows:

### PRELIMINARY STATEMENT

1.      Janet Monge, Ph.D. ("Dr. Monge") has spent her entire career working for social justice by restoring personhood to unidentified human remains. In fact, being able to bring the identity of those remains to light is one of Dr. Monge's most important aspects of her chosen field.

2.      As a curator for the Penn Museum, she was named "Best Museum Curator" by Philadelphia Magazine, and as a Professor and researcher in the

6

Anthropology Department at the University of Pennsylvania, she has earned numerous awards for her teaching and scholarship.

3.     Further, as an expert consultant with the Philadelphia Medical Examiner's Office, the Philadelphia Defenders Association, and Federal Defender's association, she has volunteered to assist with several criminal cases involving unidentified human remains throughout her career.

4.     One of the most challenging cases in Dr. Monge's storied career was the matter involving the "Jane Doe" bone fragment remains removed by the City of Philadelphia from the site of the tragic 1985 bombing by the City, whose officials dropped an aerial explosive fire bomb on the home of its own citizens in one of the most horrific examples of excessive force found in American history; it killed eleven (11) persons (including five children) who were member of a group known as the MOVE family.

5.     Dr. Monge worked for 36 years to identify the person whose bone fragments were not properly identified as belonging to any member of the MOVE family, extensively researching and studying them, along with attempting to contact known MOVE family members multiple times in an effort to gain their cooperation so the remains could be conclusively identified.

6.     From the beginning of her engagement by the City of Philadelphia, which sought her aid as a world-renowned forensic physical/biological anthropologist, Dr. Monge worked tirelessly to restore identity to the Jane Doe bone fragment remains, all while contextualizing the tragedy of the MOVE bombing in social and political arenas.

7

7.     However, in 2021, false, defamatory, and widely disseminated media reports about Dr. Monge's efforts made her the victim of vicious attacks on her personal and professional reputation initiated by a current doctoral candidate at the University of Pennsylvania, Paul Mitchell, with the help of his PhD advisor, Penn Anthropology professor Deborah Thomas, solely for their own unlawful purposes and in retaliation for Dr. Monge having reported the unprofessional conduct of Mr. Mitchell.

8.     To conduct the attack on Dr. Monge's character and reputation, Mr. Mitchell purposefully, and with full knowledge that he was falsifying information, cooperated with his then-girlfriend Maya Kasutto, a writer for the Billy Penn 501(c)(3) news organization (a project of WHYY Philadelphia), to aid her in authoring an article containing malicious, sensationalized allegations of racial bias about the investigatory process undertaken by two respected anthropologists, Dr. Alan Mann and Dr. Monge, based entirely on false and misleading statements and attacking Dr. Monge's well-deserved, excellent reputation worldwide as a forensic physical/biological anthropologist.

9.     The defamatory statements about Dr. Monge in that Billy Penn article became even more widely disseminated through the actions of Defendant Thomas who released email blasts to colleagues and others in furtherance of Defendant Mitchell's intentional actions to disparage Dr. Monge's reputation.

10.     Additionally, the contents of Billy Penn article, and all its defamatory misstatements, was then republished and embellished, in whole or in part, by several major media outlets, including those named Defendants herein, which

Case ID: 220401655

resulted in great harm to Dr. Monge's reputation and employment as a professor and curator, and caused her great economic harm.

11.    Although Dr. Monge has never been found to have violated any professional, ethical, or legal standards in her handling of the remains, reports published in the media repeated the false and defamatory sentiments from the Billy Penn article, directly stating and implying that Dr. Monge's work was inappropriate, unethical, and inhumane.

12.    Moreover, the published statements falsely accused, directly or by innuendo, Dr. Monge of criminally violating the rights of one of the children who died in the bombing and resulting fire, even though the bone fragments properly provided to and retained by Dr. Monge were not related to the child identified in the defamatory reports.

13.    The damage done by those false and defamatory statements and articles was then amplified by the University of Pennsylvania, who made statements, both to its own faculty and to the public, that apologetically condemned the investigatory efforts of its employee although she had done nothing wrong.

14.    When these false statements were published, Defendants knew or should have known from reasonable investigation that the statements being made were false or would wrongly imply falsities about Dr. Monge, yet Defendants published them anyway for the purpose of gaining pageviews for its misplaced agendas, all starting with Defendant Kasutto's article written with Defendant Mitchell's help.

9

Case ID: 220401655

15.     As a result of these false and defamatory statements which have continued even after the filing of this action, Dr. Monge's reputation has been irreparably and wrongfully destroyed, she has been the victim of adverse employment actions, and she has received threatening emails and phone calls, including multiple death threats.

16.     Due to the Defendants' individual and collective actions, Dr. Monge now seeks, through this lawsuit, to recover the severe economic and non-economic damages that have been caused by the malicious and outrageous continuing defamatory actions of the defendants and to obtain published retractions of the false statements and apologies for the harm they have caused.

## THE PARTIES

17.     Plaintiff, Janet Monge, is an adult individual residing at 106 Federal Street, Philadelphia, Pennsylvania 19147.

18.     Dr. Monge received her bachelor's degree in Anthropology from Pennsylvania State University, graduating magna cum laude, and her PhD from the University of Pennsylvania.

19.     Since 2011 and before her recent demotion caused by the actions of the defendants, she had been a Keeper and Associate Curator of collections housed at the Penn Museum and a Lecturer and Adjunct Professor employed by the Department of Anthropology of the University of Pennsylvania.

20.     Prior to the vicious attack on her reputation, Dr. Monge was recognized as an expert and scholar in her field and holds teaching awards in all

Case ID: 220401655

categories for which she has been eligible. She was named "Best Museum Curator" by Philadelphia Magazine in 2014.

21.     Dr. Monge has engaged in extensive research covering nearly the entire spectrum of physical/biological anthropology and has volunteered her time as a forensic consultant for, *inter alia*, the Philadelphia Medical Examiner's Office, Philadelphia Defender's Association, and Federal Defender's Association.

22.     Defendant, University of Pennsylvania, is a privately held American Ivy League research university located in Philadelphia, Pennsylvania. Its Office of General Counsel is located at 2929 Walnut Street, Suite 400, Philadelphia, Pennsylvania 19104.

23.     The University of Pennsylvania operates the University of Pennsylvania Museum of Archaeology and Anthropology, commonly known as the "Penn Museum," which is located on its campus.

24.     At all times applicable to the averments in this Complaint, the University of Pennsylvania is and was Plaintiff's employer.

25.     Defendant, Amy Gutmann, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take action and make statements on its behalf. At all times applicable hereto, Gutmann was the President of the University of Pennsylvania.

26.     Defendant, Wendell Pritchett, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take action and make statements on its behalf. At all times applicable hereto, Pritchett was the Provost of the University of Pennsylvania.

11

Case ID: 220401655

27.    Defendant, Kathleen Morrison, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take actions and make statements on its behalf. At all times applicable hereto, Morrison was and is the Chair of the Anthropology Department at the University of Pennsylvania.

28.    Defendant, Deborah Thomas, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take actions and make statements on its behalf. At all times applicable hereto, Thomas was and is a Professor in the Anthropology Department at the University of Pennsylvania.

29.    Defendant, Christopher Woods, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take actions and make statements on its behalf. Appointed in 2021, Woods has, at all times applicable hereto, served as the Director of the Penn Museum.

30.    Defendant, Paul Mitchell, is an adult individual who, upon information and belief, resides at 511 N. Broad Street, Philadelphia, Pennsylvania 19123 and is presently a doctoral candidate at the University of Pennsylvania.

31.    Defendant, Billy Penn, is a membership 501(c)(3) media organization associated with and a program of WHYY Philadelphia, providing local Philadelphia news through the internet with its principal place of business located at 150 N. 6th Street, Philadelphia, Pennsylvania 19106.

Case ID: 220401655

32.     Defendant, Maya Kasutto, is an adult individual who, at all times applicable hereto, was employed by Billy Penn and authorized to take actions and make statements on its behalf. Upon information and belief, Kasutto is the current or former girlfriend of Defendant, Paul Mitchell.

33.     Defendant, Philadelphia Inquirer, is a Delaware Public Benefit Corporation with its principal place of business located at 801 Market Street, Suite 300, Philadelphia, Pennsylvania, 19107. It operates an internet-based news website as well as two newspapers serving the Philadelphia region, and it published a defamatory article authored by Defendant Abdul Aliy-Muhammad.

34.     Defendant, Abdul Aliy-Muhammad, is an adult individual who, at all times applicable hereto, was employed as an author by Philadelphia Inquirer, which published his defamatory statements about Plaintiff. He currently is the recipient with Defendant Jake Nussbaum of a grant sponsored by the University of Pennsylvania School of Arts and Sciences that will allow him to continue to disseminate misinformation regarding the actions of Dr. Monge and continue the defamatory attacks on Dr. Monge.

35.     Defendant, Jenice Armstrong, is an adult individual who, at all times applicable hereto, was also employed as an author by Philadelphia Inquirer, which published her defamatory statements about Plaintiff.

36.     Defendant, The New Yorker, is a business entity with its principal place of business located at 1 World Trade Center, New York, New York 10007. It is an American magazine published by Conde Nast providing news and commentary on politics, global affairs, business, technology, pop culture, and

13

Case ID: 220401655

the arts. The New Yorker publishes articles on its website, which is disseminated and is accessible anywhere in the United States, including Pennsylvania.

37.     Defendant, Heather Ann Thompson, is an adult individual who, at all times applicable hereto, was employed by the New Yorker and authorized to take actions and make statements on its behalf.

38.     Defendant, ESPN, Inc., is a Connecticut corporation with its principal place of business located at 545 Middle Street, Bristol, Connecticut 06010. ESPN operates Andscape, a popular sports and pop culture website that seeks to explore the intersections of race, sports, and culture. Andscape publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

39.     Defendant, Nicole Froio, is an adult individual who, at all times applicable hereto, was employed by Andscape and authorized to take actions and make statements on its behalf.

40.     Defendant, American Anthropological Association ("AAA"), is a business entity filed in the District of Columbia with its principal place of business located at 2300 Clarendon Boulevard, Suite 1301, Arlington, Virginia 22201. It is the world's largest scholarly and professional organization of anthropologists. The Association of Black Anthropologists operates as one of the AAA's forty (40) distinct membership sections with a stated goal of bringing Black anthropologists together to create scholarship linking anthropological theory to struggles for social justice.

14

Case ID: 220401655

41.     Defendant, Society of Black Archaeologists, is a business entity with a corporate mailing address of PO Box 3771, Santa Monica, California 90409. It is an international organization of Black archaeologists, with the stated goal of advocacy for the histories and material culture of global Black and African communities in archaeological research.

42.     Defendant, The Guardian Media Group, is a public limited company organized in England. It has a United States Headquarters and principal place of business located at 61 Broadway, New York, New York 10006. The Guardian Media Group owns and operates The Guardian, a British national daily newspaper with a United States news website and digital edition. The website and digital edition are disseminated to and accessible from anywhere in the United States, including Pennsylvania.

43.     Defendant, Ed Pilkington is an adult individual who, at all times applicable hereto, was employed by the Guardian and authorized to take actions and make statements on its behalf.

44.     Defendant, Daily Mail and General Trust, PLC, is a public limited company organized in England. It has a United States Headquarters and principal place of business located at 51 Astor Place, New York, New York 10003. Daily Mail and General Trust operates Daily Mail, a British middle-market daily newspaper with a news website. Daily Mail's website is disseminated to and accessible from anywhere in the United States, including Pennsylvania.

Case ID: 220401655

45.    Defendant, Adam Schrader, is an adult individual who, at all times applicable hereto, was employed by Daily Mail and authorized to take actions and make statements on its behalf.

46.    Defendant, Slate, is a Delaware corporate entity with its principal place of business located at 15 Metrotech Center, 8th Floor, Brooklyn, New York 11201. It is a progressive online magazine covering current affairs, politics, and culture in the United States. It publishes materials on its website, which is accessible anywhere in the United States, including Pennsylvania.

47.    Defendant, Elaine Ayers, is an adult individual who, at all times applicable hereto, was employed by Slate and authorized to take actions and make statements on its behalf.

48.    Defendant, NYP Holdings, Inc., is a Delaware corporation with its principal place of business located at 1211 Avenue of the Americas, New York, New York 10036. It operates the New York Post, a conservative daily tabloid newspaper published in New York City. The New York Post also has a digital edition and news website, which is accessible anywhere in the United States, including Pennsylvania.

49.    Defendant, Jackson O'Bryan, is an adult individual who, at all times applicable hereto, was employed by the New York Post and authorized to take actions and make statements on its behalf.

50.    Defendant, Teen Vogue, is a publisher with its principal place of business located at 1 World Trade Center, New York, New York 10007. It operates an American online publication targeting teenagers, and it offers information

16

Case ID: 220401655

about the latest entertainment and feature stories on current issues and events. Teen Vogue publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

51.   Defendant, Ezra Lerner, is an adult individual who, at all times applicable hereto, was employed by Teen Vogue and authorized to take actions and make statements on its behalf.

52.   Defendant, Hyperallergic Media, is a New York corporation with its principal place of business located at 181 North 11th Street, Suite 302, Brooklyn, New York 11211. It operates Hyperallergic, an online arts and current events magazine. Hyperallergic publishes articles on its website that are accessible from anywhere in the United States, including Pennsylvania.

53.   Defendant, Kinjal Dave, is an adult individual who, at all times applicable hereto, was employed by Hyperallergic and authorized to take actions and make statements on its behalf. Dave is also a doctoral student at the University of Pennsylvania's Annenberg School for Communications.

54.   Defendant, Jake Nussbaum, is an adult individual who, at all times applicable hereto, was employed by Hyperallergic and authorized to take actions and make statements on its behalf. Nussbaum is a Ph.D. candidate in anthropology at the University of Pennsylvania. He currently is the recipient with Defendant Abdul Aliy-Muhammad of a grant sponsored by the University of Pennsylvania School of Arts and Sciences that will allow him to continue disseminating misinformation regarding the actions of Dr. Monge and continue the defamatory attacks on Dr. Monge.

Case ID: 220401655

55.     Defendant, Nora McGreevy, is an adult individual residing at 5826 N. Wayne Ave., Apt. 2, Chicago, Illinois 60660. At all times applicable hereto, she was a freelance writer working for various news and media outlets, including the Smithsonian Magazine. She focuses her writing on the arts, astronomy, history, and academic research. McGreevy is presently a full-time employee of the Princeton University Art Museum, located at 22 Chambers Street, Suite 101, Princeton, New Jersey 08542.

56.     Defendant, Al Dia News, is a Pennsylvania corporation with its principal place of business located at 1835 Market Street, 4th Floor, Philadelphia, Pennsylvania 19103. It is a media company that focuses on the Latino experience in the United States. The articles posted on its website are accessible anywhere in the United States, including Pennsylvania.

57.     Defendant, Brittany Valentine, is an adult individual who, at all times applicable hereto, was employed by Al Día News and authorized to take actions and make statements on its behalf.

58.     Defendant, New York Times Co., is a New York corporation with its principal place of business located at 620 8th Avenue, New York, New York 10018. It operates one of the top American daily newspapers with a wide international audience. The New York Times publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

59.     Defendant, Michael Levenson, is an adult individual who, at all times applicable hereto, was employed by the New York Times and authorized to take actions and make statements on its behalf.

Case ID: 220401655

## JURISDICTION AND VENUE

60. Subject matter jurisdiction over the Defendants with respect to these claims and causes of action is conferred upon this Court pursuant to 42 Pa.C.S. § 931 and 42 Pa.C.S.A. § 8341 *et seq.*

61. This Court has personal jurisdiction over the Defendants under 42 Pa. C.S.A. § 5301, because the Defendants either live in Pennsylvania, are incorporated in Pennsylvania, or carry out a continuous and systematic part of their general business within this Commonwealth.

62. Venue is proper in this Court pursuant to Pennsylvania Rule of Civil Procedure 1006(a), because Plaintiff resides in Philadelphia County, and the transactions and occurrences at issue, out of which the within causes of action arise, took place in Philadelphia County, causing the resulting harms suffered by Plaintiff there.

## FACTS

**A. The MOVE Bombing Shocks Philadelphia, And Dr. Monge's Involvement With Bones Removed From The Bomb Site**

**1. The MOVE Family**

63. In 1972, Vincent Leaphart founded the "Christian Action Life Movement," an organization which later become known as the MOVE Organization.

64. Leaphart adopted the name "John Africa" to pay homage to the continent, which he felt was the mother continent of all life. Since then, all MOVE members have changed their surname to "Africa."

Case ID: 220401655

65.     The MOVE organization considers itself "a family of strong, serious, deeply committed revolutionaries founded by a wise, perceptive, strategically minded Black man named John Africa."[1]

66.     The MOVE Commission Report published after the 1985 MOVE bombing described MOVE as "a small group of self-styled back-to-nature, anti-technology, anti-social advocates," and opined that MOVE "came to reject and to place themselves above the laws, customs, and social contracts of society" that "threatened violence to anyone who would attempt to enforce normal societal rules."[2]

67.     MOVE philosophies include a love of animals and the rejection of cooked and processed foods, which requires a diet of only raw meat, vegetables, and fruit. MOVE members rejected all modern technology and medicine, as well as normal societal norms. These practices were instituted at all of MOVE's properties, including its primary residence in Philadelphia and properties in Richmond, Virginia and Rochester, New York.

68.     Throughout its existence, members of MOVE have seen themselves as the target of unwarranted and unlawful discrimination, harassment, and treatment by law enforcement, the courts, and other regulatory agencies.

---

[1] On a Move, "About Move: Belief and Practice," (http://onamove.com/about/).

[2] *The Findings, Conclusions, and Recommendations of the Philadelphia Special Investigation Commission*, 59 Temp. L.Q. 339, 345 (1986) ("MOVE Commission Report").

Case ID: 220401655

### 2.    The MOVE Bombing

69.    In 1983, Philadelphia members of the MOVE organization began living at 6221 Osage Avenue, Philadelphia, Pennsylvania, in the predominantly Black neighborhood of Cobbs Creek.

70.    As tensions began to mount between MOVE and their neighbors, the other racial minority members of the Cobbs Creek neighborhood formed the "United Residents of the 6200 Block of Osage Avenue" to protest MOVE's presence in their neighborhood.

71.    Based upon this group's complaints and previous existing conflicts between MOVE and the police, Philadelphia Mayor Wilson Goode met with high-ranking members of the Philadelphia Police Department and District Attorney's Office to create a tactical plan regarding the MOVE organization.

72.    On May 12, 1985, after a Philadelphia Court of Common Pleas judge approved requests for search and arrest warrants for certain MOVE members, police evacuated the Osage Avenue neighborhood. Then, in the early morning hours of May 13, 1985, with the Osage Avenue block secured, the Police Commissioner announced over a bullhorn that four people inside 6221 Osage Avenue were named in arrest warrants, giving them fifteen minutes to surrender.

73.    When the MOVE members, responding over a loudspeaker, announced that they would not be surrendering, the police began untenably firing high-pressured water, tear gas, and smoke projectiles at the front and rear of the house, ultimately firing over 10,000 rounds of live ammunition into the compound.

Case ID: 220401655

74.     At 3:45 PM, after the police made no progress in removing the MOVE members from their home, Philadelphia Mayor W. Wilson Goode, a City politician of African American descent, announced at a televised press conference that he planned to seize control of the MOVE house by "any means necessary."[3]

75.     Mayor Goode then approved the implementation of dropping an aerial bomb on the occupied property from a helicopter.

76.     Shortly thereafter, at 5:30 PM, police dropped the bomb on the MOVE house, causing the house to erupt in flames.

77.     After a brief discussion, the Police and Fire Commissioners decided to let the fire burn for several hours rather than extinguishing it, allowing the uncontrolled fire to spread to other houses on the block.

78.     By the time the Fire Department finally extinguished the fire at 11:41 p.m., it had destroyed six adjoining homes on Osage Avenue and Pine Street and caused severe damage to at least another 100 homes.

79.     Eleven (11) MOVE members were killed during the bombing, presumed to consist of six (6) adults and five (5) children.

80.     Shockingly, no one from Mayor Goode's administration responsible for the siege on the MOVE compound ever faced any consequences for the horrifying actions that took place on May 13.

---

[3] MOVE Commission Report, at 349.

Case ID: 220401655

### 3. The City of Philadelphia's Processing of the MOVE Bomb Site

81. After the fire was extinguished, attention turned to processing the MOVE bomb site and any evidence that remained.

82. Unfortunately, the City's processing of the site was a complete debacle. Forensic analysis of the bomb site was already going to be a difficult task since the fire caused by the bombing, which reached temperatures more than 2,000 degrees Fahrenheit, reduced the bomb site and surrounding homes to debris, rubble, and dust. However, the difficulties were exacerbated by the inaction of the Philadelphia Medical Examiner's Office, whose representatives refused to go to the bomb site until after the first body was discovered well into the day after the bombing, May 14, 1985.

83. By the time representatives from the Medical Examiner's Office arrived at the MOVE site, the City had, contrary to proper and standard crime scene procedures, already begun using cranes and other construction equipment to dig up debris and body parts, severely damaging the remains of the individuals who had died in the conflagration and comingling valuable evidence with the remains of the individuals who had died in the bombing and fire, with no identification of location or position at the scene.

84. There was no systematic procedure for recording evidence, no proper control over the physical remains of the dead, and lateral x-rays and toxicology tests of the remains were not immediately taken.

Case ID: 220401655

85.     In sum, the City's initial forensic processing of the MOVE site was a complete failure, setting the stage for the severe difficulties in identifying certain remains removed from the site.

### 4.     Dr. Monge's Involvement In Analyzing Bones Removed From The MOVE Bomb Site And Disagreement Over The Identification of the Remains

86.     The aforesaid failures caused by the City's attempt to minimize its horrible murderous actions made it clear that forensic analysis of the MOVE bombing site would not be possible without outside help. Accordingly, Philadelphia's then Chief Medical Examiner, Dr. Marvin Aronson, invited Dr. Alan Mann, professor in the Department of Anthropology at the University of Pennsylvania with expertise in identifying small bone fragments, to assist with the investigation.

87.     Dr. Mann in turn invited his doctoral student and mentee, Dr. Monge, to assist him with his analysis of the disassociated bone fragments removed from the bomb site.

88.     None of the skeletal remains at the site were intact or complete, so Dr. Mann and Dr. Monge began by sorting recovered bone fragments based on age profiles.

89.     Upon examination, they concluded that a pelvis bone and proximal femur bone fragments did not conform to any of the ages of the individuals who were presumed to have been killed in the bombing and subsequent fire.

90.     Dr. Mann and Dr. Monge determined that the bones were from a young adult female, likely between the ages of 17 and 21.

24

Case ID: 220401655

91.    Since the oldest child known to be in the MOVE house was a 14-year-old girl named Katricia (Tree) Africa, these bones were considered unaffiliated with any of the known MOVE victims and thereafter referred to by them as Jane Doe.

92.    Sometime thereafter, the MOVE Commission, appointed to investigate the MOVE bombing and subsequent excavation, established its own outside pathology group led by a pathologist Dr. Ali Hameli, tasking the group with identifying the remains of the victims. The MOVE Commission's pathology group did not include Dr. Mann or Dr. Monge.

93.    In a flawed report without the full input of Drs. Mann and Monge, Dr. Hameli wrongly and unscientifically stated that the Jane Doe pelvis and femur fragments were associated with Katricia "Tree Africa" Dodson.

94.    After receiving the Commission's recommendation, Dr. Mann conducted a second investigation and issued a report reaffirming Dr. Monge's and his conclusion that the pelvis and proximal femur fragments could not have belonged to Katricia.

95.    Contrary to the Commission's erroneous conclusions, Drs. Mann and Monge's conclusions were confirmed by at least seven different forensic anthropologists.

96.    Thereafter, the Philadelphia Medical Examiner's Office, with the help of Dr. Mann and Dr. Monge, retained the responsibility and authority of identifying the unidentified human bone fragments.

Case ID: 220401655

97.    On December 14, 1985, the remains conclusively identified as belonging to Katricia Africa were buried after their release to Hankins Funeral Home.

98.    The pelvis and proximal femur bone fragments that could not be conclusively identified (the "unidentified fragments") were released to Dr. Mann for further investigation at his office at the Penn Museum.

### 5.    The Handling And Storage of The Unidentified Fragments Removed From The MOVE Bomb Site And Dr. Monge's First Attempt To Return The Unidentified Remains

99.    From 1986 to 2001, the bone fragments, which had still not been conclusively identified to any known individual, were stored in Dr. Mann's Office in the physical anthropology section of the Penn Museum in strict compliance with standard forensic best practices. All storage boxes were made from cardboard and lined with cotton fiber for absorbency, as the remains still had small areas of tissue attached, and then safely protected in bubble wrap to further protect them.

100.    In addition, the unidentified fragments were also kept in a secured and locked room, which was only accessible to curators of the Physical Anthropology section of the Penn Museum.

101.    In her effort to continue the investigation, in 1995, Dr. Monge sought out contact with Ramona Africa who had just been released from a long prison sentence suggesting that the unidentified fragments could be turned over to her as the MOVE family representative even though there was no conclusive evidence that the fragments were the remains of a MOVE family member. Ramona Africa

Case ID: 220401655

declined the suggestion and the fragments were returned to safe storage at the Museum.

102. From 1985 through 2001, the unidentified fragments remained stored in Dr. Mann's office at the Penn Museum and were not used for any teaching purposes.

> ### 6. Dr. Mann Leaves To Join Princeton's Anthropology Department, But The Unidentified Fragments Stay At Penn

103. In 2001, Dr. Mann left Penn to join the Anthropology Department at Princeton University as a full-time faculty member.

104. When he joined the department, he was the only biological anthropologist on the faculty, and he required teaching support to complete his duties. As such, Dr. Monge continued to assist Dr. Mann with his courses at Princeton University in the same way she did when he was at Penn.

105. When Dr. Mann left his position at the University of Pennsylvania, the unidentified bone fragments remained in safe storage at the Penn Museum due to Penn's superior facilities for forensic analysis and its access to a medical school that could provide CT scans and other testing technologies that could possibly assist in any further analysis.

106. At Penn, the remains stayed safely stored in the manner described above and were kept in the office or lab space Dr. Monge was provided to complete her work.

107. During the time period from 2001 to 2015 (when Dr. Mann retired), Dr. Monge brought the unidentified remains to Princeton's campus for further

Case ID: 220401655

investigation between two and five times, largely for the purpose of having other anthropologists, who were visiting Princeton, to review them.

108.  Such transfers to Princeton were conducted in strict accordance with chain of custody protocols and promptly returned to the Museum safe store afterwards.

### 7.    Monge's Renewed Attempts To Identify The Remains

109.  In 2014, after being moved to a new lab in the physical anthropology department at the Penn Museum, Dr. Monge began working with a geneticist from another leading research university on a number of research projects.

110.  At some point during their work together, the two discussed the possibility of using then just recently developed DNA analysis that permitted bone fragments to be identified with relatives.

111.  Because such an analysis required a DNA sample from a relative of Katricia to support that the fragment was from another older female, Dr. Monge again had hope that a renewed contact with Consuella Dodson, Katricia's mother, could aid in the securing of a DNA sample that would conclusively resolve that the fragments were from a yet unidentified and unrelated individual.

