**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| JANET MONGE, | | **:** | |
| | Plaintiff | **:** | CIVIL ACTION |
| v. | | **:** | |
| | | **:** | No. 22-cv-02942 (GP) |
| UNIVERSITY OF PENNSYLVANIA, et al. | | **:** | |
| | | **:** | |
| | Defendants. | **:** | |
| | | **:** | |
| | | **:** | |
| | | **:** | |
| | | **:** | |
| | | **:** | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
NORA MCGREEVY'S MOTION TO DISMISS**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTS AS ALLEGED IN THE AMENDED COMPLAINT ............................ 2
        A.      *The MOVE Bombing and Plaintiff's Role in the Bones Recovered at the
                Site* ........................................................................................................... 2
        B.      *Monge Alleges that Two Former Colleagues (But Not Defendant
                McGreevy) Conspired to Defame Her* ..................................................... 4
        C.      *Several Days Later, McGreevy Writes a Summary of Other News
                Accounts Under the Direction of, and Then Published By, the Federal
                Government* ............................................................................................... 6

III.    ARGUMENT ...................................................................................................... 7
        A.      *McGreevy Has Official Immunity From Defamation Claims Because
                She is a Federal Contractor* ..................................................................... 9
        B.      *Even if McGreevy Were Not Immune From Suit, Plaintiff Has Not
                Pleaded that McGreevy Defamed Her* ................................................... 13
                1.      McGreevy's Article Contains No False Statements of Fact ......... 14
                2.      McGreevy Did Not Act Negligently, Much Less with Actual
                        Malice ......................................................................................... 18
        C.      *Monge Has Not Adequately Alleged False Light* .................................. 21
        D.      *McGreevy Did Not Aid or Abet Any Other Defendant's Alleged
                Transgressions* ....................................................................................... 22

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**   **Page(s)**

*Am. Future Sys. Inc. v. Better Bus. Bureau*, 923 A.2d 389 (Pa. 2007) .................................14, 18

*Appleby v. Daily Hampshire Gazette*, 478 N.E.2d 721 (Mass. 1985) ...................................20, 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................8, 20

*Associated Press v. United States*, 326 U.S. 1 (1945) ....................................................................7

*Baker v. Lafayette College*, 532 A.2d 399 (Pa. 1987) ..................................................................17

*Barr v. Mateo*, 360 U.S. 564 (1959) ...................................................................................12, 13

*Bartlett v. Bradford Publ'g, Inc.*, 885 A.2d 562, (Pa. Super. Ct. 2005) ...............................19, 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................................8, 20

*Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256 (3d Cir. 2006)......................................................2

*Clark v. Allen*, 204 A.2d 42 (Pa. 1964).........................................................................................8

*Curran v. Phila. Newspapers, Inc.*, 546 A.2d 639 (Pa. Super. Ct. 1988) ....................................19

*Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6 (Pa. Super. Ct. 1982).........................................14

*Earley v. Gatehouse Media Pa. Holdings, Inc.*, No. 3:12-1886, 2013 U.S. Dist.
LEXIS 140631 (M.D. Pa. Sept. 30, 2013) ...........................................................................20

*Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.*, 566 F.2d 289
(D.C. Cir. 1977) ...............................................................................................................8, 9, 12

*Gibney v. Fitzgibbon*, 547 F. App'x 111 (3d Cir. 2013)...........................................................8, 16

*Gulati v. Zuckerman*, 723 F. Supp. 353 (E.D. Pa. 1989) .............................................................12

*I.M. Wilson, Inc. v. Otvetstvennostyou GRICHKO*, 500 F. Supp. 3d 380 (E.D. Pa.
2020) .....................................................................................................................................8

*Joseph v. Scranton Times, L.P.*, 129 A.3d 404 (Pa. 2015) ......................................................13, 18

*Kane v. Chester Cnty.*, 811 F. App'x 65 (3d Cir. 2020) ..............................................................17

*Kurowski v. Burroughs*, 994 A.2d 611 (Pa. Super. Ct. 2010)......................................................16

*Lewis v. Phila. Newspapers, Inc.*, 833 A.2d 185 (Pa. Super. Ct. 2003) ......................................14

*Mallory v. S & S Publishers*, 260 F. Supp. 3d 453 (E.D. Pa. 2017) ...........................................16

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ...............................................................14

*McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir. 1985) ...............................................................18

*McKinney v. Avery J., Inc.*, 393 S.E.2d 295 (N.C. Ct. App. 1990) .............................................21

*Mikkilineni v. PayPal, Inc.*, No. 20-647-CFC-SRF, 2020 U.S. Dist. LEXIS
118735 (D. Del. July 7, 2020)...............................................................................................9

*Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990)..............................................................................14

*Miller v. Shubin*, No. 4:15-cv-1754, 2016 U.S. Dist. LEXIS 62018 (M.D. Pa. May 11, 2016) .............................................................................................................21

*Misra v. Smithsonian Astrophysical Observatory*, 248 F.3d 37 (1st Cir. 2001)............................9

*Nelson v. Assoc. Press, Inc.*, 667 F. Supp. 1468 (S.D. Fla. 1987) .................................20

*Nevyas v. Friedman*, No. 00946, 2011 Phila. Ct. Com. Pl. LEXIS 157 (June 17, 2011) .............................................................................................................19

*Nicole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340 (3d Cir. 2012) .............................................................................................................10

*Nicole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, No. 10-389, 2011 U.S. Dist. LEXIS 33032 (E.D. Pa. Mar. 28, 2011) .......................................................11

*Nothstein v. U.S. Cycling*, 499 F. Supp. 3d 101 (E.D. Pa. 2020)..................................22

*Peschmann v. Quayle*, No. 1:17-cv-00259, 2019 U.S. Dist. LEXIS 137468 (W.D. Pa. Aug. 13, 2019) .......................................................................................22

*Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) ...........................................13

*Reader's Digest v. Marin Cty. Sup. Ct.*, 690 P.2d 610 (Cal. 1984) .............................21

*Reilly v. WNEP*, No. 557 MDA 2020, 2021 Pa. Super. Unpub. LEXIS 734 (Mar. 17, 2021) .............................................................................................................17

