## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANET MONGE, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | No. 2:22-CV-02942-GEKP |
| | : | |
| UNIVERSITY OF PENNSYLVANIA, *et al.* | : | |
| | : | |
| Defendant | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

**SPECTOR GADON ROSEN VINCI P.C.**
By: Alan B. Epstein (Pa. I.D. No. 02346)
    Adam A. Filbert (Pa. I.D. No. 330960)
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8832 / (215) 531-9103 (Fax)
aepstein@sgrvlaw.com

*Attorneys for Plaintiff, Janet Monge*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

I.     INTRODUCTION ....................................................................................................... 1

II.    STATEMENT OF THE CASE ................................................................................... 1

       A.     PROCEDURAL HISTORY ............................................................................ 1

       B.     STATEMENT OF FACTS ............................................................................. 2

              1. OVERVIEW ............................................................................................ 2

              2. STATEMENT OF MATERIAL FACTS AS RELATED TO MCGREEVY ................ 9

III.   STATEMENT OF CONTROLLING LEGAL PRINCIPALS .................................... 10

       A.     APPLICABLE STANDARDS GOVERNING A MOTION TO DISMISS ..................... 10

       B.     DEFAMATION ............................................................................................ 11

              1. STATUS OF PLAINTIFF ........................................................................ 11

              2. GENERAL PRINCIPLES OF A DEFAMATION CASE ............................... 14

              3. DEFAMATION BY IMPLICATION/INNUENDO ....................................... 17

       C.     FALSE LIGHT ............................................................................................ 18

       D.     CIVIL AIDING AND ABETTING ................................................................. 19

IV.    DISCUSSION ............................................................................................................ 20

       A.     MCGREEVY IS NOT ENTITLED TO GOVERNMENT CONTRACTOR IMMUNITY
              ....................................................................................................................... 21

              1.   DERIVATIVE IMMUNITY ................................................................... 21

              2.   GOVERNMENT CONTRACTOR IMMUNITY ....................................... 23

       B.     PLAINTIFF HAS ADEQUATELY STATED A CLAIM FOR DEFAMATION AND
              DEFAMATION BY IMPLICATION ................................................................. 25

              1.   MCGREEVY'S ARTICLE IS CAPABLE OF DEFAMATORY MEANING ......... 25

              2.   PLAINTIFF IS A PRIVATE FIGURE THAT MUST ONLY SHOW NEGLIGENCE
                   IN THE PUBLISHING OF THE DEFAMATORY STATEMENTS ..................... 27

C.    PLAINTIFF HAS ADEQUATELY STATED A CLAIM FOR FALSE LIGHT ............ 29

D.    PLAINTIFF HAS ADEQUATELY STATED A CLAIM FOR CIVIL AIDING AND
       ABETTING ......................................................................................................... 31

V.    CONCLUSION ......................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

Aamco Automatic Transmissions, Inc. v. Tayloe, 368 F.Supp. 1283, 1286-87 (3d Cir. 1973) ................. 11

American Future Systems, Inc. v. Better Business Bureau, 923 A.2d 398, 400 (Pa. 2007) ....................... 14

Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) ............................................................................... 10

Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 555 (2007) ....................................................... 10

Bogash v. Elkins, 176 A.2d 677, 679 (Pa. 1962) ............................................................................... 17

Boyle v. United Techs. Corp., 487 U.S. 500, 512 (1988) .............................................................. 23, 24

Campbell-Ewald Co. v. Gomes, 577 U.S. 153 (2016) ................................................................... 21, 22

Clemente v. Espinosa, 749 F. Supp. 672, 677-78 (E.D. Pa. 1990) ...................................................... 16

Cornell Cos., Inc. v. Borough of New Morgan, 512 F.Supp.2d 238, 271 (E.D. Pa. 2007) ............ 14, 15, 26

Dunlap v. Philadelphia Newspapers, Inc., 448 A.2d 6, 15 (Pa. Super. 1982) .................................. 17, 25

Franklin Prescriptions, Inc. v. New York Times Co., 2004 WL 1770296, at *8
       (E.D. Pa. Aug. 5, 2004) ............................................................................................................ 15

Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) ....................................................................... 12, 14

Gould Elecs. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) ...................................................... 10

Green v. Minzer, 692 A.2d 169, 172 (Pa. Super. 1997) ................................................................ 14, 17

Harris v. Kellogg, Brown & Root Servs., Inc., No. CV 08-563, 2016 WL4720048 (W.D. Pa. Sept. 9,
       2016) ....................................................................................................................................... 22

Hutchinson v. Proxmire, 443 U.S. 448 (1976) ...................................................................... 13, 28, 29

Larsen v. Philadelphia Newspapers, Inc., 543 A.2d 1181, 1188 (Pa. Super. 1988) ........................... 18, 19

Livingston v. Murray, 612 A.2d 443, 449 (Pa. 1992) ........................................................................ 17

Lopez v. Beard, 333 Fed. Appx. 685, 687 (3d Cir. 2009)................................................................11

Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1078 (3d Cir. 1985).........................13, 27

Menkowitz v. Peerless Publications, Inc., 176 A.3d 968 (Pa. Super. 2017) ................................................18

Mzamane v. Winfrey, 693 F.Supp.2d 442, 477 (E.D.Pa. 2010) ....................................................13, 17, 27

New York Times v. Sullivan, 376 U.S. 254 (1964) ................................................................11

Northstein v. USA Cycling, 499 F.Supp.3d 101 (E.D. Pa. 2020)..............................................................26

Oshiver v. Levin, Fishbein, Cedrone and Berman, 38 F.3d 1380, 1384 (3d Cir. 1994) ............................10

Pelagatti v. Cohen, 536 A.2d 1337, 1345 (Pa. Super. 1987)........................................................15, 17, 26

Petula v. Mellody, 588 A.2d 103 (Pa. Cmwlth. 1991) ................................................................16

Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008) ........................................................10

Pring v. Penthouse Int'l Ltd., 695 F.2d 438 (1992) ................................................................13

Redco v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985), cert. den., 474 U.S. 843 (1985)...........................16

Rhoads Indus., Inc. v. Shoreline Foundation, Inc., 2022 WL 742486 (E.D. Pa. Mar. 10, 2022)...21, 22, 23, 24

Sarkees v. Warner-W Corp., 37 A.2d 544, 546 (Pa. 1944)........................................................17, 18, 25

Smyth v. Barnes, No. 04-930, 1995 WL 576935, at *10 (M.D. Pa. Sept. 25, 1995) ................................15

Sovereign Bank v. Valentino, 2006 Pa. Super. 338 (2006)........................................................19, 20, 21, 22

Thomas Merton Ctr. V. Rockwell Int'l Corp., 442 A.2d 213, 217 (Pa. 1981)..........................................17

Times, Inc. v. Firestone, 424 U.S. 448 (1976) ................................................................12

Tucker v. Fischbein, 237 F.3d 275, 282 (3d Cir. 2001) ................................................................14, 15

U.S. Healthcare v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 938 (3d Cir. 1990)................13, 27

Vangjeli v. Banks, No. 19-1635, 2020 WL 5880131 (E.D. Pa. Oct. 2, 2020) ....................................22, 23

Valjet v. Wal-Mart, 2007 WL 4323377 (E.D. Pa. Dec. 11, 2007)........................................................16

Wolston v. Reader's Digest Ass'n, 429 F.Supp. 167 (D.D.C. 1977), aff'd 578 F.2d 427
(D.C. Cir. 1978), rev'd 443 U.S. 157 (1979) ................................................................12

Yearsley v. W.A. Ross Const. Co., 309 U.S. 18 (1940) ................................................................21, 22

iii

**STATUTES**

28 U.S.C. § 1442(a)(1) ............................................................................................................2

42 Pa. C.S.A. § 8343 ...........................................................................................................14

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(6) ......................................................................10, 11

Restatement (Second) of Torts § 652E ...............................................................18, 19, 29, 30

Restatement (Second) of Torts § 876 ..................................................................19, 20, 31

Restatement (Second) of Torts, § 573 ......................................................................16, 18

Plaintiff, Janet Monge, by her undersigned attorneys, respectfully submit the following Memorandum of Law in Opposition to the Motion to Dismiss filed by Defendant, Nora McGreevy ("McGreevy").

