**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JANET MONGE,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **UNIVERSITY OF PENNSYLVANIA** *et al.,* | : | |
| *Defendants* | : | **No. 22-2942** |

**MEMORANDUM**

PRATTER, J.                                                JANUARY 23, 2023

### INTRODUCTION

A very grim series of events in the history of Philadelphia that occurred almost 40 years ago continues to engender troubling direct and indirect consequences. The aftermath of the 1985 MOVE events provides the setting for this case.

Dr. Janet Monge filed a complaint against numerous defendants asserting claims for defamation, defamation by implication, false light, and civil aiding and abetting. Defendants Al Dia News and Brittany Valentine moved to dismiss Dr. Monge's complaint for failure to state a claim. For the reasons set forth below, the Court will grant Al Dia News and Ms. Valentine's motion to dismiss with prejudice as to Dr. Monge's claims for defamation and false light, and without prejudice as to Dr. Monge's claims for defamation by implication and civil aiding and abetting.

### BACKGROUND

**I.    The 1985 MOVE Bombing and Dr. Monge's Involvement with the Identification of the MOVE Event Human Remains**

Dr. Monge alleges that Al Dia News and Ms. Valentine made false and defamatory statements about her regarding her involvement in the identification of the human remains of those

who died following the MOVE bombing events. In 1985, the Philadelphia Police Department dropped a bomb on the residence of some of the people involved in the MOVE organization—an organization of revolutionaries, all of whom have adopted the surname "Africa." Eleven MOVE members, presumed to include six adults and five children, were killed during the bombing. Because the fire burned for several hours before it was extinguished, processing the bomb site was especially difficult. By the time the Philadelphia Medical Examiner's Office arrived, the City had begun using cranes and other construction equipment to dig up the debris and body parts, resulting in severe damage to the human remains.

Philadelphia's Chief Medical Examiner invited Dr. Alan Mann—then a professor in the Department of Anthropology at the University of Pennsylvania—to assist with the identification of the remains. Dr. Mann invited Dr. Janet Monge, his then doctoral student and mentee, to assist with the identification. Because the remains were not intact or complete, Drs. Mann and Monge sorted the remains based on age. Drs. Mann and Monge concluded that a pelvis bone and femur bone fragments did not conform to the ages of the individuals presumed to have been killed during the bombing. They determined that the bones belonged to a female between the ages of 17 and 21, but the oldest child known to be in the MOVE residence was Katricia (Tree) Africa, a 14-year-old-girl. Drs. Mann and Monge thus considered the remains to be unaffiliated with the MOVE victims and referred to them as "Jane Doe." The MOVE Commission, appointed by the City of Philadelphia to investigate the MOVE bombing and its aftermath, issued a report in which Dr. Ali Hameli concluded that the Jane Doe pelvis bone and femur bone fragments were associated with Katricia (Tree) Africa. Given the disputed identity of the remains, the Philadelphia Medical Examiner's Office, along with Drs. Mann and Monge, retained responsibility for identifying the

unidentified human bone fragments, which were released by the Philadelphia Medical Examiner's Office to Dr. Mann for further investigation at The Penn Museum.

From 1986 to 2001, the bones were stored in Dr. Mann's office at the Penn Museum. In 2001, Dr. Mann joined the Anthropology Department at Princeton University. Dr. Monge assisted Dr. Mann with teaching his courses at Princeton and, from 2001 to 2015, Dr. Monge transported the MOVE remains to Princeton from the Penn Museum two to five times. In 1995 and again in 2014, Dr. Monge unsuccessfully attempted to contact members of the MOVE organization— Ramona Africa and Consuella Dotson—regarding the remains. Because Dr. Monge concluded that she would not be able to get help from the Africa family, and because she did not think she would be able to conclusively identify the remains, Dr. Monge declared the case cold.

