IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANET MONGE, | : | |
| *Plaintiff* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF PENNSYLVANIA *et al.*, | : | |
| *Defendants* | : | No. 22-2942 |

## MEMORANDUM

PRATTER, J.                                                                                       MARCH 24, 2023

The factual and procedural background of this matter is set forth in the Court's February 3, 2023 memorandum. This memorandum addresses the Philadelphia Inquirer, PBC, Abdul-Aliy Muhammad, and Jenice Armstrong's (collectively "the Inquirer Defendants") motion to dismiss. For the reasons that follow, the Court grants the Inquirer Defendants' motion to dismiss with prejudice as to the claims for defamation and false light, and without prejudice as to the claims for defamation by implication and civil aiding and abetting.

### BACKGROUND

On April 21, 2021, the Philadelphia Inquirer published an article by Abdul-Aliy Muhammad entitled "Penn Owes Reparations for Previously Holding Remains of a MOVE Bombing Victim." Dr. Monge alleges that the article

> conclusively asserted that the unidentified bone fragments were the remains of two of the black children who died in the tragic bombing and fire, Katricia and Delisha Africa. . . . It also stated that Dr. Monge "mishandled" the remains and called upon the Penn Museum and the University of Pennsylvania to apologize for the "unethical possession" of the remains, characterizing the handling of the bone fragments as an "egregious act."

Am. Compl. ¶¶ 155, 156.

On May 18, 2021, the Philadelphia Inquirer published an article by Jenice Armstrong titled "The Disrespectful Handling of the MOVE Victims' Remains by the City and Penn Merits More

1

Investigation." Dr. Monge alleges that Ms. Armstrong "falsely implies unlawful and unprofessional racially motivated actions by Dr. Monge." *Id.* The article includes the following language:

> This latest atrocity is beyond horrible. The MOVE victims' remains have been treated like laboratory specimens, passed from the University of Pennsylvania to Princeton University and then back to Penn. According to the Guardian, they were even included in a now-deleted video promoting a class called "Real Bones: Adventures in Forensic Anthropology."

Am. Compl. 161(g); Am. Compl. Ex. L.[1]

## LEGAL STANDARD

An action may be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion to dismiss stage, the Court must accept factual allegations as true, "but [it is not] compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations and quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

[1] The Philadelphia Inquirer articles attached to Dr. Monge's Amended Complaint as Exhibit B and Exhibit L are incomplete. Large portions of the text of the articles are not visible in the exhibits, including portions of the language quoted by Dr. Monge in the complaint.

## DISCUSSION

### I. Dr. Monge's Defamation Claim

"A complaint for defamation must, on its face, identify specifically what allegedly defamatory statements were made, and to whom they were made." *Bank v. Cmty. Coll. of Phila.*, No. 22-cv-293, 2022 WL 2905243, at *3 (E.D. Pa. July 22, 2022) (citing *Moses v. McWilliams*, 549 A.2d 950, 960 (Pa. Super. 1988)). To state a claim for defamation, the plaintiff must plead:

> (1) The defamatory character of the communication. (2) Its publication by the defendant. (3) Its application to the plaintiff. (4) The understanding by the recipient of its defamatory meaning. (5) The understanding by the recipient of it as intended to be applied to the plaintiff. (6) Special harm resulting to the plaintiff from its publication. (7) Abuse of a conditionally privileged occasion.

42 Pa. C.S. § 8343(a). Where the plaintiff meets the burden of proof, the burden shifts to the defendants to prove: (1) the truth of the defamatory statement; (2) the privileged nature of the communication; and (3) that the subject matter of the defamatory statement is a matter of public concern. 42 Pa. C.S. § 8343(b).

Courts will dismiss meritless defamation claims at this preliminary stage. *See e.g., Gibney v. Fitzgibbon*, 547 F. App'x 111, 114 (3d Cir. 2013) (affirming the dismissal of a defamation claim because the "statement was not capable of a defamatory meaning as a matter of law"); *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, 500 F. Supp. 3d 380, 422–25 (E.D. Pa. 2020) (dismissing defamation claim at the motion to dismiss stage because "the Court [did] not find that the statements [were] capable of defamatory meaning"); *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004) (noting that "[i]f the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial").

3

## A. <u>Falsity Is a Required Element That the Plaintiff Must Prove Against a Media Defendant When the Matter Is of Public Concern</u>

Although the defendant bears the burden of proof when asserting truth as a defense, the plaintiff bears the burden of proving falsity where the defendant is a media defendant and the statement involves a matter of public concern. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986); *see also Kuwait & Gulf Link Transp. Co. v. Doe*, 216 A.3d 1074, 1087 (Pa. 2019) ("If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an element, that the alleged defamatory statement is in fact false."). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal citations and quotation marks omitted). "[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law . . . where a media defendant is involved." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20 (1990).

The <u>Inquirer</u> Defendants argue that because they are media defendants, and because the MOVE bombing and its aftermath are matters of public concern, the burden of establishing the falsity of their allegedly defamatory statements falls on Dr. Monge in proving her defamation claim. Dr. Monge disagrees. However, the Court concludes that the MOVE altercation and bombing and the aftermath are matters of public concern because they relate to "matter[s] of political, social, or other concern to the community" and are the "subject of legitimate news interest." *Snyder*, 562 U.S. at 453. Therefore, Dr. Monge has the burden of proving the falsity of the statements at issue in Mr. Muhammad's and Ms. Armstrong's articles.

4

### A. Capable of Defamatory Meaning

The first step is to determine whether the statement at issue is capable of defamatory meaning. *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 399 (E.D. Pa. 2011). The Court considers "(1) whether the communication was reasonably capable of conveying the particular meaning ascribed to it by the plaintiff; and (2) whether that meaning is defamatory in character." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 510 (E.D. Pa. 2020). When the statement at issue is not "'reasonably susceptible of a defamatory meaning,' the plaintiff has failed to state a claim." *Id.* (citing *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 191 (3d. Cir. 1999)).

A defamatory statement is one that "tends so to harm the reputation of another as to lower him or her in the estimation of the community or to deter third persons from association or dealing with him or her." *U.S. Healthcare v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990). "[T]he statement must do more than merely embarrass or annoy the plaintiff; it must provoke 'the kind of harm which has grievously fractured [one's] standing in the community of respectable society.'" *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014).

#### 1. Truth Is a Defense to Defamation

Truth is an affirmative defense to defamation. *Tucker v. Fischbein*, 237 F.3d 275, 287 (3d Cir. 2001); 42 Pa. C.S. § 8343(b)(1). To assert truth as a defense, the defendant must establish that the statement at issue is substantially true. However, defendant need not prove that the statement is absolutely true. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516–17 (1991) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting of the libelous charge be justified.") (internal quotation marks omitted). The statement will not be considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* (citation omitted).

5

The Court notes that because the Inquirer Defendants are media defendants, the burden of establishing the falsity of the statements is more appropriately placed on Dr. Monge. *See Hepps*, 475 U.S. at 776–77.

### 2. Pure Opinions Are Not Capable of Defamatory Meaning

Pennsylvania law draws a distinction between opinions and statements of fact. *Meyers v. Certified Guar. Co.*, 221 A.3d 662, 670 (Pa. Super. Ct. 2019) (citing Restatement (Second) of Torts § 566 cmt. a (1977)). "A statement of fact can be verified as true or false, whereas an expression of opinion only conveys a subjective belief of the speaker." *Meyers*, 221 A.3d at 670. Pennsylvania law further draws a distinction between pure opinions and mixed opinions. *Id.* (quoting Restatement (Second) of Torts § 566 cmt. b (1977)). Mixed opinions, which "impl[y] the allegation of undisclosed defamatory facts as the basis for the opinion," are actionable. *Braig v. Field Commc'ns*, 456 A.2d 1366, 1372 (Pa. Super. Ct. 1983). Pure opinions, which are based on disclosed facts, are "absolutely privileged" and "cannot be defamatory . . . no matter how derogatory they are." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020) (quoting *Braig*, 456 A.2d at 1373) (internal quotation marks omitted).

## B. The Philadelphia Inquirer and Mr. Muhammad's Allegedly Defamatory Statements

### 1. The Allegedly Defamatory Statements Are True

Dr. Monge alleges that the Philadelphia Inquirer and Mr. Muhammad defamed her by conclusively asserting that the remains belonged to Katricia and Delisha Africa, two black children killed during the MOVE bombing. This allegation misstates the article, which states that the remains belonged to "*someone* who died in a state murder." Am. Compl. Ex. B (emphasis added). Mr. Muhammad's article further acknowledges that there was a dispute regarding whether the remains belonged to Katricia Africa or not, and the article itself did not take a position as to the identification of the remains. Am. Compl. Ex. B.

6

The statements in Mr. Muhammad's article regarding the identity of the remains are true. First, it is undisputed that the remains belong to someone killed in the 1985 MOVE bombing, which is evidenced by Dr. Monge's own allegations that she assisted Dr. Mann with his analysis of the bones recovered from the MOVE bombing site. It is also true that there was a dispute over whether or not the remains belonged to Katricia Africa. Despite Dr. Monge and Dr. Mann's conclusion that the remains belonged to someone between the ages of 17 and 21 (and thus not to the 14-year-old Katricia Africa), Dr. Ali Hameli, the lead pathologist of the MOVE Commission, concluded that the remains were Katricia Africa's.

Because the allegedly defamatory statements in Mr. Muhammad's article are true, they are not actionable. *See Tucker*, 237 F.3d at 287.

### 2. The Allegedly Defamatory Statements Are Pure Opinions

Dr. Monge also alleges that the Philadelphia Inquirer and Mr. Muhammad defamed her by asserting that Dr. Monge mishandled the remains, that the handling of the remains was an egregious act, and that the possession of the remains was unethical. Once again, Dr. Monge's allegations mischaracterize the statements in Mr. Muhammad's article.

The Court turns first to the statement that Dr. Monge supposedly mishandled the remains. Before asserting that "[t]he remains of murdered Black people were mishandled," the article details the City of Philadelphia's negligence in handling the remains of the people killed during the MOVE bombing and the Penn Museum's possession of both the Morton Cranial Collection and the remains of the MOVE bombing victims. Am. Compl. Ex. B. The article states in part:

> In the aftermath of the MOVE bombing, the city showed neglect in assuring proper handling of the remains of the people who were killed. Richard Kent Evans, visiting professor at Haverford, states in his book *MOVE: An American Religion* that "for six months the bodies of the MOVE people . . . decomposed in a city morgue," instead of being returned to family members for proper burial. Evans also notes that "machine operators crushed bones and mangled skeletons."

7

> Despite touting its work on the Morton Cranial Collection, Penn has not publicly addressed Philadelphia's Black communities for holding remains from a MOVE bombing victim—someone who died in a state murder.
>
> The remains of murdered Black people were mishandled then, but as Penn continues their reckoning with past practices around human remains, there is an opportunity here for them to make amends to West Philadelphia.

Am. Compl. Ex. B.

In asserting that the remains of Black people were mishandled, Mr. Muhammad does not directly address Dr. Monge's handling of the MOVE remains. However, even if the article did state that Dr. Monge mishandled the remains, this is non-actionable as a pure opinion. Neither party presented the Court with any objective standard setting forth the proper handling of human remains in similar circumstances. Therefore, whether the remains were mishandled cannot "be verified as true or false." *Meyers*, 221 A.3d at 670.

Second, the statement follows a detailed description of the City of Philadelphia's handling of the remains when processing the MOVE bombing site as well as the Penn Museum's retention of the remains for decades after the bombing. "When an article discloses the underlying facts, readers can easily judge the facts for themselves." *McCafferty*, 955 F.3d at 357. Here, readers of Mr. Muhammad's article can determine for themselves, based on the facts disclosed in the article, whether the MOVE remains were mishandled by the City of Philadelphia, the Penn Museum, or Dr. Monge.

The Court next turns to Dr. Monge's allegation that the article includes a statement that the possession of the MOVE remains was unethical. In Mr. Muhammad's article, unethical possession refers to the Penn Museum's collection and possession of the Morton Cranial Collection: "Just as Penn has apologized for its *unethical collection of human skulls*, the university must also apologize for holding these MOVE remains and agree to make restitution," and "If '[t]he Penn Museum and

the University of Pennsylvania apologize for the *unethical possession of human remains in the Morton Collection*,' . . . the museum must make a public, specific apology with plans for restitution to the MOVE family for this egregious act." Am. Compl. Ex. B. (emphasis added). Mr. Muhammad is characterizing the Penn Museum's collection and possession of the Morton Cranial Collection as unethical, which is a non-actionable opinion. *See Kane v. Chester Cnty.*, 811 F. App'x 65, 70 (3d Cir. 2020) (holding that statements that plaintiff's conduct was "unethical, unprofessional, and harassing," and "call[ed] into serious question [plaintiff's] judgment" were nonactionable opinions). To the extent the article implies that the possession of the MOVE remains was unethical, the Court will address this below.

Finally, the Court addresses the statement that the handling of the MOVE remains was an egregious act. This statement is similarly a non-actionable pure opinion because it cannot be verified as true or false and it is based on disclosed facts. *See McCafferty*, 955 F.3d at 357. The statement appears at the end of the article, following a detailed description of the Penn Museum's possession of the Morton Cranial Collection, the MOVE bombing, the handling of the MOVE remains by the City of Philadelphia and Drs. Mann and Monge, Dr. Monge's online course in which she displayed the remains, and a statement by Mike Africa Jr. The article then states that "[Mr.] Africa demands that the surviving family members be notified by Penn immediately, that [Dr.] Monge be fired, that Penn makes a public apology for this *egregious act*, and that there is 'some kind of restitution.'" Am. Compl. Ex. B (emphasis added). Readers can judge for themselves, based on these disclosed facts in the article itself, whether the handling of the remains was an egregious act, rendering the statement a non-actionable pure opinion. *See McCafferty*, 955 F.3d at 357.

9

Because the Philadelphia Inquirer and Mr. Muhammad's statements are pure opinions, they are, as a matter of law, not capable of defamatory meaning. *Id.*

### C. The Philadelphia Inquirer and Ms. Armstrong's Allegedly Defamatory Statements

#### 1. The Allegedly Defamatory Statements Are True

Dr. Monge alleges that the Philadelphia Inquirer and Ms. Armstrong defamed her by stating that "[t]he MOVE victims' remains have been treated like laboratory specimens, passed from the University of Pennsylvania to Princeton University and then back to Penn. According to the Guardian, they were even included in a now-deleted video promoting a class called 'Real Bones: Adventures in Forensic Anthropology.'" Am. Compl. ¶ 161(g). The allegations in Dr. Monge's Amended Complaint demonstrate that this statement is, in all material respects, true, and thus the Philadelphia Inquirer and Ms. Armstrong cannot be held liable. *See Tucker*, 237 F.3d at 287. First, Dr. Monge admits that "from 2001 to 2015 . . . Dr. Monge brought the unidentified remains [from the Penn Museum at the University of Pennsylvania] to Princeton's campus for further investigation between two and five times, largely for the purpose of having other anthropologists, who were visiting Princeton, to review them." Am. Compl. ¶ 107. Second, Dr. Monge admits that she displayed the remains during her online course "Real Bones: Adventures in Forensic Anthropology." *Id.* ¶¶ 121, 127–29, 131. Dr. Monge admits that "[t]he one and only time the unidentified remains were displayed in the course occurred in the ninth class" and "[i]n that 14-minute class, Dr. Monge can be seen in the Penn Museum's lab with one of her students and the unidentified bone fragments." *Id.* ¶¶ 127–28. Finally, Dr. Monge admits that the course was shut down after being available on the Coursera website for almost a year. *Id.* ¶¶ 131–32.

Because the allegedly defamatory statements in Ms. Armstrong's article for the Philadelphia Inquirer are true, they are not actionable. *See Tucker*, 237 F.3d at 287.

10

### 2. The Allegedly Defamatory Statements Are Pure Opinions

Dr. Monge alleges that the Philadelphia Inquirer and Ms. Armstrong defamed her by stating that "[t]his latest atrocity is beyond horrible." Am. Compl. ¶ 161(g). The Armstrong article begins by setting forth historical examples of scientific studies using the bodies of African Americans. These examples include the use of stolen remains of enslaved Africans in medical experimentation, the Tuskegee syphilis experiment where Black men were used for medical experiments, and the study of tissue taken from Henrietta Lacks—an African American woman suffering from terminal cancer—without her knowledge or consent. After setting forth this historical precedent, Ms. Armstrong characterizes the treatment of the MOVE remains as the latest in a series of atrocities. Although the article does not set forth a detailed overview of the MOVE bombing and its aftermath, it does provide that the remains of those killed during the bombing were passed back and forth between the University of Pennsylvania and Princeton University, and that the remains were used in an online class. Am. Compl. Ex. L.

The characterization of the MOVE bombing and its aftermath as horrible and as an atrocity are non-actionable pure opinions because they are based on the facts disclosed in the article. *See McCafferty*, 955 F.3d at 357.

As pure opinions, they are, as a matter of law, not capable of defamatory meaning. *Id.*

For all of these reasons, the Court will grant with prejudice the Inquirer Defendants' motion to dismiss the complaint as to the defamation claim.

## II. Defamation by Implication

"Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010). "To establish defamation by innuendo, the innuendo

11

must be *warranted, justified, and supported by the publication*." *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. 1992) (emphasis added) (internal quotation marks omitted). The implication "cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1994). The Court must determine whether the language used "could fairly and reasonably be construed to have the meaning imputed in the innuendo." *Id.* "When the implication alleged by the plaintiff is not 'reasonably susceptible of a defamatory meaning,' the plaintiff has failed to state a claim." *Pace*, 432 F. Supp. 3d at 510. Moreover, "[i]f the publication complained of is not in fact libelous, it cannot be made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication." *Sarkees*, A.2d at 546.

### A. The Philadelphia Inquirer and Mr. Muhammad's Allegedly Defamatory Statements

Dr. Monge argues that the article authored by Mr. Muhammad defames her by implying that (1) the remains were Katricia Africa's; (2) Dr. Monge mishandled the remains and that she deviated from professional standards in handling the remains; (3) the Penn Museum's retention of the MOVE remains was unethical; and (4) by calling her handling of the remains egregious, that Dr. Monge was motivated by race and engaged in professional misconduct.

First, the alleged implication that the remains belonged to Katricia Africa is not capable of defamatory meaning because it is substantially true. *See Masson*, 501 U.S. at 516–17. As Dr. Monge notes in her Amended Complaint, the lead pathologist for the MOVE Commission, Dr. Hameli, identified the remains as belonging to Katricia Africa, notwithstanding Dr. Mann and Dr. Monge's conclusions to the contrary. This statement cannot serve as the basis for Dr. Monge's defamation by implication claim. *See Pace*, 432 F. Supp. 3d at 510.

12

Second, the alleged implication that Dr. Monge deviated from professional standards and engaged in professional misconduct is not supported by the article because the article does not mention or address professional standards governing the practice of anthropologists. *See Livingston*, 612 A.2d at 449. The innuendo "cannot be used to introduce new matter, or enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." *Sarkees*, 37 A.2d at 546. Dr. Monge's reading of the article as implying that she violated professional standards introduced new matter into the article such that the implication is not warranted or justified by the publication.[2] *See Livingston*, 612 A.2d at 449.

Third, Dr. Monge alleges that Mr. Muhammad's article implies that the Penn Museum's retention of the MOVE remains was unethical. The article explicitly refers to the Penn Museum's retention of the Morton Cranial Collection as unethical, so Dr. Monge's alleged implication is warranted based on a reading of the article because Ms. Armstrong contends that if the University of Pennsylvania apologizes for its unethical possession of the Morton Cranial Collection, it must also apologize for its retention of the MOVE remains. However, whether or not the possession of the remains was unethical is a non-actionable pure opinion. The article does not say that the Penn Museum or Dr. Monge violated any ethical rules governing the conduct of anthropological professionals, and Dr. Monge has not pointed to any relevant ethical rules or standards in her complaint that, if violated, would render her conduct unethical as a matter of objective fact. Thus,

---

[2] Dr. Monge argues that the Inquirer Defendants' motion to dismiss that Mr. Muhammad's article is defamatory *per se* because the purported implications disparage her professional fitness. "Defamation *per se* can be either 'words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct.'" *Syngy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999). "A statement is defamatory *per se* as an accusation of business misconduct if it 'ascribes to another conduct, characteristics or a condition that would adversely affect his fitness of the proper conduct of his lawful business.'" *Id.* Here, because the alleged implication that Dr. Monge violated professional standards is not supported or warranted by the article, the Court need not address Dr. Monge's argument that this alleged implication is defamatory *per se*.

the assertion that the retention of the MOVE remains is unethical is the expression of Mr. Muhammad's subjective belief, and because it is based on disclosed facts, is a non-defamatory pure opinion. *See Meyers*, 221 A.3d at 670.

Finally, the alleged implication that Dr. Monge acted with racial motivation is a non-actionable pure opinion. *See McCafferty*, 955 F.3d at 357. In *McCafferty*, the Third Circuit Court of Appeals held that "[e]veryone is free to speculate about someone's motivations based on disclosed facts about that person's behavior. . . . Those statements are just more opinions based on disclosed facts, so they too are not actionable." 955 F.3d at 359. Because the implication that Dr. Monge was racially motivated is a pure opinion, it is, as a matter of law, not capable of defamatory meaning.[3] *Id.*

The alleged implications set forth by Dr. Monge are either not capable of defamatory meaning or are not warranted by a reasonable reading of the article as a whole.

### B. The Philadelphia Inquirer and Ms. Armstrong's Allegedly Defamatory Statements

Dr. Monge alleges that the Philadelphia Inquirer and Ms. Armstrong defamed her by "falsely impl[ying] unlawful and unprofessional racially motivated actions by Dr. Monge." Am. Compl. ¶ 161(g). To the extent the article implies unlawful racially motivated actions on Dr. Monge's part, this implication as alleged is not actionable because it is a pure opinion and is, as a matter of law, not capable of defamatory meaning. *See McCafferty*, 955 F.3d at 357359.

For these reasons, the Court will grant without prejudice the Inquirer Defendants' motion to dismiss as it relates to the defamation by implication claim. Dr. Monge may seek to cure the claim's shortcomings if she does so in a timely manner.

---

[3] The Court notes that the allegations do not claim that any defendant called Dr. Monge a racist or went beyond an at most imprecise implication. The Court acknowledges that it well could be actionable defamation to state that someone is a racist, but that is not this case on the current record.

14

## III. False Light

Dr. Monge also asserts a claim for false light under Section 652E of the Restatement (Second) of Torts.[4] A publication is actionable under Section 652E of the Restatement if it (1) "is not true," (2) "is highly offensive to a reasonable person," and (3) "is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136; *see also Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988). "Opinions based on true, disclosed facts cannot support a false-light claim unless they create a false impression." *McCafferty*, 955 F.3d at 360. "In Pennsylvania, falsity means the same thing for false light as it does for defamation." *Id.* "In both contexts, an opinion based on disclosed facts cannot be false." *Id.*; *see also Meyers*, 221 A.3d at 670.

The statements at issue in both Philadelphia Inquirer articles are not "false" because they are either substantially true statements of fact or "opinion[s] based on disclosed fact." *McCafferty*, 955 F.3d at 360. Because the statements at issue cannot be false, the false light claim must fail as a matter of law. *Larsen*, 543 A.2d at 1188; *see also McCafferty*, 955 F.3d at 360. The Court will grant with prejudice the Inquirer Defendants' motion to dismiss the false light claim.

## IV. Civil Aiding and Abetting

Dr. Monge also brings a claim for civil aiding and abetting. She alleges that "[t]he behaviors in which Defendants engaged aided and abetted the tortious misconduct of each of the other defendants by giving rise to false and defamatory information against Dr. Monge in a concerted effort to accomplish the particular result of branding [Dr.] Monge as incompetent and

---

[4] Section 652E defines this cause of action as follows: "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652.

15

racist." Am. Compl. ¶ 218. Section 876(b) of the Restatement (Second) of Torts provides that "one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself[.]" To bring such a claim, the plaintiff must establish that "the defendant knew of or could reasonably foresee the underlying bad actor's misdeed," or that the defendant exhibited intentional ignorance as the to the underlying actor's bad deeds. *Marion v. Bryn Mawr Trust Co.*, 253 A.3d 682, 690 (Pa. Super. Ct. 2021) (citing *Grimm v. Grimm*, 149 A.3d 77, 88 (Pa. Super. Ct. 2016)). To demonstrate "substantial assistance," the plaintiff must establish that the defendant took "some affirmative action which cause[d] the tortious actor to conduct himself inappropriately." *Doe v. Liberatore*, 478 F. Supp. 2d 742, 759 (M.D. Pa. 2007). Liability "can only be imposed where a plaintiff avers sufficient facts indicating that the [defendant] substantially assisted or encouraged [the bad actor's] tortious conduct." *Welc v. Porter*, 675 A.2d 334, 339 (Pa. Super. Ct. 1996).

Dr. Monge's allegations regarding her civil aiding and abetting claim against the Inquirer Defendants do not "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678 (internal quotations omitted). Based on the facts alleged, the Court is unable "to draw the reasonable inference that the defendant[s] are liable for the misconduct alleged." *Id.* Thus, the Court will grant without prejudice the Inquirer Defendants' motion to dismiss to the civil aiding and abetting claims.

CONCLUSION

For all of these reasons, the Court will grant the Philadelphia Inquirer, Mr. Muhammad, and Ms. Armstrong's motion to dismiss with prejudice as to the defamation and false light claims, and without prejudice as to the defamation by implication and civil aiding and abetting claims. An appropriate order follows.

BY THE COURT:

/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE