## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANET MONGE, | : | |
| *Plaintiff* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF PENNSYLVANIA *et al.*, | : | |
| *Defendants* | : | No. 22-2942 |

### MEMORANDUM

PRATTER, J.                                                    MAY ___, 2023

### INTRODUCTION

The consequences of a troubling series of events in Philadelphia's history continue to engender trouble now, almost 40 years later. The aftermath of the 1985 MOVE events provides the setting for this case.

Dr. Janet Monge filed a complaint against numerous defendants asserting claims for defamation, defamation by implication, false light, and civil aiding and abetting. Defendants Advance Magazine Publishers Inc. d/b/a The New Yorker and Teen Vogue, Ezra Lerner, Heather A. Thompson, Associated Newspapers Limited d/b/a The Daily Mail, Adam Schrader, ESPN Inc. d/b/a Andscape, Linn Washington, Nicole Froio, Guardian News & Media Limited d/b/a The Guardian, Ed Pilkington, NYP Holdings, Inc. d/b/a New York Post, Jackson O'Bryan a/k/a Blake Montgomery, The New York Times Company, Michael Levenson, The Slate Group, LLC, and Elaine Ayers (collectively, "the Media Defendants") filed a motion to dismiss Dr. Monge's complaint for failure to state a claim under the Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Court grants the Media Defendants' motion to dismiss in part with prejudice and in part without prejudice.

## Table of Contents

Introduction ........................................................................................................... 1

Background ........................................................................................................... 3

I.     The 1985 MOVE Bombing and the Identification of the MOVE Event Human Remains . 3

II.    Dr. Monge's Coursera Course ................................................................... 4

III.   Publication of the Allegedly Defamatory Statements by the Media Defendants ............... 5

   A.   Daily Mail Article Authored by Adam Schrader ............................................. 5

   B.   The Guardian Article Authored by Ed Pilkington .......................................... 6

   C.   New York Post Article Authored by Jackson O'Bryan ................................... 6

   D.   The New York Times Article Authored by Michael Levenson ......................... 6

   E.   Slate Article Authored by Elaine Ayers ....................................................... 7

   F.   Andscape Article Authored by Nicole Froio ................................................. 7

   G.   The New Yorker Article Authored by Heather Ann Thompson ....................... 7

   H.   Andscape Article Authored by Linn Washington ......................................... 8

   I.   Teen Vogue Article Authored by Ezra Lerner ............................................... 8

Legal Standard ..................................................................................................... 9

Discussion ............................................................................................................ 9

I.     The New Yorker Article Is Protected by Pennsylvania's Fair Report Privilege ................ 9

II.    Dr. Monge's Complaint Is Time-Barred as to the New York Times and Michael Levenson
       12

III.   Dr. Monge's Defamation Claim ................................................................. 13

   J.   Capable of Defamatory Meaning ................................................................ 14

   K.   Dr. Monge Has Not Shown that the Statements are Capable of Defamatory Meaning. 16

IV.    Defamation by Implication ........................................................................ 20

   A.   A Number of the Allegedly Defamatory Implications Are Pure Opinions and Thus Not
Capable of Defamatory Meaning ...................................................................... 20

   B.   A Number of The Allegedly Defamatory Implications Relate to Professional
Misconduct and Thus the Court Must Assess Defamation *Per Se* ............................ 23

   C.   Public vs. Private Figure ........................................................................... 26

V.     False Light ............................................................................................. 31

VI.    Civil Aiding and Abetting .......................................................................... 32

Conclusion .......................................................................................................... 34

BACKGROUND

I.  **The 1985 MOVE Bombing and the Identification of the MOVE Event Human Remains**

The MOVE organization, founded in the 1970s, is a group of revolutionaries, all of whom adopted the surname "Africa." In 1985, the Philadelphia Police Department dropped a bomb on the MOVE residence. Eleven MOVE members died. Of these, six were adults and five were children. The resulting fire burned for several hours before it was extinguished, making it difficult to process the bomb site. By the time the Philadelphia Medical Examiner's Office arrived at the bomb site, the City of Philadelphia had already begun using cranes and other construction equipment to dig up the debris and body parts, indiscriminately resulting in severe damage to the human remains of those killed by the bombing.

Dr. Alan Mann, then a professor in the Department of Anthropology at the University of Pennsylvania, was asked to assist with the identification of the remains by Philadelphia's Chief Medical Examiner. Dr. Mann invited Dr. Janet Monge, then his doctoral student, to assist him. Drs. Mann and Monge sorted the remains—which were fragmented and incomplete because of the City's use of cranes at the site—based on age. Drs. Mann and Monge concluded that a pelvis bone and femur bone fragments did not conform to the ages of the individuals presumed to have been killed during the bombing. The oldest child known to have been killed during the MOVE bombing was 14-year-old Katricia (Tree) Africa, but Drs. Mann and Monge determined that the pelvis and femur bones belonged to a female between the ages of 17 and 21. Drs. Mann and Monge considered the remains to be unaffiliated with the known MOVE victims and referred to them as the bones of "Jane Doe."

The City of Philadelphia formed a MOVE Commission to investigate the infamous MOVE bombing and its aftermath. Dr. Ali Hameli, the lead pathologist of the MOVE Commission, issued

a report in which he concluded that the unidentified pelvis bone and femur bone fragments were associated with Katricia Africa. However, because the identity of the remains was in dispute, the Philadelphia Medical Examiner's Office, along with Drs. Mann and Monge, retained responsibility for identifying the remains and the Medical Examiner's Office released the remains to Dr. Mann for further study at the Penn Museum.

The Penn Museum stored the remains from 1986 to 2001, until Dr. Mann joined the Anthropology Department at Princeton University. From 2001 to 2015, when Dr. Mann retired, Dr. Monge transported the remains between the Penn Museum to Princeton between two and five times. Also during this time, Dr. Monge unsuccessfully attempted to contact members of the MOVE organization—Ramona Africa and Consuela Dotson[1]—regarding the remains. Dr. Monge first attempted contact in 1995 and then again in 2014. Because Dr. Monge concluded that she would not be able to get help from the Africa family, and because she did not think she would be able to conclusively identify the remains, Dr. Monge declared the case cold.

## II.   Dr. Monge's Coursera Course

In August 2020, Dr. Monge published "Real Bones: Adventures in Forensic Anthropology" on the Coursera online platform, a free website that makes classes available to anyone who enrolls through the website. The stated purpose of Dr. Monge's course was to teach how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of bone remains. Dr. Monge used the MOVE remains as teaching aids during her course. In the first two classes, Dr. Monge described the MOVE organization, the history of the MOVE bombing, the inappropriate excavation of the bomb site, and displayed slides of the remains. In the ninth class, Dr. Monge and one of her students are seen

---

[1]    Dr. Monge spells Ms. Dotson's name as "Consuella" while the Media Defendants spell her name as "Consuela" or "Consuewella." This opinion will refer to her as Consuela Dotson.

in Penn Museum's laboratory using the MOVE remains to explain how forensic techniques can be used to determine the age of remains. Dr. Monge is also describing the process she took to estimate the age of the MOVE remains. During the video, Dr. Monge describes the remains as "juicy" and "greasy" which, according to Dr. Monge, are anthropological terms of art.

Beginning in April 2021, numerous articles and statements were published about Dr. Monge's involvement in the identification of the MOVE remains and her use of the remains in the online course. These articles and statements form the basis of Dr. Monge's present action. In short, she claims that by various published statements she has been defamed or exposed in a false light. All of the defendants move to dismiss her complaint. This memorandum addresses the joint motion of the 16 Media Defendants: Advance Magazine Publishers Inc. d/b/a The New Yorker and Teen Vogue, Ezra Lerner, Heather A. Thompson, Associated Newspapers Limited d/b/a The Daily Mail, Adam Schrader, ESPN Inc. d/b/a Andscape, Linn Washington, Nicole Froio, Guardian News & Media Limited d/b/a The Guardian, Ed Pilkington, NYP Holdings, Inc. d/b/a New York Post, Jackson O'Bryan a/k/a Blake Montgomery, The New York Times Company, Michael Levenson, The Slate Group, LLC, and Elaine Ayers.

### III. Publication of the Allegedly Defamatory Statements by the Media Defendants

#### A. Daily Mail Article Authored by Adam Schrader

Daily Mail published an article by Adam Schrader entitled "'They Are Juicy': Princeton Professor is Slammed for Disrespecting the Bones of a 14-year Old Black Girl Killed by a Bomb Dropped by Philadelphia Police in 1985 After Members of Her Commune Fired at Cops." Dr. Monge alleges that this article falsely states that the remains belonged to a Black child killed during the MOVE bombing. She also alleges that the article takes issue with her use of the word "juicy" when describing the remains in her online course, implying that the word carries racial undertones.

**B.  The Guardian Article Authored by Ed Pilkington**

The Guardian published an article by Ed Pilkington entitled "Bones of Black Children Killed in Police Bombing Used in Ivy League Anthropology Course." Dr. Monge alleges that this article conclusively asserts that the remains are those of Katricia Africa and implies that Dr. Monge engaged in professional misconduct and was motivated by racial animus. Dr. Monge also alleges that this article took issue with her use of the terms "juicy" and "greasy" in her online course, both of which Dr. Monge avers are anthropological terms of art.

**C.  New York Post Article Authored by Jackson O'Bryan**

The New York Post published an article by Jackson O'Bryan entitled "Remains of Black Teen Killed in Philadelphia Police Bombing Used in Online Class." Dr. Monge alleges that this article implies that Dr. Monge acted with racial animus. The article reads in relevant part: "The bones of at least one black teenager killed in the 1985 police bombing in Philadelphia are being used as a case study in an online anthropology course – taught by an Ivy League professor who called the remains juicy." Am. Compl. ¶ 160(c).

**D.  The New York Times Article Authored by Michael Levenson**

On April 24, 2021, the New York Times published an article by Michael Levenson entitled "Decades After Police Bombing, Philadelphians 'Sickened' by Handling of Victim's Bones." Dr. Monge alleges that this article falsely identified the remains as those of Delisha Africa and suggests that Dr. Monge's treatment of the remains disrespected Black life. Dr. Monge also contends that the article's statement that the remains had been kept in a cardboard box is defamatory to her because, she alleges, that the remains were stored at the Penn Museum following forensic best practices.

**E.   Slate Article Authored by Elaine Ayers**

Slate published an article by Elaine Ayers titled "The Grim Open Secret of College Bone Collections." Dr. Monge alleges that this article states that Dr. Monge was motivated by racial animus. The article states that "the physical anthropology departments like the ones that employ Mann and Monge exist today as uneasy reminders of many museums' and universities' racist and colonial foundations." Am. Compl. Ex. H, at ECF 138. Dr. Monge further alleges that the article suggests that the terms "juicy" and "greasy" carry racial undertones and states that Dr. Monge's use of these terms in her online course reflects the "most recent example of an ongoing legacy of Black People's bodies used for academic research and pedagogy." Am. Compl. ¶ 161(c).

**F.   Andscape Article Authored by Nicole Froio**

Andscape, a website run by ESPN, published an article by Nicole Froio entitled "The Scandal Over the MOVE Bombing Victims' Remains Is Part Of Anthropology's Racist History." Dr. Monge alleges that the article suggests that Dr. Monge's investigatory actions were racially motivated. The article reads in part:

> The handling of the remains of the two MOVE bombing victims is certainly not . . . a 'conspiracy.' The reality is much worse. The theft of Tree's and Delisha's bones indicates that despite attempts to purge academia and anthropology of colonial logics . . . , they are baked into the structure. It is clear that there is still a belief in the field of anthropology that the remains of Black people are scientific objects to be studied or stored away in boxes rather than laid to rest by their families.

Am. Compl. Ex. J, at ECF 155. The article further states that "[i]n death, [the MOVE family's] bones were used as objects of colonial plunder at academic institutions." Am. Compl. Ex. J, at ECF 156–57.

**G.   The New Yorker Article Authored by Heather Ann Thompson**

The New Yorker published an article by Heather Ann Thompson entitled "Saying Her Name." Dr. Monge alleges that the article implies that Dr. Monge's actions were racist. The article

states in part that "the idea that the museum was holding the bones of a Black Philadelphian who was alive as recently as 1985 in the same way that it has held the skulls of enslaved people, procured by graverobbers, was beyond comprehension." Am. Compl. Ex. K, at ECF 160. Dr. Monge also alleges that the article conclusively asserts that the remains were those of Katricia Africa by stating that "[t]he remains that Mann claimed had never been satisfactorily identified had, in fact, been found to belong to a teen-age girl who, along with her sister, died that day." Am. Compl. Ex. K, at ECF 161.

### H. Andscape Article Authored by Linn Washington

Andscape published an article by Linn Washington entitled "Disrespect for the MOVE Families Is a Stain That Never Goes Away in Philadelphia." Dr. Monge alleges that this article states that Dr. Monge mistreated the remains and that her actions were unprofessional and unlawful. The article reads in part: "Although the scandal caused Princeton to cancel that online course, anthropologist Janet Monge . . . retains her positions at the Penn Museum and on the university's faculty." Am. Compl. Ex. M, at ECF 182. The article further suggests that the University of Pennsylvania's failure to remove Dr. Monge from her position "renders the University of Penn's apology hollow." Am. Compl. Ex. M, at ECF 182.

### I. Teen Vogue Article Authored by Ezra Lerner

Teen Vogue published an article by Ezra Lerner entitled "MOVE Bombing Remains Scandal Shows Enduring Racism in Anthropology." Dr. Monge alleges that the article implies that Dr. Monge engaged in professional misconduct and that her handling of the remains was unethical. The article states that "the remains of at least one young girl—believed to possibly belong to Tree as well as Delisha Africa . . .—had been improperly kept for decades by archaeologists Alan Mann and Janet Monge." Am. Compl. Ex. N, at ECF 186.

LEGAL STANDARD

An action may be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion to dismiss stage, the Court must accept factual allegations as true, but it is not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal citations and quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The complaint must show "more than a sheer possibility that a defendant has acted unlawfully," *id*., and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

DISCUSSION

## I.    The New Yorker Article Is Protected by Pennsylvania's Fair Report Privilege

The New Yorker and Ms. Thompson argue that Dr. Monge's complaint should be dismissed against them pursuant to Pennsylvania's fair report privilege. The fair report privilege provides that

> a newspaper has the privilege to report the acts of the executive or administrative officials of the government. . . . However, this is a qualified or conditional privilege, rather than absolute. If the newspaper account is fair, accurate and complete, and not published solely for the purpose of causing harm to the person defamed, it is privileged and no liability attaches, even though information contained [in the official report] is false or inaccurate. Further, it is not essential that . . . the official report[] be set forth verbatim by the newspaper. A summary of substantial accuracy is all that is required.

*Sciandra v. Lynett*, 187 A.2d 586, 588–89 (Pa. 1963) (internal citations omitted); *see also King v. Phila. Inquirer*, No. 07-cv-3581, 2007 WL 9813073, at *5–*6 (E.D. Pa. Nov. 28, 2007); *c.f. Sylva v. Ude*, No. 21-cv-4102, 2022 WL 327204, at *5 (E.D. Pa. Feb. 3, 2022); *Lee v. TMZ Prods., Inc.*, No. , 2015 WL 5638081, at *5 (D.N.J.), *aff'd* 710 F. App'x 551 (3d Cir. 2017). The privilege is "an exception to the common law rule that the republisher of a defamation was subject to liability similar to that risked by the original defamer." *Medico v. Time, Inc.*, 643 F.2d 134, 137 (3d Cir. 1981).

The statement which the New Yorker and Ms. Thompson argue is privileged is as follows: "The remains that Mann claimed had never been satisfactorily identified had, in fact, been found to belong to a teen-age girl who, along with her sister, died that day." Mot. to Dismiss at 29. The New Yorker and Ms. Thompson argue that this statement was a report on an official proceeding—the MOVE Commission investigation report—as set forth in a later paragraph in the article:

> By the close of the official MOVE inquiry, official documents related to the investigation, including one of its final legal documents—the report of the Philadelphia County grand jury that had been convened to decide if anyone would be indicted as a result of the deaths at Osage Avenue—had identified B-1 not simply as a teen-ager, nor just as a girl, but specifically as belonging to Katricia Dotson, who, in life, had been called Tree Africa.
>
> ....
>
> Ultimately, it was agreed, and *officially recorded, that B-1 was Katricia (Tree) Dotson.*

Am. Compl. Ex. K, at ECF 164 (emphasis added); Mot. to Dismiss at 29. Thus, the New Yorker and Ms. Thompson contend that the statement at issue is a fair and accurate summary of the proceeding and investigation conducted by the MOVE Commission. Dr. Monge, on the other hand, argues that the fair report privilege does not apply because the New Yorker's reporting is unfair and inaccurate. *See First Lehigh Bank v. Cowen*, 700 A.2d 498, 503 (Pa. Super. Ct. 1997) ("There

is . . . no doubt . . . that the fair report privilege is qualified and can be forfeited if the report is inaccurate or unfair.").

The Court concludes that the New Yorker and Ms. Thompson are subject to Pennsylvania's fair report privilege because the statement at issue fairly and accurately summarizes the official proceeding conducted by, and the report issued by, the MOVE Commission regarding its investigation of the identity of the MOVE remains. The allegations in Dr. Monge's complaint support this conclusion.[2] She alleges that the MOVE Commission, which was appointed to investigate the MOVE bombing, established a pathology group led by Dr. Hameli. Dr. Monge admits that in the MOVE Commission's report, Dr. Hameli concluded that the unidentified bone fragments recovered from the MOVE bombing site belong to Katricia Africa. Although Dr. Monge alleges that the report was flawed in part because she and Dr. Mann were not members of the pathology group, these assertions do not negate the fact that Dr. Hameli's conclusion, on behalf of the MOVE Commission, was that the remains were Katricia Africa's.

The statement that the remains had been found to belong to Katricia Africa is a fair and accurate summary of the MOVE Commission's report, including Dr. Hameli's conclusion regarding the identity of the remains. The New Yorker and Ms. Thompson are protected by Pennsylvania's fair report privilege, and the Court will grant the Media Defendants' motion to dismiss the defamation, defamation by implication, and false light claims as to the New Yorker and Ms. Thompson with prejudice.

---

[2] "In evaluating a motion to dismiss, [the Court] may consider documents that are attached to or submitted with the complaint and 'any matters incorporated by reference or integral to the claim . . . .'" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal citation omitted). The official report of the MOVE Commission was incorporated by reference in Dr. Monge's complaint. Not only does she provide the full citation for the report—entitled "The Findings, Conclusions, and Recommendations of the Philadelphia Special Investigation Commission"—but she cites to and references the report several times throughout her complaint. Therefore, the Court may properly consider the MOVE Commission's report.

## II.   Dr. Monge's Complaint Is Time-Barred as to the New York Times and Michael Levenson

The claims against the New York Times and Mr. Levenson must be dismissed because they are time-barred. Pennsylvania's statute of limitations for defamation and false light claims is one year from the date of publication. 42 Pa. Cons. Stat. § 5523(1); *Gorman v. Shpetrik*, No. 20-cv-4759, 2022 WL 717075, at *4 (E.D. Pa. Mar. 10, 2022). The New York Times published the article authored by Mr. Levenson on April 24, 2021. Yet Dr. Monge did not commence her action against the New York Times and Mr. Levenson until May 17, 2022, when she amended her writ of summons. Dr. Monge's original writ of summons, filed on April 20, 2022, did not name the New York Times or Mr. Levenson as defendants. By the time she amended her writ, the statute of limitations had expired, rendering her claims against the New York Times and Mr. Levenson untimely. *See Banka v. Columbia Broad. Co.*, 63 F. Supp. 3d 501, 505 (E.D. Pa. 2014) (noting that "[t]he statute of limitations may be tolled by filing a praecipe for writ of summons . . . [only] prior to the expiration of the limitations period").

Dr. Monge argues that the claims are not time-barred because the discovery rule tolled the statute of limitations. Dr. Monge relies in part on *Fine v. Checcio*, 870 A.2d 850, 857, 859 (Pa. 2005), which provides that "a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion" and that "the discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises." Dr. Monge argues that she did not have a reason to "awaken inquiry and direct diligence" to inform herself of the New York Times article. *Fine*, 870 A.2d at 859. She claims that she undertook a reasonable investigation of her claims but did not discover the New York Times article because the article did not appear until the sixth page of her inquiry on an online search engine.

However, the discovery rule does not apply to media defendants like the New York Times and Mr. Levenson if the allegedly "defamatory statement [was] disseminated through a mass medium, like a website, and received by tens of thousands of readers." *Wolk v. Olson*, 730 F. Supp. 2d 376, 378 (E.D. Pa. 2010) (declining to apply the discovery rule to defamation claim arising from article published online because it would "nullif[y] the stability and security that the statute of limitations aims to protect"); *see also Leisten v. CBS Broad., Inc.*, No. 21-cv-974, 2021 WL 6550921, at \*3 ("Pennsylvania Federal courts have declined to consider a potential discovery rule extension in defamation suits arising from mass media publications."). The New York Times article was published online and qualifies as a mass media publication, thus the discovery rule does not apply.

The Court grants the Media Defendants' motion to dismiss the defamation, defamation by implication, and false light claims against the New York Times and Mr. Levenson with prejudice.

### III.   Dr. Monge's Defamation Claim

To state a claim for defamation, the plaintiff must plead:

(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

42 Pa. Cons. Stat. § 8343(a). Where the plaintiff meets her burden of proof, the burden shifts to the defendants to prove: (1) the truth of the defamatory statement; (2) the privileged nature of the communication; or (3) that the subject matter of the defamatory statement is a matter of public concern. 42 Pa. C.S. § 8343(b).

Courts can dismiss meritless defamation claims at this preliminary stage. *See e.g., Gibney v. Fitzgibbon*, 547 F. App'x 111, 114 (3d Cir. 2013) (affirming the dismissal of a defamation claim

13

because the "statement was not capable of a defamatory meaning as a matter of law"); *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, 500 F. Supp. 3d 380, 422–24 (E.D. Pa. 2020) (dismissing defamation claim at the motion to dismiss stage because "the Court [did] not find that the statements [were] capable of defamatory meaning"); *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004) ("If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial.").

## J.  Capable of Defamatory Meaning

The first step a Court must take in the defamation analysis is to determine whether the statement at issue is capable of defamatory meaning. *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 399 (E.D. Pa. 2011). The Court considers "(1) whether the communication was reasonably capable of conveying the particular meaning ascribed to it by the plaintiff; and (2) whether that meaning is defamatory in character." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 510 (E.D. Pa. 2020). When the statement at issue is not "'reasonably susceptible of a defamatory meaning,' the plaintiff has failed to state a claim." *Id.* (citing *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 191 (3d. Cir. 1999)).

A statement is defamatory if it "tends so to harm the reputation of another as to lower him [or her] in the estimation of the community or to deter third persons from association or dealing with him [or her]." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990). "[T]he statement must do more than merely embarrass or annoy the plaintiff; it must provoke 'the kind of harm which has grievously fractured [one's] standing in the community of respectable society.'" *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Tucker*, 848 A.2d at 124).

1. **Falsity Is a Required Element That the Plaintiff Must Prove Against a Media Defendant When the Matter is of Public Concern**

In Pennsylvania, generally truth is an affirmative defense to defamation. *Tucker v. Fischbein*, 237 F.3d 275, 287 (3d Cir. 2001); 42 Pa. Cons. Stat. § 8343(b)(1) ("[T]he defendant has the burden of proving . . . [t]he truth of the defamatory communication."). While the defendant bears the burden of proof when asserting truth as a defense, the plaintiff bears the burden of proving falsity where the defendant is a member of the media and the statement involves a matter of public concern. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986); *see also Kuwait & Gulf Link Transp. Co. v. Doe*, 216 A.3d 1074, 1087 (Pa. Super. Ct. 2019) ("If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an element, that the alleged defamatory statement is in fact false."). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal citations and quotation marks omitted). "[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law . . . where a media defendant is involved." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20 (1990).

The Court concludes that not only are the Media Defendants members of the media, but also that the MOVE bombing and its aftermath, including the possession and treatment of remains of victims of the bombing, are matters of public concern because they relate to "matter[s] of political, social, or other concern to the community" and are the "subject of legitimate news interest." *Snyder*, 562 U.S. at 453. Therefore, Dr. Monge has the burden of proving the falsity of the statements at issue in the Media Defendants' articles.

### 2.   Pure Opinions Are Not Capable of Defamatory Meaning

Pennsylvania law draws a distinction between opinions and statements of fact. *Meyers v. Certified Guar. Co.*, 221 A.3d 662, 670 (Pa. Super. Ct. 2019) (citing Restatement (Second) of Torts § 566 cmt. a (1977)). "A statement of fact can be verified as true or false, whereas an expression of opinion only conveys a subjective belief of the speaker." *Meyers*, 221 A.3d at 670. Pennsylvania law further draws a distinction between pure opinions and mixed opinions. *Id.* (quoting Restatement (Second) of Torts § 566 cmt. b (1977)). Mixed opinions, which "impl[y] the allegation of undisclosed defamatory facts as the basis for the opinion," are actionable. *Braig v. Field Commc'ns*, 456 A.2d 1366, 1372 (Pa. Super. Ct. 1983) (quoting Restatement (Second) of Torts § 566). Pure opinions, which are based on disclosed facts, are "absolutely privileged" and "cannot be defamatory . . . no matter how derogatory they are." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020) (quoting *Braig*, 456 A.2d at 1373) (internal quotation marks omitted). "When an article discloses the underlying facts, readers can easily judge the facts for themselves." *McCafferty*, 955 F.3d at 357.

### K.   Dr. Monge Has Not Shown that the Statements are Capable of Defamatory Meaning

### 1.   Daily Mail Article Authored by Adam Schrader

Dr. Monge alleges that Daily Mail and Mr. Schrader defamed her by publishing that the remains used in the online video were bones of a "black child killed in a 1985 police bombing." Am. Compl. ¶ 160(a). The allegations in Dr. Monge's amended complaint demonstrate that this statement is, in all material respects, substantially true, and thus the Daily Mail and Mr. Schrader cannot be held liable. *See Tucker*, 237 F.3d at 287. First, Dr. Monge alleges that the unidentified remains—a pelvis bone and femur bone fragments—were collected from the MOVE bombing site. Second, while Dr. Monge alleges that she and Dr. Mann determined that the bones belonged to an individual between the ages of 17 to 21, she admits that Dr. Hameli concluded that the bones

belonged to Katricia Africa, a 14-year-old girl presumed to have been killed during the MOVE bombing. It is therefore at least arguably true that the remains belonged to a "black child killed in a 1985 police bombing." *See Masson v. New Yorker Mag.*, 501 U.S. 496, 516–17 (1991); *Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. Ct. 1982) ("The proof of 'truth' must go to the 'gist' or 'sting' of the defamation. The test is 'whether the [alleged] libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"). Finally, Dr. Monge concedes that she used these remains during her online course.

### 2.   The Guardian Article Authored by Ed Pilkington

Dr. Monge alleges that the Guardian and Mr. Pilkington defamed her by publishing that "the bone fragments are 'almost certainly those of the older MOVE girls who died.'" Am. Compl. ¶ 160(b). This statement is proven true by the allegations in Dr. Monge's complaint. Dr. Monge alleges that Dr. Hameli concluded that the remains belong to Katricia Africa, the oldest child known to have been killed during the MOVE bombing. The article refrains from asserting that the remains have been conclusively identified as belonging to Katricia Africa by stating that the remains were "almost certainly" Katricia Africa's.[3] Thus, the statement is substantially true. *See Masson*, 501 U.S. at 516–17; *Dunlap*, 448 A.2d at 15.

### 3.   New York Post Article Authored by Jackson O'Bryan

Dr. Monge alleges that the New York Post and Mr. O'Bryan defamed her by publishing the following: "The bones of at least one black teenager killed in the 1985 police bombing in Philadelphia are being used as a case study in an online anthropology course – taught by an Ivy League professor who called the remains juicy." The entirety of this statement is substantially true. First, as alleged in the amended complaint, the remains were determined by Drs. Mann and Monge

---

[3]     The statements in Mr. Pilkington's article for the Guardian are more equivocal and less definitive than the statements made in the articles published by various other Media Defendants.

to belong to a young woman between the ages of 17 and 21 who was killed during the MOVE bombing. Second, Dr. Monge was a lecturer and adjunct professor at the University of Pennsylvania, an Ivy League institution, and she admits that she used the remains during her online anthropology course. Lastly, Dr. Monge acknowledges that she used the term "juicy" when describing the remains during the online course.

### 4. Andscape Article Authored by Linn Washington

Dr. Monge alleges that the Andscape article authored by Ms. Washington falsely states that Dr. Monge mistreated the remains. This is a non-actionable pure opinion because it expresses Ms. Washington's subjective belief, and the article discloses the facts upon which this opinion is based. *Meyers*, 221 A.3d at 670; *McCafferty*, 955 F.3d at 357. The article sets forth Ms. Washington's own recollection of the MOVE events, including the 1985 bombing of the home occupied by the MOVE members and the ensuing fire which destroyed over 60 homes in the surrounding neighborhood. Ms. Washington also recalls watching a news conference in 2019 after two MOVE members—Janet Africa and Janine Africa—were released from prison, during which they recounted the insensitivity they experienced after the MOVE bombing, including being taunted and mocked by prison guards about the death of their children. The article then discusses more recent events, including the exposure of the alleged mistreatment of the remains by media outlets and Philadelphia city officials. For example, the article includes a link to the Andscape article authored by Ms. Froio and details the public apology made by Philadelphia Mayor James Kenney, who ordered an investigation into the mistreatment of the MOVE remains. Thus, the statement that the remains were "mistreated" is a non-actionable pure opinion.

**5.   Teen Vogue Article Authored by Ezra Lerner**

Dr. Monge alleges that Teen Vogue and Mr. Lerner defamed her by stating that "the remains of at least one young girl—believed to possibly belong to Tree as well as Delisha Africa—had been improperly kept for decades by archaeologists Alan Mann and Janet Monge." The statements in the Teen Vogue article are at least substantially true. First, Dr. Monge alleges that she and Dr. Mann identified the remains as belonging to a female between the ages of 17 to 21 but that Dr. Hameli identified the remains as belonging to Katricia (Tree) Africa, a 14-year-old girl. Further, Dr. Monge alleges that she and Dr. Mann retained possession of the remains for 36 years without obtaining permission from the Africa family.

The statement that the remains had been kept "improperly" is a pure opinion. It "conveys [the] subjective belief of the speaker," here Mr. Lerner, and it is based on facts disclosed in the article. *Meyers*, 221 A.3d at 670; *McCafferty*, 955 F.3d at 357. The article states that rather than returning the remains in 1985 upon the completion of his investigation, Dr. Mann stored the remains at the Penn Museum and Dr. Monge later used the remains in her online course. The article then states that "[t]he University of Pennsylvania, the Penn Museum and Princeton University have all released statements apologizing for the improper handling of the remains." Am. Compl. Ex. N, at ECF at 186. So, Mr. Lerner's statement that the remains were improperly kept is a non-actionable pure opinion.

\* \* \* \* \*

Because all of the aforementioned statements are either at least substantially true or are pure opinions, and are thus not actionable, the Court will grant with prejudice the Media Defendants' motion to dismiss Dr. Monge's complaint as to her defamation claim against Daily Mail and Mr. Schrader, the Guardian and Mr. Pilkington, the New York Post and Mr. O'Bryan, Andscape and Ms. Washington, and Teen Vogue and Mr. Lerner.

19

IV.     **Defamation by Implication**

"Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010). "To establish defamation by innuendo, the innuendo must be *warranted, justified and supported by the publication*." *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. Super. Ct. 1992) (emphasis added) (internal quotation marks omitted). The implication "cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1994). The Court must determine whether the language used "could fairly and reasonably be construed to have the meaning imputed in the innuendo." *Id.* "When the implication alleged by the plaintiff is not reasonably susceptible of a defamatory meaning, the plaintiff has failed to state a claim." *Pace*, 432 F. Supp. 3d at 510 (internal quotation marks omitted). Moreover, "[i]f the publication complained of is not in fact libelous, it cannot be made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication." *Sarkees*, 37 A.2d at 546.

A.    **A Number of the Allegedly Defamatory Implications Are Pure Opinions and Thus Not Capable of Defamatory Meaning**

1.    **Slate Article Authored by Elaine Ayers**

Dr. Monge alleges that Slate and Ms. Ayers defamed her by implying that she was driven by a racially based animus as to her involvement with the MOVE remains. The following language from the article serves as the basis for Dr. Monge's claim: "the physical anthropology departments like the ones that employ Mann and Monge exist today as uneasy reminders of many museums' and universities' racist and colonial foundations." Am. Compl. Ex. H, at ECF 138. However,

before making this statement, Ms. Ayers details the controversial Samuel G. Morton Cranial

Collection held at the Penn Museum. The article provides in relevant part:

> The [Penn M]useum had already committed to repatriating skulls after decades of
> protests . . . . From the 1830s to 1840s, Morton, a physician and anatomist often
> referred to as the founder of the "American school of ethnology," collected the
> skulls from around the world, compiling his craniometric research into a racial
> hierarchy that argued for "polygenism"—the idea that different races constituted
> different species and had different origins. His work was often used to justify
> slavery and racial subjugation.

Am. Compl. Ex. H, at ECF 136. Ms. Ayers then provides a detailed background on the MOVE

events including the City of Philadelphia's bombing of the MOVE residence, the investigation of

the remains by Dr. Hameli (the lead pathologist of the MOVE Commission), the investigation of

the remains by Drs. Mann and Monge, the movement of the remains between the Penn Museum

and Princeton University, and Dr. Monge's use of the remains during her online course.

Any implication that Dr. Monge's actions were motivated by a racially based animus is a

non-actionable pure opinion. First, the opinion is based on the above non-defamatory facts which

were disclosed in Ms. Ayers's article. *See Meyers*, 221 A.3d at 670. Second, as the Third Circuit

Court of Appeals has held, "[e]veryone is free to speculate about someone's motivations based on

disclosed facts about that person's behavior. . . . Those statements are just more opinions based on

disclosed facts, so they too are not actionable." *McCafferty*, 955 F.3d at 359.

Because the alleged implication is a pure opinion, and perhaps reflecting a lengthy stretch

at that, it is, as a matter of law, not capable of defamatory meaning.

### 2.  Andscape Article Authored by Nicole Froio

Dr. Monge similarly alleges that Andscape and Ms. Froio defame her by suggesting racist

motivations for Dr. Monge's actions related to her handling of the MOVE remains. Dr. Monge

appears to derive this implication from the following language in Ms. Froio's article: "It is clear

that there is still a belief in the field of anthropology that the remains of Black people are scientific

21

objects to be studied or stored away in boxes rather than laid to rest by their families," and "[i]n death, [the MOVE family's] bones were used as objects of colonial plunder at academic institutions." Am. Compl. Ex. J, at ECF at 155–57. However, before providing these opinions, Ms. Froio provides an overview of the MOVE bombing events and sets forth a detailed overview of the history of racism in the anthropology profession.

First, Ms. Froio explains that the remains from the MOVE bombing were not returned to the Africa family but rather were taken to the Penn Museum, and later to Princeton, with no notice being provided to the Africa family as to the whereabouts of the remains. Ms. Froio notes that the chair of the anthropology department at Princeton, Carolyn Rouse, said that there was not any malicious intent in the handling of the bones. Ms. Froio then asserts that the handling of the MOVE remains is "right in line with the systematic desecration of African human remains in the discipline of anthropology." Am. Compl. Ex. J, at ECF at 153. To demonstrate this point, Ms. Froio summarizes, and provides links to, several essays authored by anthropologists which discuss colonialism, the anthropology profession, and the historical use of Black people's remains for educational purposes.

Ms. Froio also discusses the legacy of Samuel G. Morton, an anthropologist who "dedicated his life to seeking scientific proof of racial differences through the collection of human remains of African people." *Id.* at ECF 154. The article provides that "[i]t was through Morton's influence that archaeological institutions across the Global North embraced the objective of justifying the racial hierarchy through collecting human remains." *Id.* These historical examples, according to Ms. Froio, demonstrate how the remains of African and African American people have been studied throughout history and have served as the foundation for museums of medicine,

anthropology, and natural history, among others. The article finally turns to a discussion of the

1985 bombing of the MOVE residence.

The alleged implication that Dr. Monge acted with racial motivation in the handling of the

remains is a non-actionable pure opinion because it is based on disclosed facts in the article and

because it speaks to a possibility as to Dr. Monge's motivations. *See McCafferty*, 955 F.3d at 359.

\* \* \* \* \*

The Court will grant without prejudice the defamation by implication claims against Slate

and Ms. Ayers, and Andscape and Ms. Froio, because the alleged implications are non-actionable

pure opinions.

### B. A Number of The Allegedly Defamatory Implications Relate to Professional Misconduct and Thus the Court Must Assess Defamation *Per Se*

"Defamation *per se* can be either 'words imputing (1) criminal offense, (2) loathsome

disease, (3) business misconduct, or (4) serious sexual misconduct.'" *Synygy, Inc. v. Scott-Levin,*

*Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999) (quoting *Clemente v. Espinosa*, 749 F. Supp. 672,

677 (E.D. Pa. 1990)). "A statement is defamatory *per se* as an accusation of business misconduct

if it 'ascribes to another conduct, characteristics or a condition that would adversely affect his

fitness of the proper conduct of his lawful business.'" *Id.* (citing Restatement (Second) of Torts §

573 (1977)). A negative opinion or mere general disparagement are not enough—the statement

"must be of the type that would be particularly harmful to an individual engaged in the plaintiff's

business or profession." *Id.*

Although Dr. Monge alleges defamation *per se*, the Media Defendants argue that any

alleged implications that Dr. Monge lacked professionalism, or engaged in misconduct, are

non-actionable opinions based on disclosed facts. *C.f. Kane v. Chester Cnty.*, 811 F. App'x 65, 70

(3d Cir. 2020) (holding that statements that plaintiff's conduct was "unethical, unprofessional, and

23

harassing," and "call[ed] into serious question [plaintiff's] judgment" were nonactionable opinions). The Court will evaluate the statements which allegedly constitute defamation *per se* in turn.

### 1. Andscape Article Authored by Nicole Froio

Dr. Monge alleges that the Andscape article authored by Ms. Froio, which refers to the retention of the remains as a "theft," implies that Dr. Monge's handling of the remains was unethical and unprofessional. The alleged implication that Dr. Monge's handling of the remains was unethical is not supported by the article. *See Livingston*, 612 A.2d at 449. An implication "cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to language a construction which it will not bear." *Sarkees*, 37 A.2d at 546. Ms. Froio's article does not mention or address ethical standards governing the field of anthropology. To read the article as implying that Dr. Monge violated these ethical standards would be to find new matter in the article that is not warranted or justified by the publication. *See Livingston*, 612 A.2d at 449.

However, the alleged implication that Dr. Monge was unprofessional is arguably supported by the article's explicit reference to the handling of the remains and the retention of the remains as a "theft" of Katricia and Delisha's bones. Nowhere in any rendition of the facts in these events is there any implication that Dr. Monge came to have any connection with the bones other than at the disclosed request of Dr. Mann and the Penn Museum. To constitute defamation *per se*, the article must ascribe to Dr. Monge conduct that would adversely affect her ability to conduct business in her profession. *Synygy*, 51 F. Supp. 2d at 580. Here, because the article implies that the Penn Museum, and thus Dr. Monge, engaged in illegal conduct by referring to the retention of the remains as a "theft," the threshold for establishing defamation *per se* is met because being

accused of the theft of human remains likely harmed Dr. Monge's engagement in her profession. *See id.*

The Court concludes that Dr. Monge has established defamation *per se* to the extent the Andscape article authored by Ms. Froio implies that Dr. Monge acted unprofessionally or committed a theft.

### 2. Andscape Article Authored by Linn Washington

Dr. Monge alleges that the Andscape article authored by Ms. Washington implies that Dr. Monge's actions were unprofessional and unlawful. The article provides that the University of Pennsylvania launched an investigation into Dr. Monge's actions related to the MOVE remains, that activists requested the removal of Dr. Monge from her position at the Penn Museum, and that the University of Pennsylvania's apology is "hollow" because Dr. Monge retained her position at that time. The article also quotes from a posting made by the American Anthropological Association (AAA) which, in relevant part reads: "Such a use clearly violates the principles of ethical conduct established by the AAA." Am. Compl. Ex. M, at ECF at 182.

These statements satisfy the requisite standard for establishing defamation *per se* because they are "particularly harmful" to Dr. Monge's engagement in the anthropology profession. *Syngy*, 51 F. Supp. 2d at 580.

### 3. Teen Vogue Article Authored by Ezra Lerner

Dr. Monge alleges that the Teen Vogue article authored by Mr. Lerner "suggests improper professional conduct by implication by stating that 'the remains of at least one young girl— believed to possibly belong to Tree as well as Delisha Africa—had been improperly kept for decades by archaeologists Alan Mann and Janet Monge' and further defamatorily states that the handling of the remains was 'unethical.'" Am. Compl. ¶ 161(i). The article is an interview between Mr. Lerner and Evonne Turner-Byfield, a Black Ph.D. student at the Ohio State University

pursuing a degree in biological anthropology. Ms. Turner-Byfield stated that after learning about the MOVE bombing, she felt that the Penn Museum was "marred" and "dirty" because of "[t]he unethical nature of how they treated the remains of these children. And these are professionals in the field that I looked up to. Alan Mann and Janet Monge are names." Am. Compl. Ex. N, at ECF at 188.

Mr. Lerner and Ms. Turner-Byfield do not expound upon the unethical treatment of the remains. But the fact that it was Ms. Turner-Byfield—an anthropology Ph.D. student—who stated this bolsters Dr. Monge's argument that this is defamatory *per se*. Presumably Ms. Turner-Byfield is familiar with the ethical standards governing anthropologists, and because she is also a member of the same profession as Dr. Monge, her statement could potentially adversely affect Dr. Monge's fitness as an anthropologist. *See Synygy*, 51 F. Supp. 2d at 580. Thus, the statement could plausibly constitute defamation *per se*. Although Ms. Turner-Byfield's statement that the treatment of the remains was unethical is an opinion, it is a mixed opinion because the article does not disclose the facts upon which the opinion is based. *See Braig*, 456 A.2d at 1372. The statement can thus be actionable as defamation *per se* because it is capable of defamatory meaning. *See id.*

### C. Public vs. Private Figure

Because Dr. Monge has established that some of these statements are defamatory *per se*, the Court must determine whether Dr. Monge has adequately alleged her defamation claim, including whether she has established the requisite level of fault. *See Mallory v. S&S Publishers*, 260 F. Supp. 3d 453, 465 (E.D. Pa. 2017), *aff'd Mallory v. Simon & Shuster, Inc.*, 728 F. App'x 132, 136 n.2 (3d Cir. 2018) ("When a limited purpose public figure raises a defamation per se claim, she must show by clear and convincing evidence that the defendant acted with actual malice in publishing statements about her."); *see also Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d

1072, 1087–88 (3d Cir. 1985) (holding that plaintiff did not prove actual malice to prevail on his defamation per se claim against the defendant). The Court must now assess whether Dr. Monge is a public figure, a limited public figure, or a private figure. This determination will dictate whether Dr. Monge is required to prove that the defamatory statements were made only negligently, or with actual malice.

"[D]efamation includes a requirement [that] the plaintiff prove a constitutionally-mandated minimum level of fault in order to impose liability on a media defendant." *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 428 (Pa. 2015). "[T]he appropriate minimum level of fault depends on whether the plaintiff is a public or private figure." *Id.*; *accord Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343 (1974). If the plaintiff is a public figure or a limited public figure, she must establish that the defendant published the defamatory statement with *actual malice*, meaning the defendant acted in reckless disregard as to the truth of the statement. *Gertz*, 418 U.S. at 342–45. If the plaintiff is a private figure, she need only establish that the defendant *negligently* published the defamatory statement. *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa.*, 923 A.2d 389, 400 (Pa. 2007).

A "limited public figure" is someone who is considered a public figure with respect to a specific public controversy. *See McDowell v. Paiewonsky*, 769 F.2d 942, 948–51 (3d Cir. 1985) (concluding that plaintiff's actions were "sufficient to transform him into a public figure for the limited purpose of his work on publicly financed building projects—the subject of the allegedly defamatory remarks"). The Third Circuit Court of Appeals has set forth a two-prong test for determining whether someone is a limited purpose public figure: "(1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of the plaintiff's involvement in that controversy." *McDowell*, 769 F.2d at 948; *accord Amor v. Conover*, No. 21-cv-5574, 2022 WL 7127657, at *3 (E.D. Pa. Oct. 12, 2022). A public controversy is "a real dispute,

the outcome of which affects the general public or some segment of it," and the plaintiff's involvement in the controversy must be voluntary. *McDowell*, 769 F.2d at 948–49. "When an individual undertakes a course of conduct that invites attention [and general public discussion], even though such attention is neither sought nor desired, he may be deemed a public figure." *Id.*; *see also Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1280–81 (3d Cir. 1979) (en banc). In other words, when "an individual voluntarily injects himself or is drawn into a particular public controversy [he] thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351.

The Media Defendants argue that Dr. Monge is a limited public figure with respect to the MOVE bombing and the retention and identification efforts of the MOVE remains. They point to, *inter alia*, her 36-year involvement in the identification process, her status as a renowned anthropologist, and her posting of the Coursera course in which she addresses the handling of the MOVE bomb site and displays the MOVE remains as teaching aids. Dr. Monge argues that she is only a private figure. She contends that she was forced into the public controversy by the publication of the defendants' articles, so her involvement is not voluntary.[4] *See McDowell*, 769 F.2d at 949.

The Court concludes that Dr. Monge is a limited public figure with respect to the MOVE bombing and the identification of the MOVE remains and that she became a limited public figure

---

[4]      Dr. Monge also alleges that a public figure must have an increased access to the media. She asserts that she lacked such access to the media and thus cannot be deemed a public figure. However, access to the media is just one factor in determining whether someone is a public figure. *See e.g., Gertz*, 418 U.S. at 344 ("Public officials and public figures *usually* enjoy significantly greater access to the channels of effective communication . . . .") (emphasis added); *Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979) (characterizing "regular and continuing access to the media" as merely "one of the accout[re]ments" of having become a public figure). In response, several defendants argue that Dr. Monge *had* greater access to the media, pointing to her continued relationship with Malcolm Burnley, the journalist with whom Dr. Monge worked multiple times in connection with the identification of the MOVE remains and the contacting of Consuela Dotson.

in 2019 when she published her course "Real Bones: Adventures in Forensic Anthropology" on the Coursera online platform. First, the MOVE bombing events, including the handling of the MOVE remains and the lengthy efforts to identify the remains, are public controversies "which affect[] the general public or some segment of it." *Id.* at 948. The sheer number of articles published on the topic, and the issues raised in the articles—including Dr. Monge's handling of the MOVE remains—demonstrates that these events affect the public and that there is a genuine dispute regarding the handling of the MOVE remains.

Second, although Dr. Monge's involvement in this public controversy spans over 36 years, it is clear that when she published her online course to the Coursera platform in 2019, she voluntarily injected herself into the public controversy. *See Gertz*, 418 U.S. at 351; *McDowell*, 769 F.2d at 948. Coursera is a free website, and the classes posted on the platform are publicly available to anyone who enrolls through the website. Further, the stated purpose of Dr. Monge's course was to teach how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of bone remains, and Dr. Monge used the MOVE remains as teaching aids during her course. Thus, by voluntarily publishing her course concerning the MOVE remains to a free, publicly available website, Dr. Monge voluntarily injected herself into the public controversy.

In *McDowell*, the Third Circuit Court of Appeals concluded that an architect was a limited public figure because he "voluntarily assumed a position that invited attention." 769 F.2d at 950. McDowell, the architect, became involved in a project that received substantial media attention from its inception. *Id.* "McDowell's decision to accept the . . . assignment almost inevitably put him *into the vortex of a public controversy*. Just as a professional athlete or coach must accept the attendant publicity surrounding his decision to assume his position, so must plaintiff accept the

consequences of his decision." *Id.* (citing *Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967); *Chuy*, 595 F.2d at 1265) (emphasis added).

Here, Dr. Monge can similarly be said to have "voluntarily assumed a position that invited attention" when she published a course concerning the identification of the MOVE remains and the MOVE bombing, an event which has received substantial media attention since 1985. *Id.* By publishing this course on the internet, in which she displayed the MOVE remains, Dr. Monge put herself "into the vortex of a public controversy," meaning that Dr. Monge is properly classified as a limited public figure. *Id.*

The Court concludes that Dr. Monge is a limited public figure with respect to the MOVE events, including the identification of the MOVE remains, at least beginning in 2019.

As a limited public figure, Dr. Monge "must allege *facts* to support an inference of actual malice" at the pleading stage. *Pace v. Baker-White*, 850 F. App'x 827, 831 (3d Cir. 2021). Actual malice is "knowledge that [the statement] was false or [was made] with reckless disregard of whether [the statement] was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). The actual malice standard is "a rigorous, if not impossible, burden to meet in most circumstances." *Bartlett v. Bradford Publ'g, Inc.*, 885 A.2d 562, 566 (Pa. Super. Ct. 2005). To satisfy the "reckless disregard" element of the actual malice standard, a plaintiff must show that the defendants "entertained serious doubts as to the truth" of the published statements. *Masson*, 501 U.S. at 510. "[M]ere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather the publisher must act with a 'high degree of awareness of . . . probable falsity.'" *Gertz*, 418 U.S. at 332 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

Dr. Monge fails to meet this high burden. She alleges no facts that even suggest the Media Defendants had serious doubts as to the truth of the statements prior to publishing them. *See*

*Masson*, 501 U.S. at 510. Dr. Monge simply makes conclusory allegations that the defendants acted with actual malice. *See* Am. Compl. ¶ 196 ("The false and defamatory statements described above and contained in the articles identified were published with knowledge that said statements, innuendo, inference, and manner in which they were presented were false and/or *with reckless disregard for whether said material was false, said conduct constituting actual malice.*") (emphasis added). Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a Rule 12(b)(6) motion to dismiss. *Ashcroft*, 556 U.S. at 678.

Because Dr. Monge fails to plead actual malice, the Court must dismiss the defamation claims as to these defendants. *See McCafferty*, 955 F.3d at 360 (affirming dismissal of defamation claim for failure to "plead facts that suggest actual malice"); *Pace*, 850 F. App'x at 831–32 (affirming dismissal of defamation claim for "conclusory allegations" of actual malice).

For all of these reasons, the Court will grant without prejudice the Media Defendants' motion to dismiss Dr. Monge's complaint as to her defamation by implication claims against Andscape, Ms. Froio, Ms. Washington, Teen Vogue, and Ezra Lerner.

## V.     False Light

Dr. Monge also asserts a claim for false light.[5] A publication is actionable under Section 652E of the Restatement if it (1) "is not true," (2) "is highly offensive to a reasonable person," and (3) "is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136; *see also Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988). "The

---

[5]     Pennsylvania has adopted Section 652E of the Restatement (Second) of Torts, which defines this cause of action as follows: "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652E.

required standard of fault in a false light claim is thus actual malice." *Rubin v. CBS Broad., Inc.*, 170 A.3d 560, 568 n.9 (Pa. Super. Ct. 2017). Further, "[o]pinions based on true, disclosed facts cannot support a false-light claim unless they create a false impression." *McCafferty*, 955 F.3d at 360. "In Pennsylvania, falsity means the same thing for false light as it does for defamation." *Id.* "In both contexts, an opinion based on disclosed facts cannot be false." *Id.*; *see also Meyers*, 221 A.3d at 671.

To the extent the statements are substantially true or are "opinion[s] based on disclosed facts," they are not "false." *McCafferty*, 955 F.3d at 360. The false light claim must fail as a matter of law as to these substantially true or opinion-based statements. *Id.; see also Larsen*, 543 A.2d at 1188.

To the extent the statements are defamatory *per se* or are "highly offensive to a reasonable person," the false light claim fails here as a matter of law because Dr. Monge fails to plead actual malice. *Graboff*, 744 F.3d at 136; *see also Rubin*, 170 A.3d at 568 n.9. Dr. Monge fails to allege that the Media Defendants published the allegedly defamatory statements with "knowledge that [the statement] was false or [was made] with reckless disregard of whether [the statement] was false or not." *N.Y. Times Co.*, 376 U.S. at 279–80. Thus, she fails to satisfy the required standard of fault for a false light claim. *See Rubin*, 170 A.3d at 568 n.9.

The Court will grant without prejudice the Media Defendants' motion to dismiss the false light claim.

## VI.   Civil Aiding and Abetting

Dr. Monge also brings a claim for civil aiding and abetting. She alleges that "[t]he behaviors in which the defendants engaged aided and abetted the tortious misconduct of each of the other defendants by giving rise to false and defamatory information against Dr. Monge in a concerted effort to accomplish the particular result of branding [Dr.] Monge as incompetent and

racist." Am. Compl. ¶ 218. She further alleges that "[w]hen each of the defendants published their defamatory statements they knew or should have known through reasonable diligence that the conduct of each of them was tortious and provided substantial assistance and/or encouragement to engage in such tortious misconduct." *Id.* ¶ 219.

A defendant is subject to liability "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself[.]" Restatement (Second) of Torts § 876(b). To bring such a claim, the plaintiff must establish that "the defendant knew of or could reasonably foresee the underlying bad actor's misdeed," or that the defendant exhibited intentional ignorance as the to the underlying actor's bad deeds. *Marion v. Bryn Mawr Trust Co.*, 253 A.3d 682, 690 (Pa. Super. Ct. 2021) (citing *Grimm v. Grimm*, 149 A.3d 77, 88 (Pa. Super. Ct. 2016)). To demonstrate "substantial assistance," the plaintiff must establish that the defendant took "some affirmative action which cause[d] the tortious actor to conduct himself inappropriately." *Doe v. Liberatore*, 478 F. Supp. 2d 742, 759 (M.D. Pa. 2007). When considering whether the defendant "gives substantial assistance or encouragement," courts consider "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, [and] his relation to the other and his state of mind[.]" *Marion*, 253 A.3d at 693 (quoting Restatement (Second) of Torts § 876 cmt. d). Liability "can only be imposed where a plaintiff avers sufficient facts indicating that the [defendant] substantially assisted or encouraged [the bad actor's] tortious conduct." *Welc v. Porter*, 675 A.2d 334, 339 (Pa. Super. Ct. 1996).

In asserting her claims against the Media Defendants, Dr. Monge fails to demonstrate that (1) these defendants had knowledge of the allegedly tortious conduct of the other defendants

named in this matter; and (2) these defendants substantially assisted the other defendants in conducting their allegedly tortious conduct. As to the defendants' knowledge, Dr. Monge vaguely alleges that the defendants "knew or should have known" of the allegedly defamatory nature of the articles and statements. Am. Compl. ¶ 219. However, Dr. Monge provides insufficient factual allegations to establish such knowledge. As to substantial assistance, Dr. Monge fails to include sufficient factual allegations to demonstrate that the Media Defendants took affirmative action to assist the other defendants in their allegedly tortious conduct. *See, e.g., Byars v. Sch. Dist. of Phila.*, 942 F. Supp. 2d 552, 572 (E.D. Pa. 2013) (quoting Restatement (Second) of Torts § 566 cmt. a) (proving that "[p]arties are considered to be 'acting in concert [for a civil aiding and abetting claim] when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result'").

Dr. Monge's allegations regarding her civil aiding and abetting claim against the Media Defendants do not "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678 (internal quotation marks omitted). Based on the facts alleged in Dr. Monge's complaint, the Court is unable "to draw the reasonable inference that the defendant[s] are liable for the misconduct alleged." *Id.* Thus, the Court will grant without prejudice the Media Defendants' motion to dismiss the civil aiding and abetting claims.

## CONCLUSION

For all of these reasons, the Court will grant the Media Defendants' motion to dismiss in part with prejudice and in part without prejudice.

The Court will grant the Media Defendants' motion to dismiss the defamation, defamation by implication, and false light claims with prejudice as to the New Yorker and Ms. Thompson on the grounds that they are protected by Pennsylvania's fair report privilege, and as to the New York

Times and Mr. Levenson on the grounds that the claims against them are time-barred by the statute of limitations.

The Court will grant with prejudice the Media Defendants' motion to dismiss Dr. Monge's complaint as to her defamation claim against the Daily Mail and Mr. Schrader; the Guardian and Mr. Pilkington; the New York Post and Mr. O'Bryan; Andscape and Ms. Washington; and Teen Vogue and Mr. Lerner.

The Court will grant the Media Defendants' motion to dismiss without prejudice as to the defamation by implication claim against Slate and Ms. Ayers; Andscape, Ms. Froio, and Ms. Washington; and Teen Vogue and Ezra Lerner.

The Court will grant without prejudice the Media Defendants' motion to dismiss the false light claim.

The Court will grant without prejudice the Media Defendants' motion to dismiss to the civil aiding and abetting claim.

An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE