IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANET MONGE,<br>　　　　*Plaintiff* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF PENNSYLVANIA *et al.*,<br>　　　　*Defendants* | : | No. 22-2942 |

### MEMORANDUM

PRATTER, J.　　　　　　　　　　　　　　　　　　　　　　　　MAY 26, 2023

#### INTRODUCTION

Billy Penn and Maya Kassutto move to dismiss the claims brought against them by Dr. Monge. For the reasons that follow, the Court grants the motion to dismiss with prejudice as to the defamation claim, and without prejudice to Dr. Monge to endeavor to replead as to the defamation by implication, false light, and civil aiding and abetting claims.

#### BACKGROUND[1]

On April 21, 2021, Billy Penn published an article by Maya Kassutto entitled "Remains of Children Killed in MOVE Bombing Sat in a Box at Penn Museum for Decades." Am. Compl. Ex. A, at ECF 63. Billy Penn is a membership 501(c)(3) media organization associated with, and a program of, WHYY Philadelphia, which provides Philadelphia local news. This Billy Penn article was the first of the articles published by the named defendants in this litigation, and Dr. Monge alleges that the defamatory content of the Billy Penn article was republished and embellished in the subsequent publications and statements of the other named defendants.

---

[1]　The factual and procedural background of this matter is set forth in the Court's February 3, 2023 memorandum.

1

With regards to the content of the Billy Penn article, Dr. Monge alleges that the "article falsely asserted that the unidentified [bone] fragments were the remains of Katricia Africa and implied serious scientific misconduct by Dr. Monge in the retention and handling of the [bone] fragments." Am. Compl. ¶ 152. Dr. Monge further alleges that the article defamed her by calling her a "chipper science teacher" and "alleging that she improperly used the remains of a black girl as 'props.'" *Id.* Finally, Dr. Monge alleges that the article defamed her "by insinuating a racist motive for the retention and investigation undertaken" by stating, in part, that "[t]he absence of ethics, void of communication, and abdication of responsibility regarding these remains mirror the circumstances that led to the 1985 disaster." *Id.* ¶ 153.

Dr. Monge alleges that defendant Paul Mitchell, an anthropology doctoral student at the University of Pennsylvania, instigated the publication of the Billy Penn article after allegedly raising concerns about Dr. Monge to the Penn Museum and not seeing the purportedly intended disciplinary results for Dr. Monge. Dr. Monge alleges that Mr. Mitchell contacted Ms. Kassutto, Mr. Mitchell's then-girlfriend, regarding the remains and Dr. Monge's alleged mishandling of the remains. Ms. Kassutto, who was writing articles for Billy Penn at the time, then published the article at issue "with the aid of Defendant Paul Mitchell." Am. Compl. ¶¶ 150, 157.

Billy Penn and Ms. Kassutto now move to dismiss the claims brought against them in Dr. Monge's Amended Complaint.

## LEGAL STANDARD

An action may be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion to dismiss stage, the Court must accept factual allegations as true, but it is not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal citations and quotation marks omitted). "To survive a motion to dismiss, a

2

complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## DISCUSSION

### I. Defamation

To state a claim for defamation, the plaintiff must plead: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa. C.S. § 8343(a). Where the plaintiff meets her burden of proof, the burden shifts to the defendants to prove the truth of the defamatory statement, the privileged nature of the communication, or that the subject matter of the defamatory statement is a matter of public concern. 42 Pa. C.S. § 8343(b).

#### A. <u>Capable of Defamatory Meaning</u>

The first step a court must take in the defamation analysis is to determine whether the statement at issue is capable of defamatory meaning. *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 399 (E.D. Pa. 2011). Courts can dismiss defamation claims at the motion to dismiss stage if the statements are not capable of defamatory meaning. *See e.g., Gibney v. Fitzgibbon*, 547 F. App'x 111, 114 (3d Cir. 2013) (affirming dismissal of defamation claim where "statement was not capable of a defamatory meaning as a matter of law"); *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, 500 F. Supp. 3d 380, 422–24 (E.D. Pa. 2020) (dismissing defamation claim at the motion to dismiss stage because "the Court [did] not find that the statements [were] capable of defamatory meaning"); *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004) ("If the court

3

determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial.").

To determine whether a statement is capable of defamatory meaning, the Court considers "(1) whether the communication was reasonably capable of conveying the particular meaning ascribed to it by the plaintiff; and (2) whether that meaning is defamatory in character." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 510 (E.D. Pa. 2020). When the statement is not "'reasonably susceptible of a defamatory meaning,' the plaintiff has failed to state a claim." *Id.* (citing *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 191 (3d. Cir. 1999)). A statement is defamatory if it "tends so to harm the reputation of another as to lower him [or her] in the estimation of the community or to deter third persons from association or dealing with him [or her]." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990). "[T]he statement must do more than merely embarrass or annoy the plaintiff; it must provoke 'the kind of harm which has grievously fractured [one's] standing in the community of respectable society.'" *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Tucker*, 848 A.2d at 124).

### 1. Falsity Is a Required Element That the Plaintiff Must Prove Against a Media Defendant When the Matter Is of Public Concern

In Pennsylvania, truth is an affirmative defense to defamation. *Tucker v. Fischbein*, 237 F.3d 275, 287 (3d Cir. 2001); 42 Pa. Cons. Stat. § 8343(b)(1). Although the defendant generally bears the burden of proof when asserting truth as a defense, the *plaintiff* bears the burden of proving falsity where the defendant is a member of the media and the statement involves a matter of public concern. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986); *see also Kuwait & Gulf Link Transp. Co. v. Doe*, 216 A.3d 1074, 1087 (Pa. Super. Ct. 2019) ("If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an element, that the alleged defamatory statement is in

4

fact false."). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal citations and quotation marks omitted). "[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law . . . where a media defendant is involved." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20 (1990).

The Court concludes that not only are Billy Penn and Ms. Kassutto members of the media, but also that the MOVE bombing and its aftermath, including the retention of the remains of the victims of the bombing, are matters of public concern. *See Snyder*, 562 U.S. at 453. Therefore, Dr. Monge has the burden of proving the falsity of the statements at issue in the Billy Penn article.

### 2. Pure Opinions Are Not Capable of Defamatory Meaning

Pennsylvania law draws a distinction between opinions and statements of fact. *Meyers v. Certified Guar. Co.*, 221 A.3d 662, 670 (Pa. Super. Ct. 2019) (citing Restatement (Second) of Torts § 566 cmt. a). "A statement of fact can be verified as true or false, whereas an expression of opinion only conveys a subjective belief of the speaker." *Meyers*, 221 A.3d at 670. Pennsylvania law further draws a distinction between pure and mixed opinions. *Id.* (quoting Restatement (Second) of Torts § 566 cmt. b). Mixed opinions, which "impl[y] the allegation of undisclosed defamatory facts as the basis for the opinion," are actionable. *Braig v. Field Commc'ns*, 456 A.2d 1366, 1372 (Pa. Super. Ct. 1983) (quoting Restatement (Second) of Torts § 566). Pure opinions, which are based on disclosed facts, are "absolutely privileged" and "cannot be defamatory . . . no matter how derogatory they are." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020) (quoting *Braig*, 456 A.2d at 1373) (internal quotation marks omitted).

5

### B. Whether Billy Penn and Ms. Kassutto's Allegedly Defamatory Statements Are Capable of Defamatory Meaning

#### 1. The Allegedly Defamatory Statements Are True

Dr. Monge alleges that Billy Penn and Ms. Kassutto defamed her by publishing that "the unidentified [bone] fragments were the remains of Katricia Africa," referring to Dr. Monge as a "chipper science teacher," and "alleging that she improperly used the remains of a black girl as 'props.'" Am. Compl. ¶ 152. The allegations in Dr. Monge's amended complaint demonstrate that these statements are, in all material respects, substantially true, and thus Billy Penn and Ms. Kassutto cannot be held liable. *See Tucker*, 237 F.3d at 287.

First, Dr. Monge admits that Dr. Ali Hameli—the lead pathologist of the MOVE Commission formed by the City of Philadelphia to investigate the MOVE bombing—concluded that the remains *did* belong to Katricia Africa. Although Dr. Monge disagrees with Dr. Hameli, the statement that "the unidentified [bone] fragments were the remains of Katricia Africa" is at least substantially true based on Dr. Hameli's conclusion. Second, Dr. Monge is, in fact, a "science teacher." Am. Compl. ¶ 152. Dr. Monge admits that she was employed by the Department of Anthropology of the University of Pennsylvania as a lecturer and an adjunct professor. She also admits that she assisted Dr. Mann in teaching his anthropology courses at Princeton University and that she taught an online course regarding the scientific investigation of boney remains. Finally, it is true that Dr. Monge "used the remains of a black girl as 'props.'" Am. Compl. ¶ 152. Dr. Monge admits that she displayed the remains during her Coursera course, compared the remains to other bone fragments, and explained how forensic techniques could be used to determine the age of such remains.

Because these allegedly defamatory statements are true, they are not actionable. *See Tucker*, 237 F.3d at 287.

6

### 2. The Allegedly Defamatory Statements Are Not Harmful to Dr. Monge's Reputation and Are Pure Opinions

Dr. Monge also alleges that the Billy Penn article defamed her by stating that she was a "chipper science teacher." Am. Compl. ¶ 152. This statement is not capable of defamatory meaning because it does not harm Dr. Monge's reputation or "lower [her] in the estimation of the community." *U.S. Healthcare*, 898 F.2d at 923. It is not capable of "provoke[ing] the kind of harm which [would] grievously fracture[] [Dr. Monge's] standing in the community of respectable society." *Graboff*, 744 F.3d at 136 (internal quotation marks omitted). To the extent that Dr. Monge considers the descriptor "offensive or distasteful," this does not make it defamatory because "the law does not extend to mere insult." *Emekekwue v. Offor*, 26 F. Supp. 3d 348, 359 (M.D. Pa. 2014); *see also Beverly Enterprises, Inc. v. Trump*, 182 F.3d 183, 187 (3d Cir. 1999) (quoting *Kryeski v. Schott Glass Technologies, Inc.*, 626 A.2d 595, 601 (Pa. 1993)) ("[S]tatements which are merely annoying or embarrassing or no more than rhetorical hyperbole or a vigorous epithet are not defamatory.").

This statement is also a pure opinion because it cannot be proven false, it conveys the subjective belief of the speaker, here Ms. Kassutto, it is based on disclosed facts, and it does not "impl[y] the allegation of undisclosed defamatory facts." *Braig*, 456 A.2d at 1372. As it relates to the Coursera course, the article states that Dr. Monge appears in the video with an undergraduate student who was attempting to determine the age of the MOVE remains for her senior thesis. Dr. Monge and her student can then be seen prodding the bones and debating the age of the persons to whom the remains belong. Further, in its discussion of the video, the article includes a hyperlink to the Coursera course, which, at the time of the article's publication, would have allowed readers to watch the video referenced in the article.[2] *See e.g., Cummings v. City of N.Y.*, No. 19-cv-7723,

---

[2] The video has since been removed from the Coursera platform.

7

2020 WL 882335, at *24 (S.D.N.Y. Feb. 24, 2020) (concluding that column's hyperlink to previously published article was a disclosure of the facts the column's author relied on in making an allegedly defamatory statement); *Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 360 (D. Mass. 2017) (concluding that articles "provide[d] all of the relevant facts" by including hyperlinks to relevant background information discussed in the articles); *Biro v. Conde Nast*, No. 11-cv-4442, 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014) ("Because this underlying information can be read to support the general conclusions in the post, and the latter contains hyperlinks to the former, those conclusions are best viewed as opinions based on disclosed facts, and are therefore not actionable."). Readers could judge for themselves, after watching the video, whether they agreed that Dr. Monge was "chipper." *See McCafferty*, 955 F.3d at 357.

For all of these reasons, the Court will grant with prejudice Billy Penn and Ms. Kassutto's motion to dismiss the complaint as to Dr. Monge's defamation claim.

## II. Defamation by Implication

"Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the *context in which these statements are issued creates a defamatory implication*, i.e., defamation by innuendo." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (emphasis added). "To establish defamation by innuendo, the innuendo must be warranted, justified and supported by the publication." *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. Super. Ct. 1992) (internal quotation marks omitted). The Court must determine whether the language used "could fairly and reasonably be construed to have the meaning imputed in the innuendo." *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1994). "When the implication alleged by the plaintiff is not reasonably susceptible of a defamatory meaning, the plaintiff has failed to state a claim." *Pace*, 432 F. Supp. 3d at 510 (internal quotation marks omitted). Moreover, "[i]f the publication complained of is not in fact libelous, it cannot be

8

made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication." *Sarkees*, 37 A.2d at 546.

## A. The Allegedly Defamatory Implications Are Pure Opinions

Dr. Monge alleges that the article "insinuat[es] a racist motive for the retention [of the MOVE remains] and investigation undertaken" by Dr. Monge. Am. Compl. ¶ 153. The following language from the article serves as the basis for Dr. Monge's claim: "The absence of ethics, void of communication, and abdication of responsibility regarding these remains mirror the circumstances that led to the 1985 disaster." Am. Compl. Ex. A, at ECF 68. Before making this statement, Ms. Kassutto sets forth details about the MOVE bombing, noting that "Philadelphia dropped a bomb on its own citizenry . . . destroying an entire block in the process" and that "[n]one of the officials in charge at the time ended up facing consequences." *Id.* at ECF 64. Ms. Kassutto then discusses the work done by Dr. Hameli—the lead pathologist of the MOVE Commission—and Drs. Mann and Monge to identify the remains, stating that Dr. Hameli and Drs. Mann and Monge reached different conclusions as to whether the remains belonged to Katricia and/or Delisha Africa.

The article also discusses the controversial Morton Collection, which was kept at the Penn Museum and, at the time of the article, was the subject of public scrutiny and protest. The article states that the Morton Collection consists "of more than 1,000 skulls . . . amassed by a 19th century white supremacist researcher who directed workers to pull the bones from unmarked graves." *Id.* at ECF 65. Ms. Kassutto states that the Penn Museum has called the Morton Collection "unethical" and "pledged to repatriate the[ skulls]." *Id.* Ms. Kassutto also provides that other institutions have taken steps to decolonize their anthropological collections. *Id.*

9

Any implication that Dr. Monge's actions with respect to the MOVE remains were motivated by race is a non-actionable pure opinion. This implication is based on the above substantially true and, thus, non-defamatory facts which were disclosed in the Billy Penn article. *See Meyers*, 221 A.3d at 670. Moreover, the Third Circuit Court of Appeals has held that "[e]veryone is free to speculate about someone's motivations based on disclosed facts about that person's behavior. . . . Those statements are just . . . opinions based on disclosed facts, so they too are not actionable." *McCafferty*, 955 F.3d at 359. Because the alleged implication that Dr. Monge acted with a racist motive is a pure opinion, it is, as a matter of law, not actionable.

### B. The Allegedly Defamatory Statements Constitute Defamation *Per Se*

Dr. Monge also alleges that the Billy Penn article "implie[s] serious scientific misconduct by Dr. Monge in the retention and handling of the [bone] fragments." Am. Compl. ¶ 152. Further, although not explicitly alleged in the complaint, Dr. Monge argues that the statement that "[t]he absence of ethics, void of communication, and abdication of responsibility regarding these remains mirror the circumstances that led to the 1985 disaster" implies that Dr. Monge engaged in professional misconduct. Am. Compl. Ex. A, at ECF 68. Because these implications go to Dr. Monge's fitness as an anthropologist, the Court must determine whether they are defamatory *per se*.

"Defamation *per se* can be either 'words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct.'" *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999) (quoting *Clemente v. Espinosa*, 749 F. Supp. 672, 677 (E.D. Pa. 1990)). "A statement is defamatory *per se* as an accusation of business misconduct if it 'ascribes to another conduct, characteristics or a condition that would adversely affect his fitness of the proper conduct of his lawful business.'" *Id.* (citing Restatement (Second) of Torts §

10

573 (1977)). A negative opinion or mere general disparagement are not enough—the statement "must be of the type that would be particularly harmful to an individual engaged in the plaintiff's business or profession." *Id.*

It is conceivable, when considering the article as a whole and "the context in which the[] statements [we]re issued," that the article "creates a defamatory implication" that Dr. Monge engaged in scientific and/or professional misconduct, *Mzamane*, 693 F. Supp. 2d at 477, and because the implications are "accusation[s] of business misconduct," they plausibly constitute defamation *per se*. *Synygy*, 51 F. Supp. 2d at 580. Ms. Kassutto provides that "[t]he indifferent treatment of the remains is not new. At Penn, according to people with first-hand knowledge, they were not kept in climate-controlled storage. They were kept in a cardboard box on a shelf." Am. Compl. Ex. A, at ECF 64. Ms. Kassutto also discusses the lack of awareness from both the Penn Museum and Princeton University regarding the whereabouts of the remains. Then, Ms. Kassutto appears to call into question Dr. Monge's retention of the remains, quoting a spokesperson for the Philadelphia Department of Public Health as saying: "As a matter of policy, remains would never be released to a third-party without the consent of the next of kin." *Id.* at ECF 65. Ms. Kassutto notes that, despite that policy, Drs. "Mann and Monge did have possession of the MOVE-connected remains, for decades." *Id.* Finally, Ms. Kassutto explicitly states that there was an "absence of ethics, void of communication, and abdication of responsibility regarding these remains." *Id.* at ECF 68. In context, it is reasonable that one could read the Billy Penn article as implying that Dr. Monge engaged in scientific and/or professional misconduct. Because these implications are "particularly harmful" to Dr. Monge's ability to conduct business as an anthropologist, or to engage in the profession of anthropology, the implications plausibly constitute defamation *per se*. *See Synygy*, 51 F. Supp. 2d at 580.

### 1. Public Versus Private Figure

Because Dr. Monge has established that the alleged implications could plausibly constitute defamation *per se*, the Court must determine whether Dr. Monge has established the requisite level of fault. *See Mallory v. S&S Publishers*, 260 F. Supp. 3d 453, 465 (E.D. Pa. 2017), *aff'd Mallory v. Simon & Shuster, Inc.*, 728 F. App'x 132, 136 n.2 (3d Cir. 2018) ("When a limited purpose public figure raises a defamation per se claim, she must show by clear and convincing evidence that the defendant acted with actual malice in publishing statements about her."); *see also Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1087–88 (3d Cir. 1985) (holding that plaintiff did not prove actual malice to prevail on his defamation per se claim against the defendant).

"[D]efamation includes a requirement [that] the plaintiff prove a constitutionally-mandated minimum level of fault in order to impose liability on a media defendant." *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 428 (Pa. 2015). "[T]he appropriate minimum level of fault depends on whether the plaintiff is a public or private figure." *Id.*; *accord Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343 (1974). If the plaintiff is a public or a limited public figure, she must establish that the defendant published the statement with *actual malice*—that the defendant acted in reckless disregard of the truth. *Gertz*, 418 U.S. at 342–45. If the plaintiff is a private figure, she need only establish that the defendant *negligently* published the defamatory statement. *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa.*, 923 A.2d 389, 400 (Pa. 2007).

One can be considered a "limited public figure" with respect to a specific public controversy. *See McDowell v. Paiewonsky*, 769 F.2d 942, 948–51 (3d Cir. 1985) (concluding that plaintiff's actions were "sufficient to transform him into a public figure for the limited purpose of his work on publicly financed building projects—the subject of the allegedly defamatory remarks"). The Third Circuit Court of Appeals has set forth a two-prong test for determining whether someone is a limited purpose public figure: "(1) whether the alleged defamation involves

12

a public controversy, and (2) the nature and extent of the plaintiff's involvement in that controversy." *McDowell*, 769 F.2d at 948; *accord Amor v. Conover*, No. 21-cv-5574, 2022 WL 7127657, at *3 (E.D. Pa. Oct. 12, 2022). A public controversy is "a real dispute, the outcome of which affects the general public or some segment of it," and the plaintiff's involvement in the controversy must be voluntary. *McDowell*, 769 F.2d at 948–49. "When an individual undertakes a course of conduct that invites attention [and general public discussion], even though such attention is neither sought nor desired, he may be deemed a public figure." *Id.*; *see also Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1280–81 (3d Cir. 1979) (en banc). In other words, when "an individual voluntarily injects himself or is drawn into a particular public controversy [he] thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351.

Dr. Monge is a limited public figure with respect to the MOVE bombing and the identification of the MOVE remains, and she became a limited public figure in 2019 when she published her course "Real Bones: Adventures in Forensic Anthropology" on the Coursera online platform. First, the MOVE bombing events, including the handling of the MOVE remains and the efforts to identify the remains, are public controversies. *See McDowell*, 769 F.2d at 948. The number of articles published, and the issues raised in the articles—including Dr. Monge's handling of the MOVE remains—demonstrates that these events "affect[] the general public or some segment of it." *Id.*

Second, Dr. Monge voluntarily injected herself into this public controversy when she published her online course to the Coursera platform in 2019. *See Gertz*, 418 U.S. at 351; *McDowell*, 769 F.2d at 948. Coursera is a free website, and the classes posted on the platform are available to anyone who enrolls through the website. During her course, Dr. Monge displayed the remains to aid in teaching how forensic anthropology can be used to identify such remains. Further,

13

Dr. Monge "voluntarily assumed a position that invited attention" when she published her course because the MOVE bombing has received substantial media attention since 1985. *McDowell*, 769 F.2d at 950. By publishing this course on the internet, in which she displayed the MOVE remains, Dr. Monge put herself "into the vortex of a public controversy," meaning that Dr. Monge is properly classified as a limited public figure. *Id.*

The Court concludes that Dr. Monge is a limited public figure with respect to the MOVE events, including the identification of the MOVE remains, at least beginning in 2019.

As a limited public figure, Dr. Monge "must allege *facts* to support an inference of actual malice" at the pleading stage. *Pace v. Baker-White*, 850 F. App'x 827, 831 (3d Cir. 2021). Actual malice is "knowledge that [the statement] was false or [was made] with reckless disregard of whether [the statement] was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). To satisfy the "reckless disregard" element, a plaintiff must show that the defendants "entertained serious doubts as to the truth" of the published statements. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991). "[M]ere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather the publisher must act with a 'high degree of awareness of . . . probable falsity.'" *Gertz*, 418 U.S. at 332 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

The current pleadings from Dr. Monge fail to meet this high burden. She alleges no facts that suggest that Billy Penn or Ms. Kassutto had doubts as to the truth of the statements prior to publishing them. *See Masson*, 501 U.S. at 510. Dr. Monge merely makes conclusory allegations that the defendants acted with actual malice. *See* Am. Compl. ¶ 196 ("The false and defamatory statements described above and contained in the articles identified were published with knowledge that said statements, innuendo, inference, and manner in which they were presented were false

14

and/or *with reckless disregard for whether said material was false, said conduct constituting actual malice.*") (emphasis added). Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a Rule 12(b)(6) motion to dismiss. *Ashcroft*, 556 U.S. at 678.

Because Dr. Monge fails to plead actual malice, the Court must dismiss the defamation by implication claim as to these two moving defendants. *See McCafferty*, 955 F.3d at 360 (affirming dismissal of defamation claim for failure to "plead facts that suggest actual malice"); *Pace*, 850 F. App'x at 831–32 (affirming dismissal of defamation claim for "conclusory allegations" of actual malice).

For all of these reasons, the Court will grant Billy Penn and Ms. Kassutto's motion to dismiss the defamation by implication claim without prejudice to Dr. Monge to endeavor to replead her claim should she determine that she is able to allege actual malice.

## III. False Light

Dr. Monge also asserts a claim for false light. Under Section 652E of the Restatement (Second) of Torts, one who places another "before the public in a false light" is subject to liability "if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652E. Thus, a publication is actionable if it (1) "is not true," (2) "is highly offensive to a reasonable person," and (3) "is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136; *see also Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988). "The required standard of fault in a false light claim is . . . actual malice." *Rubin v. CBS Broad., Inc.*, 170 A.3d 560, 568 n.9 (Pa. Super. Ct. 2017). Further, "[o]pinions based on true, disclosed facts cannot support a false-light claim unless they create a false impression."

15

*McCafferty*, 955 F.3d at 360. "[I]n Pennsylvania, falsity means the same thing for false light as it does for defamation" and "[i]n both contexts, an opinion based on disclosed facts cannot be false." *Id.*; *see also Meyers*, 221 A.3d at 671.

To the extent the statements at issue in the Billy Penn article are substantially true, are not "highly offensive to a reasonable person," or are "opinion[s] based on disclosed facts," they are not "false." *McCafferty*, 955 F.3d at 360. The false light claim fails here as a matter of law as to these substantially true or opinion-based statements. *Id.*; *see also Larsen*, 543 A.2d at 1188. To the extent the statements are defamatory *per se* and are "highly offensive to a reasonable person," the false light claim fails here as a matter of law because Dr. Monge fails to sufficiently plead actual malice, the required standard of fault for a false light claim. *Graboff*, 744 F.3d at 136; *see also Rubin*, 170 A.3d at 568 n.9.

The Court will grant without prejudice Billy Penn and Ms. Kassutto's motion to dismiss the false light claim, subject to the same possibilities as mentioned above.

## IV.   Civil Aiding and Abetting

Dr. Monge also brings a claim for civil aiding and abetting. She generally alleges that "[t]he behaviors in which the defendants engaged aided and abetted the tortious misconduct of each of the other defendants by giving rise to false and defamatory information against Dr. Monge in a concerted effort to accomplish the particular result of branding [Dr.] Monge as incompetent and racist." Am. Compl. ¶ 218. She further alleges that "[w]hen each of the defendants published their defamatory statements they knew or should have known through reasonable diligence that the conduct of each of them was tortious and provided substantial assistance and/or encouragement to engage in such tortious misconduct." *Id.* ¶ 219.

A defendant is subject to liability for civil aiding and abetting if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other

16

so to conduct himself." Restatement (Second) of Torts § 876(b). To demonstrate "substantial assistance," the plaintiff must establish that the defendant took "some affirmative action which cause[d] the tortious actor to conduct himself inappropriately." *Doe v. Liberatore*, 478 F. Supp. 2d 742, 759 (M.D. Pa. 2007). When considering "substantial assistance," courts consider "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, [and] his relation to the other and his state of mind." Restatement (Second) of Torts § 876 cmt. d. Liability "can only be imposed where a plaintiff avers sufficient facts indicating that the [defendant] substantially assisted or encouraged [the bad actor's] tortious conduct." *Welc v. Porter*, 675 A.2d 334, 339 (Pa. Super. Ct. 1996).

In asserting her claim against Billy Penn and Ms. Kassutto, Dr. Monge fails to demonstrate that (1) these two moving defendants had knowledge of the allegedly tortious conduct of the other defendants; and (2) these defendants substantially assisted the other defendants in conducting their allegedly tortious conduct. As to the defendants' knowledge, Dr. Monge vaguely alleges that the defendants "knew or should have known" of the allegedly defamatory nature of the statements. Am. Compl. ¶ 219. However, Dr. Monge provides insufficient factual allegations to establish such knowledge. Further, Dr. Monge fails to allege facts which establish that Ms. Kassutto knew or should have known that Mr. Mitchell's accusations regarding Dr. Monge, which purportedly served as the impetus of the Billy Penn article, were false or defamatory to Dr. Monge.

As to substantial assistance, Dr. Monge argues that Ms. Kassutto substantially assisted Mr. Mitchell in publicizing his allegedly defamatory accusations regarding Dr. Monge by writing the article at issue for Billy Penn. Dr. Monge alleges that Mr. Mitchell contacted Ms. Kassutto, who he knew worked for Billy Penn at the time, after which she wrote the allegedly defamatory article. However, because Ms. Kassutto was unaware that Mr. Mitchell's conduct was potentially tortious,

she did not substantially assist Mr. Mitchell's allegedly tortious conduct, nor did she "take some affirmative action which cause[d] [Mr. Mitchell] to conduct himself inappropriately." *Doe*, 478 F. Supp. 2d at 759; *see also Welc*, 675 A.2d at 338–39 (holding that plaintiff could not recover from drunk driver's passenger as an aider or abetter because plaintiff did not allege that the passenger "engaged in any conduct that substantially assisted or encouraged [the driver] to consume alcohol and operate his vehicle in a negligent or reckless manner"). Thus Dr. Monge's civil aiding and abetting claim must fail.

The Court will grant Billy Penn and Ms. Kassutto's motion to dismiss the civil aiding and abetting claim without prejudice.

## CONCLUSION

For all of these reasons, the Court will grant Billy Penn and Ms. Kassutto's motion to dismiss the defamation claim with prejudice and the defamation by implication, false light, and civil aiding and abetting claims without prejudice. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE