**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JANET MONGE, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | No. 2:22-CV-02942-GEKP |
| | : | |
| UNIVERSITY OF PENNSYLVANIA, *et al.* | : | |
| | : | |
| Defendant | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
MEDIA DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

**SPECTOR GADON ROSEN VINCI P.C.**
By: Alan B. Epstein (Pa. I.D. No. 02346)
    Adam A. Filbert (Pa. I.D. No. 330960)
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8832 / (215) 531-9103 (Fax)
aepstein@sgrvlaw.com           *Attorneys for Plaintiff, Janet Monge*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................................................ii

I.      INTRODUCTION.................................................................................................1

II.     STATEMENT OF THE CASE................................................................................1

      A.  PROCEDURAL HISTORY...........................................................................1

      B.  STATEMENT OF FACTS.............................................................................2

          i.  OVERVIEW....................................................................................2

          ii.  STATEMENT OF MATERIAL FACTS AS RELATED TO MOVING DEFENDANTS...............................................................................12

III.    STATEMENT OF CONTROLLING LEGAL PRINCIPALS...................................16

      A.  APPLICABLE STANDARDS GOVERNING A MOTION TO DISMISS...................16

      B.  DEFEMATION.........................................................................................17

          i.  STATUS OF PLAINTIFF..................................................................17

          ii.  GENERAL PRINCIPALS OF A DEFAMATION CASE..................................18

          iii.  DEFAMATION BY IMPLICATION / INNUENDO..........................................21

      C.  FALSE LIGHT.........................................................................................23

      D.  CIVIL AIDING AND ABETTING.................................................................24

IV.    DISCUSSION....................................................................................................25

      A.  THE LAW OF THE CASE DOCTRINE DOES NOT PRECLUDE PLAINTIFF'S SECOND AMENDED COMPLAINT.................................................................25

      B.  PLAINTIFF HAS ADEQUATE PLED HER DEFAMATION BY IMPLICATION CLAIMS.................................................................................................26

          i.  PLAINTIFF IS NOT A LIMITED PUBLIC FIGURE, BUT REGARDLESS, SHE HAS SUFFICIENTLY PLED ACTUAL MALICE...................................26

      C.  THE CHALLENGED STATEMENTS ARE ACTIONABLE.........................................29

          i.  THE MEDIA DEFENDANTS' STATEMENT THAT IMPLY SHE IS A RACIST ARE ACTIONABLE OPINIONS..........................................................29

          ii.  THE MEDIA DEFENDANTS THAT IMPLY DR. MONGE ACTED UNPROFESSIONALLY AND UNETHICALLY ARE ACTIONABLE.............30

      D.  PLAINTIFF HAS ADEQUATELY STATED A CLAIM FOR FALSE LIGHT...............31

      E.  PLAINTIFF HAS ADEQUATELY STATED A CLAIM FOR CIVIL AIDING AND ABBETTING...........................................................................................32

V.     CONCLUSION..................................................................................................34

## TABLE OF AUTHORITIES

### CASES

Aamco Automatic Transmissions, Inc. v. Tayloe, 368 F.Supp. 1283, 1286-87 (3d Cir. 1973) .................17

American Future Systems, Inc. v. Better Business Bureau, 923 A.2d 398, 400 (Pa. 2007) ......................18

Arizona v. California, 460 U.S. 605, 618 (1983)............................................................................................25

Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) .........................................................................................16

Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 555 (2007) ............................................................16

Bogash v. Elkins, 176 A.2d 677, 679 (Pa. 1962) ........................................................................................21

Brs v. Sch. Dist. of Philadelphia, 942 F.Supp.2d 552, 564 (E.D. Pa. 2013)................................................19

Celle v. Filipino Reporter Enterprises, Inc., 209 F.3d 163, 184 (2d Cir. 2000)............................................27

Christianson v. Colt Indus. Operating Co., 486 U.S. 800, 816 (1988)........................................................25

Clemente v. Espinosa, 749 F. Supp. 672, 677-78 (E.D. Pa. 1990) ....................................................20, 30, 31

Cornell Cos., Inc. v. Borough of New Morgan, 512 F.Supp.2d 238, 271 (E.D. Pa. 2007)....................20, 30

Dunlap v. Philadelphia Newspapers, Inc., 448 A.2d 6, 15 (Pa. Super. 1982)............................................22

Franklin Prescriptions, Inc. v. New York Times Co., 2004 WL 1770296, at *8 (E.D. Pa. Aug. 5,
2004).......................................................................................................................................20, 28, 30

Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) ...............................................................................18, 28

Gillon v. Bernstein, 2013 WL 5159625 (D.N.J. Sept. 12, 2013)............................................................17, 18

Goldfarb v. Kalodimos, 539 F.Supp.3d 435 (2021)..................................................................................19, 20

Gordon v. Lancaster Osteopathic Hospital, 489 A.2d 1364, 1368 (Pa. Super. 1985)................................19

Gould Elecs. v. United States, 220 F.3d 169, 178 (3d Cir. 2000)..............................................................16

Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) ....................................................................32

Green v. Minzer, 692 A.2d 169, 172 (Pa. Super. 1997)............................................................................22

Harte-Hanks Communications v. Connaughton, 491 U.S. 657, 668 (1989)........................................27, 28

Herbert v. Lando, 441 U.S. 153, 164 n. 12 (1970)................................................................................26, 27

In re Pharmacy Benefit Managers Antitrust Litig., 582 F.3d 432 439 (3d Cir. 2009)................................25

Larsen v. Philadelphia Newspapers, Inc., 543 A.2d 1181, 1188 (Pa. Super. 1988)................................23

Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287, 1293 (D.C. Cir. 1988)......................................27

Livingston v. Murray, 612 A.2d 443, 449 (Pa. 1992)................................................................................22

Lopez v. Beard, 333 Fed. Appx. 685, 687 (3d Cir. 2009)..........................................................................16

Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1078 (3d Cir. 1985)................................27

MacElree v. Philadelphia Newspapers, 674 A.2d 1050, 1055 (Pa. 1996)............................................24, 30

McCafferty v. Newsweek Media Group, Ltd., 955 F.3d 352, 358 (3d Cir. 2020)...........................24, 26, 32

Menkowitz v. Peerless Publications, Inc., 176 A.3d 968 (Pa. Super. 2017)................................................22

Moore v. Vislosky, 240 Fed.Appx. 457, 468 (3d Cir. 2007)........................................................................27

Mzamane v. Winfrey, 693 F.Supp.2d 442, 477 (E.D.Pa. 2010)...................................................................21

New York Times v. Sullivan, 376 U.S. 254 (1964)......................................................................................26

Northstein v. USA Cycling, 499 F.Supp.3d 101 (E.D. Pa. 2020).................................................................31

Oshiver v. Levin, Fishbein, Cedrone and Berman, 38 F.3d 1380, 1384 (3d Cir. 1994).............................16

Pelagatti v. Cohen, 536 A.2d 1337, 1345 (Pa. Super. 1987).......................................................................22

Petula v. Mellody, 588 A.2d 103 (Pa. Cmwlth. 1991).................................................................................29

Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008)............................................................16

Pub. Interest Research Group of NJ, Inc. v. Magnesium Elektron, 123 F.3d 111, 116 (3d Cir. 1997)........25

Puchalski v. School Dist. of Springfield, 161 F.Supp.2d 395, 408 (E.D. Pa. 2001)...................................30

Redco v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985), cert. den., 474 U.S. 843 (1985)...........................19

Reilly v. WNEP, 2021 WL 1017154, at *6 (Pa. Super. Ct. Mar. 17, 2021).................................................29

Sarkees v. Warner-W Corp., 37 A.2d 544, 546 (Pa. 1944).............................................................21, 22, 23

Schiavone Const. Co. v. Time, Inc., 847 F.2d 1069, 1089-90 (3d Cir. 1988).......................................26, 27

Shadle v. Nexstar Broad. Group, Inc., 2014 WL 3590003 (M.D. Pa. July 21, 2014)................................23

Smyth v. Barnes, No. 04-930, 1995 WL 576935, at *10 (M.D. Pa. Sept. 25, 1995)..................................20

Sovereign Bank v. Valentino, 2006 Pa. Super. 338 (2006)....................................................................24, 25

Sprague v. Walter, 656 A.2d 890, 907 (Pa. Super. 1995)............................................................................26

St. Amant v. Thompson, 390 U.S. 727, 732 (1968)......................................................................................27

Swietlowich v. County of Bucks, 610 F.2d 1157, 1164 (3d Cir. 1979)........................................................26

Tavoulareas v. Piro, 817 F.2d 762, 789 (D.C. Cir. 1987)...........................................................................26

Thomas Merton Ctr. V. Rockwell Int'l Corp., 442 A.2d 213, 217 (Pa. 1981).............................................21

Trivedi v. Slawecki, 2012 WL 5987410 (M.D. Pa. Nov. 28, 2012).............................................................18

Tucker v. Fischbein, 237 F.3d 275, 282 (3d Cir. 2001).........................................................................19, 20

Valjet v. Wal-Mart, 2007 WL 4323377 (E.D. Pa. Dec. 11, 2007)..............................................................29

Woods Servs. v. Disability Advocates, Inc., 2018 WL 2134016, at *6 (E.D. Pa. May 9, 2018).................17

iii

**STATUTES**

28 U.S.C. § 1442(a)(1)..................................................................................................2

42 Pa. C.S.A. § 8343..................................................................................................19

42 Pa. C.S.A. § 5510..................................................................................................21

35 P.S. 1095..................................................................................................21

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(6)..................................................................16, 17

Restatement (Second) of Torts § 573..................................................................20, 22

Restatement (Second) of Torts § 652E..................................................................23, 31

Restatement (Second) of Torts § 875..................................................................24, 25

Restatement (Second) of Torts § 876..................................................................24,

Plaintiff, Janet Monge, by her undersigned attorneys, respectfully submits the following Memorandum of Law in Opposition to the Motion to Dismiss filed by Defendants, Advance Magazine Publishers Inc. d/b/a The New Yorker and Teen Vogue, Ezra Lerner, Heather A. Thompson, Associated Newspapers Limited d/b/a The Daily Mail, Adam Schrader, ESPN, Inc. d/b/a Andscape, Linn Washington, Nicole Froio, Guardian News & Media Limited d/b/a The Guardian, Ed Pilkington, NYP Holdings, Inc. d/b/a New York Post, Jackson O'Bryan d/b/a Blake Montgomery, The New York Times Company, Michael Levenson, The Slate Group LLC, and Elaine Ayers (hereinafter "Moving Defendants" or "Media Defendants").

## I.      INTRODUCTION

The Moving Defendants have filed a broadly targeted Motion to Dismiss all Counts of the Complaint filed by Plaintiff Janet Monge ("Dr. Monge") averring that they are not liable to Plaintiff because: (1) the law of the case doctrine precludes Plaintiff from re-pleading her claims despite this Court's Order to do just that; (2) Plaintiff failed to sufficiently plead that the Media Defendants published their articles with actual malice despite her not being a limited public figure, and regardless, her having pled sufficient facts to infer actual malice; (3) the statements made by the Media Defendants were non-actionable opinions; and (4) no actions taken by any of the Moving Defendants provided assistance to any defaming Defendant. As set forth below, it is respectfully asserted that each of these suggestions are without factual or legal merit, and therefore, the Motion to Dismiss Plaintiff's claims against Moving Defendants must be denied.

## II.     STATEMENT OF THE CASE

### A.      Procedural History

Dr. Monge commenced this action on April 20, 2022 by filing a Praecipe to Issue a writ of Summons in the Philadelphia Court of Common Pleas. On May 20, 2022, Dr. Monge filed her Complaint, and then an Amended Complaint on June 22, 2022, adding the American

1

Anthropological Association and removing The Association of Black Anthropologists and the Smithsonian Magazine as Defendants. The Amended Complaints brought the following causes of action against the Defendants: (1) defamation (Count I), (2) defamation by implication (Count II), (3) false light (Count III), and (4) civil aiding and abetting (Count IV).

On July 27, 2022, Defendant Nora McGreevy filed a Notice of Removal of the action to Federal Court under 28 U.S.C. § 1442(a)(1), bringing the action to this Court. Between August 4, 2022 and August 12, 2022, all of the defendants filed Motions to Dismiss Plaintiff's First Amended Complaint. From January 23, 2023 to June 28, 2023, the Court issued Orders granting the defendants' Motions to Dismiss, dismissing some of Plaintiff's claims with prejudice and allowing Plaintiff leave to amend her other claims. Plaintiff filed her Second Amended Complaint on July 28, 2023, which cured the deficiencies found by the Court in its various opinions on the Motions to Dismiss. The Media Defendants filed the instant motion to dismiss a month later, on August 28, 2023.

### B.      Statement of Facts

#### i.      Overview

On May 13, 1985, the Philadelphia Police Department dropped an aerial explosive firebomb on the home of its own citizens, and that destruction was further exacerbated when the Philadelphia Police and Fire Commissioners let the resulting fire burn for several hours rather than extinguishing it. *See* Plaintiff's Second Amended Complaint, attached hereto as Exhibit "A," at ¶ 73-74. The incident ultimately resulted in the deaths of eleven (11) people, including five (5) children. *Id.* at ¶ 75.

From the beginning, the forensic processing of the bomb site was a disaster. *Id.* at ¶ 77-78. The Philadelphia Medical Examiner's Office refused to assist in the processing until the first body

was discovered the day after the bombing had occurred, and by the time they had arrived, the City had already begun breaking down the bombsite with construction equipment, severely damaging any human remains located there. *Id.* at ¶ 78. On top of the lack of care in moving the human remains, there was also a complete lack of any systematic procedure for recording evidence, no proper control of the physical remains of the dead, and none of the appropriate evidentiary tests were taken. *Id.* at ¶ 79-80. The City's failure to adequately process the bomb site made it nearly impossible to identify the victims of the bombing, at least not without outside help. *Id.*

Facing such an uphill battle, Philadelphia's then Chief Medical Examiner, Dr. Marvin Aronson, invited Dr. Alan Mann, professor in the Department of Anthropology at the University of Pennsylvania with expertise in identifying small bone fragments, to assist with the investigation. Plaintiff's Second Amended Complaint, at ¶ 82. When he arrived, Dr. Mann brought along his mentee, Dr. Monge, who he had tasked with assisting him in his analysis of the remains found at the bomb site. *Id.* at ¶ 83.

After examining the remains, Drs. Mann and Monge concluded that a pelvis bone and proximal femur bone fragments could not possibly belong to a person of the ages of the individuals presumed to have died in the bombing. *Id.* at ¶ 84-85. This conclusion was based on the fact that the bones analyzed by Drs. Mann and Monge could only have belonged to a young adult female, likely between the ages of 17 and 21. *Id.* at ¶ 86. But the oldest child known to be in the MOVE house was a 14-year-old girl named Katricia (Tree) Africa, so these bone fragments were found to be unaffiliated with any of the known MOVE victims and thereafter referred to as Jane Doe. *Id.* at ¶ 86-87.

After an outside pathology group appointed by the MOVE Commission issued its own, flawed report associating the Jane Doe pelvis and femur fragments with Katricia "Tree Africa"

Dodson, Dr. Mann conducted a second investigation and issued his own report reaffirming Dr. Monge's and his conclusion that the pelvis and proximal femur fragments could not have belonged to Katricia. *See* Plaintiff's Second Amended Complaint, at ¶ 88-91.

Dr. Mann confirmed his conclusions with other forensic anthropologists, and thereafter, the Philadelphia Medical Examiner's Office retained the responsibility and authority of identifying the unidentified human bone fragments. *Id.* at ¶ 91-92. On December 14, 1985, the remains conclusively identified as belonging to Katricia Africa were buried after their release to Hankins Funeral Home, and the pelvis and proximal femur bone fragments that could not be conclusively identified as relating to any of the known MOVE victims, including Katricia (the "unidentified fragments") were released to Dr. Mann for further investigation at his office at the Penn Museum. *Id.* at ¶ 93.

From 1986 to 2001, Dr. Mann stored the unidentified fragments in the physical anthropology section of the Penn Museum in strict compliance with standard forensic practices. *Id.* at ¶ 94. During this time, Dr. Monge sought out contact with one of the surviving MOVE members, Ramona Africa, with the hope of gaining her assistance in ascertaining the identity of the older woman whose bone fragments had been safely retained in appropriate storage at the museum. But Ramona Africa declined to speak with Dr. Monge. *Id.* at ¶ 95.

In 2001, Dr. Mann left Penn to join the Anthropology Department at Princeton University as a full-time faculty member, and Dr. Monge continued to assist him with his courses at Princeton the same way she did at Penn. *Id.* at ¶ 96. However, Dr. Monge remained at Penn, and the unidentified bone fragments remained in safe storage at the Penn Museum due to Penn's superior facilities for forensic analysis. *See* Plaintiff's Amended Complaint, at ¶ 98.

From 2001 to 2015 (the latter date when Dr. Mann retired from teaching), Dr. Monge brought the unidentified fragments to Princeton's campus for further investigation between two and five times, largely for the purpose of having other anthropologists who were visiting Princeton to review them. *Id.* at 99. Such transfers were conducted in strict accordance with chain of custody protocols and promptly returned to safe storage at the Penn Museum afterwards. *Id.* There was never a time where the unidentified fragments were not well-protected or safely stored. *Id.*

In 2014, the Penn Museum renovated its physical anthropology lab, providing Dr. Monge with the lates scientific technologies and capabilities for identifying bone fragments. *Id.* at ¶ 100. So, Dr. Monge began working with a geneticist from another leading research university on a number of research projects, and the two discussed the possibility of using then just recently developed DNA analysis that permitted bone fragments to be identified with relatives. *Id.* at ¶ 101. The DNA analysis would have required a DNA sample from a relative of Katricia to show there was no relationship between the unidentified fragments and Katricia, but rather that the fragments were from another, older female. *Id.* at ¶ 102. Dr. Monge sought out to contact the MOVE family to ask for a sample of her DNA through a local writer, Malcom Burnley ("Burnley"), but there was no meaningful conversations with them, and Dr. Monge was forced to label the case "cold" after failing to get a DNA sample. *Id.* at ¶ 102-103. Burnley reached out to restart the investigation four years later, but Dr. Monge ultimately declared an end to the efforts after they determined they would not be able to secure any help from the MOVE members despite several attempts. *Id.* at ¶ 104-105.

In 2017 and 2018, Dr. Monge was approached by Dr. Carolyn Rouse, the Chair of Princeton University's Anthropology Department, where Dr. Monge had been teaching as an visiting professor, regarding the creation of an online course on Forensic Anthropology with Dr.

Jeffrey Himpele, another Princeton anthropology professor. *See* Plaintiff's Second Amended Complaint, at ¶ 107. In furtherance of that effort in 2019, a discussion ensued regarding the use of the unidentified fragments – which had already been declared a "cold" case – to address the difficulties anthropologists face when identifying remains. *Id.* at ¶ 108.

The discussions between Drs. Rouse, Hempele, and Monge ultimately resolved in an online course titled, "Real Bones: Adventures in Forensic Anthropology, which was published on the Coursera online platform. *Id.* at ¶ 109. Coursera is an online platform that works with universities and other institutions to create online courses and certificate programs in a wide array of subjects. *Id.* at ¶ 110. The courses are not mass-broadcasted to large audiences, but rather, any individual interested in a course's content must first sign up for a Coursera account and specifically enroll in that course. *Id.* Coursera does not pay its course-creating partners any money, and Dr. Monge did not profit in any way from the production of "Real Bones: Adventures in Forensic Anthropology." *Id.*

The course was designed to discuss forensic anthropology using real world examples, with an overall purpose of teaching how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains. *Id.* at ¶ 111. The one and only time the unidentified remains were displayed in the course occurred in the ninth class, titled "MOVE – An Analysis of the Remains." *Id.* at ¶ 113. In that 14-minute class, Dr. Monge can be seen in the Penn Museum's lab with one of her students and the unidentified bone fragments comparing those fragments to other similar bone fragments and models and explaining how forensic techniques could be used to determine the age of the remains. *See* Plaintiff's Second Amended Complaint, at ¶ 113. At all times during the video, both Dr. Monge and her student properly, scientifically, and discreetly handled the remains, utilizing rubber gloves to ensure that

there would be no outside contamination. *Id.* at ¶ 114. The lesson's discussion involved only the process utilized in providing the age estimate of the person from whom the fragments originated with Dr. Monge explaining that, despite her diligence, the human source of the fragments had never been identified. *Id.* at ¶ 115.

"Real Bones: Adventures in Forensic Anthropology" was published in August 2020 and available for almost a year without any controversy or complaint. *Id.* at ¶ 116. During that timeframe, it was viewed by a very limited audience – 450 academic-minded individuals seeking to learn more about forensic anthropology. *Id.* It was never broadcast to the public at large. *Id.* at ¶ 117. But then, Defendant, Paul Mitchell's ("Mitchell"), deliberate, retaliatory, and self-elevating smear campaign against Dr. Monge made the matter a public controversy causing Coursera to shut it down. *Id.*

Dr. Monge had known Mitchell since he was an undergraduate and master's student at the University of Pennsylvania from 2009-2014. *Id.* at ¶ 118. In fact, throughout his tenure at Penn, Mitchell took several courses from Dr. Monge, and she was the advisor on his master's thesis. *Id.* at ¶ 119. Dr. Monge even helped Mitchell return to Penn for his PhD after he had initially enrolled in a doctoral program at the University of California Berkely but was dismissed that program for professional misconduct. *Id.* at ¶ 120-121.

But when Mitchell returned to Penn for his PhD, things were different. He began engaging in severe misconduct by, inter alia: (a) defacing Penn Museum lab books; (b) tearing pages from the equipment used to catalogue entries for the lab's micro-CT scanner; (c) engaging in published plagiarism; (d) improperly accessing the lab with his friends to inappropriately explore with them the bones and bone fragments stored at the lab for educational purposes; (e) illegally duplicating the keys to Dr. Monge's office space and adjacent storage spaces and using his unlawful access to

remove certain stored remains, including but not limited to the remains of famous Chicago serial killer, H.H. Holmes; and (f) stealing DNA samples and other forensic materials without authorization. *See* Plaintiff's Second Amended Complaint, at ¶ 123. Upon discovering Mitchell's misconduct, she reported his unlawful and disturbing activities to the Penn Museum Security and Administrators, along with Dr. Kathleen Morrison, Chair of Penn's Anthropology Section. *Id.* at ¶ 124. But despite these well-founded allegations backed by objective evidence, Penn and its administrators took no action to punish Mitchell or deter him from his continued unlawful actions. *Id.*

Instead, Dr. Monge's allegations became the subject of a confrontation by Mitchell of her in the presence of several witnesses in May 2019. *Id.* at ¶ 125. During this confrontation, Mitchell began screaming at Dr. Monge, throwing objects in her direction, slamming his fists down on tables, and threatening Dr. Monge, who became terrified by his comments and actions. *Id.* Dr. Monge once again filed a report with the Museum's Administration, but they did nothing. *Id.* So, fearing for the safety of the equipment and remains she had been tasked with protection – along with her own safety and wellbeing – Dr. Monge changed the locks in the Museum and her lab, and she denied Mitchell any further, unsupervised access to the Physical Anthropology collections at the Penn Museum. *Id.* at ¶ 126. These final actions, although well within Dr. Monge's rights, gave rise to the vengeful, malicious, and defamatory actions that Mitchell took next. *Id.*

Mitchell's vengeful actions began in early April 2021 when he met with Christopher Woods, who had recently been hired as the Director of the Penn Museum, to accuse, without foundation, Dr. Monge of mishandling the unidentified fragments and engaging in other professional misconduct in reference to the issue of the MOVE bombing investigation. *Id.* at ¶ 127. Mitchell further expressed concerns over the Penn Museum's policies on the handling of the

remains, including the unidentified bone fragments from the MOVE site, and unfairly and defamatorily accused Dr. Monge of lacking professionalism in connection with the Coursera course. *Id.* Then, fearing his false allegations would not bear the disciplinary result he intended against Dr. Monge, Mitchell instigated the first article regarding the unidentified bone fragments by contacting his then-girlfriend, Defendant Maya Kasutto, a writer for Defendant Billy Penn who harbored her own grudge against Dr. Monge, to discuss his unfounded and untruthful allegations. *Id.* at ¶ 128.

Kasutto was a fellow Penn graduate who initially studied biological anthropology under Dr. Monge, but ultimately received her undergraduate degree in cultural anthropology and creative writing. *Id.* at ¶ 129. Dr. Monge had assisted Kasutto in matriculating at Penn, and she had looked at Dr. Monge as a mentor while a biological anthropology student. *Id.* at ¶ 130. However, their relationship soured when Kasutto left the biological anthropology program, and Dr. Monge was forced to revoke her ability to work with remains in the Physical Anthropology section of the Penn Museum. *Id.*

Aligned against their common target, Kasutto and Mitchell determined they could harm Dr. Monge – while elevating their own careers – by spearheading a "Cancel Culture" movement against Dr. Monge. *Id.* at ¶ 131. To do so, they determined they would declare she harbors racist animus against persons of African descent even though they knew she had spent her entire career seeking to bring respect and humanity to identify remans of persons of all races. *Id.* They also suggested that another of Mitchell's close associates, Defendant, Abdul Aliy-Muhammad, publish his own article insinuating Dr. Monge was racist to lend further credibility to the story. *See* Plaintiff's Second Amended Complaint, at ¶135-137.

On April 21, 2021, the first two of many false and defamatory articles were published by Billy Penn and the Philadelphia Inquirer, falsely asserting that the unidentified bone fragments were the remains of Katricia Africa. *Id.* at ¶ 132-137. But believing that the falsities planted in local Philadelphia news outlets would be too small in scope to punish Dr. Monge enough for the perceived wrongs she had done to him, Mitchell then prepared his own paper on the handling and identify of the remains removed from the MOVE site, arguing without foundation that the remains are indisputably those of Katricia and Delisha Africa and condemning the handling of the remains. *Id.* at ¶ 138. Mitchell widely distributed this paper to Penn employees, MOVE members, and several media outlets with the hopes of lending further credibility to the false stories his associates had published and broadening the reach of his lies against Dr. Monge. *Id.* Mitchell's plan was simple: create a Hobson's choice for Dr. Monge's employer, the University of Pennsylvania, news outlets around the world, and the general public at large – they can either (1) accept Mitchell's false narrative and cast Dr. Monge out as an unethical racist whose work cannot be trusted or (2) investigate the truth behind Mitchell's false narrative and risk being labeled as a racist themselves. *Id.* at ¶ 139. Each of the Defendants chose the former alternative, despite the clear indications that allegations from a scorned former student would likely be false, solely to avoid the latter and risk a loss of readership. *Id.*

Over the next several months, the remaining media Defendants created a firestorm of media coverage of Mitchell's false assertions, continuing to perpetuate the false and defamatory statements and implications of systemic racism created by the initial articles. *Id.* at ¶ 140-145. These articles were written without any investigation being done despite clear indications that Mitchell, a student with a clear grudge against Dr. Monge, would fabricate such claims. *See* Plaintiff's Second Amended Complaint, at ¶ 161, 176. Indeed, the facts of the matter showed that

Dr. Monge had always treated all remains in her possession during her career with the utmost care and respect. *Id.* at ¶ 155. But the Defendants sensed the start of a viral social justice movement (albeit one based on false and malicious truths pushed by a supposed enemy of Dr. Monge), and they quickly jumped on to expand the reach of Mitchell's false reality and assist him in pushing his false narrative. *Id.* at 176.

Even worse, Dr. Monge also found herself attacked by anthropology associations, the University of Pennsylvania, and other faculty members at the University. Dr. Monge had initially assumed that her fellow anthropologists, her employer – Upenn – whose policies and procedures she had always followed, and her fellow faculty members would defend her against lies professed by Mitchell. But they did not; instead, they blindly accepted the allegations of Dr. Monge's scorned former student and republished them as fact to the public. *Id.* at ¶ 146. On April 26, 2021, a collective statement by the Association of Black Anthropologists (ABA), the Society of Black Archaeologists (SBA), and the Black in Bioanthropology Collective (BiBA) was released, which suggested unethical and illegal racially motivated animus and professional misconduct and further requested that Dr. Monge be removed from her position. *Id.* at ¶ 147-148. Then, Defendants Gutmann and Prickett authored an email to employees of the Penn Museum calling Dr. Monge's actions "insensitive, unprofessional, and unacceptable." *Id.* at ¶ 150. A similar statement was sent to the full University of Pennsylvania community. *Id.*

Thereafter, although Dr. Monge had done nothing wrong, she was locked out of her lab and all Physical Anthropology collection storage spaces and was put on a "work pause". *Id.* at ¶ 151. She was then removed from her position as Professor at the University of Pennsylvania and was demoted with a salary reduction of more than $65,000 per year. *Id.* at ¶ 153-154. Accordingly, based entirely upon the false and defamatory statements made by Defendants individually and

collectively, Dr. Monge's reputation has been irreparably and wrongfully destroyed, she has been the victim of adverse employment actions, and she has received threatening emails and phone calls, including multiple death threats. *Id.* at ¶ 156.

## ii.    Statement of Material Facts As Related to Moving Defendants

The Moving Defendants are all media outlets who reported on Dr. Monge's handling of the unidentified remains after the Billy Penn and Philadelphia Inquirer Articles were published. Specifically, Moving Defendants published eight relevant articles:

**The Daily Mail Article:** On April 23, 2021, the Daily Mail published an article on its website authored by Adam Schrader, titled "'They Are Juicy': Princeton Professor is Slammed for Disrespecting the Bones of a 14-year Old Black Girl Killed by a Bomb Dropped by Philadelphia Police in 1985 After Members of Her Commune Fired at Cops." The author of that article falsely averred that the remains were bones of a "black child killed in a 1985 police bombing" despite the fact that the bones could only belong to a young adult, and it further condemned Dr. Monge's use of the word "juicy" in the Coursera video, implying her speech carried racial undertones when in fact the word "juicy" is an anthropological term of art indicating the preserved status of bones and bone fragments. Indeed, the entire purpose and tone of the article was to create the implication that Dr. Monge is a bigoted racist who was flaunting and desecrating the bones of a young black girl, despite the findings that Dr. Monge had done nothing more than what she was asked to do as part of her job and that she had followed all appropriate protocols in handling the remains at all times.

**The Guardian Article:** On April 23, 2021, the Guardian published an article titled "'Bones of Black children killed in police bombing used in Ivy League anthropology course," by Ed Pilkington. That article also falsely averred that the bone fragment remains are "almost certainly those of the older MOVE girls who died" and suggested Dr. Monge's use of the words "juicy" and

12

"greasy", suggesting those words carry disrespectful racial undertones when in fact they are anthropological terms of art. Mr. Pilkington further implies that Dr. Monge's actions constituted scientific impropriety and racist-fueled misconduct – border lining criminality – by comparing Dr. Monge's work to the "nationwide racial reckoning in the wake of George Floyd's murder." By making such comparison, Mr. Pilkington raises a similar call to action for Dr. Monge to face her own "racial reckoning" in the form of adverse employment actions, death threats, and a complete loss of standing in the anthropological community despite doing nothing wrong.

**The New York Post Article:** On April 23, 2021, the New York Post published an article authored by Jackson O'Bryan titled "Remains of Black Teen Killed in Philadelphia Police Bombing Used in Online Class." That article suggested a racist animus for Dr. Monge's actions and statements, thereby implying she committed professional misconduct by abusing her position as a professor and curator and flaunting the remains in her possessions simply because they were from a Black individual.

**The Slate Article:** On April 30, 2021, Slate published an article titled "The Grim Open Secret of College Bone Collections" and authored by Elaine Ayers. That article states that Drs. Mann and Monge were driven by racially based animus: "the physical anthropology departments like that ones that employ Mann and Monge exist today as uneasy reminders of many museums' and universities' racist and colonial foundations." The Slate article further states that the use of the terms "juicy" and "greasy" by Dr. Monge reflect the "most recent example of an ongoing legacy of Black people's bodies used for academic research and pedagogy," suggesting those words carry racial undertones when in fact they are anthropological terms of art properly used in anthropological instructional context. By repeatedly framing Dr. Monge's actions, which were

completely proper, in the context of longstanding racism, the article improperly implies that Dr. Monge abused her position by flaunting the bones of a Black individual.

**The May 7 Andscape Article:** On May 7, 2021, Andscape, a popular website run by ESPN, published the article "The Scandal Over the MOVE Bombing Victims' Remains Is Part Of Anthropology's Racist History" authored by Nicole Froio. The article blatantly suggests racist motivations for the investigatory actions of Dr. Monge:

> "The handling of the remains of the two MOVE bombing victims is certainly not, as Rouse noted, a "conspiracy." The reality is much worse. The theft of Tree's and Delisha's bones indicates that despite attempts to purge academia and anthropology of colonial logics, they are baked into the structure. It is clear that there is still a belief in the field of anthropology that the remains of Black people are scientific objects to be studied or stored away in boxes rather than laid to rest by their families."

Ms. Froio further alleges racist insensitivity by stating that "[i]n death, [Katricia and Delisha's] bones were used as objects of colonial plunder at academic institutions," and she directly asserts that Dr. Monge's handling of the bone fragment remains was unethical, unprofessional, and racist.

**The New Yorker Article:** On May 16, 2021, The New Yorker published the article "Saying Her Name" by Heather Ann Thompson. This article falsely implies that the actions of Dr. Monge were unlawfully racist, stating that "the idea that the museum was holding the bones of a Black Philadelphian who was alive as recently as 1985 in the same way that it has held the skulls of enslaved people, procured by grave-robbers, was beyond comprehension," and she directly contradicts the scientifically supported findings of Drs. Mann and Monge that the bone fragment remains were not that of Katricia: "The remains that Mann claimed had never been satisfactorily identified has, in fact, been found to belong to a teen-age girl who, along with her sister, died that day." Once again, by comparing Dr. Monge's proper possession with the remains to remains of

slaves procured by "grave-robbers", the not only implied that Dr. Monge acted with racist intent, but also that her actions may have been criminal.

**The May 26 Andscape Article:** On May 26, 2021, Andscape published a second article. This article, written by Linn Washington, was titled "Disrespect for the MOVE Families Is a Stain That Never Goes Away in Philadelphia." That published piece falsely states that Dr. Monge "mistreated" the unidentified remains of Katricia and Delisha Africa and further falsely asserts that Dr. Monge's actions were unprofessional and unlawful:

> "Although the scandal caused Princeton to cancel that online course, anthropologist Janet Monge retains her positions at the Penn Museum and on the university's faculty."

Mr. Washington then went on to suggest that Penn's failure to remove Dr. Monge from her position "renders the University of Penn's apology hollow." In doing so, he implied that Dr. Monge has departed from professional standards to the degree that she must lose her job, despite the fact that she was never found to have violated any professional standards.

**The Teen Vogue Article:** On July 16, 2021, Teen Vogue published the article "MOVE Bombing Remains Scandal Showing Enduring Racism in Anthropology" by Ezra Lerner. That published writing suggests improper conduct by implication by stating that "the remains of at least one young girl – believed to possibly belong to Tree as well as Delisha Africa, victims of the police's 1985 bombing of the MOVE house in Philadelphia – had been improperly kept for decades by archaeologists Alan Mann and Janet Monge" and further defamatorily states that the handling of the remains was "unethical."

III.     **STATEMENT OF CONTROLLING LEGAL PRINCIPLES**

A.     **Applicable Standards Governing A Motion to Dismiss**

In deciding on a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the Court is required to accept as true all factual allegations in the Complaint and draw any and all inferences derived from those facts in a light most favorable to the Plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). *See also Oshiver v. Levin, Fishbein, Cedrone and Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994). The Complaint is not required to make detailed factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atlantic Corporation v. Twombly*, 550 U.S. 554, 555 (2007). Instead, to state a cognizable claim, a Complaint must only allege "enough 'factual matter' (taken as true) to suggest a required element' and being 'more than mere labels and conclusions, and formulaic recitation of the elements of a cause of action.'" *Phillips*, 515 F.3d at 234 (*citing Twombly*, 550 U.S. at 556). The movant bears a heavy burden in establishing that the Complaint fails to state a claim upon which relief can be granted. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

Applying the above principles, federal courts will generally engage in a two-step process in evaluating a complaint when reviewing a Motion to Dismiss. *Iqbal*, 556 U.S. at 679. First, the court must identify allegations that are not entitled to the assumption of truth because they are merely conclusions. Second, well pled factual allegations that are assumed to be true are reviewed to determine whether the allegations plausibly give rise to an entitlement to relief. *Id. See also Lopez v. Beard*, 333 Fed. Appx. 685, 687 (3d Cir. 2009). If the Complaint "pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the Complaint should be deemed "plausible on its face" and the motion to dismiss denied. *Twombly*, 550 U.S. at 570. Put another way, a Rule 12(b)(6) motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts

in support of [her] claim which would entitle [her] to relief." *Aamco Automatic Transmissions, Inc. v. Tayloe*, 368 F.Supp. 1283, 1286-87 (3d Cir. 1973).

    **B.**    <u>**Defamation**</u>

        **i.**    <u>**Status of Plaintiff**</u>

Almost universally, the Defendants assert that Plaintiff is a limited purpose public figure, basing at least in some part on the fact that this Court has found Dr. Monge to be a limited purpose public figure in a limited number of rulings on Defendants' Motions to Dismiss. However, there was no analysis of this issue in several of the decisions, and the law of the case doctrine does not preclude Plaintiff from repleading these issues given the ambiguities in the Court's prior Orders and the fact the Court explicitly requested that Plaintiff replead her claims. Accordingly, Dr. Monge respectfully asserts that she cannot be a limited purpose public figure under the law. Rather, she is nothing more than a professor, researcher, and curator who was simply doing her job in the background. It was only when Defendants individually and collectively published articles fabricating a need for public outcry against Dr. Monge that she was thrust into the public spotlight. Therefore, under the applicable law, Plaintiff is nothing more than a private figure forced into a public controversy, and she must simply plead ordinary negligence.

Initially, Plaintiff must note that the question of whether a plaintiff is a limited purpose public figure is a difficult and fact-specific question not suitable for resolution under Federal Rule of Civil Procedure 12(b)(6), and thus, courts regularly find that a determination of a litigant's status as a public or private figure should be deferred until summary judgment when a full factual record can be developed. *See Woods Servs. v. Disability Advocates, Inc.*, 2018 WL 2134016, at *6 (E.D. Pa. May 9, 2018); *see also Gillon v. Bernstein*, 2013 WL 5159625 (D.N.J. Sept. 12, 2013) ("While the Complaint notes that Gillon has appeared on at least two television programs, … the [c]ourt

finds it appropriate to defer the public figure inquiry until after the record has been more fully developed through discovery."); *Trivedi v. Slawecki*, 2012 WL 5987410 (M.D. Pa. Nov. 28, 2012) (finding that the question of public figure status "is more appropriately resolved at the summary judgment stage on the basis of record evidence"). Thus, Dr. Monge respectfully asserts that this Court should defer any further ruling on her status until a record can be developed to assist in that analysis. But even if the Court is compelled to complete the analysis now, it is clear Dr. Monge does not meet the status required to be even a limited purpose public figure.[1]

If the Court holds that Plaintiff is a private figure, which Plaintiff asserts is the only proper determination, Pennsylvania law requires that she need only prove negligence in a civil libel case. *See American Future Systems, Inc. v. Better Business Bureau*, 923 A.2d 398, 400 (Pa. 2007) (applying formulation announced in *Gertz*, 418 U.S. at 343). Thus, as the *Gertz* Court recognized in the media context, "private plaintiffs may recover … under a standard less than actual malice since the strong and legitimate state interest in compensatory injury to the reputation of private individuals requires … a different rule … with respect to them." 418 U.S. at 343. Regardless, Plaintiff's Second Amended Complaint adequately pleads actual malice, and her claims should not be dismissed.

### ii.    General Principles of a Defamation Case

To state a claim for defamation, Dr. Monge must plead: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its

---

[1] Plaintiff relies on and incorporates its discussion of the law on limited purpose public figures set forth in its Opposition to the Media Defendants' Motion to Dismiss Plaintiff's Amended Complaint. The relevant excerpt is attached hereto as Exhibit "A".

publication; and (7) abuse of a conditionally privileged occasion. 42 Pa.C.S. § 8343(a). "A statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating with him." *Tucker v. Fischbein*, 237 F.3d 275, 283 (3d Cir. 2001). It is a question of law for this Court to determine whether a statement is capable of defamatory meaning. *Brs v. Sch. Dist. of Philadelphia*, 942 F.Supp.2d 552, 564 (E.D. Pa. 2013).

But while a Court may determine whether a statement is capable of defamatory meaning, it can only dismiss a defamation claim if it is **certain** that the statements made, as alleged in Dr. Monge's Second Amended Complaint, are not susceptible to **any** defamatory meaning. *See Gordon v. Lancaster Osteopathic Hospital*, 489 A.2d 1364, 1368 (Pa. Super. 1985). A recent case from this district is instructive in this regard. *Goldfarb v. Kalodimos*, 539 F.Supp.3d 435 (2021). In *Goldfarb*, the plaintiff, a former school teacher, sued a colleague for defamation, alleging that the colleague defamed the plaintiff on Twitter by alleging the plaintiff had attempted to silence students from discussing instances of sexual and racial harassment at the University of Pennsylvania Medical School. *Id.* at 444-46. Like the Defendants in the instant case, the *Goldfarb* defendant argued that his tweets were not defamatory because they were true and were opinions. *Id.* at 455. This Court rejected that argument and held the tweets were actionable, relying on the distinction between actionable statements and non-actionable opinions that the Third Circuit established in *Redco Corp. v. CBS Inc.*, 758 F.2d 970 (3d Cir. 1985);

> Although there may be no such thing as a false opinion, an opinion which [sic] is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

*Id.* at 972. After reviewing the five (5) tweets at issue and applying this distinction, the *Goldfarb* Court found the defendant's tweets, which discussed events that allegedly transpired in the plaintiff's classroom and offered opinions thereon, could be interpreted by a reader who was not present for the events as being susceptible to a defamatory meaning. *Goldfarb*, 539 F.Supp.3d at 459-60. In other words, "**if the allegedly defamatory statements are susceptible to several interpretations, some of which are benign, some of which are not, it is for the jury to decide how the statement is likely to be interpreted by the intended audience**," and "a court should not dismiss a complaint unless it is clear that the publication is incapable of a defamatory meaning." *Valjet v. Wal-Mart*, No. 06-01842, 2007 WL 4323377, at *8 (E.D. Pa. Dec. 11, 2007) (*quoting Smyth v. Barnes*, No. 04-930, 1995 WL 576935, at *10 (M.D. Pa. Sept. 25, 1995)) (Emphasis supplied); *Tucker*, 237 F.3d at 282.

Furthermore, it is well settled in Pennsylvania that statements imputing criminal activity or character that adversely affects fitness for a person's profession are defamatory *per se*. *Cornell Cos. v. Borough of New Morgan*, 512 F.Supp.2d 238, 271 (E.D. Pa. 2007); *see also*, *Franklin Prescriptions, Inc. v. New York Times Co.*, 2004 WL 1770296, at *8 (E.D. Pa. Aug. 5, 2004). Defamation per se on the basis of accusations of "business misconduct" are evaluated under the position set forth by the Restatement (Second) of Torts, as follows

> One who publishes a slander that ascribes to another conduct, characteristics, or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, […] is subject to liability without proof of special harm.

Restatement (Second) of Torts, § 573. *Clemente v. Espinosa*, 749 F. Supp. 672, 677-78 (E.D. Pa. 1990). Significantly, "a statement may be per se defamatory although it does not explicitly charge the subject with a failure of business or professional performance, and a finding of defamation per

20

se is proper if "the particular quality disparaged ... is peculiarly valuable in the plaintiff's business and profession." *Id.* at 678.

Similarly,"[a] statement constitutes slander per se as an accusation of criminality when it charges whether directly or indirectly the commission of a specific offense punishable by imprisonment. A charge of criminal intent or design, or mere ability to commit a crime is not sufficient to state a cause of action." *Id.* at 679. Further, "words are slanderous per se under the crime category if a crime is readily apparent from properly pleaded innuendo." *Id.*

Here, it is clear that the Defendants' statements were defamatory *per se*, as they reasonably created the false implications that (1) Dr. Monge is incompetent and cannot be trusted in her job; (2) Dr. Monge is a racist; and (3) that Dr. Monge desecrated the remains of Black individuals due to her purported racist views, not only call into question Dr. Monge's fitness in her profession, but also suggest that her conduct constituted criminal behavior. *See See* 18 Pa.C.S.A. § 5510 and 35 P.S. 1095.

### iii.   Defamation by Implication/Innuendo

A claim for defamation "may exist where the words utilized are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Mzamane v. Winfrey*, 693 F.Supp.2d 442, 477 (E.D.Pa. 2010) (*citing Thomas Merton Ctr. V. Rockwell Int'l Corp.*, 442 A.2d 213, 217 (Pa. 1981); *Bogash v. Elkins*, 176 A.2d 677, 679 (Pa. 1962); *Sarkees v. Warner-W Corp.*, 37 A.2d 544, 546 (Pa. 1944) (all discussing defamation by innuendo)).

The legal test to be applied to determine whether a statement is defamatory by implication is whether the challenged language can "fairly and reasonably be construed" to imply the defamatory meaning alleged by a plaintiff. *Sarkees*, 37 A.2d at 546. The "innuendo must be

warranted, justified, and supported by the publication." *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. 1992). To determine whether a publication is capable of a defamatory meaning, "the court must consider the effect of the entire article and the impression it would engender in the minds of the average reader among whom it is circulated." *Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. 1997).

"[E]ven where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient." *Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1987). "[T]he literal accuracy of separate statements will not render a communication 'true' where, as here, the implication of the communication as a whole was false." *Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. 1982). A publisher may be liable "for the *implications* of what he has said, not merely the specific literal statements made." *Id.* at 15.

The case *Menkowitz v. Peerless Publications, Inc.*, 176 A.3d 968 (Pa. Super. 2017), affirmed on issues of innuendo, 653 Pa. 573 (2019), provides an example. In that case, the Pennsylvania Superior Court was faced with the issue of whether statements that a well-known surgeon was suspended for "professional misconduct regarding his treatment of an older female patient." *Id.* at 984. In fact, the plaintiff surgeon was suspended for yelling at other staff members in the presence of the patient. However, the Superior Court determined that the use of the phrase "professional misconduct regarding his treatment of an older female patient," while literally true, could reasonably imply that the surgeon had engaged in sexual misconduct with her. *Id.* Ultimately, it determined that such statements constitute defamation by innuendo due to the damage caused by the implication that the surgeon was committing sexual misconduct in his practice. *Id.*

Therefore, even where statements made may be literally true, when the article as a whole can "fairly and reasonably be construed" to create defamatory implications, that article is actionable under defamation by implication/innuendo. *Sarkees*, 37 A.2d at 546.

### C.   <u>False Light</u>

To establish a claim for false light, a plaintiff must show that a person or entity published material "that is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of falsity." *Shadle v. Nexstar Broad. Group, Inc.*, 2014 WL 3590003 (M.D. Pa. July 21, 2014). The plaintiff is not required to demonstrate that the matters complained of did not involved matters of public concern. *See Larsen v. Philadelphia Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. 1988).

Accordingly, in proper consideration of the controlling law, Dr. Monge need not demonstrate that the matter published was not of legitimate concern to the public to succeed Rather, Dr. Monge is simply required to demonstrate that the false light in which she was placed would be "highly offensive to a reasonable person" and that Defendants "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652E. Certainly, the published articles that accuse her of professional impropriety and race-based insensitivity establish the necessary element of her being highly offended as a reasonable person. The Third Circuit has held that a plaintiff can establish falsity "by showing that a defendant selectively printed out or broadcast true statements or pictures in a manner which created [a] false impression," and it clear that accusing an individual of being a "racist" could be found to be highly offensive to a reasonable person. *See McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352, 358 (3d Cir. 2020); *MacElree v. Philadelphia Newspapers*, 674 A.2d 1050, 1055 (Pa. 1996) (holding a statement accusing an

individual of being racist can be actionable where the individual's reputation, based on said statement, could be lowered in the community or deter third parties from associating with him). Certainly, the published articles that accuse her of professional impropriety and race-based insensitivity establish the necessary element of her being highly offended as a reasonable person.

   **D.**   **Civil Aiding and Abetting**

In Sovereign Bank v. Valentino, 2006 Pa. Super. 338 (2006), the Pennsylvania Superior Court specifically noted that Pennsylvania has adopted Section 876 of the Restatement (Second) of Torts addressing the tort of civil aiding and abetting, which is also known as concerted tortious conduct:

**Section 876. Persons Acting in Concert.**

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) **gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person**.

Restatement (Second) of Torts, § 876 (emphasis supplied).

The Superior Court also affirmed that Pennsylvania has adopted Section 875 of the Restatement (Second) of Torts and that Section 876 is a "specific application" of the rule stated in Section 875. *Sovereign Bank*, 2006 Pa. Super. at 421. Section 875 specifically addresses the liability of contributing tortfeasors:

**Section 875. Contributing Tortfeasors General Rule.**

> Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.

Restatment (Second) of Torts, § 875.

24

Therefore, like with "agency" or "secondary, indirect liability," Plaintiff's burden against the Defendants herein is not heavy. As noted in *Sovereign Bank*, *supra*, all that Plaintiff is required to show is the identities of the wrongdoers and those who acted in concert. As discussed below, Plaintiff's Amended Complaint not only identifies each person who has wronged her, but it also shows how the articles provided substantial assistance to each of the other Defendants by bolstering the media coverage and notoriety of the story through their additional reporting.

IV. **DISCUSSION**

A. **The Law Of The Case Doctrine Does Not Preclude Plaintiff's Second Amended Complaint**

The Media Defendants describe the "law of the case" doctrine as absolute, completely prohibiting the Court from reassessing Plaintiff's claims against them. However, although the doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," *Christianson v. Colt Indus. Operating Co.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)), the doctrine is discretionary and flexible. Indeed, it "does not restrict a court's power but rather governs its exercise of discretion." *Pub. Interest Research Group of NJ, Inc. v. Magnesium Elektron*, 123 F.3d 111, 116 (3d Cir. 1997); *see also Christianson*, 486 U.S. at 817 (*quoting Arizona*, 460 U.S. at 618 n. 8). Specifically, the doctrine does not prevent a court from "clarifying or correcting an earlier, ambiguous ruling" or from "reconsider[ing] an issues … whenever it appears that a previous ruling, even if unambiguous, might lead to an unjust result." *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432 439 (3d Cir. 2009) (*quoting Swietlowich v. County of Bucks*, 610 F.2d 1157, 1164 (3d Cir. 1979)). Accordingly, there is no bar to re-examination of the issues presented by the Media Defendants' Motion to Dismiss. This is

especially true here, as since, as discussed below, it would assist in clarifying earlier ambiguous Orders and the Court explicitly granted Plaintiff a right to replead her claims in relation to those issues, and thus, to deny Plaintiff the opportunity to present her claims now would be manifestly unjust.

### B.      Plaintiff Has Adequate Pled Her Defamation By Implication Claims

#### i.      Plaintiff Is Not A Limited Public Figure, But Regardless, She Has Sufficiently Pled Actual Malice

While Dr. Monge wholeheartedly disagrees that – with respect to the facts alleged in her Second Amended Complaint – she is a limited purpose public figure, she has nevertheless pled facts sufficient to establish the Media Defendants' actual malice by clear and convincing evidence. *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020) (*citing N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

It is fundamental to the law in Pennsylvania that the subjective state of actual malice may be proven by and inferred from objective circumstantial evidence. *See, e.g., Sprague v. Walter*, 656 A.2d 890, 907 (Pa. Super. 1995), *appeal denied*, 670 A.2d 142 (Pa. 1996) ("[a]ny competent evidence can be used to establish actual malice") (*citing Herbert v. Lando*, 441 U.S. 153, 164 n. 12 (1970)). In fact, "'[a]ll the relevant circumstances surrounding the transaction may be shown,' including, *inter alia* 'ill will or hostility between the parties.'" *Id.*; *see also Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C. Cir. 1987) (a libel plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence); *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1089-90 (3d Cir. 1988) ("[a] plaintiff may 'rarely be successful in proving awareness of falsehood from the mouth of the defendant himself.'") (*citing Herbert*, 441 U.S. at 170).

Accordingly, objective circumstantial evidence can suffice to demonstrate actual malice, and the forms of circumstantial evidence that may be used are broad. To that point:

> The defendant in a defamation action brought by a public official **cannot**, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *see also Moore v. Vislosky*, 240 Fed.Appx. 457, 468 (3d Cir. 2007) (*quoting Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 184 (2d Cir. 2000) (*quoting Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)) ("Actual malice can be shown '[t]hrough the defendant's own actions, or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence."). Thus, although a mere failure to investigate before publishing a defamatory statement will not establish actual malice, "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 668 (1989). Recklessness may be found, for example, "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 688 (*quoting St. Amant*, 390 U.S. at 732); *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1089 (3d Cir. 1985) (same); *see also Schiavone*, 847 F.2d at 1090 ("where the defendant finds internal inconsistencies or apparently reliable information that contradicts its libelous assertions, but nevertheless publishes those statements anyway, the *New York Times* actual malice standard can

be met"); *Franklin Prescriptions Inc. v. The New York Times Co.*, 267 F.Supp.2d 425, 438 (E.D. Pa. 2003) (same). Plaintiff has adequately pled actual malice in the Second Amended Complaint.

In their Motion to Dismiss, the Media Defendants isolate one single paragraph of Dr. Monge's Second Amended Complaint, stating that the paragraph is insufficient to plead actual malice because the actual malice is not "brought home" to each individual defendant and a failure to investigate based on increased profits is not enough to constitute actual malice. *See* Media Defendants' Memorandum of Law, at p. 17-20. But Dr. Monge's amended complaint must be read as a whole, and its averments and inferences reasonably drawn therefrom must be viewed in the light most favorable to her, and the Media Defendants ignore the other, individualized paragraphs in Plaintiff's Complaint that show actual malice. Specifically, Dr. Monge alleged in extensive detail the grudge harbored by Dr. Monge's former students, Defendants, Mitchell and Kasutto, their retaliatory scheme to create a defamatory "Cancel Culture" movement, and the fact that they provided false information that the Media Defendants used to publish their stories. Although "[m]ere proof, without more, cannot establish reckless disregard for the truth," recklessness may be found, "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974); *Harte-Hanks Communications*,491 U.S. at 688. When the Media Defendants received the false and defamatory information regarding Dr. Monge, there were obvious reasons to doubt its veracity given that Dr. Monge had never been charged with any professional misconduct in her decades of service as an anthropologist, and the information came directly from two scorned former students seeking retribution against her. At that time, the Media Defendants should have been aware of the flawed source for their articles, yet they buried their head in the sand. They each relied entirely on the fraudulent assertions made by the other defendants without doing any type of investigation to back

them up, despite clear reasons to conduct one. Instead, they published the article, which falsely implied racist-fueled professional misconduct on Dr. Monge's part for the sole purpose of tearing her down.

Accordingly, Dr. Monge has adequately pled enough circumstantial facts to show actual malice, and her claims cannot be dismissed for this reason.

### C.  The Challenged Statements Are Actionable

#### i.  The Media Defendants' Statements That Imply She Is A Racist Are Actionable Opinions

The Media Defendants first argue that Plaintiff's Second Amended Complaint must be dismissed against them because the statements are pure opinions based on disclosed facts and simply calling a person a racist is not enough to be defamatory. *See* Media Defendants' Memorandum of Law, at p. 21 (*citing Reilly v. WNEP*, 2021 WL 1017154, at *6 (Pa. Super. Ct. Mar. 17, 2021) ("What one person may view as racist may be acceptable to others as healthy socio-political debate.")).

First, although "[i]t is true that opinion, without more, does not create a cause of action in libel," this does not mean there is "a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Valjet v. Wal-Mart*, 2007 WL 4323377 (E.D. Pa. Dec. 11, 2007); *Petula v. Mellody*, 588 A.2d 103 (Pa. Cmwlth. 1991). Expressions of opinion may often imply an assertion of objective fact, and thus, "[a] defamatory communication may [sic] consist of a statement in the form of an opinion and is actionable if it implies an allegation of undisclosed defamatory facts as the basis therefore." *Id.* As discussed below, the Media Defendants' statements, although they characterize them as opinions, create false implications that Dr. Monge committed racially motivated, and potentially criminal, professional misconduct. Such implications constitute defamation per se, and thus, Dr. Monge's claims should not be dismissed.

Moreover, to the extent the Media Defendants rely on the fact that calling someone a racist is not defamatory, such an argument ignores the fact that courts, including this one, have held that calling someone racist is defamatory when it implies that the person is not capable of doing their job. *See Puchalski v. School Dist. of Springfield*, 161 F.Supp.2d 395, 408 (E.D. Pa. 2001); *MacElree v. Philadelphia Newspapers, Inc.*, 674 A.2d 1050, 1054 (1996). That is precisely what happened in this case: the Media Defendants defamatorily implied that Dr. Monge is a racist that could not be trusted, and thus is incompetent at her job.

### ii.   The Media Defendants That Imply Dr. Monge Acted Unprofessionally and Unethically Are Actionable

As discussed above, it is well settled in Pennsylvania that statements imputing criminal activity or character that adversely affects fitness for a person's profession are defamatory *per se*, and a finding of defamation *per se* is especially appropriate if "the particular quality disparaged … is peculiarly valuable in the plaintiff's business and profession." *Clemente v. Espinosa*, 749 F.Supp. 672, 677-78 (E.D. Pa. 1990); *Cornell Cos. v. Borough of New Morgan*, 512 F.Supp.2d 238, 271 (E.D. Pa. 2007); *see also*, *Franklin Prescriptions, Inc. v. New York Times Co.*, 2004 WL 1770296, at *8 (E.D. Pa. Aug. 5, 2004). But they cannot escape the fact that their repeated accusations of professional misconduct and unethical handling of human remains go directly to Dr. Monge's profession as a Professor of Anthropology, Curator, and Forensic Anthropologist, thus making them defamatory by law. The fact that the Media Defendants claim they are opinions does not save them, as they are mixed opinions that imply criminal and professional misconduct on Dr. Monge's behalf.

Contrary to the Media Defendants' assertions, the implications in their articles that Dr. Monge is unprofessional and unethical cannot constitute opinions since it has already been "prov[en] as false" that she committed no professional misconduct. *Northstein v. USA Cycling*,

499 F.Supp.3d 101, 124 (E.D. Pa. 2020).[2] But even if this Court were to consider it an opinion, it must be considered a mixed opinion because the article, when read as a whole, implies that Dr. Monge is a racist improperly using the bones of an unknown Black adult for her own benefit. Not only does this imply serious professional misconduct warranting dismissal from her profession, but it also labels her a "racist" that has no place in the field in which she worked her entire life. Even further, since the ethical handling of remains is at the heart of every anthropologist's job, the Media Defendants have disparaged a quality "peculiarly valuable" in Dr. Monge's profession, which means that the statements are defamatory *per se*. *Clemente*, 749 F.Supp. at 677-78. Accordingly, given the multitude of defamatory implications in these purported "opinions," it is clear that they are actionable mixed opinions, and Dr. Monge's defamation by implication claims should not be dismissed.

### D. Plaintiff Has Adequately Stated A Claim For False Light

As previously noted, Dr. Monge is not required to demonstrate that the statements complained of did not involve matters of public concern in order to prevail with respect to her false light invasion of privacy claim. Rather, she must simply show that the false light in which she was placed would be "highly offensive to a reasonable person" and that Moving Defendants "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652E. Moreover, she can show such falsity "by showing that a defendant selectively printed out or broadcast true statements or pictures in a manner which created [a] false impression," and it clear that accusing an individual of being a "racist" could be found to be highly offensive to a reasonable person.

---

[2] In fact, as alleged in the Amended Complaint, three separate independent investigations conducted on the handling of the unidentified remains have cleared Dr. Monge of having violated any professional, ethical, or legal standards.

*Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014). *See McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352, 358 (3d Cir. 2020).

The Second Amended Complaint alleges that Mitchell and Kasutto engaged in a spiteful, retaliatory, and defamatory smear campaign against Dr. Monge after she reported Mitchell for severe professional misconduct. Prior to their relationship souring, Dr. Monge had been nothing but supportive of both Mitchell and Kasutto, assisting them in matriculating at Penn and acting as their mentor. As such, Mitchell and Kasutto were fully aware that Dr. Monge cared about her work, followed all forensic best practices, and respected every set of remains she encountered. Despite this knowledge, they spearheaded a "Cancel Culture" movement against Dr. Monge, declaring she harbors racist animus against persons of African descent. Mitchell then came to Moving Defendants to assist them with the writing of articles that would increase the publicity of Kassutto's and his false and defamatory allegations. At that time, Moving Defendants should have been aware of the flawed source for their article and the unreliable information they were being provided, but they did nothing to verify his false claims. Instead, they "selectively printed out or broadcast true statements or pictures in a manner which created [a] false impression" that Dr. Monge is a racist. *Graboff*, 744 F.3d at 136.

It is clear that being called a racist and having your ethics and professional abilities called into question, as the Moving Defendants' defamatory articlea did to Dr. Monge, would be "highly offensive to a reasonable person," and thus Dr. Monge has adequately plead a cause of action for False Light, and those claims must not be dismissed.

### E.       Plaintiff Has Adequately Stated A Claim For Civil Aiding And Abetting

As discussed above, Dr. Monge has adequately pled a claim for civil aiding and abetting by alleging that the Defendants aided and abetted others to defame Dr. Monge by publishing

broadly read articles that supported the defamation initially started by Mitchell and Kasutto and continued by the other Defendants in the media. A defendant will be found liable for the tortious conduct of another if he or she gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. Restatement (Second) of Torts § 876(c). On a Motion to Dismiss, the burden on the Plaintiff is not heavy, and all that Plaintiff is required to show is the identities of the wrongdoers and those who acted in concert. Plaintiff has done so here.

Plaintiff's Second Amended Complaint identifies all of the wrongdoers and principal players in Defendants' falsified "Cancel Culture" Movement, and it further adequately alleges that they each hopped onto that movement by publishing their own defamatory stories despite the fact that the sole source of information for those stories was a scorned former student of Dr. Monge with a grudge against her. Despite being put on notice that their source was flimsy at best and a blatant liar at worst, the Defendants conducted no investigations as to the allegations made by Mitchell and the other Defendants' articles, nor did they care to do so. Rather, they were determined to assist in amplifying Mitchell's "Cancel Culture" movement against Dr. Monge, and they did so by publishing their own knowingly false stories to lend legitimacy to the false narrative being pushed and allowing that false narrative to be read by a much wider audience. It has thus adequately plead a civil aiding and abetting claim, and that claim should not be dismissed.

## V. <u>CONCLUSION</u>

For any and all of the foregoing reasons, Plaintiff, Janet Monge, respectfully requests that the Court to deny the Media Defendants' Motion to Dismiss with prejudice.

Respectfully Submitted,

**SPECTOR GADON ROSEN VINCI P.C.**

By: /s/ *Alan Epstein*

Alan B. Epstein, Esquire (Pa. I.D. No. 2346)
Adam Filbert, Esquire
*Attorneys for Plaintiff*

Dated:  September 27, 2023