**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANET MONGE, | : |
|                  Plaintiff | :   CIVIL ACTION |
| v. | :   No. 2:22-CV-02942-GEKP |
| UNIVERSITY OF PENNSYLVANIA, *et al.* | : |
|                  Defendant | : |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CHRISTOPHER WOODS AND KATHLEEN MORRISON'S MOTION TO DISMISS
<u>PLAINTIFF'S SECOND AMENDED COMPLAINT</u>**

**SPECTOR GADON ROSEN VINCI P.C.**
By: Alan B. Epstein (Pa. I.D. No. 02346)
    Adam A. Filbert (Pa. I.D. No. 330960)
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8832 / (215) 531-9103 (Fax)
aepstein@sgrvlaw.com                                       *Attorneys for Plaintiff, Janet Monge*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................i

I.     INTRODUCTION ............................................................................................................. 1

II.    STATEMENT OF THE CASE ......................................................................................... 1

       A.    PROCEDURAL HISTORY.................................................................................. 1

       B.    STATEMENT OF FACTS ................................................................................... 2

             1. OVERVIEW ..................................................................................................... 2

             2. STATEMENT OF MATERIAL FACTS AS RELATED TO MOVING
                DEFENDANTS .............................................................................................. 11

III.   STATEMENT OF CONTROLLING LEGAL PRINCIPALS ........................................ 12

       A.    APPLICABLE STANDARDS GOVERNING A MOTION TO DISMISS ..... 12

       B.    CIVIL AIDING AND ABETTING .................................................................... 13

IV.    DISCUSSION ................................................................................................................. 14

       A.    THE LAW OF THE CASE DOCTRINE DOES NOT PRECLUDE PLAINTIFF'S
             SECOND AMENDED COMPLAINT ............................................................... 14

       B.    PLAINTIFF HAS ADEQUATELY STATED A CLAIM FOR CIVIL AIDING AND
             ABETTING ......................................................................................................... 15

V.     CONCLUSION ............................................................................................................... 17

**TABLE OF AUTHORITIES**

**Cases**

Aamco Automatic Transmissions, Inc. v. Tayloe, 368 F.Supp. 1283, 1286-87 (3d Cir. 1973) ... 13

Arizona v. California, 460 U.S. 604, 618 (1983) ....................................................................... 15

Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) ................................................................... 12, 13

Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 555 (2007) ........................................ 12, 13

Christianson v. Colt Indus. Operating Co., 486 U.S. 800, 816 (1988) ....................................... 15

Gould Elecs. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) ............................................... 13

In re Pharmacy Benefit Managers Antitrust Litig., 582 F.3d 432, 439 (3d Cir. 2009) ................. 15

Lopez v. Beard, 333 Fed. Appx. 685, 687 (3d Cir. 2009) ............................................................ 13

Oshiver v. Levin, Fishbein, Cedrone and Berman, 38 F.3d 1380, 1384 (3d Cir. 1994) ............... 12

Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008) ....................................... 12, 13

Pub. Interest Research Group of NJ, Inc. v. Magnesium Elektron, 123 F.3d 111, 116 (3d Cir. 1997) ................................................................................................................................. 15

Sovereign Bank v. Valentino, 2006 Pa. Super. 338 (2006) ..................................................... 13, 14

Swietlowich v. County of Bucks, 610 F.2d 1157, 1164 (3d Cir. 1979) ....................................... 15

**STATUTES**

28 U.S.C. § 1442(a)(1) .................................................................................................................... 1

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(6) ......................................................................... 14, 15, 16

Restatement (Second) of Torts § 875 ........................................................................................... 14

Restatement (Second) of Torts § 876 ...................................................................................... 13, 15

Plaintiff, Janet Monge, by her undersigned attorneys, respectfully submit the following Memorandum of Law in Opposition to the Motion to Dismiss filed by Defendants, Christopher Woods and Kathleen Morrison ("Moving Defendants").

## I. **INTRODUCTION**

The Moving Defendants have filed a broadly targeted Motion to Dismiss all Counts of the Complaint filed by Plaintiff Janet Monge ("Dr. Monge") averring that it is not liable to Plaintiff because Plaintiff has failed to include the factual allegations necessary to plead an aiding and abetting claim against them. As set forth below, it is respectfully asserted that this suggestion is without factual or legal merit, and therefore, the Motion to Dismiss Plaintiffs claims against Moving Defendants must be denied.

## II. **STATEMENT OF THE CASE**

### A. **Procedural History**

Dr. Monge commenced this action on April 20, 2022 by filing a Praecipe to Issue a writ of Summons in the Philadelphia Court of Common Pleas. On May 20, 2022, Dr. Monge filed her Complaint, and then an Amended Complaint on June 22, 2022, adding the American Anthropological Association and removing The Association of Black Anthropologists and the Smithsonian Magazine as Defendants. The Amended Complaints brought the following causes of action against the Defendants: (1) defamation (Count I), (2) defamation by implication (Count II), (3) false light (Count III), and (4) civil aiding and abetting (Count IV).

On July 27, 2022, Defendant Nora McGreevy filed a Notice of Removal of the action to Federal Court under 28 U.S.C. § 1442(a)(1), bringing the action to this Court. Between August 4, 2022 and August 12, 2022, all of the defendants filed Motions to Dismiss Plaintiff's First Amended Complaint. From January 23, 2023 to June 28, 2023, the Court issued Orders granting the

defendants' Motions to Dismiss, dismissing some of Plaintiff's claims with prejudice and allowing Plaintiff leave to amend her other claims. Plaintiff filed her Second Amended Complaint on July 28, 2023, which cured the deficiencies found by the Court in its various opinions on the Motions to Dismiss. The Media Defendants filed the instant motion to dismiss a month later, on August 28, 2023.

**B.     Statement of Facts**

   1. **Overview**

On May 13, 1985, the Philadelphia Police Department dropped an aerial explosive firebomb on the home of its own citizens, and that destruction was further exacerbated when the Philadelphia Police and Fire Commissioners let the resulting fire burn for several hours rather than extinguishing it. *See* Plaintiff's Second Amended Complaint, attached hereto as Exhibit "A," at ¶ 73-74. The incident ultimately resulted in the deaths of eleven (11) people, including five (5) children. *Id.* at ¶ 75.

From the beginning, the forensic processing of the bomb site was a disaster. *Id.* at ¶ 77-78. The Philadelphia Medical Examiner's Office refused to assist in the processing until the first body was discovered the day after the bombing had occurred, and by the time they had arrived, the City had already begun breaking down the bombsite with construction equipment, severely damaging any human remains located there. *Id.* at ¶ 78. On top of the lack of care in moving the human remains, there was also a complete lack of any systematic procedure for recording evidence, no proper control of the physical remains of the dead, and none of the appropriate evidentiary tests were taken. *Id.* at ¶ 79-80. The City's failure to adequately process the bomb site made it nearly impossible to identify the victims of the bombing, at least not without outside help. *Id.*

Facing such an uphill battle, Philadelphia's then Chief Medical Examiner, Dr. Marvin Aronson, invited Dr. Alan Mann, professor in the Department of Anthropology at the University of Pennsylvania with expertise in identifying small bone fragments, to assist with the investigation. Plaintiff's Second Amended Complaint, at ¶ 82. When he arrived, Dr. Mann brought along his mentee, Dr. Monge, who he had tasked with assisting him in his analysis of the remains found at the bomb site. *Id.* at ¶ 83.

After examining the remains, Drs. Mann and Monge concluded that a pelvis bone and proximal femur bone fragments could not possibly belong to a person of the ages of the individuals presumed to have died in the bombing. *Id.* at ¶ 84-85. This conclusion was based on the fact that the bones analyzed by Drs. Mann and Monge could only have belonged to a young adult female, likely between the ages of 17 and 21. *Id.* at ¶ 86. But the oldest child known to be in the MOVE house was a 14-year-old girl named Katricia (Tree) Africa, so these bone fragments were found to be unaffiliated with any of the known MOVE victims and thereafter referred to as Jane Doe. *Id.* at ¶ 86-87.

After an outside pathology group appointed by the MOVE Commission issued its own, flawed report associating the Jane Doe pelvis and femur fragments with Katricia "Tree Africa" Dodson, Dr. Mann conducted a second investigation and issued his own report reaffirming Dr. Monge's and his conclusion that the pelvis and proximal femur fragments could not have belonged to Katricia. *See* Plaintiff's Second Amended Complaint, at ¶ 88-91.

Dr. Mann confirmed his conclusions with other forensic anthropologists, and thereafter, the Philadelphia Medical Examiner's Office retained the responsibility and authority of identifying the unidentified human bone fragments. *Id.* at ¶ 91-92. On December 14, 1985, the remains conclusively identified as belonging to Katricia Africa were buried after their release to Hankins

3

Funeral Home, and the pelvis and proximal femur bone fragments that could not be conclusively identified as relating to any of the known MOVE victims, including Katricia (the "unidentified fragments") were released to Dr. Mann for further investigation at his office at the Penn Museum. *Id.* at ¶ 93.

From 1986 to 2001, Dr. Mann stored the unidentified fragments in the physical anthropology section of the Penn Museum in strict compliance with standard forensic practices. *Id.* at ¶ 94. During this time, Dr. Monge sought out contact with one of the surviving MOVE members, Ramona Africa, with the hope of gaining her assistance in ascertaining the identity of the older woman whose bone fragments had been safely retained in appropriate storage at the museum. But Ramona Africa declined to speak with Dr. Monge. *Id.* at ¶ 95.

In 2001, Dr. Mann left Penn to join the Anthropology Department at Princeton University as a full-time faculty member, and Dr. Monge continued to assist him with his courses at Princeton the same way she did at Penn. *Id.* at ¶ 96. However, Dr. Monge remained at Penn, and the unidentified bone fragments remained in safe storage at the Penn Museum due to Penn's superior facilities for forensic analysis. *See* Plaintiff's Amended Complaint, at ¶ 98.

From 2001 to 2015 (the latter date when Dr. Mann retired from teaching), Dr. Monge brought the unidentified fragments to Princeton's campus for further investigation between two and five times, largely for the purpose of having other anthropologists who were visiting Princeton to review them. *Id.* at 99. Such transfers were conducted in strict accordance with chain of custody protocols and promptly returned to safe storage at the Penn Museum afterwards. *Id.* There was never a time where the unidentified fragments were not well-protected or safely stored. *Id.*

In 2014, the Penn Museum renovated its physical anthropology lab, providing Dr. Monge with the lates scientific technologies and capabilities for identifying bone fragments. *Id.* at ¶ 100.

So, Dr. Monge began working with a geneticist from another leading research university on a number of research projects, and the two discussed the possibility of using then just recently developed DNA analysis that permitted bone fragments to be identified with relatives. *Id.* at ¶ 101. The DNA analysis would have required a DNA sample from a relative of Katricia to show there was no relationship between the unidentified fragments and Katricia, but rather that the fragments were from another, older female. *Id.* at ¶ 102. Dr. Monge sought out to contact the MOVE family to ask for a sample of her DNA through a local writer, Malcom Burnley ("Burnley"), but there was no meaningful conversations with them, and Dr. Monge was forced to label the case "cold" after failing to get a DNA sample. *Id.* at ¶ 102-103. Burnley reached out to restart the investigation four years later, but Dr. Monge ultimately declared an end to the efforts after they determined they would not be able to secure any help from the MOVE members despite several attempts. *Id.* at ¶ 104-105.

In 2017 and 2018, Dr. Monge was approached by Dr. Carolyn Rouse, the Chair of Princeton University's Anthropology Department, where Dr. Monge had been teaching as an visiting professor, regarding the creation of an online course on Forensic Anthropology with Dr. Jeffrey Himpele, another Princeton anthropology professor. *See* Plaintiff's Second Amended Complaint, at ¶ 107. In furtherance of that effort in 2019, a discussion ensued regarding the use of the unidentified fragments – which had already been declared a "cold" case – to address the difficulties anthropologists face when identifying remains. *Id.* at ¶ 108.

The discussions between Drs. Rouse, Hempele, and Monge ultimately resolved in an online course titled, "Real Bones: Adventures in Forensic Anthropology, which was published on the Coursera online platform. *Id.* at ¶ 109. Coursera is an online platform that works with universities and other institutions to create online courses and certificate programs in a wide array of subjects.

5

*Id.* at ¶ 110. The courses are not mass-broadcasted to large audiences, but rather, any individual interested in a course's content must first sign up for a Coursera account and specifically enroll in that course. *Id.* Coursera does not pay its course-creating partners any money, and Dr. Monge did not profit in any way from the production of "Real Bones: Adventures in Forensic Anthropology." *Id.*

The course was designed to discuss forensic anthropology using real world examples, with an overall purpose of teaching how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains. *Id.* at ¶ 111. The one and only time the unidentified remains were displayed in the course occurred in the ninth class, titled "MOVE – An Analysis of the Remains." *Id.* at ¶ 113. In that 14-minute class, Dr. Monge can be seen in the Penn Museum's lab with one of her students and the unidentified bone fragments comparing those fragments to other similar bone fragments and models and explaining how forensic techniques could be used to determine the age of the remains. *See* Plaintiff's Second Amended Complaint, at ¶ 113. At all times during the video, both Dr. Monge and her student properly, scientifically, and discreetly handled the remains, utilizing rubber gloves to ensure that there would be no outside contamination. *Id.* at ¶ 114. The lesson's discussion involved only the process utilized in providing the age estimate of the person from whom the fragments originated with Dr. Monge explaining that, despite her diligence, the human source of the fragments had never been identified. *Id.* at ¶ 115.

"Real Bones: Adventures in Forensic Anthropology" was published in August 2020 and available for almost a year without any controversy or complaint. *Id.* at ¶ 116. During that timeframe, it was viewed by a very limited audience – 450 academic-minded individuals seeking to learn more about forensic anthropology. *Id.* It was never broadcast to the public at large. *Id.* at

6

¶ 117. But then, Defendant, Paul Mitchell's ("Mitchell"), deliberate, retaliatory, and self-elevating smear campaign against Dr. Monge made the matter a public controversy causing Coursera to shut it down. *Id.*

Dr. Monge had known Mitchell since he was an undergraduate and master's student at the University of Pennsylvania from 2009-2014. *Id.* at ¶ 118. In fact, throughout his tenure at Penn, Mitchell took several courses from Dr. Monge, and she was the advisor on his master's thesis. *Id.* at ¶ 119. Dr. Monge even helped Mitchell return to Penn for his PhD after he had initially enrolled in a doctoral program at the University of California Berkely but was dismissed that program for professional misconduct. *Id.* at ¶ 120-121.

But when Mitchell returned to Penn for his PhD, things were different. He began engaging in severe misconduct by, inter alia: (a) defacing Penn Museum lab books; (b) tearing pages from the equipment used to catalogue entries for the lab's micro-CT scanner; (c) engaging in published plagiarism; (d) improperly accessing the lab with his friends to inappropriately explore with them the bones and bone fragments stored at the lab for educational purposes; (e) illegally duplicating the keys to Dr. Monge's office space and adjacent storage spaces and using his unlawful access to remove certain stored remains, including but not limited to the remains of famous Chicago serial killer, H.H. Holmes; and (f) stealing DNA samples and other forensic materials without authorization. *See* Plaintiff's Second Amended Complaint, at ¶ 123. Upon discovering Mitchell's misconduct, she reported his unlawful and disturbing activities to the Penn Museum Security and Administrators, along with Dr. Kathleen Morrison, Chair of Penn's Anthropology Section. *Id.* at ¶ 124. But despite these well-founded allegations backed by objective evidence, Penn and its administrators took no action to punish Mitchell or deter him from his continued unlawful actions. *Id.*

Instead, Dr. Monge's allegations became the subject of a confrontation by Mitchell of her in the presence of several witnesses in May 2019. *Id.* at ¶ 125. During this confrontation, Mitchell began screaming at Dr. Monge, throwing objects in her direction, slamming his fists down on tables, and threatening Dr. Monge, who became terrified by his comments and actions. *Id.* Dr. Monge once again filed a report with the Museum's Administration, but they did nothing. *Id.* So, fearing for the safety of the equipment and remains she had been tasked with protection – along with her own safety and wellbeing – Dr. Monge changed the locks in the Museum and her lab, and she denied Mitchell any further, unsupervised access to the Physical Anthropology collections at the Penn Museum. *Id.* at ¶ 126. These final actions, although well within Dr. Monge's rights, gave rise to the vengeful, malicious, and defamatory actions that Mitchell took next. *Id.*

Mitchell's vengeful actions began in early April 2021 when he met with Christopher Woods, who had recently been hired as the Director of the Penn Museum, to accuse, without foundation, Dr. Monge of mishandling the unidentified fragments and engaging in other professional misconduct in reference to the issue of the MOVE bombing investigation. *Id.* at ¶ 127. Mitchell further expressed concerns over the Penn Museum's policies on the handling of the remains, including the unidentified bone fragments from the MOVE site, and unfairly and defamatorily accused Dr. Monge of lacking professionalism in connection with the Coursera course. *Id.* Then, fearing his false allegations would not bear the disciplinary result he intended against Dr. Monge, Mitchell instigated the first article regarding the unidentified bone fragments by contacting his then-girlfriend, Defendant Maya Kasutto, a writer for Defendant Billy Penn who harbored her own grudge against Dr. Monge, to discuss his unfounded and untruthful allegations. *Id.* at ¶ 128.

Kasutto was a fellow Penn graduate who initially studied biological anthropology under Dr. Monge, but ultimately received her undergraduate degree in cultural anthropology and creative writing. *Id.* at ¶ 129. Dr. Monge had assisted Kasutto in matriculating at Penn, and she had looked at Dr. Monge as a mentor while a biological anthropology student. *Id.* at ¶ 130. However, their relationship soured when Kasutto left the biological anthropology program, and Dr. Monge was forced to revoke her ability to work with remains in the Physical Anthropology section of the Penn Museum. *Id.*

Aligned against their common target, Kasutto and Mitchell determined they could harm Dr. Monge – while elevating their own careers – by spearheading a "Cancel Culture" movement against Dr. Monge. *Id.* at ¶ 131. To do so, they determined they would declare she harbors racist animus against persons of African descent even though they knew she had spent her entire career seeking to bring respect and humanity to identify remans of persons of all races. *Id.* They also suggested that another of Mitchell's close associates, Defendant, Abdul Aliy-Muhammad, publish his own article insinuating Dr. Monge was racist to lend further credibility to the story. *See* Plaintiff's Second Amended Complaint, at ¶135-137.

On April 21, 2021, the first two of many false and defamatory articles were published by Billy Penn and the Philadelphia Inquirer, falsely asserting that the unidentified bone fragments were the remains of Katricia Africa. *Id.* at ¶ 132-137. But believing that the falsities planted in local Philadelphia news outlets would be too small in scope to punish Dr. Monge enough for the perceived wrongs she had done to him, Mitchell then prepared his own paper on the handling and identify of the remains removed from the MOVE site, arguing without foundation that the remains are indisputably those of Katricia and Delisha Africa and condemning the handling of the remains. *Id.* at ¶ 138. Mitchell widely distributed this paper to Penn employees, MOVE members, and

9

several media outlets with the hopes of lending further credibility to the false stories his associates had published and broadening the reach of his lies against Dr. Monge. *Id.* Mitchell's plan was simple: create a Hobson's choice for Dr. Monge's employer, the University of Pennsylvania, news outlets around the world, and the general public at large – they can either (1) accept Mitchell's false narrative and cast Dr. Monge out as an unethical racist whose work cannot be trusted or (2) investigate the truth behind Mitchell's false narrative and risk being labeled as a racist themselves. *Id.* at ¶ 139. Each of the Defendants chose the former alternative, despite the clear indications that allegations from a scorned former student would likely be false, solely to avoid the latter and risk a loss of readership. *Id.*

Over the next several months, the remaining media Defendants created a firestorm of media coverage of Mitchell's false assertions, continuing to perpetuate the false and defamatory statements and implications of systemic racism created by the initial articles. *Id.* at ¶ 140-145. These articles were written without any investigation being done despite clear indications that Mitchell, a student with a clear grudge against Dr. Monge, would fabricate such claims. *See* Plaintiff's Second Amended Complaint, at ¶ 161, 176. Indeed, the facts of the matter showed that Dr. Monge had always treated all remains in her possession during her career with the utmost care and respect. *Id.* at ¶ 155. But the Defendants sensed the start of a viral social justice movement (albeit one based on false and malicious truths pushed by a supposed enemy of Dr. Monge), and they quickly jumped on to expand the reach of Mitchell's false reality and assist him in pushing his false narrative. *Id.* at 176.

Even worse, Dr. Monge also found herself attacked by anthropology associations, the University of Pennsylvania, and other faculty members at the University. Dr. Monge had initially assumed that her fellow anthropologists, her employer – Upenn – whose policies and procedures

10

she had always followed, and her fellow faculty members would defend her against lies professed by Mitchell. But they did not; instead, they blindly accepted the allegations of Dr. Monge's scorned former student and republished them as fact to the public. *Id.* at ¶ 146. On April 26, 2021, a collective statement by the Association of Black Anthropologists (ABA), the Society of Black Archaeologists (SBA), and the Black in Bioanthropology Collective (BiBA) was released, which suggested unethical and illegal racially motivated animus and professional misconduct and further requested that Dr. Monge be removed from her position. *Id.* at ¶ 147-148. Then, Defendants Gutmann and Prickett authored an email to employees of the Penn Museum calling Dr. Monge's actions "insensitive, unprofessional, and unacceptable." *Id.* at ¶ 150. A similar statement was sent to the full University of Pennsylvania community. *Id.*

Thereafter, although Dr. Monge had done nothing wrong, she was locked out of her lab and all Physical Anthropology collection storage spaces and was put on a "work pause". *Id.* at ¶ 151. She was then removed from her position as Professor at the University of Pennsylvania and was demoted with a salary reduction of more than $65,000 per year. *Id.* at ¶ 153-154. Accordingly, based entirely upon the false and defamatory statements made by Defendants individually and collectively, Dr. Monge's reputation has been irreparably and wrongfully destroyed, she has been the victim of adverse employment actions, and she has received threatening emails and phone calls, including multiple death threats. *Id.* at ¶ 156.

### 2. Statement of Material Facts As Related to Moving Defendants

Defendant Woods is the Director of the Penn Museum, while Defendant Morrison is the Chair of the Anthropology Department at the University of Pennsylvania. After the first flurry of media coverage, they could have responded by defending Dr. Monge, their loyal employee. Indeed, the University of Pennsylvania has its own internal mechanism for determining whether

faculty research is appropriate – the Institutional Review Board – that could have investigated Dr. Monge's research and cleared her name. But upon information and belief, neither Woods nor Morrison ever contact the Institutional Review Board to review the case. Instead, they chose to lock her out of her lab and all Physical Anthropology collection storage spaces, ultimately placing her on a "work pause" and removing her from teaching any more classes at Penn.

On May 4, 2021, Moving Defendants decided to cancel all of Dr. Monge's summer programs at the Penn Museum, as well as her scheduled high school talks for Penn. And a few months later, in August 2021, they removed Dr. Monge from Penn's Anthropology Department's webpage where it lists "Graduate Group and Affiliated Faculty," and then decided to demote Dr. Monge from adjunct professor and associate curator to museum keeper. This demotion included a salary cut of $65,000 per year for the following two years of Dr. Monge's employment, after which she will be deemed retired.

### III.  STATEMENT OF CONTROLLING LEGAL PRINCIPLES

#### A.  Applicable Standards Governing A Motion to Dismiss

In deciding on a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the Court is required to accept as true all factual allegations in the Complaint and draw any and all inferences derived from those facts in a light most favorable to the Plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). *See also Oshiver v. Levin, Fishbein, Cedrone and Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994). The Complaint is not required to make detailed factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atlantic Corporation v. Twombly*, 550 U.S. 554, 555 (2007). Instead, to state a cognizable claim, a Complaint must only allege "enough 'factual matter' (taken as true) to suggest a required element' and being 'more than mere labels and conclusions, and formulaic recitation of the

elements of a cause of action.'" *Phillips*, 515 F.3d at 234 (*citing Twombly*, 550 U.S. at 556). The movant bears a heavy burden in establishing that the Complaint fails to state a claim upon which relief can be granted. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

Applying the above principles, federal courts will generally engage in a two-step process in evaluating a complaint when reviewing a Motion to Dismiss. *Iqbal*, 556 U.S. at 679. First, the court must identify allegations that are not entitled to the assumption of truth because they are merely conclusions. Second, well pled factual allegations that are assumed to be true are reviewed to determine whether the allegations plausibly give rise to an entitlement to relief. *Id. See also Lopez v. Beard*, 333 Fed. Appx. 685, 687 (3d Cir. 2009). If the Complaint "pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the Complaint should be deemed "plausible on its face" and the motion to dismiss denied. *Twombly*, 550 U.S. at 570. Put another way, a Rule 12(b)(6) motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Aamco Automatic Transmissions, Inc. v. Tayloe*, 368 F.Supp. 1283, 1286-87 (3d Cir. 1973).

**B.     Civil Aiding and Abetting**

In Sovereign Bank v. Valentino, 2006 Pa. Super. 338 (2006), the Pennsylvania Superior Court specifically noted that Pennsylvania has adopted Section 876 of the Restatement (Second) of Torts addressing the tort of civil aiding and abetting, which is also known as concerted tortious conduct:

> **Section 876. Persons Acting in Concert.**
>
> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of

13

> duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) **gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person**.

Restatement (Second) of Torts, § 876 (emphasis supplied).

The Superior Court also affirmed that Pennsylvania has adopted Section 875 of the Restatement (Second) of Torts and that Section 876 is a "specific application" of the rule stated in Section 875. *Sovereign Bank*, 2006 Pa. Super. at 421. Section 875 specifically addresses the liability of contributing tortfeasors:

**Section 875. Contributing Tortfeasors General Rule.**

> Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.

Restatment (Second) of Torts, § 875.

Therefore, like with "agency" or "secondary, indirect liability," Plaintiff's burden against the Defendants herein is not heavy. As noted in *Sovereign Bank*, *supra*, all that Plaintiff is required to show is the identities of the wrongdoers and those who acted in concert. As discussed below, Plaintiff's Amended Complaint not only identifies each person who has wronged her, but it also shows how the articles provided substantial assistance to each of the other Defendants by bolstering the media coverage and notoriety of the story through their additional reporting.

**IV.   DISCUSSION**

    **A.   The Law Of The Case Doctrine Does Not Preclude Plaintiff's Second Amended Complaint**

To the extent the Moving Defendants rely on the Court's previous rulings in support of their Motion to Dismiss, it should be noted as the "law of the case" doctrine is not absolute, and it does not completely prohibit the Court from reassessing Plaintiff's claim against them. Although

the doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," *Christianson v. Colt Indus. Operating Co.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)), the doctrine is discretionary and flexible. Indeed, it "does not restrict a court's power but rather governs its exercise of discretion." *Pub. Interest Research Group of NJ, Inc. v. Magnesium Elektron*, 123 F.3d 111, 116 (3d Cir. 1997); *see also Christianson*, 486 U.S. at 817 (*quoting Arizona*, 460 U.S. at 618 n. 8). Specifically, the doctrine does not prevent a court from "clarifying or correcting an earlier, ambiguous ruling" or from "reconsider[ing] an issues … whenever it appears that a previous ruling, even if unambiguous, might lead to an unjust result." *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432 439 (3d Cir. 2009) (*quoting Swietlowich v. County of Bucks*, 610 F.2d 1157, 1164 (3d Cir. 1979)). Accordingly, there is no bar to re-examination of the issues presented by the Moving Defendants' Motion to Dismiss. This is especially true here, as since, as discussed below, it would assist in clarifying earlier ambiguous Orders and the Court explicitly granted Plaintiff a right to replead her claims in relation to those issues, and thus, to deny Plaintiff the opportunity to present her claims now would be manifestly unjust.

        **B.**      **Plaintiff Has Adequately Stated A Claim For Civil Aiding And Abetting**

As discussed above, a defendant will be found liable for the tortious conduct of another if he or she knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. Restatement (Second) of Torts § 876(b). On a Motion to Dismiss, the burden on the Plaintiff is not heavy, and all that Plaintiff is required to show is the identities of the wrongdoers and those acted in concert. Plaintiff has done so here.

15

Here, the Moving Defendants had to have been aware of Dr. Monge's stellar record as an employee and anthropologist who followed all the accepted best practices because they were overseeing all of her work. Thus, when the other defendants published their false and defamatory articles implying Dr. Monge was a racist who committed professional misconduct, the Moving Defendants knew those claims were false. And even if they didn't, they had a way of investigating such claims – the Institutional Review Board. But despite knowing Dr. Monge had always been an upstanding employee and anthropologist, the Moving Defendants never contacted the review board to investigate, instead deciding to stoke the flames of the false allegations against Dr. Monge by enacting adverse employment actions against her. The Moving Defendants locked Dr. Monge out of her lab and all Physical Anthropology collection storage spaces at the Penn Museum, placed her on a work pause, and ultimately removed her from teaching any more classes at Penn. Shortly, thereafter, they removed Dr. Monge from Penn's Anthropology Department's webpage where it lists "Graduate Group and Affiliated Faculty," and then decided to demote Dr. Monge from adjunct professor and associate curator to museum keeper. This demotion included a salary cut of $65,000 per year for the following two years of Dr. Monge's employment, after which she will be deemed retired. In conducting these actions, the Moving Defendants provided substantial assistance to the other defendants by lending credibility to their claims of racism and professional misconduct, as well as by "punishing" Dr. Monge with a loss of her job and financial resources as the remaining defendants intended.

Given these detailed allegations in Plaintiff's Second Amended Complaint, Dr. Monge has sufficiently alleged a claim of civil aiding and abetting, and that claim should not be dismissed.

## V. CONCLUSION

For any and all of the foregoing reasons, Plaintiff, Janet Monge, respectfully requests that the Court to deny Defendants' Motion to Dismiss with prejudice.

Respectfully Submitted,

**SPECTOR GADON ROSEN VINCI P.C.**

By: /s/ *Alan Epstein*
Alan B. Epstein, Esquire (Pa. I.D. No. 2346)
Adam Filbert, Esquire
*Attorneys for Plaintiff*

Dated: September 27, 2023