**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JANET MONGE,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **UNIVERSITY OF PENNSYLVANIA** *et al.*, | : | |
| *Defendants* | : | **No. 22-2942** |

**M E M O R A N D U M**

PRATTER, J.                                                                    MAY 14, 2024

In *The Canceling of the American Mind*, Greg Lukianoff and Rikki Schlott argue that the "modern era of Cancel Culture" began in 2014 and continues to the present. Greg Lukianoff & Rikki Schlott, The Canceling of the American Mind 27 (Simon & Shuster 2023). From 2014 to mid-2023, the authors argue that there were "more than 1,000 attempts to get professors fired, punished, or otherwise silenced." *Id.* at 26. Of those, two-thirds of cases were successful in that they led to "consequences from investigation to termination." *Id.* at 26-27. The authors argue that the sheer number of professors being fired is "truly unprecedented" and has not "been seen since the Supreme Court first established First Amendment protections of academic freedom and campus speech." *Id.* at 27. According to the authors, "more professors have been terminated during the era of Cancel Culture than in the era of McCarthyism[.]" *Id.* at 59.

Enter Dr. Janet Monge, who spent much of her academic career working for the University of Pennsylvania in Philadelphia. Dr. Monge alleges that she is one of the numerous professors who has been a victim of the modern era of Cancel Culture. Dr. Monge brings defamation, defamation by implication, false light, and civil aiding and abetting claims against, among others, the University of Pennsylvania, former Penn President Dr. Amy Gutmann, and former Penn Provost

1

Dr. Wendell Pritchett ("Penn Defendants") for statements that they made regarding Dr. Monge's role as an anthropology professor when she used bone fragments and unidentified remains of victims of the 1985 MOVE bombing in an online anthropology course. The Court previously granted the Penn Defendants' motion to dismiss, though provided Dr. Monge the opportunity to amend her complaint to cure the deficiencies outlined in the Court's previous Order and Opinion. Addressing only the motions to dismiss of Penn, Dr. Gutmann, and Dr. Pritchett, the Court finds that Dr. Monge, in her Second Amended Complaint, has plausibly alleged all claims against the Penn Defendants, and denies their Motions to Dismiss.

FACTUAL BACKGROUND

## I.   The MOVE Organization and the 1985 MOVE Bombing

The "Christian Action Life Movement," later known as the MOVE family, was founded in 1972 by Vincent Leaphart. All MOVE family members changed their surname to "Africa" as a way to pay homage to the continent. The MOVE family was "a family of strong, serious, deeply committed revolutionaries" who rejected modern technology, medicine, cooked and processed foods, and conventional social norms.

In 1983, the Philadelphia MOVE members resided at 6221 Osage Avenue in a predominantly Black neighborhood in Cobbs Creek, Philadelphia. MOVE members and their neighbors began to come into conflict, with several neighbors complaining to the Philadelphia police and then-Philadelphia Mayor Wilson Goode, with the police having other existing conflicts with the organization. During the morning of May 13, 1985, the Philadelphia Police Commissioner announced over a bullhorn that four people inside the MOVE residence had 15 minutes to surrender to police authorities who had a warrant for their arrest. The MOVE members refused to leave, leading to the police firing over 10,000 rounds of live ammunition into the MOVE residence and firing high-pressured water, tear gas, and smoke projectiles.

Later that afternoon, at approximately 3:45 p.m., Mayor Goode announced that the City would seize control of the MOVE residence by "any means necessary." Less than two hours later, the police dropped an aerial bomb via helicopter on the MOVE residence. The Philadelphia Police and Fire Commissioners allowed the residence to burn for several hours before extinguishing it, which led to the fire spreading to other houses on the block. Eleven MOVE members were killed, presumably six adults and five children.

After the MOVE bombing, the City began removing debris from and processing the site, though did so in an inappropriate way that damaged the remains of those who perished in the MOVE bombing. In light of the City's failure, its then-Chief Medical Examiner, Dr. Marvin Aronson, invited Dr. Alan Mann, a professor in the Department of Anthropology at the University of Pennsylvania, to assist in identifying those killed during the MOVE bombing. Dr. Mann's doctoral student at the time was Dr. Janet Monge.

## II.     Dr. Monge and the Bone Fragment Remains from the MOVE Bombing

During Dr. Mann's and Dr. Monge's investigation, they came across remains that they believed may not have been affiliated with any of the known MOVE victims and thus began referring to those remains as belonging to Jane Doe. The City worried about its own liability if the bombing killed neighbors unrelated to the incident and appointed a MOVE Commission to investigate the bombing and excavate the area. The MOVE Commission issued a report in which it claimed that the remains belonged to MOVE member 14-year-old Katricia "Tree" Africa, though Dr. Mann issued a later report in which he reaffirmed that he and Dr. Monge believed that the bone fragments instead belonged to a Jane Doe. Because of the conflicting reports, the Philadelphia Medical Examiner's Office permitted Dr. Mann to continue analyzing the bone fragments with Dr. Monge's assistance at his lab at the University of Pennsylvania Museum of Archaeology and Anthropology, or, more simply, the Penn Museum.

The bones were stored in Dr. Mann's Office in the Penn Museum from 1986 to 2001. In 2001, Dr. Mann left the University of Pennsylvania to join Princeton University, and Dr. Monge then became in charge of storing the bones at the Penn Museum, though she also assisted Dr. Mann in teaching his courses at Princeton. From 2001 to 2015, Dr. Monge brought the bone fragments to Princeton's campus between two and five times to further investigate their source before Dr. Mann retired in 2015. Dr. Monge alleges that the bone fragments were always well-protected and safely stored during these transportations.

Dr. Monge discussed using new technologies, such as DNA analysis, to identify the bones starting in 2014 with another anthropologist. Dr. Monge attempted to retrieve a DNA sample from one of Katricia Africa's relatives to test whether the bones in fact belonged to her, though Dr. Monge was unable to do so. Dr. Monge concluded that she would not receive help from the MOVE family members, and, because she needed the DNA sample to perform the requisite analysis, considered the case cold.

### III.    Dr. Monge's Coursera Course, Paul Mitchell, and the Ensuing Controversy

In August 2020, Dr. Monge published a course titled "Real Bones: Adventures in Forensic Anthropology" on Coursera, an online platform that partners with universities and other organizations to provide online courses on myriad subjects. In one of the classes, Dr. Monge works with one of her students in the Penn Museum. The bone remains are shown during the class, and Dr. Monge and her student compare those bones to other similar bone fragments for comparison. In the video, Dr. Monge describes the bones as "juicy" and "greasy," which are anthropological terms of art. Dr. Monge alleges that she and her student "properly, scientifically, and discreetly handled the remains, utilizing rubber gloves and observing all appropriate protocols" in the video. Dr. Monge alleges that the course only became a matter of public controversy when Paul Mitchell "began his deliberate, retaliatory, and self-elevating smear campaign" against her.

Dr. Monge first met Mr. Mitchell in 2009 when he was an undergraduate student in the Penn Anthropology Department. Mr. Mitchell took several of Dr. Monge's classes, and she advised his master's thesis, though after Mr. Mitchell enrolled in his doctoral program at another school, he was allegedly accused of plagiarism and was consequently removed from the program. Mr. Mitchell then contacted Dr. Monge, who worked with Penn to allow Mr. Mitchell to transfer to Penn to complete his doctorate degree. Dr. Monge alleges that Mr. Mitchell engaged in misconduct while at Penn by defacing books in the Penn Museum, "engaging in published plagiarism," improperly accessing the lab with friends to explore bones and bone fragments stored for educational purposes, and stealing DNA samples without authorization. Dr. Monge alleges that once she discovered these actions, she "reported all these unlawful and disturbing activities to Penn Museum Security and Administrators, along with Dr. Kathleen Morrison, Chair of Penn's Anthropology Section." Neither Penn nor its administrators punished Mr. Mitchell for his actions.

Additionally, in May 2019 in the presence of several witnesses, Mr. Mitchell allegedly screamed at Dr. Monge, threw objects at her, slammed his fists on a table, and threatened Dr. Monge. Dr. Monge filed a report with the Penn Museum's administration, though Dr. Monge alleges that neither Penn nor its administrators took action to punish Mr. Mitchell. Dr. Monge then changed the locks to the Museum and lab and denied Mr. Mitchell any unsupervised access to the Penn Museum's Physical Anthropology collections.

In April 2021, Mr. Mitchell met with Christopher Woods, then-Director of the Penn Museum, where he accused Dr. Monge of mishandling the MOVE bone fragments and engaging in professional misconduct regarding the MOVE bombing investigation. Mr. Mitchell allegedly referenced the Coursera course in that discussion. Dr. Monge avers that Mr. Mitchell also worked with his then-girlfriend, Maya Kasutto, a writer for the news organization Billy Penn, to broadcast

the same sentiment about Dr. Monge. Dr. Monge alleges that Ms. Kasutto had her own grudge against her because, while Ms. Kasutto was studying at Penn, Dr. Monge was forced to revoke her ability to work with remains in the Physical Anthropology section of the Penn Museum for her senior thesis when she left the biological anthropology program to instead receive her undergraduate degree in cultural anthropology and creative writing. Dr. Monge alleges that Ms. Kasutto and Mr. Mitchell then worked together to "cancel" Dr. Monge by declaring that "she harbors racist animus against persons of African descent even though they knew she had spent her entire career seeking to bring respect and humanity to identify remains of persons of all races."

Shortly thereafter, starting in April 2021, a number of news articles and statements began to be published regarding Dr. Monge's involvement in identifying the MOVE bone remains and her use of the bones in the Coursera course. Dr. Monge alleges that the press attention has adversely affected her reputation in the anthropology and academic communities, where "third persons have been deterred from working with her, and she has been forced to remove herself from research articles and other scholarly papers for the sole reason that her employer falsely held her out to be a racist and unethical anthropologist." These statements underlie Dr. Monge's present action, in which she claims to have been defamed or exposed in a false light in these publications. This Memorandum addresses the motion of defendants Amy Gutmann, Wendell Pritchett, and the University of Pennsylvania ("Penn Defendants").

### IV.   Penn Defendants' Actions and Allegedly Defamatory Statements

On April 26, 2021, the Association of Black Anthropologists ("ABA"), the Society of Black Archaeologists ("SBA"), and the Black in Bioanthropology Collective ("BiBA") released a statement that they "condemn in the strongest possible language the University of Pennsylvania, . . . along with Professors Alan Mann and Janet Monge, for their horrific treatment of the remains of Tree and Delisha Africa, and for the unfathomable heartlessness and disrespect shown towards

the Africa family." That same day, Dr. Monge alleges that Penn locked Dr. Monge out of her laboratory and all Physical Anthropology collection storage spaces.

Two days later, Amy Gutmann, the President of the University of Pennsylvania at the time, and Wendell Pritchett, Penn's Provost at the time, authored and sent an email to all Penn Museum employees. That statement, in full, read:

> We were profoundly disturbed to learn this past week that human remains, provided to a faculty member by the medical examiner many decades ago in an effort to identify a victim from the 1985 bombing of the MOVE house, had been kept at the Penn Museum for much of that time. Simply said, this was insensitive, unprofessional and unacceptable.
>
> An official apology has been extended to the Africa family by the Museum and the University, and the Museum is currently working to return the remains to the family. In our judgment, it is imperative that we bring in an outside investigator who can examine how this unfolded and provide us with a complete report on what transpired. To this end, we have hired attorneys Joe Tucker and Carl Singley of the Tucker Law Group to investigate how the remains came into the possession of the Museum and what transpired with them for nearly four decades. We will share this report with the community and use its findings to help us ensure that nothing of this nature is repeated in the future.[1]

Ex. A, Mot. to Dismiss Second Am. Compl., Doc. 141-2. Dr. Monge alleges that a similar statement was later sent to the full Penn community.

Dr. Monge alleges that shortly after the publication of this statement, the Chair of Penn's Anthropology Department told Dr. Monge that she was being put on a "work pause" and would be removed from teaching Penn classes. In early May, Dr. Monge alleges that her summer programs at the Penn Museum and scheduled high school talks for Penn were being canceled, all

---

[1] "In evaluating a motion to dismiss, [the Court] may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim[.]" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotation marks omitted). As the Court explained in its memorandum regarding the Penn Defendants' first motion to dismiss, though Dr. Monge did not incorporate the full statement in the operative complaint, she relies on its contents. *See Monge v. Univ. of Pa.*, 2023 WL 3594471, at *1 n.3 (E.D. Pa. May 22, 2023). For the same reasons, the Court considers Dr. Gutmann's and Dr. Pritchett's full statement here. *Id.*

while Penn posted a call to action to terminate Dr. Monge's employment on the Penn Anthropology Department website. Three months later, according to Dr. Monge, she was informed that she would not "teach any of her current classes, be an adjunct professor, or even be an associate curator at the Penn Museum, and was being demoted to Museum Keeper." The demotion led to a $65,000 salary cut, and, after two years, Penn would deem Dr. Monge retired.

The Institutional Review Board is Penn's internal mechanism that investigates whether faculty research is appropriate. Dr. Monge alleges that the Institutional Review Board could have investigated Dr. Monge's research and potentially "cleared her name." However, Penn never contacted the Institutional Review Board to review her case. In fact, Dr. Monge "has never been found to have violated any professional, ethical, or legal standards" when handling the bone fragments from the MOVE Bombing.

## PROCEDURAL HISTORY

Dr. Monge filed her original complaint in May 2022 in the Court of Common Pleas of Philadelphia against approximately 40 defendants and then filed an amended complaint in the same court in June 2022. One of the defendants, Nora McGreevy of Smithsonian Magazine, removed the case to federal court in July 2022.

Defendants in this action then filed a bevy of motions to dismiss the First Amended Complaint, with the Court deciding the first of these in January 2023. The Court granted all of the motions to dismiss and dismissed the First Amended Complaint without prejudice to afford Dr. Monge the opportunity to file an amended complaint to potentially cure any defects. Dr. Monge then filed her Second Amended Complaint in July 2023, which yet again led to a flurry of motions to dismiss from the various defendants starting in August. The Court heard oral argument on the motions to dismiss on November 1, 2023. The Court now addresses the motions to dismiss from

the University of Pennsylvania, former Penn President Dr. Amy Gutmann, and former Penn Provost Dr. Wendell Pritchett.

## LEGAL STANDARD

In deciding a motion to dismiss, the Court "accept[s] the factual allegations in the complaint as true, draw[s] all reasonable inferences in favor of the plaintiff, and assess[es] whether the complaint and the exhibits attached to it contain enough facts to state a claim to relief that is plausible on its face[.]" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (internal quotation marks and citations omitted). The complaint must contain "sufficient factual matter" to show that a claim is plausible. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court is "not compelled to accept unsupported conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal quotation marks and citations omitted).

## DISCUSSION

### I.   Dr. Monge's Defamation Claim[2]

To plead a defamation claim under Pennsylvania law, a plaintiff must establish

(1) the defamatory character of the communication.

---

[2]   The Court previously analyzed whether Dr. Monge's defamation claim against the Penn Defendants was adequately pled and capable of defamatory meaning. *Monge*, 2023 WL 3594471, at *2-5. There are no new arguments in the Penn Defendants' renewed Motion to Dismiss that alter this analysis, and no other circumstance alters the Court's holding. That is because, "[b]ased on these facts, the statement appears to be an official declaration issued on behalf of the University of Pennsylvania by its President and its Provost, rather than a statement expressing the subjective opinions of Drs. Gutmann and Pritchett." *Id.* at *4.

By characterizing Dr. Monge as "unprofessional," the Penn Defendants made a statement harmful "to Dr. Monge's ability to conduct business as an anthropologist, a professor, or a museum curator, or to engage in the profession of anthropology." *Id.* Thus, for the same reasons discussed and analyzed in its previous memorandum, the Court finds that the Penn Defendants' allegedly defamatory statements made to the Penn community and Penn Museum employees are adequately pled and capable of defamatory meaning.

(2) its publication by the defendant.

(3) its application to the plaintiff.

(4) the understanding by the recipient of its defamatory meaning.

(5) the understanding by the recipient of it as intended to be applied

to the plaintiff.

(6) special harm resulting to the plaintiff from its publication.

(7) abuse of a conditionally privileged occasion.

42 Pa. Cons. Stat. § 8343(a). "The pleading standard set forth in the Federal Rule of Civil Procedure 8(a) governs Dr. Monge's defamation claim." *Monge v. Univ. of Pa.*, No. 22-2942, 2023 WL 3594471, at *2 (E.D. Pa. May 22, 2023) (collecting cases). Under the Rule 8(a) standard, so long as the defamation claim "provides sufficient notice to defendants, it states a claim[,]" unlike under the state standard requiring the complaint to "identify specifically what allegedly defamatory statements were made, and to whom they were made." *Rishell v. RR Donnelley & Sons Co.*, No. 06-4782, 2007 WL 1545622, at *3 (E.D. Pa. May 24, 2007) (citations omitted). "To survive dismissal, [Dr. Monge] must allege at least some specific statements identifying the speaker, the approximate date, the content, and the audience." *Lee v. Univ. of Pa., Sch. of Dental Med.*, No. 19-835, 2019 WL 4060843, at *6 (E.D. Pa. Aug. 27, 2019).

If the plaintiff properly pleads a defamation claim, there are three affirmative defenses available that the defendant or defendants has the burden of proving: "(1) the truth of the defamatory communication[,] (2) the privileged character of the occasion on which it was published[,] or (3) the character of the subject matter of defamatory comment as of public concern." 42 Pa. Cons. Stat. § 8343(b); *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990).

A. **Public vs. Private Figure**

Defamation requires that Dr. Monge prove a minimum level of fault for the Court to impose liability. *See Joseph v. Scranton Times L.P.*, 129 A.3d 404, 428 (Pa. 2015). The requisite level of fault depends on Dr. Monge's status as either a public or private figure. *Id.* A higher standard of proof is required if the individual is a public figure. *Ralston v. Garabedian*, 676 F. Supp. 3d 325, 349 (E.D. Pa. 2021). An individual may "achieve such pervasive fame or notoriety that he becomes a public figure for all purposes." *Id.* at 350 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). Such public figures are those who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1077 (3d Cir. 1988). Examples of public figures might include former President Barack Obama, singer Taylor Swift, singer Beyonce, and Pittsburgh Steelers Quarterback Russell Wilson.

At the same time, there are limited purpose public figures, who are individuals "deemed public figures only within the context of a particular dispute as a result of voluntarily 'thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 498 (E.D. Pa. 2010) (quoting *Gertz*, 418 U.S. at 345). "When a limited purpose public figure raises a defamation per se claim, she must show by clear and convincing evidence that the defendant acted with *actual malice* in publishing statements about her." *Mallory v. S&S Publishers*, 260 F. Supp. 3d 453, 465 (E.D. Pa. 2017) (emphasis added), *aff'd sub nom. Mallory v. Simon & Schuster, Inc.*, 728 F. App'x 132, 136 n.2 (3d Cir. 2018).

The Third Circuit Court of Appeals has created a two-part inquiry to determine whether an individual is a limited purpose public figure: "(1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of the plaintiff's involvement in that controversy."

*McDowell v. Paiewonsky*, 769 F.2d 942, 948 (3d Cir. 1985). Though not explicitly defined, a public controversy "must be a real dispute, the outcome of which affects the general public or some segment of it . . . [t]o be 'public,' the dispute must affect more than its immediate participants." *Amor v. Conover*, 635 F. Supp. 3d 363, 368 (E.D. Pa. 2022) (alterations in original) (quoting *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1083 (3d Cir. 1985)). Furthermore, an individual may be deemed a limited purpose public figure when he or she "undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired[.]" *McDowell*, 769 F.2d at 949. In sum, an individual becomes a limited purpose public figure when he or she "voluntarily injects" him or herself "into a particular public controversy." *Monge*, 2023 WL 3594471, at *5 (quoting *Gertz*, 418 U.S. at 351).

Here, the Court previously found that Dr. Monge was a limited purpose public figure "with respect to the MOVE events, including the identification of the MOVE remains, at least beginning in 2019," *id.* at *6, though Dr. Monge argues that the Court should revisit its prior analysis and find that Dr. Monge is not a limited purpose public figure. However, the Second Amended Complaint demonstrates that Dr. Monge is a limited purpose public figure.

At the outset, the Court finds that there was a clear controversy regarding the bone fragment remains where the MOVE Commission found them to belong to Katricia "Tree" Africa, and Dr. Monge and Dr. Mann issued a report stating that they were not those of Katricia Africa and instead belonged to a Jane Doe. *Id.* ¶¶ 87-91. Dr. Monge's Second Amended Complaint even states that Dr. Mann's and her findings "put the City at risk of liability for murdering not only members of the MOVE organization, but also unsuspecting neighbors that were unrelated to the incident. . . ." *Id.* ¶ 88. Such a finding, according to Dr. Monge, was so grave that the City "refused to accept" their findings and instead led to the MOVE Commission's contrary report. *Id.* ¶¶ 88-89. Whether

the bone fragment remains belonged to Katricia Africa or Jane Done constituted "a real dispute, the outcome of which [would] affect[] the general public" by potentially making the City susceptible to liability for the deaths of individuals outside of the MOVE organization. *See Amor*, 635 F. Supp. 3d at 368.

At a minimum, Dr. Monge chose to insert herself into the public controversy of the MOVE Bombing when she published her Coursera course online. For example, to access Dr. Monge's course, any individual who wanted to view the content simply needed to "sign up for a Coursera account, browse the Coursera course selection, and specifically enroll in [her] particular online course to gain access to its contents." Second Am. Compl. ¶ 110. The course featured two classes in which Dr. Monge discussed the history of the MOVE Bombing, and Dr. Monge displayed the bone fragment remains in another class. *Id.* ¶¶ 111-13. One of those first two classes is even titled, "Losing Personhood: MOVE A Case Study." *Id.* ¶ 112. Dr. Monge specifically describes the MOVE organization, the history of the MOVE Bombing, and the excavation of the bomb site. *Id.* By discussing the MOVE Bombing, a public controversy which Dr. Monge herself describes as "one of the most horrific examples of excessive force found in American history," *id.* ¶ 3, Dr. Monge is "voluntarily inject[ing]" herself into the "particular public controversy" of the MOVE Bombing, thus making her a limited purpose public figure on the topic. *See Gertz*, 418 U.S. at 351.

Not only does Dr. Monge discuss the MOVE Bombing, but she also displays and handles the bone fragments. In her ninth class, titled "MOVE – An Analysis of the Remains," Dr. Monge is seen working with one of her students in the Penn Museum's lab with the bone fragments. Second Am. Compl. ¶ 113. In that video, Dr. Monge is seen "comparing those fragments to other similar bone fragments and models for comparison and explaining how forensic techniques could be used to determine the age of the remains." *Id.* Dr. Monge could have chosen to compare any

other two sets of bone fragments for purposes of teaching her anthropology course.  Instead, Dr. Monge specifically titles the class "MOVE – An Analysis of the Remains," chooses to use the bone fragment remains from the MOVE Bombing, and thus injects herself into the MOVE bombing public controversy.  Thus, the Court continues to find that Dr. Monge is a limited purpose public figure with respect to the MOVE events, including the identification of the MOVE remains.

### B.  Actual Malice

"Because [Dr. Monge] is a limited purpose public figure, [s]he must prove that [the Penn Defendants'] remarks were made with actual malice. as prescribed in." *McDowell*, 769 F.2d at 951 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)). "Actual malice is 'knowledge that [the statement] was false or [was made] with reckless disregard of whether [the statement] was false or not.'" *Monge*, 2023 WL 3594471, at *6 (quoting *Sullivan*, 376 U.S. at 279–80). "Reckless disregard" means "that the defendant in fact entertained serious doubts as to the truth of the statement or that the defendant had a subjective awareness of probable falsity." *Boone v. Newsweek LLC*, No. 22-1601, 2023 WL 2245104, at *2 (E.D. Pa. Feb. 27, 2023) (quoting *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 91 (3d Cir. 2013)). Though actual malice requires "clear and convincing" evidence to prevail at trial, *id.* at *4 (citing *Gertz*, 418 U.S. at 432), at the motion to dismiss stage, Dr. Monge need "only plead facts that, taken as true, raise a 'reasonable inference' that [the Penn Defendants] acted with actual malice," *id.* (citing *Iqbal*, 556 U.S. at 678).

Determining whether the Penn Defendants acted with actual malice focuses on their attitude towards the truth of the statements, not towards Dr. Monge. *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir. 2020) (quoting *DeMary v. Latrobe Printing & Publ'g Co.*, 762 A.2d 758, 764 (Pa. Super. Ct. 2000)). And the Court may find actual malice where the defendant had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports, such as where the defendant is aware of internal inconsistencies or has access to apparently

reliable information that contradicts the defamatory assertions." *Mzamane*, 693 F. Supp. 2d at 505 (internal quotation marks and citations omitted).

Here, Dr. Monge has adequately pled facts that raise a "reasonable inference" that the Penn Defendants acted with actual malice. In her Second Amended Complaint, Dr. Monge alleges that she made Penn and its administrators aware multiple times that Mr. Mitchell had engaged in "unlawful and disturbing" activities while he was pursuing his doctorate degree. Second Am. Compl. ¶¶ 121-25. Penn and the administration, of which Dr. Gutmann and Dr. Pritchett are members, took no action against Mr. Mitchell. *Id.* ¶¶ 124-25. Mr. Mitchell also allegedly discussed the bone fragments and Dr. Monge's mishandling of them with the Penn Museum Director shortly before the media firestorm about Dr. Monge began. *Id.* ¶¶ 127-32. In the wake of those allegations, Penn and its administrators *did* take action when Penn (1) locked Dr. Monge out of her lab and all Physical Anthropology collection storage spaces, (2) released a statement from Dr. Gutmann and Dr. Pritchett to employees of the Penn Museum describing Dr. Monge's actions as "insensitive, unprofessional, and unacceptable," (3) released a later statement from Dr. Gutmann and Dr. Pritchett to the broader Penn community, (4) placed Dr. Monge on a "work pause," (5) canceled Dr. Monge's summer classes, (6) removed Dr. Monge from the Anthropology Department's website, (7) canceled all of Dr. Monge's regular semester courses, (8) demoted her, (9) cut her pay by $65,000, and (10) told her that she would be deemed retired after two years because of her demotion . *Id.* ¶¶ 149-54.

The asymmetry between Penn's response to the complaints of Paul Mitchell regarding Dr. Monge with those of Dr. Monge regarding Paul Mitchell certainly raises a reasonable inference that the Penn Defendants acted with actual malice with regards to their statements about Dr. Monge. Indeed, the Penn Defendants had "obvious reasons to doubt the veracity of" Mr. Mitchell's

claims against Dr. Monge, and Mr. Mitchell's statements largely coincided with those published throughout the media firestorm during which the Penn Defendants published the defamatory statements about Dr. Monge. *See Mzamane*, 693 F. Supp. 2d at 505. Taking Dr. Monge's allegations as true, the Second Amended Complaint sufficiently demonstrates that the Penn Defendants were aware of Paul Mitchell's potential bias against Dr. Monge yet took no action to corroborate his complaints or investigate the matter further before publishing the statements about Dr. Monge.

The Penn Defendants argue that Dr. Monge has not pled actual malice as to Mr. Mitchell and thus cannot impute such malice to the Penn Defendants. Mem. L. in Supp. Mot. to Dismiss at 17-18, Doc. No. 141-1. They rely on the Court's Opinion regarding Mr. Mitchell's original motion to dismiss where the Court found that Dr. Monge had not alleged facts to suggest that Mr. Mitchell doubted the truth of his statements about her and thus those statements did not constitute actual malice. *Id.* at 17 (citing *Monge v. Univ. of Pa.*, 2023 WL 4032661, at *6 (E.D. Pa. June 14, 2023)). However, the relevant inquiry for the Penn Defendants is not whether *Paul Mitchell* doubted the veracity of his statements regarding Dr. Monge but rather whether the *Penn Defendants* had their own reasons to doubt the veracity of Mr. Mitchell's statements. The Penn Defendants *did* have reason to doubt the truth of Mr. Mitchell's statements in that, as Dr. Monge alleges, Penn and the administration, which includes Dr. Gutmann and Dr. Pritchett, were aware that Mr. Mitchell held a possible bias against Dr. Monge after she reported him for his prior acts. Thus, the Penn Defendants' argument is misplaced.

An even stronger indicator of the potential for actual malice is the fact that Penn did not properly investigate the claims against Dr. Monge through its own internal mechanism for such claims. Dr. Monge alleges that Penn has an Institutional Review Board that investigates claims

regarding faculty research to determine if research is appropriate. Second Am. Compl. ¶ 149. In Dr. Monge's case, however, Penn allegedly never contacted the Institutional Review Board. *Id.* Without using the proper channels of investigation for claims against Penn faculty and then publishing a statement describing Dr. Monge's actions as "insensitive, unprofessional, and unacceptable" before conducting *any* investigation, there is a reasonable inference that the Penn Defendants acted with reckless disregard and "entertained serious doubts as to the truth of the statement[s]" about Dr. Monge." *Kendall*, 716 F.3d at 89 (quoting *Schiavone*, 847 F.2d at 1089). Though "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth," *Gertz*, 418 U.S. at 332, here, in addition to Penn's failure to investigate, Penn also had reasons to doubt the veracity of Mr. Mitchell's statements. Thus, the Court finds that Dr. Monge has adequately pled actual malice and that the defamation claim against the Penn Defendants proceeds beyond the motion to dismiss stage.

## II.    Dr. Monge's Defamation by Implication Claim[3]

In Pennsylvania, a plaintiff has a defamation by implication claim "where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Monge*, 2023 WL 3594471, at *7 (quoting *Mzamane*, 693 F. Supp. 2d at 477). "To establish defamation by innuendo, the innuendo must be warranted, justified and supported by the publication." *ToDay's Housing v. Times Shamrock Commc'ns, Inc.*, 21 A.3d 1209, 1215 (Pa. 2011) (quoting *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. Super. Ct. 1992)). "The legal test to be applied is whether the challenged language could 'fairly and reasonably be construed' to imply the defamatory meaning alleged by

---

[3]    The Court previously held that Dr. Monge's claim that the Penn Defendants' statement implied she was racist or unethical was not supported by the statements. *Monge*, 2023 WL 3594471, at *7. Since that time, the statements themselves have not changed, nor has any other factor that would affect the Court's analysis. Thus, the statements still do not imply that Dr. Monge is either racist or unethical.

a plaintiff." *Id.* (quoting *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1944)). "In defamation by implication cases, there is an additional element to the actual malice standard: the plaintiff must show that [the] defendant 'either intended to communicate the defamatory meaning or knew of the defamatory meaning and was reckless in regard to it.'" *Boone*, 2023 WL 2245104, at *5 (quoting *Kendall*, 716 F.3d at 90). Recklessness in this context "requires that the defendants knew that the defamatory meaning was not just possible, but likely, and still made the statement despite their knowledge of that likelihood." *Kendall*, 716 F.3d at 91.

Here, as the Court previously held, the statement calling Dr. Monge's actions "insensitive, unprofessional, and unacceptable" "'could fairly and reasonably be construed to have the meaning imputed in the innuendo,' specifically that Dr. Monge deviated from professional standards governing anthropologists." *Monge*, 2023 WL 3594471, at *7 (quoting *Livingston*, 612 A.2d at 449). Such a statement is "particularly harmful" to Dr. Monge's work in anthropology. *Id.*

Unlike at the previous motion to dismiss stage, however, Dr. Monge now sufficiently pleads a defamation by implication claim against the Penn Defendants. As demonstrated above, Dr. Monge has adequately pled that the Penn Defendants acted with reckless disregard for the truth, demonstrating actual malice. At this stage, the Court cannot ascertain whether the Penn Defendants had actual knowledge that there was a defamatory meaning to the two statements they made; however, a holistic reading of the Second Amended Complaint contains sufficient allegations that they did.

Dr. Monge specifically pleads that on April 26, 2021, "a collective statement by the Association of Black Anthropologists (ABA), the Society of Black Archaeologists (SBA), and the Black in Bioanthropology Collective (BiBa) . . . stat[ed] that they 'condemn[ed] in the strongest possible language the University of Pennsylvania, . . . along with Professors Alan Mann and Janet

Monge" regarding Penn's and Dr. Monge's actions regarding the bone fragments and then requested that Dr. Monge be removed from her position at Penn. Second Am. Compl. ¶¶ 147-48. Their statement specifically reads "that their members were 'outraged by the stunning ethical indifference shown by all parties . . . [and] that these entities effectively monetized the remains of Black children murdered in a state terrorist attack. . . .'" *Id.* ¶ 148.

Only two days later, Dr. Gutmann and Dr. Pritchett published their statement to all employees of the Penn Museum calling Dr. Monge's actions "insensitive, unprofessional, and unacceptable." *Id.* ¶ 150. Though the Penn Defendants' statement may not mention race or ethics, by issuing their statement only two days after a collective of Dr. Monge's Black peers in anthropology accused her of racism and ethical violations, the possible implication is that the Penn Defendants agreed with the message from these anthropology groups making such accusations. Dr. Monge avers that the Penn Defendants' statement, along with the alleged statement later sent to the full Penn community, legitimized such claims against her. After Penn, her employer, and Drs. Gutmann and Pritchett, two of the highest-ranking personnel within the university, published their own statements, "there was simply no way to pull it back and return Dr. Monge's reputation to normal." *Id.*

As discussed above, the Penn Defendants' statements, on their own, are capable of defamatory meaning and demonstrate actual malice. Furthermore, considering the backdrop against which the Penn Defendants published their statements, it is plausible that the Penn Defendants may have known that their statements would hurt Dr. Monge's reputation within the anthropology field and her ability to continue working within the discipline. This satisfies the final element needed for the defamation by implication claim that the Penn Defendants "either intended to communicate the defamatory meaning or knew of the defamatory meaning and was reckless in

regard to it." *Boone*, 2023 WL 2245104, at *5 (quoting *Kendall*, 716 F.3d at 90). Although the

Penn Defendants may not have known that their statements were capable of defamatory meaning,

the Court presently only evaluates the Second Amended Complaint, which adequately pleads that

the Penn Defendants knew that their statements would curtail Dr. Monge's career in anthropology

and academia. Thus, the defamation by implication claim against the Penn Defendants also

survives their motion to dismiss.

### III.    Dr. Monge's False Light Claim

False light claims involve "publicity that unreasonably places the other in a false light

before the public." *Mzamane*, 693 F. Supp. 2d at 510 (quoting *Ciolli v. Iravani*, 651 F. Supp. 2d

356, 376 (E.D. Pa. 2009)). Pennsylvania courts have adopted the elements of false light from the

Restatement (Second) of Torts, "which imposes liability on a person who publishes material that

'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in

reckless disregard of its falsity.'" *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014)

(quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988) (en banc)).

When defamation and false light claims are premised on the same underlying facts, Pennsylvania

courts use the same analysis for evaluating plaintiffs' false light claims as for their defamation

claims. *Boone*, 2023 WL 2245104, at *7 (quoting *Graboff*, 744 F.3d at 137). Thus, for the same

reasons that Dr. Monge's defamation claims proceed, her false light claim against the Penn

Defendants also survives the motion to dismiss stage.

### IV.    Dr. Monge's Civil Aiding & Abetting Claim

Dr. Monge includes a final claim of civil aiding and abetting in which she avers that the

Penn Defendants "aided and abetted the tortious misconduct of each of the other defendants by

giving rise to false and defamatory information against Dr. Monge in a concerted effort to

accomplish the particular result of branding [Dr.] Monge as incompetent in her chosen field and a

racist." Second Am. Compl. ¶ 193. Dr. Monge alleges that each of the defendants, in publishing their statements, "assist[ed] in the initial tortious actions taken by [Mr.] Mitchell and his then-girlfriend and associate." *Id.* ¶ 195.

A civil aiding and abetting claim requires a showing that the defendant "(1) committed a tortious act in concert with another or pursuant to a common design with another; or (2) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (3) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Byars v. Sch. Dist. of Philadelphia*, 942 F. Supp. 2d 552, 572 (E.D. Pa. 2013) (citing *Burnside v. Abbott Lab'ys*, 505 A.2d 973, 982 (Pa. Super. Ct. 1985)).

In its prior Opinion, the Court granted the motion to dismiss without prejudice on the aiding and abetting claim against the Penn Defendants because Dr. Monge:

> vaguely allege[d] that [the Penn Defendants] "knew or should have known" of the allegedly defamatory nature of the articles and statements published prior to the April 26, 2021 statement. However, Dr. Monge provide[d] no factual allegations which demonstrate how or why [the Penn Defendants] would have possessed such knowledge as to the conduct of those who they allegedly aided or abetted. As to substantial assistance, Dr. Monge fail[ed] to include sufficient factual allegations to demonstrate that the [Penn Defendants] took affirmative action to assist the other defendants in their allegedly tortious conduct.

*Monge*, 2023 WL 3594471, at *9 (citation omitted).

As the Penn Defendants themselves point out, however, new allegations contained in the Second Amended Complaint include that (1) Penn took no action when Dr. Monge reported Mr. Mitchell's misconduct, (2) Penn simply accepted Mr. Mitchell's statements as true without investigating their veracity, (3) the Institutional Review Board did not investigate the claims against Dr. Monge, and (4) Penn did not conduct any other investigation regarding Mr. Mitchell's

statements or those from media outlets. Mem. L. in Supp. Mot. to Dismiss at 23–24, Doc. No. 141-1 (citing Second Am. Compl. ¶¶ 124-25, 146, 149, 195).

The sum of these allegations supports Dr. Monge's aiding and abetting claim. The Penn Defendants' decision not to investigate Mr. Mitchell's statements or those in news outlets about an employee with decades of experience at the school, coupled with the Penn Defendants' notice of tensions between Dr. Monge and Mr. Mitchell due to Dr. Monge's reports of Mr. Mitchell's alleged prior misconduct, suggest that the Penn Defendants, in publishing their statements, may have acted "in concert with another or pursuant to a common design with another." *See Byars*, 942 F. Supp. 2d at 572 (quoting *Burnside*, 505 A.2d at 982). Taking the allegations in the Second Amended Complaint as true, the Penn Defendants published their defamatory statements with knowledge of Mr. Mitchell's bias against Dr. Monge and without investigating the prior allegedly defamatory statements for their truth so that there would be an even larger harm confronting Dr. Monge, her career, and her reputation. As Dr. Monge argues, the Penn Defendants, representing her employer, knew the most about Dr. Monge's work history and were in the best position to investigate the claims against her; instead, the Penn Defendants used their position, one with perhaps the largest influence of all the defendants in this case, to summarily designate Dr. Monge's actions as "insensitive, unprofessional, and unacceptable." With the publication of those statements, the Penn Defendants crossed the Rubicon. Based on Dr. Monge's allegations, the operative complaint now includes sufficient allegations that the Penn Defendants acted in concert with others to defame Dr. Monge. Thus, the civil aiding and abetting claim against the Penn Defendants also proceeds to discovery.

## CONCLUSION

There is no doubt that the MOVE Bombing is a stain on the storied history of Philadelphia and represents the worst impulses of our society. Dr. Monge, through her anthropological work in

the aftermath of the bombing and creation of an online course, injected herself into the public discourse on this fraught topic. When such involvement became known to a wider audience, the University of Pennsylvania, former President Amy Gutmann, and former Provost Wendell Pritchett allegedly failed to utilize Penn's internal measures that govern investigating such claims against a faculty member's work. Instead, in the "modern era of Cancel Culture," they published a statement calling Dr. Monge's actions "insensitive, unprofessional, and unacceptable" and discussed opening an investigation "to help . . . ensure that nothing of this nature is repeated in the future" that ostensibly attempts to hold Dr. Monge accountable for her work with the bone fragments. The case against the Penn Defendants proceeds in full to discovery, which will shed light on whether the Penn Defendants themselves must be held accountable for their own statements and actions.

BY THE COURT:

<u>s/ Gene E.K. Pratter</u>
**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**