JANET MONGE

                PLAINTIFF,

       v.

UNIVERSITY OF PENNSYLVANIA, et al.,

             DEFENDANTS

Civ. No. 2:22-cv-02942-MRP

## ANSWER TO SECOND AMENDED COMPLAINT

Defendants University of Pennsylvania ("Penn"), Amy Gutmann, and Wendell Pritchett (collectively, "Defendants"), by and through their attorneys, hereby answer Plaintiff Janet Monge's ("Plaintiff") Second Amended Complaint as follows:

1.     Janet Monge has spent her entire career working for social justice by restoring personhood to unidentified human remains – one of the most important aspects of her chosen profession as a forensic physical/biological anthropologist.

**RESPONSE:** Defendants admit that Plaintiff is a physical anthropologist. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1 of the Second Amended Complaint.

2.     Throughout her career, Dr. Monge has experienced success as a curator for the Penn Museum, a professor and researcher in the Anthropology Department of the University of Pennsylvania, and an expert consultant with the Philadelphia Medical Examiner's Office, the Philadelphia Defenders Association, and Federal Defender's association, where she volunteered to assist with criminal cases involving unidentified human remains.

**RESPONSE:** Defendants admit that Plaintiff was previously a curator for the Penn Museum and a professor in the Anthropology Department of the University of Pennsylvania, as well as a consultant to the Philadelphia Medical Examiner's Office. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 2 of the Second Amended Complaint and, therefore, those allegations are denied.

3.      Prior to Dr. Monge's professional success, however, her former graduate school professor and mentor, Alan Mann, Ph.D. ("Dr. Mann"), pulled her into what turned out to be one of the most challenging cases of her career: the matter of the "Jane Doe" bone fragments removed by the City of Philadelphia from the site of the tragic 1985 incident in which City officials dropped an aerial explosive on the home of its own citizens in one of the most horrific examples of excessive force found in American history (the "Jane Doe Fragments"). The incident killed eleven (11) persons (including five children) who were members of a group known as the MOVE family.

**RESPONSE:** Defendants admit that, on May 13, 1985, the City of Philadelphia dropped an aerial explosive on the home of a group of individuals known as the Africa family, tragically killing eleven people, and that Plaintiff assisted Dr. Mann with attempts to identify certain remains recovered by the City from the site. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3 of the Second Amended Complaint.

4.      Initially as a graduate student and then over the course of her entire career, Dr. Monge tried to identify the Jane Doe Fragments, which were never properly identified as belonging to any member of the MOVE family, by conducting extensive research and even attempting to contact known MOVE family members to gain their cooperation and conclusively identify the remains as being any of the known victims of the MOVE bombing.

**RESPONSE:** Defendants admit that Plaintiff assisted Dr. Mann in trying to identify the remains in 1986, and that, in 1995 and 2014, Plaintiff contacted two of the Africa family members. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4 of the Second Amended Complaint.

5.      From the beginning, Dr. Monge had one goal in mind: make a proper identification so the family of the unidentified decedent could pay their respects. Dr. Monge herself had nothing but respect for the bone fragments she was attempting to identify, and she handled them with the appropriate dignity and professional care always required from forensic anthropologists.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5 of the Second Amended Complaint.

6.      Despite the fact that Dr. Monge has always maintained the utmost respect for the Jane Doe fragments and exhibited professional decorum throughout her attempts to identify those remains, false, defamatory media reports widely disseminated in 2021 made Dr. Monge the victim of brutal attacks on her personal and professional reputation.

**RESPONSE:** Defendants admit that media reports in 2021 described Plaintiff's handling of remains recovered from the scene of the MOVE tragedy. It is denied that those reports were attacks on Plaintiff's reputation. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 6 of the Complaint.

7.      These attacks were initiated by a current doctoral candidate at the University of Pennsylvania, Paul Mitchell ("Mitchell"), solely for his own unlawful purposes and in pure retaliation for Dr. Monge having previously reported Mitchell for unprofessional misconduct affected by Mr. Mitchell and witnessed by Dr. Monge in her capacity as the curator of the Penn Museum. Then, as fully discussed below, the remaining defendants named herein took steps to

legitimize and amplify Mitchell's false, defamatory message – namely, the false statements and implications that Dr. Monge is a racist who engaged in callous actions that disrespected the humanity of persons of African decent by mishandling the averred remains of two children who died in the MOVE conflagration.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Paul Mitchell's alleged purposes or motivations. The remaining allegations in Paragraph 7 of the Second Amended Complaint are denied.

8. Mitchell first cooperated with his then-girlfriend, Maya Kasutto, a writer for the Billy Penn, a 501(c)(3) broadcast media outlet. Ms. Kasutto, a former student of Dr. Monge's with her own grudge against the professor, was solicited by Mitchell to seek her aid in retaliating against Dr. Monge. This retaliation resulted in a widely published article containing false, malicious, and sensationalized allegations of racial bias about the investigatory process undertaken two respected anthropologists, Drs. Mann and Monge.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Paul Mitchell's alleged interaction with Maya Kasutto and Ms. Kasutto's alleged motives. The remaining allegations in Paragraph 8 of the Second Amended Complaint are denied.

9. The aforesaid article, based entirely on false and grossly misleading statements, was published for the sole purpose of attacking Dr. Monge's professional reputation as a forensic physical/biological anthropologist by labeling her as a racially motivated bigot who had an unlawful animus against persons of African decent.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the alleged purpose of the article. The remaining allegations in Paragraph 9 of the Second Amended Complaint are denied.

10.     The contents of Billy Penn article, and all its defamatory misstatements, were then republished and embellished, in whole or in part, by individuals through several major media outlets, including those named as Defendants herein, which resulted in great harm to Dr. Monge's reputation and employment as a forensic anthropologist, respected professor and museum curator, and further caused her great economic harm.

**RESPONSE:** Defendants admit that the Billy Penn article was cited in subsequent articles published by other media organizations.  The remaining allegations in Paragraph 10 of the Second Amended Complaint are denied.

11.     Although Dr. Monge has never been found to have violated any professional, ethical, or legal standards in her handling of the remains, reports published in the media repeated the false and defamatory sentiments first published in the Billy Penn article, directly stating and implying that Dr. Monge's proper analysis that the Jane Doe Fragments are the bones of an unidentified adult human being somehow constituted inappropriate, unethical, and inhumane behavior arising from racially motivated and insensitive animus.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that "Dr. Monge has never been found to have violated any professional, ethical, or legal standards in her handling of the remains."  To the extent that Plaintiff purports to characterize the investigative report that was issued by the Tucker Law Group on August 20, 2021 (the "Tucker Report"), such allegations are denied insofar as the Tucker Report is a document that speaks for itself. Plaintiff's characterizations of the media reports are similarly denied to the extent

that such reports are reflected in documents that speak for themselves. To the extent that Plaintiff is suggesting that she was found to have acted appropriately in the Tucker Report, those allegations are denied. The remaining allegations in Paragraph 11 of the Second Amended Complaint are denied.

12. Moreover, the published statements falsely accused, directly or by innuendo, Dr. Monge of criminally violating the rights of one of the children who died in the bombing and resulting fire, even though the bone fragments properly provided to and retained by Dr. Monge were not related to that child identified in the defamatory reports.

**RESPONSE:** The allegations in Paragraph 12 of the Second Amended Complaint are denied insofar as they purport to characterize documents that speak for themselves.

13. The damage done by those false and defamatory statements and articles was then further amplified by the University of Pennsylvania, who made statements, both to its own faculty and to the public at large, that apologetically condemned the investigatory efforts of its employee although Dr. Monge had done nothing wrong.

**RESPONSE:** Defendants admit that a statement was issued by Penn's President and Provost that truthfully and fairly described the retention of human remains at the University Museum over a period of years, and that Defendants Gutmann and Pritchett shared their opinions that such conduct was insensitive, unprofessional and unacceptable. Defendants deny the remaining allegations in Paragraph 13 of the Second Amended Complaint.

14. When these false statements were published, Defendants knew or should have known from reasonable investigation that the statements being made were false or would wrongly imply falsities about Dr. Monge.

**RESPONSE:** Denied.

15. Defendants published the defamatory statements in reckless disregard for the truth of their statements for the purpose of gaining pageviews from the reading public, all emanating from Defendant Kasutto's false and defamatory statements in her article resulting from the actual malice of Paul Mitchell.

**RESPONSE:** Denied.

16. As a result of these false and defamatory statements which have continued even after the filing of this action, Dr. Monge's reputation has been irreparably and wrongfully destroyed, she has been the victim of adverse employment actions, and she has received threatening emails and phone calls, including multiple death threats from persons in the general public reacting to the remarks made by the Defendants in their published statements.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Second Amended Complaint relating to threatening emails and phone calls. The remaining allegations in Paragraph 16 of the Second Amended Complaint are denied.

17. Due to the Defendants' individual and collective actions, Dr. Monge now seeks, through this lawsuit, to recover economic and non-economic damages that have been directly caused by the malicious and outrageous continuing defamatory actions of the defendants and to obtain published retractions of the false statements and apologies for the harm they have caused to attempt to restore her unblemished reputation existing before the false and defamatory statements were published by the Defendant individually and collectively.

**RESPONSE:** Defendants admit that Plaintiff purports to bring defamation, false light, and civil aiding and abetting claims against Defendants. Defendants deny that they defamed

Plaintiff, that Plaintiff was damaged by any wrongful conduct, and that Plaintiff is entitled to any relief from Defendants.

18. Plaintiff, Janet Monge, Ph.D., is an adult individual residing at 106 Federal Street, Philadelphia, Pennsylvania 19147.

**RESPONSE:** Admitted, upon information and belief.

19. Dr. Monge received her bachelor's degree in Anthropology from Pennsylvania State University, graduating magna cum laude, and her Ph.D. in her chosen field of anthropology from the University of Pennsylvania.

**RESPONSE:** Admitted.

20. Since 2011 and before her recent demotion directly resulting from the actions of the defendants, she had been a Keeper and Associate Curator of collections housed at the Penn Museum and a Lecturer and Adjunct Professor employed by the Department of Anthropology of the University of Pennsylvania.

**RESPONSE:** Defendants admit that Plaintiff was Keeper of the Penn Museum from 2012-2023 and an Adjunct Professor employed by the Department of Anthropology of the University of Pennsylvania from 2003-2023. Defendants deny the remaining allegations in Paragraph 20 of the Second Amended Complaint.

21. Prior to the vicious attacks on her reputation, Dr. Monge was recognized as an expert and scholar in her field and holds teaching awards in all categories for which she has been eligible, including being awarded as being the "Best Museum Curator" by Philadelphia Magazine in 2014.

**RESPONSE:** Defendants admit that Plaintiff was named "Best Museum Curator" by Philadelphia Magazine in 2014 and that she was well known in her field and a limited public figure.

Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 21 of the Second Amended Complaint.

22.     Over her career, Dr. Monge has engaged in extensive research covering nearly the entire spectrum of physical/biological anthropology and has volunteered her time as a forensic consultant for, inter alia, the Philadelphia Medical Examiner's Office, Philadelphia Defender's Association, and Federal Defender's Association.

**RESPONSE:**  Defendants admit that Plaintiff has engaged in a variety of anthropological research during her career and that she served as a consultant to the Philadelphia Medical Examiner's Office in at least 1985.  Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 22 of the Second Amended Complaint.

23.     Defendant, University of Pennsylvania, is a privately held American Ivy League research university located in Philadelphia, Pennsylvania. Its Office of General Counsel is located at 2929 Walnut Street, Suite 400, Philadelphia, Pennsylvania 19104.

**RESPONSE:**  Admitted, except it is denied that the University is "privately held."

24.     The University of Pennsylvania operates the University of Pennsylvania Museum of Archaeology and Anthropology, commonly known as the "Penn Museum," which is located on its campus.

**RESPONSE:**  Admitted.

25.     At all times applicable to the averments in this Complaint, the University of Pennsylvania is and was Dr. Monge's employer.

**RESPONSE:** Defendants admit that the Trustees of the University of Pennsylvania employed Plaintiff in various capacities in the Penn Museum from 1984-2023, and in the

Department of Anthropology from 1987-2023. Defendants deny the remaining allegations in Paragraph 25 of the Second Amended Complaint.

26. Defendant, Amy Gutmann, is an adult individual who, at all times applicable hereto, was a resident of the Commonwealth of Pennsylvania employed by the University of Pennsylvania and authorized to take action and make statements on its behalf. At all times applicable hereto, Gutmann was the President of the University of Pennsylvania.

**RESPONSE:** Defendants admit that Dr. Gutmann is an adult individual who resided in the Commonwealth of Pennsylvania and was employed by the Trustees of the University of Pennsylvania as its President from 2004-2022. The allegations about Dr. Gutmann's authority are legal conclusions to which no response is required. Defendants deny the remaining allegations in Paragraph 26 of the Second Amended Complaint.

27. Defendant, Wendell Pritchett, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take action and make statements on its behalf. At all times applicable hereto, Pritchett was the Provost of the University of Pennsylvania.

**RESPONSE:** Defendants admit only that Wendell Pritchett is an adult individual who resides in the Commonwealth of Pennsylvania, that he is employed by the Trustees of the University of Pennsylvania, and that he previously served as Provost of the University from 2017-2021. The allegations about Dr. Pritchett's authority are legal conclusions to which no response is required. Defendants deny the remaining allegations in Paragraph 27 of the Second Amended Complaint.

28. Defendant, Kathleen Morrison, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take actions and make

statements on its behalf. At all times applicable hereto, Morrison was and is the Chair of the Anthropology Department at the University of Pennsylvania.

**RESPONSE:** Defendants admit that Kathleen Morrison is an adult individual who resides in the Commonwealth of Pennsylvania, that she is employed by the Trustees of the University of Pennsylvania, and that she previously served as Chair of the University's Anthropology Department. The allegations about Dr. Morrison's authority are legal conclusions to which no response is required. Defendants deny the remaining allegations in Paragraph 28 of the Second Amended Complaint.

29. Defendant, Christopher Woods, is an adult individual who, at all times applicable hereto, was employed by the University of Pennsylvania and authorized to take actions and make statements on its behalf. Appointed in 2021, Woods has, at all times applicable hereto, served as the Director of the Penn Museum.

**RESPONSE:** Defendants admit that Christopher Woods is an adult individual who resides in the Commonwealth of Pennsylvania, that he is employed by the University of Pennsylvania, and that he has served as Director as of the Penn Museum from 2021 to present. The allegations about Mr. Woods' authority are legal conclusions to which no response is required. Defendants deny the remaining allegations in Paragraph 29 of the Second Amended Complaint.

30. Defendant, Paul Mitchell, is an adult individual who, upon information and belief, and at all times applicable to the allegations made herein resided at 511 N. Broad Street, Philadelphia, Pennsylvania 19123 and is presently a doctoral candidate at the University of Pennsylvania.

**RESPONSE:** Defendants admit that Paul Mitchell is an adult individual who was previously a doctoral candidate at the University of Pennsylvania. Defendants lack knowledge or

information sufficient to form a belief regarding the remaining allegations in Paragraph 30 of the Second Amended Complaint.

31.     Defendant, Billy Penn, is a membership 501(c)(3) media organization associated with and a program of WHYY Philadelphia, providing local Philadelphia news through the internet with its principal place of business located at 150 N. 6th Street, Philadelphia, Pennsylvania 19106.

**RESPONSE:** Defendants admit only that the Second Amended Complaint names Billy Penn as a defendant.  Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 31 of the Second Amended Complaint.

32.     Defendant, Maya Kasutto, is an adult individual who, at all times applicable hereto, was employed by Billy Penn and authorized to take actions and make statements on its behalf. Upon information and belief, Kasutto was at all times applicable to the present Complaint and was the current or former girlfriend of Defendant, Paul Mitchell.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Maya Kasutto as a defendant.  Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 32 of the Second Amended Complaint.

33.     Defendant, Philadelphia Inquirer, is a Delaware Public Benefit Corporation with its principal place of business located at 801 Market Street, Suite 300, Philadelphia, Pennsylvania, 19107. It operates an internet-based news website as well as two newspapers serving the Philadelphia region, and it published a defamatory article authored by Defendant Abdul Aliy-Muhammad.

**RESPONSE:** Defendants admit that the Second Amended Complaint names the Philadelphia Inquirer as a defendant.  Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 33 of the Second Amended Complaint.

34.     Defendant, Abdul Aliy-Muhammad, is an adult individual who, at all times applicable hereto, was a writer for Philadelphia Inquirer, which published his false, defamatory statements about Dr. Monge. He currently is the recipient with Defendant Jake Nussbaum of a grant sponsored by the University of Pennsylvania School of Arts and Sciences that will allow him to continue to disseminate misinformation regarding the actions of Dr. Monge and continue the defamatory attacks on Dr. Monge.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Abdul Aliy-Muhammad as a defendant and that he is the recipient of a grant awarded by the Sachs Program for Arts Innovation. Defendants deny the remaining allegations in Paragraph 34 of the Second Amended Complaint.

35.     Defendant, Jenice Armstrong, is an adult individual who, at all times applicable hereto, was also employed as an author by Philadelphia Inquirer, which published her defamatory statements about Dr. Monge.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Jenice Armstrong as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 35 of the Second Amended Complaint, which are not directed at Defendants.

36.     Defendant, The New Yorker Magazine, is a business entity with its principal place of business located at 1 World Trade Center, New York, New York 10007. It is an incorporated magazine entity published by Conde Nast providing news and commentary on politics, global affairs, business, technology, pop culture, and the arts. The New Yorker publishes articles on its website and in paper form, disseminated and is accessible anywhere in the United States, including Pennsylvania.

**RESPONSE:** Defendants admit only that the Second Amended Complaint names The New Yorker Magazine as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 36 of the Second Amended Complaint, which are not directed at Defendants.

37. Defendant, Heather Ann Thompson, is an adult individual who, at all times applicable hereto, was employed by the New Yorker and authorized to make statements through dissemination in paper form and on the magazine's website.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Heather Ann Thompson as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 37 of the Second Amended Complaint.

38. Defendant, ESPN, Inc., is a Connecticut corporation with its principal place of business located at 545 Middle Street, Bristol, Connecticut 06010. ESPN operates Andscape, a popular sports and pop culture website that seeks to explore the intersections of race, sports, and culture. Andscape publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

**RESPONSE:** Defendants admit that the Second Amended Complaint names ESPN, Inc. as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 38 of the Second Amended Complaint.

39. Defendant, Nicole Froio, is an adult individual who, at all times applicable hereto, was employed by Andscape and authorized to take actions and make statements on its behalf.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Nicole Froio as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 39 of the Second Amended Complaint.

40. Defendant, American Anthropological Association ("AAA"), is a business entity filed in the District of Columbia with its principal place of business located at 2300 Clarendon Boulevard, Suite 1301, Arlington, Virginia 22201. It is the world's largest scholarly and professional organization of anthropologists.

**RESPONSE:** Defendants admit that the Second Amended Complaint names the American Anthropological Association as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 40 of the Second Amended Complaint.

41. The Association of Black Anthropologists operates as one of the AAA's forty (40) distinct membership sections with a stated goal of bringing Black anthropologists together to create scholarship linking anthropological theory to struggles for social justice for persons of Africa decent.

**RESPONSE:** Defendants admit that the Second Amended Complaint names the Association of Black Anthropologists as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 41 of the Second Amended Complaint.

42. Defendant, The Guardian Media Group, is a public limited company organized in England. It has a United States Headquarters and principal place of business located at 61 Broadway, New York, New York 10006. The Guardian Media Group owns and operates The Guardian, a British national daily newspaper with a United States news website and digital edition. The website and digital edition are disseminated to and accessible from anywhere in the United States, including Pennsylvania.

**RESPONSE:** Defendants admit that the Second Amended Complaint names The Guardian Media Group as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 42 of the Second Amended Complaint.

43. Defendant, Ed Pilkington is an adult individual who, at all times applicable hereto, was employed by the Guardian and authorized to make statements in its publications.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Ed Pilkington as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 43 of the Second Amended Complaint.

44. Defendant, Daily Mail and General Trust, PLC, is a public limited company organized in England. It has a United States Headquarters and principal place of business located at 51 Astor Place, New York, New York 10003. Daily Mail and General Trust operates Daily Mail, a British middle-market daily newspaper with a news website is disseminated to and accessible from anywhere in the United States, including Pennsylvania.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Daily Mail and General Trust, PLC as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 44 of the Second Amended Complaint.

45. Defendant, Adam Schrader, is an adult individual who, at all times applicable hereto, was employed by Daily Mail and authorized to make statements in the paper and on the website maintained by the Daily Mail and General Trust, PLC.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Adam Schrader as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 45 of the Second Amended Complaint.

46. Defendant, Slate, is a Delaware corporate entity with its principal place of business located at 15 Metrotech Center, 8th Floor, Brooklyn, New York 11201. It is a progressive online magazine covering current affairs, politics, and culture in the United States. It publishes materials on its website, which is accessible anywhere in the United States, including Pennsylvania.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Slate as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 46 of the Second Amended Complaint.

47. Defendant, Elaine Ayers, is an adult individual who, at all times applicable hereto, was employed by Slate and authorized to make statements by Defendant Slate in Defendant Slate's online magazine.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Elaine Ayers as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 47 of the Second Amended Complaint.

48. Defendant, NYP Holdings, Inc., is a Delaware corporation with its principal place of business located at 1211 Avenue of the Americas, New York, New York 10036. It operates the New York Post, a conservative daily tabloid newspaper published in New York City. The New York Post also has a digital edition and news website, which is accessible anywhere in the United States, including Pennsylvania.

**RESPONSE:** Defendants admit that the Second Amended Complaint names NYP Holdings, Inc. as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 48 of the Second Amended Complaint.

49. Defendant, Jackson O'Bryan, is an adult individual who, at all times applicable hereto, was employed by the New York Post and authorized to make statements on and in the newspaper and the digital and news website.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Jackson O'Bryan as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 49 of the Second Amended Complaint.

50. Defendant, Teen Vogue, is a magazine publisher with its principal place of business located at 1 World Trade Center, New York, New York 10007. It operates an American online publication targeting teenagers, and it offers information about the latest entertainment and feature stories on current issues and events. Teen Vogue publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Teen Vogue as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 50 of the Second Amended Complaint.

51. Defendant, Ezra Lerner, is an adult individual who, at all times applicable hereto, was employed by Teen Vogue and authorized to make statements on its widely disseminated website.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Ezra Lerner as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 51 of the Second Amended Complaint.

52.     Defendant, Hyperallergic Media, is a New York corporation with its principal place of business located at 181 North 11th Street, Suite 302, Brooklyn, New York 11211. It operates Hyperallergic, an online arts and current events magazine. Hyperallergic publishes articles on its website that are accessible from anywhere in the United States, including Pennsylvania.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Hyperallergic Media as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 52 of the Second Amended Complaint.

53.     Defendant, Kinjal Dave, is an adult individual who, at all times applicable hereto, was employed by Hyperallergic and authorized to make statements in its online publication. Dave is also a doctoral student at the University of Pennsylvania's Annenberg School for Communications.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Kinjal Dave as a defendant and that she is a doctoral student at the University of Pennsylvania's Annenberg School for Communications. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 53 of the Second Amended Complaint.

54.     Defendant, Jake Nussbaum, is an adult individual who, at all times applicable hereto, was employed by Hyperallergic and authorized to make statements on its website. Nussbaum is a Ph.D. candidate in anthropology at the University of Pennsylvania. He currently is the recipient with Defendant Abdul Aliy-Muhammad of a grant sponsored by the University of Pennsylvania School of Arts and Sciences that will allow him to continue disseminating misinformation regarding the actions of Dr. Monge and continue the defamatory attacks on Dr. Monge.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Jake Nussbaum as a defendant, that he is a Ph.D. candidate in anthropology at the University of Pennsylvania, and that he is the recipient of a grant awarded by the Sachs Program for Arts Innovation. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 54 of the Second Amended Complaint.

55. Defendant, Nora McGreevy, is an adult individual residing at 5826 N. Wayne Ave., Apt. 2, Chicago, Illinois 60660. At all times applicable hereto, she was a freelance writer working for various news and media outlets, including the Smithsonian Magazine. She focuses her writing on the arts, astronomy, history, and academic research. McGreevy is presently a full-time employee of the Princeton University Art Museum, located at 22 Chambers Street, Suite 101, Princeton, New Jersey 08542.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Nora McGreevy as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 55 of the Second Amended Complaint.

56. Defendant, Al Dia News, is a Pennsylvania corporation with its principal place of business located at 1835 Market Street, 4th Floor, Philadelphia, Pennsylvania 19103. It is a media company that focuses on the Latino experience in the United States. The articles posted on its website are accessible anywhere in the United States, including Pennsylvania.

**RESPONSE:** Defendants admit that the Second Amended Complaint names Al Dia News as a defendant. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 56 of the Second Amended Complaint.

57.     Defendant, Brittany Valentine, is an adult individual who, at all times applicable hereto, was employed by Al Dia News and authorized to make statements on the website of Defendant Al Dia News.

**RESPONSE:**  Defendants admit that the Second Amended Complaint names Brittany Valentine as a defendant.  Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 57 of the Second Amended Complaint.

58.     Defendant, New York Times Co., is a New York corporation with its principal place of business located at 620 8th Avenue, New York, New York 10018. It operates one of the top American daily newspapers with a wide international audience. The New York Times publishes articles on its website, which is accessible anywhere in the United States, including Pennsylvania.

**RESPONSE:**  Defendants admit that the Second Amended Complaint names New York Times Co. as a defendant.  Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 58 of the Second Amended Complaint.

59.     Defendant, Michael Levenson, is an adult individual who, at all times applicable hereto, was employed by the New York Times and authorized to make statements on its behalf on its website.

**RESPONSE:**  Defendants admit that the Second Amended Complaint names Michael Levenson as a defendant.  Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 59 of the Second Amended Complaint.

60.     Subject matter jurisdiction over the Defendants with respect to these claims and causes of action is conferred upon this Court pursuant to 28 U.S.C. § 1332, and pursuant to the Court's supplemental jurisdiction 28 U.S.C. § 1367, and it has personal jurisdiction over the

Defendants because they either live in Pennsylvania, are incorporated in Pennsylvania, or carry out a continuous and systematic part of their general business within the Commonwealth.

**RESPONSE:** The allegations in Paragraph 60 of the Second Amended Complaint are legal conclusions as to which no response is required.

61. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff resides in Philadelphia County, and the transactions and occurrences at issue, out of which the within causes of action arise, took place in Philadelphia County, causing the resulting harms suffered by Plaintiff there.

**RESPONSE:** The allegations in Paragraph 61 of the Second Amended Complaint are legal conclusions as to which no response is required.

62. In 1972, Vincent Leaphart founded the "Christian Action Life Movement," an organization which later become known as the MOVE family. When doing so, he adopted the name "John Africa" to pay homage to the continent, which he believed was the mother continent of all life. Like the organization's founder, all MOVE members have changed their surname to "Africa".

**RESPONSE:** Admitted based upon publicly available information and the Tucker Report.

63. The MOVE organization considers itself "a family of strong, serious, deeply committed revolutionaries founded by a wise, perceptive, strategically minded Black man named John Africa."

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63 of the Second Amended Complaint.

64. The MOVE Commission Report published after the 1985 MOVE bombing described MOVE as "a small group of self-styled back-to-nature, anti-technology, anti-social

advocates," and opined that MOVE "came to reject and to place themselves above the laws, customs, and social contracts of society" by "threatening "violence to anyone who would attempt to enforce normal societal rules."

**RESPONSE:** The allegations in Paragraph 64 of the Second Amended Complaint purport to characterize a written document, the terms of which speak for themselves, and therefore Defendants deny the allegations in Paragraph 64 to the extent they are inconsistent with that document.

65. MOVE philosophies include a love of animals and the rejection of cooked and processed foods, which requires a diet of only raw meat, vegetables, and fruit. MOVE members rejected all modern technology and medicine, as well as normal societal norms. These practices were instituted at all of MOVE's properties, including its primary residence in Philadelphia and properties in Richmond, Virginia and Rochester, New York.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65 of the Second Amended Complaint.

66. Throughout its existence, members of MOVE have seen themselves as the target of unwarranted and unlawful discrimination, harassment, and treatment by law enforcement, the courts, and other regulatory agencies.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66 of the Second Amended Complaint.

67. In 1983, Philadelphia members of the MOVE organization took residence in a house at 6221 Osage Avenue, Philadelphia, Pennsylvania, in the predominantly Black neighborhood of Cobbs Creek, Philadelphia.

**RESPONSE:** Admitted based upon publicly available information and the findings of the Tucker Report.

68.     Shortly thereafter, tensions began to mount between MOVE and their neighbors, and the other racial minority members of Cobbs Creek formed the "United Residents of the 6200 Block of Osage Avenue" ("United Residents") to protest MOVE's presence in their neighborhood.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68 of the Second Amended Complaint.

69.     United Residents made several complaints to the Philadelphia police, who had had their own prior conflicts with MOVE, and Philadelphia Mayor Wilson Good decided something needed to be done; so, he met with high-ranking members of the Philadelphia Police Department and District Attorney's Office to create a tactical plan regarding the MOVE organization.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 of the Second Amended Complaint.

70.     On May 12, 1985, a Philadelphia Court of Common Pleas judge approved requests for search and arrest warrants for certain MOVE members, and Philadelphia police evacuated the Osage Avenue neighborhood for the warrants to be executed.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 of the Second Amended Complaint.

71.     In the early morning hours of May 13, 1985, with the Osage Avenue block secured, the Police Commissioner announced over a bullhorn that four people inside 6221 Osage Avenue were named in arrest warrants, giving them fifteen minutes to surrender to the police authorities present at the scene.

**RESPONSE:** Admitted based upon publicly available information and the findings of the Tucker Report.

72. The MOVE members responded over a loudspeaker, announcing that they would not be surrendering. Shortly thereafter, the police began untenably firing high-pressured water, tear gas, and smoke projectiles at the front and rear of the house, ultimately firing over 10,000 rounds of live ammunition into the MOVE compound.

**RESPONSE:** Admitted based upon publicly available information and the findings of the Tucker Report.

73. At 3:45 PM, after the police made no progress in removing the MOVE members from their home, Philadelphia Mayor W. Wilson Goode, a City politician of African American descent, announced at a televised press conference that he planned to seize control of the MOVE house by "any means necessary," and then approved the dropping of an aerial bomb on the occupied property from a helicopter.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73 of the Second Amended Complaint.

74. The police dropped the aerial bomb via helicopter on the MOVE house at 5:30 p.m., and when the house burst into flames, the Police and Fire Commissioners decided to let it burn for several hours rather than extinguishing it immediately. This decision allowed the uncontrolled fired to spread to other houses on the block, and by the time the Fire Department was able to extinguish the fire at 11:41 p.m., it had already destroyed the MOVE house and the six homes adjoining it on Osage Avenue and Pine Street, along with causing severe fire damage to at least another 100 homes.

**RESPONSE:** Defendants admit, based upon the findings of the Tucker Report, that the police dropped the aerial bomb via helicopter on the MOVE house at approximately 5:30 p.m., that the fire was permitted to burn unabated for 45 minutes, and that the fire burned out of control until the Fire Department extinguished it at 11:41 p.m., after it had destroyed sixty adjoining homes on Osage Avenue and Pine Street and damaged another 100.

75.      Eleven (11) MOVE members were killed during the bombing, presumed to consist of six (6) adults and five (5) children.

**RESPONSE:** Admitted based upon the findings of the Tucker Report.

76.      Despite the actions of Mayor Goode's administration being irrefutably improper and horrifying, those responsible for the siege on the MOVE compound never faced any consequences for their actions.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76 of the Second Amended Complaint.

77.      Once the fire was extinguished, attention turned to processing the MOVE bomb site and any evidence that remained.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77 of the Second Amended Complaint.

78.      Unfortunately, the City's processing of the site was a complete debacle; forensic analysis of the bomb site was already complicated by the fire's temperature of more than 2,000 degrees Fahrenheit, which effectively reduced the bomb site and surrounding area to debris, rubble, and dust, and the Philadelphia Medical Examiner's Office exacerbated these difficulties by their inaction – their representatives refused to go to the bomb site until after the first body was discovered well into the day after the bombing, May 14, 1985.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78 of the Second Amended Complaint.

79. By the time the Medical Examiner's representatives arrived at the scene, the City had already begun using cranes and other inappropriate bulk construction equipment to remove fire debris including the body parts of the individuals who had died in the conflagration, thereby damaging those remains.

**RESPONSE:** Admitted based upon the findings of the Tucker Report,

80. Those actions caused a professional collection and damaging of valuable evidence related to the remains of the individuals who had died in the bombing and fire, with no identification of location or position at the scene. These actions were contrary to proper and standard crime scene procedures since there was no systematic procedure for recording evidence and no proper control over the physical remains of the date. Moreover, required lateral x-rays and toxicology tests of the remains were not taken.

**RESPONSE:** Admitted based upon the findings of the Tucker Report.

81. The City's initial failure in appropriately processing the MOVE site set the stage for the severe difficulties faced by the anthropologists tasked with identifying the remains removed from the site.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81 of the Second Amended Complaint.

82. The City's failures caused by its unprofessional, hasty actions in removing the spector of the City's murder of the MOVE individuals prompted then Chief Medical Examiner, Dr. Marvin Aronson, to invite Dr. Alan Mann, professor in the Department of Anthropology at the

University of Pennsylvania who possessed the necessary expertise in identifying bone fragments, to assist with the identification of the individuals killed in the fire.

**RESPONSE:** Defendants admit that Dr. Alan Mann was retained by the Medical Examiner to assist with the identification of the remains. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 82 of the Second Amended Complaint.

83. Dr. Mann in turn tasked his then doctoral student, Dr. Monge, with assisting him with the analysis of the disassociated bone fragments removed from the bomb site.

**RESPONSE:** Admitted based upon the findings of the Tucker Report.

84. Since none of the skeletal remains at the site were intact or complete, Dr. Mann and Dr. Monge began sorting recovered bone fragments based on age profiles.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84 of the Second Amended Complaint

85. During this investigation, their examination of a certain pelvis bone and proximal femur bone fragments revealed that those remains did not conform to any of the ages of the MOVE individuals presumed to have been killed in the bombing and subsequent fire.

**RESPONSE:** Defendants admit, based upon the findings of the Tucker Report, that Dr. Mann concluded that the remains composed of fragments of the pelvis and a portion of the femur were the remains of an older female between the ages of 17 and 21 and could not be those of the victim identified by the MOVE Commission. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85 of the Second Amended Complaint.

86.     Specifically, they noted that those particular bone fragments were clearly the remains from a young adult female, likely between the ages of 17 and 21 and were not the fragments of bones from the oldest child thought to be in the MOVE house at the time of the bombing and fire, a 14-year-old girl named Katricia (Tree) Africa.

**RESPONSE:**  Defendants admit, based upon the findings of the Tucker Report, that in the spring/summer of 2021, Dr. Mann concluded that the remains composed of fragments of the pelvis and a portion of the femur were the remains of an older female between the ages of 17 and 21 and could not be those of the victim identified by the MOVE Commission.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86 of the Second Amended Complaint.

87.     Since the remains did not match the ages of any MOVE members, Dr. Mann and Dr. Monge considered the bones to be unaffiliated with any of the known MOVE victims and thereafter referred to by them as Jane Doe.

**RESPONSE:**  Defendants admit that Dr. Mann concluded that the remains were not those of Katricia Africa.  Defendants lack information or knowledge sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 87 of the Second Amended Complaint.

88.     But because Dr. Mann's and Dr. Monge's findings put the City at risk of liability for murdering not only members of the MOVE organization, but also unsuspecting neighbors that were unrelated to the incident, the City refused to accept those findings.

**RESPONSE:**  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 88 of the Second Amended Complaint.

89.     Instead, the City appointed MOVE Commission investigating the bombing and subsequent excavation established its own outside pathology group led by pathologist Ali Hameli,

M.D. to identify the remains of the victims in a way that would limit the City's liability. That group did not include Dr. Mann or Dr. Monge or rely on their findings.

**RESPONSE:** Defendants admit, based upon the Tucker Report, that the City-appointed MOVE Commission engaged three forensic pathologists, including Ali Hameli, M.D., to identify the remains of the victims of the MOVE bombing and the causes of their deaths, and that Dr. Mann and Dr. Monge were not engaged by the Commission as part of this effort. Defendants lack information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 89 of the Second Amended Complaint.

90.     In a flawed report calculated to support any inference that the bombing may have killed persons not part of the MOVE family without any input of Drs. Mann and Monge, Dr. Hameli wrongly and unscientifically stated that the Jane Doe pelvis and femur fragments were associated with the 14-year old Katricia "Tree" Africa (Dodson) ("Katricia").

**RESPONSE:** Defendants admit, based upon the findings of the Tucker Report, that the Commission's experts concluded that the remains belonged to Katricia Africa. Defendants lack information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 90 of the Second Amended Complaint.

91.     After receiving the Commission's recommendation, Dr. Mann conducted a second investigation and issued a report reaffirming Dr. Monge's and his conclusion that the pelvis and proximal femur fragments were not the bone fragments from Katricia, conclusions that were later confirmed by at least seven different forensic anthropologists.

**RESPONSE:** Defendants admit, based upon the findings of the Tucker Report, that Dr. Mann conducted a second investigation and issued a report reaffirming his conclusion that the pelvis and femur fragments were not those of Katricia Africa. Defendants lack information or

knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91 of the Second Amended Complaint.

92.     But due to the conflicting conclusion improperly reached by Dr. Hameli, the Philadelphia Medical Examiner's Office sought to further identify the Jane Doe fragments, and it provided those bone fragments to Dr. Mann to allow him to continue his analysis in his lab at the Penn Museum with Dr. Monge's assistance.

**RESPONSE:**  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 92 of the Second Amended Complaint.

93.     On December 14, 1985, the remains conclusively identified as belonging to Katricia Africa were buried after their release to Hankins Funeral Home.

**RESPONSE:**  Admitted based upon the findings of the Tucker Report.

94.     From 1986 to 2001, the bone fragments, which had still not been conclusively identified to any known individual, were stored in Dr. Mann's Office in the physical anthropology section of the Penn Museum in strict compliance with standard forensic best practices. All storage boxes were made from cardboard and lined with cotton fiber for absorbency to properly preserve the remains which had small areas of tissue attached. The Jane Doe Fragments were also safely wrapped in bubble wrap to further protect them and kept in a secured and locked room, which was only accessible to curators of the Physical Anthropology section of the Penn Museum.

**RESPONSE:**  Defendants admit, based upon the findings of the Tucker Report, that the remains were stored in a box in Dr. Mann's office from 1986 to 1991.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 94 of the Second Amended Complaint.

95.     In her effort to continue the investigation, in 1995, Dr. Monge sought out contact with one of the surviving MOVE members Ramona Africa (who had just been released from a long prison sentence) with the hope of gaining her assistance in ascertaining the identity of the older woman whose bone fragments had been retained in safe and appropriate storage at the museum. Ramona Africa declined Dr. Monge's overtures, and the Jane Doe Fragments remained in safe storage at the Museum.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95 of the Second Amended Complaint.

96.     In 2001, Dr. Mann left Penn to join the Anthropology Department at Princeton University as a full-time faculty member. At that time, Dr. Monge inherited the task of storing and preserving of the Jane Doe Fragments as The Keeper and Curator of the Physical Anthropology section of the Penn Museum.

**RESPONSE:** Defendants admit that Dr. Mann left Penn in 2001 to join Princeton University and that, around that time, Plaintiff became a Keeper at the Penn Museum. Defendants deny the remaining allegations in Paragraph 96 of the Second Amended Complaint.

97.     When Dr. Mann joined Princeton's Anthropology Department as the only biological anthropologist on the faculty, he required teaching support to complete his duties and once again solicited his former graduate student Dr. Monge to assist him with his courses at Princeton in the same way she had when he was a Professor at Penn.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 of the Second Amended Complaint.

98.     When Dr. Mann left his position at the University of Pennsylvania, the Jane Doe fragments remained in safe storage at the Penn Museum due to Penn's superior facilities for

forensic analysis and its access to a medical school that could provide CT scans and other testing technologies to assist with any further analysis. The storage protocol for the fragments did not change at any time.

**RESPONSE:** Defendants admit that the remains were kept by Plaintiff in the Penn Museum after Dr. Mann left the University of Pennsylvania. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98 of the Second Amended Complaint.

99.     From 2001 to 2015 (when Dr. Mann retired), Dr. Monge brought the Jane Doe fragments to Princeton's campus for further investigation of their source between two and five times. These transfers were conducted for the purpose of having other anthropologists, who were visiting Princeton, to review them and provide their analysis, and they were conducted in strict accordance with chain of custody protocols. Throughout the aforesaid process, the bone fragments were always well-protected and safely stored.

**RESPONSE:** Defendants admit, based upon the findings of the Tucker Report, that Plaintiff took the remains back and forth to Princeton's campus between two and five times. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 99 of the Second Amended Complaint.

100.     In 2014, the Penn Museum renovated the lab in its physical anthropology department, which provided Dr. Monge with the latest scientific technologies and capabilities for the identification of bone fragments.

**RESPONSE:** Defendants admit only that the Penn Museum lab was renovated in 2014. The remaining allegations in Paragraph 100 of the Second Amended Complaint are denied.

101.    Shortly thereafter, Dr. Monge began working with a geneticist from another leading research university on a number of research projects, and the two discussed the possibility of using then just recently developed DNA analysis technology to identify the Jane Doe fragments through relatives of the deceased.

**RESPONSE:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 of the Second Amended Complaint

102.    That DNA analysis would have required a DNA sample from a relative of Katricia to show that there was no relationship to Katricia but rather were fragments of bone from another older female. In order to conclusively rule out the Katricia's relationship, Dr. Monge sought to contact the MOVE family – specifically Katricia's mother, Consuella Dodson who had also just been released from jail – to ask for a sample of her DNA or the DNA of other relatives through a local writer, Malcom Burnley ("Burnley").

**RESPONSE:**  Defendants admit, based upon the findings of the Tucker Report, that Plaintiff worked with Malcolm Burnley to attempt to make contact with Consuewella Africa. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 102 of the Second Amended Complaint.

103.    Despite multiple efforts to communicate with Consuella, Burnley was unable to have a meaningful conversation with her, and Dr. Monge failed to retrieve a DNA sample from any of Katricia's relatives. So, despite her continued interest in restoring humanity to the unidentified bone fragments, Dr. Monge was forced to label the case "cold" and accept that it was unlikely she would ever be able to conclusively identify the source of the fragments.

**RESPONSE:**  Defendants admit only, based upon the findings of the Tucker Report, that Mr. Burnley attempted multiple times to make contact with Ms. Africa and that Ms. Africa

ultimately declined to speak with him. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 103 of the Second Amended Complaint.

104.     Burnley reached out to Dr. Monge again four years later in December 2018 to see if she would be interested in taking any further action in the identification process.

**RESPONSE:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104 of the Second Amended Complaint

105.     Although Dr. Monge had already considered the case "cold," she and Mr. Burnley briefly continued to discuss further investigation but ultimately determined that they would not be able to secure any help from the MOVE family members and declared the end of their efforts to identify the person whose bone fragments had been retained and carefully preserved over those many years.

**RESPONSE:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105 of the Second Amended Complaint.

106.     Although Dr. Mann retired from the Princeton faculty in 2015, Dr. Monge remained to serve Princeton University as a Visiting Professor and Lecturer.

**RESPONSE:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106 of the Second Amended Complaint.

107.     In 2017 and 2018, Dr. Monge was approached by Dr. Carolyn Rouse, the Chair of Princeton's Anthropology Department, and Dr. Jeffrey Himpele, another Princeton anthropology professor, regarding the creation of an online course on Forensic Anthropology that would utilize videos that Drs. Monge and Himpele were already planning to make for an upper-level anthropology course they were teaching together.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107 of the Second Amended Complaint.

108.     In furtherance of that effort in 2019, a discussion ensued regarding the use of the Jane Doe fragments – which had already been declared a "cold" case – to address the difficulties that forensic anthropologists face when identifying remains.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 of the Second Amended Complaint.

109.     The discussions regarding the online course ultimately resulted in the MOOC, "Real Bones: Adventures in Forensic Anthropology," which was published on the Coursera online platform.

**RESPONSE:** Defendants admit that the MOOC "Real Bones: Adventures in Forensic Anthropology" was published on the Coursera online platform.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 109 of the Second Amended Complaint.

110.     Coursera is an online platform that works with universities and other academic and professional organizations to create online courses and certificate programs in a wide array of subjects. Notably, these courses are not mass-broadcasted, and any individual interested in viewing a course's content must sign up for a Coursera account, browse the Coursera course selection, and specifically enroll in a particular online course to gain access to its contents. Coursera does not pay its course creating partners any money, and Dr. Monge did not profit in any way from the production of "Real Bones: Adventures in Forensic Anthropology."

**RESPONSE:** Defendants admit that Coursera is an online platform that provides free and publicly available courses on a range of topics.   Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 110 of the Second Amended Complaint.

111.    The course was designed to discuss forensic anthropology using real world examples, with an overall purpose of teaching how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains. It featured eleven sessions – seven recorded in a studio and four recorded at the Penn Museum in the lab facilities.

**RESPONSE:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 of the Second Amended Complaint.

112.    The first two classes, titled "Losing Personhood: MOVE A Case Study" and "Restoring Personhood" respectively, described the MOVE organization and discussed the history of the MOVE Bombing before explaining the gross, inappropriate excavation of the bomb site and displaying slides of the unidentified Jane Doe Fragments pulled from the wreckage.

**RESPONSE:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112 of the Second Amended Complaint.

113.    Other classes were titled "Tools of the Trade," "Bone: The Basics," "How Bones Grow and Develop," "Dental and Hand-Wrist Standards," "Aging Dentition," and "Gross Morphology," and the one and only time the Jane Doe fragments were displayed in the course occurred in the ninth class, titled "MOVE – An Analysis of the Remains". In that 14-minute class, Dr. Monge can be seen in the Penn Museum's lab with one of her students and the Jane Doe fragments comparing those fragments to other similar bone fragments and models for comparison and explaining how forensic techniques could be used to determine the age of the remains.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113 of the Second Amended Complaint.

114. At all times during the video, both Dr. Monge and her student properly, scientifically, and discreetly handled the remains, utilizing rubber gloves and observing all appropriate protocols.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 of the Second Amended Complaint.

115. The discussion involved only the process utilized in providing the age estimate of the person from whom the fragments originated with Dr. Monge explaining that, despite her diligence, the human source of the fragments had never capable of identification.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115 of the Second Amended Complaint

116. "Real Bones: Adventures in Forensic Anthropology" was published in August 2020 and available for almost a year without any controversy or complaint. During that timeframe, it was viewed by a very limited audience of academic-minded individuals seeking to learn more about forensic anthropology.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116 of the Second Amended Complaint.

117. The course was never broadcast to the public at large and only 450 persons watched all or some of the online course segments. It was only after Paul Mitchell began his deliberate, retaliatory, and self-elevating smear campaign against Dr. Monge that the matter became a public controversy causing Corsera to shut it down.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117 of the Second Amended Complaint

118.     Dr. Monge first met Defendant, Paul Mitchell ("Mitchell"), when he came to the University of Pennsylvania as an undergraduate student in the Anthropology Department in 2009. Mitchell would later receive both his bachelor's degree (2013) and master's degree (2014) from the University of Pennsylvania.

**RESPONSE:** Admitted.

119.     Throughout his tenure at the University, Mitchell took several courses from Dr. Monge, and she was the advisor for his master's thesis.

**RESPONSE:** Admitted.

120.     After graduating from Penn with a master's degree, Mr. Mitchell was enrolled in a doctoral program at the University of California at Berkeley, but shortly after matriculating there, he was accused of professional misconduct related to allegations of plagiarism and was removed from the program.

**RESPONSE:** Defendants admit that Mr. Mitchell graduated from Penn with a master's degree, enrolled in a doctoral program at the University of California at Berkeley, and then returned to Penn and enrolled in a doctoral program at Penn.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 120 of the Second Amended Complaint.

121.     With nowhere else to go, Mitchell reached back out to his previous advisor, Dr. Monge, who, in turn, worked with Penn's Anthropology Department to allow Mitchell to transfer and earn his doctorate degree at Penn.

**RESPONSE:** Defendants admit that Mr. Mitchell graduated from Penn with a master's degree, enrolled in a doctoral program at the University of California at Berkely, and then returned to Penn and enrolled in a doctoral program at Penn. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 121 of the Second Amended Complaint.

122.  Mitchell's doctoral work at Penn was focused on the Samuel G. Morton Cranial Collection, a collection of almost one thousand skulls located at the Penn Museum – more specifically, Mitchell became concentrated on Morton's scientific methodology and the racial and social implications of his work.

**RESPONSE:** Admitted.

123.  However, on information and belief, mirroring his improper actions at Berkely, Mitchell began engaging in further misconduct by, inter alia:

    a.   Defacing Penn Museum lab books;

    b.   Tearing pages from the equipment used to catalogue entries for the lab's micro-CT scanner;

    c.   Engaging in published plagiarism;

    d.   Improperly accessing the lab with his friends to inappropriately explore with them the bones and bone fragments stored at the lab for educational purposes;

    e.   Illegally duplicating the keys to Dr. Monge's office space and adjacent storages space and using his unlawful access to remove certain stored remains, including but not limited to the remains of famous Chicago serial killer, H.H. Holmes; and

    f.   Stealing DNA samples and other forensic materials without authorization.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123 of the Second Amended Complaint.

124.  Once she discovered those actions by Mitchell, and as part of her duties at the Museum, Dr. Monge reported all these unlawful and disturbing activities to Penn Museum Security

and Administrators, along with Dr. Kathleen Morrison, Chair of Penn's Anthropology Section. Despite these well-founded allegations backed by objective evidence, Penn and its Administrators took no actions to punish Mitchell for or deter him from his continued unlawful actions.

**RESPONSE:** Defendants admit that Plaintiff complained about Mr. Mitchell. The remaining allegations in Paragraph 124 of the Second Amended Complaint are denied.

125. Dr. Monge's allegations became the subject of a confrontation by Mitchell of her in the presence of several witnesses in May 2019, in which Mitchell began screaming at her, throwing objects in her direction, slamming his fists down on tables, and threatening Dr. Monge, who became terrified by his comments and actions. Dr. Monge immediately filed a report with the Museum's administration due to the threatening and unpredictable behavior Mitchell exhibited. Once again, Penn and its Administrators did nothing.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125 of the Second Amended Complaint.

126. Fearing for the safety of the equipment and remains she had been tasked with protecting, along with her own safety and wellbeing, Dr. Monge also changed the locks in the Museum and the Lab, and she denied Mitchell any further, unsupervised access to the Physical Anthropology collections at the Penn Museum. It is these final actions that, while all well within Dr. Monge's rights, gave rise to the vengeful, malicious actions that Mitchell took next.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126 of the Second Amended Complaint

127. Mitchell's malicious actions first began in early April 2021, when he met with Christopher Woods, the then-new Director of the Penn Museum, to accuse (without any foundation) Dr. Monge of mishandling the unidentified bone fragments and engaging in other

professional misconduct in reference to the issue of the MOVE bombing investigation. He further expressed concerns over the Penn Museum's policies on the handling of remains, including the unidentified bone fragments from the MOVE site, and unfairly and defamatorily accused Dr. Monge of lacking professionalism in connection with the Coursera course.

**RESPONSE:** Defendants admit that Dr. Woods, whose tenure as Director of the Penn Museum began on April 1, 2021, attended a meeting with Mr. Mitchell in April 2021 and that during this meeting, Mr. Mitchell expressed concern regarding the handling and retention of unidentified remains from the MOVE bombing. Defendants deny the remaining allegations in Paragraph 127 of the Second Amended Complaint.

128.    Then, fearing that his unfounded allegations against Dr. Monge would not bear the disciplinary result he intended against her, he instigated the first article regarding the unidentified bones by contacting his then-girlfriend, Defendant Maya Kasutto, a writer for Defendant Billy Penn who harbored her own grudge against Dr. Monge, to discuss his unfounded and untruthful accusations against Dr. Monge.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128 of the Second Amended Complaint.

129.    Kasutto was a fellow Penn graduate, initially studying biological anthropology but ultimately receiving her undergraduate degree in cultural anthropology and creative writing from the University.

**RESPONSE:** Admitted.

130.    Like Mitchell, Kasutto also had help from Dr. Monge in matriculating at Penn, and had looked to Dr. Monge as a mentor while a biological anthropology student. However, their relationship soured when Kasutto left the biological anthropology program, and Dr. Monge was

forced to revoke her ability to work with remains in the Physical Anthropology section of the Penn Museum for her senior thesis.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130 of the Second Amended Complaint.

131. Aligned against their common target, Kasutto and Mitchell determined they could harm Dr. Monge, while elevating their own careers, by spearheading a "Cancel Culture" movement against Dr. Monge. To do so, they would declare she harbors racist animus against persons of African descent even though they knew she had spent her entire career seeking to bring respect and humanity to identify remains of persons of all races.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131 of the Second Amended Complaint

132. On April 21, 2021, Defendant Billy Penn published an online article written by Maya Kasutto titled "Remains of Children Killed in MOVE Bombing Sat in a Box at Penn Museum for Decades". A copy of that article is attached hereto as Exhibit "A." Despite only Kasutto's name being supplied as the author of the article, all of the false and defamatory information contained therein was supplied by Mitchell, and Kasutto used it for the sole purpose of fostering sentiments against their former mentor and boosting their own credentials.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations relating to the source of the referenced article. The remaining allegations in Paragraph 132 of the Second Amended Complaint purport to characterize a written document, the terms of which speak for themselves, and those allegations are therefore denied.

133. In the article, Kasutto knowingly made the false assertion that the unidentified fragments were conclusively established to be the remains of Katricia Africa, and she further

implied serious and criminal scientific misconduct by Dr. Monge in her retention and handling of the Jane Doe Fragments, defaming Dr. Monge as a "chipper science" teacher who used the remains of a black girl as "props" out of disrespect for this young black woman.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations about what Ms. Kasutto knew. The remaining allegations in Paragraph 133 of the Second Amended Complaint purport to characterize a written document, the terms of which speak for themselves, and those allegations are therefore denied.

134. Even worse, Kasutto explicitly insinuated a racist motive for Dr. Monge's retention and investigation of the bone fragments by calling back to the City's horrific actions during the 1985 MOVE bombing itself:

> "The absence of ethics, void of communication, and abdication of responsibility regarding these remains mirror the circumstances that led to the 1985 disaster."

**RESPONSE:** The allegations in Paragraph 134 of the Second Amended Complaint purport to characterize a written document, the terms of which speak for themselves, and those allegations are therefore denied.

135. At the suggestion of Paul Mitchell, on that same day, another of Mitchell's close associates, Abdul-Aliy Muhammad, published an article in the Philadelphia Inquirer titled "Penn Owes Reparations for Previously Holding Remains of a MOVE Bombing Victim". A copy of that article is attached hereto as Exhibit "B."

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations relating to a friendship between Abdul-Aliy Muhammad and Mr. Mitchell or the reason Mr. Muhammad published the referenced article. The remaining allegations in Paragraph 135 of the Second Amended Complaint purport to characterize a written document, the terms of which speak for themselves, and those allegations are therefore denied.

136.     Like Kasutto's polemic, Muhammad's article was also based almost entirely on the false, defamatory narrative that Mitchell had created to "cancel" Dr. Monge. It conclusively asserted that the unidentified bone fragments were the remains of the two of the black children who died in the tragic bombing and fire – Katricia and Delisha Africa – and it further asserted that Dr. Monge "mishandled" the unidentified bone fragments, implying that she acted unprofessionally and with racial animus. Muhammad then called upon the Penn Museum and University of Pennsylvania to apologize for Dr. Monge's "unethical possession" of the bone fragments, characterizing her handling of them as an "egregious act."

**RESPONSE:** The allegations in Paragraph 136 of the Second Amended Complaint purport to characterize a written document, the terms of which speak for themselves, and those allegations are therefore denied.

137.     Both of these slanderous writings were disseminated broadly and were intended by the authors to reflect Mitchell's false reality wherein Dr. Monge was an unethical racist who should not be holding a responsible position in academia.

**RESPONSE:**   Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations relating to the intent of the authors of the articles  Defendants deny the remaining allegations in Paragraph 137 of the Second Amended Complaint.

138.     Believing that falsities planted in local Philadelphia news outlets would be too small in scope to punish Dr. Monge enough for the perceived wrongs she had done to him, Mitchell then prepared his own paper on the handling and identity of the remains removed from the MOVE site, arguing without foundation that the remains are indisputably those of Katricia and Delisha Africa. He widely distributed this paper to Penn employees, MOVE members, and several larger

media outlets with the hopes of lending further credibility to the false stories his associates had published and broadening the reach of his lies against Dr. Monge.

**RESPONSE:** Defendants admit, based on the findings of the Tucker Report, that Mr. Mitchell prepared and disseminated a paper on the handling and identity of the MOVE remains. The remaining allegations in Paragraph 138 of the Second Amended Complaint are denied.

139.    Mitchell's plan was to create a Hobson's choice for Dr. Monge's employer, the University of Pennsylvania, news outlets around the world, and the general public at large: either to (1) accept Mitchell's false narrative and cast Dr. Monge out as an unethical racist whose work cannot be trusted; or (2) to fight his false narrative and risk being labeled as a racist publisher itself for defending her. Each of the Defendants chose the former alternative in order to avoid the latter and risk a loss of readership.

**RESPONSE:** Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations about Mr. Mitchell's alleged "plan." Defendants deny the remaining allegations in Paragraph 139 of the Second Amended Complaint.

140.    On April 23, 2023, three major media outlets picked up the story and published their own blatantly false, defamatory narratives:

(a)    The Daily Mail published an article on its website authored by Adam Schrader, titled "They Are Juicy': Princeton Professor is Slammed for Disrespecting the Bones of a 14-year Old Black Girl Killed by a Bomb Dropped by Philadelphia Police in 1985 After Members of Her Commune Fired at Cops." A copy of that article is attached hereto as Exhibit "C." The author of that article falsely avers that the remains were bones of a "black child killed in a 1985 police bombing" and it further condemned Dr. Monge's use of the word "juicy" in the Coursera video,

implying that such a word carries racial undertones when in fact it is an anthropological term of art indicating the preserved status of bones and bone fragments;

(b)     The Guardian published an article titled 'Bones of Black children killed in police bombing used in Ivy League anthropology course," by Ed Pilkington. A copy of that article is attached hereto as Exhibit "D." That article also falsely averred that the bone fragment remains are "almost certainly those of the older MOVE girls who died" and implied scientific impropriety and racist-fueled misconduct regarding Dr. Monge's actions and statements. It also took issue with Dr. Monge's use of the words "juicy" and "greasy," suggesting those words carry disrespectful racial undertones when in fact they are anthropological terms of art; and

(c)     The New York Post published an article authored by Jackson O'Bryan titled "Remains of Black Teen Killed in Philadelphia Police Bombing Used in Online Class." A copy of this article is attached hereto as Exhibit "E." That article also implied a racist animus for Dr. Monge's actions and statements:

> "The bones of at least one black teenager killed in the 1985 police bombing in Philadelphia are being used as a `case study' in an online anthropology course – taught by an Ivy League professor who called the remains `juicy.'"

**RESPONSE:** Defendants admit that the referenced articles were published.   The remaining allegations in Paragraph 140 of the Second Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and those allegations are therefore denied.

141.     Upon information and belief, these articles were written without any investigation or research being done beyond the authors simply accepting Mitchell's originally proffered falsities to avoid being called a racist themselves. Moreover, the goal of these articles was to expand the reach of Mitchell's false reality, and to aid and abet the intended implication that Dr. Monge is an unethical, disrespectful, and racist anthropologist whose work cannot be trusted.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141 of the Second Amended Complaint

142. Sensing the start of a possibly viral social justice movement (albeit one based on false and malicious untruths), other media sources were quick to jump on their horse and ride into the battle Mitchell had created based on false and malicious lies. Almost immediately, a flurry of news articles were published on widely accessible websites, all of which implying the bone fragments were those of Katricia and Delisha Africa and falsely condemning Dr. Monge for racist, unprofessional conduct without any basis therefore:

(a) On April 24, 2021, the New York Times published the article "Decades After Police Bombing, Philadelphians `Sickened' by Handling of Victim's Bones" by Michael Levenson. A copy of this article is attached hereto as Exhibit "F." The article falsely identified the bone fragments as the remains of Delisha Africa and defamatorily suggested that the treatment of the remains showed "disrespect for Black life." The article further stated "that the remains had been kept in a cardboard box on a shelf' even though in reality the remains were stored at the Penn Museum following forensic best practices at all times. As a worldwide leader in news coverage, the publishing of this article by the Times aided and abetted Mitchell and in turn the other Defendants in their unlawful actions by increasing both the narrative's exposure and legitimacy.[1]

(b) Two days later, on April 26, 2021, an article written by then freelance writer, Defendant Nora McGreevy, and titled "Museum Kept Bones of Black Children Killed in 1985 Police Bombing in Storage for Decades," was published by the Smithsonian Magazine. A copy of this article is attached hereto as Exhibit "G." That article also implied that Dr. Monge acted unprofessionally and her actions were driven by a racist animus:

---

[1] Though Dr. Monge's claims against the New York Times for defamation, defamation by implication, and false light were dismissed with prejudice, her claim for aiding and abetting was not, and thus, it is discussed herein.

"What's more, the remains appear to have been used as a "case study" in an online course presented by Princeton University and hosted on Coursera. Titled "Real Bones: Adventures in Forensic Anthropology," the class was recorded in 2019 and includes footage of Janet Monge, an adjunct professor in anthropology at the University of Pennsylvania and former student of Mann, picking up the bones and describing them in graphic detail. She makes no reference to the fact that the families of probable victims Tree and Delisha never provided consent for their daughters' bones to be used in this way, the Guardian notes."

The article also falsely asserted that the unidentified remains are those of Katricia and Delisha and it suggests that a failure to contact their families constituted professional misconduct on the part of Dr. Monge;

(c)     On April 30, 2021, Defendant Slate published an article titled "The Grim Open Secret of College Bone Collections" and authored by Elaine Ayers. A copy of that article is attached hereto as Exhibit "H." That article stated that Drs. Mann and Monge were driven by racially based animus: "the physical anthropology departments like the ones that employ Mann and Monge exist today as uneasy reminders of many museums' and universities' racist and colonial foundations." The Slate article further stated that the use of the terms "juicy" and "greasy" by Dr. Monge reflect "most recent example of an ongoing legacy of Black people's bodies used for academic research and pedagogy," declaring improper racial animus when in fact the terms are anthropological terms of art properly used in anthropological instructional context;

(d)     On May 3, 2021, Defendant Al Dia News published the article "There Will Be No Justice For Penn and Princeton's Treatment of MOVE Victims" authored by Defendant Brittany Valentine. A copy of this article is attached hereto as Exhibit "I." In the article, Ms. Valentine falsely accused Drs. Monge and Mann of professional misconduct, stating "[b]ombshell reports revealed the universities shuttled the remains back and forth, and used them in educational settings without ever contacting next of kin";

(e)     On May 7, 2021, Andscape, a popular website run by ESPN, published the article "The Scandal Over the MOVE Bombing Victims' Remains Is Part Of Anthropology's Racist History" authored by Defendant Nicole Froio. A copy of this article is attached hereto as Exhibit "J." The article blatantly reiterated the false narrative of the other articles and ascribed suggested racist motivations for the investigatory actions of Dr. Monge:

> "The handling of the remains of the two MOVE bombing victims is certainly not, as Rouse noted, a "conspiracy." The reality is much worse. The theft of Tree's and Delisha's bones indicates that despite attempts to purge academia and anthropology of colonial logics, they are baked into the structure. It is clear that there is still a belief in the field of anthropology that the remains of Black people are scientific objects to be studied or stored away in boxes rather than laid to rest by their families."

Ms. Froio further alleged racist insensitivity by stating that "[i]n death, [Katricia and Delisha's] bones were used as objects of colonial plunder at academic institutions" and directly asserted that Dr. Monge's handling of the bone fragment remains was unethical, unprofessional, and racist;

(f)     On May 16, 2021, The New Yorker published the article "Saying Her Name" by Heather Ann Thompson. A copy of this article is attached hereto as Exhibit "K." That article also falsely implied that the actions of Dr. Monge were unlawfully racist, stating that "the idea that the museum was holding the bones of a Black Philadelphian who was alive as recently as 1985 in the same way that it has held the skulls of enslaved people, procured by grave-robbers, was beyond comprehension," and she directly contradicted without any reason that the scientifically supported findings of Drs. Mann and Monge that the bone fragment remains were not that of Katricia: ("The remains that Mann claimed had never been satisfactorily identified had, in fact, been found to belong to a teen-age girl who, along with her sister, died that day");

(g)     On May 18, 2021, the Philadelphia Inquirer published yet another article regarding the treatment of the remains, this time authored by Jenice Armstrong and titled "The Disrespectful Handling of the MOVE Victims' Remains by the City and Penn Merits More Investigation." A

copy of this article is attached hereto as Exhibit "L." In the article, Armstrong falsely implies unlawful and unprofessional racially motivated actions by Dr. Monge:

> "This latest atrocity is beyond horrible. The MOVE victims' remains have been treated like laboratory specimens, passed from the University of Pennsylvania to Princeton University and then back to Penn. According to the Guardian, they were even included in a now-deleted video promoting a class called "Real Bones: Adventures in Forensic Anthropology";

(h)     On May 26, 2021, Andscape published a second article. The article, written by Linn Washington, was titled 'Disrespect for the MOVE Families Is a Stain That Never Goes Away in Philadelphia." A copy of this article is attached hereto as Exhibit "M." That published piece article falsely states that Dr. Monge "mistreated" the unidentified remains of Katricia and Delisha Africa and further falsely asserts that Mr. Monge's actions were unprofessional and unlawful:

> "Although the scandal caused Princeton to cancel that online course, anthropologist Janet Monge retains her positions at the Penn Museum and on the university's faculty."

Ms. Washington then went on to suggest that Penn' s failure to remove Dr. Monge from her position "renders the University of Penn's apology hollow";

(i)     On July 16, 2021, Teen Vogue published the article 'MOVE Bombing Remains Scandal Shows Enduring Racism in Anthropology" by Ezra Lerner. A copy of that article is attached hereto as Exhibit "N." That published writing suggested improper professional conduct by implication by stating that "the remains of at least one young girl – believed to possibly belonging to Tree as well as Delisha Africa, victims of the police's 1985 bombing of the MOVE house in Philadelphia – had been improperly kept for decades by archaeologists Alan Mann and Janet Monge" and further defamatorily states that the handling of the remains was "unethical";

(j)     On October 31, 2021, Hyperallergic published the article 'How the Possession of Human Remains Led to a Public Reckoning at the Penn Museum," authored by Kinjal Dave and Jake Nussbaum. A copy of this article is attached hereto as Exhibit "O." Like its predecessors, the

article details the aftermath of the media firestorm, but falsely blames Dr. Monge for a racially motivated investigation of the bone fragments, stating "Consuella did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching."

**RESPONSE:** It is admitted that the referenced articles were published. The allegations in Paragraph 142 of the Second Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and those allegations are therefore denied. The remaining allegations in Paragraph 142 of the Second Amended Complaint are denied.

143.    Each of the aforecited articles contain statements and/or implications that were false, and the defendants either knew or should have known at the time of publication that they were false because they were coming from Dr. Monge's scorned former student, his girlfriend, and his business associate.

**RESPONSE:** Denied.

144.    But rather than seek to publish the truth, the defendants published the aforecited articles for the sole purpose of lending credibility to Mitchell's defamatory lies and increasing the scope of his false narrative from the city of Philadelphia to the entirety of the world.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144 of the Second Amended Complaint.

145.    Indeed, although a few articles in local news outlets might be construed as opinion, those opinions become undeniably factual to the public when reported repeatedly by several trusted news sources. Thus, the news created a false and malicious reality, with each of the articles unlawfully aiding and abetting the false and actually malicious lies of Mr. Mitchell and the University of Pennsylvania Defendants.

**RESPONSE:** Denied.

146. Though Dr. Monge understood that the general public might not fully understand her work and the respect and care she takes with each case before her, she assumed that at least her fellow anthropologists, UPenn, and her fellow faculty members would defend the truth. Unfortunately, they did not; instead, without any reasonable investigation, they blindly accepted the statements fomented by Mitchell and the University of Pennsylvania and republished them as fact to the public.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146 of the Second Amended Complaint. It is denied that the media reports accepted statements fomented by Penn.

147. Dr. Monge could not even find safety in the professional community and university where she had dedicated decades of her life. Specifically, on April 26, 2021, a collective statement by the Association of Black Anthropologists (ABA), the Society of Black Archaeologists (SBA), and the Black in Bioanthropology Collective (BiBA) released a statement (a copy of which is attached hereto as Exhibit "P") stating that they "condemn in the strongest possible language the University of Pennsylvania, Princeton University, Coursera, along with Professors Alan Mann and Janet Monge, for their horrific treatment of the remains of Tree and Delisha Africa, and for the unfathomable heartlessness and disrespect shown towards the Africa family." These statements were intended to suggest that Dr. Monge had an unethical and illegal racially motivated animus towards the remains that she works with.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief about the allegations relating to the intent behind the referenced April 26, 2021 statement and the impact on Plaintiff. The remaining allegations in Paragraph 147 of the Second Amended Complaint

purport to characterize a written document, the terms of which speak for themselves, and those allegations are therefore denied.

148. The groups further went on to state that their members were "outraged by the stunning ethical indifference shown by all parties involved to both Tree and Delisha and to the Africa family, but also by the fact that these entities effectively monetized the remains of Black children murdered in a state terrorist attack – a fact made all the more painful given the heightened public awareness of brutal murders of Black children and youth by the police over the past few years." The statement ended by requesting that Dr. Monge be removed from her position with the University of Pennsylvania.

**RESPONSE:** The allegations in Paragraph 148 of the Second Amended Complaint purport to characterize a written document, the terms of which speak for themselves, and those allegations are therefore denied.

149. The University of Pennsylvania could have responded by defending their loyal employee. Indeed, Penn has its own internal mechanism for determining whether faculty research is appropriate – the Institutional Review Board – that could have investigated Dr. Monge's research and cleared her name. But upon information and belief, Penn never contacted the Institutional Review Board to review the case. Instead, on the same day the ABA's statement was released, Penn locked Dr. Monge out of her lab and all Physical Anthropology collection storage spaces.

**RESPONSE:** Defendants admit that the Institutional Review Board did not review Plaintiff's retention of the MOVE remains, and that access to the Physical Anthropology collection storage spaces was restricted for all Penn Museum employees, not only Plaintiff. The remaining allegations in Paragraph 149 of the Second Amended Complaint are denied.

150.    Two days later, Defendants Gutmann and Prickett authored an email to employees of the Penn Museum calling Dr. Monge's actions "insensitive, unprofessional, and unacceptable." A similar statement authored by them was sent to the full University Pennsylvania community. As Dr. Monge's employer, Penn's statements condemning her actions and implying impropriety aided and abetted the defamatory actions of the other defendants by legitimizing their claims. Once Penn asserted Mitchell's false narrative as fact, there was simply no way to pull it back and return Dr. Monge's reputation to normal.

**RESPONSE:** Defendants admit that on April 26, 2021 they published a statement expressing their opinion that the retention of the remains at the Penn Museum was insensitive, unprofessional, and unacceptable, and that an apology had been extended to the Africa family. It is further denied that the referenced statement incorporated or was based on a false narrative, as the factual recitations in the statement were true. The remaining allegations in Paragraph 150 of the Second Amended Complaint are denied.

151.    Shortly thereafter the publication of the University's condemnation of Dr. Monge, the Chair of Penn's Anthropology Department, Dr. Kathleen Morrison, told Dr. Monge that she was being put on a "work pause" and would be removed from teaching any University classes.

**RESPONSE:**  Defendants admit that, in consultation with Plaintiff, Dr. Kathleen Morrison informed Plaintiff that she would not be teaching classes in the upcoming semester. Defendants deny the remaining allegations in Paragraph 151 of the Second Amended Complaint.

152.    Then, on May 4, 2021, Dr. Monge was informed that her scheduled summer programs at the Penn Museum and scheduled high school talks for Penn were also being cancelled, and the following day, Penn posted a call to action for the termination of Dr. Monge on its Anthropology Department's webpage.

**RESPONSE:** Defendants admit that summer programs at the Penn Museum that were to be taught by Plaintiff and high school talks were cancelled. Defendants deny the remaining allegations in Paragraph 152 of the Second Amended Complaint.

153. In August 2021, Dr. Monge discovered that Penn had also removed her from the department's webpage where it lists the current "Graduate Group and Affiliated Faculty" and shortly thereafter, she was informed that she would no longer be able to teach any of her current classes, be an adjunct professor, or even be an associate curator at the Penn Museum, and was being demoted to Museum Keeper.

**RESPONSE:** Defendants admit that when Plaintiff's membership term in the Anthropology Department Graduate Group expired on July 1, 2021, her name was no longer listed on the webpage among the group's members, and that Plaintiff was informed she would not be teaching her scheduled undergraduate course in Fall 2021. Defendants deny the remaining allegations in Paragraph 153 of the Second Amended Complaint.

154. This demotion was affected by a salary cut of $65,000 per year for the following two years of her employment, upon which Penn would deem Dr. Monge as retired.

**RESPONSE:** Defendants admit that the portion of Plaintiff's salary funded by the College of Arts and Sciences was reduced after she was relieved of teaching duties. The remaining allegations in Paragraph 154 of the Second Amended Complaint are denied.

155. To date, three separate independent investigations have been conducted on the handling of the unidentified remains from the MOVE bombing site, and none of the reports have found that Dr. Monge violated any professional, ethical, or legal standards, nor have they concluded that the bone fragments were those belonging to Katricia or Delisha Africa.

**RESPONSE:** Defendants admit that the independent investigation conducted by Tucker Law Group in the spring/summer of 2021, which culminated in the issuance of the Tucker Report, did not identify violations by Plaintiff of specific professional, ethical or legal standards, but that the report did find Plaintiff's retention of the remains and their use in an online video course demonstrated, at a minimum, extremely poor judgement and gross insensitivity to the human dignity and social and political implications of her conduct. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 155 of the Second Amended Complaint.

156. Based entirely upon the false and defamatory statements discussed above, Dr. Monge's reputation has been irreparably and wrongfully destroyed, and she has been forced to remove herself as an author or co-author from several research articles on which she conducted extensive research solely due to her fear that the work would be condemned as racist.

**RESPONSE:** Defendants deny that they made any false or defamatory statements about Plaintiff or that statements made by Defendants caused harm to Plaintiff's reputation. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 156 of the Second Amended Complaint.

157. Dr. Monge has also been the victim of adverse employment actions, and she has received threatening emails and phone calls, including multiple death threats.

**RESPONSE:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157 of the Second Amended Complaint.

**COUNT I**
***DEFAMATION***
*[Plaintiff vs. University Of Pennsylvania, Amy Gutmann,*
*Paul Mitchell, And Wendell Pritchett]*

158.　The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint as though fully set forth herein.

**RESPONSE:**　Defendants incorporate by reference their responses to the above paragraphs as if fully set forth herein.

159.　The statements of defendants, University of Pennsylvania, Amy Gutmann, Paul Mitchell, and Wendell Pritchett described above are entirely false insofar as they reflect falsely and unfavorably upon Plaintiff's conduct as a professional, as well as her character and reputation. Specifically, Mitchell's statements created a false narrative that Dr. Monge was an unethical racist whose work could not be trusted, and rather than investigate the truth and protect their faculty, the University of Pennsylvania and its agents – including Gutmann and Pritchett – chose to legitimize and perpetuate that false narrative through their own false statements.

**RESPONSE:**　Denied.

160.　Mitchell was fully aware that his allegations were false, but he made them anyway based on a personal animus against Dr. Monge – namely, that she reported him for professional and academic misconduct after several instances of inappropriate behavior.

**RESPONSE:**　Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 160 of the Second Amended Complaint.

161.　The remaining defendants named in this Court published their own statements with reckless disregard for their truth or falsity because they knew the allegations against Dr. Monge were, a dedicated employee of the University for decades, were false, and the allegations Dr. Monge had made against Mitchell were grounded in objective evidence. But faced with the

Hobson's choice of going along with Mitchell's plan or being tagged as racist along with Dr. Monge, Penn and its Administrators knowingly chose the easy route and protected Mitchell and his known lies, thereby joining in on his actual malice against Dr. Monge.

**RESPONSE:** Defendants deny that they published statements about Plaintiff that were false or with disregard for their truth or falsity. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the other defendants. The remaining allegations in Paragraph 161 of the Second Amended Complaint are denied.

162. The University's favoritism towards Mitchell and animus towards Dr. Monge were evidenced in Dr. Monge's meeting with school officials when she lost her positions as Adjunct Professor and Curator. Every transgression brought up by the school dealt with Dr. Monge's alleged unfair treatment of Mitchell even though Dr. Monge did nothing more than follow the appropriate procedures when reporting Mitchell for misconduct.

**RESPONSE:** Denied.

163. The defendants' false and defamatory statements described above were widely stated to others through published articles, published on the Penn website and circulated among and readers across the globe.

**RESPONSE:** Defendants admit that the statement by Dr. Gutmann and Dr. Pritchett was published on a publicly available website. It is denied that the statement was false or defamatory. Defendants lack knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 163 of the Second Amended Complaint.

164. The defendants' false and defamatory statements described above applied to the Plaintiff, were understood by the recipients of the statements to have a defamatory meaning and

were understood or reasonably understood by the recipients of the statements as intended to be applied to the Plaintiff.

**RESPONSE:** Defendants deny that they made false or defamatory statements about Plaintiff. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 164 of the Second Amended Complaint.

165. The defendants' false and defamatory statements described above constitute defamatory publications made with actual malice which are actionable per se and are libel per se, as they cast doubt on Dr. Monge's ability to perform in her chosen profession and suggest that Dr. Monge has committed a crime by violating the civil rights of a deceased bombing victim and her family based on race.

**RESPONSE:** Denied.

166. The defendants' false and defamatory statements described above severely injured and caused special harm to Plaintiff in that they have (a) ruined her reputation; (b) exposed her to hatred, contempt, ridicule, and humiliation; (c) ascribed to her characteristics incompatible with the proper conduct of a professional anthropologist; and (d) injured her in the practice of her chosen field.

**RESPONSE:** Denied.

167. As a direct and proximate result of the intentional, malicious, reckless, negligent, and/or careless statements contained in the articles identified above, Plaintiff's reputation and esteem in the community have been adversely affected, third persons have been deterred from working with her, and she has been forced to remove herself from research articles and other scholarly papers for the sole reason that her employer falsely held her out to be a racist and unethical anthropologist.

**RESPONSE:** Denied.

168. As a result of the aforementioned defamatory statements, Plaintiff has sustained, and will sustain in the future, a loss of income and earning capacity.

**RESPONSE:** Denied.

169. As a further result of the aforementioned defamatory statements, Plaintiff has sustained grave mental anguish, humiliation, and loss of her enjoyment of life.

**RESPONSE:** Denied.

170. The publication of the false and defamatory statements described above have been and continue to be republished, and the plaintiff therefore demands presumed, compensatory, economic, and punitive damages for the harm flowing from any and all such republications of the false and defamatory statements in addition to damages for the harm flowing from their initial publication.

**RESPONSE:** Defendants admit that Plaintiff seeks presumed, compensatory, economic, and punitive damages, but deny that she is entitled to any such relief.

171. The false and defamatory statements contained in the articles identified and described above are not subject to any recognized privilege, and/or to the extent that any privilege existed or could exist, the Defendants abused any such privilege.

**RESPONSE:** Denied.

172. Due to the willful, wanton, intentional and malicious nature of the Defendants' conduct, Plaintiff also demands an award of punitive damages in an amount to be determined at trial.

**RESPONSE:** Defendants admit that Plaintiff seeks punitive damages, but deny that she is entitled to any such relief.

## COUNT II
### DEFAMATION BY IMPLICATION
*[Plaintiff vs. University Of Pennsylvania, Amy Gutmann, Paul Mitchell, Billy Penn, Maya Kasutto, The Philadelphia Inquirer PBC, Abdul Aily Muhammad, ESPN D/B/A Andscape, Nicole Froio, American Anthropological Association, Slate, Elain Ayers, Teen Vogue, Ezra Lerner, Hyperallergic Media, Kinjal Dave, Nora McGreevy, Al Dia News, Brittany Valentine, Wendell Pritchett, Jenice Armstrong, Linn Washington, Jake Nussbaum]*

173.     The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint as though fully set forth herein.

**RESPONSE:**  Defendants incorporate by reference their responses to the above paragraphs as if fully set forth herein.

174.     The statements made by the defendants contained in the aforementioned articles constitute defamation by implication, in that their context was such that, although the statements may be construed as literally true, those statements create an overall false and defamatory impression of Dr. Monge.

**RESPONSE:**  Denied.

175.     The articles identified above did so by maliciously, intentionally, recklessly, and falsely, by words, innuendo, inference, and manner in which they were presented, held Dr. Monge out to public scorn and ridicule, attributed improper conduct to Dr. Monge, and cast doubt on Dr. Monge's ability to properly carry out the responsibilities of her job and chosen profession. Specifically, all of the above articles can be read by the average reader as carrying the implication that Dr. Monge was an unethical racist whose work could not be trusted.

**RESPONSE:**  Denied.

176.     The defendants in Count II published these articles intentionally or recklessly aiding and abetting Mitchell's false "cancel culture" movement against Dr. Monge to amplify a potentially "viral" news story to increase their viewership and revenue. Upon information and belief, they conducted no investigation as to the allegations made by Mitchell and in the other

defendants' articles, nor did they care to do so. Rather, their only intention was to create a story that would rile up the public against the purported wrongdoing of Dr. Monge. In doing so, the defendants published their false and defamatory statements with reckless disregard for whether the material was false, and this conduct constitutes actual malice.

**RESPONSE:** Denied.

177.     The false and defamatory statements described above and contained in the articles identified were in no manner privileged nor did the articles constitute fair comment on matters of public concern or interest. Indeed, there was no public concern whatsoever over Dr. Monge's professional handling of the unidentified Jane Doe Fragments until Mitchell's false narrative, accelerated by the other defendants' publications, cast her into the public light as a racist despite those allegations being false.

**RESPONSE:** Denied.

178.     Dr. Monge is not, and has never been, either a general or limited purpose public figure. She has never been recognizable to the general public, did not thrust herself to the forefront of any public controversy, or create the public controversy falsely reported on by the defendants. She was a forensic physical/biological anthropologist, professor, and researcher who worked in her lab, outside of the spotlight, to restore humanity to the remains before her. It was only after Mitchell's smear campaign, aided and abetted by the other defendants that Dr. Monge ever became known.

**RESPONSE:** Denied.

179.     The statements and implications set forth above constitute defamatory publications which are actionable per se, are libels per se, and were published with actual malice.

**RESPONSE:** Denied.

180. The false and defamatory statements described above and contained in the articles identify severely injured and caused special harm to Plaintiff in that they have (a) ruined her reputation; (b) exposed her to hatred, contempt, ridicule, and humiliation; (c) ascribed to her characteristics incompatible with the proper conduct of a professional anthropologist; and (d) injured her in the practice of her chosen field.

**RESPONSE:** Denied.

181. As a direct and proximate result of the intentional, malicious, reckless, negligent, and/or careless statements contained in the articles identified above, Plaintiff's reputation and esteem in the community have been adversely affected, third persons have been deterred from working with Plaintiff, Plaintiff has sustained (and will sustain in the future) a loss of income and earning capacity, and Plaintiff has sustained grave mental anguish, humiliation, and loss of her enjoyment of life.

**RESPONSE:** Denied.

182. The publication of the false and defamatory statements and those contained in the articles identified and described above have been and continue to be republished, and the plaintiff therefore demands presumed, compensatory, economic, and punitive damages for the harm flowing from any and all such republications of the false and defamatory statements in addition to damages for the harm flowing from their initial publication.

**RESPONSE:** Defendants admit that Plaintiff seeks presumed, compensatory, economic, and punitive damages, but deny that she is entitled to any such relief.

183. Due to the willful, wanton, intentional and malicious nature of the Defendants' conduct, Plaintiff also demands an award of punitive damages in an amount to be determined at trial.

**RESPONSE:**  The allegations in Paragraph 183 of the Second Amended Complaint state conclusions of law to which no responsive pleading is required.  To the extent that any responsive pleading is required, the allegations are denied.

**COUNT III**
***FALSE LIGHT***
***[Plaintiff vs. University Of Pennsylvania, Amy Gutmann, Paul Mitchell, Billy Penn, Maya Kasutto, ESPN D/B/A Andscape, Nicole Froio, Guardian Media Group, Ed Pilkington,  Daily Mail And General Trust PLC, Adam Schrader, Slate, Elain Ayers, NYP Holdings  Inc., Jackson O'Bryan, Teen Vogue, Ezra Lerner, Wendell Pritchett, Linn Washington]***

184.    The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint.

**RESPONSE:**  Defendants incorporate by reference their responses to the above paragraphs as if fully set forth herein.

185.    The aforementioned statements and articles, made and published without regard to their truth or falsity, also created false impressions by repeatedly, widely, and extensively publicizing information which stated or implied falsehoods about Plaintiff and placed her before the public in a false light of a kind highly offensive to a reasonable person.

**RESPONSE:**  Denied.

186.    The statements were made public by Defendants, in that they were published in print and on websites accessible by the public at large and to so many persons that the matter must be regarded as public knowledge.

**RESPONSE:**  Denied.

187.    The statements included major misrepresentations of the Plaintiff's character, conduct and activities, and are highly offensive to the Plaintiff, as they would be to any reasonable person.

**RESPONSE:**  Denied.

188.     The misrepresentations contained in the statements were in no manner privileged nor did they constitute fair comment on matters of public concern or interest. Indeed, there was no public concern whatsoever over Dr. Monge's professional handling of the unidentified bone fragments until Mitchell's false narrative, accelerated by the other defendants' publications, cast her into the public light as a racist despite those allegations being false.

**RESPONSE:**  Denied.

189.     The misrepresentations contained in the statements for published solely to join in enhance and aid and abet Mitchell's "cancel culture" movement against Dr. Monge and amplify a potentially "viral" news story to increase viewership and revenue. Upon information and belief, defendants conducted no investigation as to the allegations made by Mitchell and in the other defendants' articles, nor did they care to do so. Rather, their only intention was to create a story that would get clicks and rile up the public. In doing so, the defendants published their misrepresentations with reckless disregard for whether the material was false – this conduct constitutes actual malice.

**RESPONSE:**  Denied.

190.     The statements were published to the general public on websites accessible anywhere in the United States and throughout the world, and they are continuously available to the general public on Defendants' websites.

**RESPONSE:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations about the statements being accessible anywhere in the United States and throughout the world.  Defendants admit the remaining allegations in Paragraph 190 of the Second Amended Complaint.

191.     As a result of these statements, the Plaintiff suffered severe harm to her interest in privacy, as well as significant damages in the form of severe monetary loss, economic and consequential damages discussed above, severe and irreparable impairment of her reputation and credibility in the community generally, and personal humiliation, mental anguish and mental suffering.

**RESPONSE:**  Denied.

**COUNT IV**
***CIVIL AIDING AND ABETTING***
***[Plaintiff vs. All Defendants]***

192.     The Plaintiff incorporates by reference the preceding Paragraphs of this Complaint.

**RESPONSE:**  Defendants incorporate by reference their responses to the above paragraphs as if fully set forth herein.

193.     The behaviors in which the Defendants engaged aided and abetted the tortious misconduct of each of the other defendants by giving rise to false and defamatory information against Dr. Monge in a concerted effort to accomplish the particular result of branding Mr. Monge as incompetent in her chosen field and a racist.

**RESPONSE:**  Denied.

194.     When each of the Defendants published their defamatory statements, they knew or should have known through reasonable diligence that the conduct of each of them was tortious and provided substantial assistance and/or encouragement to the original wrong doers to engage in such tortious misconduct.

**RESPONSE:**  Denied.

195.     Yet despite this, the defendants conducted no investigation as to the allegations made by Mitchell and in the other defendants' articles, nor did they care to do so. Rather, they simply wanted to publish a story that would get clicks by enraging the public. In doing so, they

lent legitimacy on the false narrative being pushed, and allowed that false narrative to be read by a much wider audience, thereby assisting in the initial tortious actions taken by Mitchell and his then-girlfriend and associate.

**RESPONSE:** Denied.

196.     As a result of Defendants' conduct aiding and abetting the tortious misconduct of the other Defendants, Plaintiff has suffered and continues to suffer harm to her reputation, humiliation, severe emotional distress, and financial harm,

**RESPONSE:** Denied.

197.     Defendants' conduct in aiding and abetting such tortious conduct was so reckless, wanton, willful, and malicious that Defendants should be punished by the assessment of punitive damages.

**RESPONSE:** Denied.

## AFFIRMATIVE DEFENSES

1.     Plaintiff fails to state a claim for relief, in whole or in part, as a matter of law and fact.

2.     The factual statement made by Dr. Gutmann and Dr. Pritchett relating to the retention and storage of human remains at the Penn Museum, as referenced in the Complaint, was true.

3.     The statement made by Dr. Gutmann and Dr. Pritchett relating to the retention and storage of human remains at the Penn Museum, as referenced in the Complaint, was not made negligently, maliciously, or in reckless disregard as to the statement's truth or falsity.

4.      The statement made by Defendants that the retention and storage of human remains at the Penn Museum was insensitive, unprofessional and unacceptable was a statement of opinion that did not imply the existence of undisclosed facts.

5.      The statements made by Dr. Gutmann and Dr. Pritchett relating to the retention and storage of human remains at the Penn Museum, as referenced in the Complaint, related to a recognized interest of the public.

6.      The statement made by Dr. Gutmann and Dr. Pritchett about the retention of human remains at the Penn Museum was not defamatory because it was subject to a qualified privilege and was not made with malice towards Plaintiff.

7.      The statements made by Dr. Gutmann and Dr. Pritchett relating to the retention and storage of human remains at the Penn Museum, as referenced in the Complaint, did not cause Plaintiff special harm.

8.      Plaintiff's claims are barred, in whole or in part, because she has not sustained any injury or damage by reason of any wrongful act or omission of Defendants.

9.      Plaintiff's claims are barred, in whole or in part, by her actions, inactions, decisions, breaches, negligence, bad faith and/or unlawful or improper conduct.

10.     Defendants have at all times acted in good faith, reasonably, and in accordance with applicable laws, and at all times have had reasonable grounds for believing that any alleged acts or omissions were not violations of Pennsylvania law.

11.     Plaintiff's claims for punitive damages are barred, in whole or in part, because Defendants' actions were not undertaken with willfulness, malice, or reckless indifference to Plaintiff's legally protected rights.

**WHEREFORE**, Defendants respectfully request that judgment be entered in their favor, and that they be awarded their costs of defense and any other relief that may be available to them as the prevailing party.

Dated: June 28, 2024                    MORGAN, LEWIS & BOCKIUS LLP

                                  By: *Michael L. Banks*

                                  Michael L. Banks (PA ID No. 35052)
                                  Ali M. Kliment (PA ID No. 318988)
                                  Alexis Caris (PA ID No. 330623)
                                  2222 Market Street
                                  Philadelphia, PA 19103
                                  Tel: 215.963.5387/4614
                                  Fax: 215.963.5001
                                  Email: michael.banks@morganlewis.com
                                          ali.kliment@morganlewis.com
                                          alexis.caris@morganlewis.com

                                  *Counsel for Defendants University of Pennsylvania, Amy Gutmann, and Wendell Pritchett*

## CERTIFICATE OF SERVICE

I, Michael L. Banks, hereby certify that a true and correct copy of the foregoing Defendants' Answer and Affirmative Defenses to the Complaint was filed electronically and is available for viewing and downloading from the Court's ECF system.

*s/ Michael L. Banks*
Michael L. Banks