IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANET MONGE | : | |
| | : | Civil Action No: 22-cv-02942-MRP |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF PENNSYLVANIA, et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT, HYPERALLERGIC MEDIA, INC. FOR RECONSIDERATION OF THIS COURT'S ORDER AND MEMORANDUM OF OCTOBER 28, 2024 GRANTING IN PART AND DENYING IN PART THE MOTION TO DISMISS OF <u>DEFENDANT,  HYPERALLERGIC MEDIA, INC.</u>**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**      **iii-iv**

**I.**      **INTRODUCTION**      **1**

**II.**      **ARGUMENT**      **2**

     **a. Legal Standard**      **2**

     **b. The Statements in Hyperallergic's Article Are Not Capable of Defamatory Meaning Because They Are Substantially True**      **3**

         **1. Truth As An Absolute Defense to Defamation.**      **3**

         **2. Pure Opinions Are Not Defamatory.**      **3**

     **c. Analysis**      **4**

**III.**      **CONCLUSION**      **12**

# TABLE OF AUTHORITIES

## CASES

*Balletta v. Spadoni,*
     47 A.3d 183 (Pa. Cmwlth. 2012)……………..…………………………..4

*Bobb v. Kraybill,*
     354 Pa. Super. 361, 511 A.2d 1379 (1986)………………….……………….……3

*Braig v. Field Commc'ns,*
     310 Pa. Super. 569, 456 A.2d 1366 (1983)…………….………………...…...…3

*Ciba-Geigy Corporation v. Alza Corporation,*
     Civ. A. No. 91-5286, 1993 WL 90412 (D.N.J. March 25, 1993)
     (citations omitted)………………………………………………………………2

*Dunlap v. Phila. Newspapers, Inc.,*
     301 Pa. Super. 475, 448 A.2d 6 (1982)…………………...……………....…3; 8

*Gertz v. Robert Welch,*
     418 U.S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974)…….……………………3-4

*Gilbert v. Bionetics Corp.,* Civ. Act. No. 98-2668,
     2000 U.S. Dist. LEXIS 8736 (E.D. Pa. June 6, 2000)…………….………..…..3; 8

*Glendon Energy Co. v. Borough of Glendon,*
     836 F. Supp. 1109, 1122 (E.D. Pa. 1993)…………………………………………2

*Gorton v. Air & Liquid Sys. Corp.,*
     303 F. Supp. 3d 278 (M.D. Pa. 2018)……….……..……………...….……………6

*Harsco Corp. v. Zlotnicki,*
     779 F.2d 906, 909 (3d Cir.1985), cert. denied, 476 U.S. 1171,
     90 L. Ed. 2d 982, 106 S. Ct. 2895 (1986)…………………………………………2

*Haynes v. Alfred A. Knopf, Inc.,*
     8 F.3d 1222 (7th Cir. 1993)……………….…..…………….….…………..…...4

*Jones v. City of Phila.,*
     893 A.2d 837 (Pa. Cmwlth. 2006)…..………..…………….…..……..…….…...4

*Kilian v. Doubleday & Co.,*
     367 Pa. 117, 79 A.2d 657 (1951)……………………………………………….…3

*Masson v. New Yorker Magazine,*

501 U.S. 496, 111 S. Ct. 2419, 115 L.Ed.2d 447 (1991)…………………………9

*McCafferty v. Newsweek Media Grp., Ltd.*,
955 F.3d 352 (3d Cir. 2020) …………………………………………………...3-4; 9

*Pension Benefit Guar. Corp. v. White Consol. Indus.*,
998 F.2d 1192 (3d Cir. 1993)……………………………………………………6

*Redco Corp. v. CBS, Inc.*,
758 F.2d 970 (3d Cir. 1985)…………….………………………………………..4

*Today's Housing v. Times Shamrock Communs., Inc.*,
2010 Pa. Dist. & Cnty. Dec. LEXIS 140……………………………...……...…3

*Tucker v. Fischbein*,
237 F.3d 275 (3d Cir. 2001)………………….…………………………...…9-10

*Wiggs v. Foley*,
No. 5:20-cv-02267, 2021 U.S. Dist. LEXIS 139390 (E.D. Pa. July 27, 2021)…...6

## RULES & REGULATIONS

Rule 12(b)(6) of the Federal Rules of Civil Procedure……………………….....2; 6; 12

## OTHER AUTHORITIES

3 Restatement (Second) of Torts § 566 cmt. c (Am. Law Inst. 1977)………..……..…….3

Tucker Law Group (2021) *The Odyssey of the MOVE Remains, Report
of the Independent Investigation into the Demonstrative Display
of MOVE Remains at the PENN Museum and Princeton University*……………..5-8

iv

Defendant, Hyperallergic Media, Inc. ("Hyperallergic"), by and through its counsel, Thomas Paschos & Associates, P.C., hereby move this Honorable Court to reconsider the order and memorandum of October 28, 2024 (attached hereto as Exhibit "A"), granting in part and denying part the Motion to Dismiss of Defendant, Hyperallergic Media, Inc., and in support thereof, avers as follows:

## I.   <u>INTRODUCTION</u>

This action arises from alleged defamatory statements published about Plaintiff as a result of her work with human remains recovered from the MOVE bombing site in Philadelphia, Pennsylvania.

On July 28, 2023, Plaintiff filed a Second Amended Complaint in this matter. Plaintiff asserted a defamation by implication and civil aiding and abetting claim against Hyperallergic, which claims were, previously, dismissed without prejudice against Hyperallergic from Plaintiff's Amended Complaint.

Plaintiff claims that "[o]n October 31, 2021, Hyperallergic published the article ""How the Possession of Human Remains Led to a Public Reckoning at the Penn Museum," authored by Kinjal Dave and Jake Nussbaum." (See Plaintiff's Second Amended Complaint, ¶ 142(j).) Plaintiff averred that "[l]ike its predecessors, the article details the aftermath of the media firestorm, but falsely blames Dr. Monge for a racially motivated investigation of the bone fragments, stating [']Consuella did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching[']" (*See* Plaintiff's Second Amended Complaint, ¶ 142(j).)

Notably, Plaintiff's employment-related claims involving her demotion and damages stemming therefrom pre-date the article attributed to Hyperallergic. That is, the article Plaintiff

references in her Second Amended Complaint pertaining to Hyperallergic is dated October 31, 2021, (*See* Exhibit O to Plaintiff's Second Amended Complaint) whereas the articles alleged to have been published by other Defendants were, according to Plaintiff's Second Amended Complaint, all published by July, 2021. (*See* Plaintiff's Second Amended Complaint, ¶ 140-142.) While Plaintiff claims she has "been the victim of adverse employment actions" (*see* Plaintiff's Second Amended Complaint, ¶ 157), any adverse employment action complained of by Plaintiff occurred months prior to Hyperallergic's October 31, 2021 publication.

On or about August 4, 2023, Hyperallergic filed a Motion to Dismiss Plaintiff's Second Amended Complaint pursuant to F.R.C.P. 12(b)(6).

On October 28, 2024, the Court granted Hyperallergic's Motion to Dismiss to dismiss Plaintiff's civil aiding and abetting claims, but not the Motion as to the defamation by implication.

As there is documentation demonstrating the substantial truth of the statements in Hyperallergic's article, and because substantial truth is the crux of a defense to a defamation by implication claim, this Motion for Reconsideration is appropriate.

## II.   ARGUMENT

### a. Legal Standard

Regarding a motion for reconsideration:

> The rationale for a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir.1985), cert. denied, 476 U.S. 1171, 90 L. Ed. 2d 982, 106 S. Ct. 2895 (1986). …[A] motion for reconsideration "addresses only factual and legal matters that the Court may have overlooked. . . . It is improper on a motion for reconsideration to 'ask the Court to rethink what [it] had already thought through--rightly or wrongly.'" Ciba-Geigy Corporation v. Alza Corporation, Civ. A. No. 91-5286, 1993 WL 90412 (D.N.J. March 25, 1993) (citations omitted).
>
> *See* Glendon Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993.)

### b.  The Statements in Hyperallergic's Article Are Not Capable of Defamatory Meaning Because They Are Substantially True

#### 1.  Truth As An Absolute Defense to Defamation.

"In Pennsylvania, truth is an absolute defense to defamation." *See Gilbert v. Bionetics Corp.*, Civ. Act. No. 98-2668, 2000 U.S. Dist. LEXIS 8736, at *10 (E.D. Pa. June 6, 2000)(citing *Bobb v. Kraybill*, 354 Pa. Super. 361, 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986).) "The truth required to avoid liability for defamation is not complete truth, but rather substantial truth." *See Gilbert v. Bionetics Corp.*, Civ. Act. No. 98-2668, 2000 U.S. Dist. LEXIS 8736, at *10 (E.D. Pa. June 6, 2000)(citing *Kilian v. Doubleday & Co.*, 367 Pa. 117, 79 A.2d 657, 660 (Pa. 1951).) "While there is no set formula, Pennsylvania has determined proof of substantial truth must go to the "gist" or "sting" of the alleged defamatory matter." *See Gilbert v. Bionetics Corp.*, Civ. Act. No. 98-2668, 2000 U.S. Dist. LEXIS 8736, at *10 (E.D. Pa. June 6, 2000)(citing *Dunlap v. Philadelphia Newspapers, Inc.*, 301 Pa. Super. 475, 448 A.2d 6, 15 (Pa. Super. Ct. 1982).) "Minor inaccuracies in a publication do not rise to the level of falsity if the gist of the allegedly defamatory statement is true." *See Today's Housing v. Times Shamrock Communs., Inc.*, 2010 Pa. Dist. & Cnty. Dec. LEXIS 140, *7.

#### 2.  Pure Opinions Are Not Defamatory.

"As Pennsylvania courts recognize, pure opinions cannot be defamatory." *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020.) "Under the First Amendment, opinions based on disclosed facts are "absolutely privileged," no matter "'how derogatory'" they are." *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020)(citing *Braig v. Field Communications*, 310 Pa. Super. 569, 456 A.2d 1366, 1373 (Pa. Super. Ct. 1983)) (quoting 3 Restatement (Second) of Torts § 566 cmt. c (Am. Law Inst. 1977)) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974))." That holds

true even when an opinion is extremely derogatory, like calling another person's statements "anti-Semitic."" *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020)(citing *Jones v. City of Philadelphia*, 893 A.2d 837, 845 (Pa. Commw. Ct. 2006).) "When an article discloses the underlying facts, readers can easily judge the facts for themselves." *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020)(citing *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985) (applying Pennsylvania law).) "Everyone is free to speculate about someone's motivations based on disclosed facts about that person's behavior." *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020)(citing [Balletta v. Spadoni, 47 A.3d 183], 197-99 [(Pa. Cmwlth. 2012)]. ""[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."" *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020)(citing *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993).) "Those statements are just more opinions based on disclosed facts, so they too are not actionable." See *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020.)

c. **Analysis**

As to Plaintiff's defamation by implication claim against Hyperallergic, the Court stated in its Memorandum accompanying its October 28, 2024 order that the statements are capable of defamatory meaning. *See* Exhibit "A" at p. 8. The Court stated that "it is literally true that Dr. Monge did not obtain Consuewella Africa's consent to use the bone fragment remains for research, and Dr. Monge then used the bone fragment remains when teaching her Coursera course." *See* Exhibit "A" at p. 9. The Court stated that "taking the allegations as true and drawing all reasonable inferences in Dr. Monge's favor, neither Dr. Monge nor Mr. Burnley discussed the bone fragment

remains with Consuewella Africa" and "[n]otwithstanding this, the article can be read to imply that Dr. Monge *did* contact Consuewella Africa, and Ms. Africa *affirmatively told* Dr. Monge not to use the bone fragment remains in her research." *See* Exhibit "A" at p. 9 (*citing ECF No. 133* at ¶ 142(j))(("*Even after those objections*, Dr. Monge used Tree Africa's remains for teaching." (emphasis added)). However, the Court stated that "[b]ecause the Hyperallergic article can be reasonably construed to imply that Dr. Monge acted unprofessionally and potentially with a racist impetus, the fact that the challenged statements are largely true does not mandate dismissal of the defamation by implication claims against the Hyperallergic Media Defendants." *See* Exhibit "A" at p. 10. The Court went on to state that "the challenged statements imply the undisclosed fact that Consuewella Africa told Dr. Monge not to use the bone fragment remains for research when, according to the Second Amended Complaint, Dr. Monge did not discuss the bone fragment remains with Ms. Africa." *See* Exhibit "A" at p. 10 (*citing ECF No. 133 at* ¶ 103.) The Court found that "[b]ecause the Hyperallergic article's opinions imply undisclosed facts that are untrue, the article is capable of a defamatory meaning."  *See* Exhibit "A" at p. 10.

Relevant to this issue is a report that was prepared by Tucker Law Group, dated August 20, 2021 and titled *The Odyssey of the MOVE Remains, Report of the Independent Investigation into the Demonstrative Display of MOVE Remains at the PENN Museum and Princeton University* ("The Tucker Report")(relevant pages attached hereto as Exhibit "B")(*See* Exhibit B, pgs. 63-65), which was also referenced in Plaintiff's Second Amended Complaint at paragraph 155 ("To date, three separate independent investigations have been conducted on the handling of the unidentified remains from the MOVE bombing site, and none of the reports have found that Dr. Monge violated any professional, ethical, or legal standards, nor have they concluded that the bone fragments were those belonging to Katricia or Delisha Africa." Paragraph 155) **The Court can properly consider**

the independent investigations referenced in Plaintiff's Second Amended Complaint, and the independent investigation ("The Tucker Report") which was also attached in full to Hyperallergic's previously-filed Motion to Dismiss Plaintiff's Amended Complaint because "[i]t is well-settled that a court may look beyond the complaint in ruling on a motion to dismiss and consider "matters of public record, including court files and records, documents referenced in the complaint, and documents essential to a plaintiff's claims and attached to either the plaintiff's complaint or the moving defendants' Rule 12(b)(6) motions to dismiss."" *See Wiggs v. Foley*, No. 5:20-cv-02267, 2021 U.S. Dist. LEXIS 139390, at *6-7 (E.D. Pa. July 27, 2021)(citing *Gorton v. Air & Liquid Sys. Corp.*, 303 F. Supp. 3d 278, 303 (M.D. Pa. 2018) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993))(emphasis provided.)

The report provides, in pertinent part, the following:

In 2014, Monge sought the assistance of Malcolm Burnley, a writer for *Philadelphia Magazine*, in contacting Consuewella Africa,[153] the mother of two of the children who died in the fire: Zanetta Dotson Africa and Katricia Dotson Africa. Monge stated that she did not feel comfortable contacting MOVE members herself, both because of what she perceived to be MOVE's aggressive public image, and because as a white woman, she did not have the lived experiences to be able to relate to MOVE's experience. Monge enlisted Burnley because she thought that, as a Black man, Consuewella and other MOVE members might be more willing to speak to him. Emails from Burnley to Monge from the Fall of 2014 state that he called Consuewella Africa on multiple occasions but was not able to reach her until December of 2014.[154] Once Burnley reached Consuewella, he said she agreed to a phone call which took place in early December of 2014.[155] Burnley sent Monge an email on December 7, 2014, detailing his conversation:

"My conversation with Consuewella did not go well. I'm extremely bummed but not willing to give up on this. The conversation began with her swearing at me and telling me that "unless I can bring her daughter back, I need to stop f...ing with her." Every time I would speak, she'd either interrupt me or stop me, then confer with someone else she had on speaker phone (a different phone I guess) about what to say next. I found out that this other person was Ramona Africa, late in the conversation. After trying to let her say her peace for 10 minutes, I spoke over Consuewella— telling her that the city did an

6

injustice on that day, and the only way I could possibly find out about bringing her daughter back, would require her participation. She seemed to consider it for a moment, and then started swearing at me again. She said that Ramona would call me (she hasn't) and talk more. It really sounds like she's still part of MOVE and is loopy. I don't know how to proceed. I can get Ramona's phone and email address and try her this week. Perhaps she'd be willing to talk reasonably about the matter, but I doubt it. As terrible as this sounds, I wonder if I could get Consuewella's DNA somehow without her consent? That's highly unethical, I know, but I'll do everything that I can to prove this. It's an important piece of history and the city shouldn't be able to have covered this up for so long. Let me know what you think.[156]

Burnley emailed Monge again on December 29, 2014, advising that he exchanged emails with Ramona Africa. He said, "Ramona emailed me back with one line, 'No, I will not talk to you.' I guess I'll have to try the uncle now. Very disappointing."[157] Monge stated that she was focused and dedicated in determining the identity of the B-1 remains so that she could have the remains returned to the appropriate relative, if possible. To that end, emails from January to March 2019 document Monge and Burnley's plans to "stakeout" Consuewella Africa's home in order to obtain a DNA sample from her trash. Monge said they decided against going through Consuewella Africa's trash because they thought it was unethical. Monge made no attempt to return the remains to the MEO.[158]

*See* Exhibit "B" (footnotes omitted.)

The Tucker Report further provides in an "Odyssey of the MOVE Remains Timeline" that:

12/7/14        Monge contacted Malcolm Burnley to get his assistance in contacting Consuewella Africa to help identify the B-1 remains

12/29/14      Burnley confirmed that Consuewella would not cooperate in identifying the B-1 remains

*See* Exhibit "B" at pgs. 95-97.

Monge's Statement, at Exhibit 14 of The Tucker Report, also provides in part that:

Work continued on these remains until 2019 when we failed to make a morphological associa- tion with Katricia. During this time period, several attempts were made to contact the Africa family including contact with the mother of Katricia, Consuela Dotson Africa to request a DNA sample. (First attempt in 1995 with Ramona Africa at a meeting at the Penn Museum; *subse- quent attempts from 2014 onward are attached here as e-mail correspondence between Mal- colm Burnley, research journalist and myself*). **The requests were** not answered or **answered in the negative.**

> Malcolm Burnley is a research journalist and person of color, at the time, working freelance for *Philadelphia Magazine* (the only journalist of color within that organization). I enlisted his help as a black man to help me approach members of the Africa family. My own background does not give me the moral authority or lived-experience to understand, and sensitively approach, the MOVE organization folks.
>
> Consuela Dotson Africa also ignored requests for the release of the remains of "B-1" remains to her, the next-of-kin, in 1985 (*see attached UPI article dated 9/18/1985*). In 2019, we tried to find Katricia's uncle, Isaac Dotson.

*See* Exhibit "B" at pg. 165 (emphasis provided.)

Further, an email exchange between Burnley and Monge at Exhibit 16 and Exhibit 17 of The Tucker Report demonstrate efforts to contact Consuewella Africa, Burnley's ultimate contact with Consuewella Africa on two occasions, the ultimate conversation Burnley had with Consuewella, and future arrangements to plan a meeting regarding the issue of the remains. *See* Exhibit "B" at pgs. 179-180; 182.

The Tucker Report demonstrates that not only did Monge contact Consuewella Africa through writer Malcolm Burnley, **but that Consuewella Africa certainly objected to the use of the bone fragment remains for research.** Thus, the statements [']Consuella did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching[']" are substantially true, and such substantial truth goes to the "gist" or "sting" of the alleged defamatory matter. (*See Gilbert v. Bionetics Corp.*, Civ. Act. No. 98-2668, 2000 U.S. Dist. LEXIS 8736, at *10 (E.D. Pa. June 6, 2000)(citing *Dunlap v. Philadelphia Newspapers, Inc.*, 301 Pa. Super. 475, 448 A.2d 6, 15 (Pa. Super. Ct. 1982)); *see also* Plaintiff's Second Amended Complaint, ¶ 142(j).)

Because the statements in Hyperallergic's article are substantially true, they are not capable of defamatory meaning, and the Court should reconsider this issue to correct this error of law. This Honorable Court should rule as it did in the Court's Memorandum granting Hyperallergic's Motion to Dismiss without prejudice as to the claim for defamation by implication, where the Court stated

that "the statements at issue in the Hyperallergic article are literally true and are pure opinions that are not capable of defamatory meaning" and "[t]o the extent the article implies racial motivation on Dr. Monge's part, this implication is not actionable because it is a pure opinion." *See Docket 108, Court's Memorandum,* attached hereto as Exhibit "C", at p. 11 (citing *McCafferty*, 955 F.3d at 357.) This Honorable Court indicated that "Hyperallergic…stated that "Consuella [sic] did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching." *See* Exhibit "C", p. 8 (citing Am. Compl. ¶ 161(j).) **This Honorable Court previously found that "[t]he allegations in [Plaintiff's] amended complaint demonstrate that this statement is, in all material respects, substantially true, and thus Hyperallergic…cannot be held liable."** *See* Exhibit "C", p. 8 (citing *Tucker*, 237 F.3d at 287; *Masson*, 501 U.S. at 516-17.) The Court explained that, "[f]irst, [Plaintiff] admits that she attempted to contact Consuwella Dotson in 2014 to obtain a DNA sample to assist [Plaintiff] in her research on the identity of the remains." Exhibit "C", p. 8 (citing Am. Compl. ¶¶ 111-13) (footnote omitted.) The Court went on to indicate that "[Plaintiff] also admits that she was unable to make contact with Consuwella Dotson and declared the case cold after concluding that she would not be able to get help from the Africa family." *See* Exhibit "C", p. 8 (citing *Id*. ¶¶ 111, 113-17.) This Honorable Court therefore found that "it is literally true that [Plaintiff] did not obtain consent from Consuwella Dotson to use the remains for research." *See* Exhibit "C", p. 8. This Honorable Court then stated that "[s]econd, [Plaintiff] admits that she used the remains in her "Real Bones" Adventures in Forensic Anthropology" course to teach people about "how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains." *See* Exhibit "C", p. 8(citing *Id*. ¶¶ 123, 127-128.) The Court thus found that "it is literally true that [Plaintiff] used the remans [sic]

for teaching." *See* Exhibit "C", p. 8. This Honorable Court ultimately found that "[b]ecause the allegedly defamatory statements are true, they are not actionable." *See* Exhibit "C", p. 8(citing *Tucker*, 237 F.3d at 287.)

Plaintiff's Second Amended Complaint failed to cure the defects in her Amended Complaint. In her Second Amended Complaint, Plaintiff identified the following purportedly defamatory statements attributed to Hyperallergic: "Consuella did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching." (*See* Plaintiff's Second Amended Complaint, ¶ 142(j).) The alleged defamatory statements in Plaintiff's Second Amended Complaint, noted above, at ¶ 142(j), are **identical** to the alleged defamatory statements that formed the basis of her defamation by implication claim that was, previously, dismissed, without prejudice, by the Court and previously set forth in her Amended Complaint at ¶ 160(j) ("Consuella did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching.") *See* ¶160(j) of Amended Complaint.

The defects of Plaintiff's Second Amended Complaint can be demonstrated through the defects of her Amended Complaint where her claims were previously dismissed, without prejudice, against Defendant Hyperallergic. At the outset, Plaintiff here again "admits that she attempted to contact Consuwella Dotson…to obtain a DNA sample to assist [Plaintiff] in her research on the identity of the remains." (*See* Exhibit "C", p. 8 (citing Am. Compl. ¶¶ 111-13) (footnote omitted.) Specifically, Plaintiff admits in her Second Amended Complaint that, "[i]n order to conclusively rule out the Katricia's relationship, Dr. Monge sought to contact the MOVE family – specifically Katricia's mother, Consuella Dodson who had also just been released from jail – to ask for a sample of her DNA or the DNA of other relatives through a local writer, Malcom

10

Burnley ("Burnley")." (*See* Plaintiff's Second Amended Complaint, ¶ 102.) Furthermore, in her Second Amended Complaint again, "[Plaintiff] also admits that she was unable to make contact with Consuwella Dotson and declared the case cold after concluding that she would not be able to get help from the Africa family." *See* Exhibit "C", p. 8(citing Id. ¶¶ 111, 113-17.) Plaintiff specifically avers in her Second Amended Complaint that "[d]espite multiple efforts to communicate with Consuella, Burnley was unable to have a meaningful conversation with her, and Dr. Monge failed to retrieve a DNA sample from any of Katricia's relatives. So, despite her continued interest in restoring humanity to the unidentified bone fragments, Dr. Monge was forced to label the case "cold" and accept that it was unlikely she would ever be able to conclusively identify the source of the fragments." (*See* Plaintiff's Second Amended Complaint, ¶ 103.) Thus, the Court should again find that "it is literally true that [Plaintiff] did not obtain consent from Consuwella Dotson to use the remains for research." *See* Exhibit "C", p. 8.

Looking to Plaintiff's Second Amended Complaint, Plaintiff again "admits that she used the remains in her "Real Bones" Adventures in Forensic Anthropology" course to teach people about "how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains." Exhibit "C" , p. 8 (citing *Id*. ¶¶ 123, 127-128)(*see also* Plaintiff's Second Amended Complaint, ¶ 110-111, 113)("Dr. Monge did not profit in any way from the production of "Real Bones: Adventures in Forensic Anthropology")("The course was designed to discuss forensic anthropology using real world examples, with an overall purpose of teaching how forensic anthropology can be used to restore the personhood of individuals unidentified through the scientific investigation of boney remains.")("…and the one and only time the Jane Doe fragments were displayed in the course

occurred in the ninth class, titled "MOVE – An Analysis of the Remains".) This information renders the statements attributable to Hyperallergic as *substantially true*.

Also, of pertinent note, the Court inaccurately stated in its memorandum of October 28, 2024 that "Kinjal Dave and Jake Nussbaum, two employees of Hyperallergic, co-authored the article." *See* Exhibit "A" (citing *[ECF No. 133]*. at ¶¶ 53, 142(j).) Kinjal Dave and Jake Nussbaum are *not* employees of Hyperallergic. Pursuant to the Freelance Contributor Agreements of Dave and Nussbaum, attached hereto as Exhibits "D" and "E", respectively, Dave and Nussbaum are independent contractors. *See* Exhibits "D" and "E", ¶ 10. Per the same Agreements, Dave and Nussbaum are to "indemnif[y] and hold[] [Hyperallergic] harmless from and against all third-party claims, actions, liabilities, damages, costs and expenses (including without limitation reasonable attorney's fees) of any kind that arises out of: a. the Contributor's breach of any representation or warranty made in this Agreement; and/or b. the gross negligence and/or willful misconduct of the Contributor." *See* Exhibits "D" and "E", ¶ 9. These errors of fact are appropriate for reconsideration at this time, as well.

Accordingly, based on the foregoing, it is respectfully requested that this Honorable Court reconsider its order and memorandum of October 28, 2024, granting in part and denying part the Motion to Dismiss of Defendant, Hyperallergic Media, Inc. and dismiss the defamation by implication claim filed by plaintiff against Hyperallergic in her Second Amended Complaint.

### III.     CONCLUSION

Defendant, Hyperallergic Media, Inc., respectfully submits that the Court reconsider the order and memorandum of October 28, 2024, granting in part and denying part the Motion to Dismiss of Defendant, Hyperallergic Media, Inc. and dismiss the defamation by implication claim

filed by plaintiff in her Second Amended Complaint against defendant, Hyperallergic Media, Inc., with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Respectfully submitted,

**THOMAS PASCHOS & ASSOCIATES, P.C.**

By:    *Thomas Paschos*
Thomas Paschos, Esquire (TP8039)
325 Chestnut Street, Suite 800
Philadelphia, PA 19106
267-205-2444
TPaschos@paschoslaw.com
Attorneys for Defendant,
Hyperallergic Media, Inc.