UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANET MONGE, <br><br> Plaintiff, <br><br> v. <br><br> UNIVERSITY OF PENNSYLVANIA et al., <br><br> Defendants. | Civil Action No.: 2:22-CV-02942 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER
OMNIBUS MOTION FOR RECONSIDERATION
OF THE COURT'S ORDERS RELATING TO DEFENDANTS'
MOTIONS TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff, Janet Monge ("Plaintiff" or "Monge"), by and through her undersigned counsel, hereby respectfully submits the instant Memorandum of Law in Support of Her Omnibus Motion for Reconsideration of the Court's Orders Relating to Defendants' Motions to Dismiss Plaintiff's Second Amended Complaint. For all the reasons that follow, Plaintiff respectfully requests that the Court reconsider its Orders to correct the issues discussed below and reissue Orders in accordance with its new analysis.

I. **INTRODUCTION/STATEMENT OF FACTS**

This is a defamation action brought by Plaintiff after a false "Cancel Culture" movement against her was started by Defendant, Paul Mitchell ("Mitchell"), with the help of the University of Pennsylvania Defendants, and then actively assisted by local, national, and international news outlets, who picked up the false stories without any investigation and have lent improper credence to Mitchell's narrative that Plaintiff was a racist who abused the bones of two young black girls killed by Philadelphia police in 1985.

1

Plaintiff filed her Second Amended Complaint on July 28, 2023, which raised claims for defamation, defamation by implication, false light, and civil aiding and abetting claims against the various Defendants in this action based on certain statements they published in 2021. (*See generally*, Second Amended Complaint.) Plaintiff's specific allegations as to the Defendants' defamatory statements, whose publication helped create the "Cancel Culture" movement against Dr. Monge initiated by Defendant, Paul Mitchell ("Mitchell"), and supported by the University of Pennsylvania Defendants, are as follows:

> 132. On April 21, 2021, Defendant Billy Penn published an online article written by Maya Kasutto titled "Remains of Children Killed in MOVE Bombing Sat in a Box at Penn Museum for Decades." …
>
> 133. In the article Kasutto knowingly made the false assertion that the unidentified fragments were conclusively established to be the remains of Katricia Africa, and she further implied serious and criminal scientific misconduct by Dr. Monge in her retention and handling of the Jane Doe Fragments, defaming Dr. Monge as a "chipper science" teacher who used the remains of a black girl as "props" out of disrespect for this young black woman.
>
> 134. Even worse, Kasutto explicitly insinuated a racist motive for Dr. Monge's retention and investigation of the bone fragments by calling back to the City's horrific actions during the 1985 MOVE bombing itself:
>
>> "The absence of ethics, void of communication, and abdication of responsibility regarding these remains mirror the circumstances that led to the 1985 disaster."
>
> 135. At the suggestion of Paul Mitchell, on that same day, another of Mitchell's close associates, Abdul-Aliy Muhammad, published an article in the Philadelphia Inquirer titled "Penn Owes Reparations for Previously Holding Remains of a MOVE Bombing Victim." …
>
> 136. Like Kasutto's polemic, Muhammad's article was also based almost entirely on the false, defamatory narrative that Mitchell had created to "cancel" Dr. Monge. It conclusively asserted that the unidentified bone fragments were the remains of [sic] two of the black children who died in the tragic bombing and fire – Katricia and Delisha Africa – and it further asserted that Dr. Monge "mishandled" the unidentified bone fragments, implying that she acted unprofessionally and with racial animus. Muhammad then called upon the Penn Museum and University of

Pennsylvania to apologize for Dr. Monge's "unethical possession" of the bone fragments, characterizing her handling of them as an "egregious act."

137. Both of these slanderous writings were disseminated broadly and were intended by the authors to reflect Mitchell's false reality wherein Dr. Monge was an unethical racist who should not be holding a responsible position in academia.

139. Mitchell's plan was to create a Hobson's choice for Dr. Monge's employer, the University of Pennsylvania, news outlets around the world, and the general public at large: either to (1) accept Mitchell's false narrative and cast Dr. Monge out as an unethical racist whose work cannot be trusted; or (2) to fight his false narrative and risk being labeled as a racist publisher itself for defending her. Each of the Defendants chose the former alternative in order to avoid the latter and risk a loss of readership.

140. On April 23, 2023, three major media outlets picked up the story and published their own blatantly false, defamatory narratives:

(a) The Daily Mail published an article on its website authored by Adam Schrader, titled "They are Juicy': Princeton Professor is Slammed for Disrespecting the Bones of a 14-year Old Black Girl Killed by a Bomb Dropped by Philadelphia Police in 1985 After Members of Her Commune Fired at Cops."… The author of that article falsely avers that the remains were bones of a "black child killed in a 1985 police bombing" and it further condemned Dr. Monge's use of the word "juicy" in the Coursera video, implying that such a word carries racial undertones when in fact it is an anthropological term of art indicating the preserved status of bones and bone fragments;

(b) The Guardian published an article titled "'Bones of Black children killed in police bombing used in Ivy League anthropology course," by Ed Pilkington…. That article also falsely averred that the bone fragment remains are "almost certainly those of the older MOVE girls who died" and implied scientific impropriety and racist-fueled misconduct regarding Dr. Monge's actions and statements. It also took issue with Dr. Monge's use of the words "juicy" and "greasy", suggesting those words carry disrespectful racial undertones when in fact they are anthropological terms of art; and

(c) The New York Post published an article authored by Jackson O'Bryan titled "Remains of Black Teen Killed in Philadelphia Police Bombing Used in Online Class"…. That article also implied a racist animus for Dr. Monge's actions and statements….

3

141. Upon information and belief, these articles were written without any investigation or research being done beyond the authors simply accepting Mitchell's proffered falsities to avoid being called a racist themselves. Moreover, the goal of these articles was to expand the reach of Mitchell's false reality, and to aid and abet the intended implication that Dr. Monge is an unethical, disrespectful, and racist anthropologist whose work cannot be trusted.

142. Sensing the start of a possibly viral social justice movement (albeit one based on false and malicious untruths), other media sources were quick to jump on their horse and ride into the battle Mitchell had created based on false and malicious lies. Almost immediately, a flurry of news articles were published on widely accessible websites, all of which implying the bone fragments were those of Katricia and Delisha Africa and falsely condemning Dr. Monge for racist, unprofessional conduct without any basis therefore:

   (a) On April 24, 2021, the New York Times published the article "Decades After Police Bombing, Philadelphians 'Sickened' by Handling of Victim's Bones" by Michael Levenson…. The article falsely identified the bone fragments as the remains of Delisha Africa and defamatorily suggested that the treatment of the remains showed "disrespect for Black life." The article further stated "that the remains had been kept in a cardboard box on a shelf" even though in reality the remains were stored at the Penn Museum following forensic best practices at all times. As a worldwide leader in news coverage, the publishing of this article by the Times aided and abetted Mitchell and in turn the other Defendants in their unlawful actions by increasing both the narrative's exposure and legitimacy.

   (b) Two days later, on April 26, 2021, an article written by then freelance writer, Defendant Nora McGreevy, and titled "Museum Kept Bones of Black Children Killed in 1985 Police Bombing in Storage for Decades" was published by the Smithsonian Magazine…. That article also implied that Dr. Monge acted unprofessionally, and her actions were driven by a racist animus…. The article also falsely asserted that the unidentified remains are those of Katricia and Delisha and it suggests that a failure to contact their families constituted professional misconduct on the part of Dr. Monge.

   (c) On April 30, 2021, Defendant Slate published an article titled "The Grim Open Secret of College Bone Collections" and authored by Elaine Ayers…. That article stated that Drs. Mann and Monge were driven by racially based animus: "the physical anthropology departments like the ones that employ Mann and Monge exist today as uneasy reminders of many museums' and universities' racist and colonial foundations. The Slate article further stated that the use of the terms "juicy" and "greasy" by Dr. Monge reflect "most recent example of an ongoing legacy of

4

    Black people's bodies used for academic research and pedagogy," declaring improper racial animus when in fact the terms are anthropological terms of art properly used in anthropological instructional context.

(d) On May 3, 2021, Defendant Al Dia News published the article "There Will Be No Justice For Penn and Princeton's Treatment of MOVE Victims" authored by Defendant Brittany Valentine…. In the article, Ms. Valentine falsely accused Drs. Monge and Mann of professional misconduct, stating "[b]ombshell reports revealed the universities shuttled the remains back and forth, and used them in educational settings without ever contacting next of kin".

(e) On May 7, 2021, Andscape, a popular website run by ESPN, published the article "The Scandal Over the MOVE Bombing Victims' Remains Is Part Of Anthropology's Racist History" authored by Defendant Nicole Froio…. The article blatantly reiterated the false narrative of the other articles and ascribed suggested racist motivations for the investigatory actions of Dr. Monge…. Ms. Froio further alleged racist insensitivity by stating that "[i]n death, [Katricia and Delisha's] bones were used as objects of colonial plunder at academic institutions" and directly asserted that Dr. Monge's handling of the bone fragment remains was unethical, unprofessional, and racist.

(f) On May 16, 2021, The New Yorker published the article "Saying Her Name" by Heather Ann Thompson…. That article also falsely implied that the actions of Dr. Monge were unlawfully racist, stating that "the idea that the museum was holding the bones of a Black Philadelphian who was alive as recently as 1985 in the same way that it has held the skulls of enslaved people, procured by grave-robbers, was beyond comprehension," and she directly contradicted without any reason that the scientifically supported findings of Drs. Mann and Monge that the bone fragment remains were not that of Katricia….

(g) On May 18, 2021, the Philadelphia Inquirer published yet another article regarding the treatment of the remains, this time authored by Jenice Armstrong and titled "The Disrespectful Handling of the MOVE Victims' Remains by the City and Penn Merits More Investigation....." In the article Armstrong falsely implies unlawful and unprofessional racially motivated actions by Dr. Monge….

(h) On May 26, 2021, Andscape published a second article. The article, written by Linn Washington, was titled "'Disrespect for the MOVE Families Is a Stain That Never Goes Away in Philadelphia…." That published piece [sic] falsely states that Dr. Monge "mistreated" the unidentified remains of Katricia and Delisha Africa and further falsely asserts that [D]r. Monge's actions were unprofessional and unlawful….

> Ms. Washington then went on to suggest that Penn's failure to remove Dr. Monge from her position "renders the University of Penn's apology hollow."
>
> (i) On July 16, 2021, Teen Vogue published the article "'MOVE Bombing Remains Scandal Shows Enduring Racism in Anthropology" by Ezra Lerner…. That published writing suggested improper professional conduct by implication by stating that "the remains of at least one young girl – believed to possibly belong to Tree as well as Delisha Africa, victims of the police's 1985 bombing of the MOVE house in Philadelphia – had been improperly kept for decades by archaeologists Alan Mann and Janet Monge, and further defamatorily states that the handling of the remains was "unethical."
>
> (j) On October 31, 2021, Hyperallergic published the article "How the Possession of Human Remains Led to a Public Reckoning at the Penn Museum," authored by Kinjal Dave and Jake Nussbaum…. Like its predecessors, the article details the aftermath of the media firestorm, but falsely blames Dr. Monge for a racially motivated investigation of the bone fragments, stating "Consuella did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching."
>
> 143. Each of the aforecited articles contain statements and/or implications that were false, and the defendants either knew or should have known at the time of publication that they were false because they were coming from Dr. Monge's scorned former student, his girlfriend, and his business associate.
>
> 144. But rather than seek to publish the truth, the defendants published the aforecited articles for the sole purpose of lending credibility to Mitchell's defamatory lies and increasing the scope of his false narrative from the city of Philadelphia to the entirety of the world.
>
> 145. Indeed, although a few articles in local news outlets might be construed as opinion, those opinions become undeniably factual to the public when reported repeatedly by several trusted news sources. Thus, the news created a false and malicious reality, with each of the articles unlawfully aiding and abetting the false and actually malicious lies of Mr. Mitchell and the University of Pennsylvania Defendants.

(*See* Second Amended Complaint, at ¶¶ 132-37, 139-145.)

Each of the Defendants filed Motions to Dismiss, which were fully briefed and argued before District Judge Gene K. Pratter. Judge Pratter thereafter denied the Motion to Dismiss of the

University of Pennsylvania, Wendell Pritchett, and Amy Gutmann before her untimely passing leading to the case being reassigned.

After accepting some additional briefings associated with the level of fault Plaintiff must show to succeed on her defamation claims, this Court issued a number of Orders related to the remaining Defendants' Motions to Dismiss. (Doc. Nos. 197-205, 208.) These Orders dismissed Plaintiff's defamation by implication claims against several of the Defendant individuals and publications on the basis that the defamatory statements these Defendants made were substantially true despite the fact that their premises were based on the false allegation that the remains were conclusively those of Katricia and Delisha Africa. Those dispositive Orders also dismissed Plaintiff's civil aiding and abetting claims against the Defendants on the basis that those defendants were not working with or seeking to aid each other in publishing the challenged statements.

However, the Defendants' statements that the bone fragment remains at issue are those of Katricia and/or Delisha Africa are definitively false – and cannot be shown to be true – and thus, any implications created by the truth of those falsehoods, such as Plaintiff's use of the remains of Black children without contacting Katricia and Delisha's next of kin being improper and racist, are also false and constitute defamation. Moreover, as explicitly pled in the Second Amended Complaint, "the defendants published the aforecited articles for the sole purpose of lending credibility to Mitchell's defamatory lies and increasing the scope of his false narrative from the city of Philadelphia to the entirety of the world," (Second Amended Complaint, ¶ 144). That is precisely the type of assistance creating civil aiding and abetting liability. Accordingly, Plaintiff respectfully requests that this Court reconsider its Orders on Defendants' Motions to Dismiss as they relate to these issues, and that it issue new Orders in accordance with the legal analysis below.

**II.     LEGAL ARGUMENT**

    **A.  Appropriate Legal Standards**

Motions for reconsideration under Federal Rule of Civil Procedure 59(e) are designed to correct manifest errors of law or fact or to present newly discovered evidence to the Court. *See Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). They are appropriate where, as here, it appears "the Court has patently misunderstood a party or has made a decision outside of the adversarial issues presented to the Court by the parties or has made an error not of reasoning but of apprehension." *Reynolds v. Barnhart*, 2005 WL 994620 (E.D. Pa. Apr. 27, 2005) (*quoting Brambles USA, Inc. v. Blocker*, 735 F.Supp. 1239, 1240 (D. Del. 1990)).

The movant on a motion for reconsideration must show one of the following: "(1) an intervening change in the controlling law; (2) new evidence that was not available when the court issued its order, or (3) the need to correct a clear error of law or prevent manifest injustice." *Gibson v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 182, 190 (3d Cir. 2021) (*citing Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010)). In this case, reconsideration is needed to correct a clear error of law and prevent manifest injustice, as it is indisputable that any statements related to the identity of the remains at issue being those of Katricia and/or Delisha Africa are materially false, and the Defendants publishing and republishing of Mitchell's false narrative to lend it credibility is the exact type of assistance that mandate the pled civil aiding and abetting claims here to proceed to be examined through further discovery. Plaintiff therefore respectfully requests that the instant Motion be granted, and the Court reissue Orders in accordance with the following analysis.

**B. There Is No Evidence Pled That Shows The Remains At Issue Are Those Of Katricia And/Or Delisha Africa, And Thus, Defendants' Defamatory Implications Based Upon Those Facts Were Properly Pled as being False Statements of Fact, not Opinion.**

Plaintiff's defamation by implication claims are based on false statements published by the Defendants that the unidentified bone fragments at issue in the publications had been conclusively identified as the partial remains of two Black children Katricia and/or Delisha Africa, that Defendants used to imply that Plaintiff's failure to contact the MOVE family was racist and constituted professional misconduct. The articles published by the Defendants further suggested that Dr. Monge acted improperly in not returning the bone fragments to next of kin associated with MOVE, albeit that the bone fragments were <u>not</u> the partial remains of either child, and therefore could not have been repatriated to any family members associated with MOVE. Simply put, there cannot be any family members who would properly be the recipients of unidentified remains. *See* Second Amended Complaint, at ¶¶ 132-37, 139-145.

The Court dismissed those claims, reasoning that the Defendants' statements were substantially true because the remains <u>belonged to Katricia and/or Delisha Africa</u> based on the erroneous conclusions issued by the MOVE Commission's pathologist, Dr. Ali Hameli, and Plaintiff did not have permission from the MOVE family to retain the remains for identification. These holdings, however, simply ignore the fact that there is absolutely no evidence pled that supports Dr. Ali Hameli's conclusions as to the identity of the remains; in fact, Plaintiff explicitly pled Dr. Hameli's conclusions were issued solely to "limit the City's liability" relating to the MOVE Bombing, which supports Plaintiff's contention that it was a clearly falsified conclusion. (*See* Second Amended Complaint, at ¶ 89.)

Because Defendants have made blatantly false statements either directly asserting or implying that the unidentified remains were those of Katricia and/or Delisha, and then used that

9

false identification to imply that Dr. Monge used her professional role to abuse the remains of Black children, it is respectfully asserted that Plaintiff has adequately pled defamation by implication claims that cannot be properly dismissed at this stage of the proceedings..

As Plaintiff has explained, defamation claims "may exist where the words utilized are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Mzamane v. Winfrey*, 693 F.Supp.2d 442, 477 (E.D. Pa. 2010) (*citing Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 217 (Pa. 1981); *Bogash v. Elkins*, 176 A.2d 677, 679 (Pa. 1962); *Sarkees v. Warner-W Corp.*, 37 A.2d 544, 546 (Pa. 1944) (all discussing defamation by innuendo)). The court "must consider the effect of the entire article and the impression it would engender in the minds of the average reader among whom it is circulated" to determine whether it could be "fairly and reasonably construed" to imply the defamatory meaning alleged by plaintiff. *Sarkees*, 37 A.2d at 546; *Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. 1997). Importantly, "even where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient." *Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1987).

Here, although it was literally true that Plaintiff did not have permission from the MOVE family to utilize the unidentified remains or continue her search for the remains' identity, the Defendants have relied on the false identification of the remains as those of a Black children who were sired by MOVE family members to imply that Dr. Monge desecrated the remains of Black children because she was a racist who did not respect Black life. Simply put, Plaintiff has never pled (and there is no evidence of record) establishing that the unidentified remains at issue were those of a Black individual, let alone those of Katricia and/or Delisha Africa. Rather, Plaintiff

explicitly pled that the City established a commission designed to "identify the remains of the victims in a way that would limit the City's liability" and that the commission "wrongly and unscientifically stated that the Jane Doe pelvis and femur fragments were associated with" Katricia Africa, despite the fact that (1) Plaintiff and her mentor had at least seven different forensic anthropologists confirm the conclusion that the bone fragments in question could not have been Katricia's, and (2) the fact that the remains already identified as belonging to Katricia were already released to the family. (Second Amended Complaint, at ¶¶ 87-93.)

Important to the resolution of these issues, these allegations were confirmed by two separate reports from the Tucker Law Group hired by the University of Pennsylvania to investigate the actions of the University and those of Drs. Mann and Monge that was used in establishing the allegations in the Complaint .

The first, issued on August 20, 2021, found that the Philadelphia Assistant Medical Examiner's, Dr. Robert Segal, stated "that he did not concur with the conclusion that the remains of B-1 belonged to Katricia Africa and further questioned the methodology employed by the MOVE Commission's experts." That report confirmed that Dr. Monge's opinion that the bone fragments identified as B-1 could not be conclusively established as those of Katricia. *See* the true and correct copy of the August 20, 2021 Tucker Report, attached hereto as Exhibit "A".

The second supplementary report, issued on September 12, 2022, dispelled that the bone fragments of Delisha, explicitly noting "that there is no credible factual or scientific evidence that the Museum possessed the remains of … Delisha" Africa. *See* the true and correct copy of September 12, 2022 Tucker Supplementary Report, attached hereto as Exhibit "B". These findings, in conjunction with the clear factual allegations contained in Plaintiff's Second Amended Complaint, make clear that the bone fragments retained at the Penn Museum were not the remains

of identified as Katricia or Delisha, and further, were never identified as a person of African American lineage.

Despite these falsehoods, however, much of the Defendants' defamatory articles imply to any reader that Dr. Monge committed racially fueled, unprofessional misconduct because she retained and mistreated the bones of young Black women without getting the permission from the next of kin. Moreover, that implication could not be further from the truth since Plaintiff spent the entirety of the relevant time period trying to identify the older individual from whom the bone fragments belonged. Importantly, until a proper identification could be made, there was no next of kin that could have been contacted for repatriation. Simply stated, taking away the assumption that these were the bones of Black children inappropriately killed by the police, the only narrative remaining is that Dr. Monge was carrying out the responsibility assigned to her and Dr. Mann by the City of Philadelphia of attempting to restore humanity to the deceased unidentified person unearthed from the fire-destroyed houses at the situs of the MOVE bombings..

Accordingly, Plaintiff respectfully requests that the instant Motion be granted and that her defamation by implication claims be allowed to proceed.

### C. Plaintiff Has Adequately Pled The Type Of Assistance Needed To Succeed On Her Civil Aiding And Abetting Claims

Many of the Court's Orders on Defendants' latest Motions dismiss civil aiding and abetting claims against media defendants on the basis that those defendants were not working with or seeking to aid each other in publishing the challenged statements. But these holdings completely ignore Dr. Monge's explicit allegations that the Defendants aided and abetted each other to defame Dr. Monge by actively participating in and purposefully amplifying Mitchell's campaign against her. They each published widely circulated articles perpetuating the defamatory statements initiated by Mitchell and protected by Penn, which were then further propagated by the other

Defendants in the media. Therefore, they substantially assisted each other in accomplishing a tortious result against Plaintiff, they must each be held liable for civil aiding and abetting, and those claims must not be dismissed at this time.

In *Sovereign Bank v. Valentino*, 2006 Pa. Super. 338 (2006), the Pennsylvania Superior Court noted that Section 876 of the Restatement (Second) of Torts addressing the tort of civil aiding and abetting, which provides for liability where a defendant: (a) does a tortious act in concert with the other [defendants] or pursuant to a common design with [them], or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. *See* Restatement (Second) of Torts, § 876. And under Section 875, each defendant found to have aided and abetted the tortious conduct "is subject to liability to the injured party for the entire harm." Restatement (Second) of Torts, § 875.

As such, like with secondary, indirect liability, Plaintiff has never born a heavy burden in pleading civil aiding and abetting against Defendants. As the Superior Court in *Sovereign Bank* noted, a Plaintiff must simply show the identities of the wrongdoers that acted in concert and the assistance each provided. The Second Amended Complaint does just that – it not only identifies each person who defamed Plaintiff, but it specifically pleads that they did so to lend credence to the false narrative started by Mitchell and shows how the articles provided the type of active and substantial assistance necessary for the civil aiding and abetting claim to move forward.

Specifically, the Second Amended Complaint meticulously identifies all the key actors in the Defendants' fabricated "Cancel Culture" movement and thoroughly outlines their articles and how those articles constituted active participation in a defamatory campaign led by Mitchell, a

13

disgruntled former student harboring a personal grudge against Dr. Monge. Without the other Defendants' articles providing credibility to Mitchell's narrative, it never would have been able to gain traction and harm Dr. Monge in the way that it did. Plaintiff has thus sufficiently pled the type of substantial assistance required to support her civil aiding and abetting claims, and they should not be dismissed at this time.

### III.   CONCLUSION

For all of the foregoing reasons, Plaintiff, Janet Monge, respectfully requests that the Court grant her instant Motion for Reconsideration and issue new Orders on Defendants' Motions to Dismiss the Second Amended Complaint that consider the aforementioned legal analysis.

Respectfully Submitted,

**SPECTOR GADON ROSEN VINCI P.C.**

By:   /s/ *Alan Epstein*

Alan B. Epstein, Esquire (Pa. Atty ID No. 2346)
Adam Filbert, Esquire (Pa. ID No. 330960)
*Attorneys for Plaintiff*

November 22, 2024