112.  After being contacted by Malcom Burnley, a local writer interested in writing an article about the MOVE tragedy and its aftermath, Dr. Monge enlisted him to help request from Consuella, who had then also been freed from her jail sentence, a DNA sample to dispel the notion that the fragments were not associated with Katricia.

Case ID: 220401655

113.   However, despite multiple efforts to communicate with Consuella, he was unable to have a meaningful conversation with her.

114.   Despite continued interest in solving the issues regarding the unidentified fragments, Dr. Monge determined the case to be "cold," and she accepted that it was unlikely she would ever be able to conclusively identify the source of the fragments.

115.   However, four years later, in December 2018, Burnley reached out to Dr. Monge again to see if she wanted to continue to explore the identification process.

116.   Although Dr. Monge had already considered the case "cold," she and Mr. Burnley continued to discuss the matter. That investigation came to a halt when they resolved that they not be able to secure any help from the MOVE family members.

117.   When these final efforts failed, Dr. Monge believed she gone down all of the possible paths towards identifying the remains, accepted that she would likely never come to a final conclusion on the remains' identity, and once again declared the case "cold."

### 8.   "Real Bones: Adventures in Forensic Anthropology," The Princeton Coursera Course

118.   Although Dr. Mann retired from the Princeton faculty in 2015, Dr. Monge remained as a visiting professor and lecturer.

119.   In 2017 and 2018, Dr. Monge began discussions regarding the creation of Massive Open Online Course ("MOOC") on Forensic Anthropology with Dr. Jeffrey Himpele, another Princeton professor, which would utilize videos

Case ID: 220401655

the two were planning to make and use in an upper-level anthropology course they were teaching together.

120. In 2019, after exhausting all avenues of identification and determining once again that the remains were a "cold" case, Dr. Monge discussed the use of the remains to address the difficulties of forensic anthropology in the field.

121. Ultimately, these discussions resulted in the production of a MOOC titled "Real Bones: Adventures in Forensic Anthropology," which was published on the Coursera online platform.

122. The streamed video Coursera classes are free but available only to those students who enroll in the course through the Coursera website.

123. "Real Bones: Adventures in Forensic Anthropology" was designed to be a multi-part course discussing forensic anthropology using real world examples, with an overall purpose of teaching how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains.

124. The course featured eleven sessions, with the first seven being recorded in a studio and the remaining four recorded at the Penn Museum in their lab facilities.

125. The first two classes, titled "Losing Personhood: MOVE A Case Study" and "Restoring Personhood" respectively, described the MOVE organization and discussed the history of the MOVE Bombing before explaining

Case ID: 220401655

the gross, inappropriate excavation of the bomb site and displaying slides of the unidentified fragments pulled from the wreckage.

126.   Other classes were titled "Tools of the Trade," "Bone: The Basics," "How Bones Grow and Develop," "Dental and Hand-Wrist Standards," "Aging Dentition," and "Gross Morphology."

127.   The one and only time the unidentified remains were displayed in the course occurred in the ninth class, titled "MOVE – An Analysis of the Remains."

128.   In that 14-minute class, Dr. Monge can be seen in the Penn Museum's lab with one of her students and the unidentified bone fragments comparing those fragments to other similar bone fragments and models for comparison and explaining how forensic techniques could be used to determine the age of the remains.

129.   At all times during the video, both Dr. Monge and her student properly, scientifically, and discretely handled the remains, utilizing rubber gloves to ensure that there would be no outside contamination.

130.   The two discussed the process they took in attempting to provide an age estimate of the person from whom the fragments originated and Dr. Monge explained that, despite her diligence, the source of the fragments has still not been identified.

131.   "Real Bones: Adventures in Forensic Anthropology" was published in August 2020 and available for almost a year without any controversy or complaint.

Case ID: 220401655

132.   It was only after Paul Mitchell began his deliberate, retaliatory, and career enhancing smear campaign against Dr. Monge that the matter became a public controversy based upon false reporting that the course was shut down.

**B.    Monge Becomes Paul Mitchell's Mentor, Helps Bring Him Back To The University of Pennsylvania**

133.   Dr. Monge first met Defendant, Paul Mitchell, when he came to the University of Pennsylvania as an undergraduate student in the Anthropology Department in 2009. Mr. Mitchell would later receive both his bachelor's degree (2013) and master's degree (2014) from the University of Pennsylvania.

134.   Throughout his tenure at the University, Mr. Mitchell took several courses from Dr. Monge, and she was the advisor for his master's thesis.

135.   After graduating from Penn with a master's degree, Mr. Mitchell was admitted to a doctoral program at the University of California at Berkeley.

136.   Shortly after matriculating there, Mr. Mitchell was accused of professional misconduct relating to allegations of plagiarism in the production of a research paper.

137.   After he was removed from Berkeley's Ph.D. program, Dr. Monge worked with Penn's Anthropology Department to allow Mitchell to transfer and earn his doctorate degree at Penn.

138.   Upon returning to the University of Pennsylvania for his graduate studies, Mr. Mitchell's work at Penn became centered on the Samuel G. Morton Cranial Collection, a collection of almost one thousand skulls located at the Penn Museum, and he became concentrated on Samuel Morton's scientific methodology and the racial and social implications Morton's work.

32

Case ID: 220401655

139.   However, perhaps mirroring his improper actions at Berkely, Mr. Mitchell began engaging in misconduct including the defacing of Penn Museum lab books, tearing pages from the equipment used to catalogue entries for the lab's micro-CT scanner, and plagiarism.

140.   Mr. Mitchell would also improperly access the lab to show it to his friends and other students and inappropriately explore with them the bones and bone fragments stored at the lab.

141.   Especially troublesome was Mitchell's illegal duplication of the keys to Dr. Monge's office in Penn's lab facilities and to the adjacent storage space.

142.   Upon information and belief, Mitchell, with unfettered access to the lab facilities and the collections they stored, began bringing remains home and storing them in other locations, purloining DNA samples, and re-sorting forensic materials.

143.   Once discovered, Dr. Monge, as part of her duties at the Museum, reported all of these unlawful and disturbing activities to Penn Museum Security and Administrators, along with Dr. Kathleen Morrison, Chair of Penn's Anthropology Section.

144.   Her allegations became the subject of a confrontation with Mr. Mitchell in May of 2019, wherein Dr. Monge confronted him about his extensive misconduct.

145.   In response, Mr. Mitchell began screaming, throwing things, slamming his fist down on tables, and threatening Dr. Monge, who was terrified

Case ID: 220401655

by his comments and actions demonstrated in the presence of witnesses who were also present during the confrontation.

146.   In direct response to Mr. Mitchell's conduct that day, Dr. Monge filed a report with the Museum's administration.

147.   Thereafter, Dr. Monge changed the locks in the Museum and the Lab, and she denied Mr. Mitchell's further un-supervised access to the Physical Anthropology collections at the Penn Museum, giving rise to his revengeful false reporting relating to the bone fragments with the aid of Defendant Thomas.

**C.     A Mentee's Grudge, The Media Firestorm It Created, And The Dismantling of Dr. Monge's Reputation**

148.   Mr. Mitchell's vengeful actions began in early April 2021 when Mitchell met with Christopher Woods, who had recently been hired as the Director of the Penn Museum, and accused, without any foundation, that Dr. Monge had mishandled the unidentified bone fragments and had engaged in other professional misconduct in reference to the issue of the MOVE bombing investigation.

149.   Mr. Mitchell expressed concerns over the Penn Museum's policies on the handling of remains, including the unidentified remains from the MOVE site, and he unfairly and defamatorily accused Dr. Monge of lacking professionalism in connection with the Coursera course.

150.   Fearing that his allegations against Dr. Monge would not bear the disciplinary result against her that he intended, he then instigated the first article regarding the unidentified bones by contacting his then girlfriend, Defendant Maya Kasutto, who was writing for Defendant Billy Penn, at the time.

Case ID: 220401655

151.   On April 21, 2021, an online article written by Maya Kasutto titled "Remains of Children Killed in MOVE Bombing Sat in a Box at Penn Museum for Decades" was published by Billy Penn on its website. A copy of that article is attached hereto as Exhibit "A."

152.   The article falsely asserted that the unidentified fragments were the remains of Katricia Africa and implied serious scientific misconduct by Dr. Monge in the retention and handling of the fragments, defaming Dr. Monge as a "chipper science teacher" and alleging that she improperly used the remains of a black girl as "props."

153.   Further pushing its false narrative about the unidentified bone fragments, the article clearly defamed Dr. Monge by insinuating a racist motive for the retention and investigation undertaken:

> "The absence of ethics, void of communication, and abdication of responsibility regarding these remains mirror the circumstances that led to the 1985 disaster."

154.   On the same day, the Philadelphia Inquirer published an article titled "Penn Owes Reparations for Previously Holding Remains of a MOVE Bombing Victim" by Abdul-Aliy Muhammad. A copy of that article is attached hereto as Exhibit "B."

155.   Like the Billy Penn article, this article also conclusively asserted that the unidentified bone fragments were the remains of two of the black children who died in the tragic bombing and fire, Katricia and Delisha Africa.

156.   It also stated that Dr. Monge "mishandled" the remains and called upon the Penn Museum and University of Pennsylvania to apologize for the

Case ID: 220401655

"unethical possession" of the remains, characterizing the handling of the bone fragments an "egregious act."

157.  Both of these articles were published with the aid of Defendant Paul Mitchell, who did so based upon his own averred opinions arising from clearly flawed research.

158.  On April 23, 2021, Mr. Mitchell prepared a paper on the handling and identity of the remains removed from the MOVE site, arguing that the remains are indisputably those of Katricia and Delisha Africa and condemning the handling of the remains.

159.  Mitchell widely distributed this paper to Penn employees, MOVE members, and several media outlets.

160.  That same day, three major media outlets picked up the story and published their own blatantly false, defamatory narratives.

(a)  The Daily Mail published an article on its website by Adam Schrader, titled ""They Are Juicy': Princeton Professor is Slammed for Disrespecting the Bones of a 14-year Old Black Girl Killed by a Bomb Dropped by Philadelphia Police in 1985 After Members of Her Commune Fired at Cops.'" A copy of this article is attached hereto as Exhibit "C."  That article falsely avers that the remains were bones of a "black child killed in a 1985 police bombing." It further condemned Dr. Monge's use of the word "juicy" in the Coursera video, implying that such a word carries racial undertones when in fact it is an anthropological term of art indicating the preserved status of bones and bone fragments.

36

Case ID: 220401655

(b)     The Guardian published an article titled ""Bones of Black children killed in police bombing used in Ivy League anthropology course," by Ed Pilkington. A copy of this article is attached hereto as Exhibit "D." This article also falsely averred that the bone fragment remains are "almost certainly those of the older MOVE girls who died" and implied scientific impropriety and racist-fueled misconduct regarding Dr. Monge's actions and statements. It also took issue with Dr. Monge's use of the words "juicy" and "greasy," suggesting those words carry racial undertones when in fact they are anthropological terms of art.

(c)     On April 23, 2021, the New York Post published an article authored by Jackson O'Bryan titled "Remains of Black Teen Killed in Philadelphia Police Bombing Used in Online Class." A copy of this article is attached hereto as Exhibit "E." That article also implied a racist animus for Dr. Monge's actions and statements:

> "The bones of at least one black teenager killed in the 1985 police bombing in Philadelphia are being used as a 'case study' in an online anthropology course — taught by an Ivy League professor who called the remains 'juicy.'"

161.    Other media sources quickly followed, starting a flurry of news articles on widely accessible websites, all of which implying the bones are those of Katricia and Delisha Africa and condemning Dr. Monge for professional misconduct.

(a)     On April 24, 2021, the New York Times published the article "Decades After Police Bombing, Philadelphians 'Sickened' by Handling of Victim's Bones" by Michael Levenson. A copy of this article is attached hereto as Exhibit "F." The article falsely identified the bone fragments as the remains of Delisha

Case ID: 220401655

Africa and defamatorily suggested that the treatment of the remains showed "disrespect for Black life." The article further stated "that the remains had been kept in a cardboard box on a shelf" even though remains were stored at the Penn Museum following forensic best practices at all times.

(b)     On April 26, 2021, an article written by then freelance writer, Defendant Nora McGreevy, and titled "Museum Kept Bones of Black Children Killed in 1985 Police Bombing in Storage for Decades," was published by the Smithsonian Magazine. A copy of this article is attached hereto as Exhibit "G." That article also implied that Dr. Monge acted unprofessionally and her actions were driven by a racist animus:

> "What's more, the remains appear to have been used as a "case study" in an online course presented by Princeton University and hosted on Coursera. Titled "Real Bones: Adventures in Forensic Anthropology," the class was recorded in 2019 and includes footage of Janet Monge, an adjunct professor in anthropology at the University of Pennsylvania and former student of Mann, picking up the bones and describing them in graphic detail. She makes no reference to the fact that the families of probable victims Tree and Delisha never provided consent for their daughters' bones to be used in this way, the Guardian notes."

The article also falsely asserts that the unidentified remains are those of Katricia and Delisha and it suggests that a failure to contact their families constituted professional misconduct on the part of Dr. Monge.

(c)     On April 30, 2021, Defendant Slate published an article titled "The Grim Open Secret of College Bone Collections" and authored by Elaine Ayers. A copy of that article is attached hereto as Exhibit "H." That article states that Drs. Mann and Monge were driven by racially based animus: "the physical

Case ID: 220401655

anthropology departments like the ones that employ Mann and Monge exist today as uneasy reminders of many museums' and universities' racist and colonial foundations." The Slate article further states that the use of the terms "juicy" and "greasy" by Dr. Monge reflect "most recent example of an ongoing legacy of Black people's bodies used for academic research and pedagogy," suggesting those words carry racial undertones when in fact they are anthropological terms of art properly used in anthropological instructional context.

      (d)    On May 3, 2021, Defendant Al Día News published the article "There Will Be No Justice For Penn and Princeton's Treatment of MOVE Victims" authored by Defendant Brittany Valentine. A copy of this article is attached hereto as Exhibit "I." In the article, Ms. Valentine falsely accuses Drs. Monge and Mann of professional misconduct, stating "[b]ombshell reports revealed the universities shuttled the remains back and forth, and used them in educational settings without ever contacting next of kin."

      (e)    On May 7, 2021, Andscape, a popular website run by ESPN, published the article "The Scandal Over the MOVE Bombing Victims' Remains Is Part Of Anthropology's Racist History" authored by Defendant Nicole Froio. A copy of this article is attached hereto as Exhibit "J." The article blatantly suggests racist motivations for the investigatory actions of Dr. Monge:

> "The handling of the remains of the two MOVE bombing victims is certainly not, as Rouse noted, a "conspiracy." The reality is much worse. The theft of Tree's and Delisha's bones indicates that despite attempts to purge academia and anthropology of colonial logics, they are baked into the structure. It is clear that there is still a belief in the field of anthropology that the remains

Case ID: 220401655

of Black people are scientific objects to be studied or stored
away in boxes rather than laid to rest by their families."

Ms. Froio further alleges racist insensitivity by stating that "[i]n death, [Katricia
and Delisha's] bones were used as objects of colonial plunder at academic
institutions" and directly asserts that Dr. Monge's handling of the bone fragment
remains was unethical, unprofessional, and racist.

(f)     On May 16, 2021, The New Yorker published the article
"Saying Her Name" by Heather Ann Thompson. A copy of this article is attached
hereto as Exhibit "K." That article also falsely implies that the actions of Dr.
Monge were unlawfully racist, stating that "the idea that the museum was
holding the bones of a Black Philadelphian who was alive as recently as 1985 in
the same way that it has held the skulls of enslaved people, procured by grave-
robbers, was beyond comprehension," and she directly contradicts the
scientifically supported findings of Drs. Mann and Monge that the bone fragment
remains were not that of Katricia: "The remains that Mann claimed had never
been satisfactorily identified had, in fact, been found to belong to a teen-age girl
who, along with her sister, died that day."

(g)     On May 18, 2021, the Philadelphia Inquirer published yet
another article regarding the treatment of the remains, this time authored by
Jenice Armstrong and titled "The Disrespectful Handling of the MOVE Victims'
Remains by the City and Penn Merits More Investigation." A copy of this article
is attached hereto as Exhibit "L." In the article, Armstrong falsely implies
unlawful and unprofessional racially motivated actions by Dr. Monge:

Case ID: 220401655

> "This latest atrocity is beyond horrible. The MOVE victims' remains have been treated like laboratory specimens, passed from the University of Pennsylvania to Princeton University and then back to Penn. According to the Guardian, they were even included in a now-deleted video promoting a class called "Real Bones: Adventures in Forensic Anthropology."

(h)     On May 26, 2021, Andscape published a second article. The article, written by Linn Washington, was titled ""Disrespect for the MOVE Families Is a Stain That Never Goes Away in Philadelphia." A copy of this article is attached hereto as Exhibit "M." That published piece article falsely states that Dr. Monge "mistreated" the unidentified remains of Katricia and Delisha Africa and further falsely asserts that Mr. Monge's actions were unprofessional and unlawful:

> "Although the scandal caused Princeton to cancel that online course, anthropologist Janet Monge retains her positions at the Penn Museum and on the university's faculty."

Ms. Washington then went on to suggest that Penn's failure to remove Dr. Monge from her position "renders the University of Penn's apology hollow."

(i)     On July 16, 2021, Teen Vogue published the article ""MOVE Bombing Remains Scandal Shows Enduring Racism in Anthropology" by Ezra Lerner. A copy of that article is attached hereto as Exhibit "N."  That published writing suggests improper professional conduct by implication by stating that "the remains of at least one young girl — believed to possibly belong to Tree as well as Delisha Africa, victims of the police's 1985 bombing of the MOVE house in Philadelphia — had been improperly kept for decades by archaeologists Alan Mann and Janet Monge" and further defamatorily states that the handling of the remains was "unethical."

41

Case ID: 220401655

(j)     On October 31, 2021, Hyperallergic published the article ""How the Possession of Human Remains Led to a Public Reckoning at the Penn Museum," authored by by Kinjal Dave and Jake Nussbaum. A copy of this article is attached hereto as Exhibit "O."  Like its predecessors, the article details the aftermath of the media firestorm, but falsely blames Dr. Monge for a racially motivated investigation of the bone fragments, stating "Consuella did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching."

162.  Each of the aforecited articles contain statements and/or implications that were false, and defendants either knew or should have known at the time of publication that they were false.

### D.     Amplification of The Media Reports and Dr. Monge's Improper Demotion, Pay Cut, and Removal as a University Of Pennsylvania Faculty Member

163.  Dr. Monge also found herself attacked by anthropology associations, the University of Pennsylvania, and other faculty members at the University.

164.  Shortly after the attacks from the media began, Dr. Monge, who is a member of the American Black Anthropologists email list serve based upon anthropological work in Kenya, began seeing that Defendant Deborah Thomas, a fellow Penn faculty member, was sharing the disparaging media reports on the list serve in the hopes it would initiate more widespread outrage against Dr. Monge.

165.  Beyond sharing the false and defamatory articles, Thomas also suggested herself that Dr. Monge improperly handled the remains, and stated

42

that she was going to work with Mitchell to create a timeline and chain of custody narrative regarding the remains to be used to target Dr. Monge.

166.  Those actions increased the visibility of the disparaging articles, severely injuring Dr. Monge's reputation in the anthropology community.

167.  On April 26, 2021, a collective statement by the Association of Black Anthropologists (ABA), the Society of Black Archaeologists (SBA), and the Black in Bioanthropology Collective (BiBA) was released. A copy of this Statement is attached hereto as Exhibit "P." In the statement, the groups stated that they "condemn in the strongest possible language the University of Pennsylvania, Princeton University, Coursera, along with Professors Alan Mann and Janet Monge, for their horrific treatment of the remains of Tree and Delisha Africa, and for the unfathomable heartlessness and disrespect shown towards the Africa family."

168. The defamatory statements in the published release suggest unethical and illegal racially motivated animus, stating members of the group were "outraged by the stunning ethical indifference shown by all parties involved to both Tree and Delisha and to the Africa family, but also by the fact that these entities effectively monetized the remains of Black children murdered in a state terrorist attack – a fact made all the more painful given the heightened public awareness of brutal murders of Black children and youth by the police over the past few years." The statement further requested that Dr. Monge be removed from her position with the University of Pennsylvania.

43

Case ID: 220401655

169. That same day, Dr. Monge found herself locked out of her lab and all Physical Anthropology collection storage spaces.

170. Two days later, Defendants Gutmann and Prickett authored an email to employees of the Penn Museum calling Dr. Monge's actions "insensitive, unprofessional, and unacceptable." A similar statement authored by them was sent to the full University Pennsylvania community.

171. The Chair of Penn's Anthology Department, Dr. Kathleen Morrison, then advised Dr. Monge that she was being put on a "work pause" and would be removed from teaching any University classes.

172. Approximately one week later, on May 4, 2021, she was informed that her scheduled summer programs at the Penn Museum and scheduled high school talks for Penn were also being cancelled.

173. The following day, Dr. Monge found a call to action for her termination on the Penn Anthropology web page, further increasing her concern over her job.

174. In August 2021, Dr. Monge discovered that she had been removed from Penn's Anthropology Department's webpage where it lists the current "Graduate Group and Affiliated Faculty" and shortly thereafter, she was informed that she would no longer be able to teach any of her current classes, be an adjunct professor, or even be an associate curator at the Penn Museum. Rather, she was being demoted to Museum Keeper.

Case ID: 220401655

175.   This demotion was affected with a salary cut of $65,000 per year for the following two years of her employment when she will have been deemed to retire.

176.   To date, three separate independent investigations have been conducted on the handling of the unidentified remains from the MOVE bombing site, and none of the reports have found that Dr. Monge violated any professional, ethical, or legal standards, nor have they concluded that the bone fragments were those belonging to Katricia Africa.

177.   Based entirely upon the false and defamatory statements discussed above, Dr. Monge's reputation has been irreparably and wrongfully destroyed, she has been the victim of adverse employment actions, and she has received threatening emails and phone calls, including multiple death threats. This must not be allowed to stand.

**COUNT I**
**DEFAMATION**
**PLAINTIFF VS. ALL DEFENDANTS**

178.   The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint as though fully set forth herein.

179.   The statements described above and contained in the articles identified above are entirely false insofar as they reflect upon Plaintiff's conduct, as well as her character and reputation.

180.   Defendants knew or should have known that the statements described above and contained in the articles identified above were false when made, and Defendants published them either intentionally and maliciously, or

45

Case ID: 220401655

with reckless disregard for their truth or falsity, or negligently and carelessly published.

181.   The false and defamatory statements described above and contained in the articles identified above were widely stated to others through published articles, published on the Defendants' websites and circulated among and read by tens of thousands of readers around the world.

182.   The false and defamatory statements described above and contained in the cited statements and articles identified above applied to the Plaintiff, were understood by the recipients of the statements to have a defamatory meaning and were understood or reasonably understood by the recipients of the statements as intended to be applied to the Plaintiff.

183.   The false and defamatory statements described above and contained in the cited statements and articles identified above constitute defamatory publications which are actionable per se and are libel per se, as they cast doubt on Dr. Monge's ability to perform in her chosen profession and suggest that Dr. Monge has committed a crime by violating the civil rights of a deceased bombing victim and her family based on race.

184.   The false and defamatory statements described above and contained in the cited statements and articles identify severely injured and caused special harm to Plaintiff in that they have (a) ruined her reputation; (b) exposed her to hatred, contempt, ridicule, and humiliation; (c) ascribed to her characteristics incompatible with the proper conduct of a professional anthropologist; and (d) injured her in the practice of her chosen field.

46

Case ID: 220401655

185. As a direct and proximate result of the intentional, malicious, reckless, negligent, and/or careless statements contained in the articles identified above, Plaintiff's reputation and esteem in the community have been adversely affected.

186. As a further result of the aforementioned defamatory articles, third persons have been deterred from working with Plaintiff.

187. As a result of the aforementioned defamatory articles, Plaintiff has sustained, and will sustain in the future, a loss of income and earning capacity.

188. As a further result of the aforementioned defamatory articles, Plaintiff has sustained grave mental anguish, humiliation, and loss of her enjoyment of life.

189. The publication of the false and defamatory statements contained in the cited statements and articles identified and described above have been and continue to be republished, and the plaintiff therefore demands presumed, compensatory, economic, and punitive damages for the harm flowing from any and all such republications of the false and defamatory statements in addition to damages for the harm flowing from their initial publication.

190. The false and defamatory statements contained in the articles identified and described above are not subject to any recognized privilege, and/or to the extent that any privilege existed or could exist, the Defendants abused any such privilege.

47

191.   Due to the willful, wanton, intentional and malicious nature of the Defendants' conduct, Plaintiff also demands an award of punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Janet Monge respectfully requests that the Court enter judgment in her favor and against the Defendants, award the Plaintiff Janet Monge compensatory and punitive damages in an amount in excess of the statutory minimum for arbitration, require each of the Defendants to publish retractions of their defamatory statements and publicly apologize to Dr. Monge for their defamatory actions, and grant such other and further relief as this Court deems just and appropriate.

### COUNT II
### DEFAMATION BY IMPLICATION
### PLAINTIFF VS. ALL DEFENDANTS

192.   The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint as though fully set forth herein.

193.   The statements made by the defendants contained in the aforementioned articles constitute defamation by implication, in that their context was such that the reader was led to believe they were true

194.   The articles identified above maliciously, intentionally, recklessly, and falsely, by words, innuendo, inference, and manner in which they were presented, held Plaintiff out to public scorn and ridicule, attributed improper conduct to Plaintiff, and cast doubt on Plaintiff's ability to properly carry out the responsibilities of her job and chosen profession.

48

Case ID: 220401655

195.    The false and defamatory statements described above and contained in the articles identified were in no manner privileged nor did the articles constitute fair comment on matters of public concern or interest.

196.    The false and defamatory statements described above and contained in the articles identified were published with knowledge that said statements, innuendo, inference, and manner in which they were presented were false and/or with reckless disregard for whether said material was false, said conduct constituting actual malice.

197.    The false and defamatory statements described above and contained in the articles identified contained distortions, misrepresentations, misstatements of fact, omissions of fact, and edited material designed to falsely imply misconduct on Plaintiff's part.

198.    The false and defamatory statements described above and contained in the articles identified were presented in a negligent manner without adequately investigating the underlying facts.

199.    The false and defamatory statements described above and contained in the articles identified were false, and defendants knew or should have known at the time of publication that they were false.

200.    The statements and implications set forth above constitute defamatory publications which are actionable per se, are libels per se, and were published with actual malice.

201.    The false and defamatory statements described above and contained in the articles identify severely injured and caused special harm to Plaintiff in

49

Case ID: 220401655

that they have (a) ruined her reputation; (b) exposed her to hatred, contempt, ridicule, and humiliation; (c) ascribed to her characteristics incompatible with the proper conduct of a professional anthropologist; and (d) injured her in the practice of her chosen field.

202.   As a direct and proximate result of the intentional, malicious, reckless, negligent, and/or careless statements contained in the articles identified above, Plaintiff's reputation and esteem in the community have been adversely affected.

203.   As a further result of the aforementioned defamatory statements and articles, third persons have been deterred from working with Plaintiff.

204.   As a result of the aforementioned defamatory statements and articles, Plaintiff has sustained, and will sustain in the future, a loss of income and earning capacity.

205.   As a further result of the aforementioned defamatory statements and articles, Plaintiff has sustained grave mental anguish, humiliation, and loss of her enjoyment of life.

206.   The publication of the false and defamatory statements and those contained in the articles identified and described above have been and continue to be republished, and the plaintiff therefore demands presumed, compensatory, economic, and punitive damages for the harm flowing from any and all such republications of the false and defamatory statements in addition to damages for the harm flowing from their initial publication.

Case ID: 220401655

207.  The false and defamatory statements  and those contained in the articles identified and described above are not subject to any recognized privilege, and/or to the extent that any privilege existed or could exist, the Defendants abused any such privilege.

208.  Due to the willful, wanton, intentional and malicious nature of the Defendants' conduct, Plaintiff also demands an award of punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Janet Monge respectfully requests that the Court enter judgment in her favor and against the Defendants, award the Plaintiff Janet Monge compensatory and punitive damages in an amount in excess of the statutory minimum for arbitration, require each of the Defendants to publish retractions of their defamatory statements and publicly apologize to Dr. Monge for their defamatory actions, and grant such other and further relief as this Court deems just and appropriate.

**COUNT III**
**FALSE LIGHT**
**PLAINTIFF VS. ALL DEFENDANTS**

209.  The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint.

210.  The aforementioned statements and articles, made and published without regard to their truth or falsity, also created false impressions by repeatedly, widely, and extensively publicizing information which stated or implied falsehoods about Plaintiff and placed her before the public in a false light of a kind highly offensive to a reasonable person.

51

Case ID: 220401655

211. The statements were made public by Defendants, in that they were published in print and on websites accessible by the public at large and to so many persons that the matter must be regarded as public knowledge.

212. The statements included major misrepresentations of the Plaintiff's character, conduct and activities, and are highly offensive to the Plaintiff, as they would be to any reasonable person.

213. The misrepresentations contained in the statements are not of any legitimate public concern.

214. The false statements were published by Defendants with the knowledge and/or reckless disregard for the false light in which the Plaintiff would be portrayed.

215. The statements were published to the general public on websites accessible anywhere in the United States and throughout the world, and they are continuously available to the general public on Defendants' websites.

216. As a result of these statements, the Plaintiff suffered severe harm to her interest in privacy, as well as significant damages in the form of severe monetary loss, economic and consequential damages discussed above, severe and irreparable impairment of her reputation and credibility in the community generally, and personal humiliation, mental anguish and mental suffering.

WHEREFORE, Plaintiff Janet Monge respectfully requests that the Court enter judgment in her favor and against the Defendants, award the Plaintiff Janet Monge compensatory and punitive damages in an amount in excess of the statutory minimum for arbitration, require each of the Defendants to publish

Case ID: 220401655

retractions of their defamatory statements and publicly apologize to Dr. Monge for their defamatory actions, and grant such other and further relief as this Court deems just and appropriate.

**COUNT IV**
**CIVIL AIDING AND ABETTING**
**PLAINTIFF VS. ALL DEFENDANTS**

217.   The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint.

218.   The behaviors in which the Defendants engaged aided and abetted the tortious misconduct of each of the other defendants by giving rise to false and defamatory information against Dr. Monge in a concerted effort to accomplish the particular result of branding Mr. Monge as incompetent and a racist.

219.   When each of the Defendants published their defamatory statements they knew or should have known through reasonable diligence that the conduct of each of them was tortious and provided substantial assistance and/or encouragement to engage in such tortious misconduct.

220.   As a result of Defendants' conduct aiding and abetting the tortious misconduct of the other Defendants, Plaintiff has suffered and continues to suffer harm to her reputation, humiliation, severe emotional distress, and financial harm,

221.   Defendants' conduct in aiding and abetting such tortious conduct was so reckless, wanton, willful, and malicious that Defendants should be punished by the assessment of punitive damages.

53

WHEREFORE, Plaintiff Janet Monge respectfully requests that the Court enter judgment in her favor and against the Defendants, award the Plaintiff Janet Monge compensatory and punitive damages in an amount in excess of the statutory minimum for arbitration, require each of the Defendants to publish retractions of their defamatory statements and publicly apologize to Dr. Monge for their defamatory actions, and grant such other and further relief as this Court deems just and appropriate.

Respectfully Submitted,
**SPECTOR GADON ROSEN VINCI P.C.**

By: /s/ *Alan Epstein*

Alan B. Epstein, Esquire
Adam Filbert, Esquire
*Attorneys for Plaintiff*

Dated: June 22, 2022

54

**CERTIFICATE OF SERVICE**

*Filed and Attested by the*
*Office of Judicial Records*
*22 JUN 2022 01:33 pm*
*A. STAMATO*

I, Alan B. Epstein, Esquire, attorney for Plaintiff, hereby certify that a copy of

Plaintiff's Writ of Summons, which was subsequently reinstated on May 17, 2022, has been

served upon the following as indicated:

| Defendant | Date | Method of Service |
|---|---|---|
| **UNIVERSITY OF PENNSYLVANIA**<br>2929 Walnut Street, Suite 400<br>Philadelphia, PA 19104 | April 21, 2022 | Hand Delivered by Process Server |
| **Amy Guttmann, Wendell Pritchett, Kathleen Morrison,**<br>**Deborah Thomas, &**<br>**Christopher Woods,**<br>in their individual capacities,<br>**c/o UNIVERSITY OF PENNSYLVANIA**<br>2929 Walnut Street, Suite 400<br>Philadelphia, PA 19104 | April 21, 2022 | Hand Delivered by Process Server |
| **Paul Mitchell**<br>511 N. Broad St.<br>Philadelphia, PA 19123 | April 21, 2022 | Hand Delivered by Process Server |
| **BILLY PENN**<br>150 N. 6th St.<br>Philadelphia, PA 19106 | April 21, 2022 | Hand Delivered by Process Server |
| **Maya Kasutto,**<br>in her individual capacity,<br>**c/o BILLY PENN**<br>150 N. 6th St.<br>Philadelphia, PA 19106 | April 21, 2022 | Hand Delivered by Process Server |
| **THE PHILADELPHIA INQUIRER, PBC**<br>801 Market Street, Suite 300<br>Philadelphia, PA  19107 | April 21, 2022 | Hand Delivered by Process Server |

| | | |
|---|---|---|
| **Abdul Aliy Muhammad & Jenice Armstrong,** in their individual capacities, **c/o THE PHILADELPHIA INQUIRER, PBC** 801 Market Street, Suite 300 Philadelphia, PA 19107 | April 21, 2022 | Hand Delivered by Process Server |
| **ESPN, INC. d/b/a ANDSCAPE** 545 Middle Street Bristol, CT 06010 | April 25, 2022 | Certified Mail, Return Receipt Requested |
| **Nicole Froio & Linn Washington**, in their individual capacities **c/o ESPN, INC.** 545 Middle Street Bristol CT 06010 | April 25, 2022 | Certified Mail, Return Receipt Requested |
| **THE SOCIETY OF BLACK ARCHAEOLOGISTS** P.O. Box 3771 Santa Monica, CA 90409 | June 10, 2022 | Certified Mail, Return Receipt Requested |
| **THE GUARDIAN MEDIA GROUP d/b/a THE GUARDIAN** 61 Broadway New York, NY 10006 | April 25, 2022 | Certified Mail, Return Receipt Requested |
| **Ed Pilkington**, in his individual capacity **c/o THE GUARDIAN** 61 Broadway New York, NY 10006 | April 25, 2022 | Certified Mail, Return Receipt Requested |
| **NYP HOLDINGS, INC. d/b/a NEW YORK POST** 1211 Avenue of the Americas New York, NY 10036 | April 28, 2022 | Certified Mail, Return Receipt Requested |
| **Jackson O'Bryan**, in his individual capacity, **c/o NEW YORK POST** 1211 Avenue of the Americas | April 28, 2022 | Certified Mail, Return Receipt Requested |

New York, NY 10036
**AL DIA NEWS**
| | | |
|---|---|---|
| 1835 Market Street, 4th Floor<br>Philadelphia, PA 19103 | April 21, 2022 | Hand Delivered by Process<br>Server |

**BRITTANY VALENTINE**,
in her individual capacity,
**c/o AL DIA NEWS**
| | | |
|---|---|---|
| 1835 Market Street, 4th Floor<br>Philadelphia, PA 19103 | April 21, 2022 | Hand Delivered by Process<br>Server |

I further certify that Plaintiff's Original Complaint has been served upon the following as indicated:

| **Defendant** | **Date** | **Method of Service** |
|---|---|---|
| **UNIVERSITY OF PENNSYLVANIA**<br>2929 Walnut Street, Ste. 400<br>Philadelphia, PA  19104 | May 23, 2022 | Hand Delivered by Process Server |
| **Amy Guttmann, Wendell Pritchett, Kathleen Morrison,<br>Deborah Thomas, &<br>Christopher Woods,**<br>in their individual capacities,<br>**c/o UNIVERSITY OF PENNSYLVANIA**<br>2929 Walnut Street, Suite 400<br>Philadelphia, PA 19104 | May 23, 2022 | Hand Delivered by Process Server |
| **Paul Mitchell**<br>511 N. Broad St.<br>Philadelphia, PA 19123 | May 23, 2022 | Hand Delivered by Process Server |
| **BILLY PENN**<br>150 N. 6th St.<br>Philadelphia, PA 19106 | May 23, 2022 | Hand Delivered by Process Server |
| **Maya Kasutto,**<br>in her individual capacity,<br>**c/o BILLY PENN** | May 23, 2022 | |

| | | |
|---|---|---|
| 150 N. 6th St.<br>Philadelphia, PA 19106 | | Hand Delivered by Process Server |
| **THE PHILADELPHIA INQUIRER, PBC**<br>801 Market Street, Suite 300<br>Philadelphia, PA  19107 | May 23, 2022 | Hand Delivered by Process Server |
| **Abdul Aliy Muhammad & Jenice Armstrong,**<br>in their individual capacities,<br>**c/o THE PHILADELPHIA INQUIRER, PBC**<br>801 Market Street, Suite 300<br>Philadelphia, PA 19107 | May 23, 2022 | Hand Delivered by Process Server |
| **ESPN, Inc. d/b/a ANDSCAPE**<br>545 Middle Street<br>Bristol, CT 06010 | May 25, 2022 | Hand Delivered by Process Server |
| **THE AMERICAN ANTHROPOLOGICAL ASSOCIATION**<br>2300 Clarendon Blvd., Suite 1301<br>Arlington, VA 22201 | May 24, 2022 | Hand Delivered by Process Server |
| **DAILY MAIL AND GENERAL TRUST, PLC d/b/a DAILY MAIL**<br>51 Astor Place<br>New York, NY 10003 | June 1, 2022 | Hand Delivered by Process Server |
| **Adam Schrader,**<br>in his individual capacity,<br>**c/o DAILY MAIL**<br>51 Astor Place<br>New York, NY 10003 | June 2, 2022 | Hand Delivered by Process Server |
| **SLATE**<br>15 Metrotech Center, 8th Floor<br>Brooklyn, NY 11201 | June 2, 2022 | Hand Delivered by Process Server |

| | | |
|---|---|---|
| **AL DIA NEWS**<br>1835 Market Street, 4th Floor<br>Philadelphia, PA 19103 | May 23, 2022 | Hand Delivered by Process<br>Server |
| **Brittany Valentine,**<br>in her individual capacity,<br>**c/o AL DIA NEWS**<br>1835 Market Street, 4th Floor<br>Philadelphia, PA 19103 | May 23, 2022 | Hand Delivered by Process<br>Server |
| **HYPERALLERGIC<br>MEDIA**<br>181 N. 11th Street, Suite 302<br>Brooklyn, NY 11211 | June 2, 2022 | Hand Delivered by Process<br>Server |

I further certify that the foregoing Amended Complaint is being sent by electronic mail on June 22, 2022 upon the following Defendants, who have acknowledged receipt of the Complaint and retained counsel:

**Morgan Lewis & Bockius LLP**
Michael L. Banks, Esq.
Benjamin K. Jacobs, Esq.
1701 Market Street
Philadelphia, PA  19103
michael.banks@morganlewis.com
benjamin.jacobs@morganlewis.com

*Counsel for the University of Pennsylvania, Amy Guttman, Wendell Pritchett, Kathleen
Morrison, Deborah Thomas, & Christopher Woods*

**LeVan Stapelton Segal Cochran LLC**
Eli Segal, Esq.
One Liberty Place
1650 Market St., Suite 3600
Philadelphia, PA 19103
esegal@levanstapleton.com

*Counsel for the Philadelphia Inquirer, Abdul Aliy Muhammad, & Jenice Armstrong*

**Gordon Rees Scully Mansukhani LLP**
Ronald A. Giller, Esq.
D. Wesley Meehan, Esq.

1717 Arch St., #610
Philadelphia, PA 19103
rgiller@grsm.com
wmeehan@grsm.com

*Counsel for Billy Penn & Maya Kasutto*

**Wilson Elser Moskowitz Edelman & Dicker LLP**
Kathleen D. Wilkinson, Esq.
Alex Hammershaimb, Esq.
Two Commerce Square
2001 Market Street, Suite 3100
Philadelphia, PA 19103
kathleen.wilkinson@wilsonelser.com
e.alexander.hammershaimb@wilsonelser.com

*Counsel for the American Anthropological Association*

**Fox Rothschild LLP**
Michael K. Twersky, Esq.
2000 Market St,, 20th Floor
Philadelphia, PA 19103
mtwersky@foxrothschild.com

*Counsel for Al Dia News & Brittany Valentine*

**Fineman Krekstein & Harris**
Andrew A. Chirls, Esq.
Ten Penn Center
1801 Market Street, Suite 1140
Philadelphia, PA 19103
achirls@finemanlawfirm.com
&
**Davis Wright Tremain LLP**
Jeremy A. Chase
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
jeremychase@dwt.com

*Counsel for NYP Holdings, Inc., d/b/a New York Post, Jackson O'Bryan, Teen Vogue, Ezra Lerner, The New Yorker, Heather Ann Thompson, Slate, Elain Ayers, Guardian Media Group, d/b/a The Guardian, Ed Pilkington, The New York Times Company, Michael Levenson, Daily Mail and General Trust, PLC d/b/a Daily Mail, and Adam Schrader*

**Thomas Paschos & Associates, P.C.**
Thomas Paschos, Esq.
325 Chestnut Street, Suite 800
Philadelphia, PA 19106
tpaschos@paschoslaw.com

*Counsel for Hyperallergic Media, Inc.*

I further certify that the foregoing Amended Complaint is being sent by first-class mail on June 22, 2022 upon the following Defendants, who have acknowledged receipt of the original Complaint but have yet to retain counsel:

**Paul Mitchell**
511 N. Broad St.
Philadelphia, PA 19123

**ESPN, Inc. d/b/a ANDSCAPE**
545 Middle Street
Bristol, CT 06010

I further certify that the foregoing Amended Complaint is being hand delivered by process server upon the following Defendants, who have yet to acknowledge receipt of the original Complaint:

**Nicole Froio & Linn Washington,**
in their individual capacities,
**c/o ESPN, INC.**
545 Middle Street
Bristol, CT 06010

**Kinjal Dave & Jake Nussbaum,**
in their individual capacities,
**c/o HYPERALLERGIC MEDIA**
181 N. 11th Street, Suite 302
Brooklyn, NY 11211

**Nora McGreevy,**
5826 Wayne Ave., Apt. 2
Chicago, IL 60660

I further certify that the foregoing Amended Complaint is being hand delivered by certified mail, return receipt requested upon the following Defendants, who has yet to acknowledge receipt of the original Complaint and only has a PO Box address:

**THE SOCIETY of BLACK ARCHAEOLOGISTS**
PO Box 3771
Santa Monica, CA 90409


/s/ *Alan B. Epstein*
_____



Filed and Attested by the
Office of Judicial Records
22 JUN 2022 01:33 pm
A. STAMATO

# Exhibit "A"

FREE DAILY NEWSLETTER

(https://billypenn.com/newsletter-signup/)
**BILLYPENN** (https://billypenn.com)

MOVE VICTIM REMAINS (HTTPS://BILLYPENN.COM/STORIES/MOVE-VICTIM-REMAINS/)

# Remains of children killed in MOVE bombing sat in a box at Penn Museum for decades

Where are they now, and who is responsible for them? No one seems to know.



Penn Museum at the University of Pennsylvania  EMMA LEE / WHYY

Maya Kassutto
Apr. 21, 2021, 3:30 p.m.

📧 *Love Philly? Sign up for the free Billy Penn email newsletter (https://billypenn.com/newsletter-signup/?utm_source=storyinsert) to get everything you need to know about Philadelphia, every day.*

▶ Listen to the audio version of this story here.

No one seems to be sure what happened to a set of remains thought to be two children killed in the 1985 MOVE bombing.

For decades, the bones were kept at the University of Pennsylvania Museum of Archaeology and Anthropology. A Penn Museum spokesperson said the remains have since been transferred to the care of researchers at Princeton — but an administrator at the New Jersey university was uncertain of their whereabouts. After this story published, a spokesperson said Princeton does not have them.

Case ID: 220401655

The indifferent treatment of the remains is not new. At Penn, according to people with first-hand knowledge, they were not kept in climate-controlled storage. They were kept in a cardboard box on a shelf.

Mike Africa Jr., a current member of the MOVE organization, was shocked and disturbed by the news that his relatives had been denied a resting place.

"They were bombed, and burned alive," Africa Jr. said, "and now you wanna keep their bones."

Princeton Anthropology Department Chair Carolyn Rouse wasn't sure of the remains' current location. Reached by phone, she said they might be in a lab run by Alan Mann, the now-retired professor who had been studying them with Janet Monge, curator of Penn Museum's physical anthropology section.

According to both universities, Mann was given custody of the remains by the Philadelphia Medical Examiner's Office in the 1980s, when he analyzed them at the city's request. At the time, he worked at Penn. When Mann transferred to Princeton in 2001, he reportedly took the bones with him.

"I don't know exactly what's in that room," Rouse said about Mann's Princeton lab, where he collaborated with Monge. "Nobody knows what's in the lab but them."

Rouse lived in Philadelphia when the bombing happened, she added. "I'm very aware of the profoundness of the MOVE thing. But nobody has been asking about the MOVE remains," she said. "There's no conspiracy here. … It's just that this is now just becoming a thing."

Six adults and five children lost their lives during the 1985 attack on the Osage Avenue MOVE compound. Last year, city lawmakers formally apologized for the incident, which shocked the nation when Philadelphia dropped a bomb on its own citizenry (https://billypenn.com/2020/05/11/move-101-why-30-years-ago-philadelphia-dropped-a-bomb-on-itself/), destroying an entire block in the process. None of the officials in charge at the time ended up facing consequences.

As part of its work unpacking what had gone wrong, the MOVE Philadelphia Special Investigation Commission hired a renowned forensic scientist to examine the human remains found in the rubble. Soon after the bombing, he identified some of the bones as being from a 14-year-old victim, known as Tree, and a 12-year-old victim named Delisha. According to documents exchanged by officials at the time, there was some uncertainty about that finding, so the city enlisted Mann to double check.

Mann was assisted by Monge, according to city records, who was a Penn student at the time. Thirty years later, as a Penn Museum curator, she began to reanalyze the remains.

"With new technology available in the museum's lab, Keeper and Associate Curator of the Physical Anthropology Section Dr. Janet Monge led continued investigations to confirm the person's identity from 2016 to 2019," said UPenn spokesperson Jill DiSanto via email. "The remains were returned to the care and stewardship of Dr. Mann at Princeton University."

But Mann received emeritus status from Princeton in 2015, and has not officially worked at the university for years. Monge is no longer affiliated with Princeton, leaving the stewardship of the remains an open question.

Case ID: 220401655

"Based on our initial investigation," wrote spokesperson Michael Hotchkiss, who said this article spurred an immediate search, "we can confirm that no remains of the victims of the MOVE bombing are being housed at Princeton University."

# MOVE remains used in teaching video

Penn Museum said the remains were transferred to Mann's custody by the Medical Examiner's Office "for continued analysis." But James Garrow, spokesperson for the Philadelphia Department of Public Health, emphasized that the city office only releases individuals' remains to their next of kin. In the case that remains go unidentified, he said, they are cremated.

"As a matter of policy, remains would never be released to a third-party without the consent of the next of kin," Garrow added.

Yet Mann and Monge did have possession of the MOVE-connected remains, for decades. During her recent analysis, Monge also apparently used them as teaching materials in a public online forensics course (https://www.coursera.org/lecture/real-bones-forensic-anthropology/forensic-anthropologist-at-work-jane-weiss-os7F1). In the video, Monge and a Penn student prod the bones before the camera like chipper science teachers.

Upon seeing the video for the first time, Africa Jr. was disturbed beyond words.

The MOVE remains aren't the first to incite controversy at the Penn Museum. Last week, following years of persistent protest from the university's student body (https://www.thedp.com/article/2020/06/penn-museum-samuel-morton-collection-repatriation-nagpra-skulls-racist-science) and surrounding community (https://twitter.com/MxAbdulAliy/status/1381803447134081025), the museum released a statement regarding its Morton Collection. Made up of more than 1,000 skulls, the collection was amassed by a 19th century white supremacist researcher who directed workers to pull the bones from unmarked graves.

Calling the possession of the Morton Collection "unethical," the museum and university pledged to repatriate them (https://www.penn.museum/sites/morton/). "It is time for these individuals to be returned to their ancestral communities, wherever possible, as a step toward atonement and repair," UPenn officials said in a statement.

Institutions around the U.S. have begun trying to decolonize their collections (https://www.nytimes.com/2021/03/22/science/dinosaurs-fossils-colonialism.html) over the past year, as curators come to the realization that it's dehumanizing (https://theconversation.com/us-museums-hold-the-remains-of-thousands-of-black-people-156558) to hold remains of Black people and others taken without consent.

"We will be reassessing our practices of collecting, stewarding, displaying, and researching human remains, a direct result of the Morton Committee's recommendations," Penn spokesperson DiSanto told Billy Penn.

Several students and museum employees said they had heard about or seen the MOVE-associated remains at Penn.

"I don't actually know why they were still there," said a former collections assistant in the museum's physical anthropology department. The Penn graduate, who asked to remain anonymous to protect their current job, described "whisper down the lane"-style conversations about the remains. "You don't know if you're getting the exact provenance of any of these things."

## A brave 14-year-old and a clever 12-year-old

Provenance is a word frequently employed in anthropology and archaeology to explain the origin of an item — describing which museum, which dig site, or which archive it came from. For Africa Jr., in this case the matter is a simple one.

"They came from people," he said. "They came from people that came from people."

Africa Jr. was 6 years old when the city bombed the house where his loved ones lived. He lost his family, lost the friends he ate and slept and played with.

He remembered Tree, the 14-year-old, as being sensitive and brave. "When we would be at the park, especially if we went to a new park, she would run, scour the park, for the biggest tree. The biggest tree. So she could climb it. And no one, no one could climb higher than she could. She didn't have any fear about the height. It seemed like the higher she went, the more comfortable she was. She never feared the way up."

Other children in the family would race Tree sometimes, Africa Jr. said, climbing as fast as they could. But there wasn't much of a point. "She'd be at the top looking down at everybody, including her competitors, with a gigantic smile on her face. I beat you again."

When Tree was climbing, 12-year-old Delisha was right on her tail, resourceful and clever. The children of MOVE were kept on a diet of raw foods, and Delisha's claim to fame was pilfering snacks from the adults, or money to buy them with. "She was like the person that you enjoy getting in trouble with," Africa Jr. said. He was always getting caught, he said — not as smart as his playmate. "And Delisha would be looking at me shaking her head. As if to say, you have a lot to learn, grasshopper."

Last November, when local lawmakers issued a formal apology (https://www.inquirer.com/news/philadelphia/move-bombing-apology-philadelphia-walter-wallace-20201112.html) for destroying the compound where these children lived, the resolution read, in part: "The Council of the City of Philadelphia hereby apologizes for the decisions leading to the devastation of May 13, 1985 and acknowledges the fundamental injustice, cruelty, brutality, and inhumanity of the MOVE Bombing."

Council declared that the anniversary of the incident would be recognized as "a day of observation, reflection and recommitment … in the spirit of moving forward, reconciliation, justice, and harmony for all people" in Philadelphia.

Case ID: 220401655

This year, the current members of MOVE are planning to commemorate May 13, Africa Jr. said, with actions and events designed to remind the city that the group is still around and active.



(https://billypenn.com/wp-content/uploads/2019/05/movefamily.jpg)

Members of the MOVE family in the 1980s COURTESY ON A MOVE (HTTP://ONAMOVE.COM/)

# Forensic debates and respect for humanity

Over the decades, some anthropologists at Penn have cast doubt on the idea that the bones in question are indeed the remains of young MOVE bombing victims.

An initial analysis was conducted in 1985 by the city's assistant medical examiner, Robert J. Segal. The Philadelphia Special Investigation Commission also brought in forensic pathologist Ali Hameli, who gained renown (https://www.washingtonpost.com/archive/politics/1985/06/22/experts-say-remains-are-mengeles/05c75ab8-c674-456e-80a6-8cd50dcf25e9/) helping identify the remains of Nazis.

Hameli found that the bodies pulled from in the rubble on Osage Avenue belonged to six adults and five children, the commission's report shows. His detailed analysis of bones and teeth concluded that some were from Delisha Africa, a child around 12 years of age, and others were from Katricia "Tree" Africa, whom he estimated at around 14 when she was killed.

In November of that year, Segal, the medical examiner, asked Penn Museum anthropologist Alan Mann to take another look at the remains. Mann, who worked on the project with then-assistant/now-curator Monge, contested the original findings, suggesting that Tree's remains were from an older person and that Delisha's remains were from a much younger child.

Case ID: 220401655

Hameli unequivocally maintained his original findings were accurate. In a letter to the commission's staff director, Hameli wrote, "Apparently following the commission's hearing, Drs. Segal and Mann reviewed again G and B-1 Bodies and decided to challenge my identification of these two cases." After examining each claim, he asserted, "my initial opinion remains unchanged."

The challenge that the remains are not those of the young MOVE victims surfaces again in the teaching video recorded by curator Monge (https://www.coursera.org/lecture/real-bones-forensic-anthropology/forensic-anthropologist-at-work-jane-weiss-os7F1), which was published on Coursera.

In the video, Monge appears with an undergraduate student, Jane Weiss, to whom she refers as "the person who's looked at [the bones] most carefully." For Weiss' undergraduate senior thesis, she was attempting to determine the age of the remains, a question Monge seems to consider unanswered. As the two prod the bones, they impersonally debate the ages of the people to whom they once belonged. "14 or 16, right?" says Weiss. "More, you know, in the 18-plus kind of a category," Monge suggests.

## What happens with the remains now?

That Penn Museum researchers were treating the bones so casually isn't an anomaly, said a current employee, who spoke on condition of anonymity.

"Human remains are often used as props and curiosities in the physical anthropology section," the museum staffer said. "[T]he ethical and the emotional connections and relations that exist around these remains and their descendent communities are obscured, because everything is viewed as a scientific specimen."

The former collections assistant, described a gulf between Penn Museum's administration and the section that houses the Morton Collection and MOVE remains. "It almost seemed like the museum was ashamed to have the physical anthropology department," they said. "It just kind of felt like people didn't really want to talk about it."

The absence of ethics, void of communication, and abdication of responsibility regarding these remains mirror the circumstances that led to the 1985 disaster. Neither the Medical Examiner's Office, the Penn Museum, or Princeton University claims stewardship of the remains. It seems no one wants these bones except their families, who have been deprived of the right to bury them for over 35 years.

Having spent his life advocating for his parents' release from prison, and now working with MOVE for the release of other incarcerated people of color, Africa seemed unfazed by the prospect of another fight.

He didn't particularly want to talk about the remains of his family members. It's not remembering them that's unpleasant, he said, but seeing them in this context. He said he thinks about Tree and Delisha and the three other children who died every day.

Case ID: 220401655

"You ever have a good day, and then you just want to hold onto that day … but eventually it fades away?" Africa Jr. said. "Well, with them kids it's like, that's how I feel every day. Sometimes a day'll go by, it'll be 11 o'clock at night before I fall asleep, and I'll say to myself, 'Oh I didn't think about 'em.' Then there they are. You know? Every day."

*Updated April 26 to remove a screenshot from the Coursera video because it's unclear exactly which bones were being held at the time.*

*Disclosure, April 26: Writer Maya Kassutto previously worked at Penn Museum. In 2013, she was an intern in the physical anthropology section, where she then worked as an undergraduate assistant. During this time, she interacted with materials in the Morton Collection, helping move them from area to area. In 2016, Kassutto left the physical anthropology section and worked in the museum's educational and programming department until her graduation in 2018.*

*Editor's note, May 2: The disclosure above should have been posted at the time the story was published, not five days later. I am deeply sorry for my oversight, and for the confusion it has caused. I was aware Maya had previously interned and assisted at Penn Museum as soon as I began working with her on the article, but I should have more fully explored her involvement with the institution before publication. The story was rigorously edited and I remain confident the reporting is solid. But I understand that credibility may have been lost because I did not include the disclosure from the start. – Danya Henninger (mailto:danya@billypenn.com)*

Billy Penn is a project of **WHYY (https://whyy.org/)**
Copyright © 2022 Billy Penn (https://whyy.org/)

Case ID: 220401655

# Exhibit "B"

Case ID: 220401655

Q

Q                  NEWS      SPORTS      BUSINESS      OPINION      POLITICS      ENTERTAINMENT

Opinion                                                                                          

# Penn Museum owes reparations for previously holding remains of a MOVE bombing victim | Opinion

Penn has not publicly addressed Philadelphia's Black communities for the holding of remains from someone who died in a state murder.



42 seconds after the drop, the bomb explodes on the roof of the MOVE house followed by secondary explosions and...
William F. Steinmetz / Philadelphia Inquirer

by Abdul-Aliy Muhammad, For The Inquirer
Published Apr 21, 2021

This month, Penn Museum affirmed a commitment to repatriate the remains of Black Philadelphians warehoused in the

ADVERTISEMENT

people and destroyed a city block.

Thirty-six years later, the scars of the West Philly bombing continue to devastate

Philadelphia's Black community. Just as Penn has apologized for its unethical collection of human skulls, the university must also apologize for holding these MOVE remains and agree to make restitution.

In 1985, under the custody of professor Alan Mann, Penn received the remains for examination through the city medical examiner's office.* The MOVE Commission, a group of independent members, was separately appointed by the mayor to investigate the event. Following a dispute over whether specific remains belonged to Tree Africa, who was 14 when killed in the MOVE bombing, Penn kept those remains until 2001 when Mann transferred to Princeton University, taking them with him. In 2016, Penn brought back the remains for a temporary investigation that lasted until 2019, and they were later returned to Princeton, per the museum's account.

In a 2019 Coursera video, presented on Princeton University's online learning platform, curator-in-charge of the physical anthropology section at Penn Museum, Janet Monge, who, in 1985, worked under

Case ID: 220401655

the MOVE bombing — a femur and pelvic bone that were badly burned. This is included in a series entitled "REAL BONES: Adventures in Forensic Anthropology" that addresses MOVE as a case study.

ADVERTISEMENT

FEATURED VIDEOS                    Powered by [*primis*]



» **READ MORE: It's past time for Penn Museum to repatriate the Morton skull collection | Opinion**

Looking back on the history of the MOVE bombing brings a disturbing reality to the fore. On May 13, 1985, after days of prolonged issues and under instructions from Mayor W. Wilson Goode Sr., police shot water cannons and deployed tear gas and 10,000 rounds of ammunition, claiming they were responding to shots from MOVE members. Around 5 p.m., a police helicopter dropped a bomb onto the MOVE property,

Case ID: 220401655

CONTENT

**Explore the cuisines in University City and you'll feel like you're exploring the world**



by SHOP PENN

The state violence against Black Philadelphians represented by the MOVE bombing, which City Council apologized for last November, overlaps with the violence of academic institutions keeping the remains of Black people rather than relinquishing those remains for burial.

Amy Sadao, former director of Penn's Institute of Contemporary Art, said that when she worked at Penn remains of a MOVE bombing victim being housed at the museum was like "an open secret" that troubled some staff. Arielle Julia Brown, the former public programs developer in the then-public programs department at Penn, worked as a cultural planning consultant for the Penn & Slavery Project. Upon hearing of the possession of the remains, Brown said it reflects to her that "Black people [are still] dispossessed of their own material future after death, after wrongful death, after violent death at the hands of white supremacy."

ADVERTISEMENT

In the aftermath of the MOVE bombing, the city showed neglect in assuring proper handling of the remains of the people who were killed. Richard Kent Evans, visiting professor at Haverford, states in his book *MOVE: An American Religion* that "for six months the bodies of the MOVE people … decomposed in a city morgue," instead of being returned to family members for proper burial. Evans also notes that "machine operators crushed bones and mangled skeletons."

Despite touting its work on the Morton Cranial Collection, Penn has not publicly addressed Philadelphia's Black communities for holding remains from a MOVE bombing victim — someone who died in a state murder.

The remains of murdered Black people were mishandled then, but as Penn continues their reckoning with past practices around human remains, there is an opportunity here for them to make amends to West Philadelphia. Although Princeton must also

Case ID: 220401655

Q

Q                    NEWS     SPORTS     BUSINESS     OPINION     POLITICS     ENTERTAINMENT

remains of Black people have been used as instruction when the family had no idea.

In response to learning how long the museum held the remains of a MOVE victim, Mike Africa Jr., the son of Debbie Sims Africa and Michael Africa Sr. of the MOVE 9 (who were incarcerated for the 1978 killing of Officer James Ramp, though Mayor Goode in the documentary *40 Years a Prisoner* stated he believed Ramp died of friendly fire) asked: How "would they feel if somebody got one of their babies and studied it? Think about that for a second — somebody just burned the baby up and now they put it in a drawer." Africa demands that the surviving family members be notified by Penn immediately, that Monge be fired, that Penn makes a public apology for this egregious act, and that there is "some kind of restitution."

If "[t]he Penn Museum and the University of Pennsylvania apologize for the unethical possession of human remains in the Morton Collection," as shared in an April 14 press release, the museum must make a public, specific apology with plans for restitution to the MOVE family for this egregious act.

*Abdul-Aliy Muhammad is an organizer and writer born and raised in West Philadelphia.*
*@MyAbdulAliy*

🔍

🔍        NEWS      SPORTS      BUSINESS      OPINION      POLITICS      ENTERTAINMENT

*examiner's office, not by the MOVE*
*Commission.*

Published April 21, 2021

---

(AM)    Abdul-Aliy Muhammad, For The Inquirer

---

ADVERTISEMENT

**About Us**

About The Inquirer

Advertise

Contact Us

Licensing & Permissions

Photo Reprints

Newspapers in Education

Jobs & Internships

Inquirer Events

Acel Moore Workshops

Newsroom Staff

**News & Info**

News

Sports

Entertainment

Business

Health

Food

Life

Opinion

Archives

Special Reports

**Marketplace**

Inquirer Store

Job Listings

All Classifieds

Death Notices

Legal Notices

Gift Subscriptions

Case ID: 220401655

NEWS     SPORTS     BUSINESS     OPINION     POLITICS     ENTERTAINMENT

Subscriber Services

## Mobile Apps

Apple iOS

Google Android

© 2022 The Philadelphia Inquirer, LLC
Terms of Use / Privacy Policy / Cancellation Policy / California
Notice / California residents do not sell my data request
California residents do not sell my data request



Case ID: 220401655

# Exhibit "C"

Case ID: 220401655

Privacy Policy | Feedback    f Follow 21.6M                    Friday, May 20th 2022 10AM 65°F    1PM 65°F    5-Day Forecast

# Daily **Mail**
.com

ADVERTISEMENT

# 'They are juicy': Princeton professor is slammed for disrespecting the bones of a 14-year-old black girl killed by a bomb dropped by Philadelphia police in 1985 after members of her commune fired at cops

- **Janet Monge, a visiting professor at Princeton University, led a highly-rated free course on forensic anthropology for the prestigious school**
- **In one video lecture, she is seen holding the bones of a child killed during a 1985 police bombing of a black liberation group and calling them 'juicy'**
- **The teen and 10 other people - including five children - died after Philadelphia Police dropped a bomb from a helicopter onto a home being used by the liberation group MOVE**
- **The video lectures for the course were filmed in 2019 and posted onto the learning platform Coursera - but have since sparked outrage from current members of MOVE**

By ADAM SCHRADER FOR DAILYMAIL.COM
**PUBLISHED:** 22:59 EDT, 23 April 2021 | **UPDATED:** 16:52 EDT, 25 April 2021

**140**
shares

**372**
View comments

An Ivy League professor was condemned for using the bones of a black child killed in a 1985 police bombing for an online lecture allegedly without the family's consent.

Janet Monge, a visiting professor at Princeton University, led a highly-rated free course on forensic anthropology for the prestigious school in which she is seen holding the teenage girl's femur and pelvis and calling them 'juicy.'

Case ID: 220401655

The teen, believed to be a 14 year-old girl called Tree Africa, was killed in 1985 in Philadelphia after police dropped a bomb from a helicopter onto a black liberation group called MOVE - killing six members of the group and five of their children.



Her bones were originally found fused inside a pair of jeans, and there is speculation that the remains may also include those of a second child victim of the bombing.

+17
View gallery

**Janet Monge, a visiting professor at Princeton University, led a highly-rated free course on forensic anthropology for the prestigious school**

Case ID: 220401655

**+17**
View gallery

**Monge is seen holding up the bones of a pelvis and femur without her mother's consent**



**+17**
View gallery

**The teen was killed in a 1985 in Philadelphia after police dropped a bomb from a helicopter onto a black liberation group called MOVE, with 10 others dying in the ensuing inferno**

Case ID: 220401655

+17
View gallery

**The bones were transferred back and forth over the years between Princeton and another Ivy League School - the University of Pennsylvania, with surviving members of MOVE outraged by the decision to display them**



+17
View gallery

**Monge is pictured in an earlier lecture from the course, where she spoke about the bombing which killed the girl whose bones were used during a subsequent lecture**

Monge is heard to say of the bones: 'The bones are, I mean, we would say, like, 'juicy. You know, meaning that you can tell that they are of a recently deceased individual.

Case ID: 220401655

Commenting on how they smell, Monge says their scent is 'like just kind of greasy like an older style grease.'

Their use was condemned by MOVE member Michael Africa, who knew Tree, and was six years old when she was killed.

'Nobody said you can do that, holding up their bones for the camera. That's not how we process our dead. This is beyond words,' Michael Africa Jr., a current member of the group, told **The Guardian**.

'The anthropology professor is holding the bones of a 14-year-old girl whose mother is still alive and grieving.'

The video lectures for the course were filmed in 2019 and posted onto the learning platform Coursera - but have since sparked outrage from current members of MOVE.

The bones were transferred back and forth over the years between Princeton and another Ivy League School - the University of Pennsylvania Museum of Archaeology and Anthropology, where Monge is also an adjunct professor.

The course has a rating of 4.8 stars out of 158 ratings made to Coursera and nearly 5,000 students have enrolled in the course.

**SHARE THIS ARTICLE**

**RELATED ARTICLES**

 Family 'responsible for opioid crisis' tried to ERASE the...

 REVEALED: Investigators used DNA taken from an airline...

 Alonzo Brooks' death is ruled a homicide after it was...

Africa Jr. told the local outlet **Billy Penn** that he was outraged that the bones of his relatives have been kept all this time by the university.

'They were bombed, and burned alive and now you wanna keep their bones,' Africa Jr. said.

The bones have never been positively identified but they are believed to belong to either Tree Africa, 14, or 12-year-old Delisha Africa, who are not related.

Everyone who is a member of MOVE, which was formed by a man named John Africa who was born Vincent Leaphart, takes on the last name Africa.

Consuela Dotson Africa, Tree's mother, was serving a 16-year prison sentence when the group was bombed. Delisha's parents, Delbert Africa and Janet Africa, were also in jail at the time.

Neither Consuela or Janet gave permission for the bones of their children to be kept by the university, it is claimed. Neither woman commented on news of the remains being used for a lecture.

Monge's course, provided to Coursera by Princeton, includes several videos which use the 1985 bombing as a case study.

It is not until the course's final video that the professor is seen handling the bones with an undergraduate student.

Case ID: 220401655



+1
View gall

**Philadelphia police carry away a MOVE supporter from the scene of a shootout between police and the radical back-to-na movement**

Case ID: 220401655



**+1**
View gall

**Smoke billows over rowhouses in the West Philadelphia after the police bombed the home of MOVE during a standoff**

Case ID: 220401655



+1
View gall

**Mourners of MOVE members killed in the bombing by the Philadelphia Police stand in front of their former headquarters**

Case ID: 220401655

**+1**
View gall

**The three blocks on either side of Osage Street in Philadelphia are burnt to the ground as a result of a shootout and bombi during a police confrontation with MOVE**

Monge says in the video that 'only a few bones were actually recovered from this individual.'

'We're fortunate in the sense that this one is actually a pelvis and a femur bone. So, there's lots to do in other words with even just those two bones,' she says.

'This is one of these cases where the material has some flesh on it, which I know is not uncommon actually in forensics and forensic anthropology. In this case, there are some soft tissue which is actually remaining and the bones were actually burned as well. So, it's got quite a complicated history.'

Monge then picks up one of the bones and shows the camera how there is tissue still attached to the bone.

'It's not a lot, but absolutely it's there. This is the tendon that goes to rectus femoris that's actually intact and it's there,' she says.

She adds: 'The bones are, I mean, we would say like 'juicy.' You know, meaning that you can tell that they are of a recently deceased individual. They have a lot of sort of sheen to them, at least this one does.'



**+1**
View gall

**Several Philadelphia police officers stroll through the West Philadelphia neighborhood destroyed by the bombing of the MOVE headquarters**

Case ID: 220401655



+1
View gall

**Members of MOVE, founded by John Africa, avoid being arrested as they gather in front of their house in the Powelton Vill section of Philadelphia**

Case ID: 220401655



**+1**
View gall

**Police use extreme force when they attack the MOVE headquarters in the Powelton Village section of Philadelphia**

Case ID: 220401655

+1
View gall

**The police use extreme force when they attack the MOVE headquarters in the Powelton Village section of Philadelphia**

Monge explains that the bones still contain bone marrow in the marrow cavity and that it is 'sort of leaching basically out and into the bone.

'So it gives that kind of slick sort of appearance. If you smell it, it doesn't actually smell bad, but it smells like just kind of greasy like an older style grease,' Monge says.

Monge explains that the bones are 'really very worthy in a study sense' before letting the undergraduate student, Jane Weiss, explain how researchers try to identify the age of the child they belonged to.

Weiss said that the child was 'malnourished' making it difficult for researchers to determine their age.

'It makes it a lot more difficult because they may appear as a younger individual when they're really an older individual,' she says.

Mike Africa Jr. told Billy Penn that he was just six years old when the home was bombed but he remembered Tree 'as being sensitive and brave.'

'When we would be at the park, especially if we went to a new park, she would run, scour the park, for the biggest tree. The biggest tree. So she could climb it. And no one, no one could climb higher than she could,' he said.

'She didn't have any fear about the height. It seemed like the higher she went, the more comfortable she was. She never feared the way up.'

Case ID: 220401655



+1
View gall

**Relatives and supporters of the radical back-to-nature group MOVE conduct an anniversary march through the Osage str
neighborhood, one year after police bombed a MOVE house, destroying 61 homes and killing 11 MOVE members**

Case ID: 220401655



+1
View gall

**An Aerial view of smoke rising from smoldering rubble where some 60 homes were destroyed by fire after a shootout and bombing at the back-to-nature group MOVE**

Case ID: 220401655

**+1**
View gall

**Heavy equipment is seen after Philadelphia police bombed a home in Western Philadelphia**



**+17**
View gallery

Case ID: 220401655

**Workers sort through debris on Osage Avenue in West Philadelphia, May 15, 1985, several days after a blaze destroyed houses in the area**

The revelation regarding the online course came just days before Philadelphia was scheduled to remember the bombing for the first time.

MOVE was founded by John Africa in 1972. Members lived in a communal setting in a townhouse in Western Philadelphia and followed teachings of anarcho-primitivism - shunning industrialization and calling for a return to a hunter-gatherer society.

The group had a strained relationship with the local community and the police before the horrific bombing. In 1977, police were granted a court order that allowed them to order MOVE off the property after neighbors complained.

But the following year, MOVE members had not left the property and got into a shootout with Philadelphia police when they tried to enter the home. A police officer named James J. Ramp was killed during that confrontation.

Nine members, including the parents of the two girls whom the bones are believed to have possibly belonged to, were later charged with third-degree murder for Ramp's death.

Two of nine members died in prison. The other seven were eventually released on parole, the most recent leaving prison in January 2020.

A couple of years after the shootout, the group moved to 6221 Osage Avenue in the Cobbs Creek area of West Philadelphia - where they were later bombed. Neighbors continued to complain about obscene political messages and piles of trash.

In 1985, police obtained warrants to arrest four members of MOVE and charge them with a variety of crimes including parole violations and the illegal possession of firearms. The group was also classified as a terrorist organization by then-Mayor Wilson Goode.

Police evacuated nearby residents and tried to force their way into the home with around 500 officers on May 13 of that year. When MOVE did not leave the property, police threw tear gas canisters at them.

Members of MOVE then fired at officers prompting a 90-minute shootout before the police commissioner ultimately ordered for the home to be bombed. The raging inferno destroyed nearly an entire city block. MOVE founder John Africa Sr was among those who died in the fire.

Monge said that there had been several canisters of gasoline on the roof which acted as an accelerant for the blaze. However, she said the Philadelphia Fire Department decided not to fight the fire.

'The fire burns out of control. The fire actually damages 60 plus houses. It really burns down a city block. And, according to most kinds of tallies approximately 100 houses in that area are actually damaged,' she said.

Academic institutions have long received criticism for the alleged misuse of black remains for scientific and medical research purposes.

The Guardian noted that construction workers in Augusta, Georgia made a grisly discovery of nearly 10,000 individual human bones under the former premises of the Medical College of Georgia in 1989.

The bone fragments had been sold to the school by grave robbers who had taken them from a cemetery for poor black Americans.

**Read more:**
**MOVE bombing: Children's remains kept in box at Penn Museum - On top of Philly news**

Case ID: 220401655

**Share or comment on this article: Outrage after professor displays 'juicy' bones of black child killed in 1985 police bomb at lecture**

**140** shares

It's a forensics class, this is how they speak. Th...
by Lesley Lesley    2806

**They Don't Make Beautiful Games Like This Very Often - Install**
Raid: Shadow Legends | Free Download

**Introducing Car Covers Like We've Never Seen Before (At Great Prices)**
Car Covers | Search Ads

Sponsored Links

**Yale Medical School Employee Admits To Stealing $40M From University**
Moguldom Nation

**Family Thought They Adopted A 'Dog', But When The Vet Sees It He Calls The Police**
Highly-Healthy

Sponsored Lin

**Gwen Stefani's No Makeup Photo: Her Real Face Is Quite Different**
Doctor Report

**Kirstie Alley Is So Skinny Now And Looks Like A Barbie**
Noteabley

Sponsored Links

**He loved her for 50 years and now after he died she discovers this horrible truth**
Soolide

**Philadelphia: Unsold Phones Are Almost Being Given Away**
Cell Phone Deals | Sponsored Searches

Sponsored Links

**Overwater Bungalow Vacations On Clearance**
Vacation Deals | Search Ads

**New Shaftless Stair Lifts Takes Only Hours To Install: See How Much They Cost**

Case ID: 220401655

Stairlift | Sponsored Links

**"Bone-On-Bone" Knee Troubles? You Need To See This!**
AmRelieve

Sponsored Links



**Comments 372**
Share what you think

Add your comment

| Newest | Oldest | Best rated | Worst rated |

View all

The comments below have not been moderated.

Loading...

View all

The views expressed in the contents above are those of our users and do not necessarily reflect the views of MailOnline.

We are no longer accepting comments on this article.

## MOST WATCHED NEWS VIDEOS

Embed this

Moment Cody Ackland enters police station to

Attorney Camille smiles when asked if she's dating

Smiling Coleen and Wayne Rooney leave Royal Courts

Nottingham Forest fans invade pitch to celebrate

Brit is brutally attacked with a dumbbell in gym in Thailand

Ukraine forces appear to use British missiles on Russian

Patel asked if she could live on £1,200 a month at police

Russian soldier pleads guilty in first war crimes trial of

Furious woman smacks groper who strokes her leg in

Brit models rip each other's extensions in heated fight in

## YOU MAY LIKE

Sponsored Links by Taboola

**Introducing Car Covers Like We've Never Seen Before (At Great Prices)**
Car Covers | Search Ads

**Philadelphia: Unsold Phones Are Almost Being Given Away**
Cell Phone Deals | Sponsored Searches

**Use This to Repair Scratches on The Car**
Bestrensing

**New Range Rover SUV Prices**

Case ID: 220401655

Range Rover | Search Ads

Back to top

| Home | U.K. | News | Sports | U.S. Showbiz | Australia | Femail | Health | Science | Money | Video | Travel | Shop | DailyMailTV |

Sitemap | Archive | Video Archive | Topics Index | Mobile Apps | Screensaver | RSS | Text-based site | Reader Prints | Our Papers | Top of page
Daily Mail | Mail on Sunday | This is Money
Metro | Jobsite | Mail Travel | Zoopla.co.uk | Prime Location

Published by Associated Newspapers Ltd
Part of the Daily Mail, The Mail on Sunday & Metro Media Group

dmg media

Contact us    How to complain    Leadership Team    Advertise with us    Contributors    Work with Us    Terms    Do not sell my info    CA Privacy Notice    About MailOnline    Privacy
policy & cookies ▷

Case ID: 220401655

# Exhibit "D"

Case ID: 220401655

Contribute →

News website of the year

**News  Opinion  Sport  Culture  Lifestyle**



**Philadelphia**

🕐 This article is more than **1 year old**

# Bones of Black children killed in police bombing used in Ivy League anthropology course

**Remains of those killed in 1985 Move bombing in Philadelphia serve as 'case study' in Princeton-backed course**

**Ed Pilkington** *in New York*

🐦 **@edpilkington**

Fri 23 Apr 2021 02.00 EDT

Case ID: 220401655

The bones of Black children who died in 1985 after their home was bombed by Philadelphia police in a confrontation with the Black liberation group which was raising them are being used as a "case study" in an online forensic anthropology course presented by an Ivy League professor.

It has emerged that the physical remains of one, or possibly two, of the children who were killed in the aerial bombing of the Move organization in May 1985 have been guarded over the past 36 years in the anthropological collections of the University of Pennsylvania and Princeton.

The institutions have held on to the heavily burned fragments, and since 2019 have been deploying them for teaching purposes without the permission of the deceased's living parents.

To the astonishment and dismay of present-day Move members, some of the bones are being deployed as artifacts in an online course presented in the name of Princeton and hosted by the online study platform Coursera. Real Bones: Adventures in Forensic Anthropology focuses on "lost personhood" - cases where an individual cannot be identified due to the decomposed condition of their remains.

It uses as its main "case study" the events of May 1985, producing as prime evidence a set of bones belonging to a girl in her teens retrieved from the ashes of the Move house at 6221 Osage Avenue in Philadelphia.

**❪❪ The professor is holding the bones of a 14-year-old girl whose mother is still alive and grieving Michael Africa Jr**

The revelation comes just days before Philadelphia stages its first official day of remembrance over the 1985 bombing, following a formal apology issued by the city council last year.

The disclosure, first reported by the local news outlet Billy Penn, also lands in the middle of a fevered debate over academia's handling of African American remains that has been rocket-charged by the nationwide racial reckoning in the wake of George Floyd's murder in Minneapolis last year by a police officer.

On 13 May 1985, Philadelphia police dropped a bomb from a helicopter on to the roof of a communal house occupied by members of Move, an organization that bore comparison to the Black Panthers combined with back-to-nature environmental activism. In the ensuing inferno, the Move house as well as the entire surrounding neighborhood was razed to the ground.

Eleven people linked to the group were killed. Among them were five children, aged seven to 14.

Last year the city apologized formally for the "immeasurable and enduring harm" caused in the bombing, paving the way to this year's inaugural commemoration.


📷 Smoke billows over rowhouses in West Philadelphia after the 1985 bombing. Photograph: Bettmann Archive

The forensic anthropology course in which the bones of a Move child are being used has almost 5,000 enrolled students. It was filmed in February 2019 and is taught by Janet Monge, an adjunct professor in anthropology at the University of Pennsylvania and a visiting professor in the same subject at Princeton.

The Move "case study" is broken up into five online videos, in which Monge relates the history of the 1985 catastrophe. In one video she picks up the bones and holds them up to the camera.

Monge describes the remains in vivid terms. They consist of two bones – a pelvis and femur – that belonged to a small girl probably in her teens that were discovered held together "because they were in a pair of jeans".

The pelvis was cracked "where a beam of the house had actually fallen on this individual". The fragment showed signs of burnt tendons around the hip joint.

Case ID: 220401655

"The bones are juicy, by which I mean you can tell they are the bones of a recently deceased individual," Monge continues. "If you smell it, it doesn't actually smell bad – it smells kind of greasy, like an older-style grease."

The UPenn and Princeton academic does not inform her students that she is displaying the remains without permission of the girl's family. She is, however, open about the tragic nature of the confrontation that led to the child's death in Osage Avenue.

"It was one of the great tragedies, to witness the remains as they were found and moved from this location ... I still feel unsettled by many aspects of it," she says. She also shares with the class that Move continues to exist to this day: "The organization is still active in Philadelphia."

The display of the human remains of a Black girl who would be in her 40s today had she survived the police bombing that took her life is certain to intensify the debate over the way the remains of Black people are handled by academia. The subject has been a talking point for decades, but has intensified in recent months following the mass protests over Floyd's death.

The Move bones have never positively been identified. But given their small size and features, they almost certainly belong to one of the older Move girls who died in the inferno.

The oldest was a 14-year-old called Tree Africa (all members of Move take the last name Africa to denote their collective commitment to Black liberation). Michael Africa Jr, a Move member who was a friend of Tree's and who was six at the time of the bombing, described her as a responsible kid who, as her name suggested, was passionate about climbing trees.

"When we went to a park, the first thing she would do is scout out the biggest tree. She was always the first one up, and she always went the highest," he told the Guardian.

Tree's mother is Consuela Dotson Africa. At the time of the fire she was serving a 16-year prison sentence related to an earlier police confrontation with Move in 1978; she still lives in the Philadelphia area.



📷 Michael Africa Jr in 2018. Photograph: Ed Pilkington/The Guardian

The other possible identification of the bones would be Delisha Africa, who was 12 in 1985. When she died, both her parents – Delbert Africa and Janet Africa – were similarly in prison in relation to the 1978 confrontation.

They were part of the so-called Move 9 who were each sentenced to 30 years to life for the contested shooting of a police officer.

Both Delisha's parents were released from prison after more than 40 years behind bars. Delbert died last June, five months after he was paroled.

Janet was set free in 2019, just three months after Monge recorded her forensic anthropology course using bones that potentially belonged to Janet's daughter. Janet Africa continues to be an active Move member living in Philadelphia.

Neither Janet nor Consuela have commented on the revelation that their daughters' remains are possibly being used to teach online anthropology courses. But it is understood that neither of them gave their consent for them to be used that way.

"Nobody said you can do that, holding up their bones for the camera. That's not how we process our dead. This is beyond words. The anthropology professor is holding the

Case ID: 220401655

bones of a 14-year-old girl whose mother is still alive and grieving," Michael Africa Jr said.

Africa Jr said that the discovery of the online course just days before the inaugural day of remembrance of the 1985 bombing was "such a shame, such a tragedy. After 36 years we find out that not only were these children abused and mistreated and bombed and burned, they haven't even been allowed to rest in peace."

The precise sequence of events relating to the Move bones remains sketchy. For years they sat in a cardboard box at the Penn Museum, part of the University of Pennsylvania where Monge is the leading bones expert.

It transpires that a Penn anthropologist, Alan Mann, acquired the remains after he was asked in the immediate aftermath of the bombing to provide specialist advice to the Philadelphia medical examiner in an attempt to identify the fragments. Mann kept possession of the bones, and in 2001 took them with him when he transferred to Princeton.

**❰❰ What you are seeing here is the scientific manifestation of white privilege Michael Blakey**

The remains appear to have shuttled between the two Ivy League institutions until 2019, when Monge, who had worked closely with Mann over many years, filmed her online course using the pelvis and femur fragments.

Where the bones are now located remains a mystery. The University of Pennsylvania told the Guardian that a set of remains of two bones from one individual, who has never been identified, "have been returned to the custody of Dr Mann at Princeton University".

But Princeton told the Guardian that it had only become aware of the issue this week and insisted it was not in possession of the bones. "We can confirm that no remains of the victims of the Move bombing are being housed at Princeton University," a spokesman said.

Monge did not respond to Guardian inquiries.

The controversy over the Move bones comes just a week after Penn Museum apologized for the "unethical possession of human remains" in its Samuel Morton Cranial collection.

Case ID: 220401655

The collection was compiled in the first half of the 19th century and used by Morton to justify white supremacist theories; it contained the remains of Black Philadelphians as well as 53 crania of enslaved people from Cuba and the US, which will now be repatriated or reburied.



📷 A view of Osage Avenue in Philadelphia after the bombing. Photograph: Bettmann/Bettmann Archive

Anthropologists and historians have become increasingly sensitive to the issues around the handling of remains. Michael Blakey, professor of anthropology at the College of William & Mary, was involved in the first reburial of African American bones from the Smithsonian Institution, which took place a year after the Move bombing, in 1986, and involved the remains of Black Philadelphians.

In the 1990s he directed the development of the African Burial Ground in New York, which was turned into a national monument following the full involvement of the local Black community. "We decided then we would not conduct any research without the permission of the community, and we created the precedent for informed consent involving any skeletal remains," Blakey said.

The Guardian asked Blakey for his reaction to the news that anthropologists were still deploying African American bones in their teaching to this day in the absence of community permission. He replied: "The United States continues to operate on the

basis of white privilege. What you are seeing here is the scientific manifestation of that – the objectification of the 'other', and the disempathy that is socialized in a society in which whites assume that they have control."

The misuse of Black remains for scientific purposes has a long history in America. In 1989, construction workers in Augusta, Georgia, discovered almost 10,000 individual human bones under the former premises of the Medical College of Georgia.

The fragments came from corpses that were sold to the college by grave robbers and taken from Augusta's cemetery for impoverished African Americans. The college used them in medical training and dissections.

Samuel Redman, a historian at the University of Massachusetts Amherst and author of Bone Rooms: From Scientific Racism to Human Prehistory in Museums, said the discovery of the Move bones was all the more disturbing given how recently the deaths occurred.

"There are people alive who are affected by this, not just in an emotional way but in a trauma-inducing way that could be harmful. The notion of 'do no harm' should be part and parcel of our research and teaching – we need to wrestle with this problem much more completely."

---

… we have a small favour to ask. Tens of millions have placed their trust in the Guardian's fearless journalism since we started publishing 200 years ago, turning to us in moments of crisis, uncertainty, solidarity and hope. More than 1.5 million supporters, from 180 countries, now power us financially – keeping us open to all, and fiercely independent.

Unlike many others, the Guardian has no shareholders and no billionaire owner. Just the determination and passion to deliver high-impact global reporting, always free from commercial or political influence. Reporting like this is vital for democracy, for fairness and to demand better from the powerful.

And we provide all this for free, for everyone to read. We do this because we believe in information equality. Greater numbers of people can keep track of the global events shaping our world, understand their impact on people and communities, and become inspired to take meaningful action. Millions can benefit from open access to quality, truthful news, regardless of their ability to pay for it.

If there were ever a time to join us, it is now. Every contribution, however big or small, powers our journalism and sustains our future. **Support the Guardian from as**

Case ID: 220401655

**little as $1 – it only takes a minute. Thank you.**

| Single | Monthly | Annual |
|--------|---------|--------|
| **$7 per month** | **$20 per month** | **Other** |

**Continue** →   ( **Remind me in July** )   *VISA*   *American Express*   *PayPal*

Case ID: 220401655



*Filed and Attested by the
Office of Judicial Records
22 JUN 2022 01:33 pm
A. STAMATO*

# Exhibit "E"

Case ID: 220401655



LOG IN

California woman worked as dental…

Wichita cops identify 'poopetrator'…

Florida man allegedly posed as surgeon,…

Secret Service agents sent home from…

Video shows chase before Florida biker w…

Shoppers at Massachusetts store get into…

GET 30 DAYS FREE

NEWS

# Remains of black teen killed in Philadelphia police bombing used in online class

By Jackson O'Bryan

April 23, 2021   3:30pm

Case ID: 220401655

# NEW YORK POST

LOG IN

| California woman worked as dental... | Wichita cops identify 'poopetrator'... | Florida man allegedly posed as surgeon,... | Secret Service agents sent home from... | Video shows chase before Florida biker w... | Shoppers at Massachusetts store get into... |



Dr. Janet Monge, museum casting project coordinator, loads a cart of cast skulls in preparation for Darwin Day at the University of Pennsylvania Museum of Archaeology and Anthropology in Philadelphia.

AP

**MORE ON:**
*PHILADELPHIA*

**Baked Apple: NYC to see summer-like temps this weekend, forecasters say**
_____

**Philadelphia gas station customer ambushed at the pump in broad daylight**
_____

**Missing Philadelphia man, 25, found dead after being shot, beaten and burned**
_____

**3 dead after collision at Philly train station, one victim left decapitated**


The bones of at least one black teenager killed in the 1985 police bombing in Philadelphia are being used as a "case study" in an online anthropology course — taught by an Ivy League professor who called the remains "juicy."

Case ID: 220401655

**NEW YORK POST**

LOG IN

| California woman worked as dental… | Wichita cops identify 'poopetrator'… | Florida man allegedly posed as surgeon,… | Secret Service agents sent home from… | Video shows chase before Florida biker w… | Shoppers at Massachusetts store get into… |

"The bones are, I mean, we would say, like, 'juicy. You know, meaning that you can tell that they are of a recently deceased individual," Monge says. She describes them as smelling "like just kind of greasy like an older style grease."



Two city blocks of rowhouses are left in ruin following the worst fire in the city's history on May 15, 1985 in West Philadelphia.

AP

The remains have never been formally identified but analysts believe they belong to a small woman between the ages of 17 and 20 — who was one of 11 people killed when Philly police bombed a townhouse during a fight with a black eco-liberation group called MOVE.

# NEW YORK POST

LOG IN

California woman worked as dental…

Wichita cops identify 'poopetrator'…

Florida man allegedly posed as surgeon,…

Secret Service agents sent home from…

Video shows chase before Florida biker w…

Shoppers at Massachusetts store get into…





LOG IN

AP

Authorities at the time were attempting to evict members from the organization's compound, resulting in a blaze that razed an entire neighborhood. Five of the dead were children and teenagers.

Monge's course focuses on "lost personhood" — when an individual cannot be identified through their decomposed remains. The bones of the "contentious individual" from the bombing served as its main "case study."

Monge is also a curator and "keeper" for the University of Pennsylvania's physical anthropology department, which owns the bones.

The course is offered online by Princeton University and is open to anyone for free via the educational video site Coursera.

Critics blasted the nature of the course.

"Nobody said you can do that, holding up their bones for the camera," Michael Africa, Jr., a current MOVE member, told The Guardian. "That's not how we process our dead. This is beyond words."

Case ID: 220401655

# NEW YORK POST

LOG IN

| California woman worked as dental… | Wichita cops identify 'poopetrator'… | Florida man allegedly posed as surgeon,… | Secret Service agents sent home from… | Video shows chase before Florida biker w… | Shoppers at Massachusetts store get into… |



A neighborhood in Philadelphia smolders after police dropped a bomb onto the MOVE compound on May 14, 1985.
AP

The city of Philadelphia has formally apologized for the deadly bombing. A day of remembrance of the bombing is planned for mid-May.

Case ID: 220401655

# NEW YORK POST

LOG IN

California woman worked as dental…

Wichita cops identify 'poopetrator'…

Florida man allegedly posed as surgeon,…

Secret Service agents sent home from…

Video shows chase before Florida biker w…

Shoppers at Massachusetts store get into…

## SPONSORED STORIES



**Do This if You Have Toenail Fungus (Try Tonight)**
Health Tips Journal



**Perfect Shave Without irritation or cuts! The Trimmer Every Man Needs!**
Luoccia



**This "Botox In A Bottle" Sold Out At Target (in 2 days)**
brunchescrunches.com



**One Thing All Cheaters Have In Common, Brace Yourself**
www.peoplewhiz.com



**6 Things Former Presidents Aren't Allowed To Do After Office**
ItsTheVibe



**[Photos] Hairstyles for Women Over 60 to Look Younger**
12Up





Case ID: 220401655



LOG IN

California
woman worked
as dental…

Wichita cops
identify
'poopetrator'…

Florida man
allegedly posed
as surgeon,…

Secret Service
agents sent
home from…

Video shows
chase before
Florida biker w…

Shoppers at
Massachusetts
store get into…





**Doctors Can't Explain Why This Fruit May Cut Your Blood Sugar By 90%**
webhealthwellness.com

**Hilarious Tattoo Fails (These People May Never Be Employed)**
Auto Overload



Recommended   1/5

Florida man 'cooked alive' after being tased by cop at gas station:
lawyer

Read More ›





Case ID: 220401655

# NEW YORK POST

LOG IN

California woman worked as dental…

Wichita cops identify 'poopetrator'…

Florida man allegedly posed as surgeon,…

Secret Service agents sent home from…

Video shows chase before Florida biker w…

Shoppers at Massachusetts store get into…

## Fungus (Try Tonight)
Health Tips Journal

## irritation or cuts! The Trimmer Every Man Needs!
Luoccia

## fathered by dancer named Zelensky: report

---

# AROUND THE WEB



**The Truth About Donald Trump's Son Is Clearly No Secret Anymore**
NickiSwift.com



**Biden's Latest Speech Mix Up Is Raising Some Eye Brows**
NYPost.com



**Heard Flips Script & Reveals Real Reason Depp Won't Look At Her**
TMZ.com



**Amber Heard Called Out In Court For A Serious Wrongdoing**
TMZ.com

Case ID: 220401655

# NEW YORK POST

LOG IN

California woman worked as dental…

Wichita cops identify 'poopetrator'…

Florida man allegedly posed as surgeon,…

Secret Service agents sent home from…

Video shows chase before Florida biker w…

Shoppers at Massachusetts store get into…



**The Tragedy Of Kimberly Guilfoyle**
NickiSwift.com



**What Hell Is Really Like, According To People Who've Been There**
Grunge.com



**Maher Savagely Fires Back At Goldberg As Beef Takes A Big Turn**
Decider.com



**Actors Who Basically Gagged Kissing Their Co-Stars**
Looper.com

Powered by ZergNet

## RECOMMENDED FOR YOU





# *NEW YORK POST*

LOG IN

| California woman worked as dental… | Wichita cops identify 'poopetrator'… | Florida man allegedly posed as surgeon,… | Secret Service agents sent home from… | Video shows chase before Florida biker w… | Shoppers at Massachusetts store get into… |



**Save $90 on two Always Pans in a one-day-only sale from Our Place**

New York Post



**Wild Walmart brawl breaks out after shopper apparently spits on…**

New York Post



**NBA Star Tristan Thompson Sells Los Angeles Home for $7.8 Million**

Mansion Global



**Breaking Down 'Saul': "Axe and Grind" (Season 6, Episode 6)**

Decider

# *NEW YORK POST*

© 2022 NYP Holdings, Inc. All Rights Reserved  | Terms of Use  | Membership Terms  | Privacy Notice  | Your Ad Choices  | Sitemap  | Your California Privacy Rights

Case ID: 220401655



LOG IN

California woman worked as dental…

Wichita cops identify 'poopetrator'…

Florida man allegedly posed as surgeon,…

Secret Service agents sent home from…

Video shows chase before Florida biker w…

Shoppers at Massachusetts store get into…

Case ID: 220401655

# Exhibit "F"

Case ID: 220401655

The New York Times | https://www.nytimes.com/2021/04/24/us/move-rowhouse-bombing-victim-remains.html

# Decades After Police Bombing, Philadelphians 'Sickened' by Handling of Victim's Bones

The disclosure that anthropologists at two Ivy League universities had kept bones from a victim of the 1985 MOVE bombing infuriated its members as well as city leaders.

**By Michael Levenson**
Published April 24, 2021   Updated May 15, 2021

In the early evening of May 13, 1985, the police flew a helicopter over a crowded West Philadelphia neighborhood and dropped a bomb on the rowhouse where members of the communal, anti-government group MOVE lived.

The bomb started a fire, and the police ordered firefighters to let it burn. Eleven people, including five children, were killed, and more than 60 nearby homes were destroyed.

The pain of that day never left for many Philadelphians, a scarring memory of how the police caused a middle-class, mostly Black neighborhood to burn.

This week, the anguish came surging back when officials at two Ivy League universities acknowledged that anthropologists had been passing the bones of a young bombing victim between them for the last 36 years. The bones were also featured in a video for an online course, "Real Bones: Adventures in Forensic Anthropology," taught by a University of Pennsylvania professor and offered by Princeton.

"I was sickened and almost in shock," said Jamie Gauthier, a member of the Philadelphia City Council, which apologized for the bombing last year. "It's just an unbelievable amount of disrespect for Black life and an unbelievable amount of disrespect for a child who suffered trauma, a child who was killed by her own government."

Mike Africa Jr., an activist, writer and member of MOVE who was 6 when the bomb was dropped, said he and others in the group did not know the bones — parts of a burned femur and a pelvis — had been used in the video and kept for decades by anthropologists.

He said he learned about the bones only days ago from an activist, Abdul-Aliy Muhammad, who wrote an opinion piece published on Wednesday by The Philadelphia Inquirer calling for the bones to be returned to MOVE. The same day, the news site Billy Penn reported that the remains had been kept in a cardboard box on a shelf.

"Anger, fury, disappointment, sadness," Mr. Africa said, describing his reaction. "It's like this never ends and no matter how much time passes, and you hope that things can get to a place where you can begin to heal some, it's right back up in your face. I haven't cried this many consecutive days since 1985."

The bombing has for decades been held up as an example of the city's mistreatment of Black people. In 1988, a grand jury cleared officials of criminal liability for the death and destruction resulting from the bombing.

"It remains a festering injustice because there was no accountability for those who dropped the bomb," said Linn Washington, a journalism professor at Temple University who covered the bombing as a reporter.



The director of the Penn Museum said he learned about the bombing victim's bones in the aftermath of another controversy about hundreds of skulls, including some of enslaved people.  Matt Rourke/Associated Press

Case ID: 220401655

Christopher Woods, the director of the Penn Museum, said that museum workers knew for years that the bones of a MOVE bombing victim had been kept there. Those people told him about the bones last Friday, he said, in the context of another controversy involving different bones at the museum.

This month, the museum and the University of Pennsylvania apologized for the decadeslong possession of hundreds of skulls, including those of enslaved people, that had been collected by a 19th-century physician whose research was used to justify white supremacist views.

The museum said it would repatriate the skulls whenever possible.

The bones of the bombing victim had been repeatedly analyzed over the years in an effort to positively identify the person they belonged to, Dr. Woods said.

"I would apologize for any trauma this has reintroduced," Dr. Woods said. "That certainly wasn't our intention. Our intention was to help solve this case and restore the personhood and identity and dignity of this individual."

Some MOVE members and city leaders said the bones of the bombing victim should have been returned years ago. Professor Washington said Penn should offer a "profuse apology" and compensation.

"This was a homicidal act and now this homicidal act has been compounded by the behavior at Penn," Professor Washington said. "I saw this as a repeat of colonialism, where people's lives were misappropriated."

Two anthropologists who analyzed the bones — Alan Mann, now a professor emeritus at Princeton, and Janet Monge, the curator-in-charge of the Penn Museum's Physical Anthropology Section — were not able to positively identify the victim, according to the museum.

The bones, according to the museum and Princeton, are currently in Dr. Mann's possession. Dr. Woods said the museum returned the bones to him on Sunday because the Philadelphia Medical Examiner's Office had originally given them to him for forensic analysis in 1985.

Dr. Mann and Dr. Monge did not respond to messages this week.

Dr. Woods, who became director of the Penn Museum on April 1, said he hopes the bones can be returned to MOVE. "We are working on it now," he said. "It's a complex issue. We all want to do the right thing."

According to the museum, Dr. Mann was originally acting as an "independent forensic anthropologist," when he received the bones in 1985. At the time, he was also a professor at the University of Pennsylvania.

After the medical examiner failed to make a positive identification, the office gave the bones to Dr. Mann in the hopes that he could eventually link them to a victim, the museum said. In 2001, when Dr. Mann became a professor at Princeton, the bones were moved there, the museum said.

In 2016, a year after Dr. Mann retired from Princeton, the remains returned to the Penn Museum for testing with new technology by Dr. Monge. She was unable to make a positive identification, the museum said.

Dr. Monge also used the bones in a video for the online forensics course offered by Princeton. In the video, she describes the history of the bombing and signs of damage on the bones, and a student says she concluded that the bones belonged to a preteen or teenage girl.

Princeton said in a statement on Friday that "out of respect for the victims of the MOVE bombing and their families we have suspended the online course."

The university said, "We have no reason to believe that anything improper is currently taking place at Princeton." It added, "We are reviewing our protocols and policies for the handling of any human remains in teaching and research to ensure they are consistent with the highest professional practice and ethical standards."

A spokeswoman for Jim Kenney, the mayor of Philadelphia, said he was recently made aware of the "unfortunate situation" involving the bones. "He is extremely disturbed by the mishandling of the victims' remains," said the spokeswoman, Deana Gamble.

She said "any future placement of these remains should be determined in concert with the victims' families."

The bones, Mr. Africa said, may belong to Delisha Africa or Tree Africa, who were 12 and 14 when they were killed, according to city officials. He said that Delisha taught him how to be mischievous and to get away with it. And Tree, he said, loved climbing trees.

"I knew those kids," Mr. Africa said. "They're not an imagination or a hallucination. There are memories."

Case ID: 220401655

# Exhibit "G"

Case ID: 220401655

SUBSCRIBE

SMART NEWS

# Museum Kept Bones of Black Children Killed in 1985 Police Bombing in Storage for Decades

Outrage erupted over the revelation that the likely remains of two young victims were held in and studied at Ivy League institutions

**Nora McGreevy**

Daily Correspondent

**April 26, 2021**

Case ID: 220401655



Following a 1985 police bombing that left 11 dead, mourners stand in front of MOVE's former headquarters, raising their arms in the Black Power salute as the funeral procession for leader John Africa passes. Bettmann / Contributor / Getty Images



Case ID: 220401655

SUBSCRIBE

Report ad

including MOVE's founder, John Africa, and five children: 12-year-old Netta Africa, 14-year-old ... 2-year-old Delisha Africa and 9-year-old Tomaso Africa. (All MOVE members take the surname .) A fire sparked by the bomb destroyed 61 homes—an entire block—and left more than 250 ... reported for *Vox* in 2019.

... nate in the West Philadelphia community. Last week, renewed controversy over the bombing ... *y Penn* reported that officials had never returned a set of remains thought to belong to two of ... eir families.

Report ad

Authorities who retrieved the bones—including a pelvic bone and part of a femur—from the rubble of Osage Avenue turned them over to Alan Mann, then an anthropologist at the University of Pennsylvania, for forensic analysis. Despite decades of study, the remains were never conclusively identified. They may belong to just one of the girls or both, per Ed Pilkington of the *Guardian*. (As *Billy Penn* reports, some scholars have also argued that the bones belong to older victims of the bombing.)

When Mann joined Princeton University's faculty in 2001, he took the remains with him to New Jersey. After *Billy Penn*'s report was published last Wednesday, a Penn Museum spokesperson told Craig R. McCoy of the *Philadelphia Inquirer* that the remains were later shuttled back to the museum, where they were kept for the past five years. The museum reportedly returned the bones to Mann on April 17.

SUBSCRIBE

reports, the badly burned remains were not stored in a climate-controlled state, but rather kept in a cardboard box on a shelf.



e University of Pennsylvania, as pictured in 2012 Public domain via Wikimedia Commons

have been used as a "case study" in an online course presented by Princeton University and es: Adventures in Forensic Anthropology," the class was recorded in 2019 and includes footage of Janet Monge, an adjunct professor in anthropology at the University of Pennsylvania and former student of Mann, picking up the bones and describing them in graphic detail. She makes no reference to the fact that the families of probable victims Tree and Delisha never provided consent for their daughters' bones to be used in this way, the *Guardian* notes.

The same day that *Billy Penn* published its report, organizer Abdul-Aliy Muhammad published an op-ed in the *Inquirer* calling on the Penn Museum and Princeton to offer reparations for their unethical possession and use of the children's remains.

"People should not have to fight to discover that remains of Black people have been used as instruction when the family had no idea," Muhammad writes.

MOVE remains active in Philadelphia today, according to West Philadelphia Collaborative History. Member Mike Africa Jr., who was six at the time of the bombing, expressed shock and dismay at the revelations in an interview with *Billy Penn*.

Report ad

SUBSCRIBE

"They were bombed, and burned alive," Africa Jr. said, "and now you wanna keep their bones."

As Muhammad notes in their op-ed, the Penn Museum recently affirmed a commitment to repatriate and rebury its Morton Cranial Collection, an unethically acquired archive of human skulls that was employed by generations of white supremacists in support of pseudo-scientific racist ideas. This collection includes the remains of Black Philadelphians, per a museum statement.

"Just as Penn has apologized for its unethical collection of human skulls, the university must also apologize for holding these MOVE remains and agree to make restitution," writes Muhammad.

News of the controversy over the MOVE victims' remains broke just days before the city of Philadelphia is slated to honor the 36th anniversary of the event, notes the *Inquirer*. Last November, the Philadelphia City Council formally apologized for the bombing, as Daryl Bell reported for the *Philadelphia Tribune* at the time.

**Nora McGreevy**



**READ MORE**

Nora McGreevy is a daily correspondent for *Smithsonian*. She is also a freelance journalist based in Chicago whose work has appeared in *Wired*, *Washingtonian*, the *Boston Globe*, *South Bend Tribune*, the *New York Times* and more. She can be reached through her website, noramcgreevy.com.

ACTIVISM       AFRICAN AMERICAN HISTORY       AMERICAN HISTORY       BONES       DEATH       MUSEUMS       PROTEST

REPATRIATION

## RECOMMENDED VIDEOS

### How to Grill Caveman T-bone Steaks

In a clip from his PBS show Primal Grill, Steve Raichlen cooks T-bone steaks by placing them directly on the charcoal to delicious effect

Case ID: 220401655

SUBSCRIBE

**POST A COMMENT**

Report ad

## **MOST POPULAR**

1.  The Deadliest Disaster at Sea Killed Thousands, Yet Its Story Is Little-Known. Why?

2.  Danish Biologists Cultivate Morel Mushrooms Year-Round With New Indoor Technique

3.  Amateur Archaeologist Stumbles Onto Trove of Coins Dated to Constantine the Great's Reign

4.  This Teenager Found a Way to Control Mosquitoes Using Essential Oils and Baker's Yeast

5.  What Really Happened to Michael Rockefeller

Case ID: 220401655

SUBSCRIBE

**EXPLORE**

Smart News
History
Science
Innovation
Arts & Culture
Travel
At The Smithsonian
Photos
Video
Games

**OUR PARTNERS**

Smithsonian Institution
Smithsonian.com
Smithsonian Store
Smithsonian Journeys
Smithsonian Channel
Smithsonian Books

**SUBSCRIBE**

Subscribe
Give a gift
Renew

**NEWSLETTERS**

Sign Up

**TERMS OF USE**

About Smithsonian
Contact Us
Advertising
RSS
Member Services
Sustainability
Terms of Use
Privacy Statement
Cookie Policy
Advertising Notice

© 2022 Smithsonian Magazine
Privacy Statement
Cookie Policy
Terms of Use
Advertising Notice
Manage My Data
Cookie Settings

Case ID: 220401655

# Exhibit "H"

Case ID: 220401655



**MORE POWER TO THE EYE**

HISTORY

# The Grim Open Secret of College Bone Collections

How did the remains of Black children killed by police end up in a Princeton course?

BY ELAINE AYERS

APRIL 30, 2021 • 2:25 PM



Supporters of MOVE conduct an anniversary march through the Osage Street neighborhood in Philadelphia on May 13, 1986, one year to the day after police bombed a MOVE house, destroying 61 homes and killing 11 MOVE members.  Bettmann via Getty Times

In a 2019 video tutorial produced by Princeton, students watched the smiling white anthropologist Janet Monge and a University of Pennsylvania undergraduate hold a human pelvic bone and a femur up to the camera as rows of human skulls, backlit and neatly lined up in wooden cabinets, rested behind them. The bones the two held, transferred between universities over decades, likely belong to Delisha Africa and Katricia "Tree" Africa, two Black children killed in the 1985 MOVE bombing, in which the city of Philadelphia dropped a

Case ID: 220401655

satchel bomb on a row house occupied by the Black liberation group after a police standoff. Released soon after the bombing to a professor at the University of Pennsylvania for forensic study, the remains will finally be collected from that professor's home on Friday. How they ended up there, and where they've been in between, is something the institutions involved have struggled to explain.

The potential source of the remains and their place in the online course were brought to light last week by reports in Philadelphia news outlets Billy Penn and the Inquirer. The subsequent uproar has rocked the University of Pennsylvania and Princeton. But while the revelation was a shock to the public, to many in the anthropology world, it was no surprise at all. Museums and universities' brutal habit of collecting human remains without family consent, proper identification, or public knowledge is far from a relic of the 19th century.

↘ **Subscribe to the Slatest Newsletter**
A daily email update of the stories you need to read right now.

Email address:

☐ Send me updates about Slate special offers.

By signing up, you agree to our Privacy Policy and Terms.

Sign Up

The University of Pennsylvania Museum of Archaeology and Anthropology (or the Penn Museum for short) itself is home to more than 1,000 skulls and other body parts collected over more than a century and held within its controversial Samuel G. Morton Cranial Collection. The museum had already committed to repatriating skulls after decades of protests from the surrounding community and reports by commissions and university committees. From the 1830s to 1840s, Morton, a physician and anatomist often referred to as the founder of the "American school of ethnology," collected the skulls from around the world, compiling his craniometric research into a racial hierarchy that argued for "polygenism"—the idea that different races constituted different species and had different origins. His work was often used to justify slavery and racial subjugation.

Of the more than half-million recorded human remains held in collections across the United States, tens of thousands of them are at universities, and not all were collected in what some consider the "bad old days" of the 19th century. Earlier this year, Harvard announced it would convene a committee to investigate the history of more than 22,000 human remains distributed across its museums to assess future ethical stewardship. (Still, the university

Case ID: 220401655

continues to fight some claims on its collection, including from descendants of enslaved people.) Yale's Cushing Center holds more recent remains, including more than 2,000 human brains collected by neurosurgeon Harvey Cushing through the 1930s, many of them taken from his former patients, some of whose families actively denied consent for autopsies and dissection. Other universities seem to have little idea of the scope or scale of their human collections, often scattered across anthropology labs and in storage rooms of medical schools rather than in temperature-controlled museum cabinets.

While this recently uncovered case is not unique, it is instructive. At 5:30 a.m. on May 13, 1985, 500 members of the Philadelphia Police Department descended on MOVE's row house after long-standing tensions with the Black liberation group. After a standoff in the early hours of the morning, police officers fired more than 10,000 rounds of bullets and tear gas canisters into the house, trapping seven adults and six children inside. Twelve hours later, police dropped two bombs on the house, and the Philadelphia Fire Department let the ensuing fire burn. By the end of the night, more than 60 homes in the predominantly Black West Philadelphia neighborhood burned to the ground, and all but two people there— including five children—died. In November of last year, the mayor finally issued a formal apology for the violent attack against the city's citizens, although family members and local residents had been awarded millions in damages soon after the bombing.

Here's what we know about what happened to the remains of the victims of the bombing, from May 1985 to the present. Soon after the bombing, the remains were sent to the Philadelphia medical examiner to be analyzed by the MOVE Special Investigation Commission, appointed by then-Mayor W. Wilson Goode in response to outcry from across the city. While forensic anthropologist Ali Hameli, who was Delaware's chief medical examiner and was acting as the MOVE commission's pathologist, identified the pelvic bone and femur fragment as belonging to Delisha and Tree Africa, Penn professor Alan Mann was called in to consult on the case. Assisted by then–graduate student Janet Monge, Mann, who initially disagreed with Hameli's identification, took custody of the remains— despite legal strictures requiring consent from next of kin—moving them in a cardboard box to Penn and then to his new job in the anthropology department at Princeton in 2001.

Ten years later, promoted to keeper and associate curator of physical anthropology at the Penn Museum, Monge reexamined the bone fragments, further questioning the victims' identities based on discrepancies in age. Monge later used the remains as pedagogical tools in her since-suspended 2019 online Coursera class at Princeton, which reached more than 5,000 viewers. In the video, Monge disagrees with the undergraduate student about the identities of the people whose remains she's handling. Monge titled sections of her hands-on tutorial "Losing Personhood" and "Restoring Personhood." At some point in the last two

Case ID: 220401655

years, the New York Times reported, the remains were returned to Mann, now an emeritus professor at Penn and Princeton, who has since been unavailable for comment.

While some anthropologists, including Princeton's Carolyn Rouse, have argued that physical and forensic anthropology simply cannot be taught without the use of human remains, questions of *where* and *how* those remains have been obtained, and whether their use in research includes consent from families, have often been given little consideration—and have even provoked outright hostility and racism. At the very least, the physical anthropology departments like the ones that employ Mann and Monge exist today as uneasy reminders of many museums' and universities' racist and colonial foundations. While institutions are quick to dismiss such racist collecting practices as an unfortunate inherited legacy of 19th century colonialism, human bodies were collected well into the 20th century, often under dubious circumstances. Samuel Redman, a historian and author of *Bone Rooms: From Scientific Racism to Human Prehistory in Museums*, told me in an interview that he was shocked by "the fact that *so many* individuals were inspired by earlier 19th century collectors and continued to gather bodies well into the 20th century." Museums with reputations for holding remains became repositories for missionaries, army medical officers, and other amateur bone collectors, who sometimes gathered remains tilled up during farming or construction projects.

Despite physical anthropologists' attempts at distancing themselves from their 19th century forebears like Samuel Morton by emphasizing their finds' archaeological value, Redman found, 20th century museums still functioned—and continue to function—as sites where human remains are transformed into "specimens" by elite academics. This situation persists even as institutions increasingly turn, at least in their public-facing comments, toward claims that they're examining their legacies through repatriation of remains. While such recently collected bodies as the MOVE bombing remains are somewhat unusual within museum collections, in 2004, allegations emerged that the wildly popular traveling Body Worlds exhibition, which reached nearly 14 million viewers, contained several corpses of people in Chinese prison camps who had died in 2001. The bodies were returned to China for burial.

In the Princeton video, Monge says, when asked how she knows that the remains "are the bones of a recently deceased individual," that "the bones are juicy" and that they "smell kind of greasy," comments that have drawn particular disgust. Ezelle Sanford III, a historian of medicine and postdoctoral fellow in the Penn Program on Race, Science and Society, which deals directly with the university's legacy of scientific racism on campus, called Monge's words just "the most recent example of an ongoing legacy of Black people's bodies used for academic research and pedagogy." Sanford studies centuries of scientific racism within

Case ID: 220401655

elite institutions, from J. Marion Sims' gynecological experiments on enslaved women in the 19th century to the harvesting of Henrietta Lacks' cervical cells at Johns Hopkins University in 1951 and Penn professor Albert Kligman's use of imprisoned men at Philadelphia's Holmesburg Prison for dermatological research from the 1950s to the 1970s. He argues that Black and disabled people continue to be made into specimens and robbed of individual identities.

Although tracing human remains can be a difficult process—a direct result of the lack of humanity assigned to people deemed "specimens" by white collectors over centuries— some museums have successfully identified and repatriated bodies, allowing for their respectful reburial by ancestors or descendant communities. There is recent precedent for this. The 1990 Native American Graves Protection and Repatriation Act led to the reburial of thousands of Indigenous remains and burial objects across North America, many of them dug up and stolen during the 19th and early 20th centuries. In 2003, for instance, Chicago's Field Museum repatriated 150 remains of Haida Gwaii ancestors stolen from burial sites in British Columbia's Queen Charlotte Islands. This action launched further legal battles for the Haida, who sought to repatriate and rebury hundreds more remains from museums like the American Museum of Natural History and the Smithsonian. Their fight is not over.

Focused on Indigenous Americans, NAGPRA does not govern the repatriation of the thousands of Black remains held by museums and universities across the United States, nor does it cover the remains of disabled, poor, or "criminal" remains collected by physicians, anthropologists, and other scientists throughout the 20th century. Some institutions, like the controversial Mütter Museum, located just across the Schuylkill River from the Penn Museum, have been hesitant to entertain calls for repatriation, claiming that their collections are necessary for ongoing scientific research, even while profiting from their sensational display. Even more disturbingly, outside of the institutional world of museums, skulls and other human remains are still sold in private auctions, often lacking provenance information, turned into unnamed commodities for individual purchase.

The human remains held in a cardboard box for decades, though, belonged to individuals with families, friends, and surviving loved ones. Speaking to the New York Times, activist and MOVE member Mike Africa Jr., who was 6 years old at the time of the bombing and remembers Delisha and Tree, expressed feelings of "anger, fury, disappointment, sadness" about the nonconsensual use of what may be his friends' body parts in a video that circulated to over 5,000 students online. "It's like this never ends and no matter how much time passes, and you hope that things can get to a place where you can begin to heal some," he said, "it's right back up in your face."

MOVE has issued a series of demands. Following protests at Princeton and the Penn Museum, both universities have apologized for the mishandling of the girls' remains and committed to launching investigations into how the bones were violated and lost. Princeton's anthropology department went further, acknowledging its explicitly racist history and ties to slavery and eugenics. Monge's Coursera class has been suspended, although it has been archived, and those registered for the course can still stream it. ◾

# SLATEGROUP

Slate is published by The Slate Group, a Graham Holdings Company.

All contents © 2022 The Slate Group LLC. All rights reserved.

Case ID: 220401655

# Exhibit "I"

Case ID: 220401655



ENG  ESP

THE BEST OF THE AMERICAN **MULTICULTURAL** EXPERIENCE

WATCH LIVE

Home    Politics    Policy    **There will be no justice**



Members of MOVE revolutionary group in front of their house in the Powelton Village neighborhood of Philadelphia in 1978. Photo: Leif Scoogfors/Getty Images

# There will be no

Case ID: 220401655



ENG  ESP

THE BEST OF THE AMERICAN **MULTICULTURAL** EXPERIENCE

# and Princeton's treatment of MOVE victims' remains

**Bombshell reports revealed the universities shuttled the remains back and forth, and used them in educational settings without ever contacting next of kin.**



By   Brittany Valentine
May 03, 2021

**SHARE THIS CONTENT:**

On Monday, April 26, members of the Black revolutionary group MOVE learned through reports from the *Philadelphia Inquirer* and *Billy Penn* that the Penn Museum had housed the remains of Delicia Phillips Africa, and Katricia "Tree" Dotson, 14, for years following the bombing on Osage Avenue.

In May 1985, following a violent confrontation between law enforcement and members of the group, the city of Philadelphia dropped a satchel bomb laced with Tovex and C-4 explosives on the MOVE organization, who were residing in a West Philadelphia row home.

Case ID: 220401655



THE BEST OF THE AMERICAN MULTICULTURAL EXPERIENCE

prisoner who was convicted of killing a Philadelphia police officer in 1981.

Consuewella Dotson Africa, the mother of Tree and Zennet Africa, who both perished in the bombing, said: "They can't give us our children. Our children are gone."

The Penn Museum did issue an apology to the Africa family, for "allowing human remains recovered from the MOVE house to be used for research and teaching, and for retaining the remains for far too long."

Both the University of Pennsylvania and Penn Museum are working on returning the remains, and the university has hired attorneys to investigate how and why the remains came into the museum's possession and what happened to them.

The organization rejected this apology during a news conference at the group's office in West Philadelphia, saying that the words, which are 36 years late, are meaningless and come from

an institution that has proven themselves to be untrustworthy.

Following the 1985 bombing, the city's medical examiner's officer supposedly transferred the remains to Penn Museum for additional forensic analysis after an initial investigation.

This analysis was conducted by a former University of Pennsylvania professor, Alan Mann, who disputed the city's original findings that some of the remains were linked to Tree and Delisha.

The museum held the remains for years until 2001 when Mann transferred them to Princeton University and allegedly took the bones with him. The bones were then used for instructional videos offered online by Princeton, and then they were returned to Penn in 2016 for more analysis.

Under the city's current policy, remains are to be directed to the next-of-kin, and unclaimed



THE BEST OF THE AMERICAN MULTICULTURAL EXPERIENCE

universities put the remains on display for instructional purposes and treated them like they were "some type of ride in a park."

Africa is enraged that not only did the universities take and defile the remains of her family and friends, but they also lied about it.

"They denied us the right of putting our family where they're supposed to be when they move on to the next level," she said at the press conference.

On the evening of Wednesday, April 28, more than 100 MOVE members and their allies gathered on Penn Museum at 33rd and Spruce Streets, making their demands clear.

They called for the immediate return of the remains of Delisha and Tree Africa, a full investigation into the two university's role in the unethical possession of the remains, the firing of Penn faculty member and curator Janet Monge, a formal apology from both universities and reparations for this inhumanity.

"They've been doing this to our Black bodies for hundreds of years, in the name of science, in the name of study," YahNé Ndgo, writer, singer and active member of Black Lives Matter Philly was quoted as saying by *The Philadelphia Tribune*.

The museum claims that Mann was tasked with confirming the identities, but James Garrow, communications director of the Philadelphia Department of Public Health, told the *Tribune* that it goes directly against policy.

"Remains would never be released to a third party without the consent of the next of kin," he said.

## RELATED CONTENT ───────────────

### Penn Museum names its first chief diversity officer

March 17th, 2022

### Meet the nominees for Philly's new Police Oversight Commission

February 10th, 2022

### Students in Minnesota walkout over the police killing of Amir Locke

February 9th, 2022

Case ID: 220401655



THE BEST OF THE AMERICAN MULTICULTURAL EXPERIENCE

Penn and Princeton University laboratories.

A course Monge taught during which she was meant to use the remains, has since been suspended.

During Wednesday's protest, Africa echoed Ndgo's statement, saying: "This system has consistently been killing our children for years.

"In the womb, outside and womb and as young children," she continued.

Africa detailed several instances where the children were not present in the Osage Avenue home on a regular basis and condemned the way city officials attacked the house with the bomb only after the children had returned from shopping on May 13, 1985.

City Councilmember Jamie Gauthier reacted similarly to the universities' actions, saying that the use of these bones to further research for their own gains dehumanizes the victims.

A Philadelphia funeral home picked up the remains of Delisha Africa and Tree Africa from the home of Alan Mann on Friday, April 30.

Gregory Burrell, President and CEO of Terry Funeral Home, told the Tribune that Penn Museum director Chris Woods contacted him earlier in the week to begin the process.

"We got that permission [to transfer the bones] Thursday, so we're picking up the bones Friday morning at Alan Mann's house. The bones will then be housed at Terry Funeral Home until further notice," Burrell said.

Editor's Note: After review, parts of this article have been amended to be more in line with AL DÍA's editorial standards.

**TAGS**

move / penn museum / black lives matter

---

**LEAVE A COMMENT:**



ENG ESP

THE BEST OF THE AMERICAN MULTICULTURAL EXPERIENCE

## MORE IN THIS SECTION



**LATINO EXECUTIVE'S SUCCESS**

May 20th, 2022



**HACU'S NATIONAL CONFERENCE**

May 20th, 2022



**ROMERO'S STRONG BACKING**

May 20th, 2022



**GROWING UP WITH GUN VIOLENCE**

May 20th, 2022



**FLAMENCO TAKES BARCELONA**

May 20th, 2022

Case ID: 220401655



**ENG  ESP**

THE BEST OF THE AMERICAN **MULTICULTURAL** EXPERIENCE



**"THE LINCOLN LAWYER"**

May 20th, 2022



**MERIDIAN BROTHERS PURE SALSA**

May 20th, 2022



**DIEGO LUNA IN STAR WARS**

May 20th, 2022

Case ID: 220401655



ENG  ESP

THE BEST OF THE AMERICAN **MULTICULTURAL** EXPERIENCE

Case ID: 220401655

# Exhibit "J"

Case ID: 220401655

COMMENTARY

# The scandal over the MOVE bombing victims' remains is part of anthropology's racist history

*To understand how this happened, we must grapple with who has been experimented on*



Members of MOVE, which was founded by John Africa, avoid being arrested as they gather in front of their house in the Powelton Village section of Philadelphia in 1978.   Leif Skoogfors/CORBIS

By Nicole Froio      @NicoleFroio

May 7, 2021

Thirty-six years after the MOVE bombings in West Philadelphia, a video on Princeton University's online learning platform surfaced in April showing Janet Monge, a curator at the University of

Case ID: 220401655

Pennsylvania Museum of Archaeology and Anthropology, handling the remains of two victims, Tree Africa and Delisha Africa, to teach students about forensic anthropology.

The MOVE family, which was founded in 1972 by John Africa, believed they had buried Tree and Delisha in 1985, but their remains were reportedly brought to the Penn Museum, and later to Princeton, by Alan Mann, now a retired professor in anthropology at both universities. As part of an investigation into the bombing, the Philadelphia Medical Examiner's Office had asked Mann to confirm the identity of the remains. It appears they were stored at Penn Museum for decades afterward.

The MOVE families were not informed of any of these decisions. Speaking to Philadelphia news site Billy Penn (https://billypenn.com/2021/04/21/move-bombing-penn-museum-bones-remains-princeton-africa/) , Princeton anthropology department chair Carolyn Rouse said she hadn't known of the bones' whereabouts but there wasn't any malicious intent in the mishandling of the bones. "I'm very aware of the profoundness of the MOVE thing. But nobody has been asking about the MOVE remains," she said. "There's no conspiracy here. It's just that this is now just becoming a thing."

It's not now becoming a thing. It's right in line with the systematic desecration of African human remains in the discipline of anthropology. Cultural anthropologist Talal Asad pointed out in a 1991 essay that anthropology was invented as a response to colonialism (https://instruct.uwo.ca/anthro/301/asad.htm#:~:text=The%20story%20reco unts%20how%20they,to%20reinvent%20their%20disrupted%20lives) , with the main goal of classifying "non-European humanity in ways that would be consistent with Europe's story of triumph as 'progress.' " Though both Princeton and Penn Museum have apologized for the mishandling of the remains, it is an undeniable fact that the field of anthropology has terrorized colonial subjects and their descendants for centuries.

Case ID: 220401655

In an essay in March for The Conversation (https://theconversation.com/us-museums-hold-the-remains-of-thousands-of-black-people-156558) , anthropologists Delande Justinvil and Chip Colwell point out that the collection of remains of Black people for "educational purposes" dates to 1763, when the bodies of enslaved people were used for the first anatomy lecture in the American colonies. This practice was further solidified by the work of Samuel George Morton (https://www.pbs.org/race/000_About/002_04-background-01-09.htm) , who is considered the founder of American physical anthropology. Morton dedicated his life to seeking scientific proof of racial differences through the collection of human remains of African people. It was through Morton's influence that archeological institutions across the Global North embraced the objective of justifying the racial hierarchy through collecting human remains.

**RELATED STORIES**

**The dangerous magical thinking of 'this is not who we are' (https://andscape.com/features/capitol-attack-trump-the-dangerous-magical-thinking-of-this-is-not-who-we-are/)**

**Kate Smith's racist songs aren't surprising, but we can do more than cover up a statue (https://andscape.com/features/kate-smiths-racist-songs-arent-surprising-but-flyers-yankees-should-do-more-than-cover-up-her-statue/)**

**Some Christian schools are finally grappling with their racist past and segregated present (https://andscape.com/features/some-christian-schools-are-finally-grappling-with-their-racist-past-and-segregated-present/)**

**Across Minneapolis, verdict in Chauvin trial brings relief and jubilation (https://andscape.com/features/across-minneapolis-verdict-in-chauvin-trial-brings-relief-and-jubilation/)**

**Bloody police assault on Miles Davis feels like it could have happened yesterday (https://andscape.com/features/bloody-police-assault-on-miles-davis-feels-like-it-could-have-happened-yesterday/)**

Prestige was, at one point in the history of anthropology, acquired through growing an institution's collection of human remains, and these remains were mostly from marginalized populations. The objective of proving the racial hierarchy was eventually abandoned (https://www.sapiens.org/archaeology/museums-human-remains/) , but the collections continued to be used for teaching skeletal biology and testing scientific methods. As such, anthropology has a culture of refusing to put Black people's remains to rest, solidifying the dehumanization of colonial subjects both in life and death.

"Ultimately, the remains of African American people, freed or enslaved, are in these collections because the captivity of their bodies, both living and deceased, was the very foundation of museums of medicine, anthropology, archaeology, natural history, and more," wrote Justinvil and Colwell. "While some academic and cultural institutions have taken the initiative to confront their legacies with slavery – such as decolonization efforts to include more diverse perspectives and values – a national effort has yet to take shape."

The handling of the remains of the two MOVE bombing victims is certainly not, as Rouse noted, a "conspiracy." The reality is much worse. The theft of Tree's and Delisha's bones indicates that despite attempts to purge academia and anthropology of colonial logics (https://www.nytimes.com/2020/07/27/us/Penn-museum-slavery-skulls-Morton-cranial.html) , they are baked into the structure. It is clear that there is still a belief in the field of anthropology that the remains of Black people are scientific objects to be studied or stored away in boxes rather than laid to rest by their families.

Six adults and five children were killed during the infamous 1985 bombing on the Osage Avenue MOVE compound that housed a collective of Black separatists who regularly protested against police brutality and for animal rights. The police and city officials repeatedly violently harassed the group, and on May 13, 1985, in an operation with nearly 500 police officers, dropped bombs on the compound when MOVE members refused to leave

Case ID: 220401655

their homes to be arrested. Though city lawmakers have previously apologized for burning the neighborhood to the ground (https://www.inquirer.com/news/move-bombing-anniversary-philadelphia-wilson-goode-apology-20200513.html) , none of the officials in charge at the time faced consequences.

"I could not imagine, in my worst nightmare, that the government would drop a bomb on us and kill my brothers and sisters," said Mike Africa Jr., a current member of MOVE, at a recent news conference held by the family (https://www.youtube.com/watch?v=5J3N1D10Fcw&ab_channel=hate5six) . "And I could not have imagined 36 years later that they would be displaying parts of our family as if they're some dinosaur relics that they dug up."

The online Coursera class was removed after the video was revealed by Billy Penn and the children's remains were finally handed over to a funeral home in Philadelphia (https://www.inquirer.com/news/penn-museum-move-remains-christopher-woods-20210428.html) . MOVE members have launched an online petition (https://actionnetwork.org/petitions/move-children-deserve-to-rest-in-peace) to demand financial reparations. Unfortunately, this reaction is symptomatic of the history of anthropology and its relationship with colonial subjects and, specifically, Black people.

Expressing rightful outrage in its petition, the MOVE family emphasized how the Penn Museum was continuing the racist violence that was perpetrated against the group. "The MOVE Family has been ceaselessly brutalized, criminalized and dehumanized by the Philadelphia Police Department, held as political prisoners, and murdered," they wrote. "Now we see clearly that the University of Pennsylvania and Princeton University have perpetuated this racist violence by defiling the remains of our children in the name of research."

There is no avenue to truly right this wrong. In life, the MOVE family was criminalized and terrorized by the state for demanding a better world. In death, their bones were used as objects of colonial plunder at academic

institutions. The debt is unpayable, but at the very least, the Penn Museum must respond to the demands for financial reparations from the MOVE family and honor the memories of Tree Africa and Delisha Africa as soon as possible.

*Nicole Froio is a Brazilian-Colombian reporter and researcher. She writes on the topics of gender, race, pop culture and feminism.*

**YOU MAY LIKE**                                         Sponsored by Taboola

**Doctor Tells: Do You Have Too Much Belly Fat? (Eat This Before Bed)**
Gundry MD

**Acura Has Done It Again. This Year's Lineup Has Left Us Speechless**
All Things Auto                                                  Learn More

**Voted The Best Drone in 2022 Available At Just $99!**
TopGadgetworld



Filed and Attested by the
Office of Judicial Records
22 JUN 2022 01:33 pm
A. STAMATO

# Exhibit "K"

Case ID: 220401655

ESSAY

# SAYING HER NAME

*Remains that were found to be those of a Black teen-ager who was killed by Philadelphia police in 1985 were treated as an anthropological specimen. How was her identity known and then forgotten?*

**By Heather Ann Thompson**

May 16, 2021



*The police bombing of the MOVE collective in West Philadelphia killed eleven people and left city blocks in ashes.* **Photograph from Bettmann / Getty**

The <u>police bombing</u> of 6221 Osage Avenue, in Philadelphia, caused a level of trauma that is difficult to exaggerate. On May 13, 1985, while many of the city's residents were still basking in the glow of the previous afternoon's Mother's Day gatherings, hundreds of heavily armed police officers surrounded a

Case ID: 220401655

row house in a Black neighborhood in West Philadelphia. After firing thousands of rounds of ammunition and cannisters of noxious tear gas into the home, they flew a helicopter over the roof and dropped a package of military-grade explosives. What followed was unimaginable.

This event—which Philadelphia's mayor later said began with the intention of serving warrants to the residents, members of a largely Black group called MOVE—left around two city blocks of a formerly vibrant neighborhood in ashes, and more than sixty mostly working- and middle-class families homeless. That would have been bad enough. But what made this a trauma from which the city could not heal was that the bodies of the six Black men and women and five Black children lay under the smoldering embers of that row house—eleven human beings whom police had known were inside when they had dropped incendiary devices. Worse? No one was ever held meaningfully accountable for these many deaths.

---

**Sign up for The Daily.**
Receive the best of *The New Yorker*, every day, in your in-box.

┌─ E-mail address ──────────────────────────────────────────────────────┐
│ Your e-mail address                                                    │
└────────────────────────────────────────────────────────────────────────┘

Sign up

By signing up, you agree to our User Agreement and Privacy Policy & Cookie Statement.

So, in late April, when news outlets revealed that human remains from that event had been kept at the Museum of Archaeology and Anthropology, at the University of Pennsylvania, and even used as a case study for an online class at Princeton University, the outpouring of disbelief and outrage from across the country was immediate and fierce. Indeed, the idea that the museum was holding the bones of a Black Philadelphian who was alive as recently as 1985 in the same way that it has held the skulls of enslaved people, procured by grave-robbers, was beyond comprehension.

This week, Philadelphia's mayor, Jim Kenney, released the additionally distressing piece of news that the city had other remains from the MOVE bombing. At first, Kenney reported that the city's health commissioner had the remains cremated and disposed of, without attempting to reach family members. He then explained that, after his first announcement, the remains had actually been found, in the basement of the medical examiner's office.

But, at first, the story we were told, about the remains at the museum, was this: in 1985, the Philadelphia medical examiner's office asked Alan Mann, an anthropologist then at the University of Pennsylvania, to identify the remains of the bodies found in the debris of the MOVE house. Mann attempted to do that, but was unable to positively identify one of the sets of bones. He kept those remains for continued study and stored them at the Penn Museum. And, at some point, Janet Monge, an anthropologist and curator at the museum, who as a graduate student had assisted Mann in his original investigation, used the remains to

teach an online course at Princeton. That course, which was recently taken down, was previously open to the public, and anyone who registered could see the remains being handled.

The early coverage of this story seemed to understand why some would find it macabre, but many articles also noted that there may not have been anything inherently sinister or unethical about Mann and Monge keeping the MOVE remains. Mann had been asked to do a forensic examination of them, and he and Monge were still trying to do just that. This was the basic argument that representatives of Princeton and Penn were making as well. As a Penn spokesperson informed a critical public, the whole point of holding on to the remains was "to restore the individual's personhood, help solve this painful case in the city's history, and bring resolution to the community."

But a full consideration of the city's history with MOVE, and of all that actually happened during the original forensic investigation of the bodies that were left in the rubble of Osage Avenue, is exactly what was missing in the earliest reporting on this story. The remains that Mann claimed had never been satisfactorily identified had, in fact, been found to belong to a teen-age girl who, along with her sister, died that day. Until last month, their mother believed that both girls had been buried in 1985. To reckon with the actual history of the case raises troubling questions about why, after the original investigation, Mann had kept the remains at all. But there is, perhaps, something even more important to consider. The full history reveals the risk of too easily, and with too little skepticism, telling a story from the vantage point of those with power or prestige: one can easily end up quite literally erasing from history the people who had neither.

Since its formation, in the early seventies, MOVE had been under constant surveillance by law enforcement. A multiracial collective of people who took the surname of Africa and saw themselves as a family, MOVE members lived a back-to-nature life style and grew increasingly outspoken against what they called "the System": its intense racism, police brutality, mistreatment of animals, pollution of nature, and much more. In the late seventies, Philadelphia's mayor, Frank Rizzo, who had previously served as police commissioner and didn't shy away from courting racist constituents, became determined to arrest MOVE members and evict them from their home—which, at that time, was in the West Philadelphia neighborhood of Powelton Village.

Between 1976 and 1978, clashes between the police and MOVE at that house reached a crisis point. That dramatic period saw the death of a MOVE baby (which some members of that group said occurred because police attacked the mother), a months-long police blockade of the MOVE house, and a shootout between police and MOVE at that house, which ended in the death of a police officer. (Police blamed MOVE, and MOVE blamed police.) On the day of the shooting, a MOVE member named Delbert Africa was beaten severely by police. Soon after, that house was levelled by cranes. These events culminated in nine MOVE members being sentenced to up to a hundred years in prison for, among other charges, the death of the police officer, and in the acquittal of three officers who were charged with the beating of Delbert Africa.

Case ID: 220401655

By 1983, a core group of MOVE members, including the group's founder, John Africa, had relocated to the house on Osage Avenue, in the Cobbs Creek area of West Philadelphia. The longer they lived there, the more determined they became to force the city and its newly elected Black mayor, Wilson Goode, to revisit the sentences of the MOVE nine. By Christmas Eve of 1983, the residents of 6221 Osage Avenue were blasting their demands for justice, and their increasingly vitriolic and profanity-laced critiques of city officials and the system, from loudspeakers day and night. As dismay about the situation mounted among MOVE's neighbors, they began pressuring the city to do something.

The city's response, however, was to once again send in hundreds of heavily armed officers to forcibly remove men, women, and children from yet another MOVE house in yet another West Philadelphia neighborhood. Notably, some of the same officers who had participated in the siege in 1978, including one of the officers who had been charged in the beating of Delbert Africa, also participated in the armed response on Osage Avenue.

By the next morning, the MOVE house was destroyed, and around two city blocks, parts of Osage Avenue and adjacent Pine Street, had burned to the ground. But rather than treat it like a crime scene, city officials dispatched a huge crane to the site, which began scooping at the debris, like so much trash, and dumping it into large piles. It was not until the afternoon, after someone saw a human leg dangling from the jaws of the crane's bucket, that an assistant medical examiner reported to the scene. There were, in the beginning, at least three city agencies seemingly in charge of the remains of the dead, each using its own system to tag them. The bones were not properly photographed or stored, and, needless to say, much of the other evidence that might have been gathered from the ashes was never collected.

How the scene was handled mattered. Indeed, the stakes couldn't have been higher. The police claimed that, when they dropped the bomb on 6221 Osage, they simply wanted to dislodge a bunker on the roof. They had never wanted to ignite the whole house, they insisted, and were, of course, devastated that people had been killed. The deaths that day had been an accident. But the more details surfaced, the less that the police officers' claims satisfied the public.

By June, the mayor had appointed the Philadelphia Special Investigation Commission on MOVE to get to the bottom of why the disaster had happened, who was responsible, and how so many people had died. During hearings, it was revealed that the police had known there were cans of gasoline on the roof where they dropped the explosives. Then came the disturbing testimony of the fire commissioner, William C. Richmond: once the fire had begun, Richmond said, the police commissioner, Gregore Sambor, instructed him to let it burn.

Most troublingly, there was a real possibility that these remains might show that MOVE members hadn't died by fire at all. It could be that some people in the house had been shot to death trying to flee the inferno, by members of the Philadelphia Police Department, who were now saying that this had all been a terrible accident.

Case ID: 220401655

As 6221 Osage Avenue crackled and began collapsing and crashing down, terrifying the people who were huddled in the basement, a boy named Birdie Africa managed to escape. He told the commission that the police had indeed been shooting at his family as they tried to flee the burning row house.

Birdie had been cowering under water-soaked blankets with his dogs and the other children—Delisha, Tree, Phil, and Tomaso, he said. They were all crying. Screaming, he said. And the air was growing thick with smoke. It was getting so hot that, soon, three grownups, Conrad, Ramona, and Birdie's mother, Rhonda, knew they had to get out. They started yelling "The kids' coming out!" over and over again, and trying to walk the kids from the basement into the back alley. But each time, Birdie said, "there was gunfire around so we couldn't get out," and they were driven back into the basement.

Birdie, who was thirteen, was tiny for his age, and he had suffered terrible burns on his body. It was hard to fathom why he would be lying. And, besides, he wasn't the only person who had managed to make it out alive. Ramona Africa had escaped, too. She was also covered in burns, but she had been handcuffed before being allowed to go to the hospital. She had not been permitted to speak to Birdie, yet she told investigators the same story that he had. "We were hollering out that we're coming out, we're bringing the children out," she said. "The children were hollering, you know, that they were coming out, that we're bringing them out. But that's not what the cops wanted. Because we know they heard us. And the instant they saw us at the doorway, saw anybody coming out, they immediately opened fire."

When the remains were first recovered, they were under the authority of the city's medical examiner's office, which recruited Alan Mann to conduct his analysis. But after the Special Investigation Commission on MOVE was appointed, the medical examiner's office was told to turn them over to the forensic experts who would be working with that investigative body. Along with two others, the commission had hired Ali Z. Hameli, a pathologist who was famous at the time for having helped identify the remains of the notorious Nazi doctor Josef Mengele.

Hameli's team worked to identify all of the MOVE remains and concluded that there were six adults and five children, naming all of them, and later testified that evidence of gunshots had been found in three sets of remains. The remains that had been known as "G" were identified as those of the twelve-year-old Melissa (Delisha) Orr Africa, and the special commission's forensic experts confirmed that, in her arm bone, they had clearly seen "one metal fragment consistent with double-ought ('double 0') buckshot or lead in a jacketed bullet." A Philadelphia County grand jury later convened to determine whether any officers had indeed shot members of MOVE to death, and chose not to indict them.

The news that the victims had been shot at did not sit well with citizens sympathetic to the MOVE family, and Hameli's identification of the remains did not sit well with Mann. In the examination he had conducted on those same remains a few months earlier, he had thought there was one more adult, and one fewer child. Specifically he had issues with Hameli's team's characterization of the remains marked as B-1 as an adolescent girl. Mann reëxamined the remains and issued a second report, on November 14, 1985, making clear that his opinion had not changed. When this second attempt was reported in the

Case ID: 220401655

press, Hameli, too, reëxamined the remains, and invited new forensics experts to conduct their own examinations as well. To a one, those examinations corroborated Hameli's team's findings.

Despite the drama surrounding Mann's report, by the time that the MOVE forensic inquiry had concluded, not only had myriad scientists laid eyes on the bones of B-1 but a consensus had been reached that they were those of a female adolescent. On January 23, 1986, Philadelphia's assistant medical examiner, Robert Segal, wrote to the special commission's staff director to confirm that he was in receipt of a recent report that "strongly supports Dr. Hameli's conclusions" that the victim was "between 12 and 17 years," and conceding that "it would be unreasonable for me reject these findings in light of the evidence that is available at this time."

By the close of the official MOVE inquiry, official documents related to the investigation, including one of its final legal documents—the report of the Philadelphia County grand jury that had been convened to decide if anyone would be indicted as a result of the deaths at Osage Avenue—had identified B-1 not simply as a teen-ager, nor just as a girl, but specifically as belonging to Katricia Dotson, who, in life, had been called Tree Africa.

In reaching this conclusion, the commission did not rely on forensic reports alone. They also had the eyewitness account of Birdie Africa, who had told authorities, in no uncertain terms, that his friend Tree had been right there with him that terrible morning, when he and all of the other kids were trying so desperately to escape the smoke-filled basement, but the sound of gunfire had kept driving them back. The chairman of the commission asked Birdie, "When the police got you after you finally got out, did they ask you anything about whether or not there were any kids still in the house or were there any other grownups still in house?" Birdie nodded and said, "I said yes." "Do you remember who it was that was still in the house?" they asked. "Tree," Birdie answered emphatically, and then continued, "Tree, Netta, and Tomaso and Melissa and the big people."

And so, even if not a single forensic scientist had examined the bones of B-1, logic seemed to dictate that B-1 was Tree Africa. All of the other victims had been accounted for.

Ultimately, it was agreed, and officially recorded, that B-1 was Katricia (Tree) Dotson. But what happened to the MOVE remains in the wake of the investigation of the bombing and the resolution of the legal proceedings is murky at best. It did appear, until recent revelations, that family members were given the remains of Tree and Netta, and had buried them at a funeral in December of 1985. In 1986, the state said that it buried the remains of Phil, Tomaso, and Delisha. But, now, not only has it been revealed that the remains which were identified as Tree's have been in the Penn Museum but one former museum intern has reported that the institution may have some of Delisha's remains as well. (The museum said that it is investigating the matter.) And now we are told that the medical examiner's office has held the remains of other MOVE victims, without anyone's knowledge or consent.

Case ID: 220401655

Delisha's mother, Janet Africa, only recently came home after serving more than forty years in prison on charges stemming from the 1978 MOVE siege. Tree and Netta's mother, Consuewella Africa, was also imprisoned when her daughters were killed. "Our children were murdered thrice over," she said. "The first time when the bomb was dropped. Then when they were buried. And now with the bones."

Three weeks into this sordid story, the question of how the bones recognized as Tree's ended up in a museum remains unanswered. To be sure, because such outrage and grief has been expressed, we know more than we did originally. Alan Mann now says that Robert Segal, of the medical examiner's office, asked him to continue investigating the identity of the bones, but no documentation of this request has emerged, and neither Segal nor the office has responded to requests for comment. Mann also says that he tried several times to reach members of MOVE, in the hopes of identifying and returning the remains, but Consuewella Africa said that no one ever called her: "Nobody called any of the mothers. All of this was done without our consent."

Mann stored the remains at the Penn Museum, but the university says that it was never given custody of the bones, as a gift or on loan, and that it is currently investigating the matter. When I spoke to Christopher Woods, who became director of the museum last month, he told me that when he learned that the remains were there, it was immediately clear to him that they should be returned to Tree's family. In his view, it was absolutely wrong not to do so decades ago. The week before the first press reports about the remains, Janet Monge, at the request of the museum, returned the remains to Mann; Woods then arranged for them to be stored at a Philadelphia funeral home. Consuewella Africa said that she has not spoken to the funeral home, but that she and other MOVE members will now discuss the situation and decide what to do.

There are many outstanding questions about the remains that were named as Tree Africa's. But perhaps the most vital is why so many people accepted, without corroboration, the claim that they hadn't been identified. Why, in this country, do we just accept what those with prestige and power tell us about an event for which they must account?

The long-term costs of elevating the statements of the prestigious and the powerful over testimonies of the traumatized are high, indeed. When white residents burned Tulsa's Black Wall Street to the ground, in 1921, Black Oklahomans lost everything they had worked generations to build. But because white officials got to explain away what happened at the time, that massacre was largely unknown to the general public until the late nineties. In 1931, when two white women accused nine Black boys of raping them on a train passing through northern Alabama, their version of events left the Scottsboro boys fighting to avoid execution. In 1971, when state officials told the nation that prisoners at the Attica State Correctional Facility, who had led an uprising for more humane conditions, had killed hostages on the day that troopers retook the prison, it wasn't just that this completely false story was printed on the front pages of the New York *Times* and the Los Angeles *Times*; this lie incited what a judge later called an

Case ID: 220401655

"orgy of violence" on almost thirteen hundred stripped, severely wounded, terrified men, completely at the mercy of captors who were hell-bent on revenge.

This week marked the thirty-sixth anniversary of the day that the Philadelphia police bombed 6221 Osage Avenue, and the day that Tree Africa tried to escape. Let us, at least, try to tell the full story of how her remains ended up in a museum. Indeed, if we are ever to hope that any real justice might actually follow the horrific fate that befell her back in 1985, we must make sure that her story gets told as she, and those around her, actually experienced it. And we might start by saying her name.

---

*Heather Ann Thompson is a historian at the University of Michigan. She is the author of "Blood in the Water: The Attica Prison Uprising of 1971 and Its Legacy," which won the Pulitzer Prize for history in 2017, and is at work on a book about the MOVE bombing.*

---

More:    Civil Rights    Philadelphia    Police    Police Brutality

---

# THE DAILY

The best of *The New Yorker*, every day, in your in-box, plus occasional alerts when we publish major stories.

**E-mail address**

Your e-mail address

Sign up

By signing up, you agree to our User Agreement and Privacy Policy & Cookie Statement.

Cookies Settings

Case ID: 220401655

# Exhibit "L"

Case ID: 220401655

Friday, May 20, 2022

**Today's Paper**

🔍

Supp

🔍   NEWS   SPORTS   BUSINESS   OPINION   POLITICS   ENTERTAINMENT

Opinion



# The disrespectful handling of the MOVE victims' remains by the city and Penn merits more investigation | Jenice Armstrong

The kind of disrespect we've seen in the handling of the remains of the MOVE bombing victims has gone on for way too long. It's time to end this sad chapter.

ADVERTISEMENT



Mike Africa, Jr. pauses as he becomes emotional while addressing a protest in front of the Penn Museum over its... TOM GRALISH / Staff Photographer

by Jenice Armstrong | Columnist
Published May 18, 2021

As horrifying as the city and Penn Museum's mishandling of the remains of MOVE victims is, their actions have historical precedent

Case ID: 220401655

of medical experimentation. And during the
late 19th century, grave robbers were known
to steal the remains of Black people from a

South Philly burial ground and take them to
Jefferson Medical College for research.

The infamous Tuskegee syphilis experiment
from 1932 to 1972 ruined the lives of several
hundred Black men who were treated as
human guinea pigs in the name of science.

Then there's Henrietta Lacks, the poor
African American woman who was suffering
from terminal cervical cancer in 1951 when
tissue was removed from her body without
her knowledge or consent at Johns Hopkins
University Hospital. The tissue multiplied
rapidly and became known as HeLa cells,
which were put into widespread use in
medical experiments and treatments still in
use today.

ADVERTISEMENT

Case ID: 220401655

like laboratory specimens, passed from the University of Pennsylvania to Princeton University and then back to Penn. According to the Guardian, they were even included in a now-deleted video promoting a class

called "Real Bones: Adventures in Forensic Anthropology."

The City of Philadelphia and the University of Pennsylvania have a lot of explaining to do.

↗ **SPONSORED CONTENT**

**If you find yourself rolling your ankles easily, do these exercises to reduce the risk of an injury**



by Rothman Orthopaedics

Mayor Jim Kenney's administration has hired Dechert LLP, one of Philadelphia's leading law firms, to investigate and has agreed to allow the Africa family's lawyers to participate. Officials have pledged to probe not just the current administration's handling of the remains but also that of all the administrations that preceded it.

"This is a 36-year-old incident that has been

Case ID: 220401655

bottom of everything that happened and put in place procedures and policies to keep them from happening again."

That's a start. However, this disturbing situation warrants independent eyes. For maximum objectivity, it can't just be a Kenney administration effort. That's why I was pleased to learn that City Controller Rebecca Rhynhart is looking into launching a separate investigation. As an elected official, Rhynhart operates independently and her office is known for its objective examinations of abuses of power such as the disgraceful teargassing of Black Lives Matter protesters during the demonstrations last year over police brutality.

"It's a troubling chain of events," Rhynhart told me Monday. "Yes, we do need to get to the bottom of it."

So many questions need to be answered:

Case ID: 220401655

a city block? Why were some remains still in city custody? Whom did former Health Commissioner Tom Farley order to dispose of the remains in 2017? Did that employee follow through? If not, what did the

employee do with the remains? And were the MOVE victims' remains really what the city reportedly discovered Friday?

"The City of Philadelphia and Penn have apologized for what they have done, and Princeton has apologized too," Mike Africa Jr. told me Monday before adding, "Apology without action is manipulation."

He's right. There needs to be accountability for what has transpired. Firing Farley last week was a start, but it doesn't go far enough. As I pointed out earlier, this kind of disrespect of Black bodies has gone on for far too long. It's time to end this sad chapter. Whatever remains of the MOVE victims once belonged to human beings with hopes and dreams like the rest of us. Their remains deserve more dignity than what the city and the University of Pennsylvania have shown them.

Published May 18, 2021

---



**Jenice Armstrong** ✉ 🐦
I'm a columnist for The Philadelphia Inquirer and Daily News covering mostly local topics

Case ID: 220401655

Friday, May 20, 2022

**Today's Paper**

🔍

**Supp**

🔍    NEWS    SPORTS    BUSINESS    OPINION    POLITICS    ENTERTAINMENT

ADVERTISEMENT

| **About Us** | **News & Info** | **Marketplace** |
|---|---|---|
| About The Inquirer | News | Inquirer Store |
| Advertise | Sports | Job Listings |
| Contact Us | Entertainment | All Classifieds |
| Licensing & Permissions | Business | Death Notices |
| Photo Reprints | Health | Legal Notices |
| Newspapers in Education | Food | Gift Subscriptions |
| Jobs & Internships | Life | |
| Inquirer Events | Opinion | |
| Acel Moore Workshops | Archives | |
| Newsroom Staff | Special Reports | |

**e-Editions**

The Inquirer
The Daily News
Subscriber Services

**Mobile Apps**

Apple iOS

Case ID: 220401655

Friday, May 20, 2022

**Today's Paper**

**Supp**

NEWS    SPORTS    BUSINESS    OPINION    POLITICS    ENTERTAINMENT

Terms of Use  /  Privacy Policy  /  Cancellation Policy  /  California
**Notice  /  California residents do not sell my data request**
**California residents do not sell my data request**

Case ID: 220401655

# Exhibit "M"

Case ID: 220401655

**COMMENTARY**

# Disrespect for the MOVE families is a stain that never goes away in Philadelphia

*The decadeslong war against the group shows the desecration of children's bones is no accident*



Protesters commemorate the 36th anniversary of the 1985 MOVE bombing by carrying signs listing names of MOVE members who perished during that incident.   LBWPhoto

**By Linn Washington**

May 26, 2021

As a journalist, I've covered MOVE (https://digitalcommons.law.yale.edu/yjll/vol1/iss1/7/) for more than 40 years. During that time, I've witnessed repeated demented decisions by Philadelphia authorities against MOVE with bloody impacts, including those on May 13, 1985.

Case ID: 220401655

A revelation last month about the mistreatment of remains belonging to two children killed in the horrific 1985 police brutality incident ripped open long-festering emotional and psychic wounds still oozing from that explosive event.

Reactions (https://whyy.org/articles/we-are-not-subjects-of-study-protesters-march-on-penn-museum-to-decry-handling-of-move-remains/) ignited by the April revelation from a whistleblower include rage from the public, regrets from authorities and ruined reputations of people involved in the mistreatment of the remains.

However, while those revelations were shocking, they didn't surprise me.

▬

On May 13, 1985, the day after Mother's Day, I watched Philadelphia police drop a bomb on a row house occupied by MOVE members during an eviction effort. Authorities compounded that abhorrent act with an outrageous decision to deliberately allow the blaze sparked by that bomb to rage into a firestorm.

The inferno incinerated 11 MOVE members, including five children.

Case ID: 220401655



**From left to right: Ramona Africa, the lone adult MOVE member to escape the 1985 bombing and fire, joins Eddie Africa, Janine Africa and Janet Africa at a 2019 news conference following their release from prison after 41 years. The children of Janine and Janet perished during that 1985 incident.**

I heard the police sniper fire that trapped MOVE members inside their burning row house, where investigators determined temperatures exceeded 2,000 degrees.

Only one adult MOVE member and one child escaped that blaze, both burned badly.

Case ID: 220401655

The inferno also destroyed 61 homes in a predominantly Black neighborhood. That destruction left 250 people homeless, their life possessions callously destroyed by decisions of governmental authorities.

While watching that conflagration, I didn't know Philly's police commissioner had ordered firefighters not to fight the fire. At the time, I wondered why firefighters did nothing as a community burned down.

While covering a fatal 1978 clash between MOVE and police, I witnessed the arrests of three MOVE mothers whose four children were among the five children who perished on May 13.

In June 2019, two of those mothers I saw arrested held a news conference. They had spent 41 years in prison.

During that news conference, I remember heart-wrenching accounts by Janet Africa and Janine Africa revealing for the first time publicly the insensitivity they experienced the day after the fiery 1985 incident.

Prison guards taunted them, mocking the deaths of their children.

Janet didn't know in 2019 that the mistreated child bones included those of her dead daughter.

―

The events of the last few weeks epitomize the disregard for Black life in Philadelphia, a city with a despicable record of abusive policing against Black people.

In April, the first revelation exposed how two anthropologists with the University of Pennsylvania Museum mistreated (https://andscape.com/features/the-scandal-over-the-move-bombing-victims-remains-is-part-of-anthropologys-racist-history/) the children's

Case ID: 220401655

charred bones. The second revelation regarded the mistreatment of fragments from other unidentified MOVE bodies kept by Philadelphia's morgue.

Hearing reactions from Philadelphia officials, it struck me that irrespective of their sincerity, those reactions obscured a critical concern that a plethora of apologies and possible payment of reparations to MOVE do not address.

Will this reckoning really result in righting wrongs that radiate from the institutional racism embedded deeply in the soul of Philadelphia, long defined as the City of Brotherly Love?

**RELATED STORY**



**The scandal over the MOVE bombing victims' remains is part of anthropology's racist history**
**Read now**
**(https://andscape.com/features/the-scandal-over-the-move-bombing-victims-remains-is-part-of-anthropologys-racist-history/?source=single-recirc)**

Not holding racists accountable for wrongful acts against Black folks is a historic scourge in Philadelphia and across America.

A consistent criticism of protesters since the initial April revelation is the failure of Philadelphia and federal authorities to hold police accountable for misdeeds during that 1985 incident.

I know the repeated confrontations between MOVE and Philadelphia authorities, beginning in the mid-1970s, erupted largely from authorities penalizing MOVE for any infraction, yet refusing to punish law enforcement personnel for acts of brutality against MOVE. That brutality included beatings where law enforcers kicked female MOVE members in their genital areas and caused miscarriages.

Case ID: 220401655

Weeks after the April revelation, a tearfully apologetic Mayor James Kenney ordered an investigation into the mistreatment of MOVE remains. Days later, he fired Philadelphia's health commissioner, who acknowledged separate mistreatment of MOVE remains held by the city's morgue.

Kenney's termination of his health commissioner exhibited some accountability. However, last year Kenney initially opposed the City Council issuing a formal apology to MOVE and others devastated on May 13, 1985. That City Council action is the first formal apology from Philadelphia's government for the 1985 debacle. It's another step toward accountability.

The University of Pennsylvania launched its own investigation into the actions and inaction of the two Penn Museum anthropologists.

Decades ago, Philadelphia's morgue retained those anthropologists to help identify body parts of MOVE members recovered from the inferno. Instead of returning the remains to city authorities or MOVE, those anthropologists shuffled the children's bones between the museum and Princeton University. One of those anthropologists even employed the bones in an online course she taught through Princeton.

---

**Many see what Malcolm X observed in a fabled 1964 speech: "I don't see any American dream; I see an American nightmare." And this nightmare must end.**

Case ID: 220401655

Although the scandal caused Princeton to cancel that online course, anthropologist Janet Monge (https://www.dailymail.co.uk/news/article-9506217/Moment-professor-holds-bones-black-teen-killed-1985-police-bombing-Philadelphia.html) retains her positions at the Penn Museum and on the university's faculty.

MOVE, activists in Philadelphia and a national coalition of Black people in anthropology, archeology and bioanthropology have requested removal of this anthropologist. Lack of action on those removal requests, according to MOVE, renders the University of Penn's apology hollow.

The coalition condemned the mistreatment of MOVE remains as a "painful reminder of anthropology's history with the Black dead." The coalition, in a public statement (http://aba.americananthro.org/) , also blasted the barbarity of all entities that "effectively monetized the remains of Black children murdered in a state terrorist attack."

The American Anthropological Association condemned the misuse of the children's remains in that online course. "Such a use clearly violates the principles of ethical conduct established by the AAA," the organization noted in a posting (https://www.americananthro.org/StayInformed/NewsDetail.aspx?ItemNumber=26217) on its website.

Two years before the April revelation, during that 2019 MOVE news conference, the organization announced what it wanted from authorities to achieve justice in the deaths of its children.

Rejecting apologies, Janet and Janine Africa declared that justice for the MOVE family required ending the injustice of a key MOVE supporter, imprisoned journalist Mumia Abu-Jamal. (https://6abc.com/mumia-abu-jamal-appeal-officer-daniel-faulkner-pennsylvania-supreme-court-philadelphia-police-killed/10672099/)

Case ID: 220401655

Many view Abu-Jamal, incarcerated for a 1981 killing of a Philadelphia police officer, as a political prisoner. I've covered his case (https://whyy.org/articles/krasners-stance-on-mumia-wont-cost-him-re-election-but-it-will-stain-his-reputation-as-a-reformer/) for decades.

Authorities ignored MOVE's request for the release of Abu-Jamal. Indignant dismissal of MOVE's requests is a pattern I've also observed for decades.

Persistent failures of authorities to ensure accountability for racist wrongs drives distrust of "the system" among persons of color.

Many see what Malcolm X observed in a fabled 1964 speech: "I don't see any American dream; I see an American nightmare."

And this nightmare must end.

*Linn Washington Jr., is a journalism professor at Temple University. He is a graduate of the journalism fellowship program at the Yale Law School.*

**YOU MAY LIKE**                                           Sponsored by Taboola

**Doctor Tells: Do You Have Too Much Belly Fat? (Eat This Before Bed)**
**Gundry MD**


**Acura Has Done It Again. This Year's Lineup Has Left Us Speechless**
**All Things Auto**                                        [ Learn More ]


**Locate Almost Anyone By Entering Their Name (This Is Addicting!)**
**TruthFinder**

Case ID: 220401655

# Exhibit "N"

Case ID: 220401655



CASPAR BENSON

Politics

# MOVE Bombing Remains Scandal Shows Enduring

Case ID: 220401655

# Racism in Anthropology

Evonne Turner-Byfield is confronting anthropology's racist, colonialist past.

**BY EZRA LERNER**

JULY 16, 2021

Evonne Turner-Byfield has a particularly intimate acquaintance with Black humanity. As an Ohio State University Ph.D. student pursuing a degree in biological anthropology, Turner-Byfield analyzes the health and trauma of the bones of enslaved human beings that worked with cotton, rum, or iron, in order to understand the people behind the forced labor.

Turner-Byfield is entering a disproportionately white field that is currently reckoning with a scandal involving two members of the Black liberation organization MOVE. Reporting in April detailed that the remains of at least one young girl — believed to possibly belong to Tree as well as Delisha Africa, victims of the police's 1985 bombing of the MOVE house in Philadelphia — had been improperly kept for decades by archaeologists Alan Mann and Janet Monge. In 1985, the Philadelphia medical examiner's office asked Mann, who enlisted the help of his then-doctoral student Monge, to investigate and identify a group of remains, as the *Philly Inquirer* reported. Rather than returning the remains upon completion of his investigation, Mann stored them at the Penn Museum, where he worked as an anthropologist. After Mann became a full-time professor there in 2001, he brought the remains with him. Monge also reexamined them in her eventual capacity as the Penn Museum's physical anthropology curator, and she has incorporated them into an online course she taught at Princeton, titled "Real Bones: Adventures in Forensic Anthropology." The University of Pennsylvania, the Penn Museum and Princeton University have all released statements apologizing for the improper handling of the remains.

In May, Philadelphia mayor Jim Kenney announced that other remains, previously thought to have been improperly cremated, had been located at the Philadelphia medical examiner's office. He promised to turn them over to the families of the dead upon the completion of an investigation.

Turner-Byfield is facing this controversy not only as a Black anthropology student

Case ID: 220401655

studying Black bodies, but as someone who has interned at the Penn Museum, met Monge, and will be a member of the next generation of anthropologists.

*Teen Vogue* speaks with Turner-Byfield about her thoughts on the MOVE remains debacle, how she got involved in the field, and how the controversy has shaped her future career goals.

*Editor's note: This interview has been condensed and edited for clarity.*

*Some 60 homes were destroyed by fire after the police engaged in a shoot-out and bombed the MOVE house in West Philadelphia.*   BETTMANN

**Teen Vogue: Do you remember realizing you wanted to be an anthropologist?**

**Evonne Turner-Byfield:** My dad and I would stay up late and watch the History Channel, and they did the forensic investigation of King Tut's death. That's when I realized it could be a job to just look at mummies and learn about history and answer questions, and I was like, "I can do that job. That sounds awesome," I remember

Case ID: 220401655

questions, and I was like, "I can do that job. That sounds awesome." I remember turning to my dad and saying, "I'm gonna do that someday."

*TV:* **That sounds like** *Law & Order,* **but 3,000 years ago.**

ET-B: That's really what it was. And I had already kind of been drawn to science. I used to do experiments in my mother's kitchen. My dad and I used to look at the stars all the time, even though that telescope was not good quality. You really couldn't see anything, but I thought it was awesome.

*TV:* **What did it feel like in those moments when you were doing experiments?**

ET-B: It felt like, This is what I am supposed to be doing, this is what I'm enjoying, and this is where I belong. I still feel that today when I'm in the lab. That's a calming place for me.

*TV:* **How do you remember hearing about the controversy with the MOVE bombings?**

ET-B: My first reaction was disbelief. I used to intern [at the Penn Museum]. The museum was my favorite place in the world. I'd go there at least once a week [in college]. When I was feeling overwhelmed, when I was feeling stressed out, that my place. It feels marred now. It feels dirty.

*TV:* **Why?**

ET-B: The unethical nature of how they treated the remains of these children. And these are professionals in the field that I looked up to. Alan Mann and Janet Monge are names. I remember meeting [Janet] and thinking, Oh, my God, I want to do what she does someday. I want to store the skeletal collection at a museum.

*TV:* **You mentioned that you interned at the museum. What was it like to work there?**

ET-B: It was 10 years ago. I was still an undergrad. I think it was one of my first encounters studying human remains. I didn't know anything about scientific consent or anything like that. I was just really excited to finally be hands-on with what I'd learned. I honestly didn't question any of it. I loved it. It was, like I said, my favorite place in the whole world.

Case ID: 220401655

place in the whole world.

**TV:** **What was it like to look up to Mann and Monge and then find out that they were involved in this?**

**ET-B:** It's disappointing, it's disheartening, but not all that surprising. Anthropology as a discipline is built on a lot of racist, colonial foundations of, "There are savages over here; I'm a little bit curious what the savages are doing. Let me insinuate myself in their life and inconvenience them as much as possible to fulfill my own curiosity." [The treatment of the remains] does not make me question the work that I want to do; it does make me question how I'm going to go about it.

(Monge did not reply to *Teen Vogue*'s request for comment. Mann declined to provide comment, citing the ongoing inquiries at Princeton and Penn.)

**TV:** **What does it make you feel as a Black woman?**

**ET-B:** There's just this absolute sadness and despair that these remains were treated with such disregard and disrespect. These babies should have been buried. Period. They should have been buried right after it happened. And to me there's no logical or reasonable explanation for why it didn't happen.

**TV:** Even though they couldn't identify them at the time?

**ET-B:** They were pretty sure they were one of two individuals. It's not like you had a cruise ship of 400 people, and you didn't know who these two were. The numbers were very low.

**TV:** **Do you still feel that same sense of belonging in anthropology that you did when you were 10 or 11?**

**ET-B:** I do. The lab is still a happy place for me, and it's heartening to know that my colleagues, my friends in anthropology — not just Black anthropologists — are just as outraged by this as I am. I still want to answer questions, but I fully believe that we can do that ethically and responsibly and morally. And when the moment comes that I can't, I know that's my time to leave.

**TV:** **You're in a generation of anthropologists who are going to take on the mantle**

Case ID: 220401655

in the field from people like the folks involved in the MOVE scandal. I'm curious what the scandal does to your understanding of what leading the field in the future looks like.

**ET-B:** It's a huge wake-up call. There needs to be more responsibility and accountability in the way that museums and scientists and collections keep their stuff. God willing, people like me coming up in the field will do the right thing when we're in that position to make those decisions.

*TV:* In some ways it sounds like you have more resolve to enter the field and change it now. Is that fair?

**ET-B:** Oh, absolutely. My dad always said, "You're gonna change the world." I was never sure how, but this could be good. The cause that I'm passionate about now, as a direct result of this, is repatriation and protection of Black remains in museums. I didn't know the problem was that bad. Now that I know, [I] can't just ignore it. I can't just leave the field and say, "Well this is a horrible place for me to be. I'm out." I can fix it. I can do better.

Want more from *Teen Vogue*? Check this out: Why U.S. Cities Are Still So Segregated

Stay up-to-date with the politics team. Sign up for the *Teen Vogue* Take!

WATCH

How Black History Month Went From A Week To A

Month

KEYWORDS BLACK AMERICANS SKELETONS RACE RACISM ARCHEOLOGY U.S. HISTORY COLONIALISM

# Exhibit "O"

Case ID: 220401655

# HYPERALLERGIC

Membership

Art

# How the Possession of Human Remains Led to a Public Reckoning at the Penn Museum

Philadelphia activists, UPenn students, and journalists contributed to the reckoning centering the museum's holdings of the remains of MOVE bombing victims.

  **by Kinjal Dave and Jake Nussbaum**
October 31, 2021



About 50 UPenn students and activists from Police Free Penn and Black & Brown Workers Co-op staged a protest on the university's campus in April of 2021. (courtesy Police Free Penn)

PHILADELPHIA — On April 21 of this year, journalists Abdul-Aliy Muhammad of the *__Philadelphia Inquirer__* and Maya Kassuto of **BillyPenn** revealed that two Ivy League forensic anthropologists held the remains of children murdered by police in the **1985 bombing** of the MOVE organization. Though the publication of this was met with a wave of protests, media coverage, and statements of condemnation,

Case ID: 220401655

for years it had been an "open secret" that professors Alan Mann and Janet Monge held Tree Africa's and Delisha Africa's remains in their personal collections. We, as Penn Anthropology student-activists, want to tell the story of how this "open secret" became a public reckoning through the concrete actions and risks of a small coalition of community activists, students, and university employees committed to challenging institutionalized anti-Blackness.

On December 14, 1985, Alan Mann, an anthropologist at the University of Pennsylvania and later Princeton University, received the remains of 14-year-old Tree Africa from Philadelphia assistant medical director Robert Segal during the city's investigation of the bombing. Mann, Monge, and Segal dispute the Philadelphia Special Investigation Commission on MOVE that confirmed the remains belonged to Tree Africa. In 2019, Janet Monge of the University of Pennsylvania used Tree Africa's remains as a teaching prop in front of over two thousand enrollees in an online course, Real Bones: Adventures in Forensic Anthropology, filmed against the backdrop of the Samuel G. Morton Cranial Collection. That same year one of Monge's undergraduate students, Jane Weiss, wrote a senior thesis confirming that the Penn Museum also held Delisha Africa's remains. However, the museum continues to deny the identity of these remains, implicitly siding with Monge and Mann's 36-year old claim that the remains cannot be conclusively identified. Following the bombing and burning of their home, MOVE family members had only fragments of their loved ones to bury. Of what little remained, Mann and Monge kept some fragments in the name of "science." A **report** commissioned by the University of Pennsylvania reveals that Monge contacted Tree Africa's mother, Consuewella Africa, in 2014. (Although they share the last name Africa, as was customary for members of MOVE, Tree Africa and Delisha Africa do not share biological parents.) Consuewella did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching. At the same time, word spread around the museum of the remeains, and we know of several people who have known of their existence since at least 2016. How does the terrain of such anti-Black behavior shift from unremarkable, and even permissible, to condemnable? What does it look like to challenge anti-Black logics and practices in museums universities?

In April 2019, community activist and West Philadelphian Abdul-Aliy Muhammad
went to a conference hosted by **the Penn and Slavery Project**, a collective of
professors and students researching the legacies of slavery at the University of
Pennsylvania. There, Muhammad **learned** that the Penn Museum held the cranial
collection of Samuel G. Morton, an early phrenologist and race scientist. Janet
Monge is the collection's curator. Between 1830 and 1851, Samuel Morton leveraged
colonial networks and the slave trade infrastructure to collect and measure about
1,000 human skulls. Morton used his research to argue for white supremacy, justify
the enslavement of Africans, and rationalize European colonization. Through the
research conducted by the Penn and Slavery Project, Muhammad learned that about
60 skulls in the collection belonged to enslaved Africans, many of which came from
a single mass plantation grave site in Cuba. Muhammad soon launched a petition
and penned an editorial for the ***Philadelphia Inquirer*** demanding that the Penn
Museum repatriate the remains of all enslaved people in the Morton Collection and,
if locating their direct descendants proved impossible, deliver them to Black
spiritual leaders in Philadelphia. They received no response from the university.

Amid global protests over police murders in the summer of 2020, students, faculty,
and employees at the University of Pennsylvania formed the abolitionist assembly
PoliceFreePenn, of which we are both active members. Among its goals,
PoliceFreePenn **demands** that Penn "redress the legacy of racism, colonialism, and
slavery on campus" through acts of repatriation and reparations. In July 2020,
PoliceFreePenn partnered with Muhammad to lead an email campaign demanding
the Penn Museum **completely abolish** the Morton Collection. These direct actions
built on the efforts of students and faculty who **raised ethical concerns** regarding
the museum's holding and display of the collection in a classroom. The museum
eventually removed the crania from display and formed a committee of museum
insiders to decide the collection's future.

In February 2021, anthropology graduate student Paul Wolff Mitchell published an
**article** detailing that, in addition to the enslaved Africans from Cuba, the Morton
Collection also contained skulls of Black Philadelphians stolen by Morton from
unmarked graves in the city. Early research suggests 14 skulls belonged to Black
Philadelphians. The news prompted a second action by Muhammad and

Case ID: 220401655

PoliceFreePenn: a **rally** at the museum, which featured Black spiritual leaders from Philadelphia, members of PoliceFreePenn, the Penn and Slavery Project, and Mitchell. Protestors demanded the immediate repatriation of Black Philadelphians to spiritual leaders in the community. They also demanded the oversight committee be made transparent and community led. The next day, the museum announced its intent to begin a repatriation process. The following week, Muhammad and Kassuto published the news that Janet Monge, the curator of the Morton Collection, also had in her possession Tree Africa's and Delisha Africa's remains.



The Penn Museum at the University of Pennsylvania in Philadelphia (via **Wikimedia Commons**)

The activism around the Morton Collection built on the momentum of the uprisings against police brutality in the summer of 2020. But in West Philadelphia, no conversation about police brutality can overlook the bombing of MOVE. Pam Africa, Ramona Africa, Mike Africa Jr., and other members of the MOVE organization have consistently been raising awareness about the bombing, which killed six adults and five children, working to hold the city accountable, and demanding the release of political prisoners like **Mumia Abu-Jamal**. Meanwhile, as curator of the Morton collection, Monge was using Tree Africa's remains in an online course. Anti-Black state violence and anti-Blackness at the university past and present converge.

While MOVE members rapidly worked to organize a response to the news, activists at the museum sought to support their efforts. PoliceFreePenn launched a second email campaign, in which thousands of participants nationwide wrote to the Penn President and Penn Museum administrators demanding that the museum return the remains to the families of Tree Africa and Delisha Africa along with financial reparations. Shortly thereafter, MOVE held a **press conference** in which the children's mothers spoke to the recurring traumas of state violence, now repeated by the university and exacerbated by its lack of accountability. Mike Africa Jr. and Krystal Strong, a Penn faculty and a member of PoliceFreePenn, then organized a protest at the museum, which culminated in a march to the Penn President's house and a heartfelt **remembrance** of Tree Africa's and Delisha Africa's lives.

The university responded by hiring **the Tucker Law Group** to conduct an internal investigation led by Joe Tucker, a former Penn professor. The objectivity of a behind-closed-doors investigation led by a former employee is questionable in itself, but the investigation's **findings** further demonstrate the violence of institutional complicity and the need for a transparent and publicly accountable process. The Tucker Law Group report concludes Mann's and Monge's behavior showed "extremely poor judgement" and "gross insensitivity to human dignity," but did not explicitly violate any institutional, ethical, or legal code. If "gross insensitivity to human dignity" is not grounds for accountability, we must question who, if anyone, these institutional, ethical, and legal codes serve to protect (Princeton's investigation comes to different **conclusions** and is far more damning of Monge's actions). To truly understand institutional complicity here would require an investigation into how the bureaucratic machinations of an institution (the Penn Museum of Anthropology) and a discipline (forensic anthropology) produce codes of conduct that permit white researchers to disregard Black dignity.

Further, the Tucker Law Group report's disproportionate focus on graduate student Paul Wolff Mitchell entirely erases the impact of organizing and direct action outlined above. Indeed, the report mentions only one protest at the museum, and implies that the outrage over the nonconsensual possession of the remains of Black children murdered by police was due to an interpersonal dispute between Mitchell and Janet Monge. The university disavows the existence of radical organizing in and

around campus in order to deny accountability for its actions. They would prefer to keep their colonial museum collections, militarized police force, tax-free real estate, and investments in fossil fuels, while avoiding reparations to the people of Philadelphia.At the University of Pennsylvania and the Penn Museum, we hear oft-repeated commitments to "diversity," "inclusion," and "anti-racism." However, the actions of these institutions indicate that their default position is complicity, not accountability. It was activists and their allies inside and outside the university who came together to genuinely disrupt this status quo. Our actions and declarations about the past shape our future. Activists (including the authors of this piece) will continue to come together to expose anti-Blackness at the university, including the **legacy of Albert Kligman**, who performed medical experiments on Black prisoners that resulted in lifelong illnesses to develop his lucrative Retin-A formula. We will continue to stand with union organizers at the museum, who have successfully asserted their power as workers to shape the museum's future. The revelations about the university's treatment of Tree Africa's and Delisha Africa's remains come against this backdrop of sustained historical study, community partnership, and solidarity-building between established voices like Mike Africa Jr., Pam Africa, and Abdul-Aliy Muhammad, and emerging campus groups like Penn and Slavery Project and PoliceFreePenn. This is the material organizing required to genuinely challenge the legacies of racism and colonialism in museums, universities, and beyond.

---

© 2022 Hyperallergic.



Case ID: 220401655

# Exhibit "P"

Case ID: 220401655



# The Wenner-Gren Blog

Home     About     Programs     Grantees     History     Contact Us

April 29, 2021 / MarkR / Around the Web

## Concerning the Possession and Unethical Use of the Remains of the Children of MOVE and the Africa Family: A Collective Statement from the Association of Black Anthropologists (ABA), the Society of Black Archaeologists (SBA), and the Black in Bioanthropology Collective (BiBA)

On May 13, 1985, after almost a decade of relentless harassment and confrontation, the City of Philadelphia dropped two bombs on the roof of 6221 Osage Avenue, the compound of the MOVE organization — a revolutionary group of Black people opposed to capitalist growth and committed to environmental justice and interspecies harmony. The bomb caused a fire that ripped through the compound, incinerating 11 of the 13 MOVE members inside, including five children aged seven to 13 (Tree Africa (14), Netta Africa(12), Delisha

### Recent Posts

> NYAS Lecture May 16th: Silence and Sacrifice: Narrative, Emergent Care, and Community in Context

> Webinar – June 2nd: Proposal Writing for the Wenner-Gren Foundation: Applying for an Engaged Research Grant

> Spotlight on the Global Initiatives Grant Program: Open Anthropology Lab, Bogota, Colombia

> Fejos Postdoctoral Fellow: Larisa Jasarevic

> Webinar – June 1st: Proposal Writing for the Wenner-Gren Foundation: Applying for an Engaged Research Grant

### Blogroll

> AAA Blog

> Anthro{dendum}

> Anthropomics

Case ID: 220401655

Africa (12), Little Phil Africa (12), and Tomasa Africa (9)), and razed the neighborhood, destroying at least 61 homes.

This past week, a number of outlets revealed the disturbing history of what became of the remains of one (and perhaps two) of the child victims of the bombing. What emerged was the disturbing complicity of anthropologists and anthropological institutions. Two forensic anthropologists, Alan Mann (at the time, a professor at the University of Pennsylvania), and Janet Monge (at the time Mann's PhD student) had been hired by Philadelphia officials to identify the remains. While Mann and Monge were unable to make a positive identification, the assumption is that the remains belonged to Tree and Delisha Africa, aged 14 and 12, respectively. After the investigation, apparently either Mann or Monge kept the remains in their personal possession, moving them between the University of Pennsylvania Museum of Archaeology and Anthropology and Princeton University. As late as last week, the remains were the focal point of the Princeton online Coursera course titled, "Real Bones: Adventures in Forensic Anthropology," taught by Monge. Some 5000 students were enrolled. Princeton claimed not to know the location of the remains; UPenn later admitted that they were in Mann's possession and that he would release them.

> Committee on the Anthropology of Science, Technology, and Computing (CASTAC)

> Cosmos & Culture (NPR)

> Dig Deeper (Leakey Foundation)

> John Hawks Weblog

> Living Anthropologically

> Neuroanthropology (PLoS)

> Somatosphere

**Categories**

> AAA

> Application Season

> Around the Web

> Conferences & Symposia

> COVID-19

> Current Anthropology

> Engaged Anthropology Grant

> Fejos Postdoctoral Fellowship

> Foundation News

> GIG

> Grant Programs

> Guest Blog

> How to Write a Grant Proposal

> Interview

Case ID: 220401655

The parents of Tree and Delisha were not notified of the existence of the remains, nor were the remains returned. The Africa family believed that their children were buried, and were not aware that their children's bones were being used as specimens for the forensic anthropology course. Mike Africa, Jr., speaking on behalf of the family, lamented: "Nobody said you can do that, holding up their bones for the camera. That's not how we process our dead. This is beyond words. The anthropology professor is holding the bones of a14-year-old girl whose mother is still alive and grieving."

The Association of Black Anthropologists, the Society of Black Archaeologists, and the Black in Bioanthropology Collective are painfully aware of the barbaric history of anthropology, especially when it comes to populations of peoples of African descent. We know that our discipline has been mobilized to rationalize eugenics and white supremacy and to justify slavery and colonialism. We also know that ethnographic museums, like Penn's Museum of Archaeology and Anthropology (which houses the collection of the notorious racist Samuel Morton) , have supported the academic rationale for the institutionalization of racism in anthropology textbooks, courses, and curricula.

It is because of this history of racism in anthropology, and because of the missions of ABA,

> New York Academy of Sciences

> SAPIENS

> Uncategorized

> Wadsworth Fellowships

> Webinar

**Archives**

> May 2022

> April 2022

> March 2022

> February 2022

> January 2022

> December 2021

> November 2021

> October 2021

> September 2021

> August 2021

> July 2021

> June 2021

> May 2021

> April 2021

> March 2021

> February 2021

> January 2021

> December 2020

> November 2020

> October 2020

> September 2020

Case ID: 220401655

SBA, and BiBA to counter it, that we as organizations condemn in the strongest possible language the University of Pennsylvania, Princeton University, Coursera, along with Professors Alan Mann and Janet Monge, for their horrific treatment of the remains of Tree and Delisha Africa, and for the unfathomable heartlessness and disrespect shown towards the Africa family. We are outraged by the stunning ethical indifference shown by all parties involved to both Tree and Delisha and to the Africa family, but also by the fact that these entities effectively monetized the remains of Black children murdered in a state terrorist attack – a fact made all the more painful given the heightened public awareness of brutal murders of Black children and youth by the police over the past few years.

Moreover, this revelation represents a painful reminder of anthropology's history with the Black dead – of which the Penn Museum, as the physical manifestation of Morton's legacy, provides a potent symbol. Even as UPenn earlier this year has tried to grapple with the legacy of Morton, we are faced with yet another affront to Black life and dignity.

Black anthropologists should not be alone in expressing this outrage and bearing this heavy ethical burden. All anthropologists should be enraged. All anthropologists need to condemn this barbaric and savage act by its own practitioners. And white anthropologists, in particular, should not

> August 2020

> July 2020

> June 2020

> May 2020

> April 2020

> March 2020

> February 2020

> January 2020

> December 2019

> November 2019

> October 2019

> September 2019

> August 2019

> July 2019

> June 2019

> April 2019

> March 2019

> February 2019

> January 2019

> December 2018

> November 2018

> October 2018

> September 2018

> August 2018

> July 2018

> June 2018

> May 2018

> April 2018

> March 2018

Case ID: 220401655

only hold themselves accountable to the ways that they continue to uphold normalized forms of antiBlackness and harm through their research and theorizing, but should also actively work to undo the centuries of violence and trauma done to nonwhite communities.

We support and are republishing the demands of Mike Africa, Jr., a MOVE family member who was 6 years old at the time when the Philadelphia police dropped the bomb on MOVE, currently circulated in the following online petition:

https://actionnetwork.org/petitions/move-children-deserve-to-rest-in-peace

**WE DEMAND:**

- **The immediate return of the remains of Delisha Africa and Tree Africa to The MOVE Family.**
- **An immediate apology by the University of Pennsylvania, Princeton University, the Penn Museum, and Coursera to The MOVE Family and the Black community of Philadelphia for this racist and abhorrent behavior.**
- **Financial reparations to The MOVE Family for the continued harm and trauma caused by Princeton University, the University of Pennsylvania, the Penn Museum, and Coursera, for the profits made by the use of**

> February 2018

> January 2018

> December 2017

> November 2017

> October 2017

> September 2017

> August 2017

> July 2017

> June 2017

> May 2017

> April 2017

> March 2017

> February 2017

> January 2017

> December 2016

> November 2016

> October 2016

> September 2016

> August 2016

> July 2016

> June 2016

> May 2016

> April 2016

> March 2016

> February 2016

> January 2016

> December 2015

> November 2015

> October 2015

Case ID: 220401655

our relatives as teaching tools and research objects.

- **The immediate removal of all online content in which these remains are used, including the online course Real Bones taught by Janet Monge.**
- **The termination of Janet Monge from her role as curator at the Penn Museum and faculty in the department of anthropology.**
- **The creation of a transparent, public investigation led by a MOVE-approved investigator and funded by the Universities, into how these remains ended up in the Museum's possession over the past 35 years.**

We ask those who are able, to attend the <u>MOVE Children Deserve to Rest in Peace Rally</u> on Wednesday, April 28, 2021 5:30 P.M. EST at Penn Museum to demand the repatriation of the remains of Delisha Africa and Tree Africa and reparations for MOVE family members for these atrocities. We encourage everyone to review the <u>MOVE Press Conference 4/26</u>, the documentaries "<u>40 Years a Prisoner</u>" and "<u>Bombing of Osage</u>," and the official website of the MOVE Organization at <u>http://onamove.com</u>.

We realize that <u>Penn and Princeton are not the only universities</u> trafficking in the human remains of nonwhite peoples. And while both the <u>Penn Museum</u> and <u>Princeton Anthropology</u> have issued

> September 2015

> August 2015

> July 2015

> June 2015

> May 2015

> April 2015

> March 2015

> February 2015

> January 2015

> December 2014

> November 2014

> October 2014

> September 2014

> August 2014

> July 2014

> June 2014

> May 2014

> April 2014

> March 2014

> February 2014

> January 2014

> December 2013

> November 2013

> October 2013

> September 2013

> August 2013

> July 2013

> June 2013

> May 2013

Case ID: 220401655

statements of contrition, we believe that they must do more. The Association of Black Anthropologists, Society of Black Archaeologists, and the Black in Bioanthropology Collective therefore demand, first, that the Penn Museum self-report this egregious IRB violation. Second, we demand that the American Anthropological Association (AAA) work in haste to help facilitate the repatriation of the remains of the Africa family children, as well as other remains held in the many anthropology museums and departments throughout the country. These include, but are not limited to, the numerous remains of peoples of African descent. Towards this end we also call for a national audit of all human remains in museum and university collections. We believe it is imperative that this information become public record, allowing descended communities to reclaim sovereignty of the remains of their ancestors.

As we come upon the 36th anniversary of the state sanctioned bombing on May 13th, we ask that you keep the families and friends of MOVE in your thoughts, prayers, and actions. Continue to push MOVE's call for the freedom of Mumia Abu Jamal and all political prisoners!

And let us bury our dead.

In solidarity.

> April 2013
> March 2013
> February 2013
> January 2013
> December 2012
> November 2012
> October 2012
> September 2012
> August 2012
> July 2012
> June 2012
> May 2012
> April 2012
> March 2012
> February 2012
> January 2012
> December 2011
> November 2011
> October 2011
> September 2011

**Recent Comments**

> Pro-Tactile American Sign Language – Welcome to the Oonaverse on Interview with Terra Edwards

> Scott Koppel on Interview with Benjamin Jewell and "Filling the Vacuum with Gardens"

Case ID: 220401655

<u>The Association of Black Anthropologists (ABA)</u>

**The Society of Black Archaeologists (SBA)**

**The Black in Bioanthropology Collective (BiBA)**

-----------------------------------------------------------

<u>No comments</u>

> **Devasish** on Interview: Uddhav Rai of Tribhuvan University

> **brenden smith on** November 1 Grant Deadline Extended to November 5

> **Daniel on** Reality and Myth: A Symposium on Axel Wenner-Gren

Wenner-Gren Foundation for Anthropological Research, Inc.

Case ID: 220401655