*Rhoads Indus. v. Shoreline Found., Inc.*, Nos. 15-921, 17-266, 2022 U.S. Dist. LEXIS 43330 (E.D. Pa. Mar. 10, 2022)..............................................................10, 11

*Rush v. Phila. Newspapers, Inc.*, 732 A.2d 648 (Pa. Super. 1999)...............................21

*Sarkees v. Warner-West Corp.*, 37 A.2d 544 (Pa. 1944) ............................................15

*Skipworth by Williams v. Lead Indus. Ass'n*, 690 A.2d 169 (Pa. 1997) ......................22

*Sprague v. Porter*, No. 1649 EDA 2013, 2014 Pa. Super. Unpub. LEXIS 1659 (Pa. Super. Ct. Aug. 26, 2014)..........................................................................17

*Thomas Merton Center v. Rockwell Int'l Corp.*, 442 A.2d 213 (Pa. 1981) ..................16

*Tucker v. Phila. Daily News*, 848 A.2d 113 (Pa. 2004) ...............................................8

*Vangjeli v. Banks*, No. 19-1635, 2020 U.S. Dist. LEXIS 182844 (E.D. Pa. Oct. 2, 2020) (Pratter, J.) .....................................................................................10, 12

*Westfall v. Erwin*, 484 U.S. 292 (1988) ...................................................................10

## STATUTES

42 Pa.C.S. § 8343(a) ..................................................................................................13

20 U.S.C. § 41...................................................................................................6, 9, 11

28 U.S.C. § 2680(h) ..................................................................................................10

## OTHER AUTHORITIES

Restatement (Second) of Torts...............................................................................21, 22

## I.      INTRODUCTION

Plaintiff, Dr. Janet Monge ("Monge") was a highly decorated professor at the University of Pennsylvania and curator at the Penn Museum.  She and her former mentor, Alan Mann, became responsible for the investigation and preservation of the remains of individuals who died in the MOVE bombing in 1985, believed by many to be children.  The remains were kept in a cardboard box at the Penn Museum for decades.  In 2019, Dr. Monge used the bones in an online course she posted to the internet, holding the bones up and describing them as "juicy" and "greasy."  While Monge thought all of this was perfectly appropriate, others were taken aback by the way these bones thought to belong to children—who were the victims of one of the most infamous chapters in the City's history—were handled.

As to Defendant Nora McGreevy ("McGreevy"), she had almost no role in any of this.  She is not alleged to have had any involvement with the underlying dispute, any connection to persons who worked with Monge, nor is she alleged to have broken any news about any of this.  All McGreevy did was write an article for Smithsonian Magazine (the "Article") which mentions Monge in a single paragraph and is based entirely on prior reporting by reputable news organizations.  Given the absurdly wide net Plaintiff has cast in this affair, she now finds herself enmeshed in this litigation against some 37 defendants.

The claims against McGreevy fail for at least three reasons.  First, McGreevy wrote the Article under contract with Smithsonian Magazine, and the Article was published by the Smithsonian Institution, a trust instrumentality of the federal government, which had ultimate control over all aspects of the Article and made the decision to publish it.  She is therefore entitled to official immunity as a federal contractor.  Second, even if she were not immune from suit, Plaintiff has not alleged any false statements of fact or false implications in the Article.  Third, Plaintiff—who did no more than publish a compilation of previously published articles by

reputable news organizations—is not alleged to have acted with the degree of fault required by the federal Constitution and Pennsylvania law.

The Court should therefore grant McGreevy's Motion to Dismiss.  As McGreevy's federal contractor defense is the sole basis for federal jurisdiction, after McGreevy is dismissed, the Court may, in its discretion, remand the case to the Court of Common Pleas.

## II.  FACTS AS ALLEGED IN THE AMENDED COMPLAINT[1]

### A.  *The MOVE Bombing and Plaintiff's Role in the Bones Recovered at the Site*

In one of the darkest days in the history of Philadelphia, on May 13, 1985, the Philadelphia Police dropped a bomb on a house in the Cobbs Creek neighborhood of the city, a predominately African American community.  Amended Complaint ("Am. Compl.") ¶¶ 69, 75-76.  The house burned down, killing all eleven persons inside, including five children.  *Id.* at ¶ 79.  The deceased were members of the MOVE organization, which described itself as "a family of strong, serious, deeply committed revolutionaries founded by a wise, perceptive, strategically minded Black man named John Africa."  *Id.* at ¶ 65.

According to the Complaint, Philadelphia authorities botched the forensic processing of the site, including the bones of the deceased.  *Id.* at ¶¶ 82-84.  Dr. Alan Mann, at the time a professor of Anthropology at the University of Pennsylvania, was invited to assist the investigation.  *Id.* at ¶ 86.  Mann invited Plaintiff Janet Monge, who was his doctoral student and mentee at the time, to assist him.  *Id.* at ¶ 87.  Mann and Monge concluded that two bones, a

---

[1] All the facts presented in this Memorandum are taken from the Amended Complaint, documents referenced therein, or are matters of public record, unless otherwise stated. "In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (first citation omitted) (quoting 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. 2004)).

pelvis and proximal femur fragment, "did not conform to any of the ages of the individuals who were presumed to have been killed in the bombing and subsequent fire," including Katricia Africa ("Tree"), who was 14 years old and lived in the MOVE house at the time of her death.  *Id.* at ¶¶ 89, 91.  This conclusion was disputed by the MOVE Commission's findings, which stated that the fragments belonged to Tree.  *Id.* at ¶¶ 92-93.[2]  In December 1985, after further tests by Mann, Monge, and other anthropologists, Monge claims that the bones "could not be conclusively identified" and so they were released to Mann "for further investigation."  *Id.* ¶¶ 94-98.

The remains were held for 15 years, until 2001, in a cardboard box at Mann's office in the Penn Museum, when Dr. Mann left Penn for Princeton University.  *Id.* at ¶¶ 99, 103.  Thereafter, the bones remained at Penn but Monge took them to Princeton (where she was a visiting professor and lecturer) "for further investigation between two and five times."  *Id.* at ¶¶ 107, 118.  More recently, in August 2020, Monge published a video on the website Coursera entitled "Real Bones: Adventures in Forensic Pathology."  *Id.* at ¶ 121.  During one class, Monge picks up and describes the bones in graphic detail:

> "The bones are, we would say, juicy, meaning that you can tell they are of a recently deceased individual.  They have a lot of, sort of, sheen, at least this one does, and that is because of course there is still marrow in the marrow cavity and its sort of leeching basically out into the bone and so it gives it that slick sort of appearance.  If you smell it, it doesn't actually smell bad but it smells kind of greasy like an older style grease."

---

[2] The MOVE Commission "retained a renowned group of expert consultants, consisting of forensic pathologist, former Delaware Chief Medical Examiner, and former President of the National Association of Medical Examiners Dr. Ali Z. Hameli, forensic odontologist Dr. Lowell J. Levine, and forensic anthropologist Dr. Ellis R. Kerley." Dechert LLP & Montgomery McCracken Walker & Rhoads LLP, "Final Report of the Independent Investigation in the City of Philadelphia's Possession of Human Remains of Victims of the 1985 Bombing of the Move Organization," at Part One 7, 43 n.194 (June 6, 2022) ("Dechert & MMWR Report"), available at: https://www.phila.gov/media/20220609141446/move-investigation-report-20220609.pdf.

Democracy Now!, *Ivy League Secret Exposed: Classes Used Bones of Black Children Killed in 1985 MOVE Police Bombing* (Apr. 27, 2021), at 4:23-5:58, available at: https://www.youtube.com/watch?v=daHwwPimoE8; Ed Pilkington, *Bones of Black Children Killed in Police Bombing Used in Ivy League Anthropology Course*, THE GUARDIAN (Apr. 23, 2021), available at: https://www.theguardian.com/us-news/2021/apr/22/move-bombing-black-children-bones-philadelphia-princeton-pennsylvania.[3]

### B.  *Monge Alleges that Two Former Colleagues (But Not Defendant McGreevy) Conspired to Defame Her*

Monge contends the issues underlying this lawsuit were "initiated by a current doctoral candidate at the University of Pennsylvania, Paul Mitchell, with the help of his PhD advisor, Penn Anthropology professor Deborah Thomas, solely for their own unlawful purposes and in retaliation for having reported the unprofessional conduct of Mr. Mitchell."  Am. Compl. ¶ 7.  Monge accused Mitchell of various misconduct at Penn, including the "illegal duplication of the keys to Dr. Monge's office in Penn's lab facilities."  *Id.* at ¶¶ 136-37, 139, 141.  After Monge reported the misconduct, Mitchell allegedly confronted Monge, screamed, threw things, and threatened her.  *Id.* at ¶¶ 144-45.  Mitchell was locked out of the Museum, and Monge apparently blames him for news about the remains hitting the press, claiming his actions gave "rise to his revengeful false reporting relating to the bone fragments with the aid of Defendant Thomas."  *Id.* at ¶ 147.

Monge claims that Mitchell "instigated the first article regarding the unidentified bones," "and with full knowledge that he was falsifying information, cooperated with his then-girlfriend Maya Kas[s]utto, a writer for the Billy Penn 501(c)(3) news organization (a project of

---

[3] The Court may consider the YouTube video on a motion to dismiss because the content therein, no longer available on *Coursera*, is referred to (incompletely and inaccurately) in and integral to the Amended Complaint.

WHYY Philadelphia), to aid her in authoring an article containing malicious, sensationalized allegations of racial bias about the investigatory process undertaken by two respected anthropologists, Dr. Alan Mann and Dr. Monge, based entirely on false and misleading statements and attacking Dr. Monge's well-deserved, excellent reputation worldwide as a forensic/biological anthropologist."  Am. Compl. ¶¶ 8, 149.

Kassutto, allegedly after being instigated to do so by Mitchell, wrote an article which was published on April 21, 2021 by Billy Penn entitled "Remains of Children Killed in MOVE Bombing Sat in a Box at Penn Museum for Decades."  *Id.* at ¶ 151; Maya Kassutto, *Remains of Children Killed in MOVE Bombing Sat in a Box at Penn Museum for Decades*, Billy Penn (Apr. 21, 2021), available at: https://billypenn.com/2021/04/21/move-bombing-penn-museum-bones-remains-princeton-africa/.  The Billy Penn article allegedly "falsely asserted that the unidentified fragments were the remains of Katricia Africa and implied serious scientific misconduct by Dr. Monge in the retention and handling of the fragments, defaming Dr. Monge as a 'chipper science teacher' and alleging that she improperly used the remains of a black girl as 'props.'"  *Id.* at ¶ 152.

Monge claims that the other 33 defendants "republished and embellished, in whole or in part," the Billy Penn article.  *Id.* at ¶ 10.  She does not, however, allege that any of these other publications knew about the supposed conspiracy involving her former colleague or knew or should have known that any information published in the Billy Penn article was false.  A number of reputable national news organizations published stories about the controversy revealed by Billy Penn from April 21 through April 24, 2021, including The Inquirer, the Guardian, and The New York Times.  *Id.* at ¶¶ 160-161(a).

C.     *Several Days Later, McGreevy Writes a Summary of Other News Accounts Under the Direction of, and Then Published By, the Federal Government*

Almost a week later, on April 26, 2021, Smithsonian Magazine published the Article, summarizing prior news accounts, which was written by McGreevy.  *Id.* at ¶ 161(b). The Smithsonian Institution was established by Congress to administer funds given by the Englishman James Smithson (1765–1829) "for the increase and diffusion of knowledge among men."  20 U.S.C. § 41.  In addition to its famous museums, the Smithsonian Institution also publishes Smithsonian Magazine: "Smithsonian Magazine[] is the official journal published by the Smithsonian Institution, a trust instrumentality of the United States."  Complaint at ¶ 55.

McGreevy wrote the Article pursuant to a contract she signed with the Smithsonian.  ECF No. 1-5.[4]  That agreement provides that the Smithsonian would select the "subject matter, content, length [and] delivery date" of any article.  *Id.*  It provided that the Smithsonian "shall have the right to rewrite and/or edit the Article at its sole discretion, including the right to add photographs or drawings/graphics," and the "Magazine shall have the right to copyright the Article(s) in its own name as author and proprietor thereof, to publish the Article . . . in any manner as the Magazine sees fit."  *Id.*  In sum, McGreevy was contracted by the federal government to write an article for it, but the federal government had ultimate control over the content and the decision to publish it.

The Article was written for *Smart News*, Smithsonian Magazine's aggregation channel which provides the "Smithsonian's take on breaking news in science, art, culture and beyond, as well as our coolest finds from around the web."  Nora McGreevy, *Museum Kept*

---

[4] Because Plaintiff has identified the relationship between the Smithsonian and McGreevy in the Amended Complaint and because the contract was attached to the Notice of Removal as a basis for federal subject matter jurisdiction, the Court may properly consider it on this Motion.

*Bones of Black Children Killed in 1985 Police Bombing in Storage for Decades*, SMITHSONIAN

MAGAZINE (Apr. 26, 2021) ("Smithsonian Mag. Article"), available at:

https://www.smithsonianmag.com/smart-news/outrage-over-penn-and-princetons-handling-

move-bombing-victims-remains-180977583/; Christopher Mims, *Introducing Smart News!* (June

14, 2012), available at: https://www.smithsonianmag.com/smart-news/introducing-smart-news-

127989112/.  The Article was headlined "Museum Kept Bones of Black Children Killed in 1985

Police Bombing in Storage for Decades."  Am. Compl. ¶ 161(b); Smithsonian Mag. Article.

Plaintiff does not allege that McGreevy wrote the headline (because she did not).

       The Article does not offer any new content.  To the contrary, consistent with

stories published in *Smart News*, it aggregates facts already published by other reputable news

organizations and incudes direct references and hyperlinks to those articles and sources.  Ex. 4,

Smithsonian Mag. Article.  Most of the Article does not refer to Monge.  *Id.*  Plaintiff is

mentioned in only one paragraph more than half-way through the Article:

> "What's more, the remains appear to have been used as a "case
> study" in an online course presented by Princeton University and
> hosted on Coursera. Titled "Real Bones: Adventures in Forensic
> Anthropology," the class was recorded in 2019 and includes footage
> of Janet Monge, an adjunct professor in anthropology at the
> University of Pennsylvania and former student of Mann, picking up
> the bones and describing them in graphic detail. She makes no
> reference to the fact that the families of probable victims Tree and
> Delisha never provided consent for their daughters' bones to be used
> in this way, the Guardian notes."

Am. Compl. ¶ 161(b).

## III.  ARGUMENT

       The First Amendment "rests on the assumption that the widest possible

dissemination of information from diverse and antagonistic sources is essential to the welfare of

the public, that a free press is a condition of a free society."  *Associated Press v. United States*,

326 U.S. 1, 20 (1945).  In particular, defamation suits against government officials are disfavored because they "have a chilling, if not paralyzing, effect on an official's willingness to speak out, in the exercise of his discretion, to further the public interest."  *Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.*, 566 F.2d 289, 292 (D.C. Cir. 1977) (en banc).  McGreevy, as a contractor of Smithsonian Magazine, spoke both as a member of the press and as a government contractor, and her speech is protected in both regards.

Federal and state courts have not hesitated to dismiss meritless defamation claims at the pleading stage.  *See, e.g.*, *Gibney v. Fitzgibbon*, 547 F. App'x. 111, 114 (3d Cir. 2013) (motion to dismiss); *I.M. Wilson, Inc. v. Otvetstvennostyou GRICHKO*, 500 F. Supp. 3d 380, 422-25 (E.D. Pa. 2020) (same); *Tucker v. Phila. Daily News*, 848 A.2d 113, 127-36 (Pa. 2004) (preliminary objections); *Clark v. Allen*, 204 A.2d 42, 43-48 (Pa. 1964) (same).

A plaintiff must set out in a complaint a cause of action and "enough facts" to make that cause of action "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  However, the Court is not required to accept "naked assertions" unsupported by facts.  *Id.* (citation omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citation omitted).  Plaintiff must "provide the 'grounds' of [her] 'entitlement to relief,' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).

A.   *McGreevy Has Official Immunity From Defamation Claims Because She is a Federal Contractor*

Congress established the Smithsonian Institution "for the increase and diffusion of knowledge among men."  20 U.S.C. § 41.  Its mission includes disseminating knowledge through various information platforms, including Smithsonian Magazine.  *See* Smithsonian Institution, "Terms of Use," available at: https://www.si.edu/termsofuse ("The Smithsonian Institution (the 'Smithsonian') has created and maintains websites and other digital properties to support its mission for the 'increase and diffusion of knowledge' (the 'Websites').").  As a trust instrumentality created by federal law, the Smithsonian enjoys immunity from suit, including absolute immunity from defamation lawsuits.  *See Expeditions Unlimited Aquatic Enters., Inc.*, 566 F.2d at 295.  In *Expeditions Unlimited*, a scientist brought a defamation lawsuit against the Smithsonian and one of its employees based on comments the employee made that were critical of the plaintiff's "capabilities in the field of underwater archaeological excavation."  *Id.* at 291.  The D.C. Circuit, *en banc*, held that state law defamation claims against the Smithsonian are barred absolutely, and that defamation claims against employees of the Smithsonian are barred so long as the employee is acting "within the outer perimeter of his duties."  *Id.* at 295.

The Smithsonian has been judged to be entitled to immunity in a variety of other contexts.  *See, e.g.*, *Misra v. Smithsonian Astrophysical Observatory*, 248 F.3d 37, 39 (1st Cir. 2001) ("The Smithsonian is a federal agency which enjoys sovereign immunity from suit."); *Mikkilineni v. PayPal, Inc.*, No. 20-647-CFC-SRF, 2020 U.S. Dist. LEXIS 118735, at *13-14 (D. Del. July 7, 2020), *adopted by* 2021 U.S. Dist. LEXIS 40213 (dismissing negligence claims which did not comply with the Federal Tort Claims Act because "the Smithsonian is a federal agency and its employees are employees of the government") (citing *Expeditions Unlimited*, 566 F.2d at 297).  The Plaintiff recognized the Smithsonian's immunity from suit here, dismissing

the Smithsonian as a defendant after having incorrectly named it in the original complaint. *Compare* Complaint *with* Am. Compl.; *cf. also* 28 U.S.C. § 2680(h) (Federal Torts Claim Act does not waive sovereign immunity for libel claims).

While McGreevy was not a Smithsonian employee and was instead acting under contract with it, federal contractors are also protected by federal immunity in a variety of circumstances. *See, e.g.*, *Nicole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340, 351 (3d Cir. 2012) (holding in affirming of dismissal that a federal contractor is "entitled to immunity for discretionary conduct that falls within the outer perimeter of their official duties"); *Rhoads Indus. v. Shoreline Found., Inc.*, Nos. 15-921, 17-266, 2022 U.S. Dist. LEXIS 43330, at *38-52 (E.D. Pa. Mar. 10, 2022) (discussing derivative immunity for acts performed under contract with the government that are within the scope of authority conveyed and the government contractor defense).

As this Court recent held, federal contractors "are entitled to absolute immunity from state tort liability for acts that are: (a) discretionary in nature and (b) fall within the scope of the officials' duties." *Vangjeli v. Banks*, No. 19-1635, 2020 U.S. Dist. LEXIS 182844, at *6-7 (E.D. Pa. Oct. 2, 2020) (Pratter, J.) (quoting *Westfall v. Erwin*, 484 U.S. 292, 299-300 (1988)) (second citation omitted). "The Federal Employees Liability Reform and Tort Compensation Act superseded this test as to federal employees, but the *Westfall* test remains the framework for determining when nongovernmental persons or entities are entitled to the same immunity." *Id.* (punctuation and citations omitted). Thus, absolute immunity applies where a federal contractor was "(1) carrying out a governmental function; (2) engaging in conduct that is discretionary; and (3) acting within the outer perimeter of their official duties." *Id.* (citation omitted).

McGreevy was carrying out a government function in writing the Article at the direction of the Smithsonian.  As noted above, the mission of the Smithsonian is "the increase and diffusion of knowledge," 20 U.S.C. § 41, and the Smithsonian uses Smithsonian Magazine and articles like the one McGreevy wrote to do that.  Plaintiff herself admits that it was Smithsonian Magazine (i.e., the government) that published the Article.  Am. Compl. at ¶ 162(b).  She also has conceded that the Smithsonian was performing a governmental function and is immune from suit by her decision to dismiss it as a defendant.  In writing the Article, McGreevy was "simply carrying out duties at the direction of the government," *Rhoads Indus.*, 2022 U.S. Dist. LEXIS 43330, at *40, and performing the same governmental function as the Smithsonian did when it published the Article.

Second, while the Smithsonian had the right to dictate the subject matter of the Article and had the right to edit (or re-write) the Article, it undoubtedly gave McGreevy discretion in how to construct the Article.  The contract makes that clear.  *See* ECF No. 1-5 ("Author shall have the right to control and determine Author's manner and method of performance under each assignment.").  And Plaintiff's pleadings concede as much, claiming that McGreevy was a "freelance" writer and that she ***wrote*** the Article, while the Smithsonian ***published*** it.  Am. Compl at ¶¶ 55, 161.

Finally, McGreevy was clearly acting within the outer perimeter of her duties in writing the Article for the Smithsonian.  Acts fall within the outer perimeter of a contractor's official duties if they are "connected with the general matters committed by law to the contractor's control or supervision."  *Nicole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, No. 10-389, 2011 U.S. Dist. LEXIS 33032, at *19 (E.D. Pa. Mar. 28, 2011) (dismissing all claims), *aff'd* 694 F.3d 340 (3d Cir. 2012).  Writing the Article was not just within the "general

matters" delegated to McGreevy, it was what the government specifically directed her to do.

And, there can be no doubt that the Smithsonian considered her actions to be within the scope of

what it asked her to do because it published the work, thereby putting its stamp approval on the

Article.  Unlike the situation in *Vangjeli*, where the contractors were allegedly acting contrary to

specifically articulated contractual guidelines, here the Smithsonian chose to publish the article,

and was well aware of the contents of the Article and the sources used by McGreevy which were

cited therein.

> "Official immunity from defamation suits is a time-honored form of the [official]

privilege."  *Gulati v. Zuckerman*, 723 F. Supp. 353, 356 (E.D. Pa. 1989) (collecting cases).  That

is because it is

> important that officials of government should be free to exercise
> their duties unembarrassed by the fear of damage suits in respect of
> acts done in the course of those duties – suits which would consume
> time and energies which would otherwise be devoted to
> governmental service and the threat of which might appreciably
> inhibit the fearless, vigorous, and effective administration of
> policies of government.

*Barr v. Mateo*, 360 U.S. 564, 589-90 (1959) (citation omitted).  Just as the employee of the

Smithsonian was entitled to immunity from defamation liability in *Expeditions Unlimited* when

acting "within the outer perimeter of his duties" as an employee, 566 F.2d at 295 (citation

omitted), McGreevy is entitled to immunity as a federal contractor when acting "within the outer

perimeter of [her] official duties" for the Smithsonian.  *Vangjeli*, 2020 U.S. Dist. LEXIS 182844,

at *6-7.

> The case for immunity is particularly strong here because McGreevy's actions

with respect to the Article are inextricably intertwined with those of the Smithsonian.  This is not

a situation in which the government delegated powers and then had no further role in the conduct

which gave rise to suit (like the security officers in *Vangjeli*).  To the contrary, the federal

government was intimately involved in every aspect of the Article.  While McGreevy wrote the Article, the Smithsonian had discretion to edit it in any way they saw fit, including adding headlines, pictures or other content (which they did).  ECF No. 1-5.  The conduct of those at the Smithsonian who edited and oversaw the Article is, therefore, directly at issue, and any suit against McGreevy will necessarily involve the Smithsonian, too.  *See also Am. Compl.* at 54 (requesting an order that would require Smithsonian Magazine to retract the Article).  The suit will thus "consume time and energies which would otherwise be devoted to governmental service" by Smithsonian personnel, which is exactly what the privilege is designed to prevent. *Barr*, 360 U.S. at 571.

Plaintiff is therefore entitled to official immunity and the Amended Complaint should be dismissed as to her.

**B.      *Even if McGreevy Were Not Immune From Suit, Plaintiff Has Not Pleaded that McGreevy Defamed Her***

While McGreevy is immune from suit and the Court can grant her motion on those grounds alone, Monge also has failed to state the basic elements of a defamation claim against McGreevy.  To prove defamation, a plaintiff must establish the following elements:

(1) The defamatory character of the communication,
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343(a).  Additionally, a plaintiff must prove that the statements at issue were false, and made with either actual malice or negligent disregard for the truth, depending on the status of the plaintiff.  *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) ("[A] private-figure plaintiff must bear the burden of showing that the speech at issue is false before

13

recovering damages for defamation from a media defendant."); *Joseph v. Scranton Times, L.P.*, 129 A.3d 404, 425, 428 (Pa. 2015) ("The U.S. Supreme Court has indicated public officials are required to prove actual malice," (citing *Norton v. Glenn*, 860 A.2d 48, 56 (Pa. 2004)), but "Pennsylvania requires private figures to prove, at a minimum, negligence in a civil libel case." (citing *Am. Future Sys., Inc. v. Better Bus. Bureau*, 923 A.2d 389, 400 (Pa. 2007)).

The pleadings here fail to offer facts to raise a plausible claim that McGreevy's Article contains any false statements of fact or that McGreevy acted negligently, much less with actual malice.

### 1.    McGreevy's Article Contains No False Statements of Fact

Where, as here, the subject matter of an article is a matter of public concern, "First Amendment concerns compel the plaintiff to prove . . . that the alleged defamatory statement is in fact false." *Lewis v. Phila. Newspapers, Inc.*, 833 A.2d 185, 191 (Pa. Super. Ct. 2003). "Minor inaccuracies" are insufficient to establish liability; the law only permits recovery for inaccuracies that cause significantly more harm to the plaintiff's reputation than would a full recital of the truth. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991); *see also Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. Ct. 1982) (the test is "whether the [alleged] libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced") (quoting SACK, LIBEL, SLANDER, AND RELATED PROBLEMS 50-51, 137-138 (1980)). Moreover, statements are only actionable where they can be proven false by objectively verifiable evidence—mere opinions that are not provable as false are not actionable. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").

14

The Article only mentions Monge in one paragraph, appearing more than half-way through the piece:

> What's more, the remains appear to have been used as a "case study" in an online course presented by Princeton University and hosted on Coursera. Titled "Real Bones: Adventures in Forensic Anthropology," the class was recorded in 2019 and includes footage of Janet Monge, an adjunct professor in anthropology at the University of Pennsylvania and former student of Mann, picking up the bones and describing them in graphic detail. She makes no reference to the fact that the families of probable victims Tree and Delisha never provided consent for their daughters' bones to be used in this way, the Guardian notes.

Am. Compl. ¶ 161(b).

None of the information in this Paragraph is alleged to be false.  Monge herself pleads that she used the bones in an online course hosted on Coursera.  *Id.* at ¶ 121 ("Ultimately, these discussions resulted in the production of a MOOC titled 'Real Bones: Adventures in Forensic Anthropology,' which was published on the Coursera online platform.").  She did pick up the bones and describe them in graphic detail.  *See id.* at ¶ 128.  The video, described *supra* at Section II.C., shows Monge describing the bones as "juicy," and saying that "[t]hey have a lot of, sort of, sheen, at least this one does, and that is because of course there is still marrow in the marrow cavity and its sort of leeching basically out into the bone and so it gives it that slick sort of appearance. If you smell it, it doesn't actually smell bad but it smells kind of greasy like an older style grease."  And Plaintiff does not allege that she had the permission of any potential family members of the deceased individuals to use the bones in this manner, including probable victims Tree and Delisha.

Because the Article contains only true statements of fact, Plaintiff tries to twist the Article by alleging it implies other things she says are false.  Monge alleges: (1) the Article "implied that Dr. Monge acted unprofessionally and her actions were driven by racist animus;"

(2) "[t]he article also falsely asserts that the unidentified remains are those of Katricia and Delisha," and (3) "it suggests that a failure to contact their families constituted professional misconduct." *Id.* ¶ 161(b).  But an allegation of implication "cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1944) (citing *Hackett v. Providence Telegram Publish'g Co.*, 18 R.I. 589 (1894)); *see Mallory v. S & S Publishers*, 260 F. Supp. 3d 453, 461 (E.D. Pa. 2017) (holding that the statement that a plaintiff "'picked up' famous men" would not lead an "average reader" to believe that she was a prostitute); *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 216-17 (Pa. 1981) (holding that it would take a "forced construction" of an article which accused plaintiff of opposing the B-1 bomber and being an unknowing recipient of Soviet funds to mean that plaintiff was an agent of the Soviet government).  It is for the Court, in the first instance, to determine whether a publication will bear the defamatory meaning that the Plaintiff ascribes to it. *See Thomas Merton Ctr.*, 442 A.2d at 215-16 ("If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial."); *Gibney*, 547 F. App'x at 113 (same) (quoting *Kurowski v. Burroughs*, 994 A.2d 611, 617 (Pa. Super. Ct. 2010)).

First, the Article does not state that Dr. Monge's actions constituted "professional misconduct," nor does it suggest any specific violation of any code of professional misconduct. To the contrary, it sets out the ***facts*** underlying the treatment of the bones, including Monge's use of the bones in a course, and the fact that she did not have permission from any family members to use the bones.  Am. Compl. ¶161(b).  The Article also notes that other publications—***in opinion pieces***—suggested the bones were handled unethically and called for

16

action.  Smithsonian Mag. Article ("organizer Abdul-Aliy Muhammad published an op-ed in the *Inquirer* calling on the Penn Museum and Princeton to offer reparations for their unethical possession of the children's remains.").  Indeed, the Article even contains a hyperlink to the Inquirer op-ed, and a news article that describes the author of that piece, entitled "Meet Abdul-Aliy Muhammad: a Black Queer Muslim HIV+ activist who has been fighting racism within LGBTQ+ spaces for years."  Bailey Williams, AIDS FOUNDATION CHICAGO (June 26, 2020), available at: https://www.aidschicago.org/page/news/inside-story/meet-abdul-aliy-muhammad-a-black-queer-muslim-hiv-activist-who-has-been-fighting-racism-within-lgbtq-spaces-for-years.

In the context of the Article, any reasonable reader would understand that any suggestion that the handling of the bones was unethical or improper was simply an opinion (of someone else) relating to the facts of how a number of individuals—including Monge—handled the bones.  An opinion based on disclosed facts is not actionable as a matter of law.  *Baker v. Lafayette Coll.*, 532 A.2d 399, 403 (Pa. 1987).  Thus, the Superior Court has held that where an author lays out the facts to support her opinion, stating that those facts seemed "underhanded and immoral to me" is a protected opinion.  *See Sprague v. Porter*, No. 1649 EDA 2013, 2014 Pa. Super. Unpub. LEXIS 1659, at *49-50 (Pa. Super. Ct. Aug. 26, 2014); *see also Kane v. Chester Cty.*, 811 F. App'x 65, 70 (3d Cir. 2020) (statements that conduct was "unethical, unprofessional and harassing" were opinions based on disclosed facts).  Similarly, to the extent that some of the sources cited in the Article raised questions about the racial overtones of the MOVE incident and the related remains, that too is simply an expression of a viewpoint or opinion which cannot form the basis of a defamation claim.  *See Reilly v. WNEP*, No. 557 MDA 2020, 2021 Pa. Super. Unpub. LEXIS 734, at *14-15 (Mar. 17, 2021) ("We have long held in Pennsylvania that an

'accusation of racial prejudice' is not defamatory.") (quoting *Rybas v. Wapner*, 457 A.2d 108, 110 (Pa. Super. Ct. 1983)).[5]

Second, the Article does not state that "the unidentified remains are those of Katricia and Delisha," it states that the "remains [are] thought to belong to two of the victims—Tree and Delisha" but then goes on to note that the owners of the bones "were never conclusively identified."  Smithsonian Mag. Article.  And, even if the Article had affirmatively stated that the bones belonged to Katricia and Delisha (which it does not), Plaintiff fails to articulate how any such statement would be defamatory.  It is undisputed that Plaintiff did not have the permission (or seek the permission) of ***any*** family members associated with the MOVE bombing to use them in her course presentation, so the precise identity of the victims is simply not material.

       2.      <u>McGreevy Did Not Act Negligently, Much Less with Actual Malice</u>

"[D]efamation includes a requirement [that] the plaintiff prove a constitutionally-mandated minimum level of fault in order for the court to impose liability on a media defendant."  *Joseph*, 129 A.3d at 428 (citing *Norton*, 860 A.2d at 55-56).  This standard defaults at "negligence" if the plaintiff is a private figure, but is increased to "actual malice" if the plaintiff is a public figure or a public official.  *See Am. Future Sys. Inc.*, 923 A.2d at 400 ("[A] private figure defamation plaintiff . . . must prove that the defamatory matter was published with 'want of reasonable care and diligence to ascertain the truth' or, in the vernacular, with negligence.'") (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343 (1974) and *Rutt v. Bethlhem's Globe Pub. Co.*, 484 A.2d 72, 83 (Pa. Super. Ct. 1984)); *McDowell v. Paiewonsky*,

---

[5] To the extent Plaintiff's claim is based on the headline, she has not alleged that McGreevy wrote the headline (because she did not).

769 F.2d 942, 947 (3d Cir. 1985) ("public figures must prove 'actual malice' to recover damages

in a defamation case") (quoting *Curtis Publish'g Co. v. Butts*, 388 U.S. 130 (1967)).

   As explained in more detail by the Al Dia Memorandum of Law in Support of

Motion to Dismiss, which is incorporated herein, Monge is a limited purpose public figure with

respect to the MOVE bombing and the remains she has worked so diligently to keep and

publicize over her career. *See Am. Future Sys., Inc.*, 923 A.2d at 402 ("[P]ublic figures

effectively have assumed the risk of potentially unfair criticism by entering into the public arena

and engaging the public's attention.") (quotation omitted) (quoting *Steaks Unlimited v. Deaner*,

623 F.2d 264, 273 (3d Cir. 1980)); ECF No. 37-2 at 18-21.  In short, Monge's role as Professor

at the University of Pennsylvania and curator of the Penn Museum put her in a public-facing

role, for which "she was named 'Best Museum Curator' by Philadelphia Magazine" and "earned

numerous awards for her teaching and scholarship." Am. Compl. ¶ 2.  Reports prepared by

independent investigators have documented Monge's involvement with the handling of the bones

and using or showing them to others since 1985.  *See* Ballard Spahr LLP, "Investigative Report

Regarding Princeton University's Role in the Handling of Victim Remains from The 1985

MOVE Bombing in Philadelphia," 20-43 (Aug. 30, 2021), available at:

https://www.princeton.edu/sites/default/files/documents/2021/08/2021-08-30-FINAL-MOVE-

REPORT.pdf; Dechert & MMWR Report at Part Two 1-2.  Part Two of the Dechert & MMWR

Report is entitled "Part Two of Three: The MOVE Victim Remains in the Custody of Drs. Alan

Mann and Janet Monge."  Further, Monge decided to publish an online video course using the

remains, subjecting her to public scrutiny.  Am. Compl. ¶¶ 131-32; *Nevyas v. Friedman*, No.

00946, 2011 Phila. Ct. Com. Pl. LEXIS 157, at *11-12 (June 17, 2011) (holding that a doctor

who advertised his professional services was a limited purpose public figure).

Monge has failed to adequately plead that McGreevy acted with actual malice. The Complaint only alleges generally that "Defendants knew or should have known that the statements described . . . were false when made, and Defendants published them either intentionally or maliciously, or with reckless disregard for their truth or falsity, or negligently and carelessly published."  Am. Compl. ¶ 180; s*ee Bartlett v. Bradford Publ'g, Inc.*, 885 A.2d 562, 567 (Pa. Super. Ct. 2005) ("To establish actual malice, there 'must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'") (quoting *Curran v. Phila. Newspapers, Inc.*, 546 A.2d 639, 643 (Pa. Super. Ct. 1988)).

"In the wake of *Iqbal* and *Twombly*, adequately pleading actual malice is an onerous task."  *Earley v. Gatehouse Media Pa. Holdings, Inc.*, No. 3:12-1886, 2013 U.S. Dist. LEXIS 140631, at *15-16 (M.D. Pa. Sept. 30, 2013).  Plaintiff has not come close to meeting this onerous task.  Indeed, she has made no allegation specific to McGreevy's state of mind anywhere.  She certainly has not offered some explanation of why McGreevy had reason to believe anything she said was false where every statement in the Article is attributed to another reputable news organization.  Thus, while "failure to investigate, without more, will not support a finding of actual malice," here as a matter of law Plaintiff cannot even plead that, since the article contains the source for each statement.[6] *Bartlett*, 885 A.2d at 567 (quoting *Fitzpatrick v. Phila. Newspapers, Inc.*, 567 A.2d 684, 688 (Pa. Super. Ct. 1989)).

---

[6] Plaintiff's entire theory of the case seems to be that others who personally knew her were out to get her and thus fabricated information to mislead the public.  *See* Am. Compl. ¶¶ 8, 150-51.  She does not allege that McGreevy had any knowledge of this issue so, if anything, under Plaintiff's theory, McGreevy would have been deceived by these actions just like the rest of the public.

Indeed, even if Monge is not a public figure, the fact that McGreevy's article is nothing more than a compilation of information from reputable news sources means she could not, as a matter of law, have acted with negligence, either.  By the time McGreevy's Article was published, several reputable sources had published articles describing Monge's conduct, such as The Philadelphia Inquirer, the Guardian, and The New York Times.  Am. Compl.  ¶¶ 154, 160(b), 161(a).  McGreevy cited both The Inquirer and Guardian articles in her aggregation, among twelve other reputable sources.  Smithsonian Mag. Article.  Many courts have held a defendant cannot be liable for simply repeating information that has already been reported by reputable news organizations.  *See Appleby v. Daily Hampshire Gazette*, 478 N.E.2d 721, 725 (Mass. 1985) ("[I]n ordinary circumstances, no jury could reasonably find that a newspaper had acted negligently in relying on the accuracy of a story from a reputable wire service."); *Nelson v. Assoc. Press, Inc.*, 667 F. Supp. 1468, 1479 (S.D. Fla. 1987) (adopting holding of *Appleby* that "republications could not constitute negligence, as a matter of law, unless the article appears on its face to be inherently unreliable"); *McKinney v. Avery J.*, Inc., 393 S.E.2d. 295, 297 (N.C. Ct. App. 1990) (holding that, "[a]s a matter of law," claims against an author who "relied on reputable wire services and daily newspapers" in writing newspaper articles could not "constitute negligence on her part"); *Reader's Digest Ass'n v. Marin Cnty. Sup. Ct.*, 690 P.2d 610, 619 (Cal. 1984) ("A publisher does not have to investigate personally, but may rely on the investigation and conclusions of reputable sources.").

Because McGreevy could not have acted with negligence, never mind actual malice, Plaintiff has failed to state a defamation claim against her.

## C.   *Monge Has Not Adequately Alleged False Light*

"Pennsylvania recognizes the tort of false light invasion of privacy, and has adopted the Restatement (Second) of Torts definition of it."  *Miller v. Shubin*, No. 4:15-cv-1754,

2016 U.S. Dist. LEXIS 62018, at *21 (M.D. Pa. May 11, 2016).  The Second Restatement of

Torts defines the elements of false light as follows:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

Restatement (Second) of Torts § 652E.  Pennsylvania courts also require that a false light claim

concern facts "which are not of legitimate concern to the public."  *Rush v. Phila. Newspapers,*

*Inc.*, 732 A.2d 648, 654 (Pa. Super. Ct. 1999) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d

979, 987 (Pa. Super. Ct. 1997)).

      Monge's false light claim fails for the same reasons as her defamation claim:

McGreevy made no false statements, and did not act with reckless disregard to falsity (which is a

required showing in a false light claim whether she is a public figure or not).  *See supra* Section

III.B.; *see also Nothstein v. U.S. Cycling*, 499 F. Supp. 3d 101, 128 (E.D. Pa. 2020) ("The

information did not indicate that the plaintiff actually perpetrated sexual assault, rather that there

were allegations of assault and those allegations had enough specificity to allege a policy has

been violated.").  Further, the false light claim fails because McGreevy's Article was about a

matter of public concern: the City of Philadelphia and the University of Pennsylvania's handling

of the remains from one of its darkest days.  Smithsonian Mag. Article.

    **D.**    ***McGreevy Did Not Aid or Abet Any Other Defendant's Alleged Transgressions***

      Monge also alleges that McGreevy, along with all other defendants, aided or

abetted each other in their alleged defamation.  Am. Compl. ¶¶ 217-21.  Civil aiding and abetting

can make a person subject to liability for harm to a third person arising from the tortious conduct

of another if he:

> "(a) does a tortious act in concert with the other or pursuant to a common design with him; or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

Restatement (Second) of Torts § 876; *see Skipworth by Williams v. Lead Indus. Ass'n*, 690 A.2d 169, 174-75 (Pa. 1997) (quoting the Second Restatement).

This claim fails because there is no underlying tortious act, no facts are pled to show that McGreevy knew of any tortious act, and no facts are pled tending to show that any of the defendants besides Mitchell, Kassutto, Thomas, and Billy Penn had any contact with each other at any time. *See Peschmann v. Quayle*, No. 1:17-cv-00259, 2019 U.S. Dist. LEXIS 137468, at *44 (W.D. Pa. Aug. 13, 2019) (holding that an "aiding and abetting claim nevertheless fails because [plaintiff] has not alleged any facts to show that any Defendant provided substantial assistance or encouragement"). In short, there are no facts whatsoever pleaded in the Amended Complaint to support such a claim against McGreevy.

WHEREFORE, for all the aforesaid reasons, Defendant Nora McGreevy respectfully requests that the Court grant her Motion to Dismiss.

Date: August 12, 2022

Respectfully submitted,

*/s/ Michael E. Baughman*
Michael E. Baughman
TROUTMAN PEPPER
HAMILTON SANDERS LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
215-981-4000
Michael.Baughman@troutman.com

*Attorney for Defendant Nora McGreevy*

23

**CERTIFICATE OF SERVICE**

I, Michael E. Baughman, attorney for Nora McGreevy, Defendant in this matter, certify that a copy of the foregoing Memorandum in Support of Nora McGreevy's Motion to Dismiss was served via this Court's electronic filing system upon all counsel of record this 12th day of August, 2022:

/s/ *Michael E. Baughman*
Michael E. Baughman