## I.    **INTRODUCTION**

Defendant McGreevy has filed a Motion to Dismiss all Counts of the Complaint filed by Plaintiff Janet Monge ("Dr. Monge") averring that it is not liable to Plaintiff because: (1) McGreevy has immunity from defamation as a contractor of a federal agency; (2) the statements made in the subject article were true and non-defamatory; (3) Adopting the discussion in the Al Dia Memorandum, Plaintiff is a limited purpose public figure and was published without the requisite actual malice; and (4) the statements made were true, not made with wreckless disregard of any falsity, and therefore, the trot of false light must fail. As set forth below, it is respectfully asserted that each of these suggestions are without factual or legal merit, and therefore, the Motion to Dismiss Plaintiffs claims against McGreevy must be denied.

## II.    **STATEMENT OF THE CASE**

### A.    **Procedural History**

Dr. Monge commenced this action on April 20, 2022 by filing a Praecipe to Issue a writ of Summons in the Philadelphia Court of Common Pleas. On May 20, 2022, Dr. Monge filed her Complaint, and then an Amended Complaint on June 22, 2022, adding the American Anthropological Association and removing The Association of Black Anthropologists and the Smithsonian Magazine as Defendants. The Amended Complaints brought the following causes of action against the Defendants: (1) defamation (Count I), (2) defamation by implication (Count II), (3) false light (Count III), and (4) civil aiding and abetting (Count IV).

On July 27, 2022, Defendant Nora McGreevy filed a Notice of Removal of the action to Federal Court under 28 U.S.C. § 1442(a)(1), bringing the action to this Court. Thereafter, on August 12, 2022, McGreevy filed the instant Motion to Dismiss.

**B.**     **STATEMENT OF FACTS**

**1. Overview**

On May 13, 1985, the Philadelphia Police Department dropped an aerial explosive fire bomb on the home of its own citizens. *See* Plaintiff's Amended Complaint, attached hereto as Exhibit "A," at 75-79. The Police and Fire Commissioners then decided to let the fire burn for several hours rather than extinguishing it, allowing the uncontrolled fire to spread to other houses on the block. *Id.* at 77. By the time the fire was finally extinguished, it had destroyed at least six (6) homes on the block and had killed eleven (11) people, including five (5) children. *Id.* at 78-79.

The forensic processing of the bomb site was a complete failure. *Id.* at 82. Although an analysis the site was already difficult since the fire, which reached temperatures of more than 2,000 degrees Fahrenheit, reduce the site and surrounding homes to debris, rubble, and dust, these difficulties were exacerbated by the inaction of the Philadelphia Medical Examiner's Office, who refused to go to the bomb site until the first body was discovered the day after the bombing occurred. *Id.* at 82. By the time the Medical Examiner finally arrived at the site, the City had already begun using cranes and other construction equipment to dig up debris and body parts. *Id.* at 83. Not only were these actions contrary to proper and standard crime scene procedures, but worse, they severely damaged the remains of the individuals who died in the fire, and they comingled valuable evidence with the remains of individuals who had died in the bombing and fire without identifying any locations or positions at the scene. *Id.* Even worse, there was no systematic procedure for recording evidence, no proper control over the physical remains of the

2

dead, and lateral x-rays and toxicology tests of the remains were not immediately taken. *Id.* at 84. This complete failure to properly analyze and mark the scene created the severe difficulties in identifying remains from the site. *Id.* at 85.

Due to the difficulties in the forensic analysis of the bomb site, Philadelphia's then Chief Medical Examiner, Dr. Marvin Aronson, invited Dr. Alan Mann, professor in the Department of Anthropology at the University of Pennsylvania with expertise in identifying small bone fragments, to assist with the investigation. *Id.* at 86. Dr. Mann, in turn, requested that his doctoral student and mentee, Dr. Monge, assist him with his analysis of the dissociated bone fragments removed from the bomb site. *Id.* at 87.

None of the skeletal remains at the site were intact or complete, so Dr. Mann and Dr. Monge began sorting recovered bone fragments based on age profiles. *Id.* at 88. Upon examination, they concluded that pelvis bone and proximal femur bone fragments (that have become central to the present litigation) did not conform to any of the ages of the individuals who were presumed to have been killed in the bombing and subsequent fire. *Id.* at 89. Dr. Mann and Dr. Monge determined that the bones were from a young adult female, likely between the ages of 17 and 21. *Id.* at 90. Since the oldest child known to be in the MOVE house was a 14-year-old girl named Katricia (Tree) Africa, these bone fragments were determined to be unaffiliated with any of the known MOVE victims and thereafter referred to as Jane Doe. *Id.* at 91.

Sometime thereafter, the MOVE Commission, appointed to investigate the MOVE bombing and subsequent excavation, established its own outside pathology group led by pathologist Dr. Ali Hameli, and it tasked the group with identifying the remains of the victims. *Id.* at 92. This pathology group did not include Dr. Mann or Dr. Monge. *Id.* In a flawed report, Dr.

Hameli wrongfully and unscientifically stated that the Jane Doe pelvis and femur fragments were associated with Katricia "Tree Africa" Dodson. *Id.* at 93.

After receiving the Commission's recommendation, Dr. Mann conducted a second investigation and issued a report reaffirming Dr. Monge's and his conclusion that the pelvis and proximal femur fragments could not have belonged to Katricia. *Id.* at 94. This conclusion has since been confirmed by at least seven different forensic anthropologists. *Id.* at 95. After Dr. Mann confirmed his conclusions, the Philadelphia Medical Examiner's Office, with the help of Dr. Mann and Dr. Monge, retained the responsibility and authority of identifying the unidentified human bone fragments. *Id.* at 96. On December 14, 1985, the remains conclusively identified as belonging to Katricia Africa were buried after their release to Hankins Funeral Home. *Id.* at 97. The pelvis and proximal femur bone fragments that could not be conclusively identified as relating to any of the known MOVE victims, including Katricia (the "unidentified fragments") were released to Dr. Mann for further investigation at his office at the Penn Museum. *Id.* at 98.

From 1986 to 2001, the unidentified fragments, which had still not been conclusively linked to any known individual, were stored in Dr. Mann's office in the physical anthropology section of the Penn Museum in strict compliance with standard forensic best practices. *Id.* at 99. Throughout this time, Dr. Monge continued the investigation in the hopes of identifying the remains. *Id.* at 101. In keeping with that ongoing forensic investigation, in 1995, Dr. Monge sought out contact with Ramona Africa, one of the MOVE family leaders who had just been released from a long prison sentence, suggesting that the unidentified fragments could be turned over to her as the MOVE family representative even though there was no conclusive evidence that the fragments were the remains of a MOVE family member. *Id.* Ramona Africa declined the suggestion and the fragments were returned to safe storage at the Penn Museum. *Id.*

In 2001, Dr. Mann left Penn to join the Anthropology Department at Princeton University as a full-time faculty member, and Dr. Monge continued to assist him with his courses at Princeton the same way she did at Penn. *Id.* at 103-04. However, Dr. Monge remained at Penn, and the unidentified bone fragments remained in safe storage at the Penn Museum due to Penn's superior facilities for forensic analysis. *Id.* at 105.

From 2001 to 2015 (the latter date when Dr. Mann retired from teaching), Dr. Monge brought the unidentified fragments to Princeton's campus for further investigation between two and five times, largely for the purpose of having other anthropologists who were visiting Princeton to review them. *Id.* at 107. Such transfers were conducted in strict accordance with chain of custody protocols and promptly returned to safe storage at the Penn Museum afterwards. *Id.* at 108.

In 2014, after being moved to a new lab in the physical anthropology department at the Penn Museum, Dr. Monge began working with a geneticist from another leading research university on a number of research projects. *Id.* at 109. At some point during their work together, the two discussed the possibility of using then just recently developed DNA analysis that permitted bone fragments to be identified with relatives. *Id.* at 110. Because this analysis required a DNA sample from a relative of Katricia to support that the fragment was from another older female, Dr. Monge again had hope that renewed contact with Consuella Dodson, Katricia's mother who had just been released from prison, could aide in securing a DNA sample that would conclusively resolve that the fragments were from a yet unidentified and unrelated individual. *Id.* at 111. After being contacted by Malcom Burnley, a local writer interested in writing an article about the MOVE tragedy and its aftermath, Dr. Monge enlisted him to help request a DNA sample from Consuella. *Id.* at 112. However, despite multiple efforts to communicate with Consuella, Burnley was unable to have a meaningful conversation with her. *Id.* at 113. Despite continued interest in solving the

issues regarding the unidentified fragments, Dr. Monge determined the case to be "cold," and she accepted that it was unlikely she would ever be able to conclusively identify the source of the fragments. *Id.* at 114.

But then, four years later, in December 2018, Burnely reached out to Dr. Monge again to see if she wanted to continue to explore the identification process. *Id.* at 115. Although Dr. Monge had already considered the case "cold," she and Burnley continued to discuss the matter. *Id.* at 116. However, that investigation came to a halt when they resolved that they would not be able to secure help from any of the MOVE family members, and Dr. Monge believed she had gone down all possible paths towards identifying the bone fragment remains. *Id.* 116-17. Accordingly, she accepted that she would likely never come to a final conclusion on the identity of the bone fragment remains, and she once again declared the case "cold." *Id.*

In 2017 and 2018, Dr. Monge began discussions regarding the creation of a Massive Open Online Course ("MOOC") on Forensic Anthropology with Dr. Jeffrey Himple, a Princeton professor, which would utilize videos the two were planning to make and use in an upper-level anthropology course they were teaching together. *Id.* at 119. At first, these discussions did not include the use of the unidentified bone fragments, but in 2019, after exhausting all avenues of identification, Dr. Monge discussed the use of them to address the difficulties of forensic anthropology in the field. *Id.* at 120. Ultimately, the discussions resulted in the production of a MOOC titled "Real Bones: Adventures in Forensic Anthropology," which was published on the Coursera online platform. *Id.* at 121.

The course, which was streamed on Coursera, was free but available only to those students who enroll in the course through the Coursera website. *Id.* at 122. It was designed to be a multi-part course discussing forensic anthropology using real world examples, with an overall purpose

6

of teaching how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains. *Id.* at 123. The course featured eleven sessions, with the first seven being recorded in a studio and the remaining four recorded at the Penn Museum in their lab facilities. *Id.* at 124.

The one and only time the unidentified remains were displayed in the course occurred in the ninth class, titled "MOVE – An Analysis of the Remains." *Id.* at 127. In that 14-minute class, Dr. Monge can be seen in the Penn Museum's lab with one of her students and the unidentified bone fragments comparing those fragments to other similar bone fragments and models and explaining how forensic techniques could be used to determine the age of the remains. *Id.* at 128. At all times during the video, both Dr. Monge and her student properly, scientifically, and discretely handled the remains, utilizing rubber gloves to ensure that there would be no outside contamination. *Id.* at 129. The two discussed the process they took in attempting to provide an age estimate of the person from whom the fragments originated, and Dr. Monge explained that, despite her diligence, the source of the fragments has still not been identified. *Id.* at 130.

"Real Bones: Adventures in Forensic Anthropology" was published in August 2020 and available for almost a year without any controversy or complaint. *Id.* at 131. It was only after Paul Mitchell began his deliberate, retaliatory, and career enhancing smear campaign against Dr. Monge that the matter became known based upon Mitchell's false reporting, and the course was shut down. *Id.* at 132. Mitchell's retaliatory efforts were only initiated  after Dr. Monge reported Mitchell for severe professional misconduct and changed the locks in the Penn Museum Lab to stop Mitchell from improperly removing remains from the Museum and improperly altering forensic materials. *Id.* at 133-47.

7

Specifically, Mitchell's vengeful actions began in early April 2021 when he met with Christopher Woods, who had recently been hired as the Director of the Penn Museum, and without any foundation, Mitchell accused Dr. Monge of mishandling the unidentified remains and that she had engaged in other professional misconduct in reference to the issue of the MOVE bombing investigation. *Id.* at 148. He expressed concerns over the Penn Museum's policies on the handling of remains, including the unidentified remains from the MOVE site, and he unfairly and defamatorily accused Dr. Monge of lacking professionalism in connection with the Coursera course. *Id.* at 149.

Fearing that his allegations against Dr. Monge would not bear the disciplinary result against her that he intended, he then instigated the first article regarding the unidentified bones by contacting his then girlfriend, Defendant Maya Kasutto, who was writing for Defendant Billy Penn at the time. *Id.* at 150. On April 21, 2021, the first two of many false and defamatory articles were published by Billy Penn and the Philadelphia Inquirer, falsely asserting that the unidentified bone fragments were the remains of Katricia Africa. *Id.* at 151-157. Two days later, Mitchell prepared a paper on the handling and identity of the remains removed from the MOVE site, arguing that the remains are indisputably those of Katricia and Delisha Africa and condemning the handling of the remains. *Id.* at 158. Mitchell widely distributed this paper to Penn employees, MOVE members, and several media outlets. *Id.* at 159. Over the next several months, the remaining media Defendants created a firestorm of media coverage of Mitchell's false assertions. *Id.* at 160-162. These articles continued to perpetuate the false and defamatory statements and implications of systemic racism created by the initial articles. *Id.* at 162.

Dr. Monge also found herself attacked by anthropology associations, the University of Pennsylvania, and other faculty members at the University. *Id.* at 163. On April 26, 2021, a

collective statement by the Association of Black Anthropologists (ABA), the Society of Black Archaeologists (SBA), and the Black in Bioanthropology Collective (BiBA) was released, which suggested unethical and illegal racially motivated animus and requested that Dr. Monge be removed from her position. *Id.* at 168. Then, Defendants Gutmann and Prickett authored an email to employees of the Penn Museum calling Dr. Monge's actions "insensitive, unprofessional, and unacceptable." *Id.* at 170. A similar statement was sent to the full University of Pennsylvania community. *Id.*

Thereafter, although Dr. Monge had done nothing wrong, she was locked out of her lab and all Physical Anthropology collection storage spaces, was put on a "work pause". She was then removed from her position as Professor at the University of Pennsylvania, and was demoted with a salary reduction of more than $65,000 per year. *Id.* at 169-175. Accordingly,, based entirely upon the false and defamatory statements made by Defendants individually and collectively, Dr. Monge's reputation has been irreparably and wrongfully destroyed, she has been the victim of adverse employment actions, and she has received threatening emails and phone calls, including multiple death threats. *Id.* at 177.

## 2.  <u>Statement of Material Facts As Related to McGreevy</u>

On April 26, 2021, an article written by then freelance writer, McGreevy, and titled "Museum Kept Bones of Black Children Killed in 1985 Police Bombing in Storage for Decades," was published by the Smithsonian Magazine. *Id.* at 161(b). The article implied that Dr. Monge acted unprofessionally and her actions were driven by a racist animus:

> What's more, the remains appear to have been used as a 'case study' in an
> online course presented by Princeton University and hosted on Coursera.
> Titled 'Real Bones; Adventures in Forensic Anthropology," the class was
> recorded in 2019 and includes footage of Janet Monge, an adjunct professor
> in anthropology at the University of Pennsylvania and former student of
> Mann, picking up the bones and describing them in graphic detail. She makes

> no reference to the fact that the families of probably victims Tree and Delisha
> never provided consent for their daughters' bones to be used in this way, the
> Guardian notes.

The article also falsely asserts that the unidentified remains are those of Katricia and Delisha, and

it suggests that a failure to contact their families constituted professional misconduct on the part

of Dr. Monge.

Finally, in the body of the Amended Complaint, McGreevy was identified as a freelance

writer and employed as an independent contractor of the federal agency, The Smithsonian.

## III.   STATEMENT OF CONTROLLING LEGAL PRINCIPLES

### A.   Applicable Standards Governing A Motion to Dismiss

In deciding on a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)

for failure to state a claim, the Court is required to accept as true all factual allegations in the

Complaint and draw any and all inferences derived from those facts in a light most favorable to

the Plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). *See also Oshiver

v. Levin, Fishbein, Cedrone and Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994). The Complaint is not

required to make detailed factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell

Atlantic Corporation v. Twombly*, 550 U.S. 554, 555 (2007). Instead, to state a cognizable claim,

a Complaint must only allege "enough 'factual matter' (taken as true) to suggest a required

element' and being 'more than mere labels and conclusions, and formulaic recitation of the

elements of a cause of action.'" *Phillips*, 515 F.3d at 234 (*citing Twombly*, 550 U.S. at 556). The

movant bears a heavy burden in establishing that the Complaint fails to state a claim upon which

relief can be granted. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

Applying the above principles, federal courts will generally engage in a two-step process

in evaluating a complaint when reviewing a Motion to Dismiss. *Iqbal*, 556 U.S. at 679. First, the

court must identify allegations that are not entitled to the assumption of truth because they are merely conclusions. Second, well pled factual allegations that are assumed to be true are reviewed to determine whether the allegations plausibly give rise to an entitlement to relief. *Id. See also Lopez v. Beard*, 333 Fed. Appx. 685, 687 (3d Cir. 2009). If the Complaint "pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the Complaint should be deemed "plausible on its face" and the motion to dismiss denied. *Twombly*, 550 U.S. at 570. Put another way, a Rule 12(b)(6) motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Aamco Automatic Transmissions, Inc. v. Tayloe*, 368 F.Supp. 1283, 1286-87 (3d Cir. 1973).

**B.   Defamation**

**1.  Status of Plaintiff**

Almost universally, the Defendants assert that Plaintiff is a public figure or at least a limited purpose public figure, and thus, she must prove actual malice to succeed on her claim. However, under the applicable law, it is clear that Plaintiff is a private figure who was forced into a public controversy by Defendants when they individually and collectively published articles creating unnecessary public outcry for the forensic exploration that she and Dr. Mann had been asked to undertake by the City of Philadelphia .

In *New York Times v. Sullivan*, 376 U.S. 254 (1964), the United States Supreme Court extended First Amendment protection to defendants in defamation cases. In determining the extent of an individual's right to recover damages for defamation, the Court devised an "actual malice" standard for suits brought by public officials. *Id.* Thus, while a private Plaintiff could sustain their

burden of proving negligence, a stricter standard was applicable for suits brought by public figures against the press.

The Supreme Court revisited the issue in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), analyzing further the status of a "private individual" and finding that Elmer Getz, a prominent Chicago attorney labeled a "Communist," was a private individual since "he had not thrust himself into the public spotlight to influence the outcome of any public issue." *Id.* at 352. As a private individual, the Supreme Court determined that Gertz could recover for defamation simply by just demonstrating fault, not actual malice as a public figure or limited purpose public figure would. In explanation for the differing standards, the Court stated, "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication rather than private individuals and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater." *Id.* at 344 (footnote omitted).

Then, in *Times, Inc. v. Firestone*, 424 U.S. 448 (1976), the Court narrowed the public figure definition even further. Plaintiff there, a wealthy socialite (whose activities were typically followed by the press) was involved in a divorce. Plaintiff convened several press conferences concerning the status of the lawsuit. "The Court concluded that the plaintiff was not a public figure because she did not assume any role of especial prominence in the affairs of society ... and she did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it." *Id.* at 453.

Other cases further reflect the Supreme Court's restricted view of what constitutes a limited purpose public figure. In *Wolston v. Reader's Digest Ass'n*, 429 F.Supp. 167 (D.D.C. 1977), *aff'd* 578 F.2d 427 (D.C. Cir. 1978), *rev'd* 443 U.S. 157 (1979), the nephew of convicted Soviet

espionage agents failed to respond to a grand jury subpoena. Plaintiff was later identified as a Soviet agent in a Reader's Digest publication. Found not to be a limited purpose public figure, the Court found that he did not "voluntarily thrust" himself into the forefront of the public controversy surrounding the investigation of Soviet espionage. *Id.* Rather, Plaintiff "was thrust unwillingly into the controversy." *Id. See also Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1078 (3d Cir. 1985). Thus, voluntary involvement in the particular public controversy at issue has been recognized as a necessary element in the public figure analysis.

In *Hutchinson v. Proxmire*, 443 U.S. 448 (1976), a noted research scientist who conducted federally funded research studies was not found to be a public figure. His notoriety came only as a result of Proxmire awarding him a "Golden Fleece" award. Thus, his notoriety came because of the media attention, which Proxmire had invited. The Court found that to conclude that Plaintiff had media access would condone "bootstrapping." 443 U.S. 135-36. "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Id.* at 135. The Court also remarked that Hutchinson "did not have the regular and continuing access to the media that is one of the accoutrements of having become a public figure." *Id.* at 135. *See also Pring v. Penthouse Int'l Ltd.*, 695 F.2d 438 (1992) (Penthouse Pet, parody issue not a public figure).

Accordingly, to conclude that Plaintiff is a public figure or limited purpose public figure requires findings that: 1) Plaintiff has greater access to media; and 2) Plaintiff voluntarily assumed the risk by "thrusting" herself into the public controversy. *Mzamane*, at 502 (*citing also U.S. Healthcare*, 898 F.2d at 938 (Under "defamation analysis, the parties' considerable access to the media and their voluntary entry into controversy are strong indicia they are limited purpose public figures. *See also Marcone*, 754 F.2d at 1078.

If the Court holds that Plaintiff is a private figure, which Plaintiff asserts is the only proper determination, Pennsylvania law requires that she need only prove negligence in a civil libel case. *See American Future Systems, Inc. v. Better Business Bureau*, 923 A.2d 398, 400 (Pa. 2007) (applying formulation announced in *Gertz*, 418 U.S. at 343). Thus, as the *Gertz* Court recognized in the media context, "private plaintiffs may recover ... under a standard less than actual malice since the strong and legitimate state interest in compensatory injury to the reputation of private individuals requires ... a different rule ... with respect to them." 418 U.S. at 343.

## 2.  **General Principles of a Defamation Case**

To state a claim for defamation, a plaintiff must plead the following elements: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; (7) abuse of a conditionally privileged occasion. *Cornell Cos., Inc. v. Borough of New Morgan*, 512 F.Supp.2d 238, 271 (E.D. Pa. 2007) (*quoting* 42 Pa. C.S.A. § 8343).

Under Pennsylvania law, "[a] publication is defamatory if it tends to blacken a person's reputation or ... injure him in his business or profession." *Green v. Minzer*, 692 A.2d 169, 172 (Pa. Super. 1997). "When communications tend to lower a person in the estimation of the community, deter third persons from associating with him, or adversely affect his fitness for the proper conduct of his lawful business or profession, they are deemed defamatory." *Id.*

Generally, to determine if a statement is defamatory, one must "evaluate the effect [the statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate." *Tucker v. Fischbein*, 237 F.3d

14

275, 282 (3d Cir. 2001). Under normal circumstances, the issue of whether a publication is

defamatory is for the jury, and should not be made by the Court:

> Where there is any doubt that the communication disparages of harms the
> complainant in his business or profession, that doubt must be resolved in
> favor of the complainant, even where a plausible explanation of the
> communication exists; if there is an alternative defamatory interpretation, it
> is for the jury to determine if the defamatory meaning was understood by the
> recipient.

*Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1988).

In other words, **"if the allegedly defamatory statements are susceptible to several**

**interpretations, some of which are benign, some of which are not, it is for the jury to decide**

**how the statement is likely to be interpreted by the intended audience.**" *Valiet v. Wal-Mart*,

No. 06-01842, 2007 WL 4323377, at *8 (E.D. Pa. Dec. 11, 2007) (*quoting Smyth v. Barnes*, No.

04-930, 1995 WL 576935, at *10 (M.D. Pa. Sept. 25, 1995)) (Emphasis supplied). Thus, "a court

should not dismiss a complaint unless it is clear that the publication is incapable of a defamatory

meaning." *Tucker*, 237 F.3d at 282.

Moreover, it is well settled in Pennsylvania that statements imputing criminal activity or

character that adversely affects fitness for a person's profession are defamatory *per se. Cornell

Cos. v. Borough of New Morgan*, 512 F.Supp.2d 238, 271 (E.D. Pa. 2007); *see also, Franklin

Prescriptions, Inc. v. New York Times Co.*, 2004 WL 1770296, at *8 (E.D. Pa. Aug. 5, 2004). In

terms of determining whether a statement is per se defamatory as an accusation of "business

misconduct," Pennsylvania follows the position set forth by the Restatement (Second) of Torts, as

follows:

> One who publishes a slander that ascribes to another conduct, characteristics,
> or a condition that would adversely affect his fitness for the proper conduct
> of his lawful business, trade or profession, or of his public or private office,
> [...] is subject to liability without proof of special harm.

Restatement (Second) of Torts, § 573.

*Clemente v. Espinosa*, 749 F. Supp. 672, 677-78 (E.D. Pa. 1990). Significantly, "a statement may be per se defamatory although it does not explicitly charge the subject with a failure of business or professional performance." *Id.* at 678. Also, a finding of defamation per se is proper if "the particular quality disparaged ... is peculiarly valuable in the plaintiff's business and profession." *Id.* With respect to whether a statement is per se defamatory as an accusation of "criminal offense," "[a] statement constitutes slander per se as an accusation of criminality when it charges whether directly or indirectly the commission of a specific offense punishable by imprisonment. A charge of criminal intent or design, or mere ability to commit a crime is not sufficient to state a cause of action." *Id.* at 679. Further, "words are slanderous per se under the crime category if a crime is readily apparent from properly pleaded innuendo." *Id.*

Lastly, although "[i]t is true that opinion, without more, does not create a cause of action in libel," this does not mean there is "a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Valjet v. Wal-Mart*, 2007 WL 4323377 (E.D. Pa. Dec. 11, 2007); *Petula v. Mellody*, 588 A.2d 103 (Pa. Cmwlth. 1991). Expressions of opinion may often imply an assertion of objective fact, and thus, "[a] defamatory communication may [sic] consist of a statement in the form of an opinion and is actionable if it implies an allegation of undisclosed defamatory facts as the basis therefore." *Id.* In this regard, the Third Circuit explained:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis [therefor] ... If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject [the proffered opinion] on the basis of an independent evaluation of the facts. However, if the opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

*Redco v. CBS, Inc.,* 758 F.2d 970, 972 (3d Cir. 1985), *cert. den.,* 474 U.S. 843 (1985).

### 3. Defamation by Implication/Innuendo

A claim for defamation "may exist where the words utilized are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Mzamane v. Winfrey*, 693 F.Supp.2d 442, 477 (E.D.Pa. 2010) (*citing Thomas Merton Ctr. V. Rockwell Int'l Corp.*, 442 A.2d 213, 217 (Pa. 1981); *Bogash v. Elkins*, 176 A.2d 677, 679 (Pa. 1962); *Sarkees v. Warner-W Corp.*, 37 A.2d 544, 546 (Pa. 1944) (all discussing defamation by innuendo)).

The legal test to be applied to determine whether a statement is defamatory by implication is whether the challenged language can "fairly and reasonably be construed" to imply the defamatory meaning alleged by a plaintiff. *Sarkees*, 37 A.2d at 546. The "innuendo must be warranted, justified, and supported by the publication." *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. 1992). To determine whether a publication is capable of a defamatory meaning, "the court must consider the effect of the entire article and the impression it would engender in the minds of the average reader among whom it is circulated." *Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. 1997).

"[E]ven where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient." *Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1987). "[T]he literal accuracy of separate statements will not render a communication 'true' where, as here, the implication of the communication as a whole was false." *Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. 1982). A publisher may be liable "for the *implications* of what he has said, not merely the specific literal statements made." *Id.* at 15.

17

The case *Menkowitz v. Peerless Publications, Inc.*, 176 A.3d 968 (Pa. Super. 2017), affirmed on issues of innuendo, 653 Pa. 573 (2019), provides an example. In that case, the Pennsylvania Superior Court was faced with the issue of whether statements that a well-known surgeon was suspended for "professional misconduct regarding his treatment of an older female patient." *Id.* at 984. In fact, the plaintiff surgeon was suspended for yelling at other staff members in the presence of the patient. However, the Superior Court determined that the use of the phrase "professional misconduct regarding his treatment of an older female patient," while literally true, could reasonably imply that the surgeon had engaged in sexual misconduct with her. *Id.* Ultimately, it determined that such statements constitute defamation by innuendo due to the damage caused by the implication that the surgeon was committing sexual misconduct in his practice. *Id.*

Therefore, even where statements made may be literally true, when the article as a whole can "fairly and reasonably be construed" to create defamatory implications, that article is actionable under defamation by implication/innuendo. *Sarkees*, 37 A.2d at 546.

### C.   <u>False Light</u>

Dr. Monge is not required to demonstrate that the statements complained of did not involve matters of public concern in order to prevail with respect to her false light invasion of privacy claim. This cause of action is premised on Restatement (Second) of Torts § 652E, which has been adopted as an accurate statement of Pennsylvania law. Larsen v. Philadelphia Newspapers, Inc., 543 A.2d 1181, 1188 (Pa. Super. 1988). This section provides:

§652E. Publicity Placing Person in False Light

> One who gives publicity to a matter concerning another places that the other before the public in a false light is subject to liability to the other for invasion of privacy, if

     (a) the false light in which the other was placed would be highly offensive to a
        reasonable person, and

     (b) the actor had knowledge of or acted in reckless disregard as to the falsity of
        the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E.

In *Larsen*, the Superior Court of Pennsylvania specifically addressed whether a plaintiff had sufficiently pled a § 652E false light invasion of privacy claim so as to overcome a demurrer. 542 A.2d at 1188. The Plaintiff in that case was a Pennsylvania Supreme Court Justice who alleged that newspaper articles had placed him in a false light by accusing him of lying under oath during proceedings before the Judicial Inquiry and Review Board. *Id.* at 1189. This was without question a matter of public concern. Regardless, the *Larsen* court determined that plaintiff had pled sufficient facts to support a false light invasion of privacy cause of action under §652E. *Id.* at 1188- 89.

      Accordingly, in proper consideration of the controlling law set forth in *Larsen* and the elements of the false light invasion of privacy tort provided in Restatement (Second) of Torts, the conclusion that Dr. Monge need not demonstrate that the matter published was not of legitimate concern to the public is compelled. Rather, Dr. Monge is simply required to demonstrate that the false light in which she was placed would be "highly offensive to a reasonable person" and that Defendants "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652E. Certainly, the published articles that accuse her of professional impropriety and race-based insensitivity establish the necessary element of her being highly offended as a reasonable person.

    **D.**   **Civil Aiding and Abetting**

      In Sovereign Bank v. Valentino, 2006 Pa. Super. 338 (2006), the Pennsylvania Superior Court specifically noted that Pennsylvania has adopted Section 876 of the Restatement (Second)

of Torts addressing the tort of civil aiding and abetting, which is also known as concerted tortious conduct:

### Section 876. Persons Acting in Concert.

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) **gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person**.

Restatement (Second) of Torts, § 876.

The Superior Court also affirmed that Pennsylvania has adopted Section 875 of the Restatement (Second) of Torts and that Section 876 is a "specific application" of the rule stated in Section 875. *Sovereign Bank*, 2006 Pa. Super. at 421. Section 875 specifically addresses the liability of contributing tortfeasors:

### Section 875. Contributing Tortfeasors General Rule.

Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.

Restatement (Second) of Torts, § 875.

Therefore, like with "agency" or "secondary, indirect liability," Plaintiff's burden against the Defendants herein is not heavy. As noted in *Sovereign Bank, supra*, all that Plaintiff is required to show is the identities of the wrongdoers and those who acted in concert. As discussed below, Plaintiff's Amended Complaint not only identifies each person who has wronged her, but it also shows how the articles provided substantial assistance to each of the other Defendants by bolstering the media coverage and notoriety of the story through their additional reporting.

## IV.    <u>DISCUSSION</u>

### A.     McGreevy Is Not Entitled To Government Contractor Immunity

There are two types of immunities provided to government contractors: derivative immunity and government contractor immunity. *See Rhoads Indus., Inc. v. Shoreline Foundation, Inc.*, 2022 WL 742486 (E.D. Pa. Mar. 10, 2022). As discussed below, McGreevy is entitled to neither.

### 1.     Derivative Immunity

McGreevy does not have a defense under derivative immunity, as she was given discretion in the completion of her article, which, as a freelancer, she would be submitted only for final approval by the Smithsonian. Moreover, the simple fact that she could have fulfilled her contract with the government without committing a tort (i.e., writing an article that does not defame Dr. Monge) renders derivative immunity inapplicable.

The preeminent cases on derivative immunity are *Yearsley v. W.A. Ross. Constr. Co.*, 309 U.S. 18 (1940) and *Campbell-Ewald Co. v. Gomes*, 577 U.S. 153 (2016). In *Yearsley*, the Supreme Court created the derivative immunity defense, explaining that "derivative immunity" should apply where a contractor's "authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." 309 U.S. at 20-21. The Court stated that such immunity would not extend to circumstances in which the contractor exceeds their authority or where the authority was not validly conferred. *Id.* The *Campbell-Ewald* Court subsequently clarified two things about the *Yearsley* defense: (1) unlike the United States and its agencies, federal contractors do not enjoy absolute, or sovereign, immunity; and (2) derivative immunity is not limited to cases involving public work projects, but rather requires an analysis of "the contractor's performance in compliance with all federal directions." 577 U.S. at 167.

"Taken together, *Yearsley* and *Campbell-Ewald* set up a two-step analysis for determining whether derivative immunity is established: (1) whether the federal government validly conferred authority on the federal contractor and (2) whether the contractor was performing as directed or otherwise exceeded their authority." *Rhoads Indus. V. Shoreline Found., Inc.*, No. 25-921, 2022 WL 742486, at *14 (E.D. Pa. Mar. 10, 2022). "In *Vangjeli*, the court explained that 'derivative immunity is limited to cases in which a contractor had *no discretion* in the design process and completely followed government specifications. *Id.* at *15 (citing *Vangjeli v. Banks*, No. 19-1635, 2020 WL 5880131, at *5 (E.D. Pa. Oct. 2, 2020)). "Where, however, the contractor is hired to perform the same task, but is allowed to exercise discretion in determining how the task should be accomplished ... the contractor is not entitled to derivative sovereign immunity." *Vangjeli*, 2020 WL 5880131, at *5 (citing *Harris v. Kellogg, Brown & Root Servs., Inc.*, No. CV 08-563, 2016 WL 4720058, at *2 (W.D. Pa. Sept. 9, 2016)). Further, "Vangjeli suggests that if a tortfeasor, carrying out duties under government contractor, could have fulfilled that contract without committing a tort, then derivative immunity should not apply." *Rhoads*, 2022 WL 74286, at *15.

Typically, derivative immunity applies in products liability cases in which a government contractor was building or manufacturing a product for the federal government using specifications provided by the government. The idea is, since the government was the one who came up with the design, and the contractor simply carried out the government's design by manufacturing the product, the contractor should not be held liable for any design flaws. Such a situation does not arise in the writing of an article, which does not involve any specifications (beyond perhaps a topic).

As such, it simply cannot be said that McGreevy had *no discretion*, as would be required for her to have derivative immunity. Rather, as a freelance writer, McGreevy was given

considerable discretion in "determining how the task should be accomplished." *Vangjeli*, 2020 WL 5880131, at *5. This is not a situation in which McGreevy acted out the exact orders of a federal agency. The Smithsonian did not dictate or write out a full outline of the article for McGreevy to simply type it up. Rather, writing of an article inherently has discretionary qualities, as each author has their own writing process, and writing involves a certain level of creativity. In fact, oftentimes, a freelance author will write an article first before sending it out to various outlets to see who will publish it. Thus, the article may not have even been written in response to a request by the Smithsonian, but, rather, the Smithsonian simply agreed to publish it after its completion. All of this suggests that McGreevy had considerable discretion in authoring the article at issue, which would curtail any claim she has to immunity.

Additionally, notwithstanding the above issue, McGreevy could have easily fulfilled her contract with the Smithsonian without committing a tort by writing an article that did not defame Dr. Monge. This alone suggests that derivative immunity should not apply. *Rhoads*, 2022 WL 74286, at *15.

Therefore, it is not likely that McGreevy has derivative immunity for her writing of the defamatory article for the Smithsonian.

### 2.   **Government Contractor Immunity**

Similarly, McGreevy does not have immunity under the government contractor immunity defense.

The Supreme Court established the "government contractor" defense in the case *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). The *Boyle* Defense consists of a three-prong test: "(1)" the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use

of the equipment that were known to the supplied but not to the United States." *Boyle*, 487 U.S. at 512. This defense was created to protect a contractor that "participates in the design of the product so long as the government's approval consists of *more than a mere rubber stamp.*" *Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*, 883 F.2d 1210, 1216 (3d Cir. 1989) (emphasis added).

"Government approval must result from a 'continuous exchange' and 'back and forth *dialogue'* between the contractor and the government." *Rhoads Indus.,* 2022 WL 742486 at *17. When the government "merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion. *Id.* Accordingly, the first prong of the *Boyle* test requires more than a contractor simply completing the government's work and subsequently receiving the government's approval. *Id.*

Here, the language of the three prongs shows that the defense is not likely to be successful, as the references to "precise specifications," "equipment," and "dangers in the use" show that such a defense applies to products liability claims, not defamation claims. An article is not "equipment" created under "precise specifications" and there are no "dangers in the use" of an article, thereby making a products liability defense worthless to McGreevy.

However, even assuming the defense does apply, McGreevy is not likely to be able to meet the *Boyle* standard. As stated, government approval of work must result from a "continuous exchange" and "back and forth dialogue" between the contractor and government throughout the completion of the work. Such dialogue is not likely to have occurred during the writing of the article at issue. McGreevy, as a freelance author, retains substantial discretion and control over her work. She is free to write under her own process and using her own creative strengths. Further, as previously noted, freelancers often write the article first, rather than answering to a specific

request, meaning that the Smithsonian may not have even seen the article until after it was complete. The only time the Smithsonian allegedly was involved (other than the publishing) was to "Edit" the article, and there is no evidence that editing was anything other than ensuring proper spelling and grammar. Such an approval process likely falls under the "rubber stamp" caution noted by the Supreme Court, which is not enough to invoke government contractor liability.

Therefore, McGreevy cannot be successful in claiming government contractor immunity against Dr. Monge's claims.

**B.      Plaintiff Has Adequately Stated A Claim For Defamation and Defamation By Implication**

**1.      McGreevy's Article Is Capable Of Defamatory Meaning**

McGreevy first asserts that the statements in her article are not defamatory because they are literally true. But Dr. Monge also brought a cause of action for defamation by implication, which allows a claim to be brought where, although the statements in a defamatory publication are literally true, the article as a whole can "fairly and reasonably be construed" to create defamatory implications. *Sarkees*, 37 A.2d at 546.

In a defamation by implication action, "the literal accuracy of separate statements will not render a communication 'true' where, as here, the implication of the communication as a whole was false." *Dunlap*, 448 A.2d at 15; *see also Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. 1982) (finding that a publisher may be liable "for the *implications* of what he has said, not merely the specific literal statements made"). Here, even if the Court were to determine that the statements in McGreevy's article were literally true, it does not change the fact that the whole article creates a defamatory implication that Dr. Monge committed professional misconduct in the handling of the unidentified remains by failing to inform the next of kin even though there was no next of kin because the remains had not been identified. Even worse, the article also could

25

fairly be read to imply that Dr. Monge may have committed misconduct may based upon some racial motive, which she did not.

"[E]ven where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient." *Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1987). Therefore, because Hyperallergic's article could reasonably be read to imply the false and defamatory implications described above and in Dr. Monge's Amended Complaint, McGreevy's Motion to Dismiss must be denied.

Moreover, to the extent McGreevy argues that the article could not have been defamatory because it rests on a difference of opinion, such argument necessarily fails because a claim as to the identity of the unknown remains is provable as false. *Northstein v. USA Cycling*, 499 F.Supp.3d 101, 124 (E.D. Pa. 2020). Dr. Monge's conclusions regarding the age have been confirmed by several anthropologists, concretely establishing that the unidentified remains could not have been Katricia or Delisha Africa's. *Plaintiff's Amended Complaint*, at 95. Accordingly, the assumption made in McGreevy's article that the remains belonged to them was not only false, but it improperly created defamatory implications towards Dr. Monge. Further, McGreevy's purported "opinion" regarding Dr. Monge's handling and use of the bones is a mixed opinion under the legal principles discussed in the sections above, as it implies additional defamatory facts to the reader. Specifically, McGreevy implies the entirely false fact that Dr. Monge committed wrongdoings in her handling of the unidentified remains that deviated from the professional standards governing anthropologists. Such an implication constitutes defamation *per se* by disparaging Dr. Monge's fitness in her profession. *See Cornell Cos.*, 512 F.Supp.2d at 271. Even further, given the racial undertones of the MOVE bombing and the cited sources, the article also falsely implies that Dr.

26

Monge may have had a racial motive for the way she allegedly mishandled the remains, adding to its defamatory nature.

Therefore, Dr. Monge's Amended Complaint sufficiently pled causes of action for defamation and defamation by implication, and McGreevy's Motion to Dismiss must be denied.

## 2. Plaintiff Is A Private Figure That Must Only Show Negligence In The Publishing Of The Defamatory Statements

McGreevy's argument that Dr. Monge must have pled actual malice in order to succeed in her defamation claims must also fail, as Dr. Monge is a private figure that must only show negligence in order to succeed in this action.

As discussed in the above section regarding controlling legal principles, in order for Dr. Monge to be considered a limited purpose public figure, this Court must first determine 1) Plaintiff has greater access to media; and 2) Plaintiff voluntarily assumed the risk by "thrusting" herself into the public controversy. *Mzamane*, at 502 (*citing also U.S. Healthcare*, 898 F.2d at 938 (Under "defamation analysis, the parties' considerable access to the media and their voluntary entry into controversy are strong indicia they are limited purpose public figures. *See also Marcone*, 754 F.2d at 1078. Neither of these findings are present in this case.

First, it simply cannot be said that Dr. Monge has greater access to the media that would allow her to combat any defamatory attacks against her. Prior to the smear campaign against her, Dr. Monge was a well-respected professor and research at the University of Pennsylvania, and a forensic consultant based on her skills in forensic physical/biological anthropology. *Plaintiff's Amended Complaint*, at ¶ 1-3. However, this experience did not make her well-known to anyone outside of the anthropologic community, and she is not recognizable to the average person on the street. In fact, the only media coverage Dr. Monge ever received prior to the defamatory articles being published was the one time she was named "Best Museum Curator" by Philadelphia

27

Magazine in 2014. *Id.* at ¶ 20. But that award neither boosted her platform nor granted her considerable access to the media. Like anyone else who received a work-related award, it got her celebrated by her colleagues and those around her, but it did not elevate her to the "celebrity" or "newsworthy" status required for her to be a public figure. Rather, she once again faded away with the coming of the next Philadelphia Magazine issue. At no point did Dr. Monge ever have "the regular and continuing access to the media that is one of the accoutrements of having become a public figure." *Hutchinson*, 443 U.S. at 135.

Second, Dr. Monge "did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it." *Times, Inc.*, 424 U.S. at 453. Rather, Dr. Monge only became involved in the forensic analysis of the unidentified remains at the MOVE site upon the request of her professor and mentor, Dr. Alan Mann. *Plaintiff's Amended Complaint*, at ¶ 87. Once involved in the investigation of the remains, she was forced to see it through, and she spent 36 years trying to identify the person to which the remains were linked. *Id.* at ¶ 5. But this investigation was conducted behind closed doors, not in the forefront of any public controversy. Dr. Monge held no press conferences, made no television appearances, and published no widespread articles in the hopes of influencing the resolution of the issues one way or the other. Rather, the only time the unidentified remains were discussed on video by Dr. Monge was in her Coursera course, which was only available to individuals with a Coursera membership that chose to enroll in the course. *Id.* at ¶ 127. Even further, in the Coursera course, Dr. Monge made no attempts to sway her students into believing one resolution or another. Rather, she simply used the unidentified remains to explain the difficulties involved in the identification of human remains and discuss methods of identification. *Id.* at ¶ 129-30.

28

And third, while the MOVE bombing itself was a public controversy at the time it happened, there was no public discussion of the remains found at the scene or the efforts to identify them. It was only after the defamatory articles published by the Defendants that the public became engaged in a discussion over the handling of the remains removed from the site. However, "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson*, 443 U.S. at 135. As such, since it was the Defendants' own actions that created the public uprising over the handling of the unidentified remains, they cannot now claim that Dr. Monge is a public figure when he made her one.

Therefore, Dr. Monge is a private figure that is only required to plead negligence, not actual malice. Since her detailed Amended Complaint clearly establishes that McGreevy was negligent in publishing their defamatory articles, her claims of defamation and defamation by implication should not be dismissed.

### C.  **Plaintiff Has Adequately Stated A Claim For False Light**

As previously noted, Dr. Monge is not required to demonstrate that the statements complained of did not involve matters of public concern in order to prevail with respect to her false light invasion of privacy claim. Rather, she must simply show that the false light in which she was placed would be "highly offensive to a reasonable person" and that McGreevy "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652E.

The Amended Complaint alleges that Mitchell engaged in a spiteful, retaliatory, and defamatory smear campaign against Dr. Monge after she reported him for severe professional misconduct. Prior to the altercation between the two, Dr. Monge had been nothing but supportive of Mitchell, even going so far as talking the University of Pennsylvania into allowing him into is

doctorate program. Mitchell was well aware that Dr. Monge cared about her work, followed all forensic best practices, and respected every set of remains she encountered, yet he falsely reported to Defendant Woods that Dr. Monge was mishandling the remains and committing other professional misconduct. *Plaintiff's Amended Complaint*, at ¶ 148-49. He then went to his then girlfriend Maya Kasutto, who was writing for Billy Penn, as well as Abdul-Aliy Muhammad, who was writing for the Philadelphia Inquirer, to assist them with the writing of articles that would increase the publicity of his false and defamatory allegations. *Id.* at ¶ 154-57. The remaining Defendants then published their own articles, citing to these initial stories without doing any independent investigation of their own. *Id.* at ¶ 161-62. McGreevy should have been aware of the need to investigate her sources given the seriousness of the allegations contained in the initial articles, yet she relied entirely on those articles' assertions without doing any type of investigation to back them up. Instead, she published her own defamatory article, which falsely asserted that the unidentified remains were those of Katricia Africa, implied serious scientific misconduct on behalf of Dr. Monge, and insinuated a racial motive for her retention of the remains. *See generally, Plaintiff's Amended Complaint.*

It is clear that being called a racist and having your ethics and professional abilities called into question, as McGreevy's defamatory article did to Dr. Monge, would be "highly offensive to a reasonable person." Restatement (Second) of Torts § 652E. Further, McGreevy either was aware or should have been aware that they were dealing with sources that require independent crosschecking given the scandalous nature of the stories, yet she published the article without making any determination for themselves as to the accuracy of those sources. Accordingly, Dr. Monge has adequately plead a cause of action for False Light, and that claim must not be dismissed.

**D.**   **Plaintiff Has Adequately Stated A Claim For Civil Aiding And Abetting**

As stated in above legal discussion, a defendant will be found liable for the tortious conduct of another if he or she gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. Restatement (Second) of Torts § 876(c). On a Motion to Dismiss, the burden on the Plaintiff is not heavy, and all that Plaintiff is required to show is the identities of the wrongdoers and those who acted in concert. Plaintiff has done so here.

In this case, Plaintiff has adequately pled causes of action for defamation, defamation by implication, and false light against McGreevy, thereby establishing the underlying torts required for a civil aiding and abetting claim. Moreover, since the actions of McGreevy constitute a breach of duty in their own right, all that must be shown for her to be held liable for civil aiding and abetting is that she gave substantial assistance to another in accomplishing a tortious result. *Id.* As further detailed in the Amended Complaint, McGreevy clearly provided that assistance by publishing her own false and defamatory article, accepting as true everything stated in the previous articles without doing adequate investigation into whether those assertions were true. *Plaintiff's Amended Complaint*, at ¶ 151-62. By continuing the false and defamatory reporting, McGreevy not only lent credibility to the false statements previously published, but she also increased the publicity of those stories and increased the number of people who reading the defamatory statements against Dr. Monge.

Therefore, the extensive Amended Complaint filed by Plaintiff, which pleads the identities of the wrongdoers, who acting together achieved the tortious result of defaming Dr. Monge, has sufficiently alleged a claim of civil aiding and abetting, and that claim should not be dismissed.

**V.**    <u>**CONCLUSION**</u>

For any and all of the foregoing reasons, Plaintiff, Janet Monge, respectfully requests that

the Court to deny Defendants' Motion to Dismiss with prejudice.

Respectfully Submitted,

**SPECTOR GADON ROSEN VINCI P.C.**

By: /s/ *Alan Epstein*

Alan B. Epstein, Esquire (Pa. I.D. No. 2346)
Adam Filbert, Esquire
*Attorneys for Plaintiff*

Dated:  September 23, 2022