## II.    Dr. Monge's Coursera Course

In August 2020, Dr. Monge published "Real Bones: Adventures in Forensic Anthropology" on the Coursera online platform. Coursera's website offers free classes that are available to anyone who enrolls through the website. The stated purpose of Dr. Monge's course was to teach how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of bone remains. Dr. Monge used the MOVE remains as teaching aids during her course. In the first two classes, Dr. Monge described the MOVE organization, the history of the MOVE bombing, the inappropriate excavation of the bomb site, and displayed slides of the remains. In the ninth class, Dr. Monge and one of her students are seen in Penn Museum's laboratory using the MOVE remains to explain how forensic techniques can be used to determine the age of remains. Dr. Monge is also describing the process she used to estimate the age of the MOVE remains. During the video, Dr. Monge describes the remains as "juicy" and "greasy" when explaining how she knows that these are the remains of a young person.

Beginning in April 2021, various articles and statements were published about Dr. Monge's involvement in the identification of the MOVE remains and her use of the remains in the online course. These articles and statements form the basis of Dr. Monge's present action. In short, she claims that she has been defamed or exposed in a false light in published statements. A number of the defendants move to dismiss her complaint. This memorandum addresses the motion of defendants Al Dia News and Ms. Valentine.

**III.    Al Dia News and Ms. Valentine's Publication of the Allegedly Defamatory Statements**

On May 3, 2021, Al Dia News published an article authored by Brittany Valentine titled "There Will Be No Justice For Penn and Princeton's Treatment of MOVE Victims." Am. Compl. ¶ 161(d). Dr. Monge alleges that the article "falsely accuses Drs. Monge and Mann of professional misconduct, stating [that] '[b]ombshell reports revealed the universities shuttled the remains back and forth, and used them in educational settings without ever contacting next of kin.'"[1]

### LEGAL STANDARD

An action may be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion to dismiss stage, the Court must accept factual allegations as true, "but [it is not] compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations and quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint must show

---

[1]     The only statement which Dr. Monge references in her amended complaint from the Al Dia News Article—quoted in the above paragraph—is the sub-headline of the article.

"more than a sheer possibility that a defendant has acted unlawfully," *id.*, and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

**DISCUSSION**

I.  **Dr. Monge's Defamation Claim**

To state a claim for defamation in Pennsylvania, the plaintiff must plead:

> (1) The defamatory character of the communication. (2) Its publication by the defendant. (3) Its application to the plaintiff. (4) The understanding by the recipient of its defamatory meaning. (5) The understanding by the recipient of it as intended to be applied to the plaintiff. (6) Special harm resulting to the plaintiff from its publication. (7) Abuse of a conditionally privileged occasion.

42 Pa. C.S. § 8343(a). "A complaint for defamation must, on its face, identify specifically what allegedly defamatory statements were made, and to whom they were made." *Bank v. Cmty. Coll. of Phila.*, No. 22-cv-293, 2022 WL 2905243, at *3 (E.D. Pa. July 22, 2022) (citing *Moses v. McWilliams*, 549 A.2d 950, 960 (Pa. Super. 1988)). Where the plaintiff meets this burden, defendants have the burden of proving: (1) the truth of the defamatory statement; (2) the privileged nature of the communication; and (3) that the subject matter of the defamatory statement is a matter of public concern. 42 Pa. C.S. § 8343(b).

Courts have not hesitated to dismiss meritless defamation claims at this stage. *See e.g.*, *Gibney v. Fitzgibbon*, 547 F. App'x 111, 114 (3d Cir. 2013) (affirming the dismissal of a defamation claim at the motion to dismiss stage because the "statement was not capable of a defamatory meaning as a matter of law"); *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, 500 F. Supp. 3d 380, 422–25 (E.D. Pa. 2020) (dismissing defamation claim at the motion to dismiss stage because "the Court [did] not find that the statements [were] capable of defamatory meaning"); *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004) (noting that "[i]f the court

determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial").

The first step a court must take in evaluating whether a statement is defamatory is to determine whether the statement is capable of a defamatory meaning. *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 399 (E.D. Pa. 2011). "In making this determination, the Court must address two questions: (1) whether the communication was reasonably capable of conveying the particular meaning ascribed to it by the plaintiff; and (2) whether that meaning is defamatory in character." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 510 (E.D. Pa. 2020). When the statement at issue is not "'reasonably susceptible of a defamatory meaning,' the plaintiff has failed to state a claim." *Id.* (citing *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 191 (3d. Cir. 1999)).

A statement is defamatory if it "tends so to harm the reputation of another as to lower him or her in the estimation of the community or to deter third persons from association or dealing with him or her." *U.S. Healthcare v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990). "[T]he statement must do more than merely embarrass or annoy the plaintiff; it must provoke 'the kind of harm which has grievously fractured [one's] standing in the community of respectable society.'" *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014). Further, the plaintiff bears "the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant." *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986).

Under Pennsylvania law, truth is an affirmative defense to a defamation claim. *Tucker v. Fischbein*, 237 F.3d 275, 287 (3d Cir. 2001); 42 Pa. C.S. § 8343(b)(1) ("[T]he defendant has the burden of proving . . . [t]he truth of the defamatory communication[.]"). To successfully assert truth as a defense, the defendant must establish that the statement at issue is substantially true, however the defendant need not prove that the statement is absolutely true. *Masson v. New Yorker*

*Mag., Inc.*, 501 U.S. 496, 516–17 (1991) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting of the libelous charge be justified.") (internal quotation marks omitted). In other words, the statement will not be considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id* (citation omitted).

Dr. Monge alleges that Al Dia News and Ms. Valentine's statement—"[b]ombshell reports revealed the universities shuttled the remains back and forth, and used them in educational settings without ever contacting next of kin"—is defamatory as to her. Am. Compl. ¶ 161(d). The factual allegations in Dr. Monge's amended complaint demonstrate that this statement is, in all material respects, substantially true, and thus not capable of defamatory meaning. *See Masson*, 501 U.S. at 516–17. First, Dr. Monge alleges that "[d]uring the time period from 2001 to 2015 . . . Dr. Monge brought the unidentified remains [from the Penn Museum] to Princeton's campus for further investigation between two and five times[.]" Am. Compl. ¶ 107. It is literally true that the remains were moved back and forth between the universities. Second, Dr. Monge admits that she used the remains in her "Real Bones: Adventures in Forensic Anthropology" course to educate people about "how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains." *Id.* ¶¶ 123, 127–128. Thus, it is literally true that Dr. Monge used the remans in an educational setting.

Finally, Dr. Monge admits that in 2014, she failed to make contact with Consuella Dotson and in 2018 she concluded that she would not be able to "secure any help from the MOVE family members." *Id.* ¶¶ 111–116. Moreover, Dr. Monge's prior attempts at contacting the Africa family had nothing to do with her desire to use the remains in an educational setting. When Dr. Monge first attempted to contact Ramona Africa in 1995, it was to turn the remains over to the Africa

family. When she attempted to contact Consuella Dotson in 2014, it was to obtain a DNA sample from her to assist with the identification of the remains. Even if Dr. Monge had successfully contacted either Ramona Africa or Consuella Dotson, the nature of the communication would have been unrelated to Dr. Monge's intent to use the remains in an educational setting. So, it is literally true that Dr. Monge used the remains in an educational setting without first contacting next-of-kin.[2]

Because the allegedly defamatory statements are true, they are not, as a matter of law, capable of defamatory meaning. *See Tucker*, 237 F.3d at 287. The Court will grant with prejudice Al Dia News and Ms. Valentine's motion to dismiss Dr. Monge's complaint as to her defamation claim.

## II.   Defamation by Implication

"Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010). "To establish defamation by innuendo, the innuendo must be *warranted, justified, and supported by the publication*." *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. 1992) (emphasis added) (internal quotation marks omitted). The implication "cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1994). The Court must determine whether the language used "could fairly and reasonably be construed to have the meaning imputed in the innuendo." *Id.* "When the implication alleged by

---

[2]    Al Dia News and Ms. Valentine also argue that if Dr. Monge is correct that the remains do not belong to Delisha or Katricia Africa, then it would not have been possible for Dr. Monge to contact next-of-kin because, even after 36 years of research, the remains could not be identified.

the plaintiff is not 'reasonably susceptible of a defamatory meaning,' the plaintiff has failed to state a claim." *Pace*, 423 F. Supp. 3d at 510. Moreover, "[i]f the publication complained of is not in fact libelous, it cannot be made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication." *Sarkees*, A.2d at 546.

Dr. Monge alleges that Al Dia News and Ms. Valentine "falsely accuse[d] Drs. Monge and Mann of professional misconduct." Am. Compl. ¶ 161(d). As discussed above, the statement at issue is literally true and is not capable of defamatory meaning on its face. Thus, to succeed on her claim of defamation by implication, Dr. Monge must establish that the article implies professional misconduct through a fair and reasonable reading of the article as a whole. *See Pace*, 432 F. Supp. 3d at 510. Al Dia News and Ms. Valentine argue that the article simply "reports on the *Billy Penn* and *Inquirer* articles from the previous week, provides a background of the MOVE Bombing, and discusses the current controversy regarding the bone fragments." Def.'s Mot. to Dismiss, at 16. Thus, Al Dia News and Ms. Valentine argue that it is only through an "unfair and forced construction" of the article that one could find the implication alleged by Dr. Monge. *Id.*, at 13, 16. Al Dia News and Ms. Valentine are correct. The implication that Dr. Monge engaged in professional misconduct is simply not "warranted, justified, [or] supported by the publication" when read as a whole, *Livingston*, 612 A.2d at 449, and the language used in the article cannot "reasonably be construed to have the meaning imputed in the innuendo." *Sarkees*, 37 A.2d at 546.

For all of these reasons, the Court will grant without prejudice Al Dia News and Ms. Valentine's motion to dismiss Dr. Monge's complaint as to her defamation by implication claim. Dr. Monge may seek to cure the claim's shortcomings, if she does so in a timely manner.

## III.    False Light

Dr. Monge also asserts a claim for false light. Section 652E of the Restatement (Second) of Torts, defines this cause of action as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

A publication is actionable under Section 652E of the Restatement if it: (1) "*is not true*," (2) "is highly offensive to a reasonable person," and (3) "is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136. (emphasis added); *see also Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988). "The required standard of fault in a false light claim is thus actual malice." *Rubin v. CBS Broadcasting, Inc.*, 170 A.3d 560, 568 n. 9 (Pa. Super. Ct. 2017).

Because the statements at issue are literally true, Dr. Monge's false light claim must fail as a matter of law. *Larsen*, 543 A.2d at 1188. The Court will grant with prejudice Al Dia News and Ms. Valentine's motion to dismiss Dr. Monge's complaint as to her false light claim.

## IV.   Civil Aiding and Abetting

Dr. Monge also bring a claim for civil aiding and abetting. Section 876 of the Restatement (Second) of Torts sets forth the elements of this cause of action:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other person in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

To bring a claim under Section 876(b) of the Restatement, the plaintiff must establish that "the defendant knew of or could reasonably foresee the underlying bad actor's misdeed," or that the defendant exhibited intentional ignorance as the to the underlying actor's bad deeds. *Marion v.*

*Bryn Mawr Trust Co.*, 253 A.3d 682, 690 (Pa. Super. Ct. 2021) (citing *Grimm v. Grimm*, 149 A.3d 77, 88 (Pa. Super. Ct. 2016)). To demonstrate "substantial assistance," the plaintiff must establish that the defendant took "some affirmative action which cause[d] the tortious actor to conduct himself inappropriately." *Doe v. Liberatore*, 478 F. Supp. 2d 742, 759 (M.D. Pa. 2007). Liability under Section 876 "can only be imposed where a plaintiff avers sufficient facts indicating that the [defendant] substantially assisted or encouraged [the bad actor's] tortious conduct." *Welc v. Porter*, 675 A.2d 334, 339 (Pa. Super. Ct. 1996).

Dr. Monge's allegations regarding her civil aiding and abetting claim against Al Dia News and Ms. Valentine do not "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678 (internal quotations omitted). Based on the facts alleged in Dr. Monge's complaint, the Court is unable "to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *Id.* Thus, the Court will grant without prejudice Al Dia News and Ms. Valentine's motion to dismiss Dr. Monge's complaint as to the civil aiding and abetting claims.

CONCLUSION

For all of these reasons, the Court will grant Al Dia News and Ms. Valentine's motion to dismiss with prejudice as to Dr. Monge's claims for defamation and false light, and without prejudice as to Dr. Monge's claims for defamation by implication and civil aiding and abetting. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE