# EXHIBIT A

# THE ODYSSEY OF THE MOVE REMAINS



**REPORT OF THE INDEPENDENT INVESTIGATION INTO THE DEMONSTRATIVE DISPLAY OF MOVE REMAINS AT THE PENN MUSEUM AND PRINCETON UNIVERSITY**

**August 20, 2021**

**Prepared By**



# TABLE OF CONTENTS

I.    Executive Summary .................................................................................3

II.   MOVE in the City of Philadelphia ......................................................10

      A.  The History of Philadelphia Police Brutality ...............................10

      B.  Frank Rizzo's Police Department ..................................................14

      C.  The Founding and Devolution of MOVE .......................................17

      D.  The Original Sin: The Excavation of 6221 Osage Avenue .........34

III.  Why The Demonstrative Display of the MOVE Remains Matters............40

      A.  The Samuel Morton Cranial Collection .........................................41

      B.  Anthropology, Scientific Racism and Repatriation ...................45

      C.  The Origins of the MOVE Remains Controversy ........................46

IV.   The Odyssey of the MOVE Remains: Findings and Conclusions ................56

      A.  Custody and Storage of the Remains.............................................56

      B.  Efforts to Identify and Return the Remains ................................63

      C.  Use and Display of the Remains.....................................................66

      D.  Museum Policy, Ethical Standards and Legal Provisions .........69

V.    Recommendations...................................................................................83

VI.   Interviews.................................................................................................86

VII.  Tucker Law Group Profile ....................................................................87

VIII. Exhibits ....................................................................................................92

# I.    EXECUTIVE SUMMARY

## A.    Introduction

The University of Pennsylvania (the "University") retained the Tucker Law Group ("TLG") to conduct an independent investigation into the circumstances under which the unidentified remains of a MOVE member killed by the City of Philadelphia on May 13, 1985 on Osage Avenue came to be stored -- four miles away, for 36 years -- at the University of Pennsylvania Museum of Archaeology and Anthropology ("Penn Museum" or "Museum"), and subsequently used as a demonstrative exhibit in a 2019 Princeton Online course taught by one of its anthropologists.

The remains were obtained in early 1986 by Dr. Alan Mann, a physical anthropology professor at the University, who was retained by the City Medical Examiner's Office ("MEO") as a private consultant to assist in the identification of the remains. Mann was assisted in this effort by Dr. Janet Monge, a graduate student at the time, who later became an associate curator at the Penn Museum. Mann stored the remains in his office at the Penn Museum until he retired in 2001 and joined the faculty at Princeton. Mann left the remains with Monge who then stored them in her office and in the Physical Anthropology Lab (the "Lab") at the Penn Museum for the next twenty years. During this time Monge showed the remains to different individuals and groups on at least ten occasions before the demonstrative exhibit in the online video course in 2019.

After consultation with some MOVE members, and unsuccessful attempts to reach possible relatives, the Penn Museum arranged to have the remains that were displayed in the video returned to MOVE members on July 2, 2021.

## B.    Objectives

Our primary objectives in this inquiry have been descriptive and prescriptive, that is: to make findings and conclusions of the facts relating to the demonstrative display of the MOVE remains; ascertain the storage and use of those remains at the Penn Museum; determine whether the possession and use of the remains conformed to the Penn

Museum's policies, or violated any relevant professional, ethical, or legal standards; make recommendations to the University relating to the MOVE remains; and suggest other actions and initiatives that the University might undertake relating to this current controversy and beyond.

### C.    Why The Demonstrative Display of the Remains Matters

Given the widespread public controversy that this matter has engendered, we thought it important that our inquiry also determine **how** this controversy arose and provide an interpretive perspective on **why** the display of the MOVE remains matters at this moment in time. As a preliminary matter, we note that much of the critical commentaries from a congeries of sources about this controversy are based, in part, on three inaccurate factual premises: (1) *that the remains used in the video were indisputably those of a specific MOVE child killed in the bombing,(2) that the remains of a second MOVE child were housed at the Museum, and (3) no effort was ever made to identify and return any of those remains to MOVE family members*. In fact, the identity of the remains used in the video is still a matter of legitimate dispute, and all that we could conclude, with a reasonable degree of certainty, is that the remains displayed in the video were of **a** MOVE member. We found no credible evidence that the remains of a second child were ever housed at the Museum. And finally, we also found that efforts were indeed made to identify the remains used in the video with the goal of returning them to MOVE family members. We point this out, not because it was outcome determinative in our investigation, because one of our objectives was to examine the ethical and legal propriety of the custody and display of **any** MOVE remains, identified or not. Rather, we do so to illustrate the potency of carefully crafted and widely disseminated misinformation to shape public opinion and inflame passions. Not surprisingly, that inaccurate narrative circulated with warped speed across print and electronic media and the internet and fueled much of the resulting public expressions of outrage and condemnation.

Notwithstanding this misleading narrative and how it arose, we believe that this issue matters because of the fortuitous confluence of the lingering sense of injustice

relating to MOVE's treatment by the City of Philadelphia; the current era of racial reckoning relating to the role of university anthropologists in the development of scientific racism; and the international movement to repatriate human remains from museums—especially those of Black and Indigenous People.

First, the City of Philadelphia's deadly confrontations with MOVE in 1978 and 1985 are just contemporary examples of the Philadelphia Police Department's long and sordid history of the use of excessive and deadly force against Black people. In 1978, after five years of conflicts with and numerous arrests of MOVE members, the City of Philadelphia blockaded the MOVE compound in Powelton Village and then waged a military style assault on the building, which contained women and children, to arrest members of MOVE for housing code violations. During the shootout that followed, a police officer was killed, and nine MOVE members were tried, convicted, and sentenced to 30-100 years in prison for his death. Many Philadelphians have never comprehended how nine people were convicted of killing one officer who died from a single bullet wound. On the other hand, the three police officers who kicked and stomped a MOVE member, after he surrendered, in full view of cameras and dozens of spectators, were tried for assault but acquitted by a judge who removed the decision from the jury.

In 1985, eleven men, women and children were killed when the City, after a 12-hour military style assault to arrest MOVE members for misdemeanor offenses, bombed the Osage Avenue MOVE house causing a fire that that they purposefully allowed to burn, which destroyed it along with sixty other homes. The only person convicted of a crime was the lone adult survivor of the bombing who was tried and sentenced to seven years in prison for riot and conspiracy. Not a single City official was ever held criminally liable for the deaths of the MOVE adults and innocent children, or the destruction caused by the City's deadly confrontation.

 Second, this current period of racial reckoning, coupled with the repatriation of human remains movement of the last several years, demand an acknowledgement that many universities and museums were complicit in creating the scientific justifications for slavery resulting in the dehumanization of Black people in life and the desecration of

their bodies after death. It also raises the moral and human dignity implications of the continuing possession and use of human remains by universities and museums, of which the Samuel Morton Cranial Collection at the Museum is emblematic.

### D.    Investigative Methodology

TLG interviewed forty people who included: members of the MOVE organization and displaced residents of Osage Avenue; current and former Penn Museum employees; faculty, graduate students, and graduates of the University; anthropologists, academics, community members, clergy, elected officials, and journalists. We reviewed thousands of pages of documents, including archival records of the MOVE Commission and their experts that investigated the 1985 bombing, which are located at Temple University; the 1988 grand jury report that investigated the bombing; and City and Police Department records and investigative reports relating to MOVE. We also reviewed the records of the Philadelphia MEO relating to (1) how the 6221 Osage Avenue site was excavated, (2) the City's efforts to identify the remains, and (3) the chain of custody of the remains that ultimately ended up at the Penn Museum. We surveyed the codes of ethics of several anthropological associations, and Pennsylvania and New Jersey statutory and common law regarding the treatment of human remains.

Finally, we reviewed newspaper articles, videos, documentaries, studies, and dissertations on the history of MOVE, police brutality, scientific racism, best stewardship standards of museums, and the ethical propriety of the housing and exhibition of human remains, particularly those of minorities and indigenous people. We also consulted widely with anthropologists, historians, journalists, and other subject-matter experts on the racial and human dignity implications of the possession and use of human remains by museums generally, and why the MOVE remains, in particular, matter with such resonance at this moment in time.

### E.     Findings and Conclusions

1.  After the Bombing of Osage Avenue, a dispute arose between the MEO and the MOVE Commission's experts over the identity of two sets of remains of MOVE children. The Commission's experts concluded that they were the remains of Katricia Africa and Delisha Africa, but the MEO disagreed with those findings.

2.  The MEO retained Dr. Alan Mann, a physical anthropologist at the University, who was acting as a private consultant, to assist in the identification of the disputed remains. He was assisted in that effort by Dr. Janet Monge, who was his graduate student assistant at that time. Mann then issued a report that disputed the conclusions of the Commission's experts as to the identity of the remains. In early 1986, Mann took the remains of what the Commission concluded were those of Katricia to his office at the Penn Museum to conduct further tests. There is no credible evidence that Mann also took the remains that the Commission concluded were those of Delisha. Mann and Monge did not believe that the remains taken to the Museum could be conclusively identified as those of Katricia Africa.

3.  After the examination in 1986, Mann conducted no further tests on the remains and stored them in his office from 1986 to 2001 when he retired from the University and joined the faculty at Princeton University. Mann left the remains at the Museum when he went to Princeton.

4.  From 1986 to 2001, Mann made no effort to return the remains to the MEO or contact any MOVE family member.

5.  The MOVE remains were never accessioned or formally added to the Penn Museum's collections.

6.  Mann did not violate any specific prevailing professional, ethical or legal standards by his retention of the remains from 1986 to 2001.

7.  Mann's retention of the remains from 1985 to 2001 after he was unable to identify them, and his failure to return them to the MEO, demonstrated extremely poor judgement, and a gross insensitivity to the human dignity as well as the social and political implications of his conduct.

8.  From 2001 to 2014, the remains were stored in a file cabinet in Dr. Janet Monge's office. Monge is the current Penn Museum associate curator, who was a graduate assistant to Mann when he took custody of the remains. From 2014 to 2021, the remains were stored in Monge's Lab at the Museum.

9.  In 1995 and 2014, Dr. Monge sought to identify and return the remains, by contacting two of the MOVE family members, one through a third-party intermediary, but they refused to help her.

10. The remains were shown by Dr. Monge to graduate students, donors, and Museum personnel on at least ten occasions between 2014 and 2019.

11. The remains were used by Dr. Monge as a case study in a Princeton Online video course that she taught in 2019 as a visiting professor at Princeton.

12. Dr. Monge did not inform MOVE family members of and obtain their consent to use the remains in the Princeton Online video course.

13. The Museum did not have a policy on the retention, display or use of the MOVE remains and other non-accessioned remains as demonstrative artifacts or for other purposes.

14. Dr. Monge's retention and use of the remains as a demonstrative artifact did not violate the Museum's _Policy Statement on Human Remains_ which was adopted in 2017 because it did not apply to the non-accessioned MOVE remains.

15. Dr. Monge did not violate any specific professional, ethical or legal standards by retaining and displaying the remains.

16. Dr. Monge's retention of the remains from 2001 to 2021 and their use in the Princeton Online video course demonstrated, at a minimum, extremely poor judgement and gross insensitivity to the human dignity and social and political implications of her conduct.

17. Although the remains were not formally a part of the Museum's collection, several persons, including a former director and deputy director of the Museum, observed some of the remains at some point during the time that they were at the Museum, and were aware of their provenance.

18. No one in a leadership position at the Penn Museum believed that having the remains at the Museum and their display to students, donors and others violated any Museum policies.

19. There is no evidence that any University Officer or Administrator was aware that Monge was in possession of the remains or of their use or display.

## F.    Recommendations

1. Appoint a University funded diverse, multidisciplinary committee to advise the University on these recommendations as well as its ongoing relationship with the West Philadelphia Community. The Committee should publish an annual report on its activities and accomplishments.

2. Establish a permanent installation on the Bombing of Osage Avenue at a publicly accessible location at the University.

3. Hire a chief diversity officer for the Penn Museum.

4. Create a new full-time position for a bio-anthropologist/archaeologist with expertise in the analysis of human remains with a record of advocacy for Black and Indigenous people and in repatriation requests; this individual should hold a dual position as a Penn Museum curator and a tenure-track faculty member in the Department of Anthropology.

5. Conduct a comprehensive review of the holdings and collection practices of the Museum's Physical Anthropology section and reassess its practices relating to the possession and various uses of human remains, accessioned as well as privately held.

6. Present a joint exhibition with the African American Museum in Philadelphia on the role of university scholars and anthropologists in the development of scientific racism.

7. Establish a scholarship program and actively recruit academically talented students who are graduates of Philadelphia public high schools and charter schools located within the 19142 and 19143 zip code areas in West Philadelphia.

## II.    MOVE IN THE CITY OF PHILADELPHIA

### A.    The History of Philadelphia Police Brutality

For over 150 years, the Philadelphia Police Department has beaten, brutalized, and killed Black people and others with impunity. The Department's deadly confrontations with MOVE in 1978 and 1985 are two of the most horrific recent examples of this history of systemic racism and institutionalized deadly violence.

In 1870, a white police officer was convicted of killing an unarmed Black man in Society Hill.[1] Since that conviction there have been hundreds of publicized instances of brutality by Philadelphia police officers against Black people and rarely were any held civilly or criminally accountable.  In August of 1870, several Black people were beaten by police at a polling place at 5th and Lombard Streets because they complained about waiting in line while white people voted.[2] On October 10, 1871,  Octavius Catto, a Black educator and political organizer, was assassinated the day after Black voters were attacked by white police officers and other politicians. His killer was acquitted despite evidence from six eyewitnesses.[3] In September of 1915, police officers attacked Black people who were protesting the

*Octavius Catto*

showing of D. W. Griffith's racist film, "The Birth of a Nation" at the Forrest Theatre on South Broad Street.[4]

---

[1] Much of this chronology is taken from "Black and Blue: Timeline of Police Brutality in Philadelphia" *Philadelphia Inquirer (2020)*
https://www.inquirer.com/news/inq/philadelphia-police-brutality-history-frank-rizzo-20200710.html

*Also see*, History of Racism in the Philadelphia Police Department" (2020) *Time Magazine*
https://time.com/5905583/philadelphia-police-racism-history/

[2] "Black and Blue"

[3] Biddle and Dubin, Tasting Freedom: Octavius Catto and the Battle for Equality in Civil War America (2017). In 2017, Mayor Jim Kenney erected a statue of Catto, the first memorial to a Black person on public land in Philadelphia history. https://www.phila.gov/news/mayors-office-of-black-male-engagement/a-philadelphia-hero-octavius-catto-statue-unveiled-at-city-hall/

[4] "The Birth of a Nation, Police Brutality and Black Protest."(2015)

In 1922, Philadelphia's police department became the first in America to obtain tear gas, and the first person they used it against was a Black man named George Rex who was suspected of having committed a robbery.[5] In March of 1946, after a fight broke out between Black and white students at Samuel Tilden High School in Southwest Philadelphia, the police arrested 14 Black students, but none of the whites.

A 1952 *University of Pennsylvania Law Review* article on racial disparities in arrests in Philadelphia found:

> Negroes who assert their rights against the police apparently do so in some cases at the risk of arrest. Arrests of negroes for disorderly conduct have been made solely for such reasons as: protesting at the police station; an illegal entrance and beating; objecting to an unauthorized search of the person and to being struck; or inquiring why a friend was in the police wagon.[6]

A 1963 study of deadly Philadelphia police shootings found that of the 32 men killed, between 1950 and 1960, 90% were Black.[7] This disparate pattern of shooting and killing of Black people has remained constant over the years. Fifty years later, a 2015 study found that 81% percent of people shot by police officers in Philadelphia from 2007 to 2013 were Black, although Black people comprised less than 40% of the City's population.[8]

---

https://www.cambridge.org/core/journals/journal-of-the-gilded-age-and-progressive-era/article/abs/birth-of-a-nation-police-brutality-and-black-protest/A664ADC7E6272ED7E23952181CD3F6FB

[5] "Black and Blue"

[6] Note, "Philadelphia Police Practice and the Law of Arrest" *100 University of Pennsylvania Law Review 1182 (1952)*
https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=8018&context=penn_law_review

[7] "Black and Blue"

[8] "Philadelphia police shooting victims are 81% African American, report finds" *The Guardian* (2015)
https://www.theguardian.com/us-news/2015/mar/24/philadelphia-police-black-people-shooting

In 1979, the United States Justice Department filed a lawsuit against Frank Rizzo, all of his cabinet members and several dozen police officers in the police department alleging:

> [T]here exists a pervasive pattern of police abuse in Philadelphia, the effect of which is to deny basic federal constitutional rights to persons of all races, colors, and national origins. This abuse…consist of such practices as, for example, using deadly force where it is unnecessary, physically abusing arrestees and prisoners, extracting information and confessions by means of physical brutality, stopping persons without probable cause, and conducting illegal searches and seizures…. *[W]hile police abuse in Philadelphia is visited to some extent on all segments of the population, it has a disproportionately severe impact on black and Hispanic persons*.[9] [Emphasis added]

William Cradle was beaten so badly by police in Society Hill in 1977 that they broke several nightsticks. Then Mayor Frank Rizzo was quoted as saying "We have a very, very good police department and they're not brutal…It's very easy to break some of those nightsticks." Three white police officers were tried but acquitted by an all-white jury in the beating of Mr. Cradle.[10] Between 1976-2018, seven police officers were charged with killing Black men, but only one was convicted of manslaughter.

Almost 100 years after George Rex was teargassed, on June 26, 2020, the Philadelphia Police Department used tear gas, pepper spray, white smoke, beanbag rounds and plastic pellets on hundreds of peaceful protesters and reporters trapped on Interstate 676 in Center City Philadelphia. The protesters had gathered to march in solidarity with the hundreds of thousands of people around the world who were protesting the public killing of George Floyd. After initially claiming that the use of force

---

[9] "Justice Department Accuse Philadelphia of Police Abuses" (1979), *Philadelphia Inquirer*
https://www.washingtonpost.com/archive/politics/1979/08/14/justice-accuses-philadelphia-of-police-abuses/46b8061c-b494-4215-b081-4c461cd06379/

A federal district court judge dismissed the complaint because he concluded that the United States Attorney General did not have the authority or standing to bring such an action. *United States vs. City of Philadelphia, 482 F.Supp.1248 (1979);* https://law.justia.com/cases/federal/district-courts/FSupp/482/1248/2095905/

[10] "Black and Blue"

was necessary because the protesters were violent – a claim that was refuted by videos – the mayor and police commissioner retracted the claim and apologized. After suspending a SWAT officer who was filmed pulling a protester's mask away from his face so that he could spray tear gas directly in his nose and eyes, the City promised to make reforms in the police department and approved an independent investigation of the incident.[11] At the time of the incident, the police commissioner claimed that she was unaware of the police department's intention to use the level of force employed, however, an independent investigation conducted by the City Controller's office released several months later concluded that she had in fact authorized the use of force against the protesters.[12]

A few months later, on October 26, 2020, two white police officers shot Walter Wallace, an obviously mentally ill Black man, who was wielding a knife, fourteen times. They claimed deadly force was necessary because they were not equipped with tasers. The killing was followed by several nights of peaceful protests as well as rioting and looting. After three nights of demonstrations the National Guard was deployed to quell the disturbances.[13]

The culture of racism and excessive deadly force against Black people is so deeply entrenched in the Philadelphia Police Department that it is resistant to reform even from police commissioners and mayors motivated by the best of intentions. And the race of these top city officials is irrelevant: at the time of the MOVE bombing, both the mayor and managing director were Black, and the police commissioner in 2020 was a Black woman. Since 1983, Philadelphia has elected three Black mayors and had six Black police

---

[11] "Pathways to Reform, Transformation and Reconciliation"
https://www.phila.gov/programs/philadelphia-reforms/

[12] "Independent Investigation into the City of Philadelphia's Response to Civil Unrest (2021)
https://controller.phila.gov/philadelphia-audits/civil-unrest-response/#/

[13] "Police Release Traumatic Body Cam Video of Walter Wallace, Jr. Shooting."
https://www.npr.org/2020/11/04/931598467/philadelphia-police-release-traumatic-bodycam-video-of-walter-wallace-jr-shooting

commissioners. The killing of unarmed Black people continued throughout the administrations of every Black mayor and every Black police commissioner. A federal review of police shootings requested by Police Commissioner Charles Ramsey in 2013 concluded that 80% of people shot by police between 2007 and 2014 were Black, and 45% were unarmed.[14] The extent to which racial animus still persists in the Police Department was demonstrated in 2019 when Police Commissioner Richard Ross suspended 72 white police officers after they posted several hundred racists posts on Facebook.[15]

### B.    Frank Rizzo's Police Department[16]

Frank Rizzo, who was a high school dropout, joined the police department in 1943 and thirty years later he was elected the mayor of Philadelphia. Early in his career, he



earned the nickname of the "Cisco Kid" for leading police raids on strip clubs and after-hours speakeasies. He once stated his philosophy of policing as *spaaco il capo*, Italian for "break their heads." He was appointed deputy commissioner in 1963 and commissioner in 1967. His rise in the Philadelphia Police Department and his subsequent political career were based on

*Rizzo wearing a tuxedo with a night stick in his cummerbund*

his projecting a tough cop image and on his condoning and vigorous defense of the

---

[14] "Report on Philadelphia Police, New Rules and Training Needed" *Philadelphia Inquirer, (2015)* https://www.inquirer.com/philly/news/20150324_DOJ_on_Philly_police_shootings__new_rules__training_needed.html

[15] "72 Police Officers Pulled Off of the Streets Because of Racist Face Book Posts" *Washington Post* (2019) https://www.washingtonpost.com/nation/2019/06/20/philadelphia-cops-pulled-off-street-amid-probe-into-racist-facebook-posts/

[16] Timothy J. Lombardo, "Civil Rights and the Rise of Frank Rizzo in 1960's Philadelphia," *Historical Society of Pennsylvania* (2019). https://hsp.org/blogs/fondly-pennsylvania/civil-rights-and-rise-frank-rizzo-1960s-philadelphia

systemic racism that permeates the police department and its brutal treatment of Black people. For much of his career Rizzo was committed to suppressing Black activist groups and demonstrations for civil rights through the use of overwhelming police power and he openly boasted about it. Rizzo had been in the police department for 20 years when he was appointed Deputy Police Commissioner in 1963. At the time, the National Association for the Advancement of Colored People ("NAACP") protested that he had used "storm trooper tactics against negroes."[17]

Between May and December of 1965, attorney Cecil B. Moore, head of the local NAACP, and other Black leaders led demonstrations to integrate racially segregated Girard College, that was located in North Philadelphia.[18] Moore and the protesters and the police, encouraged by Rizzo, clashed frequently leading to dozens of arrests. During these demonstrations, Rizzo's reputation as a tough "law and order" policeman defending the white status quo enhanced his emerging local and national reputation. In August of 1966, Rizzo led a series of raids on several houses occupied by a local chapter of the Student Nonviolent Coordinating Committee ("SNCC") under the pretext that they were amassing explosives to use in blowing up Independence Hall. Several members were arrested and charged but were acquitted of all charges.[19]

In November 1967, 3500 Black students demonstrated at the Philadelphia School District headquarters to demand the hiring of more Black teachers, the teaching of Black History courses and the right to celebrate Black History.[20] Rizzo ordered over 100 heavily armed police officers in riot gear and police dogs to break up the protest. He is alleged to

---

[17] "Black and Blue."

[18] "School Desegregation and Civil Rights Stories: Girard College" *Educators Resources, National Archives* https://www.archives.gov/education/lessons/desegregation/philadelphia.html

[19] Timothy J. Lombardo, "Civil Rights and the Rise of Frank Rizzo in 1960's Philadelphia," *Historical Society of Pennsylvania* (2019). https://hsp.org/blogs/fondly-pennsylvania/civil-rights-and-rise-frank-rizzo-1960s-philadelphia

[20] *Id.*

have said at the time "Get their Black asses" as he led the police charge into the crowd.[21]

When the national Black Panther Party planned a conference in Philadelphia for September of 1970, Rizzo used the unrelated shootings of three police officers in a



different section of the city as a pretext to quash the convention and discredit the Party. On August 31, 1970, Rizzo ordered police raids on the Black Panther's head quarters in North Philadelphia and directed that they be stripped naked in public. He bragged about the incident in a documentary filmed in 1978 stating, "They're a little angry. They were humiliated. We took their pants off them to search them."[22]

During his years as police commissioner, Rizzo acquired military style vehicles, equipment and weapons and increased the number of police officers from 7,000 to 9,000 and the department's budget increased from $60 million to $100 million.  He once boasted on a national news show that "We are equipped to fight wars. We could invade Cuba and win."[23]

Rizzo took office as mayor in 1972, the same year that MOVE was founded.  He ran a racist "law and order" campaign for mayor urging people to "Vote White." Once

---

[21] Jake Blumgart, "The Brutal Legacy of Frank Rizzo, the Most Notorious Cop In Philadelphia History" (2015)
https://www.vice.com/en/article/kwxp3m/remembering-frank-rizzo-the-most-notorious-cop-in-philadelphia-history-1022

[22] Gambacorta and Laker, "Frank Rizzo Leaves a Legacy of Unchecked Police Brutality and Division in Philadelphia" *Philadelphia Inquirer*, June 3, 2020

Robert Mugge, *Amateur Night at City Hall: The Story of Frank Rizzo (2016)*
https://www.amazon.com/Frank-L-Rizzo-Amateur-Night/dp/B07JLT6VVYP/

[23] *Id.*

he got elected, he continued the militarization of the Philadelphia Police Department, and encouraged and defended its brutal treatment of and use of excessive force against Black people especially Black activists. It was just a matter of time before the "toughest cop" in America would encounter a very different and unorthodox Philadelphia based Black activist group -- one that was cult-like, unpredictable, and far more tenacious than the NAACP, SNCC or the Black Panthers.

### C.    The Founding and Devolution of MOVE[24]

#### 1.  <u>1972-1978: The Early Years</u>



All living beings, things that move, are equally important, whether they are human beings, dogs, birds, fish, trees, ants, weeds, rivers, wind or rain. To stay healthy and strong, life must have clean air, clear water and pure food. If deprived of these things, life will cycle to the next level, or as the system says, 'die'.

— *John Africa*

AZ QUOTES

MOVE was founded in 1972 by Vincent Leaphart, as the "Christian Action Life Movement." Leaphart, who was not educated beyond the third grade, could not read or write. He adopted the name John Africa, and his followers took the same last name,

---

[24] Craig McCoy, "Who Was John Africa?" *Philadelphia Inquirer*, January 12, 1986

Linn Washington, "MOVE: A Double Standard of Justice" published in the *Yale Journal of Law and Liberation* (1989).

Seven-Part Documentary on MOVE (1978)
https://www.youtube.com/watch?v=1-3BzrSVK0g&list=UUb8aGNw2RmOITgm4EjXhWFQ&index=8

"MOVE Collection" *West Philadelphia Collaborative History*
https://collaborativehistory.gse.upenn.edu/stories/move#after-content-container

*Cf.* "20 Years on the MOVE: John Africa's Revolution" for a contrasting history of the MOVE organization. http://onamove.com/twenty-years-on-the-move-excerpt/

considered themselves his "family"[25] and practiced an anti-technology, communal lifestyle. The name MOVE is not an acronym and is thought to be a shortened version of the word "movement." With the assistance of the MOVE co-founder, a white University of Pennsylvania social worker named Donald Glassey,[26] John Africa is said to have dictated and distributed a set of governing principles, 300 pages long, for members that was called at various times, "the Guidelines," "The Teachings of John Africa" or "The Book."


*Donald Glassey*

MOVE practiced a back-to-nature, philosophy that included a love of animals, the rejection of processed foods, eating only raw meat, vegetables and fruit, and natural childbirth. They rejected all modern technology and medicine, as well as all of the widely shared political and social norms of modern society, the political process, and rejected the authority of the law and the courts. The MOVE children received no formal education, could not read or write, and were only taught John Africa's "principles."[27] MOVE's philosophy and communal lifestyle was to be practiced by its members wherever they lived even if in urban areas. Although their primary residence was Philadelphia, at different times, MOVE also owned properties in Richmond, Virginia and Rochester, New York.[28]

---

[25] He chose the name "Africa" to pay homage to the continent where "all life began." McCoy, *supra*. Several of the original members were related by blood. *See* Exhibit 2: *MOVE Family Chart*. John Africa's sisters Louise James and Laverne Sims and six of their children belonged to MOVE. It is estimated that MOVE in the early years never had more than 150 members, many of whom were part-timers and sympathizers. Washington, *supra* p. 68. John Africa arranged all marriages between MOVE members. Louise James Telephone Interview with the Philadelphia Police Department, July 13, 1984

[26] By 1977 Glassey had become disenchanted with John Africa. He stated that "there is a thin line between genius and insanity" and John Africa had crossed that line. He became an undercover informant for the federal government and served as a prosecution witness against John Africa when he was tried and acquitted in 1981 in federal court on weapons and explosives charges. McCoy, *supra*  His sister, Louise James, described him as "legally insane" after John Africa ordered her son, Frank Africa, to severely beat her for disobeying him. Louise James Telephone Interview with the Philadelphia Police Department, July 13, 1984

[27] Louise James In-Person Interview with the Philadelphia Police Department February 21, 1984

[28] McCoy, *supra*.

MOVE's founding in 1972 was against a backdrop of political fervor which included massive demonstrations against the Vietnam War, and Black activism in Philadelphia and in cities around the country aimed at challenging continuing vestiges of racial discrimination, systemic racism, and institutionalized violence against Black people by the police. Richard Nixon had been elected three years earlier with his "Southern Strategy" and on an implicitly racist "law and order" platform that was a backlash to the race riots of the late 1960's, especially those that occurred in dozens of cities after the assassination of Dr. Martin Luther King, Jr. in the summer of 1968.

The Black Panther Party was founded in 1966 as a Black liberation movement that armed its members and declared their willingness to defend themselves against police brutality by any means necessary. By 1970 it had grown to several thousand members with chapters in 68 cities, including Philadelphia. Delbert Africa was a member of the Black Panther Party in Chicago before he joined MOVE. In 1969, FBI Director J. Edgar Hoover described the Black Panther Party as "the greatest threat to the internal security of the county," and the FBI and state and city law enforcement agencies waged a campaign to discredit and destroy the Party. The government's tactics ranged from misinformation, surveillance, and infiltration to humiliating raids on their headquarters, some of which resulted in the killing of some of its members. The Party's popularity in the Black community increased as a result of this persecution and it expanded into various state prisons. In August of 1971, George Jackson, a prison inmate at Soledad Prison who was also a Black Panther, was killed when he allegedly tried to escape. Black activists were convinced that Jackson was assassinated because of his militancy and his protests of prison conditions. The following month in September, a riot by inmates at Attica Prison in upstate New York resulted in the killing, by gunshot, of 29 Black and Latino inmates and ten white hostages.[29]

---

[29] *See* Heather Ann Thompson, "The Lingering Injustice of Attica." Although the death toll in Attica was substantially higher than with MOVE in 1985, the overwhelming use of deadly force by law enforcement against unarmed Black people, including the use of a helicopter to drop teargas before the assault, and the lack of legal accountability for their deaths is comparable.
https://www.nytimes.com/2011/09/09/opinion/the-lingering-injustice-of-attica.html?_r=0

While these national political developments[30] may have influenced John Africa's decision to found MOVE, the Philadelphia Police Department's long history of brutality against Black people and the emergence of Rizzo were likely the dominant motivations. Rizzo would become the main antagonist in MOVE's frequent, violent, and ultimately deadly clashes with the City in the early years. MOVE's first demonstration was in 1972 at the Philadelphia Zoo to protest the caging of animals. That demonstration was the first of what would be hundreds of clashes over the next 13 years with the Philadelphia Police Department and the federal government, that culminated in the siege in Powelton Village and ultimately the bombing of 6221 Osage Avenue.[31]

---

Thompson's book on the Attica riot, <u>Blood in the Water: The Attica Prison Uprising of 1971 and its Legacy</u> (2017) won a Pulitzer Prize. Thompson is writing a book on the MOVE confrontations.

[30] In fact, John Africa's original "teachings" had very little of the political rhetoric and Black liberation goals of their contemporary counterparts such as SNCC, the NAACP or the Black Panthers. Bobby Seale, one of the founders of the Black Panthers, criticized MOVE in 1985 because he felt that rather than uplifting and serving Black people, MOVE was determined to antagonize and divide the Black Community in an effort to free their imprisoned members. Washington, *supra*

[31] MOVE members were arrested over 50 times in 1973 and 150 times in 1974. Each of these encounters involved violent struggles with the police. *See* Washington, p. 71. MOVE members were regularly charged with disorderly conduct, assault, and contempt of court. But no police officers were ever criminally charged for their use of force against MOVE members. *Id.*

Seven-Part MOVE Documentary(1978)
https://www.youtube.com/watch?v=1-3BzrSVK0g&list=UUb8aGNw2RmOITgm4EjXhWFQ&index=8

MOVE claimed that in 1976 Janine Africa's baby, Life Africa, was killed by the Police Department when they assaulted Janine and stomped her while she was on the ground. Several elected officials were invited to the home in Powelton Village to see the remains. "20 Years on the MOVE: John Africa's Revolution" for a contrasting history of the MOVE organization. http://onamove.com/twenty-years-on-the-move-excerpt/

After several incidents and arrests involving excessive force by the Philadelphia Police Department, in 1976 MOVE filed a $26 million lawsuit in federal court alleging that the City was harassing them for exercising their constitutional rights. The lawsuit was dismissed.

## 2. 1978: The Siege in Powelton Village[32]

*"The police will be in there to drag*
*them out by the backs of their necks.*
*They will be taken by force,*
*children or not"*

*Frank Rizzo[33]*

In the summer of 1973, MOVE moved into a building owned by MOVE co-founder Donald Glassey at 307 North 33rd Street in the Powelton Village section in West Philadelphia. They used wooden beams and metal sheets to convert it into a fortified compound, including a reinforced barricade in the front of the building. MOVE then regularly used a bullhorn to loudly broadcast John Africa's principles to its neighbors and passersby, and to criticize the racist and brutal treatment of MOVE members and other Black people by the Philadelphia Police Department. Some of MOVE's neighbors complained to the City about the unsanitary conditions in the MOVE compound and stated that several of the minor children living there were not enrolled in school and often appeared filthy, naked, and malnourished. MOVE also kept numerous stray dogs, cats, and rats in the compound, fed them raw meat, and allowed the dogs to roam freely in the streets.

Since they believed that "all life begets life" MOVE composted their garbage with human and animal feces often dumping it and raw sewage in the streets, creating a stench, and attracting rats and roaches. As a result, for much of its history MOVE was regularly cited for violations of the City's health and housing codes. In 1975, some of MOVE's neighbors also complained of being verbally and physically assaulted by MOVE members. In early 1977, MOVE armed themselves and could be seen on the top of the

---

[32] John C. Puckett and Devin DiSilvis, "MOVE in Powelton Village: 1973-1978" *West Philadelphia Collaborative History.* https://collaborativehistory.gse.upenn.edu/stories/move-powelton-village

[33] Seven-Part MOVE Documentary (1978)
https://youtu.be/xnl_MF3NsF0?list=PL00D8AB63627DAEAF

building brandishing handguns and rifles, stating that they had the weapons to protect themselves from the police and announcing that they would not hesitate to use them.



*307-309 North 33rd Street, Powelton Village*

After receiving frequent complaints about health and housing code violations at the house from MOVE's neighbors, MOVE's refusal to pay utilities, and their frequent clashes with the police, the City obtained a court order in early 1978 that required MOVE to vacate the compound within 90 days. MOVE initially agreed to do so and surrendered some of their weapons. In March of 1978 when MOVE refused to leave the house, Rizzo deployed hundreds of police officers to set up a blockade of several blocks around the house, which lasted 55 days. This blockade, which was intended to starve MOVE into surrendering, also prevented residents from entering the area without passbooks and they were subject to searches before they could enter. The result was numerous demonstrations and rallies in support of MOVE.[34]

Finally on August 8, 1978, the police and fire departments began an assault on the house and demanded that the MOVE members for which there were arrest warrants surrender. Twelve adult men and women as well as several children were in the house at the time. When MOVE refused to surrender, the City used a crane and a bulldozer to destroy the wall and reinforced front of the house, and pumped hundreds of gallons of water and dozens of tear gas cannisters into the house with full knowledge that there

---

[34] Seven-Part MOVE Documentary(1978)
https://www.youtube.com/watch?v=1-3BzrSVK0g&list=UUb8aGNw2RmOITgm4EjXhWFQ&index=8

were children inside. When a shot was fired from an undetermined direction, a shootout ensued for several minutes between MOVE and the police, and a police officer named James Ramp was tragically killed. Several other police officers, firefighters, bystanders and MOVE members were also injured. One MOVE member, Delbert Africa, surrendered with his arms extended and was still pulled out of the building by his hair and kicked and beaten in the street by three police officers in full view of the public and news media.



*The Public Beating of Delbert Africa, August 8, 1978*

Shortly after the shootout ended, and a 90-minute "investigation" of the building, Rizzo ordered that the building be razed, he claimed, to prevent other MOVE members from reoccupying the building which by that time was uninhabitable. Consequently, the crime scene was effectively destroyed before a proper investigation could be conducted into who caused Officer Ramp's death. Although MOVE contended that he was killed by gunfire from the police, nine of their members (the "MOVE 9") were convicted of third-degree murder in August of 1981 and sentenced to 30-100 years in prison.[35] As was their

---

[35] The police officers who beat Delbert Africa were not criminally charged until 1981 because the Police Department refused to provide their names. Notwithstanding the video evidence of the beating, in an unprecedented ruling, Philadelphia Common Pleas Judge Stanley Kubacki issued a directed verdict of acquittal even though their lawyers did not ask that he do so. *Commonwealth v. Geist,* 5 Phila. 210 (1981).

practice, MOVE rejected the assistance of lawyers and represented themselves in a nineteen-week, nonjury trial which was the longest criminal trial in Philadelphia history at the time.[36] The convicted members were Merle Africa, Phil Africa, Delbert Africa, Janet Africa, Chuck Africa, Janine Africa, Eddie Africa, Mike Africa, Sr., and Debbie Africa. Janine and Phil 's son, Phil, and Janet and Delbert's daughter, Delisha would both later be killed at Osage Avenue. Merle Africa and Phil Africa died while incarcerated and Delbert Africa died six months after his release from prison in 2020. The six remaining MOVE 9 members are no longer incarcerated.



*MOVE 9*

### 3. <u>The Bombing and Burning of Osage Avenue</u>[37]

**"*I bet they won't call the Police Commissioner
a mother f…. anymore*"[38]**

In 1983, John Africa and several of the remaining MOVE members forcibly occupied a three-bedroom row house at 6221 Osage Avenue in the predominantly Black working-class area of Cobbs Creek that was owned by his sister Louise James.[39] The

---

[36] Three other persons, including one MOVE member Consuewella Africa, were represented by lawyers during the trial, and were acquitted. Washington, p. 69

[37] The Report of the Philadelphia Special Investigation Commission ("MOVE Commission Report") http://library.temple.edu/scrc/philadelphia-special-1

Louis Massiah, "The Bombing of Osage Avenue" (1986) https://www.youtube.com/watch?v=Cqgwm0iFAIs

[38] MOVE Commission Report. Statement heard over a police radio as the fire consumed 6221 Osage Avenue.

[39] After most of the interior walls were knocked down, James was confined to her bedroom and denied free movement inside the house, and her mail was censored. In October of 1983, James was severely beaten by her son Frank James, on John Africa's orders, after their sister, Laverne Sims, allegedly disrespected John Africa. Louise James and Laverne Simms Interview with the Philadelphia Police Department, February 21, 1984

interior walls were removed and reinforced, and more than thirteen men, women and children lived in the house. On Osage, MOVE continued its "back to nature" lifestyle which included the same unsanitary conditions in and around the MOVE house. Neighbors again complained that the minor children living there were not enrolled in school and often appeared filthy, naked, and malnourished. Other than Birdie Africa, none of the children who lived at Osage were with their parents. In fact, Katricia Africa and Delisha Africa's parents were incarcerated members of the MOVE 9. As they had done in Powelton Village, MOVE continued its practice of composting its household, human and animal waste. They erected a pigeon coop on the roof, kept numerous stray dogs, cats, and rats in the compound, fed them raw meat, and allowed the dogs to roam freely in the streets. They also blocked off the common rear driveway that was used by other neighbors on the block.



*MOVE demonstrating on Broad Street to demand release of MOVE 9*

By 1983, an embittered MOVE's protest tactics aimed at freeing the MOVE 9 became even more aggressive and their relationship with their Black neighbors on Osage was drastically different than in 1978. For much of the time that MOVE was in Powelton Village, the neighbors were generally supportive, notwithstanding the conditions in the house and their occasional clashes with the neighbors. In fact, the 1978 blockade, assault and the resultant brutal treatment of several neighbors during the assault, resulted in



*Bunker on 6221 Osage*

several hours of protests and statements of support for MOVE and its cause.

On Osage Avenue, MOVE immediately began to campaign for the release of the jailed MOVE 9, and in October 1984 they constructed a bunker on the top of the house. They also obtained weapons and were frequently seen brandishing them from their roof and the roofs of their neighbors. MOVE installed a loudspeaker on the roof which they used day and night to harangue and insult the neighbors with profanity and insisted that they join in their demand that the City's first Black mayor, Wilson Goode, release their members from prison. On Christmas Eve of 1983, a profanity laced MOVE harangue lasted for 36 straight hours. MOVE routinely used profanity directed to neighbors, city employees, police officers and judges as a tactical weapon.[40] By May of 1985, MOVE had, as the MOVE Commission found, evolved into:

---

[40] This deliberate strategy to provoke its Black neighbors was acknowledged recently on a MOVE website called **onamove.com,** which is managed by MOVE supporters: "By 1983, a core group of *MOVE* members, including the group's founder, John Africa, had relocated to the house on Osage Avenue, in the Cobbs Creek area of West Philadelphia. The longer they lived there, the more determined they became to force the city and its newly elected Black mayor, Wilson Goode, to revisit the sentences of the *move* nine. By Christmas Eve of 1983, the residents of 6221 Osage Avenue were blasting their demands for justice, and their increasingly vitriolic and profanity-laced critiques of city officials and the system, from loudspeakers day and night. As dismay about the situation mounted among move's neighbors, they began pressuring the city to do something." http://onamove.com/

"An authoritarian, violence threatening cult…that was armed and dangerous, and used threats, abuse and intimidation to terrify their neighbors and bring about a confrontation with city government."[41]

After several months of failed negotiations between the City and MOVE over the conditions of the house and to resolve the complaints of the neighbors, on May 13, 1985, the City mounted a military style assault to arrest MOVE members for parole violations, illegal possession of firearms and making terrorist threats.[42]



*Louise James, owner of 6221 Osage, sister of John Africa and mother of Frank Africa who perished in the house*

Before the assault began, Police Commissioner Gregore Sambor, using a bullhorn, stated "Attention MOVE: this is America, you have to obey the law," and announced that they had arrest warrants for four of the persons in the house and demanded that they surrender within 15 minutes. At the time of the assault, the City knew that there were children in the house. When MOVE members rejected the ultimatum over the group's loudspeaker, the City commenced a siege of the house at 5:50 a.m. As they had done in 1978, the Fire Department then used high powered water cannons to direct thousands of gallons of water at the bunker on the top of the house in an effort to destroy it before they commenced the military style assault. The water completely flooded the basement of the house. When MOVE still did not surrender, the Police Department used explosives to destroy the front of the house as well as the adjoining walls of two houses on each side,

---

[41] MOVE Commission Findings # 1 and #2. The Report of the Philadelphia Special Investigation Commission (MOVE Commission) (1986) http://library.temple.edu/scrc/philadelphia-special-1

The MOVE organization of 1985 was no longer, as recent media accounts described them: "a social justice organization" or a "black liberation group." Washington, *infra; See also:* Platt, "The Forgotten Victim of the MOVE Bombing" *The Philadelphia Citizen (May 21, 2021)* https://thephiladelphiacitizen.org/forgotten-victim-move/

[42] MOVE Commission "Chronology," Exhibit 3.

and then pumped numerous tear gas cannisters into the house. MOVE responded to the assault by firing several shots at the police. The Police Department, armed with 12-gauge pump shotguns, machine guns, semi-automatic rifles, silencer equipped sniper rifles, and Uzis fired over 10,000 rounds of ammunition into the house in a 90-minute period.  After the fire, the City recovered two .38 revolvers, two 12-gauge pump shotguns, and a .22 caliber bolt action rifle from the fire ravaged ruins of the MOVE house.

When all of these efforts still failed to force the MOVE members to surrender, and after a 12-hour standoff, at 5:27 p.m., the City made an impromptu decision to drop an



improvised bomb on the house from a Pennsylvania State Police helicopter aimed at destroying the bunker-like structure on the roof.[43] The bomb targeted the bunker even though the Police Department had reason to believe that gasoline was stored in the bunker. The bomb caused a fire that Police Commissioner Sambor decided to let burn unabated for 45 minutes.  He rationalized his conduct by claiming that letting the fire burn would force the MOVE members out of the house.[44] The fire quickly raged out of control and spread to adjoining homes on that block and others, and burned until the Fire Department finally extinguished it at 11:41 p.m.

---

[43] The use of the bomb was not a part of the original assault plan. In fact, the City's decision to use the improvised explosive device made from C-4 explosive was made late in the afternoon when all other tactics had failed to dislodge the MOVE members from the building. *1988 Grand Jury Report*

[44] MOVE Commission Finding #27

Bowser, Let the Bunker Burn (1989)

Boyette, Let it Burn, MOVE, the Philadelphia Police Department and the Confrontation That Changed a City (2013) https://library.ccp.edu/record=b1144527~S0

When a male adult and child had tried to escape through a back alley, there was testimony before the MOVE Commission that they were fired upon by the police and forced back into the building.[45]

When the siege ended 18 hours later, eleven members of MOVE had been killed.



Ramona Africa



"Birdie" Africa

The eleven MOVE members who perished were six adults: John Africa, Rhonda Africa, Frank James Africa, Conrad Africa, and Teresa Africa; and five children: Katricia Dotson Africa, Zanetta Dotson Africa, Delisha Africa, and Tomasa Africa. One adult female, Ramona Africa and one child Michael "Birdie" Ward Africa did manage to escape and were the only survivors. Birdie was rescued by a white police officer name James Berghaier who was called a "nigger lover" by some his fellow police officers for doing so.[46]

In 1986, Ramona Africa, who acted as her attorney, was tried, and convicted on riot and conspiracy charges and sentenced to a seven-year prison sentence, although there was no evidence presented that she ever held or fired a weapon. In 1996, she and two relatives of MOVE members killed in the bombing obtained a $1.5 million judgement against the City of Philadelphia. Michael "Birdie" Ward died in a drowning accident in 2013.

The fire also destroyed sixty adjoining homes on Osage Avenue and Pine Street and damaged another 100. The 250 residents who were told the night before the siege to pack just enough personal items for 24 hours when they were evacuated, were left homeless, with all their prized possessions and lifetimes of memories lost forever.

---

[45] MOVE Commission Finding #28. The 1988 grand jury contradicted this Commission finding. *1988 Grand Jury*

[46] Berghaier statement in forthcoming documentary, "Philly on Fire"(2021)



### 4. **The MOVE Commission**[47]

In the aftermath of this horrific disaster, Mayor W. Wilson Goode issued an executive order[48] that created the eleven-member Philadelphia Special Investigation Commission ("MOVE Commission" or "Commission") to investigate and make findings and conclusions on the events leading up to and the City's conduct during and after the assault on the MOVE house. The staff included a director, special counsel, seven investigators, and numerous support personnel. Outside experts in explosives, fires and forensic pathology were retained, and eleven attorneys and forty-five law students conducted over one thousand interviews in the summer of 1985.

After conducting hundreds of interviews and gathering evidence from a wide variety of sources, the Commission held five weeks of televised public hearings in the Fall of 1985, during which 92 witnesses testified. The members of the police bomb unit

---

[47] The full Report is published at *59 Temple Law Quarterly* 354 (1986), and the Commission's records are located at the main Temple Library: http://library.temple.edu/scrc/philadelphia-special-1

[48] Executive Order No. 5-85 "Establishing the Philadelphia Special Investigation Commission" https://www.phila.gov/ExecutiveOrders/Executive%20Orders/1985_EO05-85.pdf

"How the Panel Came to Be" *Philadelphia Inquirer*, May 8, 2010 https://www.inquirer.com/philly/news/How_the_panel_came_to_be.html

refused to testify, taking the Fifth Amendment after attempts by the Fraternal Order of the Police to block their appearance through legal challenges failed. The lone surviving adult MOVE member, Ramona Africa, refused to testify, but Birdie Africa did testify. The witnesses included several MOVE members: Louise James, who owned 6221 Osage Avenue and was the sister of John Africa and the mother of Frank Africa, both of whom died in the fire. Her sister, Laverne Sims, who was also the mother of Debbie Africa, who was one of the imprisoned MOVE 9, testified as well. Several key City officials testified including Mayor Wilson Goode, Managing Director Leo Brooks, Police Commissioner Gregore Sambor and Fire Commissioner William Richmond.

The Commission also heard from Osage Avenue residents, citizen negotiators and its forensics expert consultants. The hearings ended in early November and the Commission deliberated for several months before issuing its report on March 6, 1986. The report denounced and strongly condemned the actions of the City government, concluding that "Dropping a bomb on an occupied row house was unconscionable" and it found that the City was "grossly negligent." In addition to its strong condemnation of the City officials responsible for the planning and execution of the siege, they also condemned the MEO's callous and inhumane treatment of the MOVE members remains during the excavation of the site and thereafter. The Commission's Report included 38 conclusions and recommendations.



*Mayor Wilson Goode, Managing Director Leo Brooks, Fire Commissioner William Richmond, and Police Commissioner Gregore Sambor testifying before the MOVE Commission*

The Commission, concluding that the City's actions were "grossly negligent" and constituted "unjustifiable homicide," called for a grand jury investigation into the Osage

catastrophe. District Attorney Edward Rendell, who had approved the arrest warrants for the four adult MOVE members, refused to convene a grand jury. A grand jury which was convened in 1988 by Rendell's successor, Ronald Castille, issued a 279-page report but refused to indict any of the City officials for criminal wrongdoing because it concluded that there was no evidence that they acted with criminal intent, recklessness, or negligence under Pennsylvania criminal law. The report stated: "We do not exonerate the men responsible for this disaster. Rather than a vindication of those officials, this report should stand as a permanent record of their morally reprehensible behavior." In what the report called a "Leadership Void," it concluded that the incident was "an epic of governmental incompetence, marked by political cowardice in its inception, inexperience in its planning and ineptitude in its execution."[49]

In a *Philadelphia Inquirer* op-ed article, MOVE Commission Chairman William Brown was highly critical of the grand jury's refusal to indict any City officials and stated:

> "The grand jury has confirmed the belief of many that in Philadelphia there are two standards of justice: one for the poor and minority and another for those who are white and economically secure….I am ashamed to be a part of a legal system that treats the loss of life so cavalierly."[50]

## 5. <u>The Aftermath</u>[51]

After the destruction of the 61 homes, Mayor Wilson Goode offered to temporarily house the 250 displaced homeowners in a nearby vacant housing project complex. When the homeowners expressed their outrage at the proposal, Goode was able to relocate them to several newly constructed but unoccupied townhouses near the airport.[52]  Goode then

---

[49] "Grand Jury Clears Everyone In Fatal Philadelphia Siege" *New York Times* (1988) https://www.nytimes.com/1988/05/04/us/grand-jury-clears-everyone-in-fatal-philadelphia-siege.html

[50] *Philadelphia Inquirer,* May 8, 1988

[51] John L. Puckett, "The Long Shadow of the MOVE Fire: 1985-2018, "*West Philadelphia Collaborative History* (2016) https://collaborativehistory.gse.upenn.edu/stories/move

Michael Coard, "MOVE 30: Inside the May 1985 Assault on Osage Avenue," *Philadelphia Magazine (2015)* https://www.phillymag.com/news/2015/05/12/move-30-year-anniversary/

[52] Baba Renfrow Interview, July 8, 2021

vowed to rebuild the neighborhood and provide new houses for the displaced residents by Christmas of 1985.[53] The City did not meet that deadline, but by the summer of 1986 most of the homes had been rebuilt, but they were defectively constructed. The projected cost to rebuild the homes was $4.9 million but the actual cost rose $8.27 million. These new homes cost $130,000 each to replace the destroyed homes that had a market value of only $30,000. The first contractor was fired and later convicted of embezzling over $130,000 of the funds. Residents constantly complained to the City about the various defects in the new homes and, in 1997, the City determined that it would cost an additional $6 million to bring the homes up to code.

By the summer of 2000, that number had risen to $10 million for an average price per house of $430,000. When that number was estimated to increase to $13 million by 2005, the City decided to board up the homes and purchase them from the owners for $150,000 each. Thirty-six of the homeowners accepted the buyout, but 24 refused and sued the City in federal court in 2005 and won a judgement of $534,000 each. In 2008, an appellate court reduced the amount to $150,000 for each homeowner, the same amount that was offered but refused in 2000. The 36 homes that the City purchased were eventually rebuilt and Osage Avenue and Pine Street are once again a stable and thriving Black middle-class neighborhood. Sadly, the financial cost to the City for the Osage bombing exceeded $50 million, and the continuing reputational harm to the City and its international image is immeasurable.

Although Goode's administration was responsible for the Osage bombing and its deadly aftermath and devastation, he ran against Rizzo in 1987 and was narrowly reelected mayor for a second term. Rendell, who authorized the arrest warrants and refused to convene a grand jury to investigate the bombing, succeeded Goode and was twice elected mayor and served two terms as governor of Pennsylvania.

---

[53] "1985 Special Report: Philadelphia MOVE Bombing" (2021)
 https://www.youtube.com/watch?v=dAZFqGqV21k

### D.    The Original Sin: The Excavation of 6221 Osage Avenue

> "*The performance of the Medical Examiner's Office was unprofessional and violated generally acceptable practices for pathologists.*"[54]



*The clamshell crane bucket being used to excavate the MOVE remains from 6221 Osage Avenue*

### 1.  Collection and Mishandling of the Remains

After the fire was brought under control at 11:41 p.m. on May 13, 1985, representatives of the Medical Examiner's Office refused to go to the Osage Avenue disaster scene until after the first body was discovered, which was late in the afternoon of May 14, 1985. By the time they arrived, the City had begun using a clam shell crane to dig up debris and body parts which resulted in the dismemberment and commingling of human body parts along with animal body parts. More importantly, these excavation methods destroyed important physical and medical evidence. Even after arriving on the scene, the pathologists in charge failed to coordinate and control the actions of the various

---

[54] MOVE Commission Finding #31

agencies that were searching for evidence and other possible victims.[55] These early incompetent, insensitive and unconscionable decisions by the MEO and the City laid the groundwork for the instant controversy over the remains and this investigation.

On May 16, 1985, Dr. Alan Mann, a University of Pennsylvania anthropologist, who was retained by the MEO to assist with the identification of victims of the bombing, arrived at their offices along with his then assistant graduate student Janet Monge to begin their examinations.[56] Monge described the examination room as being twenty by twenty feet full of "mountains of dirt," piles that were a few feet high with human body parts comingled with those of animals and other debris.[57] On May 23, 1985, ten days after the burning and excavation of 6221 Osage Avenue, Louise James the owner of the building, was sent a letter from a City department stating:

> The Department of Licensing and Inspections has determined that your property at 6221 Osage Avenue is imminently dangerous…. You are hereby notified that the Department …will demolish the remaining portions of your property…. A lien will be placed against your property for the costs of demolition.[58]

The MOVE Commission harshly criticized the MEO's conduct in the collection and mishandling of the remains and concluded that:

---

[55] Hameli Reports: "Review of Scene Investigation", "Examination of the Remains", "Condition of the Remains", Exhibit 4

"The Role of a Forensic Anthropologist in a Death Scene Investigation" Journal of Forensic Research (2012)https://www.hilarispublisher.com/open-access/the-role-of-a-forensic-anthropologist-in-a-death-investigation-2157-7145.1000154.pdf

[56] Mann Report, Exhibit 6. Mann's claim in his written statement dated July 8, 2021, that his "involvement at the time was tied to my position at Penn" suggests that he was doing so in his capacity as a professor at the University. In fact, as he had done for ten years previously, he was paid as a private forensic consultant as evidenced by an invoice for $300 paid directly to him. Mann Invoice, Exhibit 7.

*See also* Segal Report, Exhibit 9.

[57] Monge Interview, May 10, 2021; Mann Statement, Exhibit 15.

[58] Letter from James Stanley White, Exhibit 5.

"**Finding 31**: **The performance of the Medical Examiner's Office was unprofessional and violated generally acceptable practices for pathologists.**

- The pathologists did not follow a systematic procedure for uncovering and recording the position of each body. For example, locator stakes were not placed where each body was found; bodies were not numbered or tagged at the scene; no sequential photographic or descriptive record was made of the recovery process. As a result, there was no proper control of the physical remains.

- In the laboratory, the pathologists…violated generally accepted practices in the storage, examination, and analysis of the bodies.

- The facility itself was unclean, and not conducive to disciplined scientific examination.

- Animal bones were mixed with human remains.

- The bodies were improperly stored at temperatures of 56 degrees, causing accelerated deterioration and the growth of fungus and mold. Recommended storage temperature is 34 to 36 degrees.

- Tissue samples for toxicology tests were not taken until long after the fire, rendering them practically useless in determining the cause of death in most of the cases.

- The pathologists did not take lateral x-rays of the remains, although the equipment and expertise to do so was present. As a result, the pathologists failed to discover metallic fragments, including firearms ammunition, in six of the bodies.

- The Medical Examiner's office failed to identify five bodies and incorrectly stated the number of dead adults and children."[59]

---

[59] Finding # 31. Hameli Reports Exhibit 4;  Kerley Report, Exhibit 11

## 2.  The Dispute Over the Identity of the Remains

On June 24, 1985, William Brown, Chairman of the Commission, informed the City's Medical Examiner, Dr. Marvin Aronson, that the Commission intended to retain a forensic pathologist to review the MEO's findings concerning the identification of the human remains found in the MOVE house. Brown further informed Aronson that the MEO was to "not release or otherwise dispose of any of the remains currently in your custody and that you provide to us at your earliest convenience all records relating to the examination of the remains…"[60] On July 19, 1985, the Commission hired three forensic pathologists to assist it in evaluating how the MEO collected the MOVE remains from the site, ascertain the identities of the victims, and determine the causes and manners of their deaths: Drs. Ali Hameli, Ellis Kerley, and Lowell Levine.[61] Mayor Goode instructed the MEO to provide the MOVE Commission experts full cooperation with their investigation. The official from the MEO overseeing the investigation was Dr. Robert Segal, the Assistant Medical Examiner. According to Segal, all MOVE victim remains were kept in a locked freezer and "stayed under the absolute control of the MOVE Commission's experts until after Dr. Hameli's public testimony before the [MOVE] Commission on November 5, 1985."[62]

The Commission experts and the MEO initially agreed on the identities of all of the victims except Katricia Africa, whose body was labeled "B-1" and Delisha, whose body was labeled "G." The Commission's experts concluded that those remains, fragments of the pelvis and a portion of the femur, belonged to Katricia, whose estimated age at the time of her death was 14 -15 years of age, and a portion of a skull belonged to Delisha.  Segal and Mann disagreed and concluded that B-1 were the remains of an older female between the ages of 17-21. After the Commission's experts testified to their

---

[60] Exhibit 19

[61] *59 Temple Law Quarterly* 354 (1986), at p. 4-5.

[62] *59 Temple Law Quarterly* 354 (1986), at p. 5.

conclusions on November 5, 1985, the MEO, at Segal's direction, continued its investigation of the identity of Body B-1 and Body G. Mann conducted a supplemental investigation in November of 1985 and issued a report in which he reaffirmed his conclusion that the remains of Body B-1 could not be those of Katricia.[63] The Commission's experts then re-examined the remains and issued a supplemental report reaffirming their conclusions that the remains of B-1 did indeed belong to Katricia.[64] The Commission's experts refused to meet with Dr. Mann or Monge during this process.[65]

On January 23, 1986, Segal informed the Commission that yet another expert that examined the B-1 remains, Dr. Judy Suchey, a Forensic Anthropologist,[66] concurred with the Commission's experts regarding B-1. Segal stated that Suchey concurred with the Commission's experts' identification of body B-1 as Katricia Africa, and that "It would be unreasonable for me to reject these findings in light of the evidence available at the time."[67] Despite Segal's publicly stated admission that he lacked evidence to dispute the Commission experts' conclusions, he wrote in his March 18, 1986 final report that he did not concur with the conclusion that the remains of B-1 belonged to Katricia Africa and further questioned the methodology employed by the MOVE Commission's experts.[68]

The Commission wrote in December 1985 that their experts had concluded that the B-1 remains were those of Katricia and that they could be released in accordance with MEO policy.[69] On December 14, 1985 what was thought to be the remains of Katricia Africa were buried after they were released to Hankins Funeral Home, by order of

---

[63] Mann Report, Exhibit 6: Mann Invoice, Exhibit 7.

[64] Correspondence from Dr. Ellis Kerley to William B. Lytton December 28, 1985, Exhibit 20.

[65] Monge Interview, May 3, 2021

[66] Correspondence from Dr. Robert Segal to William By Lytton, January 23, 1986, Exhibit 21.

[67] *Id*.

[68] Segal Report, Exhibit 9, at p. 4.

[69] Correspondence from William B. Lytton to Dr. Robert Segal, December 4, 1985, Exhibit 22.

Nathaniel Galloway, Katricia's father.[70] On September 22, 1986, what was thought to be the remains of Delisha Africa were also released for burial to Hankins Funeral Home, by order of Gerald Ford (Africa), who had been given Power of Attorney by three mothers of the children who perished on March 13, 1985.[71]

The City gave the MOVE Commission and its experts the final authority to complete the identification of the MOVE victim remains and determine the cause of death. Segal had no authority to retain the disputed B-1 remains which he apparently later released to Mann for further investigation. It would appear that Mann took possession of a femur and several pelvic fragments in early 1986 and took them to his office at the Penn Museum for further examination.[72] Since Mann, through his lawyer, would not agree to an interview, we were unable to ask him what, if any, efforts he made after 1986 to confirm his theory regarding the identity of the B-1 remains which conflicted with the consensus of the three MOVE Commission experts.[73] Furthermore, it appears that Mann lost all interest in the remains and had no idea where they were located after he took them to the Penn Museum in 1986.[74]

---

[70] City of Philadelphia Officer of the Medical Examiner Release of Body Form for Katricia Africa, Exhibit 23.

[71] City of Philadelphia Officer of the Medical Examiner Release of Body Form for Delisha Africa, Exhibit 24.

[72] Mann Statement, Exhibit 15

[73] Monge stated that the conclusions that she and Mann reached in 1985 regarding B-1 were subsequently confirmed by at least seven different forensic anthropologists between 1986 and 2019. For example, during an American Board of Forensic Anthropology conference in 1988 several student anthropologists reviewed the B-1 remains and concluded that they were the remains of a female at least 17 years of age. Monge Statement, Exhibit 14 (Dr. Monge incorrectly referenced in her interview and written statement that the Society of Forensic Anthropology conducted the diplomatic examination of MOVE remains in 1988.  Dr. Monge has since confirmed that it was indeed the ABFA).

See also, Marc Kaufman, "A MOVE Finding is Disputed: 4 Experts Challenge Panel on Remains" *Philadelphia Inquirer,* January 21, 1986.

[74] Mann Statement, Exhibit 15

### III.    WHY THE DEMONSTRATIVE DISPLAY OF THE MOVE REMAINS MATTERS

Our primary objectives in this inquiry have been descriptive and prescriptive -- that is: to make findings and conclusions of the facts relating to the demonstrative display of the MOVE remains; ascertain the storage and use of those human remains at the Penn Museum and Princeton University; determine whether the possession and use of these remains by Mann and Monge conformed to the Penn Museum's policies or any relevant professional ethical, or legal standards; make recommendations relating to the MOVE remains; and suggest other actions and initiatives that the University might undertake relating to this current controversy and beyond.

Given the widespread public controversy that this matter has engendered, we thought it important that our inquiry also determine **how** this controversy arose and provide an interpretive perspective on **why** the display of the MOVE remains matters at



this moment in time. As a preliminary matter, we note that most of the critical commentaries from a congeries of sources about this controversy are based, in part, on three inaccurate factual premises: (1) *that the remains used in the video were indisputably those of Katricia Africa, one of the MOVE children killed in the bombing,(2) that the remains of a second child Delisha were also housed at the Museum, and (3) no effort was ever made to identify and return any of the remains to MOVE family members*. In fact, the identity of the remains taken to the Museum by Dr. Mann is still a matter of legitimate dispute, and all that we could conclude, with a reasonable degree of certainty, is that the remains displayed in the video in 2019 were of **a** MOVE member. We found no credible evidence that Delisha's remains were ever housed at the Museum. And finally, we also found that efforts were indeed made to identify the remains used in the video with the goal of returning them to MOVE family members. With regard to the assumption that the remains were used in the video

without the consent of MOVE members, it would follow that if they were in fact unidentified, there would have been no persons with a legal relationship to the remains from whom consent could have been obtained. The femur and pelvic remains were returned to MOVE members on July 2, 2021.[75]

We point this out, not because it was outcome determinative in our investigation, because one of our objectives was to examine the ethical and legal propriety of the custody and display of **any** MOVE remains, identified or not. We do so to illustrate the potency of carefully crafted and widely disseminated misinformation to shape public opinion and inflame passions.[76] Not surprisingly, that misleading narrative moved with warped speed across print and electronic media and the internet and fueled much of the resulting public expressions of outrage and condemnation.

### A.     The Samuel Morton Cranial Collection[77]

The root cause of the current public controversy surrounding the MOVE remains is the Samuel Morton Cranial Collection ("Collection") at the Penn Museum.[78] The Collection, which contains over 1300 skulls, is one of the largest and most famous in the



world. The public dispute over the repatriation of skulls from the Collection dates back

---

[75] "Toward a Respectful Resolution" Penn Museum Statement on the MOVE Remains (July 14, 2021) https://www.penn.museum/towards-respectful-resolution/?fbclid=IwAR3aNkSaGYlrk2Mn-uByEjhkbcVVnMXKcY1kPQcG8tQ8_9Me7LskZP7fRAo

[76] *See* The Professional and Personal Dispute Over the Collection, *infra*

[77] "The Samuel George Morton Cranial Collection" Penn Museum Brochure https://www.penn.museum/sites/expedition/the-samuel-george-morton-cranial-collection/

[78] "The Morton Cranial Collection and the Legacies of Scientific Racism in Museums" (2021) *The History of Anthropology Review* (2021) https://histanthro.org/tag/morton/

to 2020,[79] and the MOVE remains controversy is a current manifestation of that dispute.[80] One of the reasons that the MOVE remains controversy is reverberating at this moment is because it involved the possession, research and display of the remains of a Black person by Mann and Monge, two University of Pennsylvania and Princeton University physical anthropologists, who served as curators at the Penn Museum. As stated more succinctly in one of the more knowledgeable critiques of this controversy: "Indeed, the idea that the museum was holding the bones of a Black Philadelphian who was alive as


*Mann and Monge with the Morton Collection*

recently as 1985 in the same way that it held the skulls of enslaved people, procured by grave robbers, was beyond comprehension."[81] Morton is widely regarded as one of the inventors of scientific racism who gained worldwide fame for promoting polygenism, the theory that mankind could be divided into five or more distinct races, each with a separate origin.[82] Both Mann and Monge have written articles in defense of Morton and the University's retention of the

---

[79] Alvarado, "The Penn Museum Must End Abuse of the Morton Collection" (June 25, 2020)*The Daily Pennsylvanian*

[80] *See* Exhibit 26, "Morton Collection/MOVE Remains Public Controversy Timeline"

[81] *Cf*: Heather Thompson, "Saying Her Name", *The New Yorker*, May 16, 2021
https://www.newyorker.com/news/essay/saying-her-name

[82] Kelleher, "How a Museum's Skull Collection Sparked a Racial Reckoning." (April 16, 2021)
https://www.forbes.com/sites/suzannerowankelleher/2021/04/16/penn-museum-samuel-morton-human-skull-collection-black-slaves-repatriation/

Morton adopted the five racial categories that were developed by the anatomist Jonathan Freidrich Blumenbach.
http://www.bibliotecauniversitaria.ge.it/export/sites/bug/documenti/UetP/7_CONTESTO_TEOLOGICO_FILOSOFICO/Blumenbach.pdf

*See also,* "Race & Anthropology: People and Cultures of the World"
http://www.anthrocervone.org/PeoplesandCultures/modules/social-relations/race-anthropology/

Collection. This controversy is occurring at a time in which the Penn Museum has come under widespread criticism for its continuing possession and, until recently, public display of the skulls of some Black and Indigenous People in the Morton Collection. It is also occurring during this era of racial reckoning that includes a national debate over the role of physical anthropologists in the invention of scientific racism.

Samuel George Morton was born in Philadelphia 1799 and received a medical degree from the University of Pennsylvania Medical School in 1820. He soon became a prominent physician in the city and was appointed professor of anatomy at the Pennsylvania Medical College where he developed an interest in the skull, or cranial.[83] In 1830, he presented a lecture entitled *"The Different Forms of the Skull as Exhibited in the Five Races of Man"* in which he postulated that the intellectual capacity of the five racial categories of mankind could be measured by the size of their skulls and concluded that the skulls of persons of European descent were larger, and they were therefore more intelligent.[84] In 1839 Morton introduced his theory of craniometry in a book called *Crania Americana* which brought him international fame. In order to prove this hypothesis, Morton began a lifelong quest to collect skulls from all regions of the world from all racial and ethnic groups.[85] In 1842 he gave a lecture called "Brief Remarks on the Diversities of the Human Species and On Some Kindred Subjects."[86]

Morton's collection efforts were wide ranging, extending to ancient civilizations as well as contemporary societies around the world. He then measured the volume of seeds that could be contained in a skull and then ranked the intelligence of the various "races" accordingly. Over the next twenty years, Morton published several more articles

---

[83] Renschler and Monge, "The Samuel George Morton Cranial Collection: Historical Significance and New Research (2008).
https://www.penn.museum/sites/expedition/the-samuel-george-morton-cranial-collection/

[84] *Id.*

[85] "A History of Craniology in Race, Science and Physical Anthropology"
https://www.penn.museum/sites/morton/craniology.php

[86] Morton Lecture: "Diversity of the Human Species and On Some Kindred Subjects" (1845).
https://collections.nlm.nih.gov/ext/mhl/9514382/PDF/9514382.pdf

and books on craniology which increased his stature in the medical and scientific community in Philadelphia and beyond. His research and theories on white racial superiority were readily adopted throughout the south as a justification for slavery, and upon his death in 1851, *The Charleston Medical Journal* published a tribute to him stating:

> We can only say that we of the South should consider him as our benefactor, for aiding most materially in giving to the negro his true position as an inferior race.[87]

The Morton Collection came to the Penn Museum in 1966 on loan from the Academy of Natural Sciences and the Museum obtained legal ownership in 1997. In the summer of 2020, after student protests, the Collection was removed from public display in a university classroom.[88] The Penn & Slavery Project was instrumental in this reckoning at the University.[89] And on April 12, 2021, the Penn Museum announced its intention to repatriate the remains of Black and Indigenous People in the Collection[90] and issued the following statement:

> "Racism has no place in our Museum. In the summer of 2020, the killing of George Floyd by police and the height of the Black Lives Matter movement ignited civil unrest that underscores the critical need for institutions like the Penn Museum to continuously examine the colonial and racist histories of their collecting practices….We reject scientific racism that was used to justify slavery and the unethical acquisition of the remains of enslaved people."[91]

---

[87] Renschler and Monge

[88] "Racism Has No Place in Our Museum"
 https://www.penn.museum/sites/morton/

[89] http://pennandslaveryproject.org/

[90] Museum Announces the Repatriation of the Morton Cranial Collection (2020)
https://www.penn.museum/documents/pressroom/MortonCollectionRepatriation-Press%20release.pdf

[91] Penn Museum Statement on the Morton Cranial Collection. https://www.penn.museum/sites/morton/

## B.    Anthropology, Scientific Racism, and Repatriation[92]

This MOVE remains controversy is also occurring at a time that the University of Pennsylvania and other universities are facing an international reckoning and scrutiny over their complicity in the invention of scientific racism[93] by university physical anthropologists in particular, and how they promoted and benefitted from it through their collections and exhibits. Dr. Mann acknowledged this development in his recent statement:

> "[A]nthropologists have sometimes historically not treated Black, Brown, and Native bodies with respect. We as a society are finally confronting the systemic racism that has pervaded academia and anthropology, in particular….The field of anthropology must confront and reckon with its racist past. Universities and museums around the globe must acknowledge their institutional racism and the harm done to communities of color."[94]

Universities and museums are being urged to repatriate items in their collections such as the human remains of Black and Indigenous People and to acknowledge that these items and other artifacts are legacies of this racist past. The racial reckoning of the past year prompted by the Black Lives Matter Movement and the killing of George Floyd has increased the urgency of doing so. The anthropology faculty at Princeton issued the following statement regarding the role of physical anthropology in promulgating scientific racism after this controversy arose over the MOVE remains:

> "…American physical anthropology began as a racist science marked by support for, and participation in, eugenics. It defended slavery, played a role in supporting restrictive immigration laws, and was used to justify segregation, oppression, and violence in the USA and beyond. Physical anthropology has used, abused, and disrespected bodies, bones, and lives

---

[92] Blakey, "Understanding Racism in Physical (Biological) Anthropology" (2020) https://onlinelibrary.wiley.com/doi/abs/10.1002/ajpa.24208

"Timeline of Scientific Racism" https://apa.nyu.edu/hauntedfiles/about/timeline/

[93] "Curating Racism: Understanding Field Museum Physical Anthropology from 1893 to 1969" (2019) https://articles.themuseumscholar.org/2019/05/01/tp_vol2procopio/

[94] Mann Statement, Exhibit 15

of indigenous and racialized communities under the guise of research and scholarship. Despite increasing anti-racist methods, theory, and action in anthropological approaches to studying human bodies and human variation, there remain too many echoes of the past in current practices."[95]

The Anthropology Department at the University also issued a statement acknowledging the roots of scientific racism in physical anthropology:

"In the last few decades, we have seen intensive scrutiny of the discipline's colonial roots, reimagined forms of ethnographic research, strengthened institutional controls on informed consent in ethnographic, biological, and archaeological studies of contemporary communities, and have established new regulations and practices surrounding the acquisition, display, and disposition of human remains and other cultural materials. These self-critiques and redressive actions have changed our practices, improved our collaborative research efforts, and have enhanced our understandings of the world. The painful processes of critique and change have not been easy or smooth nor are they close to complete. The first step is to acknowledge and apologize for the damage we have done, which we do here now."[96]

## C.    The Origins of the MOVE Remains Controversy

### 1.  <u>The Public Controversy</u>

In February of 2019, Dr. Janet Monge, the Keeper and Associate Curator of the Physical Anthropology Section at the Penn Museum, used three fragments of bones that were the remains of a deceased MOVE member as demonstrative artifacts in a free, 11 - session video course that she taught for the Princeton University Online learning platform class called *Coursera*. The 1985 MOVE confrontation and the remains were used as a case study in a class called "Real Bones: An Adventure in Forensic Anthropology."[97]

---

[95] https://anthropology.princeton.edu/news/legacies-violence-and-complicity-current-policies-and-guidelines

[96] "Statement on Anthropology, Colonialism and Racism"
 https://anthropology.sas.upenn.edu/news/2021/04/28/statement-anthropology-colonialism-and-racism

[97] The course has been removed from the *Princeton Online* platform.

At the time that she taught the course, Monge was serving as a visiting professor at Princeton.

Although the video course was taught over two years ago, it did not become a matter of public controversy until April 23, 2021. When it did become public, it precipitated a firestorm of controversy resulting in numerous critical online and print newspaper articles and editorials, statements of condemnation from various anthropological associations, and several protest demonstrations on the University of Pennsylvania's campus and in West Philadelphia. The University, the President of Princeton and the Anthropology Department at Princeton University issued statements of apology.[98] It also ignited a broader public debate on the ethics of the housing and displaying of human remains by universities and museums, especially those of minorities and indigenous people.[99]

Several days before the public controversy surfaced on April 21, 2021, Paul Wolff Mitchell, an anthropology graduate student at the University, met via video conference with Christopher Woods, the incoming director of the Penn Museum. Mitchell expressed his concerns about the Penn Museum's policies with regard to the MOVE remains and other human remains housed at the Penn Museum including the Samuel Morton Cranial Collection. Mitchell had written extensively on the Morton Collection, including his master's thesis.[100]

---

[98] https://www.penn.museum/towards-respectful-resolution/?fbclid=IwAR3aNkSaGYlrk2Mn-uByEjhkbcVVnMXKcY1kPQcG8tQ8_9Me7LskZP7fRAo

https://president.princeton.edu/blogs/princetons-responsibilities-human-remains-move-bombing

https://anthropology.princeton.edu/news/legacies-violence-and-complicity-current-policies-and-guidelines

[99] Deborah Thomas, "Enclosures and Extractions: Move and the Penn Museum" (May 14, 2021) https://histanthro.org/news/observations/enclosures-and-extraction/

[100] Mitchell, "The Fault in His Seeds: Lost Notes to the Case of Bias in Samuel George Morton's Cranial Race Science"(2018) https://journals.plos.org/plosbiology/article?id=10.1371/journal.pbio.2007008

"A New Take on the 19th Century Skull Collection of Samuel Morton"(October 2018) https://penntoday.upenn.edu/news/new-take-on-infamous-Morton-skulls

Mitchell also expressed his concerns about Monge's stewardship as curator and what he believed was the overall lack of professionalism at the Penn Museum and what he regarded as the lack of transparency relating to remains in the Museum. During the meeting, Mitchell told Woods that in 2015 he had seen the remains of two MOVE children among what he claims was a "teaching collection" of un-accessioned remains and expressed his view that their presence in the Penn Museum was unethical. He followed up with a detailed letter that provided details of the matters he had previously discussed.[101] He also informed Woods that he had heard that there were several articles about to be published regarding the MOVE remains at the Museum.

Shortly after his meeting with Woods, Mitchell said that he heard a rumor that the Penn Museum was planning to issue a public statement on the MOVE remains, which he considered a "preemptive strike" designed to coverup the actual number of children represented in the remains.[102] Mitchell then instigated the first media articles on the MOVE remains.[103] The first two articles on the video course appeared simultaneously in print and electronic media on April 21, 2021. The first was an op-ed article in the *Philadelphia Inquirer* by Abdul-Aily Muhammad entitled: "Penn Owes Reparations for Previously Holding Remains of a MOVE Bombing Victim."[104] The article asserted that the remains were those of two young girls, Katricia Africa and Delisha Africa, who were killed during the 1985 fire, and criticized the Penn Museum for displaying the remains in the *Coursera* video and for not returning them to surviving MOVE family members.

Also, on the same day of the Muhammad op-ed, an online article was published in a WHYY online newsletter called *Billy Penn*, entitled "Remains of Children Killed in

---

[101] Mitchell Letter, April 16, 2021

[102] *Id.*

[103] Exhibit 26, "Morton Collection/MOVE Remains Controversy Timeline."

[104] https://www.inquirer.com/opinion/commentary/penn-museum-reparations-repatriation-move-bombing-20210421.html

MOVE Bombing Sat in a Box at Penn Museum for Decades."[105] The online article was written by Maya Kassutto, who also wrote a second article on April 26, 2021, entitled "Move Members Mourn Their Children's Lives as Penn Museum Apologizes for Storing Remains."[106] This second article, unlike the previous one, disclosed that Kassutto was a former student in the Anthropology Department at the University who had worked at the Penn Museum. The two op-ed articles by Muhammad, including the one dated May 5, 2021, were based on Mitchell's research as were the two articles written by Kassutto.[107] According to Mitchell, he first heard of the existence of the *Coursera* video in early April of 2021 from Kassutto, whom he had previously dated, who told of him of her plans to write a story about it. In fact, Mitchell knew of the video as early as January of 2019 because Monge had invited him to participate in the course.[108]

On April 23, 2021, Mitchell prepared a paper on the purported chain of custody and identity of the MOVE remains at the Penn Museum which he argued were indisputably those of **two** MOVE children named Katricia and Delisha. He distributed his paper widely to employees at the University, several MOVE members, other persons in the news media, and elsewhere.[109] Also on April 23, 2021, another article appeared in *Hyperallergic,* an online publication, entitled "Penn Museum Kept Remains of MOVE Bombing Victim: Now, Activists Call for Curator's Firing."[110] Also on that date, an editorial appeared in *Inside Higher Education* condemning the Penn Museum's treatment

---

[105] https://billypenn.com/2021/04/21/move-bombing-penn-museum-bones-remains-princeton-africa/

[106] https://billypenn.com/2021/04/26/move-remains-penn-museum-apology-africa-family-mann-monge/

[107] Mitchell Interview, May 12, 2021

[108] Monge Email to Mitchell, January 21, 2019

[109] Mitchell, *Preliminary Report on the Archives of the Philadelphia Special Investigation Commission in Relation to the Remains of MOVE Bombing Victims Stored at the Penn Museum,* April 23, 2021

[110] https://hyperallergic.com/640344/philadelphia-activists-call-for-penn-museum-curator-firing/

of the remains.[111] And on April 24, 2021, *The New York Times* published an article entitled: "Decades After Police Bombing, Philadelphians are Sickened by Handling of Victims' Bones."[112]

Muhammad had published two previous op-ed articles in the *Philadelphia Inquirer* on the Morton Collection using Mitchell's research. In July of 2019 he wrote an op-ed entitled "As Reparations Debate Continues, the University Has a Role to Play."[113] On April 5, 2021, he published an op-ed entitled "Penn Museum Kept Remains of MOVE Bombing Victim: Now, Activists Call for Curator's Firing.[114] A February 16, 2021 article in the *Philadelphia Inquirer* by Stephen Salisbury entitled "Some Skulls in a Penn Museum Collection May Be the Remains of Enslaved People Taken From a Nearby Burial Ground" was based on an article that Mitchell published on February 14, 2021.[115]

On April 26, 2021, the University of Pennsylvania issued a statement apologizing to MOVE members for Monge's possession and use of the remains stating: "We understand the importance of reuniting the remains with the family and we are working now to find a respectful, consultative resolution." It further stated, "We are reassessing

---

[111] https://www.insidehighered.com/quicktakes/2021/04/29/penn-princeton-apologize-treatment-move-bombing-victims-remains

[112] https://www.nytimes.com/2021/04/24/us/move-rowhouse-bombing-victim-remains.html

[113] https://www.inquirer.com/opinion/commentary/university-of-pennsylvania-slavery-reparations-debate-20190712.html This article appeared a month after the  heated argument between Monge and Mitchell over the Morton Collection in May of 2019. *See* The Professional and Personal Dispute Over the Collection, *Infra*.

[114] https://www.inquirer.com/news/mortion-collection-skulls-upenn-museum-repatriation-racial-justice-20210405.html

[115] https://www.inquirer.com/news/penn-museum-morton-collection-black-philadelphians-skulls-20210216.html

On February 15, 2021, Mitchell published an article on the provenance of some of the skulls called "Black Philadelphians in the Samuel Morton Cranial Collection." https://prss.sas.upenn.edu/penn-medicines-role/black-philadelphians-samuel-george-morton-cranial-collection

our practices of collecting, stewarding, displaying, and researching human remains."[116] That same day, both the American Association of Anthropologists and the Association of Black Anthropologists issued statements condemning the treatment of the remains.[117]

The controversy regarding the disposition of MOVE remains took an unexpected turn on May 13, 2021, when Philadelphia Mayor James Kenney announced that the City's Health Commissioner, Thomas Farley, to whom the Medical Examiner's Office reports, had been asked to resign because in 2017 he had ordered the destruction of several additional MOVE remains that had been stored in the office since 1985. Farley stated that he decided to disclose his previous decision to destroy the remains because of the controversy surrounding the MOVE remains at the Penn Museum. The following day the City reported that the remains had not in fact been destroyed because a lower-level employee in the office had secretly refused to do so. The City has hired a law firm to conduct an inquiry into the Medical Examiner's recent handling of the remains and has also retained another law firm to separately represent the MOVE organization.[118]

## 2.  <u>The Professional and Personal Dispute Over the Collection</u>

The MOVE remains controversy is the result, in part, of a professional disagreement and a personal dispute regarding the Morton Collection between Monge and Mitchell, who she had mentored since he came to the University. The inaccurate factual narrative regarding the location of the MOVE remains at the Penn Museum and their purported identities was disclosed to the media by



*Paul Mitchell and the Morton Collection*

---

[116] https://www.penn.museum/towards-respectful-resolution/?fbclid=IwAR3aNkSaGYlrk2Mn-uByEjhkbcVVnMXKcY1kPQcG8tQ8_9Me7LskZP7fRAo

[117] https://www.americananthro.org/StayInformed/NewsDetail.aspx?ItemNumber=26217 http://aba.americananthro.org/

[118] https://www.phila.gov/2021-07-12-city-provides-update-on-mishandling-of-move-victims-remains/

Mitchell and others to bring public disapprobation on the Museum for its continuing possession of the Morton Collection and other human remains and to personally discredit Monge. Monge, while acknowledging Morton's role in promoting scientific racism, advocated retaining the Collection at the Museum and establishing a gradual process for the repatriation of certain remains in the Collection.[119] On September 9, 2020, eight women anthropologists wrote to University Provost Wendell Pritchett to express their concerns that the Morton Collection controversy was being used to disparage Monge and get her fired:

> "The intention of this letter is to alert you to a growing and damaging misrepresentation of how the Penn Museum approaches the curation of the Samuel G. Morton Cranial Collection and the potential for an inexcusable scapegoating of its steward, Dr. Janet Monge…. We are deeply concerned that descriptions in the media have been fueled by individuals on the Penn campus with careerist motivations and/or without sufficient knowledge about the history of the debate."[120]

Mitchell, who is now a Ph.D. candidate, came to the University as an undergraduate student in the Anthropology Department in 2009 and received his bachelor's degree in 2013 and master's degree in 2014. He took several courses from Monge, who over the next several years would be his teacher, mentor, employer, benefactor, advisor on his master's thesis and serve on his dissertation committee.[121] In fact, after receiving his master's degree from the University, Mitchell entered a Ph.D. program at the University of California at Berkeley. When Mitchell encountered some difficulty completing his studies there, and left the program, Monge encouraged him to come back to Penn to pursue his Ph.D.[122]

---

[119] Kauer Letter, Exhibit 12; Mitchell Letter to Christopher Woods, Exhibit 13 ; Mitchell Interview May 12, 2021; Murray Interview, July 22, 2021

[120] *See* Exhibit 25, "The Samuel G. Morton Cranial Collection and Its Steward, Dr. Janet Monge" (September 9, 2020)

[121] "Paul Mitchell: At Penn, Four Years of Looking at the Past "(2013) https://penntoday.upenn.edu/news/paul-mitchell-penn-four-years-looking-past

[122] Monge Interview, May 19, 2021; Mitchell Interview, May 12, 2021; Mitchell Email , May 13, 2021

Mitchell's graduate work concentrated on Morton's scientific methodology, the racial implications of his work, and the identities and provenance of the skulls in the collection.[123] In 1981, Stephen J. Gould wrote <u>The Mismeasure of a Man</u>[124], in which he argued that the work of Morton and others led to the invention of scientific racism. Mitchell agreed with Gould's conclusions and wrote his master's thesis on what Mitchell argued was the flawed methodology that Morton used to support his theories. Both Mann and Monge had written on Morton, and they disagreed with Gould over his interpretations and the implications of Morton's research.[125] For example, Mann wrote in 2009: "Samuel George Morton, [is] considered the founder of physical anthropology. The American School of Anthropology, which argued for the polygenic origins of human races, was substantially founded on Morton's work. Recent accusations that Morton manipulated data to support his racist views would appear unfounded."[126] Mitchell also believed that Monge was attempting to divorce Morton from the scientific racism of his research and to "valorize" him to justify keeping and displaying the Collection at the Penn Museum.[127]

---

[123] Mitchell, "The Fault in His Seeds: Lost Notes to the Case of Bias in Samuel George Morton's Cranial Race Science"(2018) https://journals.plos.org/plosbiology/article?id=10.1371/journal.pbio.2007008

Mitchell, "A New Take on the 19th Century Skull Collection of Samuel Morton"(October 2018) https://penntoday.upenn.edu/news/new-take-on-infamous-Morton-skulls

[124] Stephen J. Gould <u>The Mismeasure of Man</u> (1981) http://biopolitics.kom.uni.st/Stephen%20Jay%20Gould/The%20Mismeasure%20of%20Man%20(148)/The%20Mismeasure%20of%20Man%20-%20Stephen%20Jay%20Gould.pdf

[125] Mann, Monge and others "The Mismeasure of Science: Stephen Jay Gould versus Samuel George Morton on Skulls and Bias"(2011) https://journals.plos.org/plosbiology/article/info%3Adoi%2F10.1371%2Fjournal.pbio.1001071

"Scientist Measure the Accuracy of Racism Claim"(2011) *New York Times* article on Mann, Monge and Morton https://www.nytimes.com/2011/06/14/science/14skull.html

[126] Mann, "The Origins of American Physical Anthropology in Philadelphia." (2009) https://pubmed.ncbi.nlm.nih.gov/19890866/

[127] Mitchell Interview, May 12, 2021

In 2019, Mitchell applied for and received a fellowship to continue his studies of the Morton Collection by collecting his correspondence, digitizing them, conducting additional research on the provenance of the skulls, and publishing them on the Museum website. Monge claimed that she first became aware of Mitchell's receipt of the fellowship when she read about it online. In fact, Monge was aware that Mitchell had applied for the fellowship in early 2019. Monge stated that she became upset because, apart from his alleged failure to consult her in advance and their professional relationship, she was also the curator responsible for the Collection. Monge believed that what Mitchell was actually proposing to do in his research was unethical and greatly impacted her own work and would possibly violate the Native American Graves Protection and Repatriation Act (NAGPRA) because some of the skulls in the Collection were of indigenous people.

In a meeting in May of 2019, attended by several other Penn Museum employees, Monge confronted Mitchell about the implications of his proposed work during the fellowship and told him that he would not be allowed to conduct the work in the manner that he proposed.[128] Monge claims that Mitchell became very angry, insulted her, and threatened her. Two of the employees who were present during the meeting confirmed Monge's statement regarding the tenor of the meeting. Monge and a museum employee then met with Stephen Tinney, the Museum's deputy director, and expressed her concerns over Mitchell's conduct and his threats. Monge then changed the locks in the Museum and the Lab and denied Mitchell access to the Collection altogether. The first article on the Morton Collection controversy appeared two months later on July 12, 2019, in the *Philadelphia Inquirer* written by Muhammed.[129]

Mitchell admitted his role in publicizing Monge's use of the MOVE remains in the *Coursera* video and claims that it was motivated solely by the concerns that he expressed in his meeting with Woods, his belief that the Museum's practices with regard to human

---

[128] Monge Interview, May 9, 2021

[129] *See* Exhibit 26, MOVE Remains/Morton Collection Timeline

remains were unethical and that Monge was engaging in a coverup. He further stated that there was "nepotism, favoritism, corruption, and intentional deception" at the Penn Museum that needed to be exposed.[130] While that may have been one of his motives, it appears that the other motive for his actions were more personal and amounted to an effort to get Monge fired for having barred him from the Lab and other rooms in the Museum and, most importantly, his access to the Morton Collection. Mitchell admitted that he had raised his voice during the meeting over the fellowship but denied that he had threatened Monge and stated that if he had an issue with a person, rather than physically assault them, he would "slowly poison them."[131] When asked whether that included leaking stories to the media, he agreed that it did. In a follow-up questionnaire to his previous interview, Mitchell was asked whether he had told anyone that he wanted Monge's job, and he stated: "I do not recall ever having done so, but it is plausible that I did. If I did so, it was only in the context…that I wanted to be a professional physical anthropologist. I would have been happy to have had Janet's job at some point…."[132]

---

[130] Mitchell Question Responses, May 17, 2021

[131] Mitchell Interview, May 12, 2021

[132] Mitchell Question Responses, May 17, 2021; Jean Henry Interview, July 23, 2021; Zhenia Bemko Interview, July 23, 2021

## IV.   THE ODYSSEY OF THE MOVE REMAINS:
## FINDINGS AND CONCLUSIONS[133]

### A.        Custody and Storage of the Remains

1. **After the Bombing of Osage Avenue, a dispute arose between the MEO and the MOVE Commission's experts over the identity of two sets of remains of MOVE children. The Commission's experts concluded that they were the remains of Katricia Africa and Delisha Africa, but the MEO disagreed with those findings.**

2. **The MEO retained Dr. Alan Mann, a physical anthropologist at the University, who was acting as a private consultant, to assist in the identification of the disputed remains. He was assisted in that effort by Dr. Janet Monge, who was his graduate student assistant at the time. Mann then issued a report that disputed the conclusions of the Commission's experts as to the identity of the remains. In early 1986, Mann took the remains of what the Commission concluded were those of Katricia to his office at the Penn Museum to conduct further tests. There is no credible evidence that Mann also took the remains that the Commission concluded**

---

[133] *See* Odyssey of the MOVE Remains Timeline, Exhibit 1

These findings and conclusions are based on our examination of Museum documents and records; email correspondence; MOVE Commission archives; and documents provided by the City of Philadelphia. We also conducted over fourteen hours of interviews with Dr. Monge, who also provided a written statement, and interviews of other Museum employees and fact witnesses; and we conducted several tours of the Museum. Dr. Monge who agreed to be interviewed without the presence of legal counsel, fully cooperated in all aspects of our investigation and, for the most part, we found her to be credible and remorseful. Monge's Interviews were conducted on April 29, May 10, 13, 19, 21 and August 17, 2021. *See* Monge Statement, Exhibit 14.

We did not interview Dr. Mann, however, because, despite several requests, we were unable to negotiate terms for the interview that were acceptable to his legal counsel. While an interview with Dr. Mann would have been preferable, it was not essential to our findings because his role in examining and taking custody of the remains is purportedly fully detailed in his written report dated November 11,1985; from interviews with Monge; in several of the documents that we reviewed; a public statement that he made; and the written statement his lawyer submitted in lieu of an interview, Exhibit 15. We sought to interview him to determine, among other things: why he thought he was qualified to render an opinion on the identity of the disputed remains; whether he took custody of both the B-1 and G remains that he wrote about in his report for further study; whether he knew that the City was prohibited from releasing the remains to him when he took possession of the remains; why he took and retained custody of the remains in his office for 16 years; why he made no further efforts to identify the remains or return them to the Medical Examiner's office in 2001; and whether he believed that his conduct violated any Museum policies, ethical standards for anthropologists or Pennsylvania law.

were those of Delisha. Mann and Monge did not believe that the remains taken to the Museum could be conclusively identified as those of Katricia Africa.

3. After the examination in 1986, Dr. Mann conducted no further tests on the remains and stored them in his office from 1986 to 2001 when he retired from the University and joined the faculty at Princeton University. Mann left the remains at the Museum when he went to Princeton.

4. From 1986 to 2001, Mann made no effort to return the remains to the MEO or contact any MOVE family member.

5. The remains were never accessioned or formally added to the Penn Museum's collections.

6. Mann did not violate any specific prevailing professional, ethical or legal standards by the retention of the remains from 1986 to 2001.

7. Mann's retention of the remains from 1985 to 2001 after he was unable to identify them, and his failure to return them to the MEO, demonstrated extremely poor judgement, and a gross insensitivity to the human dignity as well as the social and political implications of his conduct.

8. From 2001 to 2014, the remains were stored in a file cabinet in Dr. Janet Monge's office. Monge is the current Penn Museum associate curator, who was a graduate assistant to Mann when he took custody of the remains. From 2014 to 2021, the remains were stored in Monge's Lab at the Museum.

After the bombing of Osage Avenue, the MOVE Commission's experts and the MEO agreed on the identities of the remains of all of the victims except for the femur and pelvic fragments of one victim, and certain skeletal bones, the mandible, and occipital bone of another. The Commission's experts, Drs. Hameli and Kerley, concluded that the femur and pelvic fragments, labeled as B-1, belonged to Katricia Africa, and the skeletal bones, mandible, and an occipital bone, labeled as G, belonged to Delisha Africa.[134] Dr. Robert Segal, the assistant Medical Examiner, did not agree with those conclusions, at least as to B-1,[135] and retained Dr. Alan Mann to examine both sets of remains. Mann concurred with the MEO and concluded that the B-1 remains were those of an older

---

[134] Hameli Report, Exhibit 8

[135] Segal Report, p. 18, Exhibit 9.

female than the estimated age of Katricia. Mann also examined the skeletal bones, mandible and occipital bone of Body G and concluded that those remains were those of a younger female than Delisha's estimated age.[136] As a result, another expert, Dr. Judy Suchey, was retained in January of 1986 to conduct another independent review to try to settle the dispute as to the B-1 remains. Those remains were then sent to Suchey at California State University in Fullerton, California for her examination. Suchey agreed with the Commission's experts' findings with regard to B-1.[137] Thereafter, Mann took custody from Segal of a small box containing the femur and fragments of a pelvic bone, that the Commission labeled B-1.[138] As stated, we were unable to interview Mann to determine whether he also received any of the three Body G remains that he examined and referenced in his report. However, his statement does acknowledge that he was asked to review "two bone fragments from the same person labeled B1."[139]

While Monge does not have a specific recollection of seeing the actual contents of the box at the time, she stated that she is certain that it did not contain the occipital bone of Body G, both because it could not be used for aging and that Segal and the MEO had accepted the Commission's experts' findings on the identity of those remains.[140] Monge's recollection is confirmed by several compelling facts. First, Mann examined not only the occipital bone of Body G, but other skeletal fragments and the mandible as well. If he was going to continue his examination of the Body G remains, he most certainly would have

---

[136] Mann Report, p. 1 and p. 5, Exhibit 9.

[137] While we have been unable to locate Suchey's report, her letter to Segal dated January 22, 1986, twice refers to her examination of remains in the singular as "the MOVE specimen" and Segal's letter to Lytton confirms that she only examined B-1 Remains, Exhibit 21.

[138] Although Monge stated that she was unsure of when Mann took possession of the MOVE remains, she believes that it had to have been transferred to Mann after Hameli's December 1985 re-examination, because the remains were at the MEO at the time of the re-examination. Because Suchey was retained to conduct an independent review of the remains in January of 1986, it is estimated that the remains were delivered to Mann by Segal sometime after Suchey completed her review and prior to Segal's issuing his final report in March of 1986. Mann confirms the likely time as early 1986. Mann Statement, Exhibit 15.

[139] Mann Statement, p. 4, Exhibit 15

[140] Segal Report, *supra*

taken all fragments of the Body G remains and not just the occipital bone, which alone would not assist in the aging analysis. Second, as of January 22, 1986, Segal was only concerned with the identity of B-1 remains, which were the only remains that he sent to Suchey for examination. Third, there is no evidence whatsoever that the remains that were released by the MEO to Delisha's family on September 22, 1986, and subsequently buried, did not include the occipital bone that Mann studied.[141] Fourth, from 2001 to 2019, Monge made several efforts to contact MOVE members to ascertain the identity of B-1. It is highly unlikely that if the Body G occipital bone was also there, that she would not have made similar outreach efforts with regards to it as well. Lastly, during that same period, Monge displayed the B-1 remains on ten separate occasions, including the Princeton video, and there is no evidence that an occipital bone was ever included in those displays.

Although the weight of the evidence that we reviewed clearly establishes that Mann and Monge did not receive the occipital bone or any other bone fragments of Body G from the MEO in 1986, there is, however, information that **an** occipital bone along with the B-1 pelvis and femur may have been together in a box at the Museum at some point. Paul Mitchell claimed that he, Maya Kassutto, and one other person observed an occipital bone along with the femur and pelvic fragments in the same box. Mitchell did not state why he or they concluded that the bone, that was not labeled, was the bone of Body G.[142] Further, neither Kassutto, nor the one other person that Mitchell identified, responded to our requests for an interview to confirm Mitchell's claim. Mitchell is the only person who

---

[141] Exhibit 24

[142] Mitchell claims that he observed the box on a single occasion in about 2015, and when he inquired about it, Monge stated, without looking at the contents of the box, "Be careful with those, they are MOVE remains." Mitchell Interview, May 12, 2021.

claims that the Body G occipital bone was ever at the Museum, and even he admits that the only information that supports his claim is "anecdotal"[143] and "suggestive."[144]

We also investigated other information that the Body G occipital bone may have been present at the Museum. During the 2018-2019 school year, Monge was the faculty advisor to an undergraduate student who wrote a senior paper on the MOVE remains.[145] That student was given access to the B-1 remains while working on the paper and arranged to have x-rays done of those remains on November 1, 2018, at the Museum. The student also had x-rays done of an occipital bone which she labeled "G1 skull" and "MOVE G1 scap and vert." The student stated that Monge played no role in arranging for and was not present when the x-rays were taken. This is the first time there was ever a reference to a "MOVE G1" remain, or a suggestion that the Body G bone was present at the Museum. The student's paper, which was 36 pages long, discussed at length the age of the B-1 remains and made only a passing reference to what she described as the "Body G" occipital bone and included an x-ray of an occipital bone.[146] Monge reviewed a first draft of the paper that did include a reference to G, but it did not have an x-ray in the draft. Monge stated that she did not review the final version of the paper before it was submitted which included the purported Body G x-ray image.

Monge offered several explanations as to how she failed to notice that the student included the occipital bone x-ray and reference in the final draft of her paper. First, she

---

[143] "Anecdotal evidence from former interns in the Penn Museum...is that there may be an occipital bone with the remains of Katricia held by the Museum." Mitchell, *Preliminary Report on the Archives of the Philadelphia Special Investigation Commission in Relation to the Remains of MOVE Bombing Victims Stored at the Penn Museum,* p.9, April 23, 2021

[144] Mitchell Email to Woods, April 25, 2021

[145] The original proposal for the paper, dated September 11, 2018, only described the B-1 or Katricia remains as a part of the research project. Why the occipital bone x-ray, which the student labeled as a MOVE remain, was added is unclear because the occipital bone and the x-rays of it were not included in her original research proposal, nor were the x-rays included in the first draft of the paper.

[146] The paper contained two sentences on the occipital bone: "As Figure 10 [the occipital bone] demonstrates, in the MOVE skull of a younger person, Body G, is very thin. From this observation, it was concluded that the skull is of a child growing up in MOVE conditions and susceptible to malnutrition while Body G is of manual density."

stated that she was not given the final draft of the paper by the student until the day it was due, and she could not review it before the student completed it and submitted it. Monge further asserts that she did not actually read the final paper until 2021 when this instant controversy arose, and she was shocked to see the reference to the Body G occipital bone and the x-ray. Monge also stated that she would have revised any initial draft that contained a reference to Body G occipital bone and deleted it from the paper.[147]

Dr. Katherine M. Moore, Undergraduate Chair, Department of Anthropology, also stated that she too only reviewed the first draft of the paper, and she recalls making significant edits and changes to the draft that were not incorporated into the final draft. She also stated that she did not review a final draft of the paper before it was submitted and did not focus on the issue of the occipital bone in the final version because it was irrelevant to the subject matter of the paper and appeared out of place.  The student, for her part, stated that she was confused and simply made an error by including the occipital bone in the final version of her paper.[148] We did not place great weight on the paper's reference to the occipital bone  because the paper was not subjected to any strict  academic rigor, Dr. Moore's critique of the paper, and the student's acknowledgment that she made an error in referencing an occipital bone as Body G. As part of this investigation, TLG and Monge conducted several extensive searches of the Lab and Museum and were unable to locate the specific occipital bone depicted in the paper. Again, Monge is firm in her position that she never possessed the Body G occipital bone.

It is important to note that whether the box that Mann received in 1986 also contained the Body G occipital bone is not outcome determinative to our inquiry which concerns, in part, the ethical propriety and legality of retaining custody of and using **any** human remains at all as demonstrative artifacts in the *Coursera* video class or otherwise.

---

[147] Monge Interview, August 18, 2021

[148] Student Interview, June 18, 2021

Once the remains were given to Mann, they were primarily kept in a box in a cabinet in Mann's office at the Penn Museum.[149]  Mann's office was a double office with an adjoining door. Mann allowed Monge, a graduate student at the time, to use one of the offices.  The cabinet containing the remains was on Monge's side of the office door. Once she earned her Ph.D. in 1991, that office became her office. The cabinet containing the remains was kept there until 2001, at which time Monge's office was moved down the hall. The remains were then stored in a cabinet in her new office until 2014 at which point Monge moved the box to the Physical Anthropology Lab (the "Lab") at the Museum.

The Lab is located in the Center for Analysis of Archeological Materials ("CAAM"), which is on the lower level of the Museum.  Key card readers are required at the doors that lead to CAAM. According to Monge, staff, such as curators and keepers, and students who have classes in CAAM have key card access. The Lab, which is room 183, also has a key card access reader at the door. Students and staff members have access to CAAM but do not have access to the Lab. Students working in the Lab, however, do indeed have access to room 183. People entering the Lab are required to sign in. A review of the Lab sign-in book revealed unsupervised students were routinely permitted access to the Lab. Mitchell stated that during his ten-year association with the Museum, he had keys and ready access to all of its facilities. In fact, in 2017, he admitted to taking some human remains from the Museum to his home and also leaving them at the home of a friend before returning them to an undisclosed location in the Museum.[150] In the Lab, there are trays and carts that contain remains.  Some of the remains are used for teaching and research and are not labeled.  There are cabinets along the walls in the Lab. Monge said she kept the box of MOVE remains in one of the cabinets. Monge also said that some other materials, including some of her forensic work, was kept in the same cabinet.

---

[149] Monge Interview, May 19, 2021

[150] Mitchell Interview, May 12, 2021

When this current controversy arose, Dr. Stephen Tinney, Deputy Director at the Museum, directed Monge to take the remains to Mann, since Mann was the original recipient of the remains. Monge complied with Tinney's request. On April 30, 2021, at the University's request, Mann then turned the remains over to a funeral director from West Philadelphia who came to his home to pick them up. At the University's direction, Terry Funeral Home, a historic and Black-owned funeral home located in West Philadelphia, sent a hearse to Mann's home to retrieve the remains. The remains that were given to Terry Funeral Home were inspected by TLG on that same date and were the femur and pelvic remains only. The remains were then placed in an infant casket at Terry Funeral Home. The femur and pelvic remains were returned to several MOVE members on July 2, 2021.

## B.    Efforts to Identify and Return the Remains

**9. In 1995 and 2014, Dr. Monge sought to identify and return the remains that the Commission's experts had concluded belonged to Katricia by contacting two of the MOVE family members, once through a third-party intermediary, but they refused to help her.**

During the years that the remains were at the Museum, Monge stated that she made several efforts to communicate with MOVE members to enlist their help in identifying the B-1 remains and, if they did belong to Katricia, return them to her mother, Consuewella Africa.[151]  Since Monge maintains that the Body G remains were never at the Museum, her interests and efforts were therefore only focused on the B-1 remains. In 1995, close to the tenth anniversary of the MOVE bombing, Monge said that she reached out to Ramona Africa, the only living survivor of Osage Avenue, because she understood that Ramona was developing a documentary on the bombing. Ramona Africa initially agreed to meet with Monge at the Museum. When Ramona Africa came to the Museum,

---

[151] Paul Mitchell stated that he had a conversation with Monge about her efforts to identify the remains in 2015. Mitchell Interview, May 12, 2021. Mann also recalls that effort by Monge in 2015 as well. Mann Statement, Exhibit 15.

Monge told her that they had custody of the B-1 remains since 1986 and that she believed that they were misidentified. Monge also asked Ramona African if she could provide them any information that would help Monge identify the remains. Ramona Africa stated that she would not help.[152]

In 2014, Monge sought the assistance of Malcolm Burnley, a writer for *Philadelphia Magazine*, in contacting Consuewella Africa,[153] the mother of two of the children who died in the fire: Zanetta Dotson Africa and Katricia Dotson Africa. Monge stated that she did not feel comfortable contacting MOVE members herself, both because of what she perceived to be MOVE's aggressive public image, and because as a white woman, she did not have the lived experiences to be able to relate to MOVE's experience. Monge enlisted Burnley because she thought that, as a Black man, Consuewella and other MOVE members might be more willing to speak to him. Emails from Burnley to Monge from the Fall of 2014 state that he called Consuewella Africa on multiple occasions but was not able to reach her until December of 2014.[154]  Once Burnley reached Consuewella, he said she agreed to a phone call which took place in early December of 2014.[155] Burnley sent Monge an email on December 7, 2014, detailing his conversation:

> "My conversation with Consuewella did not go well. I'm extremely bummed but not willing to give up on this. The conversation began with her swearing at me and telling me that "unless I can bring her daughter back, I need to stop fucking with her." Every time I would speak, she'd either interrupt me or stop me, then confer with someone else she had on speaker phone (a different phone I guess) about what to say next. I found out that this other person was Ramona Africa, late in the conversation. After trying to let her say her peace for 10 minutes, I spoke over Consuewella — telling her that the city did an injustice on that day, and the only way I could possibly find out about bringing her daughter back, would require her

---

[152] Monge Interview, May 19, 2021

[153] Consuewella Africa died on June 16, 2021, https://digital.olivesoftware.com/Olive/ODN/PhiladelphiaInquirer/shared/ShowArticle.aspx?doc=PHQP%2F2021%2F06%2F17&entity=Ar02000&sk=9DE75FE7&mode=text

[154] Email exchange between Burnley and Monge. Exhibit 16, December 7, 2014

[155] *Id.*

participation. She seemed to consider it for a moment, and then started swearing at me again. She said that Ramona would call me (she hasn't) and talk more. It really sounds like she's still part of MOVE and is loopy. I don't know how to proceed. I can get Ramona's phone and email address and try her this week. Perhaps she'd be willing to talk reasonably about the matter, but I doubt it. As terrible as this sounds, I wonder if I could get Consuewella's DNA somehow without her consent? That's highly unethical, I know, but I'll do everything that I can to prove this. It's an important piece of history and the city shouldn't be able to have covered this up for so long. Let me know what you think.[156]

Burnley emailed Monge again on December 29, 2014, advising that he exchanged emails with Ramona Africa. He said, "Ramona emailed me back with one line, 'No, I will not talk to you.' I guess I'll have to try the uncle now. Very disappointing."[157] Monge stated that she was focused and dedicated in determining the identity of the B-1 remains so that she could have the remains returned to the appropriate relative, if possible. To that end, emails from January to March 2019 document Monge and Burnley's plans to "stakeout" Consuewella Africa's home in order to obtain a DNA sample from her trash. Monge said they decided against going through Consuewella Africa's trash because they thought it was unethical. Monge made no attempt to return the remains to the MEO.[158]

---

[156] *Id.*

[157] Email exchange between Burnley and Monge. Exhibit 17, December 29, 2014

[158] Monge Interview, May 19, 2021

## C.    Use, Display and Knowledge of the Remains at the Museum

10. The remains were shown by Dr. Monge to graduate students, donors, and Museum personnel on at least ten occasions between 2014 and 2019.

11. The remains were used by Dr. Monge as a case study in a Princeton Online video course that she taught in 2019 as a visiting professor at Princeton.

12. Dr. Monge did not inform MOVE family members of and obtain their consent to use the remains in the Princeton Online video course.

13. The Museum did not have a policy on the retention and display or use of the remains and other non-accessioned remains as demonstrative artifacts or for other purposes.

14. Dr. Monge's retention and use of the remains as a demonstrative artifact did not violate the Museum's _Policy Statement on Human Remains_ which was adopted in 2017 because it did not apply to the non-accessioned MOVE remains.

15. Dr. Monge did not violate any specific professional, ethical or legal standards by retaining and displaying the remains.

16. Dr. Monge's retention of the remains from 2001 to 2021 and their use in the Princeton Online video course demonstrated, at a minimum, extremely poor judgement and gross insensitivity to the human dignity and social and political implications of her conduct.

17. Although the remains were not formally a part of the Museum's collection, several persons, including a former director and deputy director of the Museum, observed some of the remains at some point during the time that they were at the Museum, and were aware of their provenance.

18. No one in a leadership position at the Penn Museum believed that having the remains at the Museum and their display to students, donors and others violated any Museum policies.

19. There is no evidence that any University Officer or Administrator was aware that Monge was in possession of the remains or of their use or display.

While the MOVE remains were at the Museum, some of them were shown or used on at least ten occasions. In 1988, the remains were made available for use by the American Board of Forensic Anthropology ("ABFA") for an exam. ABFA was in Philadelphia for a meeting at that time, and the head of ABFA asked Monge for

permission to use materials in the Museum for a diplomat exam for four students. Monge made the decision to use the MOVE remains as part of the exam. Monge took the remains to the room in the Museum where the exam was being taken. Monge stated that she allowed ABFA to use the remains for the exam because she wanted people to age the remains without knowing their history. Once the students took the exam, the remains were returned to Monge. Monge stated that the students confirmed her and Mann's conclusions that the B-1 remains were not those of Katricia. Notably, no Body G remains were used as part of ABFA's examination, which supports Monge's contention that they were never at the Museum. Neither the Museum nor Monge were compensated for this use of the B-1 remains.[159]

Stephen Tinney, the deputy director of the Museum, also recalls that a box containing some remains was used in 2015 during a meeting of Museum donors at the Silver Circle level to showcase Monge's forensic work. Tinney introduced Monge and she discussed her work on the MOVE remains.[160]  However, Monge said she could not recall the specific date of that donor meeting. Also, Dr. Julian Siggers, the immediate past director of the Penn Museum, recalls seeing some remains sometime in 2019 although he could not recall specifically which ones or the circumstances.[161]

Although she does not remember the exact date, Monge recalls displaying the remains during a class for a graduate seminar on race at Princeton University. Monge traveled from the Museum to Princeton with the remains for that class and took the remains back to the Museum after that class. In addition, Monge said she occasionally showed the remains to other anthropologists to get their opinions on the aging of the remains when they visited the Museum. Monge maintains that her use of the remains was part of her attempt to age the remains and to demonstrate that the remains were not Katricia's remains.

---

[159] Monge Interview, May 19, 2021

[160] Tinney Interview, May 4, 2021

[161] Siggers Interview, June 7, 2021

In 2019, Monge displayed the B-1 remains, the femur and two fragments of the pelvis, during a free video class on the Princeton Online platform, *Coursera,* called "Real Bones: Adventures in Forensic Anthropology." The course, which Monge taught in her capacity as a visiting professor at Princeton, used the MOVE bombing and the conditions of the remains caused by the fire, and subsequent inhumane handling of the remains as a case study. The overall purpose of the course was to teach how the techniques of forensic anthropology could be used to restore the "personhood" of unidentified remains.[162]  The course consisted of eleven sessions, the first seven of which were recorded at the McGraw Center Studio at Princeton, and four at the Museum by a Princeton film crew. The first class entitled "Losing Personhood: MOVE A Case Study" described the history of MOVE and its deadly confrontation with the City of Philadelphia. The second class, entitled "Restoring Personhood" described the excavation of 6221 Osage Avenue and displayed slides and x-rays of the remains. Subsequent classes were entitled: "Tools of the Trade", "Bone: The Basics", "How Bones Grow and Develop", "Dental and Hand-Wrist Standards", and "Aging, Dentition, Gross Morphology."

The first time that the remains were displayed and handled in the course was in the ninth class entitled: "MOVE – An Analysis of the Remains" which was filmed at the Lab in the Museum.[163] In that class, which was almost 14 minutes in length, Monge and a student displayed and examined the two pelvic fragments and a femur, and compared them to other bones and fragments and discussed forensic techniques that could possibly be used to determine the age of the remains. In discussing the remains, Monge used the

---

[162] Course Outline, Exhibit 18

*Cf:* "Princeton Owes the Families of the MOVE Bombing Victims Answers" *http://historynewsnetwork.org/article/180027*

[163] A 3½ minute promotional trailer for the course shows a six second excerpt of that class and the remains.

term "juicy" to describe the remains. Monge has stated that this term is her forensic term of art to describe remains that are relatively new.

Monge continued to believe that since the remains were unidentified, and that her previous efforts to contact MOVE members were unsuccessful, there were no MOVE members that she could consult and obtain their informed consent to display them in the online course.

### D. Museum Policies, Ethical Standards and Legal Provisions

#### 1. Penn Museum Policies

As we have seen, the MOVE remains that Mann received in 1986 were given to him in his capacity as a private consultant and not as an employee of the University of Pennsylvania or the Museum as he stated in his written statement. Mann also falsely claimed that he "entrusted the remains to the Penn Museum for safekeeping."[164] As Dr. Mann surely knew, since he had performed similar work for the MEO over the previous ten years, as a private consultant, that the remains were never intended to be and in fact could never be added to the Museum's official and permanent collection of human remains. That is, they were never accessioned[165] and therefore would not have been "entrusted to the Museum." Accession is the term used by museums and comparable institutions to describe the process of legally acquiring, validating, cataloguing, storing, studying, and displaying objects or artifacts in their permanent collections.[166]  Further, the remains were not accessioned because according to Monge, she and Mann never intended that they become a part of the permanent Museum collection, and they hoped that at some point they could be identified and returned to MOVE family members. Finally, Mann claims that he "felt assured, however, that the bone fragments were being

---

[164] Mann Statement, Exhibit 15.

[165] Sigger's Interview June 7, 2021

[166] *See* Accessioning Guide of the American Alliance of Museums.
https://www.aam-us.org/wp-content/uploads/2018/01/acquisitions-activity.pdf

safeguarded because they were secured in the Penn Museum's temperature and humidity-controlled laboratory, and by bubble wrapping them and placing them in a box inside a locked steel cabinet."[167] Apart from not stating who, if anyone gave him such "assurances," that claim is contradicted by the very next sentence in his statement which says, "I do not specifically recall, apart from the re-examining the bone fragments, what we did with the fragments after we secured them at the Penn Museum."[168] After taking the remains to the Museum in 1986, Mann lost all interests in them, made no further efforts to identify them over the next 15 years, and he abandoned them when he went to Princeton.

Between 1985 and 2017 the Museum did not have a written policy on the use of un-accessioned human remains or artifacts that were not a part of its permanent collection.[169] According to Siggers, he organized a committee to draft a policy addressing the use and display of the *accessioned* human remains in the Museum's collection.[170] A policy was written and adopted by the Museum in 2017, and posted to the Museum's website.[171] The policy addressed: 1) the respectful, professional, and treatment of human remains, 2) documentation of the Museum's inventory of human remains, 3) the accession and deaccession process, 4) loaning, storage, and access to human remains, 5) research, 6) display, and 7) educational use.[172] Siggers stated that the Museum had in place a formal accession process to decide whether to accept materials as part of the

---

[167] Mann Statement, Exhibit 15, page 4.

[168] *Id.*

[169] Woods Interview, June 15, 2021

[170] Siggers Interview, June 7, 2021 (Dr. Siggers holds a Ph.D. in Archaeology and served as Director of the Museum from July 2012 through August 2020)

[171] Statement on Human Remains
https://www.penn.museum/about-collections/statements-and-policies/statement-on-human-remains

[172] *Id.* (The Museum's policy is currently being reassessed in light of the action plan stated in the Morton Collection Committee report.)

Museum's collection.[173] It also created a rotating committee comprised of individuals whose expertise was relevant to the items being considered for accession.[174] The committee would consider where the potentially accessioned item came from and whether it was legally procured.[175]

The MOVE remains stored in the Lab were never accessioned into the Museum's collection. Siggers stated that it was not uncommon for museum affiliated experts, including anthropologists, such as Mann and Monge, to have in their possession non-accessioned objects that were the subject of academic study and/or related to forensic work being conducted for a government body (i.e., a medical examiner or coroner's office). Siggers stated that the technology necessary to conduct a forensic examination was more likely to be located at a museum lab than a medical examiner's office.

Siggers stated that the Museum still does not have a policy governing non-accessioned items such as human remains, that are brought to or stored in any of the Museum's facilities, and none that governed how Monge utilized the MOVE remains.

A previous director and current deputy director at the Museum, Siggers and Tinney, observed MOVE remains at some point during the time that they were at the Museum and were aware of their provenance. Neither believed that having the MOVE remains at the Museum and their display to students, donors, and others violated any Museum policies. Since the remains were not accessioned and not part of a collection, or formally used in an exhibition, the guidelines of the Institute of Museum Ethics on the treatment of human remains would not apply.[176] Likewise, the American Alliance of

---

[173] Siggers Interview, June 7, 2021

[174] *Id.*

[175] *Id.*

[176] http://www.museumethics.org/2009/09/museum-q-and-a-2/

Museums' Code of Ethics section on "Collections" would not apply for the same reasons.[177]

## 2. Professional Ethical Standards

Dr. Mann and Dr. Monge are *physical* anthropologists. Anthropology, as an academic discipline, has several other branches that are fluid, some of which overlap.[178] For example, there are also *forensic* anthropologists, *biocultural* anthropologists, *paleo* anthropologists, *social* anthropologists, *cultural* anthropologists, and *linguistic* anthropologists. Archaeology is considered a branch of anthropology, which has its own sub-branches.[179] Finally, we found that it is not unusual for biological and physical anthropologists to perform the same type of investigative work that forensic anthropologists[180] perform, as was done by Mann and Monge.[181] This made our efforts to identify common ethical standards to use in evaluating the propriety of Mann and Monge's conduct over a 36-year period especially daunting.

Just as there are various branches in anthropology and archaeology, there are also multiple professional associations with largely aspirational goals and statements of principle, but no specific rules of conduct or authority to sanction members who violate

---

[177] https://www.aam-us.org/programs/ethics-standards-and-professional-practices/code-of-ethics-for-museums/

[178] "History and Branches of Anthropology", *National Geographic*
https://www.nationalgeographic.org/article/history-branches-anthropology/

"Fields of Anthropology " https://www2.palomar.edu/anthro/intro/fields.htm

[179] While none of the anthropological associations have specific rules relating to the handling of human remains, the Society for American Archaeology, founded in 1934, does:
https://documents.saa.org/container/docs/default-source/doc-careerpractice/saa-human-remains-statement-draft-4-14-2021.pdf?sfvrsn=3565512b_2df?sfvrsn=3565512b_2

[180] Forensic anthropology is the analysis and identification of human remains to assist  coroners or medical examiners. https://www.bionity.com/en/encyclopedia/Biological_anthropology.html

[181] In fact, Monge did forensic anthropological work for the Philadelphia Public Defender's Association and the Federal Defender's Association subsequent to 1985. See Monge Statement, Exhibit 14. Michael Blakey Interview, July 6, 2021

them.[182] Also, these rules mostly seem to apply to persons who are actually members of the respective associations. This is the case for organizations such as: the Society of Forensic Anthropology,[183] the Society for Applied Anthropology,[184] the American Board of Forensic Anthropology,[185] and the American Academy of Forensic Sciences.[186] The other organizations, such as the American Anthropological Association, state that while their codes are primarily for its members, they also exist generally for educational purposes and to foster discussions within the field at-large.[187]

Lastly, and more importantly, our task was further complicated by the differences in Mann and Monge's conduct and the varying dates and timeframes in which they occurred. For example, we examined the ethical implications of Mann's actions in taking custody of the remains in 1986 and retaining them until 2001, while making no further efforts to identify them during the time, and then leaving them at the Museum when he went to Princeton without attempting to return them to the MEO. We then examined Monge's actions for the period of 2001 to 2019, when she retained custody of the remains and displayed them on multiple occasions also without attempting to return them to the MEO.

There are several professional associations whose ethical standards are arguably relevant to Mann and Monge's conduct as physical anthropologists, but to draw any conclusions that their actions were ethically improper under these various standards

---

[182] Unlike certain regulated professions such as law and medicine with licensure requirements, there are no authoritative bodies with the responsibility for promulgating ethical standards, interpreting them in specific situations and then sanctioning violations.

[183] http://www.sofainc.org/code-of-ethics

[184] https://www.appliedanthro.org/about#jl_magic_tabs_ethics_gix2

[185] http://theabfa.org/wp-content/uploads/2020/04/2020-ABFA-Policies-and-Procedures-29-March-2020.pdf

[186] http://www.ethicscodescollection.org/detail/163abc00-0baa-4650-b571-3ac3758fd1bd

[187] https://www.americananthro.org/LearnAndTeach/Content.aspx?ItemNumber=22869&navItemNumber=652

would be problematic given the varying dates when these associations were formed and when they adopted their codes of ethics. For example, the oldest association, the American Anthropology Association, founded in 1902, first adopted a Code of Ethics in 1971 and amended it in 1986, 1998 and 2012. None of these iterations had any specific guidelines on the custody and use of unidentified human remains.[188] The preamble to the AAA Code states:

> Ethics and morals differ in important ways. The complex issues that anthropologists confront rarely admit to the simple wrongs and rights of moral dicta, and one of the prime ethical obligations of anthropologists is to carefully and deliberately weigh the consequences and ethical dimensions of the choices they make — by action or inaction. *Similarly, ethical principles and political positions should not be conflated; their foci of concern are quite distinct. Finally, ethics and law differ in important ways, and care must always be taken in making these distinctions. Different processes are involved in making ethical versus legal decisions, and they are subject to different regulations. While moral, political, legal, and regulatory issues are often important to anthropological practice and the discipline, they are not specifically considered here. These principles address ethical concerns.*[189] *[Emphasis added]*

With these caveats, we surveyed the ethics codes of several professional associations: the American Anthropological Association (AAA),[190] the Society for Applied Anthropology (SAA),[191] the American Association of Physical Anthropologists (AAPA),[192] and the American Association of Biological Anthropologists (AABA).[193] Since Mann was acting as a forensic anthropologist when he was retained to help identify the remains in 1985, we consulted standards that are applicable to that specialty: the

---

[188] https://www.americananthro.org/LearnAndTeach/Content.aspx?ItemNumber=22869#Gusterson5

[189] *Id.*

[190] *Id.*

[191] https://www.appliedanthro.org/about

[192] https://physanth.org/

[193] *Id.*

Society of Forensic Anthropology (SOFA),[194] the American Board of Forensic Anthropology (ABFA),[195] and the American Academy of Forensic Sciences (AAFS).[196]

We also consulted several anthropologists and others whose initial reactions when they read the inaccurate news accounts relating to Mann and Monge's conduct in keeping and displaying the remains was that it was clearly unethical but could identify no specific professional ethical standards that were applicable. When we clarified that there was a legitimate dispute about the identity of the remains, and that Monge had tried to identify and return some of the remains, several stated that her conduct was, at a minimum, "insensitive" and demonstrated "poor judgment." Interestingly, none of the statements of condemnation issued by several of these organizations when this controversy arose identified the specific ethical standards of their associations that were violated and how they might apply to Mann and Monge's conduct over 36 years.[197]

Dr. Mann and Dr. Monge have both had long and distinguished careers as professors, scholars, and researchers. In the absence of clear and specific ethical criteria that were applicable at the relevant points in time, we are loath to tarnish those reputations by conflating conduct that was, at worst, "insensitive" and exhibited "poor judgment," with "unethical" conduct, and to do so in hindsight. It is tempting during public controversies such as this one, with the attendant political passions of the moment, to rush to judgment. It is also normal to feel an intuitive sense of outrage and to believe that certain conduct is "just wrong" or "offends moral sensibilities." Such feelings alone, however widespread or honestly held, should never be allowed to unfairly disparage and ruin the reputations of the persons who are caught in the vortex of such a controversy.

---

[194] http://www.sofainc.org/

[195] http://theabfa.org/wp-content/uploads/2020/04/2020-ABFA-Policies-and-Procedures-29-March-2020.pdf

[196] http://ethics.iit.edu/codes/AAFS%201978.pdf

[197] https://www.americananthro.org/StayInformed/NewsDetail.aspx?ItemNumber=26217

The codes of ethics for all of the anthropological associations we surveyed share several animating ideals: promote *intellectual honesty and professionalism* in research endeavors; strive to *restore personhood*; avoid harm to *human dignity;* and obtain *informed consent* for research whenever possible. While we cannot conclude that their actions were "unethical" as such, we do conclude that Mann's cavalier treatment in the storage and retention of the remains from 1986-2001 and Monge's similar actions from 2001 to 2019 exhibited extremely poor judgment and gross insensitivity to the moral, social, and political implications of their conduct. Furthermore, their actions were inconsistent with the implied overarching principle of the *respectful treatment of human remains.*

Monge's display of the remains on several occasions, when viewed in context, served legitimate professional and educational objectives, and the display of the remains in the *Coursera* class was done in a dignified manner. Since both Mann and Monge, at some point, had a good faith belief that the remains were unidentified, Monge did not violate the *informed consent* principle when she displayed the remains, because she knew of no persons with a clear legal relationship to the remains from whom such consent could have been sought.

### American Anthropological Association

The American Anthropological Association (AAA) is the world's largest scholarly and professional organization of anthropologists.[198] Its membership is comprised of professors, students, and researchers dedicated to advancing the field and adhering to industry standards as well as a code of ethics. The AAA has seven *Principles of Professional Responsibility,* but none, by their literal terms, apply to the handling of unidentified human remains:

1. Do No Harm
2. Be Open and Honest Regarding Your Work

---

[198] https://www.americananthro.org/LearnAndTeach/Content.aspx?ItemNumber=22869#Gusterson5

*See also* statement of the Association of Black Anthropologist (ABA) which is a section of the AAA. https://aba.americananthro.org/category/abaaaa/; https://aba.americananthro.org/

3. Obtain Informed Consent and Necessary Permissions

4. Weigh Competing Ethical Obligations Due Collaborators and Affected Parties

5. Make Your Results Accessible

6. Protect and Preserve Your Records

7. Maintain Respectful and Ethical Professional Relationships

The one principle that would appear to apply is the first one, which is similar to the Hippocratic Oath[199] found in medicine – "do no harm" – and the one that was cited by the AAA in its statement of April 26, 2021.[200] But the statement fails to state how it applies to the facts of this controversy that involves the continued custody and use of the MOVE remains by Mann and Monge. The relevant commentary to the principle states:

> A primary ethical obligation shared by anthropologists is to do no harm. It is imperative that, before any anthropological work be undertaken - in communities with non-human primates or other animals, at archaeological and paleoanthropological sites – each researcher thinks through the possible ways that the research might cause harm. *Among the most serious harms that anthropologists should seek to avoid are harm to dignity, and to bodily and material well-being, especially when research is conducted among vulnerable populations*. [Emphasis added]

The third principle relating to informed consent would arguably apply if there was no dispute about the identity of the remains and there were persons from whom consent could be sought. In any event, Monge did reach out to MOVE members to get their assistance in identifying the remains and presumably return them, but they refused.[201]

### Society for Applied Anthropology

Another association whose ethical standards arguably apply is the Society for Applied Anthropology, founded in 1941 making it one of the oldest of the associations. SAA promotes the advancement of the field of anthropology with a focus on applying its

---

[199] https://www.britannica.com/topic/Hippocratic-oath

[200] https://www.americananthro.org/StayInformed/NewsDetail.aspx?ItemNumber=26217

[201] *See* Finding and Conclusion No. 9, *supra*

principles to help address contemporary issues. Its *Statement of Ethics and Professional Responsibilities* which applies to its members states:

> This statement is a guide to professional behavior for the members of the Society for Applied Anthropology. As members or fellows of the society, we shall act in way consistent with the responsibilities stated below irrespective of the specific circumstances of our employment.

The *Statement* contains six broad, aspirational principles that speak generally of affording dignity, integrity, and worth to communities ultimately affected by an anthropologist's work.[202] However none relate specifically to the custody and use of the unidentified MOVE remains by either Monge or Mann.

### American Association of Physical Anthropologists
### American Association of Biological Anthropologists

The American Association of Physical Anthropologists (AAPA) adopted a code of ethics in 2003. The provisions of this code include considerations for physical anthropologists which are based largely on the principles developed by the AAA.[203] Because the AAPA relied on the AAA to form its own code of ethics, it also does not have specific guidelines for proper handling and usage of human remains. Instead, it addresses ethical obligations generally and urges respect to the peoples and materials they study.[204] The American Association of Biological Anthropology is apparently the same as the AAPA. One provision discusses obtaining the informed consent of persons owning or controlling access to material being studied.[205]

### Professional Forensics Associations

After our survey of the codes of various anthropological associations that were generally applicable, we examined the codes of three that were specific to forensic

---

[202] https://www.appliedanthro.org/about#jl_magic_tabs_ethics_gix2

[203] https://physanth.org/documents/3/ethics.pdf

[204] *Id.*

[205] *Id.*

anthropology: the Society of Forensic Anthropology (SOFA), the American Board of Forensic Anthropology (ABFA), and the American Academy of Forensic Sciences (AAFS). None contained provisions relating to the treatment of human remains.

The Society of Forensic Anthropologists is a professional organization of forensic anthropologists founded in 2003. Their work focuses on ways to improve the practices in the field. This involves the application of psychical and biological anthropological knowledge and skills to the medical investigation of death and interpretation of human skeletal remains.[206] Part A of their code emphasizes that a forensic anthropologist should "serve the interests of justice" and that their motives should be "conducted with respect for human dignity."[207]

The American Board of Forensic Anthropology Code of Ethics, adopted in 2001, includes a series of ethical and professional standards for forensic anthropologists.[208] There are no specific ethical guidelines regarding the custody and use of human remains. The American Academy of Forensic Sciences was formed in 1986 as an organization to promote professionalism, integrity, and competency in the forensic sciences.[209] Its by-laws include ethical and professional standards but has no guidelines regarding the custody and use of unidentified human remains.

### 3.  <u>Relevant Legal Provisions</u>

Pennsylvania and New Jersey have some limited case law and statutes that concern liability for the mishandling of human remains. We have surveyed this legal framework to determine their applicability to Dr. Mann and Dr. Monge's custody and use of the unidentified MOVE remains from 1986-2019. It is our opinion that their actions did not violate any of those legal provisions, either because the statutes or holdings by

---

[206] http://www.sofainc.org/

[207] http://www.sofainc.org/code-of-ethics

[208] http://theabfa.org/wp-content/uploads/2020/04/2020-ABFA-Policies-and-Procedures-29-March-2020.pdf

[209] https://aafs.org/common/Uploaded%20files/About%20Us/AAFS%20Bylaws-April2021.pdf

their terms did not apply, the requisite states of mind required for liability were not present,[210] or the statutes of limitations had run on any potential claims. In addition, since the remains are unidentified, it is not clear which members of the MOVE family would have standing to assert these claims.

**Case Law**

Pennsylvania courts have adopted the *First Restatement of Torts, Section 868*[211] relating to interference with a dead body: "a person who wantonly mistreats the body of a dead person or who without privilege intentionally removes, withholds or operates upon the dead body is liable to the member of the family of such person who is entitled to the disposition of the body."[212] The Pennsylvania Supreme Court adopted this language and created a cause of action in a 1970 case in which the parents of a child sued a driver who hit the child with his car and buried him in effort to hide the remains.[213] The court concluded that family members were entitled to recover for mental damages, emotional disturbance, embarrassment, and humiliation stemming from interference with the body.[214]

Since then, courts have clarified *wanton mistreatment* and *intentional mishandling* of human remains as behavior that, even if not intentional, is reckless and demonstrates at

---

[210] For example, the line of cases discussing intentional conduct or wanton conduct presumes [defendant has knowledge of the identity of the remains, their next of kin and nevertheless acted in a way that caused harm or with disregard for the harm that could be reasonably expected from their conduct].

[211] The *Restatements of the Law* are a collection of legal concepts and principles compiled by the American Law Institute (ALI) that distilled various common law principles in several areas of the law into model statements that could be adopted by courts and legislatures around the country. Such Restatements are persuasive principles only and not controlling unless adopted by the highest court in the state or the state legislature. The ALI, which is based in Philadelphia, is an organization of judges, lawyers, and law professors founded in 1923.
https://www.ali.org/about-ali/faq/

[212] *Restatement (Second) of Torts* § 868 (1939)

[213] *Papieves v. Lawrence*, 437 Pa. 373, 376 (1970).

[214] *Id*. at 381.

least a willingness to injure and an indifference to the wrongdoing.[215] Wanton misconduct means that, "the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."[216] In another case, the court found that the plaintiff had pled enough facts from which a jury could reasonably find that a hospital's conduct might have been wanton where it only made a halfhearted effort to contact the family before sending the body to a nearby university where the decedent's organs were removed against the family's wishes.[217] In another case, the court found no wanton conduct where the plaintiff's mother's casket and body sustained considerable damage during a flight.[218]

On the question of liability for *intentional* conduct, courts have concluded that such actions include, "unlawful interment or disinterment of a body, intentional interference with a burial, or unauthorized embalming of a corpse, and other intentional, reckless or wanton acts likely to cause severe emotional distress."[219] The courts noted that this definition for intentional conduct was consistent with the common legal understanding of intent that is found when one shows, "either a desire to cause mental distress or a belief or knowledge that one's conduct is substantially certain to cause the plaintiff mental distress."[220]  Although it has been the subject of debate, the courts in Pennsylvania have not expanded the concept to include *negligent* interference with a body.[221]

---

[215] *Stubbs v. Frazer*, 454 A.2d 119, 120 (Pa. Super. Ct. 1982).

[216] *Id*. (internal quotations omitted).

[217] *Weiley v. Albert Einstein Med. Ct.*, 51 A. 3d 202 (Pa. Super. Ct. 2012).

[218] *Hackett v. United Airlines*, 528 A.2d 971, 974 (Pa. Super. Ct. 1987).

[219] *Weiley*, A. 3d at 210-11 (emphasis added).

[220] *Id*. at 211 (citing Restatement (Second) of Torts § 8A (1965)).

[221] *Id*. at 214 (citing *Hackett*, A. 2d at 974).

A similar legal framework exists in New Jersey common law where the Supreme Court has adopted language from the *Second Restatement of Torts, Section 868* to create liability for the mishandling of human remains.[222] One important distinction is that New Jersey *does* allow a plaintiff to recover for negligent infliction of emotional distress resulting from the mishandling of a corpse.[223] In New Jersey, negligent mishandling of a corpse is an exception to the standard rule requiring that the plaintiff show physical proof of emotional distress.[224] The courts reasoned that mishandling a corpse creates an overwhelming likelihood of genuine and serious mental distress which serves as proof that the claim is not frivolous.[225]

## Statutory Law

Pennsylvania has one relevant statute which states that, "a person who treats a corpse in a way that would outrage ordinary family sensibilities commits a second-degree misdemeanor."[226] However, it carries a two-year statute of limitations and is inapplicable altogether to Mann's conduct that occurred from 1986 to 2001, or Monge's from 2001-2019.[227] Similarly, a New Jersey statute makes it unlawful to "purposely or knowingly fail to dispose of human remains in a manner required by law."[228] The statute of limitations for that offense is five years.[229]

---

[222] *Strachan v. John F. Kennedy Memorial Hosp.*, 109 N.J. 523, 531 (1988).

[223] *Lacy v. Cooper Hosp./University Med. Ctr.*, 745 F. Supp. 1029, 1033 (D.N.J. 1990).

[224] *Strachan*, 109 N.J. at 537.

[225] *Id*. at 538.

[226] 18 Pa. C.S.A. §5510.

[227] 42 Pa. C.S.A. § 5552(a).

[228] N.J. Rev. Stat. § 2C:22-1.

[229] N.J. Rev. Stat. § 2C:1-6.

# V.    RECOMMENDATIONS

**1.  Appoint a University funded diverse, multidisciplinary external committee to advise the University on these recommendations as well as its ongoing relationship with the West Philadelphia Community. The Committee should publish an annual report on its activities and accomplishments.**

We understand that the University has numerous programs and initiatives in its various schools, colleges and other facilities aimed at providing and sharing its vast intellectual and financial resources with the surrounding West Philadelphia community. However, the fortuitous occurrence of the MOVE remains controversy provides the University with the opportunity to reassess the adequacy and efficacy of these programs and to redouble its efforts. This committee could provide an array of perspectives and critical feedback on these existing efforts and assist in developing new ones.

**2.  Establish a permanent installation on the Bombing of Osage Avenue at a publicly accessible location at the University.**

Our investigation revealed that there is very little contemporary understanding of one of the most horrific events in Philadelphia history, which included not only the killing of eleven people, but also the destruction of 61 homes and permanent dislocation and disruption of the lives of over 250 residents. Other than the simple historical marker depicted on the cover of this Report, there is no place that memorializes, educates, and provides a balanced perspective on this event. While the University bears no responsibility for the events of May 13, 1985, it has the unique opportunity, as an elite city institution, to provide a vitally needed public service. While we don't have a recommendation on where such an installation should be housed at the University, we strongly recommend that it be permanent and open to the public at no charge.

**3.  Hire a chief diversity officer for the Penn Museum.**

The Museum has nearly 200 employees and other than the new director, there are no Blacks in the 40 upper-level management positions at the Museum. The Museum should set hiring goals aimed at remedying this underrepresentation by 2023. A minority

perspective at the Museum over the last years would have emphasized the social and political implications of having the Morton Collection at the Museum at all, and how the display of the MOVE remains, however well intentioned, would be perceived by minority and indigenous communities.  In addition, that person should be the Museum's liaison with the community.

**4. Create a new full-time position for a bio-anthropologist/archaeologist with expertise in the analysis of human remains with a record of advocacy for Black and Indigenous people and in repatriation requests; this individual should hold a dual position as Penn Museum curator and a tenure-track faculty member in the Department of Anthropology.**

This position brings the same diversity of perspectives to the academic and scholarly endeavors of the Museum and the University that the chief diversity officer brings to employment and human resources. The employment of a person with expertise and scholarly achievement in the area of the repatriation of human remains is critical to the credibility of the Museum's efforts in that regard.

**5. Conduct a comprehensive review of the holdings and collection practices of the Museum's Physical Anthropology section and reassess its practices relating to the possession and various uses of human remains, accessioned as well as privately held.**

The Museum has the remains of thousands of individuals in its collections, most of which are accessioned and governed by the Policy Statement issued in 2017. As the MOVE remains controversy illustrates, there may be other remains that are privately held by anthropologists at the Museum and no clear policy relating to the possession, cataloguing and use of such remains or records of their provenance.

**6. Present a joint exhibition with the African American Museum in Philadelphia on the role of University-trained scholars and anthropologists in the development of scientific racism.**

As we have seen, the root cause of this MOVE remains controversy is the Morton Collection and the ongoing professional debates about the role that Morton's research

and his collection played in the development and advancement of scientific racism. At a minimum the possession of the Collection requires that the University acknowledge its historical complicity – intended or not – in this development and join other institutions in this reckoning and reconciliation. The Penn and Slavery Project has done significant research in this area. A collaborative exhibit with the African American Museum in Philadelphia would enhance the credibility of this effort.

7. **Establish a scholarship program to actively recruit academically talented students who are graduates of Philadelphia public high schools and charter schools located within the 19142 and 19143 zip code areas in West Philadelphia.**

The University is one of this country's most elite educational institutions. The University's graduates have been instrumental in shaping the country's and Philadelphia's political, financial and cultural landscape. The University has a demonstrated record of community involvement and outreach to its neighbors, especially in the area of health-care disparities. These particular zip code sections of West Philadelphia are immediately adjacent to the University. These areas have faced long-standing educational and social-economic challenges that are enigmatic of Philadelphia. There is also a historical distrust of the University and a concern in these zip code areas that the University seeks to displace its residents. And because of the perceived and actual disparity between the University and its neighbors, trust and cooperation have been problematic. The specific identification of high school students from these zip code areas and the granting of scholarships to them will be a meaningful step to maintaining and reinforcing relationships between neighbors.

# VI.   INTERVIEWS

Debbie Africa
Janet Africa
Janine Africa
Mike Africa, Sr
Mike Africa, Jr.
Sue Africa
Zhenia Bemko, Major Gifts Coordinator, Penn Museum
Dr. Michael Blakey, Professor of Anthropology, College of William and Mary
Dr. Marie-Claude Boileau, Director, Center for the Analysis of Archaeological Materials, University of Pennsylvania
William H. Brown, Former Chairman of MOVE Commission
Sean Burke, Associate General Counsel, University of Pennsylvania
Gregory Burrell, Director, Terry Funeral Home
William Conrad, Board of Directors, Penn Museum
Michael Coard, Civil Rights Attorney
Stacey Espenlaub, NAGPRA Coordinator, Penn Museum
Michelle Flamer, Esquire, Civic Leader
Councilwoman Jamie Gauthier, Third Councilmanic District
Ernest Jones, Esquire, Former President of the Urban Affairs Coalition
Dr. Jean Henry, Art Historian, Psychotherapist and Museum Volunteer
Dr. Charles Howard, Chaplin, University of Pennsylvania
Dr. Jane Kauer, Former Penn Museum Employee
Tisa Loewen, Graduate Student, Center for Bio Archaeological  Research, Arizona State University
Paul Wolff Mitchell, Graduate Student in Anthropology, University of Pennsylvania
Dr. Janet Monge, Keeper and Associate Curator of the Physical Anthropology Department at the Penn Museum;  Adjunct Professor, Princeton University
Dr. Katherine Moore, Professor of Anthropology, University of Pennsylvania
Abdul-Aily Muhammad, Community Activist
Dr. Melissa Murphy, Professor of Anthropology, Director of Graduate Studies Anthropology, University of Wyoming
Jake Nussbaum, Graduate Student in Anthropology, University of Pennsylvania
Walter Palmer, Community Activist, Lecturer at University of Pennsylvania
Wendell Pritchett, Provost, University of Pennsylvania
Baba Renfrow, Osage Avenue Resident
Dr. Julian Siggers, Former Director of Penn Museum
Dr. Deborah Thomas, Professor of Anthropology, University of Pennsylvania
Dr. Steve Tinney, Deputy Director of Penn Museum
Leland Ware, Professor of Law, University of Delaware
Linn Washington, Professor of Journalism, Temple University
Undergraduate Student
Wendy White, Senior Vice President and General Counsel, University of Pennsylvania
Lucy Fowler Williams, Associate Curator, Penn Museum
Dr. Christopher Willoughby, Visiting Scholar at Harvard University
Dr. Christopher Woods, Director of Penn Museum

# VII.  TUCKER LAW GROUP PROFILE

**Tucker Law Group ("TLG")** is a boutique litigation and trial law firm. TLG represents a diverse client base, ranging from individual litigants, Fortune 100 companies, higher education institutions, non-profit organizations and state and local governmental entities. TLG attorneys represent clients in all aspects of litigation, trial and appellate courts at the federal and state levels, administrative agencies, arbitration, and mediation proceedings. TLG often is called upon to conduct highly sensitive internal investigations concerning workplace policies, discrimination claims and financial impropriety. TLG's lawyers are involved in all aspects of Philadelphia community and civil life; TLG's lawyers provided hundreds of hours of pro bono and community service work each year.  The lawyers serve on non-profit boards and are active members of Philadelphia's religious and cultural society.

## THE REPORT INVESTIGATION TEAM

**Joe H. Tucker, Jr.**, founder and CEO of Tucker Law Group, concentrates his practice on complex civil litigation matters. Mr. Tucker's lawyering skills are nationally recognized, and he has received the Martindale-Hubbell's "AV" Preeminent Rating, which is the highest national rating (5 out of 5) for attorneys. Mr. Tucker has been consistently selected by the Pennsylvania *Super Lawyers* as one of the top 100 attorneys in Pennsylvania. *Chambers USA* has recognized Mr. Tucker as one of America's best lawyers and clients have praised him in *Chambers* stating he is "a phenomenal trial lawyer and human being" and "an excellent trial lawyer."  Mr. Tucker is a Fellow and Secretary/Treasurer in the International Academy of Trial Lawyers, an invitation only trial lawyers' organization limited to 500 members.

Mr. Tucker previously served as President of the Barristers' Association of Philadelphia. Mr. Tucker is deeply involved in the Philadelphia community. He currently serves on the Boards of Big Brothers/Big Sisters Independence Region, Free Library of Philadelphia Foundation, Philadelphia Police Foundation and Pennsylvanians for

Modern Courts. His recognitions and awards include, among others: Women Against Abuse, Advocate of the Year; The Support Center for Child Advocates' 40 for 40 Friends Award; Spectrum Health Services' 50 Community Gems Award; African American Chamber of Commerce *Game Changer* Award; Temple Law Alumni Association Diversity Leadership Award; Temple University Black Law Students' Cecil B. Moore Award; and 6ABC's *African American Businessman Making a Difference in the Community Award*. Mr. Tucker founded and funds two academic scholarships for minority law students.

Mr. Tucker grew up in North Philadelphia and attended public schools in the city. Mr. Tucker received his B.B.A from Howard University and his law degree from Temple University School of Law.  Prior to practicing law, Mr. Tucker was a certified public accountant.

**Carl E. Singley,** counsel to the firm, has had a diverse professional career as a practicing attorney in the private and public sectors and as a legal educator and administrator.  Mr. Singley was a law professor at Temple University from 1974 to 2004 when he retired as professor emeritus.  He served as dean of the school from 1983-1987. At the time of his appointment, he was the first Black, the first Temple graduate and the youngest dean in the history of the University. His teaching interests included Civil Procedure, Evidence, Municipal Finance, Jurisprudence and Commercial Bankruptcy. Mr. Singley has written and published numerous articles and essays on a wide variety of subjects including legal ethics, evidence, public inquiry commissions, criminal justice, jury trials, affirmative action, legal history, municipal finance, and leadership theory.

Mr. Singley served as counsel to the Philadelphia Special Investigation Commission (MOVE Commission) that investigated the MOVE bombing in 1985. *See,* Singley, "The MOVE Commission: The Use of Public Inquiry Commissions to Investigate Government Misconduct and Other Matters of Vital Public Concern", *59 Temp. L.Q. 303 (1986).* In 1984 he served on the Mayor's Commission on Affirmative Action in the Philadelphia Police Department, and in 2009 he chaired Philadelphia Mayor Michael Nutter's Advisory Commission on Construction Industry Diversity.  Mr. Singley chaired

the board of the African American Museum in Philadelphia for several years, and in 1999 he was the curator and author of the brochure catalogue of an exhibit entitled "Call to Order: African Americans and the Law - 1776-1999."

Mr. Singley practiced for ten years in his own firm before serving as a partner in two large Philadelphia law firms for eight years. Mr. Singley also served as First Deputy City Solicitor. His practice concentration has been in the areas of civil and commercial litigation, appellate advocacy, government contracts municipal finance and business transactions. Mr. Singley has litigated and argued cases on employment law, contracts and business law, tort liability, libel law, constitutional law, and municipal law in various state and federal trial and appellate courts. He is a member of the bar of Pennsylvania and admitted to practice before the United States Supreme Court.

Mr. Singley's awards include *Thurgood Marshall Award* (Thurgood Marshall Scholarship Fund,); *Diversity Attorney of the Year* (Philadelphia Bar Association, *Legal Intelligencer*); *A. Leon Higginbotham Award for Distinguished Service* (Pennsylvania Bar Association); Temple University Law Review, *75th Anniversary Honoree*; *Lifetime Achievement Award* (Barristers Association of Philadelphia); and induction into the *History Makers Inc.*

Mr. Singley served as the chairman of board of the Philadelphia Urban League, vice-chairman of the Pennsylvania Convention Center Authority, member of the Delaware River Port Authority, and member of the board of the Federal Reserve Bank of Philadelphia. Mr. Singley received the LL.M. from Yale University Law School, a J.D. from Temple University School of Law and a B.A. in Economics and History from Talladega College.

**Dimitri Mavroudis** is an experienced and versatile litigator and trial attorney who focuses his practice on complex civil and commercial litigation matters, employment discrimination cases, and civil rights litigation. Mr. Mavroudis has tried numerous jury trials to verdict in federal and state courts. He has also brought and defended against motions for preliminary and special injunction concerning commercial, constitutional, and municipal tax matters. Mr. Mavroudis is experienced in all aspects of pre-trial and trial practice.

Prior to joining the Tucker Law Group, Mr. Mavroudis worked at the City of Philadelphia Law Department. During his time in the Law Department, he served as the Senior Attorney in the Affirmative and Special Litigation and Civil Rights Units. In that capacity he served as counsel to multiple City departments as a litigator in disputes concerning breach of contract, construction, real estate and land use, election law, software development agreements, leases, tax disputes, and class actions.

In addition to his commercial litigation practice, Mr. Mavroudis defended challenges to City ordinances such as the Philadelphia Beverage Tax litigation. He also served as counsel to the City in the *Bailey v. City of Philadelphia* "Stop & Frisk" litigation and participated in the Philadelphia Police Department's training on stop and frisk practices. Mr. Mavroudis also successfully defended injunction motions brought against the City seeking to enjoin government action related to contract formation and the collection of real estate tax revenue.

Mr. Mavroudis represented pharmaceutical companies in a wide array of products liability and class action matters for five years in the Philadelphia office of a large international law firm. In this role he coordinated all aspects of the firm's pretrial discovery process and worked with national and local trial counsel and in-house legal teams to devise discovery and overall litigation strategies in these matters. Mr. Mavroudis received a J.D. from Temple University School of Law and a B.A. from Boston University.

**Raashida S. Fleetwood** recently joined the Tucker Law Group as an associate specializing in civil litigation. Prior to joining the firm, Ms. Fleetwood worked at a workers' compensation defense firm. There, she represented governmental entities, private companies and insurance companies in cases involving injuries sustained in the workplace. She achieved favorable verdicts and resolved cases amicably for those clients. Ms. Fleetwood also clerked for the Honorable Karen Shreeves-Johns and worked for a criminal defense firm, litigating cases in municipal court. Ms. Fleetwood received a J.D. from George Washington Law School and a B.A. from Howard University, *Summa Cum Laude* and Phi Beta Kappa.

**David Carcamo** is a rising third-year law student at Temple University School of Law. He is currently a summer clerk at Tucker Law Group and served as a research assistant for this report. In law school, David has interned with the Honorable L. Felipe Restrepo in the Third Circuit Court of Appeals as well as Philadelphia City Councilwoman Maria Quiñones-Sánchez. Prior to this, he attended the Pennsylvania State University where he earned degrees in international politics and global security.

# VIII. EXHIBITS

Exhibit 1:       Odyssey of MOVE Remains Timeline

Exhibit 2:       MOVE Family Chart

Exhibit 3:       MOVE Commission Chronology

Exhibit 4:       Dr. Ali Hameli Reports
                 "Review of Scene Investigation"
                 "Investigation of the Remains"
                 "Condition of the Remains"

Exhibit 5:       Letter from James Stanley White to Louise James

Exhibit 6:       Dr. Alan Mann Report, November 14, 1985

Exhibit 7:       Invoice of $300 for Dr. Alan Mann's Services, May 20, 1985

Exhibit 8:       MOVE Commission Identification of Remains

Exhibit 9:       Dr. Robert Segal Report, March 18, 1986

Exhibit 10:      Executed Certificate of Identification by Nathaniel Galloway, November
                 18, 1985

Exhibit 11:      Dr. Ellis Kerley Report

Exhibit 12:      Dr. Jane Kauer Letter, May 6, 2021

Exhibit 13:      Paul Wolff Mitchell email to Dr. Christopher Woods, April 16, 2021.

Exhibit 14:      Dr. Janet Monge Statement

Exhibit 15:      Dr. Alan Mann Statement, July 8, 2021

Exhibit 16:      Email Between Malcolm Burnley and Monge, December 7, 2014

Exhibit 17:      Email Between Malcolm Burney and Monge, December 29, 2014

Exhibit 18:      *Coursera* Course Outline

Exhibit 19:    William H. Brown, III Correspondence to Dr. Marvin E. Aronson, June 24, 2015

Exhibit 20:    Correspondence from Dr. Ellis Kerley to William B. Lytton, December 28, 1985

Exhibit 21:    Correspondence from Dr. Robert Segal to William By Lytton, January 23, 1986

Exhibit 22:    Correspondence from William B. Lytton to Dr. Robert Segal, December 4, 1985

Exhibit 23:    City of Philadelphia Officer of the Medical Examiner Release of Body Form for Katricia Africa, December 7, 1985

Exhibit 24:    City of Philadelphia Officer of the Medical Examiner Release of Body Form for Delisha Africa, September 17, 1986

Exhibit 25:    Letter Concerning Monge and the Morton Collection, September 9, 2020

Exhibit 26:    Morton Collection/MOVE Remains Public Controversy Timeline

EXHIBIT 1

## ODYSSEY OF THE MOVE REMAINS TIMELINE

5/13/85             5:27 p.m. **-** The bombing of 6221 Osage Avenue

                         11:41 p.m. - The resulting fire is controlled

5/14/85             Several City agencies began the evacuation of the site with clam claw crane.

                         3:50 p.m. Dr. Catherman from MEO went to site and to assist in the recovery of the remains.

5/15/85             Dr. Robert Segal went to site and supervised the transfer of all remains to the MEO

5/16 -17/85        Dr. Mann and Janet Monge examined the remains

6/19/1985         Mayor Goode appointed the MOVE Commission

6/24/1985         William H. Brown, III, Chairman of the MOVE Commission, informed Dr. Marvin E. Aronson, the City's Medical Examiner, hat the Commission intended to retain a forensic pathologist to review the MEO's findings concerning the remains recovered from the MOVE house on Osage Avenue.  Brown further instructed Aronson that the MEO was not to release or otherwise dispose of any remains in the custody of the MEO.

7/12/85             MOVE Commission forensic experts, Hameli, Kerley and Levine retained

July 1985          The identities of all six adults and three of the children were resolved. The dispute over the identities of B-1 and Body G developed

Fall, 1985         MOVE Commission hearings

11/5/85             Hameli testified before the MOVE Commission.

                         Hameli issued report concluding that the B-1 remains were those of Katricia Africa and the Body G remains were those of Delisha Africa

| | |
|---|---|
| 11/14/85 | Mann issued report contradicting Hameli's conclusions on the identity of B-1 and Body G |
| 11/20/85 | Commission requested copy of Mann Report |
| 12/1/85 | *Philadelphia Inquirer* article reports that Hameli will conduct a follow up examination of the B-1 remains. |
| 12/3/85 | Hameli conducted second examination of B-1 and Body G. |
| 12/4/85 | Hameli authorized release of B-1 and Body G remains to families |
| 12/14/85 | City released remains of Katricia Dotson (B-1) to her father Nathaniel Galloway for burial. |
| 1/00/85 | Dr. Judy Suchey was retained at Dr. Hameli's request to render an opinion on the identity of the B-1 remains and sends them to her office at California State University at Fullerton, California |
| 1/22/86 | Suchey concluded her examination, issued a report that confirms Hameli's findings regarding B-1 and returned the remains to Segal |
| 1/23/86 | Segal informed Commission that Dr. Judy Suchey was retained to render an opinion on the identity of the B-1 remains. |
| | Segal stated in correspondence to the Commission that it would be unreasonable for him to reject Suchey, Hameli, and Kerley's findings as to Body B-1 in light of the evidence available at that time.  Segal made no mention of Body G in this correspondence. |
| 1/31/86 | *Philadelphia Inquirer* article on Suchey's conclusions |
| 1/30/86 | Kerley issued a supplemental report confirming initial conclusions regarding the identities of B-1 and Body G |
| 2/00/86 | Segal gave Mann a box containing the B-1 remains, femur and pelvic fragments, which he takes to his offices at the Penn Museum for further study. (Early February) |
| 3/6/86 | MOVE Commission issued final report |
| 4/14/86 | Segal issued his final report on the MOVE investigation, which disagreed with the Commission's findings regarding identity of B-1 |

| | |
|---|---|
| 9/22/86 | Remains of Delisha (Body G) released to Gerald Ford and were buried |
| 1988 | Monge displayed the B-1 remains to the students from the American Board of Forensic Anthropology to assist in the identification of B-1. |
| 1995 | Monge reached out to Ramona Africa to get her assistance in identifying the B-1 remains and is rebuffed. |
| 2001 | Mann left the University to take a position at Princeton and left the B-1 remains with Monge |
| 12/7/14 | Monge contacted Malcolm Burnley to get his assistance in contacting Consuewella Africa to help identify the B-1 remains |
| 12/29/14 | Burnley confirmed that Consuewella would not cooperate in identifying the B-1 remains |
| 2015 | Paul Mitchell claimed to have seen an occipital bone in a box along with the B-1 remains at the Museum |
| | Monge displayed the B-1 remains during a presentation to Museum donors |
| 2/00/19 | Monge displayed B-1 remains during a Princeton Online video class. |
| 2019 | An undergraduate student, supervised by Monge, wrote a senior paper on the B-1 remains that also included an occipital bone x-ray that was labeled Body G |
| 4/16/21 | Paul Mitchell met with Dr. Christopher Woods and informed him that that he had observed the remains of two MOVE children at the Penn Museum and that Monge had displayed them in the Princeton Online video class |
| 4/18/21 | Dr. Steve Tinney directed Monge to take B-1 remains to Mann's home |
| 4/20/21 | Tucker Law Group retained to conduct an independent investigation |

| | |
|---|---|
| 4/21/21 | The first of several online and print articles are published asserting that the remains of two MOVE children were at the Museum and one set was used in the Princeton Online video. |
| 4/21/21 | Paul Mitchell circulated his report claiming that both the B-1 and Body G remains were housed at the Museum |
| 4/26/21 | University issued public statement apologizing to MOVE members. |
| 4/30/21 | The University paid Terry Funeral Home to transport the B-1 remains back to its offices |
| 5/13-14/21 | The City of Philadelphia reports, then retracts a statement that in 2017 the Health Commissioner had ordered the destruction of certain MOVE remains that had been in the Medical Examiner's Office since 1985 |
| 5/29/21 | The University purchased a casket from Terry to bury the B-1 remains |
| 6/16/21 | Consuewella Africa died |
| 6/24/21 | Consuewella Africa's remains were cremated |
| 7/2/21 | B-1 remains delivered to Sue Africa by agreement of several MOVE mothers |

EXHIBIT 2

**TLG** TUCKER LAW GROUP

## MOVE NINE

## OSAGE VICTIMS**

Merle Africa
(Deceased)

Eddie Africa
(Cousin of
Conrad)

Chuck Africa
(Son of
Laverne)

Mike Africa, Jr.

Mike Africa, Sr.

Debbie Africa
(Daughter of
Laverne)

Janet Africa

Delbert Africa
(Deceased)

Janine Africa

Phil Africa
(Deceased)

John Africa
**F**

Frank James
Africa
**K**

Theresa Brooks
Africa
**B**

Raymond Foster
Africa
**E**

Rhonda Harris
Africa **I**
(Mother)

Delisha
Africa **G**
(Minor)

Zanetta Dotson
Africa **D**
(Minor)

Katricia Dotson
Africa **B-1**
(Minor)

Phil Africa **C**
(Minor)

James Conrad
Africa **A**

Tomasa Africa
**H**
(Minor)

Louise James
Africa
(Deceased)
(Sister to John &
Laverne,
mother of Frank)

Laverne Sims
Africa
(Deceased)
(Sister to John &
Louise, mother of
Chuck & Debbie)

Ramona Africa

Michael "Birdie"
Ward Africa
(Deceased)

Pam Africa

Consuewella
Dotson
Africa
(Deceased)
(Mother)

Nathaniel
Galloway
(Father)
(Not Member)

Carlos Africa

Sue Africa
(Mother)

**
**MOVE
Commission's
Identification of
MOVE Remains**

EXHIBIT 3

# CHRONOLOGY

*This chronology is presented as a frame of reference
for the findings and conclusions which follow:*

| | |
|---|---|
| **Early 1970s** | The public and city administrations become aware of the emergence in Philadelphia of a small group of self-styled back-to-nature, anti-technology, anti-social advocates known as MOVE, and led by John Africa, also known as Vincent Leaphart. |
| **1978**<br>**August 8** | A blockade by police of MOVE's headquarters in Powelton Village ends in a gunfight. Police Officer James Ramp is shot to death; four other police and four firefighters are wounded by gunfire. |
| **1981**<br>**August 4** | Nine MOVE members are sentenced to prison terms of 30 to 100 years each for the killing of Officer Ramp. |
| **1982-1983** | MOVE adults and children take up residence at 6221 Osage Ave., the home of John Africa's sister, Louise James. In letters to public officials, in meetings and conversations with federal agents, and in a nighttime loudspeaker harangue, the occupants of 6221 Osage Ave. demand the release of their imprisoned colleagues, threaten various office holders, and state that they will kill any police officer who attempts to enter their house. Residents of the neighborhood unsuccessfully petition public officials for relief from MOVE's intrusion into their lives. |
| **1984**<br>**March 9** | The Mayor is briefed by the Police Commissioner on MOVE's occupancy and fortification of 6221 Osage Ave. |
| **May 3** | Man with a shotgun appears on the roof of 6221 Osage Ave.; police surround neighborhood, then withdraw. Mayor tells press conference: "We do not want to do anything that will cause an unnecessary confrontation." |
| **May 13-27** | MOVE stages series of weekend loudspeaker addresses to the community, threatens public officials; neighborhood disrupted. |
| **May 28** | Memorial Day; 15 residents of Osage Avenue meet for several hours with the Mayor and assert that MOVE is infringing upon their rights. |
| **May 30** | The Mayor, Managing Director, Police Commissioner, City Solicitor and District Attorney meet with the U.S. Attorney, plus officials of the FBI and Secret Service, and are told that no grounds exist for federal action against MOVE. The U.S. Attorney cautions city officials not to violate the civil rights of the occupants of 6221 Osage Ave. |
| **Late May** | The Police Commissioner gives Sgt. Kirk the sole responsibility of preparing a plan for the removal of the people from 6221 Osage Ave. |
| **June 22** | The District Attorney advises the Mayor that legal grounds exist for the arrest of some of the occupants of 6221 Osage Ave. |
| **Late June** | The Mayor decides not to take immediate action against MOVE, and waits to see what will occur on August 8, the anniversary of the 1978 Powelton Village shootout. |
| **July 4** | Residents of Osage Avenue again meet with the Mayor, who tells them the city does not plan any aggressive action at this time. |
| **July 28** | In a third meeting with MOVE's neighbors, the Mayor states that he will act when he decides it is appropriate. |
| **July 31** | Louise James and Laverne Sims tell the Mayor that members of MOVE have become more violence-prone, and are prepared to use weapons against police. |
| **August 8** | Police stand by in force, prepared to execute the Kirk Plan, as the sixth anniversary of the Powelton Village clash passes without incident. |
| **October 2** | Police confirm a report by Osage Avenue residents that a "wooden shack" is being constructed on the roof of 6221 Osage Ave. |

**1985**

| | |
|---|---|
| **February-March** | Neighbors form The United Residents of the 6200 Block of Osage Avenue to protest conditions in their neighborhood caused by MOVE's presence. |
| **April 25** | 30 residents meet at the Cobbs Creek Community Center to object to harassment and threats by MOVE. Several men announce they will respond to MOVE "in kind." |
| **April 29** | Spectators and police surveillance officers listen as MOVE members over loudspeakers threaten to kill the Mayor and police. Officers are told by a neighbor that men with a rifle have been seen inside the wooden structure on the rooftop of 6221 Osage Ave. |
| **April 30** | The Police Commissioner initiates police planning for a confrontation. |
| **May 1** | The United Residents hold a press conference and announce that they no longer can coexist with MOVE. They publicly ask the Governor for help. |
| **May 2** | As reflected in a police memo, neighbors tell police that a five-gallon gasoline can was hoisted to the roof of 6221 Osage Ave. A news photograph corroborates this event. |
| **May 3** | The Mayor concludes that an armed conflict between MOVE and the other residents of Osage Avenue is a probability. He asks the District Attorney to re-examine the legal justification for the city taking action against the people residing in 6221 Osage Ave. |
| **May 5** | Police and prosecutors interview 19 residents to support applications for search and arrest warrants. |
| **May 7** | The Mayor meets with the Managing Director, Police Commissioner and District Attorney, and authorizes the Police Commissioner to prepare and execute a tactical plan, under the supervision of the Managing Director. |
| **May 9** | Managing Director leaves town. The Police Commissioner briefs the Mayor on the tactical plan. The Mayor approves the plan and authorizes its execution on the morning of May 13. |
| **May 11** | A Court of Common Pleas judge approves search and arrest warrants. The Police Commissioner briefs the Mayor on the plan. |
| **May 12** | Police evacuate the Osage Avenue neighborhood. MOVE members tell citizen intervenors that they will not send the children out of the house and they are prepared for a confrontation. The Managing Director returns to Philadelphia in the evening. At about 9 P.M., in the presence of the Police Commissioner, he briefs the Mayor by telephone concerning the plan. |
| **May 13** | |
| **3:00 A.M.** | Bomb Disposal and Stakeout Units report to staging area in parking lot behind the command center at Walnut Park Plaza. |
| **3:40 A.M.** | Police Commissioner and tactical planners hold general briefing inside the command center. |
| **3:45-4:00 A.M.** | Utility crews cut off gas and electricity to 6200 block of Osage Avenue. |
| **4:05 A.M.** | Fire Department high pressure water hoses on remote controlled booms, known as "Squrts," are positioned on Pine Street, the block behind the MOVE house. |
| **5:35 A.M.** | Police Commissioner, using a bullhorn from inside a house on Osage Avenue, announces that four persons inside 6221 Osage Ave. are named in arrest warrants and have 15 minutes to surrender. A man and a women, responding over MOVE's loudspeaker, reject the ultimatum. |
| **5:50 A.M.** | Water is trained on the MOVE rooftop. Police guns fire tear gas and smoke projectiles at the front and rear of the MOVE house, to provide cover for police insertion teams. |
| **5:53-6:00 A.M.** | Insertion teams enter houses at 6217 and 6223 Osage Ave. |
| **6:00 A.M.** | First shots fired at police from MOVE house. At least 10,000 rounds of ammunition are fired by police in the next 90 minutes. |
| **6:15 A.M.** | Police commanders at scene order delivery of more ammunition from the Police Academy. |

2

| | |
|---|---|
| 6:18 A.M. | First explosions heard as insertion teams begin detonating charges to blow holes in the walls of 6221 Osage Ave. |
| 6:51 A.M. | Sharp explosion, followed by heavy gunfire. |
| 7:06 A.M. | Newly-deployed gas and smoke are dense on Osage Avenue. |
| 7:30 A.M. | Heavy gunfire ends. |
| 7:30-10:30 A.M. | Insertion teams use explosives in houses on both sides of 6221 Osage Ave. Fronts of 6219 and 6217 Osage Ave. are heavily damaged. |
| 10:40 A.M. | "A" Team sets off the last explosion; it blows out the fronts of 6223 and 6221 Osage Ave. |
| 12:30 P.M. | The use of explosives and tear gas have failed to force the occupants out of 6221 Osage Ave. Insertion teams withdraw from Osage Avenue, regroup in Cobbs Creek Park. |
| 1:30 P.M. | The Managing Director, Fire Commissioner and the commissioners of Licenses and Inspections and Health are escorted into Police Post 1 by the Police Commissioner. They observe the damage to the front of the houses across the street. |
| 3:45 P.M. (approx.) | The Mayor tells a televised press conference that he intends to "seize control of the house . . . by any means necessary." |
| 4:00 P.M. | The Police Commissioner and Managing Director discard as unworkable the idea of using a construction crane to dislodge the bunker. Explosives are discussed. |
| 4:15-4:40 P.M. | A citizens' group, using bullhorns, pleads with those inside 6221 Osage Ave. to surrender. There is no response. |
| 4:30-4:40 P.M. | The Police Commissioner, in the presence of the Managing Director, instructs the head of the Bomb Disposal Unit to assemble an explosive package to be dropped on the roof of the MOVE house from a State Police helicopter in the hope of dislodging the bunker. |
| 4:45 P.M. | The Managing Director advises the Mayor that the citizens' mediation effort was unsuccessful. |
| 5:00 P.M. | The Mayor, in a telephone conversation with the Managing Director, approves the use of explosives on the roof of 6221 Osage Ave. |
| 5:15 P.M. | Stakeout units evacuate their positions surrounding the MOVE house. |
| 5:27 P.M. | The bomb is dropped and the bunker is not dislodged. |
| 5:35 P.M. | Two men and one woman are observed inside the front porch of 6221 Osage Ave. Stakeout units return to their positions. |
| 5:49 P.M. | The head of the Bomb Disposal Unit, in a helicopter, reports seeing flames on the roof. |
| 6:08-6:12 P.M. (approx.) | In a two minute conversation, the Police Commissioner and the Fire Commissioner confer and decide to let the bunker burn. |
| 6:14 P.M. | Police in a post located diagonally across from 6221 Osage Ave. see a man and a woman inside the first floor. |
| 6:20-6:25 P.M. | The bunker falls through the roof into the second floor. |
| 6:32 P.M. | The Fire Department "Squrts" on Pine Street are turned on the fire for the first time. |
| 6:54 P.M. | The first fire alarm is sounded. |
| 7:00-7:35 P.M. | Gunfire reported in the alley behind the MOVE house. |
| 7:30 P.M. | Post 4's sergeant reports on the radio that one female, three children and one male, "firing," had come out the rear of 6221 Osage Ave. |
| 7:35 P.M. | Stakeout officers in the alley take into custody a woman and a child. |
| 9:30 P.M. | Firefighters begin fighting the fire in a conventional manner for the first time. |
| 9:34 P.M. | The sixth alarm is sounded. |
| 11:41 P.M. | The Fire Commissioner declares the fire under control. |

**\*Chronology taken from the MOVE Commission Report**

## Post - MOVE Commission Chronology

| | |
|---|---|
| 1988 | City and federal grand juries exonerate city officials in the handling of the confrontation |
| 1990 | City settles claims of parents of MOVE children killed for $2.5 million. It had already spent $15 million to rebuild the neighborhood. |
| 1991 | City agrees to pay Birdie Africa $1.7 million |
| 1992 | Ramona Africa released after serving a 7-year prison term |
| 2020 | Delbert Africa released after serving a  29-year prison term |

EXHIBIT 4

REVIEW OF SCENE INVESTIGATION

The review of scene investigation is based on the informa-
tion received from the Assistant Medical Examiners during vari-
ous meetings as well as the information received from the members
of the Philadelphia Fire Marshall's Office in the afternoon of Sa-
turday, August 10, 1985.  The remains were recovered in two days,
Tuesday, May 14 and Wednesday, May 15.  The location, day, date
and the time of recovery of each body are recorded on two separate
sheets (Exhibit D).

It was learned that during the initial scene investigation
no representative from the Office of the Medical Examiner was pre-
sent.  The Fire Marshall indicated that requests were made to the
Office of the Medical Examiner at about 10:00 a.m. and 11:00 a.m.
on Tuesday, May 14.  Their response from the Office was to inform
them as soon as the first body is found.

The first body was found at approximately 4:19 p.m.  In fact
two bodies were found at the same time when the crane's loading
bucket was picking up debris.  When it was noted that remains were
among the debris, the crane bucket was lowered and at that point
the Medical Examiner reported to the scene.  In accordance with the
presentation of the Fire Marshall four bags of the remains were re-
covered the first day.  It was learned later on that these four
bags consisted of six remains.  The last body was recovered on the
first day at about 7:32 p.m.  During the first day of scene inves-
tigation Doctor Catherman, the Deputy Chief Medical Examiner, was
present at the scene and conducted the scene removal.

On the second day, May 15, the first body was recovered, in
accordance with the Fire Marshall's note at about 11:36 a.m.  Doc-
tor Segal was supervising the removal of the body on the second day
and his note indicates that the first body was found at approxi-
mately 12:37 p.m.  The last body recovered, while Doctor Segal was
present at the scene, was that of Body I, Rhonda Harris.  This was
at 4:06 p.m.  At that time Doctor Segal left the scene and instruc-
ted the crew at the scene to send the body to the Office of the Me-
dical Examiner if one is found.  Shortly after 5:00 p.m. the last
body, designated as K, was found and was transported to the Office
of the Medical Examiner.

IMPORTANT OBSERVATIONS:

1.  It was a high intensity fire and heat and therefore most
    of the bodies were conflagrated and portions of the bodies
    were consumed by the fire.

2.  The entire structure of the house and debris collapsed on
    top of the bodies which were found in the lowest level of
    the house.  This had caused considerable fractures and dis-
    location of bones as well as crushing of the body parts.

-2-

3.  The recovery of the bodies was not done similar to an
    archeological method of layer by layer uncovering of the
    debris.  One must keep in mind that the scene conditions
    created extremely difficult situation.

4.  The use of a crane with the bucket had caused additional
    post mortem fractures, dismemberment as well as commingling
    of the remains.

5.  There was apparently no definitive understanding on the
    part of the various agencies and departments present at
    the scene as to who was in charge of the recovery of the
    bodies.

6.  At least three agencies numbered the locations and the
    bodies recovered and took photographs, namely the Offices
    of Fire Marshall, Medical Examiner and the Crime Labora-
    tory.  Apparently each agency used a different numbering
    and lettering system which for a while caused some con-
    fusion.

7.  Each human part recovered was not staked with a number or
    identifying mark to be photographed.  Many photographs
    were taken, however, these were not labelled for identi-
    fication by the photographer from the Medical Examiner's
    Office until about a month or two later and then without
    any definitive reference.  He had to solely rely upon his
    memory.

8.  Based on my information, the three agencies had no meet-
    ings together in order to compare and coorelate their
    findings at the scene.

9.  Considering the foregoing the task of identification of
    the remains became extremely difficult not only for the
    staff of the Medical Examiner's Office but also for the
    team of experts retained by the Special Investigation Com-
    mission.

Ali Z. Hameli, M.D., P.A.
Consultant Forensic Pathologist

## EXAMINATION OF THE REMAINS

I have reviewed the autopsy reports prepared by the Assistant Medical Examiners of the City of Philadelphia. All ante mortem x-rays as well as the post mortem x-rays taken by the Philadelphia Medical Examiners Office were reviewed. The remains of Bodies B-1, C, D, F, G, H and K all were carefully examined by myself, multiple x-rays were taken from the bodies, AP and lateral views, as well as the x-rays of any debris present on each tray.

Drs. Kerley and Levine conducted extensive examinations of the skeletal and dental structures and reported important findings in the areas of the identification including age, sex and race determination.

I have carefully examined all the remains, present at the Office of the Medical Examiner, for foreign objects, especially those having a metallic consistency.

I have also examined the exhumed remains of Conrad Hampton and Rhonda Harris as well as the cremated remains of Theresa Brooks, confirmed their identifications, previously made by the Office of the Medical Examiner.

I recovered metallic objects and fragments which were embedded in the bodies of Conrad Hampton (A), Vincent Leaphart (F), Delicia Africa (G), Rhonda Harris (H) and FRANK James Africa (K). In reviewing the cremated remains of Theresa Brooks (B), I found a piece of metallic object.

All recovered metallic objects were submitted to the FBI Laboratory for examination. The metallic projectile found in the body of FRANK James Africa was examined by the New York City Police Crime Laboratory as well as the FBI Laboratory. The results of the laboratory analyses were studied.

Examination of the Remains
Page 2

The available blood and tissue samples from the bodies of Katricia and Zenetta Dotson (B-1 and D), Phil Africa (C), Delicia Africa (G) and Vincent Leaphart (F) were sent to the Connecticut Forensic Laboratory for blood grouping and the results obtained were reviewed.

Based on the findings above and the information obtained from the family members, hospital and dental records, consultation reports available from all forensic scientists who examined these remains, and the investigative data surrounding the circumstances of these deaths, I have reached the following opinion:

1. A total of eleven persons died in the MOVE house; six adults and five children.

2. The identifications of the six bodies, previously established by the Office of the Medical Examiner, are confirmed.

3. The identifications of the five remaining bodies are established.

4. The exact cause of death in each case cannot be definitively established. However, it is my opinion that all eleven persons present in the MOVE house died as a result of "injuries sustained during the event of May 13, 1985". The term of injury is stated in its broadest term. It may include chemical injuries such as those by carbon monoxide poisoning, thermal injuries such as fire, physical injuries such as explosion effects and falling objects and injuries sustained by metallic projectiles such as firearm ammunitions.

5. The manner of death could best be left unclassified until all inquiries are finalized. However, based on

Examination of the Remains
Page 3

the information presently available, it is my considered opinion that:

a.  These deaths were not the result of natural causes.

b.  They were not caused by accidental means.

c.  The deaths of the five children were ~~caused by~~ the consequences of the measured and deliberate acts of, and interactions between, the adults responsible for the MOVE house and the officials of the City of Philadelphia. *Therefore, the classification of Homicide applies.*

d.  The deaths of the six adults were not natural or accidental.  Classification of suicide and homicide are the two remaining choices.  Such determination should be made by inquiring bodies and agencies such as the Philadelphia Special Investigation Commission, Office of the District Attorney, Federal Prosecutor's Office and the Courts of Law.

Ali Z. Hameli, M.D., P.A.
Consultant Forensic Pathologist

## CONDITION OF THE REMAINS

A period of over two months had already elapsed between the time of death and the start of examination by the Commission Forensic Team. I found the remains, at my initial visit to the Office, in the main refrigeration facilities along with the other bodies. At that time a mild to moderate amount of molding was noted in patchy areas of various remains. I would attribute this possibly to variation of the temperature of the refrigerator and other extraneous elements. During the ensuing weeks and months the conditions of the remains became extremely deteriorated. Multi-colored fungal growth covered the entire surfaces of the bodies and their parts. Some portions of the bodies revealed extreme dryness and hardening of the tissue while other parts showed advanced decomposition and fragmentation. In some areas of the body during my examination the fungal growth penetrated into the depth of the tissue extending down to the bony structure. In short the conditions of the bodies which were already autopsied and examined by several forensic experts previously were as such that made my examination and that of my colleagues extremely difficult and time consuming.

Shortly after our examination began, at the request of the Commission, the bodies were moved to another refrigeration facility where appropriate temperature was maintained during the summer. The bodies were kept secured with the combination lock on the door, accessible to myself and Mr. Al Jordan of the Commission.

Ali Z. Hameli, M.D., P.A.

EXHIBIT 5



**CITY OF PHILADELPHIA**

Municipal Services Building, Philadelphia, Pa. 19102

JAMES STANLEY WHITE
Commissioner

HENRY G. HERLING
Deputy Commissioner

RAYMOND M. TATE
Deputy Commissioner

May 23, 1985

Louise James

Philadelphia, Penna.  19104

Re:  6221 Osage Avenue

Dear Ms. James:

The Department of Licenses and Inspections has determined that your property at 6221 Osage Avenue is imminently dangerous within the meaning of Chapter 4-110.1.3 of the Philadelphia Building Code.

You are hereby notified that the Department of Licenses and Inspections will demolish the remaining portions of your property.

A lien will be placed against your property for the costs of demolition.

Sincerely,

JAMES STANLEY WHITE
Commissioner

JSW:j

EXHIBIT 6

REPORT ON MOVE REMAINS, 14 NOVEMBER, 1985

This report is an expansion on the anthropological report
submitted by the Move Commission Pathology Group (referred to
hereafter as the pathology group) and specifically concerns the
examination of the bodies identified as Bl and G.  My associate,
Janet Monge, and I examined the preserved portions of these bodies on
Thursday, 14 November, 1985.


Body Bl

Our findings on this body differ dramatically from those
presented in the pathology group report, vis:

1)  The triradial plate is fully and completely closed.  The
pathology group report described it as "in the process of fusing".
What seems to have led to this disagreement is that the Move
Commission pathology group incorrectly identified as an open, still
growing area, a (probable) post-mortem fracture of the innominate
bone which runs across the general area of the triradial line,
between ilium and pubis/ischium.  A minor bit of cleaning removed
small bits of soft tissue and showed unmistakenly the extent and
range of this crack in the bone, and demonstrated the lack of any of
the features associated with the triradial growth plate.  Indeed it
is not even precisely located over the portion of the innominate bone
 where fusion had occurred earlier, but just off this line in an area
of the pelvis which is thin and likely to break under pressure.

-2-

Probably related to this crack is another bit of damage, this involving the ischial/pubic ramus, which was shattered in a direction which suggests that both breaks occurred when a marked bending force was applied to the bone.

2) The Move pathology group describes only .7 mm of fusion of the iliac crest at its anterior end. We agree there is fusion but much more than .7mm, probably closer to 7 - 8 mm. However, as the rest of the crest has been lost, there is really no way to ascertain whether or not additional small portions of the crest were partially fused and lost during the events surrounding the destruction of much of the rest of the body. It should be emphasized, however, that the crest had begun to fuse--enough of the crest remains attached to the blade to absolutely document this.

3) We agree with the observation noted in the pathology group report that both greater and lesser trochanter are present, but our observations lead us to conclude that both are virtually completely fused.

4) Not noted at all in the pathology group report is the partial presence of the ischial tuberosity. Although it has been broken, the inferior 1/2 of the tuberosity is present and is virtually totally fused to the ischium.

If we eliminate the observation made in the pathology group report of an open triradial plate as being the result of a mistaken identification, there remains not a single feature that could be used to base an estimated age at death of 13-15, the pathology group's

-3-

conclusion.  To the contrary, all of these features argue strongly for an age at death of about 19 with a plus and minus range of 1 year: 18-20 years of age.  This is the original age for this body as reported by the M.E.  It should also be noted that this changes the often cited and well publicized mature/immature count provided by the pathology group from their six adults/ five children, to the seven/four originally given by the M.E. office, and now shown to be the correct distribution.

In May, during our preliminary examination, we had identified this individual as a female.  The pathology group agrees with this identification.

The mandible, "E-1", of a dental age 13-15 placed with this body by the pathology group, can not reasonably be placed with these older in age postcranial materials, and it has been removed.

BODY G

As described in the original preliminary report of the Medical Examiner's office, and confirmed by the Move pathology group report, body G is a badly burned and only partially  preserved juvenile female,

The pathology group has assessed the age at death of this individual as 9-12 on the basis of partial fusion of one of the two

-4-

preserved ischio-pubic rami, the open spinous processes of the C1 C2 and L5, and the process of fusion of the coracoid process of the scapula. The pathology group report describes the long bones as "small in size".

In addition to the examination of the skeletal bones which were described by the pathology group report, we also focussed on the skull bones. The occipital bone is complete and here we found that the basilar portion of this bone was in the process of fusion to the lateral processes: a surgical blade easily slips in between the two sections. Fusion of basilar portion to lateral process of the occipital occurs at about 6 to 7 years of age.

Contrary to the pathology group report, the ischio-pubic ramus is unfused bilaterally. Indeed the soft cartilage of the growth plate is present and clearly visible on the edges of the rami. Fusion of ischial and pubic rami occurs between the ages of 7 and 8.

The coracoid process of the scapula is presnet but its state of fusion is unclear. A significant growth plate and gap is present but the process nevertheless appears to be in the process of fusion. Given the size of the gap containing cartilage, it is unclear if this is true fusion or possibly an effect of heat. If this is fusion it would be occurring at about 15 years, and thus is well out of sequence with the other developmental events outlined above, and is indeed several years older than the pathology group suggested range.

The post-cranial and cranial evidence indicates a child of 6 or

7.  The fusion sequence of the vertebrae were not analyzed in detail, but preliminary examination does not seem to justify an age designation of 9-12.

Both the preliminary Medical Examiner's report and the pathology group report associated with this individual a fragment of the right mandible, containing an erupted molar and immediately behind, an unerupted molar in its crypt.  At the present time, it is unclear whether the erupted tooth is a second molar, as identified by the pathology group (eruption time 11-13 years, or a first molar (eruption time 5-7 years).  The morphology of the tooth itself is much more in keeping with a first molar.  In order to help resolve this identification problem, we removed the unerupted molar from its crypt.  Unfortunately, the crown was partially damaged by fire and the total remaining morphological pattern is not clear enough to warrent absolute identification.  If the teeth represent an erupted second and developing third molar, as suggested by the pathology group report, then considering the evidence of the post-cranial remains as those of a 6 to 7 year old, it would appear more likely that this jaw fragment belongs to another of the immature remains (perhaps D).

The bulk of the skeletal evidence of the G individual clearly points to an age at death of about 6-7 years.  There is virtually no skeletal evidence to support the age designation of 9-12, as offered by the pathology group.    It remains to be determined whether or not the mandibular fragment previously associated with this individual truly belongs here or with another.

-6-

Finally, in our examination we noted the presence of a marked bone pathology on the neck of the mandibular condyle, of apparent long duration as it had resulted in the development of a marked pit on the bone's surface.  This pathology of the TMJ may be associated with a chronic untreated ear infection of the sort that is today routinely treated with antibiotics.  This pathology is not common in a population with access to medical care, but given MOVE philosophy would not be unusual in a young child under their care.

Alan Mann, Ph.D.

15 November, 1985

EXHIBIT 7

## UNIVERSITY of PENNSYLVANIA
### PHILADELPHIA 19104

**School of Arts & Sciences**

DEPARTMENT OF ANTHROPOLOGY
University Museum
33rd and Spruce Streets F1

20 May, 1985

Dr. Robert Segal
Office of the Medical Examiner
321 University Avenue
Phila., PA   19104

Professional Services in Forensic Anthropology:

    1½ days @ $200.00 perdiem...........$300.00
     (5/16 - 5/17)

Alan Mann
Department of Anthropology
University of Pennsylvania
Phila., PA  19104

EXHIBIT 8

<u>IDENTIFICATION OF THE REMAINS</u>

I have confirmed, Drs. Kerley and Levine concurring,
the identifications of the six bodies identified by the Office
of the Medical Examiner as follows:

BODY A
James Conrad Hampton
Fingerprints detached L hand
Comparison of Lumbar Spine
Discoloration, Upper Incisors
X-ray of bones        30-45
Teeth                 35-50

BODY B
Theresa Brooks
Fingerprints detached hands
Dental Bite Wing Comparison
Postmortem FX LT Clavicle
History of FX LT Clavicle
X-ray of Bones        18-30
Teeth                 18-25

BODY E
Raymond Foster
Fingerprints Detached L Hand
Postmortem Appendectomy Scar
History of Appendectomy

BODY H
Temasa Africa
Bone Age              7-9
Teeth Age             8-9
Visual Identification, Police

BODY I
Rhonda Harris
Fingerprints Hands
Dental Chart
Dental X-ray
Teeth Age             25-30
X-Ray of Bones        25-35

BODY K
Frank James Africa
Fingerprints Hands
Chipped Upper Incisor
Missing Lower Incisor
Family Information
Bone Age              25-35
Teeth Age             25-30
Stature       71"± 3"

*Ali Z. Hameli*
Ali Z. Hameli, M.D., P.A.
Consultant Forensic
Pathologist

## IDENTIFICATION OF THE REMAINS

    I have determined, Drs. Kerley and Levine concurring, the identifications of the five unidentified remains as follows:

       BODY B-1
Katricia Dotson
Bone Female     13-15
Teeth          13-16
Pubic Hair
Postmortem Blood Group O
Mother's Blood Group O

       BODY D
Zenetta Dotson
X-Ray Female    11-14
Teeth         12±
White Shirt, Red Trim
Postmortem Blood O
Antemortem Blood O
Mother's Blood  O

       BODY G
Delicia Africa
Bones  Female    9-12
Teeth Age      12-13
Postmortem Blood A

       BODY C
Phil Africa
Bone  Male      10-12
Teeth          10
Paddle-Shaped Clavicles
Antemortem X-Ray Comparison
Postmortem Blood A

       BODY F
Vincent Leaphart
Male  Age      50±5
Stature       68¼"
Fracture L Big Toe
Antemortem Blood O
Postmortem Blood O
Enhanced X-Ray Comparison

                         *Ali Z. Hameli M.D.*

                    Ali Z. Hameli, M.D., P.A.
                    Consultant Forensic Pathologist

EXHIBIT 9

## FINAL REPORT ON THE MOVE INVESTIGATION

Robert J. Segal M. D.
Assistant Medical Examiner

RJS - 3

## FINAL REPORT ON THE MOVE INVESTIGATION

3/18/86

THE REPORT IS DIVIDED INTO 6 SECTIONS:

1. CHRONOLOGY
2. IDENTIFICATION
3. CAUSE OF DEATH
4. MANNER OF DEATH
5. CONCLUSIONS AND OPINIONS
6. COMMENTS

## I.  CHRONOLOGY

On May 13, 1985 a confrontation between the "MOVE" Organization and the City of Philadelphia occurred at 6221 Osage Avenue.

On the morning of May 14, the Medical Examiner was requested to come to the scene in preparation for recovering any of the victims that were present in the house. Dr. Aronson declined and gave instructions to contact us when the first body was found. Dr. Catherman was the duty pathologist and was called at about 3:50 P.M. He proceeded to the scene with Investigator Suplee and the duty photographer and personally supervised and conducted the recovery of the remains which he designated with the letters "A", "B", "C", "D" and "E". These remains were extensively burned, damaged, destroyed and comingled at the scene in such a way that their recovery and separation, although done as carefully as possible, was done with the full knowledge that there would be some mixing of the parts. The comingling was due to the collapse of the building and the heavy machinery used in the discovery-recovery process.

On May 15, Dr. Catherman prior to going back to the recovery site was informed of the death of his mother and was no longer able to continue with the examination and identification of the bodies. In the latter portion of the morning Dr. Aronson asked Dr. Fillinger and me to take over the examination of the remains recovered by Dr. Catherman. At approximately noon, the Medical Examiner's Office was informed that an additional body had been discovered at the MOVE site and asked OME personnel to come to the scene. Dr. Aronson declined and instructed that the remains be brought to the morgue. After further discussion, it

was decided that I would go to the MOVE site with a medical investigator and photographer to supervise the recovery operations. I arrived at the MOVE site in the early afternoon and found that a body had been recovered from the front of the house by a construction "crane" and had been deposited on the street. At that point the body had been recognized for what it was and the procedures stopped. The remains were photographed, the debris cleared away, the body isolated and labeled with the letter "F" and transported to the morgue by morgue personnel. Careful examination of the debris removed with the body failed to locate any additional human parts. Careful examination of the site where the "crane" removed the body was conducted and no human parts were found. I then went to the area where Dr. Catherman had recovered the remains labeled "A through E" because fire personnel had discovered another body. With the help of the police and fire personnel, bodies "G", "H" and "I" were recovered from this location. They were reasonably intact with no evidence of significant co-mingling. Found among them were the remains of some dogs, blankets and clothing. The bodies were photographed during their recovery and transported to the Medical Examiner's Office by Medical Examiner's personnel. After this I returned to the office. Later in the day body "K" was found and transported to the office without Medical Examiner's personnel participating in it's recovery. On the afternoon of May 15, Dr. Stuart Shapiro came to the Medical Examiner's Office and relieved Dr. Aronson of his responsibilities in the MOVE investigation. He placed me in charge of the investigation. He, along with Philadelphia Inquirer reporter Donald Drake spent many hours over the next days and weeks overseeing, supervising and questioning the entire operation. This was done despite my strong objections.

On May 16, Dr. Alan Mann and his assistant Janet Monge from the University of Pennsylvania Anthropolgy Department, Dr. Haskell Askin consultant forensic odontologist and Special Agent Ron Hurt and his team from the FBI began their examinations of the remains. Meanwhile, Investigator Suplee contacted various agencies to obtain fingerprint records of known MOVE members and started compiling a list of known MOVE members and sympathizers. The list totaled approximately 90 individuals. Preliminary interviews conducted by police with Birdie Africa aka Michael Ward resulted in the compiling of a list of 10 missing individuals, five children and five adults.

By the end of the week, the FBI had come up with positive fingerprints on five adults. In two of the cases the hands were attached to the remains and in the other three the hands and/or fingers were separate. Through additional factors such as age, dentition, etc. these five were positively identified.

From this point the investigation continued in two directions.

A.    The bodies were examined and described in detail. Postmortem x-rays, additional dental work, blood type determinations, further anthropologic examinations, autopsy examinations and toxicology studies were undertaken. This included the examination of the remains labeled "B-1" and "F" by Stephanie DaMadio of the Smithsonian Institution. Postmortem x-rays were examined by Dr. Spencer Borden and his staff at The Childrens Hospital of Philadelphia and toxicology material was provided to Dr. Jane Speaker of our office, Dr. Fred Rieders of National Medical Services Inc. and Dr. Asakura of the Childrens Hospital.

B.    Investigator Suplee and his co-workers undertook a nationwide search for any information which could be used to confirm suspected and tentative identifications.

By the end of July the five adults "A", "B", "E", "I" and "K" had been positively identified as had the child labeled "H". Body "F" was strongly suspected to be that of John Africa and body "C" was suspected of being that of Phil. Body "G" was thought to be a young female about 6 or 7 years old; body "D" a 12 to 14 year old girl and body "B-1" a 19 to 23 year old female.

Preliminary toxicology indicated the presence of carbon monoxide in some of the remains but not all of them. Three of the bodies showed either gross or microscopic evidence of soot in the airway and none showed evidence of any injuries independent of fire and smoke or natural disease processes that would have caused death. I therefore concluded that the 11 individuals had died as a result of the fire and that the manner of death in all cases was accidental.

On or about July 19, 1985 Dr. Ali Hameli was retained by the Philadelphia Special Investigation Commission. He along with Drs. Ellis Kerley and Lowell Levine were instructed to conduct a independent investigation for the purpose of establishing the

identification of the MOVE victims and the cause and manner of their deaths. On direct orders from the Mayor, on penalty of being fired, the Medical Examiner's Office was instructed to give the consultants our full cooperation. Approximately a week prior to Dr. Hameli's appointment copies of all photographs, x-rays and written documents were submitted to the MOVE Commission. Shortly following the beginning of Dr. Hameli's investigation the remains of the MOVE victims were placed in a locked refrigerator effectively ending any further work by the medical examiner's staff. The remains stayed under the absolute control of the MOVE Commission's experts until after Dr. Hameli's public testimony before the Commission on November 5, 1985.

The Medical Examiner's Office investigation resumed following Dr. Hameli's testimony. Dr. Hameli was kind enough to meet with us, turning over copies of his reports, key photographs and x-rays and provided explanations for some of his conclusions. Subsequently, the Medical Examiner's Office has attempted to verify Dr. Hameli's findings and develop additional evidence on it's own.

On March 14, 1986 the Acting Health Commissioner related to the Medical Examiner's Office staff the Mayor's desire to put an end to this tragic event and to move forward. She indicated quite clearly that there was a desire to have no further debate on this subject, either in public or in private.

## II.  IDENTIFICATION

The identification of "Unknown Human Remains" is a day in and day out procedure in any busy Medical Examiner's Office. Many varied tools and techniques are available, some more sophisticated than others. The usual techniques for establishing positive identification includes (1) Visual identification by a close friend or relative. (2) Matching fingerprints of the "unknown" to a previously obtained set of fingerprints on file with some organization or agency. (3) Dental comparison of postmortem examination findings to antemortem dental records (4) Comparison of postmortem x-rays to antemortem x-rays using either a single extraordinarily unique feature common to both or a large number of identical although common features seen in both. Obviously a unique feature in one that is missing from the other would be absolutely exclusory. (5) Unique external marks, scars and

tattoos such as social security numbers or military i.d. numbers can positively establish an identification. (6) Blood grouping patterns in the ABO and sub-group systems are useful in providing supportive evidence for an identification. (7) Age, race, sex, height, weight, etc. are features that are used to begin an identification process and obviously if wrong would be exclusory. (8) From a practical standpoint, identification may be established by the "manifest" method. An example of this is: a husband and wife are known to be flying in their airplane when it crashes. The remains are recovered and are found to be a man and a woman. It is reasonable to establish the identification based on these findings alone. However, it must be realized that to establish positive identification to a reasonable degree of medical and scientific certainty, one must utilize the techniques listed in numbers 1 - 5.

The temptation to over-state or over-reach when trying to establish an identification was pointed out by Drs. Kerley, Levine and Maples in their review of the United States Military identification of the 13 individuals recently returned from a aircrash site near Pakse, Laos. The Army Central Identification Laboratory in Honolulu, Hawaii examined the remains of the 13 service men known to be on a plane when it crashed and established identification in all 13 cases. Dr. Kerley wrote "We came to the following conclusions: a. We did not find that any of the bodies in question had been misidentified. There were no out-right errors or inconsistencies that would exclude the identifications. b. We were not able to make many of the identifications in these cases that had been made using the standard methods with which we were familiar. Only two of the cases from Paske, Laos could be identified by us with confidence. c. Some of the points of comparison were based on presumptive findings in badly fragmented incomplete cases. These included the determination of sex and race based on the knowledge of the occupants of the airplane rather than evidence from the skeletons itself. e. We found that some determinations of age or stature were too specific for the material available and could not be used with reliability to distinguish between other bodies close to the same ages or stature. f. Some of the dental identifications while not in error, were not as positive as the reports implied. A few of the single teeth could have been from more than one individual with which they were identified". Dr. Kerley further writes the following recommendations: "1. Only cases in which direct fingerprint, serologic profile or radiographic comparisons between actual x-rays of the remains and antemortem clinical

x-rays should be referred to as "positive" identifications in any of the case reports. Identifications should be as accurate and solidly based as possible, as they should stand up to any scrutiny."

## IDENTIFICATION OF MOVE BODIES

Body "A" - James Conrad Hampton was identified by fingerprints, x-ray comparisons of antemortem and postmortem pelvic films and the presence of discolorations of the upper central incisor which were known and reported to this office. Dr. Hameli in his report uses the same features and standards for identification and concurs.

Body "B" is that of Theresa Brooks who was identified by fingerprints and comparison of antemortem and postmortem dental x-rays by both Dr. Haskell Askin and Dr. Lowell Levine. A history of a fractured clavicle was obtained. Dr. Hameli examined the postmortem x-rays and diagnosed an old healed fracture of the left clavicle. I examined x-rays and did not feel that there was sufficient evidence to make this diagnosis. Subsequently, antemortem films taken of the fracture were obtained and show that the fracture is located at the distal end of the clavicle while the area in question on the postmortem films is in the mid-portion of the clavicle. This evidence is therefore of no value in establishing or supporting the identification.

Body "E" is that of Raymond Foster and was identified by use of fingerprints and the presence of an appendectomy scar consistent with a known history of having had his appendix removed in the past. Dr. Hameli in his report uses the same features and standards for identification and concurs.

Body "H" is that of Temasa Africa aka Boo and was identified through visual examination of postmortem polaroid films by City of Philadelphia Police who knew him from their surveillance work. Examination of this child indicated some caucasion features. Dr. Hameli uses the same evidence and concurs.

Body "I" was identified as that of Rhonda Harris through fingerprint identification of attached hands and through comparison of antemortem and postmortem dental examinations. Dr. Hameli uses the same evidence and concurs.

Body "K" is that of Frank James Africa and is identified by fingerprints on an attached hand as well as some consistent dental information. Dr. Hameli uses the same evidence and concurs.

Body "F" is identified as that of John Africa aka Vincent Leaphart. Identification is established through the following features: the height and weight of the remains are consistent with those of John Africa. Blood type of the deceased is "O" as determined independently by the Medical Examiner's consultant and Dr. Hamelis' expert. Vincent Leaphart's military records show his blood type to be "O". Antemortem chest x-rays were compared to postmortem chest x-rays by Dr. Fitzpatrick, a forensic radiologist from Chicago who concluded that the films allowed establishment of positive identification.* Dr. Hameli obtained a history of an injury to one of the great toes of Vincent Leaphart when he was a child. He took postmortem x-rays of the toes and diagnosed an old fracture of the left great toe. Examination of these films by me and others indicated that the area diagnosed as a fracture was in fact a soft tissue fold. Additional postmortem x-rays taken after some of the soft tissues had been removed clearly indicates that there is no fracture present.

Body "C" is identified as that of Phil Africa. By history, Phil is known to be a 10 year old boy who was somewhat smaller than his chronologic age. The remains of body "C" anthropologically are 10 to 12 years old with a dental age of 10 to 11. Dr. Kerley during his examination of the remains discovered an unusual configuration of the clavicles which when compared to films taken in Virginia 5 years earlier revealed an excellent match and so established positive identification. I concur with these observations and conclusions. Dr. Hameli did postmortem blood typing and found that the blood type was "A". Since no antemortem blood typing is available this information is of no value.

*Early in July, Dr. Claus Speth called me and suggested that I send the military x-rays to a friend of his for x-ray enhancement and identification. I told him that I would do it if no better methods for identification were forthcoming.

Bodies "G", "D" and "B-1 have no unique identifying characteristics. Delicia Africa and Zenetta Dotson are both chronologically 13 year olds and Katricia Dotson is chronologically 14-1/2 years old. Delicia was known to be small for her age and Katricia was about 5 feet tall, 110 to 120 pounds. None had been hospitalized or received any dental treatment. All three had been examined in Virginia on February 8, 1980 and had had extensive x-rays and general examinations. A review of this material revealed that Delicia had a bone age of 5 years to 5 years 9 months, Zanetta had a bone age of 6 years and Katricia had a bone age of 7 years 10 months in 1980. This represented a delayed maturation of between 2 and 2-1/2 years each. Each showed prominent growth arrest lines. None had any features that could be considered unique for the purpose of establishing identification.

Body "D" - There is general agreement that this individual is a girl with a bone age between 11 and 14 years. Dr. Hameli's consultant determined the postmortem blood group to be blood type "O".

Body "G" - Anthropologic examination of the bony tissues indicates a skeletal age by Dr. Mann and Ms. Monge of 6 to 7 years, by Dr. Kerley of 9 to 12 years, by three anthropoligists at the Smithsonian Institute of 10 years plus or minus, by Dr. Clyde Snow of 10 years plus or minus 2 and by another anthropologist of 7 to 10 years. Postmortem x-rays read by Dr. Borden at Childrens' Hospital indicate an age of approximately 10 years old. Examination of a portion of mandible found with the body is interpreted by Dr. Mann as that of a 6 to 7 year old, by radiologists at the University of Pennsylvania Dental School as that of an 11 to 12 year old, by Dr. Haskell Askin as that of an 11 or 12 year old and by Dr. Lowell Levine as that of a 12 year old plus or minus. As this portion of mandible was actually found in the chest cavity of body "G" it is likely that it belongs with it. Postmortem x-ray fluorescent analysis of bone from body "G" and this portion of mandible show a spectral comparison which cancels out to 0 when subtracted indicating an extremely high probability that they are from the same individual. Dr. Hameli's consultant determined the blood type to be "A".

"B-1" - The remains of "B-1" are the most difficult to evaluate as it only consists of half a femur and half a pelvis. Initially Dr. Mann and Ms. DaMadio determined the age to be between 19 and 23. Dr. Kerley's initial examination indicated an age of 13 to 15. Subesquent re-evaluation by Dr. Kerley indicates an age of 15 to 17 with extremes of 14 to 18. Three forensic anthropologists at the Smithsonian Institute now feel that the bone age is between 16 to 18 with 15 being a possibility. Dr. Clyde Snow places the age at 16 plus or minus 2 years. Dr. Judy Suchey places the age at 12 to 16 years and one additional consultant for the Medical Examiner's Office places the age at 16 to 20. Both the Medical Examiner's consultant and Dr. Hameli's consultant determined the blood type to be "O".

Two portions of mandible were received as part of the specimen labeled "E".

    (1)   One portion is designated as "E" and has 4 teeth in it. It was originally determined by Dr. Askin to be that of a 13 to 14 year old. Examination of this specimen by Dr. Levine indicates it to be a 13 to 16 year old. Dr. Mann's examination indicated this to be a 13 to 15 year old.

    (2)   The second portion of mandible was labeled "E miscellaneous" and physically looked to be about the same size as the portion of mandible labeled "G". This specimen was thought to be from a 6 to 7 year old by Dr. Mann. Dr. Askin felt unsure of himself with this specimen and said that it was either from a 7 year old or an 11 to 12 year old. Dr. Levine placed the age at 12 or 13 years old.

    It is probable that the "E miscellaneous" belongs with Body "G". There is no scientific basis to decide whether the mandibular segment labeled "E" belongs with Body "B-1" or "D".

A single maxillary bicuspid was recovered and estimated to be from a 12 year old - plus or minus - by both Drs. Askin and Levine. There is no scientific basis to decide whether it belongs with "B-1", "D" or "G" as all 3 are missing their maxillary teeth and all 3 are in approximately the same age range.

From this information it is clear that "positive" identification of these 3 bodies cannot be established as there are <u>no unique</u> identifying features.

Body "D" is that of an 11 - 14 year old girl with a blood type of "O". Zenetta Dotson is a 13 year old girl with a blood type of "O".

Body "G" is that of an 8 - 12 year old girl with a blood type of "A". Delicia Africa is known to be a relatively small 13 year old with an unknown blood type. Making allowances for some growth arrest due to dietary factors Delicia is consistent with body "G".

Body "B-1" is the most difficult as there is so little material to work with. Age estimates range from 12 to 23 years old with the median being about 15 - 18 years. Katricia Dotson was known to be 14-1/2 years old. Five years ago she had a 2 year delay in her bone age. Assuming "G" is Delicia she was 2-1/2 years behind in bone age 5 years ago and is still about 2 years behind. It is known that Birdie Africa was 2 years behind 5 years ago and is still behind now. It is not reasonable, logical or consistent to postulate that Katricia would make up the 2 year delay seen in 1980 and add 1 or 2 years on top of it. In my opinion there is no <u>scientific</u> evidence to support the identification of "B-1" as Katricia Dotson. However, if one were to use the "manifest" method of identification and assume that Katricia Dotson was the only choice left, then this body would have to be hers. However there is no guarantee that there were no other people in the house at the time of the fire and there is evidence that Katricia left the house at the same time as Ramona and Birdie and was seen running up the street away from the house. It is possible that she collapsed and was buried under some of the rubble in the alley a distance from the 6221 Osage Avenue site. It is also possible that she ran into one of the houses up the street and died there. Neither of these areas were searched to recover human remains.

## III.  CAUSE OF DEATH:

The determination of the cause of death of an individual found in a fire is a routine procedure in our Medical Examiner's Office. The first question that must be answered is whether the individual was alive or dead at the time of the fire. Evidence that the person was alive during the fire includes the presence of soot in the airway, the presence of products of combustion such as carbon monoxide and cyanide in the body and the presence of vital reaction in the form of blister formation and marginal erythema at the junction of the burned and normal skin. If the person was dead before the fire then a natural or unnatural cause for the death must be sought. If the person died after the fire but from an unrelated cause then that cause must be determined. If the person died because of the fire then the reason the individual was not able to escape the fire should be sought.

It is known that many individuals die as fire victims with low or no levels of carbon monoxide in their blood. Dr. Canfield, et al presented "Case Study of Factors Affecting Lethal Levels of Carboxyhemoglobin" at the American Academy of Forensic Sciences meeting in New Orleans in February of this year. His group studied 1880 cases of deaths both from fires and other carbon monoxide producing sources and determined that 42% of those people dying in fires had levels of carboxyhemoglobin below 60% which is generally excepted as the lethal level. Two victims of arson fires had levels of 20 and 40% and one individual who died in an automobile fire and had only 30%. 424 people were found dead after being overcome by automobile exhaust fumes and 20% had a carboxyhemoglobin level below 60%. In his presentation Dr. Canfield stated that "fire studies have shown that death can occur within 2 minutes of exposure to temperatures at or in excess of $100^{\circ}$ C. These temperatures can be reached in fire within a few minutes after fire propagation. Therefore death could occur from elevated temperatures before lethal levels of carboxyhemoglobin could be reached. Knowing that oxygen levels in a fire often drop below 1% concentration even in rooms some distance from the fire origin, it is clear that a lack of sufficient oxygen could be the cause of death or a contributing factor. Levels of oxygen below 6% can result in heart arrest within 6 to 8 minutes. Sudden oxygen depletion which can occur within a few minutes (2) of fire propagation could result in the death of a victim before lethal levels of carboxyhemoglobin could be reached."

## CAUSE OF DEATH ANALYSIS:

Case "A" - James Conrad Hampton was found in the back of the basement with 8 of the other victims. The postmortem examination revealed the presence of carbon monoxide by all 3 examiners ranging from a low of 12% to a high of 42%. No evidence of potentially fatal natural disease was found. No gunshot wounds were identified. Three small metallic foreign objects were recovered from the neck muscles by Dr. Hameli and determined by the F.B.I. not to be fire arm material. Numerous bony fractures were found. It could not be determined whether these were antemortem or postmortem but could have occurred when the building collapsed or during recovery procedures. Since none of the individuals in this house were smokers the carbon monoxide levels found must be attributed to the inhalation of smoke during the fire. The cause of death, to a reasonable degree of medical certainty, is a direct result of the fire.

Case "B" - Theresa Brooks was found in the back of the building. Carbon monoxide levels ranged from 8 to 24% and were positive by all 3 laboratories. Autopsy examination was negative for potentially lethal natural disease or gunshot wounds. Dr. Hameli recovered a metal foreign body from the cremated remains. The F.B.I. reported that this was not fire arm material. Multiple bony injuries were identified but it was not possible to determine whether these were antemortem or postmortem. The cause of death, to a reasonable degree of medical certainty, is a direct result of the fire.

Case "C" - Phil Africa was one of the nine people found in the back of the building. Carbon monoxide levels were reported at 6%, 12% and 28% by the 3 laboratories. The autopsy examination revealed a trace of soot in the airway. There were many bony fractures identified at the autopsy but it was not possible to determine whether these were antemortem or postmortem. No natural disease or gunshot wounds were identified. The cause of death, to a reasonable degree of medical certainty, is a direct result of the fire.

Case "D" - Case "D" (?Zanetta Dotson) is that of a young girl who was found with the others at the back of the basement. No blood was available for carbon monoxide testing by either Dr. Asakura or Dr. Rieders and our laboratory found no carbon monoxide in the tissues. The autopsy revealed multiple bony fractures but it was not possible to determine whether they were antemortem or postmortem. No natural disease or gunshot wounds were found. There is insufficient scientific evidence to establish a cause of death in this case.

Case "E" - Raymond Foster was found in the back of the basement along with the others. Chemical testing for carbon monoxide was positive by all 3 examiners and ranged from a low of 12% to a high of 33%. The autopsy demonstrated multiple bony fractures but it was not possible to determine if they were antemortem or postmortem. No natural diseases or lethal gunshot wounds were identified. It is my opinion, to a reasonable degree of medical certainty, that the cause of death was a direct result of the fire.

Case "F" - John Africa was found in the basement at the front of the house. The remains were headless and there were multiple bony fractures but it was not possible to determine whether they were antemortem or postmortem. No carbon monoxide was found by 2 laboratories and 1 laboratory found a level of 15%. There was a trace of cyanide present. The autopsy examination failed to demonstrate any lethal gunshot wounds or potentially lethal natural diseases. A metallic foreign body was recovered by Dr. Hameli from the left gluteal region which the F.B.I. reports is consistent with OO Buck. He also recovered a metallic pellet the size of #6 shot from the left chest wall but the F.B.I. determined that the metalergy was wrong for #6 shot. The cause of death in this case can not be determined with reasonable medical certainty.

Case "G" - Case "G" (?Delicia Africa) is that of a young female who was found with the group in the back of the basement. Multiple bony fractures were identified but it was not possible to determine whether they were antemortem or postmortem. Chemical testing by 2 laboratories indicated levels of carbon monoxide below 5% and one demonstrated a level of 13%. The autopsy failed to demonstrate any lethal gunshot wounds or natural diseases. Metallic foreign bodies were recovered from the muscles about one elbow. The F.B.I. reports one specimen was not fire arm material and the other is the size of #8 shot

but has metallurgy of OO Buck. Microscopic examination of the lungs demonstrated some soot in the airway. The perponderance of the evidence indicates that the cause of death was due to the fire and its effects.

Case "H" - Temasa Africa was found with the group in the back of the basement. Postmortem examination demonstrated some bony injury but it was not possible to determine whether they were antemortem or postmortem. Chemical testing by 2 laboratories was negative for carbon monoxide and one laboratory demonstrated a level of 62%. The autopsy examination of the reasonably complete and intact body failed to demonstrate any natural diseases or gunshot wounds. The perponderance of the evidence indicates that the death resulted from the fire and its effects.

Case "I" - Rhonda Harris was found with the group in the back of the basement. Chemical testing by the Medical Examiner's laboratory was negative for carbon monoxide. No specimens were given to Dr. Asakura. Portions of the lung were provided to Dr. Rieders who did not find any carbon monoxide. The autopsy examination was strongly positive, both grossly and microscopically, for soot in the airway. Some bony injuries were identified at the autopsy but it was not possible to determine whether they were antemortem or postmortem. No natural disease or lethal gunshot wounds were found. Three portions of metallic foreign bodies were recovered by Dr. Hameli from one ankle. The F.B.I. reported that two of them were too small for shot. All three were metallurgically consistent with OO Buck. The cause of death, to a reasonable degree of medical certainty, is a direct result of the fire.

Case "K" - Frank James was found in a location separate from either case "F" or the large group in the back of the building. Chemical testing was negative for carbon monoxide by two laboratories and the third laboratory reported a level of 17%. Examination of the body revealed some fractured ribs. There was definite marginal erythema present on the skin. There were no natural diseases or gunshot wounds that could be the cause of death. Dr. Hameli found two foreign bodies in the pelvic muscle. One was reported by the F.B.I. as a portion of brick. The other was identified by the New York Police Laboratory to be a pressure valve from a pipe. The perponderance of the evidence indicates that the death resulted from the fire and its related effects.

Case "B-1" - Case "B-1" is that of a teen age female found with the group in the back of the basement. There was insufficient material available to make any reasonable determination of the cause of death.


COMMENT:

1. Dr. Hameli examined ten of the bodies and recovered metallic foreign objects suspected of being fire arm projectiles in six of them. These were submitted to the F.B.I. who found that those recovered from James Conrad Hampton, Theresa Brooks, and Frank James were definitely not from fire arms. Those from John Africa, Delicia Africa and Rhonda Harris showed no markings to identify them as bullets but had the metallurgy of OO Buck. Dr. Hameli was unable to determine if these foreign objects entered the bodies before or after death. Although no great weight can be placed on it, at no time has Michael Ward aka Birdie Africa ever suggested or indicated that any of the people in the MOVE house had been shot, killed or otherwise injured by gun fire prior to his successful escape at 7 P.M. on the night of May 13. It is my opinion to a reasonable degree of medical certainty that none of the people listed above died as a result of injuries caused by the foreign objects recovered by Dr. Hameli. Furthermore I believe that these foreign objects entered the bodies after death, either when the building collapsed or during the process of recovering the remains.

2. It has been stated that some of the victims could have been shot with fully jacketed rifle ammunition which can pass completely through the body without leaving any evidence by X-ray. This is true but these rifle bullets are high speed projectiles and leave large holes in the body as the pass through. These were searched for and none were found.

3. It is interesting to note that 4 of the 5 bodies recovered on May 14th were positive for carbon monoxide (B-1" is excluded as no reasonable specimen was available for testing). None of the bodies recovered the next day had significant levels of carbon monoxide dispite the fact that scot could be seen in the air way of two of them and another showed marginal errhythema.

IV.  <u>MANNER OF DEATH:</u>  The determination of the manner of death in these cases is extremely complex.

1.  ADULTS:

A.  HOMICIDE:  If one were to conclude that the adults deaths resulted from the actions of the police, the fire fighters and/or the city officials then they should be ruled homicides.  If the investigation revealed that they caused the deaths but acted properly given the nature of the situation then the deaths should be ruled justifiable or excusable homicides.  If their actions were found to be grossly negligent then the terms justifiable or excusable would not be applicable.

2.  SUICIDE:  If one were to conclude that the adult's were given sufficient opportunity to surrender and chose instead to die as heros and martyrs then one would conclude that the manner of death was suicide.

3.  ACCIDENT:  If one were to conclude that the police wished to drive the MOVE members from the house by using warnings, threats, gunfire, tear gas, explosives and fire and hoped to do so without loss of life on either side; and, if one were to further conclude that the MOVE members wished to provoke and antagonize the situation as much as possible but had no intention of being killed in the process; and, if one were to conclude that both sides horribly misjudged the other and let the situation get totally out of control; then, it would reasonable to conclude (as I did), that the manner of death was accidental.

2.  <u>CHILDREN:</u>

A.  HOMICIDE:  If one were to conclude that the children were innocent victims of circumstance and were not able to escape because of the actions of the police etc. then the manner of death would be homicide and the city would be responsible for the deaths.  If at any time the children could have escaped and the escape was prevented by the adult MOVE members then the manner of death would be homicide and the MOVE members would be responsible.

2.  ACCIDENTAL - See above under adults.

CONCLUSIONS AND OPINIONS:

1.   Positive identification of James Conrad Hampton, Theresa Brooks, Raymond Foster, Temesa, Rhonda Harris, Frank James, Phil and John Africa has been established to a reasonable degree of medical certainty.

2.   Presumptive identification of Delicia and Zanetta Dotson has been established by age and sex and in the case of Delicia, by blood grouping.

3.   In my opinion "B-1" remains unidentified.

4.   In my opinion, to a reasonable degree of medical and scientific certainty the cause of death of James Conrad Hampton, Theresa Brooks, Phil, Raymond Foster and Rhonda Harris is the fire and its related consequences.

5.   In the case of Temesa, Frank James, and Delicia it is my opinion that the perponderance of the evidence indicates that the cause of death is the result of the fire.

6.   In the cases of "B-1", Zanetta Dotson and John Africa, there is no scientific evidence upon which to base a determination of the cause of death.  Circumstantially, it is more likely than not, that the two girls died as a result of the fire.

7.   In my opinion the manner of death in all cases is accidental although strong arguements can be made for Homicide or Undetermined.


COMMENTS:

The Philadelphia Medical Examiners Office has come under wide ranging criticism for it's handling of these cases.  Some of the criticism has been justified but most has not.

1.   There is no question that the OO buck shot and related foreign materials should have been recovered although they played no roll in any of the deaths.

2.   Drs. Kerley and Levine pointed up discrepancies in the age determination of case "G" which ultimately lead to a presumptive identification of Delicia.  Dr. Kerley identified the unusual clavicles in the case of Phil which confirmed his identification.

3.    Dr. Hameli found a "fractured left great toe" in John
Africa which we "missed".    Our follow-up studies clearly
show that there is no fracture.    Dr. Hameli described a
healed fractured left clavicle in the postmortem x-rays of
Theresa Brooks.    Comparison with antemortem films show that
the area in question is in a different location than the
fracture seen in the hospital films.    Neither of these
errors make any difference in the final analysis.

4.    The Medical Examiners Office did not misidentify any of
the remains.    When Dr. Hameli took over, positive
identifications had been made in six cases and pre-sumptive
identifications in two others.    We were aware that Michael
Ward said the other three were Delicia, Zanetta and
Katricia, but there was no scientific evidence to establish
these identifications; there still isn"t.

Dr. Hameli used the dentition "E" as evidence of the age in
"B-1" when there is no scientific justification for deciding
whether it belongs with "B-1" or "D".    He then used a single
maxillary bicuspid tooth as evidence of the dental age of
"D" when this one tooth could go with "D", "G" or "B-1".
This resulted in a nice neat package which to the uninformed
was very convincing.    He did exactly what Dr. Kerley said
should not be done when he reviewed the work done in Hawaii
by the military in the Paske, Laos matter.    (see pg. 6)

5.    Determination of the cause of death in five of the cases
is clearly established and in three more there is good
evidence to support the conclusion that death resulted from
the fire.    Only in three is there no basis for establishing
cause except for the circumstances surrounding the deaths.
Unfortunately Dr. Hameli concluded that the toxicologic
evidence was of no value and was unable to draw any
conclusion as to the cause of death in any of the cases.
This was done despite the evidence of soot in the airway of
at least two of the victims and no other reasonable cause of
death demonstrated after the initial autopsy and his
re-autopsy.

EXHIBIT 10

| CERTIFICATION OF IDENTIFICATION | CITY OF PHILADELPHIA DEPARTMENT OF PUBLIC HEALTH OFFICE OF THE MEDICAL EXAMINER | CASE NO. 2599-85 |
|---|---|---|

| APPARENT PLACE OF DEATH 6221 OSAGE AVENUE | USUAL RESIDENCE State ✓ | County ✓ |
|---|---|---|

| PHYSICIAN PRONOUNCING DEATH RLC | DATE AND TIME OF PRONOUNCEMENT 5/13/85 | CITY, BOROUGH, TOWNSHIP |
|---|---|---|

| PLACE OF PRONOUNCEMENT 6221 OSAGE AVENUE | STREET ADDRESS 6221 OSAGE AVE. |
|---|---|

| NAME OF DECEDENT (First) KATRICIA | (Middle) JUANETTE | (Last) DOTSON | (Also known as) | VETERAN ☐ Yes ☒ No |
|---|---|---|---|---|

| SEX F | RACE B | DATE OF BIRTH 9-15-70 | AGE 14 | MARITAL STATUS S. | |
|---|---|---|---|---|---|

| CITIZENSHIP USA | OCCUPATION N/A | SOCIAL SECURITY NO. N/A | BIRTHPLACE PHILA., PA. | a. WAR |
|---|---|---|---|---|

| FULL NAME OF SPOUSE N/A | MOTHER'S MAIDEN NAME Consuewella Quintella Dotson | b. SERIAL NO. |
|---|---|---|

| FATHER'S NAME Nathaniel Galloway | RELIGION Muslim. | NEW PLATE ☐ Yes ☐ No |
|---|---|---|

| I.D. WITNESS (if not informant) NAME & ADDRESS | RELATIONSHIP | I.D. WITNESS (if informant) NAME & ADDRESS Nathaniel Galloway 415 Manton St | RELATIONSHIP Father |
|---|---|---|---|
| | TELEPHONE | | TELEPHONE NO. 467-8449. |

**DECEDENT HISTORY (Check all applicable boxes)**

| ☐ Asthma | ☐ Allergy | ☐ Cancer | ☐ Depression | ☐ Diabetes | ☐ Epilepsy | ☐ Heart Disease |
|---|---|---|---|---|---|---|
| ☐ High Blood Pressure | ☐ Injury | ☐ Liver Disease | ☐ Mental Illness | ☐ Rheumatic Fever | ☐ Stroke | ☐ Suicide Attempt |
| ☐ Tuberculosis | ☐ Ulcer | ☐ None | ☒ Unknown | ☐ Other (Specify) | | |

| L.M.D. (Name) | ADDRESS | HOW LONG TREATED | DATE LAST VISIT |
|---|---|---|---|

| PLACE(S) AND DATE(S) OF HOSPITALIZATION(S) AND OPERATION(S) ☒ In Patient ☐ Out Patient | BIRTH at PENNSYLVANIA HOSPITAL. |
|---|---|

USE OF ALCOHOL, DRUGS, TOBACCO AND MEDICATIONS

UNK ———————→

| LIST KIND(S) OF WORK PERFORMED | HAZARDOUS TRADE ☐ Yes ☐ No |
|---|---|

GIVE FACTS RELATIVE TO CIRCUMSTANCES OF DEATH

I am Katricia's father and am exercising my rights to claim her remains. I understand that the MED is awaiting to hear from her mother who is in Muncy.

I accept the identification of my daughter Katricia as established by the Philadelphia Special Investigation Commission.

Hankins
KENNETH

| AUTHORIZED FUNERAL DIRECTOR | PHONE NO. | BODY VIEWED ☐ Yes ☒ No | PLACE OF VIEW ☐ O.M.E. ☐ Scene ☐ Hospital |
|---|---|---|---|
| NAME OF NEXT OF KIN IF NOT I.D. WITNESS | RELATIONSHIP | DATA SUPPLIED BY INFORMANT ☐ Personally ☐ Via Phone ☐ From Records | |

| SIGNATURE OF IDENTIFICATION WITNESS Mr. Nathaniel Galloway SR. | CERTIFIED TO (Investigator's Signature) Eugene Hughes, 2 | DATE/TIME 11-18-85 11:40 AM |
|---|---|---|

55-X-495 (Rev. 9/68)

EXHIBIT 11

This material comes from the holdings of:
TEMPLE UNIVERSITY LIBRARIES/CHARLES LIBRARY
SPECIAL COLLECTIONS RESEARCH CENTER
1900 N. 13th St.
PHILADELPHIA PA 19122
NOTICE: This material may be protected by copyright law (Title 17, U.S. Code).

MOVE-85-1

ANTHROPOLOGICAL REPORT

 

    The burned remains of the bodies of people who died in the MOVE incident in Philadelphia on May 13, 1985 were examined by me in the Philadelphia Medical Examiner's Office with Dr. Ali Hameli and Dr. Lowell Levine in consultation for the MOVE Commission Investigation between July and October of 1985.

    Generally, the bodies were in very bad shape at the time having been burned and cooked to varying degrees, and also pulled apart to some extent during recovery. In addition, they were dried out and rigid in some areas, necrotic and in advanced stages of decomposition in others. Fungus of various colors covered most of them by the end of the summer. It was apparent that the refrigerated room in which they had been kept was not sufficiently cold during the entire period the remains were there.

    The staff of the Medical Examiner's office was generally cooperative and helpful in providing space, equipment and such information as they could. They had their normal routine work to perform, however and were not always available while we were there. It was evident that they did not have much detailed information concerning the MOVE people, who had been in the house prior to the fire. Also, the Medical Examiner's Office is in need of new equipment -- particularly radiographic -- andmore personnel.

    Several of the bodies had been identified prior to my examination. In fact, some had been released and buried or cremated. It was possible to make at least two additional identifications and to make probable identifications of all bodies present based on information available concerning who was in the house and the personal characteristics of each. For instance, three girls were reported to have been there. Listing the age ranges of the children's skeletal remains indicated which skeleton was most likely to belong to each girl. A boy named "Phil" and Vincent Leaphart were identified by direct radiographic comparisons with pre-existing clinical radiographs, as well as complete agreement of age, sex and stature and no excluding inconsistencies.

    There are miscellaneous parts of bodies that could belong to any of several remains. Some of these were consolidated with the appropriate remains. Others could have belonged with one of several bodies and were left as miscellaneous parts. No duplications were found that would indicate the presence of more than eleven individuals.

Ellis R. Kerley, Ph.D, DABFA

EXHIBIT 12

I graduated from Penn in 1988 with a BA in psychology, and then in 2002 with a Ph.D. in biocultural anthropology. My father graduated with a Ph.D. in anatomy from the School of Medicine in 1973.  Although Dr. Monge was not on my dissertation committee, she took time to carefully mentor me by supporting my fledging teaching career when I served as her TA. From 2002 to 2015 I taught as a lecturer in the Anthropology Department, for the Critical Writing Program, and as a co-instructor in Political Science. During the time I was teaching my own classes, I often benefited from Dr. Monge's expertise, shared casually, in passing, or when I was wrestling with how best to engage students.

In January of 2016 I retired from teaching, and have since been working and volunteering in a variety of ways to support local nonprofit organizations. This includes volunteering in the physical anthropology section at the Penn Museum. I am responsible for maintaining records of who makes requests to use physical anthropology section materials for either teaching or research, how they are intended to be used, as well as where and when. This includes every time materials are used in Penn classes or in the classrooms of other institutions, and for presentations given to visitors of the Museum from nearby high schools and occasionally middle schools. I also keep track of the use of physical anthropology materials for museum programming purposes, whether for public programs, fundraising, or other internal programs.

The notion that Dr. Monge has acted unethically by housing unidentified remains from the MOVE bombing is a convenient narrative that was carefully crafted by Paul Wolff Mitchell (PWM), currently the graduate student of Dr. Deb Thomas. PWM was a Penn undergraduate who studied with Dr. Monge, and who over the years has worked with her as an affiliate in the Physical Anthropology section of the museum. The last time Dr. Monge provided mentoring support for PWM was in 2017 when she wrote a letter to a German institute to support his work; at the time she was also instructing him in the use of the 3D laser scanner for creating records of 129 skulls from the Morton collection. I know PWM in his capacity as an affiliate, and had frequent interactions with him until he lost access to the physical anthropology section in May 2019. PWM has continued to use portions of the physical anthropology collections in presentations for museum events, including the Morton collection.  He has also used the collections for teaching purposes. I have no personal relationship with PWM, and know him only in so far as I have recorded his use of the collections as he is required to request access to any physical anthropology materials.

In 2019, Dr. Monge learned that PWM had received the Provost's Graduate Academic Engagement Fellowship from reading the Penn Almanac, by happenstance. PWM did not at any time share with Dr. Monge that he was planning to apply for a fellowship that would support work requiring the use of Penn Museum physical anthropology section collections, nor had she seen or reviewed the proposal he submitted. Although Dr. Monge was the curator-in-charge and keeper of the physical anthropology section, and PWM he had an existing professional relationship with her, he at no point

communicated his plans to her. Dr. Monge found out after he had received the fellowship. Let me repeat that, at no time did PWM request access to the Physical Anthropology materials at the Museum that would be the basis of the work he proposed to do using the support for that fellowship. It is important to be very clear: PWM was and is well aware of the policy of the physical anthropology section that no part of the collection may be used—including teaching collection, casts, Morton collection, and all other items in the physical anthropology collections, and the section's equipment and texts—without explicit and direct permission from Dr. Monge, in writing, and which is communicated as well to myself, as I am the person who keeps the records for what specimens are used, for what, where, and when.

At the time she learned of PWM's receipt of the fellowship, I suggested that Dr. Monge share this lack of compliance with either Provost Pritchett's office or the Chair of the Anthropology department, but she declined because she was, even then, trying not to be an obstacle to a graduate student. Around the same time, on May 13, 2019, the lab's log book for the CT scanner was found to have been vandalized, and several pages torn from it were missing. Because of this and other irregularities with items missing from the physical anthropology lab, Dr. Monge had the locks replaced to Physical Anthropology section storage, and PWM's access to the physical anthropology section was withdrawn.

After Dr. Monge found that PWM had applied for the fellowship without her sign-off as keeper of the Museum's physical anthropology collection, he requested a meeting with herself, the Chair of the NAGPRA (Native American Graves Protection and Repatriation Act) committee and the Museum's coordinator of all NAGPRA processes; the meeting happened on May 22. At this meeting, PWM was to reveal that the fellowship proposal had included a plan to add to the Museum's website, as part of the information on the Morton collection, a page that would have made his analysis of the historical materials associated with the collection public. As this would have violated NAGPRA protocols, and could have exposed the Museum to public censure for doing so, Dr. Monge denied PWM's request to create and publicly post the webpage with the Physical Anthropology section materials. PWM "became violent" in the meeting, after which Dr. Monge and the NAGPRA coordinator went to meet with the Museum Director, Julien Siggers, to talk about PWM's inappropriate behavior, and the issues arising from the fact that the Museum's physical anthropology section curator had not been notified of the fellowship proposal. Dr. Monge subsequently meet with both Julien Siggers and Steve Tinney about the issues arising from PWM's behavior, reporting theft of materials, violent and inappropriate behavior, vandalism, and an unwillingness to adhere to physical section policies.

The fact that a white man with no credentials has placed himself in a position to benefit from a story that is ultimately about Black pain and trauma is a terrible irony of the ongoing scandal. To add insult to injury is that this position results in discrediting a scholar with deep expertise and an unimpeachable rich record, who also happens to be a woman and non-tenure track faculty.

I have never met someone who is as devoted to being a good and effective teacher as Dr. Monge, whether the audience is Penn undergrads, middle school students, a group of local dentists, or a roomful of well-sated donors. Likewise, Dr. Monge's rigor as a scientist is exemplary, and in her work she holds herself and others to the highest standards. Finally, she is an incredibly generous colleague, not only within the Penn community, but across the world.

Penn has benefited, as is appropriate, from Dr. Monge's teaching, scientific rigor, and collegiality. She not only teaches in the anthropology department, and is the curator-in-charge and keeper of the physical anthropology section, but she has been instrumental in numerous major events that the Museum has held in recent years for the public (e.g., The Public Classroom: Science and Race–History, Use, and Abuse, 2016; Human Evolution exhibit, 2008). Further, she has devoted many hundreds of hours of her time specifically to fundraising efforts on behalf of not just the Penn Museum, but of the entire University. In the last 3 years alone, Dr. Monge has been asked to take two trips to cultivate donors, which she enthusiastically planned and then presented for several days running, programming to donors in California (Central Development, 2019) and Florida (Museum development office, 2020). The Development department has planned numerous major fundraising events at which Dr. Monge was a central feature, for example the Museum curators' party: *Under My Skin* in October of 2016. In no case, for the extra time planning, preparing, presenting, or traveling, was Dr. Monge compensated in any way. I bring light to this because I feel strongly that the institution that has drawn so very much support from Dr. Monge, MUST do its best to support her as a member of the Penn community, and the Penn faculty.

Penn is allowing Dr. Monge to take the fall for issues that we all know are broader than anthropology, or one person's course. These problems arising from America's history of white supremacy exist across academic disciplines, and tarring and feathering Dr. Monge is not going to solve anything. What is happening now is that Penn is allowing the statements of a single White man without any recognized credentials in the field, with reference to his own un-reviewed research, to create a narrative that is false, and serves his own interests.

Please do something about this.


Sincerely,

Jane Kauer, Ph.D.

EXHIBIT 13

**From:** Paul Wolff Mitchell ████████████████████████
**Date:** Friday, April 16, 2021 at 3:42 PM
**To:** "Woods, Christopher" ████████████████████████████
**Subject:** Re: confidential information relating to Physical Anthropology collections at Penn Museum

Chris,

An additional note, by way of establishing context, on my chronology and involvement with the collection:
I was an undergraduate at Penn from 2009-2013. I started working in the Physical Anthropology section in summer 2010 and worked intensively, usually 20 hours/week, as a work-study student in the collection through the remainder of my undergraduate time at Penn. I returned to Penn for a PhD in 2015. I worked with Janet and in the collection for the first year after my return, but switched my project in 2016 to an ethnographic one, feeling that Janet was not effectively supporting the development of my research. Feeling that the best dissertation would be one that I could do uniquely well, given my experience, I decided a year later instead to pursue a project in the history of anthropology, around 19th century racial science, human remains collections, etc. Although my primary advisors have been historians and cultural and museum anthropologists, I continued to work closely with Janet in 2017-19 (although I was traveling for dissertation research in summer and fall 2018) until the late spring of 2019, when I was asked to present at the Penn and Slavery Project symposium on the remains of enslaved individuals in the collection. After that time, I have not actively worked in the collection, although I have worked extensively with archives related to the PA collection at Penn, particularly the Morton collection.

Again, thanks for your time and attention. If you have any questions or know of how I can be helpful, do let me know.

Best,
Paul

On Fri, Apr 16, 2021 at 4:25 PM Paul Wolff Mitchell ██████████████████████ wrote:

Hi Chris,

I am writing following Deb Thomas's suggestion, so that you have a clear record of relevant information. I ask for your confidentiality as I relay this information.

Concerning other remains from forensic cases that are in the museum:

The remains of fetuses from the Kermit Gosnell abortion clinic in West Philadelphia were given to Janet by the police after she and I conducted analysis of the bones in 2013. They were ultimately never used as evidence in court. Last I was there, these were in a black shadow box in shelves on the left side of the room in CAAM 183,

above and to the left of the sink in the lab. The shadow box indicates at the top that these remains were taken from a garbage disposal.

I believe that there are more unaccessioned remains from forensic cases on the top of shelves in 156. In particular, there are burnt remains of a significantly intact body from Hamburg, Pennsylvania. I don't know other details than those, which are on a card present with the remains in a plastic container in which the body is stored. This may go back to Wilton Krogman (retired 1970), although I am not sure.

There are other cases of unaccessioned remains in that room from archaeological contexts, including remains excavated by John Cotter from the potter's field underneath Franklin Field, and human remains from Botswana (Gwi Pan) relating to a dissertation in the early 1990s by Trudy van Houten on faunal remains from the same site. There are other cases that I would be able to help identify upon sight, but I can't recall without looking through the material myself. Janet is the ultimate source of almost all of this information about the collections.

Another important story:

The remains of HH Holmes, including a left arm, hand and leg bones, are, I believe, still in the museum. The full skeleton was excavated in spring 2017. All remains were set to be reinterred, after analysis, in fall 2017. Some of the remains (as I recall: left arm, hand and leg bones) were still on a cart in the physical anthropology lab (CAAM 183) after the reburial - court ordered, as I understand - was supposed to have taken place. Several students in the PA section (Fiona Jensen Hitch and Sharon Ashok) and I noticed these, as these were prominently filmed/photographed, etc. for a History Channel series, and the bones have a notable dark discoloration. After Fiona pointed out that these looked to be the bones of HH Holmes still at the museum after the date of reburial, Janet moved them from 183 to another room (I recall 160, although I may be misremembering the number). At some point in fall 2017, I asked Janet about them and she told me to "not put my nose where it doesn't belong." I didn't have anything to do with the analysis of HH Holmes, but Sam Cox, a former bachelors and masters student at Penn physical anthropology and long-time mentee of Janet (since awarded a PhD in archaeology at Cambridge) undertook the analysis and was a part of the History Channel series. I had known Sam since 2010 and asked her about the bones and if Janet had talked to her about them. Sam was genuinely surprised and dismayed at the sight of the remains. She said that Janet had not talked to her about them, and that Janet was supposed to have put them all in a box for Sam to take for reburial. According to Sam, Janet had missed some of the bones, and Sam did not take an inventory before reburial. I asked Sam if she was going to do anything about it, and she said that she would not. Some weeks later, I found that Janet (or someone; the only other person who would have had access and would have known about them was Sam, but it seems implausible that Sam would have done anything without notifying or working with Janet) had put the bones in a tray of other bones used as "teaching collection" examples for osteology courses. Feeling that this mixing in of these remains with others in the collection was egregious and would potentially permanently disassociate them and render them "lost" in the collection, but not knowing what else to do, I put the bones in bags and put them in a taped-shut small card box box on the top of the shelves in 156, hoping to be able to address the issue at a later time. At the time, Janet was on my dissertation committee, and Sam is the daughter of a major donor and figure in the collection, and I was concerned that, to be frank, it would be an issue for me and progress in my dissertation, or my continued work with the collection, if I were to tell the director at the time. Janet's response to me when I pointed out the bones to her indicated to me that she would not welcome my interference. Even so, I did not want the remains to become mixed up in the teaching collection. Perhaps Janet knows these are in a box on top of the shelves in 156, perhaps not. My relationship with Janet went from very close to effectively estranged (access to PA section revoked, etc.) following my involvement with the Penn and Slavery project in the spring of 2019.

It is because you've asked directly about cases beyond the MOVE remains that represent unaccessioned bones in the museum that should not be there, and because there is now a clear institutional impetus to make the physical anthropology section much more transparent than it has been, that I am relaying this information. I do not believe there is any reason to suppose that the HH Holmes case - or any of the other cases I have described save the MOVE one - will be the cause of controversy, as very few people know the relevant information, and there are no websites displaying these remains in the museum, etc. My strong preference would be that the HH Holmes case be addressed only after Janet has retired. I understand that the museum has many interests to protect here, and I will protect these by not sharing any of this information. In any case, I request your consideration in keeping my identity confidential, particularly in relation to Janet, as these issues are addressed. That said, I am happy to be helpful however I can be.

It was wonderful to meet you, Chris.

With thanks for your attentiveness and consideration,
Paul
--
Paul Wolff Mitchell
PhD Candidate in Anthropology, University of Pennsylvania
Affiliated Doctoral Fellow in the Penn Program on Race, Science, and Society
Editor, *History of Anthropology Review*
███████████████
█████████

--
Paul Wolff Mitchell
PhD Candidate in Anthropology, University of Pennsylvania
Affiliated Doctoral Fellow in the Penn Program on Race, Science, and Society
Editor, *History of Anthropology Review*
████████████████
██████████

EXHIBIT 14

I enlisted the help of Mr. Alan Epstein (Spector Gadon Rose Vince P.C.) on May 4th. I was frightened by a sequence of events that seemed to be a process of removal of me from my position at Penn.

10 days of events that precipitated my action:

4/26    Locked out of lab and for all Physical Anthropology collection storage spaces for my own protection. Dr. Woods and conveyed to me by Dr. Tinney

4/28    I became aware of an e-mail authored by Dr. Gutmann and Provost Prickett that called my actions "insensitive, unprofessional, and unacceptable".

4/28    Requested a call with Wendy White. I asked her if I was being fired and if I should find an attorney

4/29    Dr. Morrison (Chair of Anthropology) requests a ZOOM call and tells me that "I have been removed from my Penn classes" and does not know if I will continue to be paid.

5/3    ZOOM meeting with Mr. Tucker and Ms. Fleetwood to describe the MOVE remains. (Proceeded by a short call from Wendy White)

5/4    Phone call with Dr. Tinney telling me that I have been removed from the summer programs at the Museum

5/4    e-mail from Ellen Owens (Director of Learning Programs, Penn Museum) that my scheduled high school talk was cancelled.

5/5    Access University of Pennsylvania Anthropology webpage.  On the front page is a call to action in my termination from Penn. (This is my home academic department.). Marie Manski (administrative assistant in anthropology) follows this up with an e-mail to ALL people associated with Anthropology at Penn.

I have not retained Mr. Epstein as my attorney but did seek advice as I prepared this document. He helped me organize my thoughts.

## 1.  Introduction.

For my entire academic life I have worked for social justice. (*See attached vita*). Including as working as a forensic anthropologist (without financial compensation) for the Philadelphia Defender's Association and the Federal Defender's Association. *(See attached except article from the Pennsylvania Gazette*: full text: https://www.upenn.edu/gazette/1199/lonkevich2.html). The restoration of personhood in forensic anthropology is a major tool in bringing about justice to victims. Bones have no voice, no identity, no personhood, no ethnicity. It is a very special skill set that is unique to my academic discipline.

The case of the "Jane Doe" remains from the MOVE house on Osage Avenue have not been identified after 36 years of effort including contact with family members. This could have been resolved several times but without cooperation of the MOVE family members, these will never be identified. From the very beginning, my colleague and I have worked tirelessly to restore identity to the remains and have contextualized the tragedy of the MOVE house bombing in a social and political arena. We were, and still are, convinced that there was a systemic cover-up of the events and the outcome was contrived to hide aspects of the tragedy.   In other words, we were working to bring justice to the MOVE extended family.

I have made no public comment on these remains both before or during this  investigation.

Mr. Paul Mitchell (graduate student in Anthropology) and Dr. Deborah Thomas (Professor Anthropology) purposely, and will full knowledge that they were falsifying information, labelled these bones as those of Katricia and did so in a public manner to cast aspersions on me, Alan Mann, the Penn Museum and the University of Pennsylvania for their own benefit. As a consequence of their actions, I have been a victim of threatening e-mails and phone calls. I have never called these remains by any name except for "Jane Doe" or the original "B-1" designation by the MEs office. To the best of my knowledge, and without DNA evidence, this case will never be resolved. In addition, and beginning with the *Billy Penn* article authored by Paul Mitchell's friend Maya Kassutto, Paul erroneously attributes another bone (or group of bones?) in the lab, to a 2nd MOVE child "G-1" (Delicia).

I have not been in the lab since April 23, 2021. It was not possible for me to check my original notes from 1985 and the details of the presentation of the child human remains from the MOVE commission report.

**2. MOVE remains at the ME office**

In 1985, Alan Mann and I were asked by Dr. Robert Segal (ME office Philadelphia) to help in the sorting and analysis of human remains (skeletal) most especially those of the child victims of the May 13th bombing on the Osage house of the MOVE organization.

      - these remains were removed from the site without proper excavation procedures after the ensuing fire and smoldering of the building. These were isolated bones not in association with each other.

      - not all of the skeletal remains of each individual were removed.

      - we were asked to sort the remains (small bones and bone fragments) into the age categories of the known children of the MOVE organization members.

This tragic event, and impact of the bodies of the victims, was overwhelming and frankly heartbreaking. The remains were broken, burned and incomplete (as I explained to Mr. Tucker and Ms. Fleetwood on 5/3).

2 victims survived the bombing - Ramona Africa and Birdie Africa (Michael Ward). Michael Ward, in initial interviews, told city officials that Katricia Africa had escaped the fire in front of him. Personally, and without any evidence, I suspect that Katricia, after exiting 6221 Osage Avenue, entered an adjacent house and was killed in the fire. Only the area of the MOVE house was excavated for the recovery of human remains.

The eldest of the children thought to be at the residence at the time of the bombing and fire was Katricia Africa (at 14.5 years of age).

Forensic Anthropologist are expert in the determination of morphological sex and the age at death of the victims to aid in the identification of "personhood" of the remains. It became clear, after our original sorting and assessment, that there were potentially no remains of youngster Katricia. A blue jean pant leg contained remains of an innominate bone and a proximal femur. Our forensic age assessment of these bones indicated an age of from 17 to 21 years and could not have belonged to Katricia.

     - originally these 2 bones were given the designation of "B-1".

     - a later assortment of bones by Ali Hamali and Ellis Kerley positioned the innominate and femur along with bones originally placed with the remains labelled "E-1" into "B-1". Hamali and Kerley refused to discuss the bones with Alan Mann and myself. This new assortment, and under much political pressure to do so, were labelled as the missing child Katricia.

     - this new assortment of bones, a composite individual, with the "B-1" designation were described as Katricia by Hamali and Kerley.  These are the remains returned to Isaac Dotson for burial in December 1985. This assortment did not contain the innominate and femur. This innominate and femur were at the time, and because of the aging criteria, fit with none of the other remains and thus was categorized as a "Jane Doe".

---

## 3.  In the Lab

Under these conditions, the innominate and femur were released to Alan Mann in 1985 to continue the investigation of the Jane Doe remains. The remaining MOVE human remains were returned to family members and the case was considered closed. We have worked continuously to identify these remains enlisting the help of many other forensic anthropologists and beginning in 2014/5, the use of new equipment made available by the Penn Museum in the Human Evolution Laboratory.

Forensic Anthropologists who did the identification of MOVE "Jane Doe" (there could actually be more than this but this is all I retained notes on)

Stephanie Damatio (at the Smithsonian at the time - not sure what is up with her now and I do not have an e-mail. This was reported in the Inquirer in 1985).

Stanley Rhine (professor at the University of New Mexico at the time and I don't have an e-mail)
He was the administrator of the Board Certification exam for the Society of Forensic Anthropology. Exam given to 4 students. I only know the name of one of the students: ██████████
All of them agreed with our assessment and all of them passed the exam.

Milford Wolpoff (University of Michigan)
David Frayer (University of Kansas)
Jakov Radovcic (Croatian Natural History Museum)

Michelle (Mica) Glantz (Colorado State University)

Jaroslav Bruzek (at the time at the University of Bordeaux)

████████████████████████████ graduate of Penn). I asked ████ to review all of the newest growth standards and apply these to the "Jane Doe" materials.

There are probably many many others but I did not record all of the names going back so many years. Ellis Kerley and William Maples came to the Museum after the exam (both were diplomats in the Society) and confronted me in the Kress Gallery and were very agitated.  Kerley and Hameli would never met with me and Alan Mann at the time the bones were in the MEs office.

In the lab, beginning in 2015, I did a microscopic analysis of the areas of the innominate associated with fusing or fused growth plates.

Work continued on these remains until 2019 when we failed to make a morphological association with Katricia. During this time period, several attempts were made to contact the Africa family including contact with the mother of Katricia, Consuela Dotson Africa to request a DNA sample. (First attempt in 1995 with Ramona Africa at a meeting at the Penn Museum; *subsequent attempts from 2014 onward are attached here as e-mail correspondence between Malcolm Burnley, research journalist and myself*). The requests were not answered or answered in the negative.

Malcolm Burnley is a research journalist and person of color, at the time, working freelance for *Philadelphia Magazine* (the only journalist of color within that organization). I enlisted his help as a black man to help me approach members of the Africa family. My own background does not give me the moral authority or lived-experience to understand, and sensitively approach, the MOVE organization folks.

Consuela Dotson Africa also ignored requests for the release of the remains of "B-1" remains to her, the next-of-kin, in 1985 (*see attached UPI article dated 9/18/1985*). In 2019, we tried to find Katricia's uncle, Isaac Dotson.

(*See attached e-mail listing the normal process of dealing with "Jane Doe" human remains.*)

In 2019, when it became clear that the remains in my possession would never be identified, I presented the fully contextualized case of the MOVE bombing, subsequent death of members of the MOVE organization, and the City of Philadelphia attempts to misrepresent the nature of the remains, as a case study in Forensic Anthropology.

COURSERA: Real Bones.

The course was "live" for 6 months from the end of 2020 to April 2021. (*See attached final Coursera statistics in April 2021.*).

2% of course content is on the MOVE bombing including a short video discussing the "Jane Doe" remains. This short video is a small part of the larger topic being discussed including: 1. The social and political context of the case; 2. The understanding of the nature of forensic remains; 3. The identification of growth plates in the skeleton; 4. How to age human  remains. The individuals were never named and referred to as a "Jane Doe" - without a voice or personhood. (At the moment, I cannot double-check because the class has been removed from Coursera.)

The COURSERA platform for this course is "free" BUT NOT OPEN TO THE PUBLIC except through registration and is password protected. Students can "explore course content" and

chose to register for the course, and eventually finish the course with all readings and examinations. Registered students write to me and ask me questions and advice.

---

### 4. Public Release of False Information and What Precipitated the Action.

PUBLIC INFORMATION ON THE JANE DOE REMAINS is released by Paul Mitchell (graduate student in Anthropology) and his advisor (Dr. Deborah Thomas) by associations with 2 op-ed writers (Inquirer op-ed and Billy Penn authored by Paul Mitchell's friend Maya Kassutto who did not disclose at the time of publication her association with Paul, me, or the University of Pennsylvania Museum). These were released simulataneously and with malicious intent. (*See attached e-mail where Deb Thomas writes to the American Anthropological Association about her direction of the actions of Paul Mitchell.*)

 This is a willful retaliation because I reported Paul Mitchell in May 2019 for plagiarism, violence, and theft of forensic specimens and was barred from access to any of the Penn Museum Physical Anthropology collections.

Paul Mitchell was removed from his graduate program at the University of California, Berkeley in 2013 for a violation of the ethical code of the university - plagiarism. (I have a copy of this letter on e-mail that he gave to me.). At that time, I spend enormous effort to help him overcome this violation and worked within the Anthropology Department to have him return to Penn for his graduate degree.

Witnesses to Paul Mitchell's violence in the lab. May 2019
Stacey Esplenlaub ███████████
Lucy Fowler Williams ███████████
Reported to Julian Siggers (Penn Museum Director until August 2020) ████████████
████

Prior to May 2019, he had access to my lab and tampered with materials. He may have gained access to the lab after May 2019 using false credentials. All of this was reported to Penn Museum security (and he admitted to to Dr. Kathleen Morrison, Chairperson of the Anthropology Department and Jean Henry* (12 year volunteer in the Physical Anthropology Section of the UPM)) and measures taken to secure the lab and all collections that are part of the Physical Anthropology Collection. This was reported to Dr. Tinney and Dr. Siggers. (Theft of DNA samples associated with the recovery and identification of the remains of H.H. Holmes.)

In addition, I requested the keys changed for my office (Room 340) and adjacent storage space (Room 331) in the Anthropology Department on April 1, 2021. (I filled in a Museum work-order that was completed by Kevin in the Facilities Department.)  I found that at sometime in the past, Paul had duplicated illegally the keys to both room after having found that he gained access to those spaces and should have had no access to keys. What was removed is unknown.

---

## 5.  Protocol in the Lab and Penn Museum

At no time were the whereabouts of the remains unknown.  They were either in the possession of Janet Monge (in a locked cabinet in my office (Room 340) prior to the opening of new lab spaces - Room 183 - at the Penn Museum) or in possession of Alan Mann (at Penn or at Princeton in the locked/security access lab in Aaron Burr Hall Room 215)  The lab area of the

Penn Museum is though 3 security doors now - in the past, through 2 security doors. (I previously told Mr. Tucker and Ms. Fleetwood that under the direction of Dr. Steve Tinney, I removed the remains from Room 183 to the home of Alan Mann in Princeton on April 18, 2021.). Often the human remains are kept in the original boxes or packing materials in which they were delivered to retain maximum information on the materials (paper labels, packing materials, etc. can be important within the context of the analysis). There is a specific process in forensic anthropology which was followed in this case (and in all forensic cases).

All forensic cases, and human remains that are being actively analyzed, are in 1 cabinet within the lab. The remains are carefully monitored. Each active case is handled and processed using normal practice in sample preparation.

Policies that apply across the university associated with human materials do not apply to forensic cases or to any skeletal materials that are part of the UPM collection (e.g. IRB regulations do not apply to deceased person skeletal materials - I have asked this question before). Within the UPM, no other area of the museum deals with anything like these sorts of materials. All of the forensic anthropologists that I know, usually work on forensic cases as an "individual researcher" and not as an "institution" and keep these cases in their labs or offices. In hindsight, I think now that I should have asked for policy changes when I brought the MOVE bones into the laboratory area of the Museum in 2014. I am confident that Dr. Woods can work with the UPM's registrar office to establish a policy on forensic cases.

Although there was no secret that the remains were in the lab, these were not shown to anyone except those directly associated with the case. I subsequently learned (in just the 2 weeks) that Paul Mitchell had without my approval, used the remains that were being actively studied by ████████ (Penn senior thesis writer that I asked to review the aging methods used on the innominate and femur), to show his friend and other undergraduate students who at that time were working in the lab for their own senior theses projects (Spring semester 2019) or recently graduated and still on campus. He appears to have misidentified bone (and occipital skull bone) as belonging to a second MOVE individual ("G-1")** that were part of another group of samples present in the lab at that time. He apparently re-sorted forensic materials including the theft of the DNA samples taken from HH Holmes (the Chicago serial killer who was executed in Philadelphia)***. He defaced lab books at the same time tearing pages from the equipment use catalogue entries for the micro-CT scanner and SEM.

I have no idea what other bones were misused, stolen or otherwise misappropriated. The Penn Museum houses and curates over 250,000 human remains.

\* In 2019, Paul Mitchell told Jean Henry that he wanted my job and wanted to discredit me in any way possible. ███████████████████████████████████████

███████████

\*\*Moreover, these human skeletal bones (occipital) cannot be used to distinguish children within these age ranges.

\*\*\*According to Jean Henry and Kathleen Morrison, he took the bones home but eventually brought them back to the Museum and "hid" them within the massive collection. I have not found these bones (as of May 9, 2021). He did this to discredit both me and the genetics post-doc researcher who was working on the DNA samples (Dr. Samantha Cox).

EXHIBIT 15

## STATEMENT TO UNIVERSITY OF PENNSYLVANIA

## INVESTIGATION

### Alan B. Mann

*July 8, 2021*

I am pleased to continue to cooperate with Penn's investigation into the circumstances relating to the possession and use of certain MOVE remains. The events underlying the inquiry occurred more than 35 years ago. While I remember some things with reasonable clarity, please understand that because it was so long ago, I do not recall many of the circumstance or details. I have not had the benefit of being able to review any documents so I have to rely on my memory alone, which is hazy on some things concerning my involvement. It would have been helpful to me to have had the opportunity to review documents to refresh my memory of times and events, so this statement is the best I can do at present to recall, as best I can, my involvement. I have asked that you provide me with certain documents several times but you have not done so. Reluctantly, therefore, I am not prepared to accept your invitation for an interview.

Below, is my best recollection of events which I understand are relevant to your investigation. If documents come to light or my memory is refreshed, I may recall additional things or correct what I do recall. While I am 81 and continue to pride myself on my analytic skills and recall, I recognize that the passage of time has had its impact. Additionally, I had a serious stroke, which required me to be put in a medical coma in intensive care, and it took many months to recover. That stroke, I think, has made more difficult the already difficult task of remembering these events from long ago.

**Background**

**My Efforts to Cooperate with Penn Investigation and the Investigation's Failure to Provide Me with Requested, Relevant Documents**

In response to an inquiry from the law firm leading the investigation, I had my counsel immediately respond to explain that I desired to cooperate with Penn's investigation. E-mail from Mark A. Aronchick to Joe Tucker dated May 17, 2021. Two days later, my counsel John Summers wrote the investigators to reinforce my desire to cooperate, explaining that because the events took place more than 35 years ago, I thought it important to review relevant documentary evidence. Mr. Summers wrote by e-mail dated May 19, 2021:

> As a scholar and teacher, Dr. Mann has a keen interest in empirical work that relies on fact. Particularly here, where the controversy appears to center on events that took place more than 35 years ago, relevant documentary evidence

is of course important.  Dr. Mann therefore requests that the University provide him access to whatever relevant documents it has or has access to so that he can recall events as completely and accurately as possible, an interest that I am sure the University shares.  We anticipate in advance and appreciate your cooperation on this.

Mr. Summers also provided the categories of documents that I thought important to me to refresh my memory.[1]

Unfortunately, the investigators elected not to provide me with copies of documents responsive to my requests and that it had access to.  In response to my request, Penn did advise that the its Museum issued a Statement on Human Remains that was adopted in 2017 and posted to the Museum's website in 2018; and further advising that the Museum did not have a policy on human remains in 1985.  E-mail from Sean Burke to John Summers dated May 26, 2021.  Thank you.

In specific response to my request for documents, Penn advised that it "had no extant relevant documents."  My request, however, was not limited to what Penn had or what Penn (or its investigators) thought relevant, but rather I had requested what documents Penn and the investigators had access to that would assist me in accurately recalling events for Penn's inquiry.  After all, what I was interested in was the documents that Penn/investigators had access to, not where they originally were found.  I therefore had my counsel explain that my request was for copies of responsive documents included those that the investigators had reviewed as part of its investigation, whether or not Penn had them.  E-Mail from John Summers to Joe Tucker dated June 29, 2021.

Regrettably, in response, although the investigators acknowledged that it had reviewed documents at Temple University and/or the City of Philadelphia that were "relevant to Dr. Mann," they continued to not provide me with copies of the requested

---

[1] We specifically identified the following categories of documents:

1.  Any and all documents constituting guidelines, policies or practices (whether or not related to forensic investigations), for the period 1985 to the present, regarding: (a) the receipt, treatment, storage or transfer of skeletal fragments or human remains at the Museum; (b) the receipt, treatment, storage or transfer of skeletal fragments or human remains by Penn faculty; and (c) the use of skeletal fragments or human remains by Penn faculty in connection with teaching, research or otherwise.

2.  Any and all documents referring or relating to the skeletal fragments or human remains from the MOVE bombing ("MOVE Remains"), including without limitation: (a) any requests for or agreements to examine, analyze or study the MOVE Remains; (b) the examination, analysis or study of the MOVE Remains; (c) the use of the MOVE Remains in connection with any examination, analysis, study or teaching; and (d) the potential or actual transfer of the MOVE Remains to the Africa (or MOVE) family, Dr. Mann or anyone else.

3.  Any and all documents related to any alleged involvement by Dr. Mann with the MOVE Remains after he left the University of Pennsylvania to join Princeton University, including without limitation, in connection with (a) any Penn Professor's teaching or other work at Princeton; or (b) the Coursera course entitled Real Bones: Adventures in Forensic Anthropology

4.  Any and all documents that refer or relate to Dr. Mann's involvement with the MOVE remains, including without limitation, each of the above topics, as well as any other involvement.

documents, and only referenced two documents.  E-Mail from Joe Tucker to John Summers dated July 1, 2021.

From my perspective, cooperation is a two way street; I have repeatedly offered to cooperate and wanted to cooperate, yet the investigators have declined to provide me with copies of documents it readily acknowledges it has had access to and are relevant to me. Nevertheless, I am prepared to assist Penn's investigation by submitting this Statement based on what I presently recall, as caveated above.  I respectfully decline, however, to submit to an interview because the investigators declined to provide me copies of documents that it acknowledges are relevant to me.  The documents would have been helpful to my recalling events; and the refusal to provide them reveals an unwillingness to cooperate with me and, frankly, offends my – and I think any reasonable person's -- sense of fundamental fairness.[2]

### 1985 MOVE Incident

On May 13, 1985, city officials dropped explosives on a home in West Philadelphia. The resulting fire killed 11 people, 5 of whom were children, and burned down more than 60 homes in the surrounding neighborhood. It was a shocking act of violence against the members of MOVE.

Thirty-six years later, this unimaginable tragedy is once again in the news and surrounded by controversy.  One part of that controversy is the handling of fragments of two bones found at the scene of the crime.

In 1985, my then-colleague Janet Monge and I, both physical anthropologists at the University of Pennsylvania, were asked by the Philadelphia medical examiner's office to help identify the victims of the MOVE massacre.  We undertook this work because we wanted to help document a crime, with the hope that identification of the victims would bring a small measure of peace to their families. I can't imagine the pain and anguish experienced by the victims and their loved ones. The loss of children, their lives cut short by the bombing of their home, is heartbreaking.

### Approximately 1985 - 1986

Within several days after May 13, at the request of the medical examiner's office I went to Osage Avenue to assist in identifying the remains of the victims of the bombing.  It was a horrible site.  The house was a smoldering rubble.  The remains of some of the MOVE family lay in the rubble, incinerated by the fire.  The site did not appear well

---

[2] The investigators wrote, "[i]f you do not [submit to an interview], we will conclude our investigation and submit our findings and recommendations without your client's input and will make note of such."  E-Mail from Joe Tucker to John Summers dated July 1, 2021.  If any such "note" (or anything similar or any criticism of me for not submitting to an interview) is made, this Statement should be attached to the writings including the "note" so that the reader can understand my explanation for not participating in the interview.

organized; the local police milled about and it was only the FBI that appeared focused on trying to identify the remains.

I recall that Dr. Monge and I were asked to review two bone fragments from the same person, labeled B1, small segments of a pelvis and an upper part of a leg bone. The question was whether they were the remains of a young girl (aged approximately 12 or 13) or of a young adult woman, aged 17 to 21. Dr. Monge and I performed the examination that was available to us at the time, namely physical examination, and concluded the latter (i.e., they were of a young adult woman) primarily because there was no discernable growth plate evident in the skeletal fragments. As the MOVE investigation proceeded, it turned out that Dr. Monge and my conclusion differed from that of other professional anthropologists, who concluded that they were fragments from a young girl, aged approximately 13. Ultimately, the MOVE Commission concluded that the remains were from a young girl based on, I understand, the opinions of other professional anthropologists' opinions.

 After the Move Commission completed its work in 1986, the City medical examiner provided Dr. Monge and me the bone fragments to allow us to continue our review, in particular to see if our opinion or that of the other anthropologists was correct. I do not recall the specifics about how Dr. Monge and I obtained the fragments or any instructions from the medical examiner's office. I do recall that, at that time, the medical examiner's office was about 5 or 6 blocks from the Penn Museum and that either Dr. Monge or I went to the medical examiner's office to pick up the fragments or the fragments were provided to Dr. Monge and me by the medical examiner's office.

My involvement at that time was tied to my positions at Penn. Dr. Monge and I both held positions at the Penn Museum and I was a tenured Professor in the Department of Anthropology. I had previously worked with the medical examiner's office while I was at Penn and with the Museum. We received the fragments for our review at the Museum and we entrusted the bone fragments to the Penn Museum for safekeeping. I don't believe that the Penn Museum had any policies governing the receipt of bone fragments or remains such as these. I felt assured, however, that the bone fragments were being safeguarded because they were secured in the Penn Museum temperature and humidity controlled laboratory, and by bubble wrapping them and placing them in a box inside a locked steel cabinet.

I do not specifically recall, apart from re-examining the bone fragments, what we did with the fragments after we secured them at the Penn Museum. As professors and scholars, we were open to trying as best we could to determine whether the bone fragments were from a young girl or a young adult woman. We continued to study the bone fragments and also allowed some outside anthropologists, while they were at the University Museum for a forensic anthropology session, to review them. They agreed with our conclusions that the fragments were from a young woman 17-21 years of age. My best recollection is that Dr. Monge's and my conclusions did not change from our initial understandings; there thus remained a difference between our original conclusions and that of the other anthropologists who originally studied the fragments. Because methods of testing bone fragments evolve

Page **4** of **6**

over time, I decided that, while my inquiry was then done, there might be future developed tests or methods that could better identify the bone fragments.

Thus, after early to mid-1986, I understood that the bone fragments continued to stay at the Penn Museum for safekeeping, allowing further study as future testing methods became available.

### After 1986

My involvement with the bone fragments ended by early to mid-1986. After then, I do not recall opening the Penn Museum cabinet that safeguarded the fragments or reviewing the fragments. I also do not recall using the bone fragments for my teaching or research.

In 2001, I left Penn to accept a position at Princeton University, where I have been ever since. To my knowledge the bone fragments did not leave the Penn Museum from 1985 to 2001. Since joining Princeton in 2001, I recall seeing the bone fragments on several occasions at Princeton when Dr. Monge came to Princeton to teach forensic anthropology. She brought the bone fragments on those occasions and I looked at them. I do not recall when that happened other than it was sometime between 2001 and 2015. I do not recall seeing or reviewing the bone fragments at any other time at Princeton, nor do I recall seeing or reviewing them, at Penn or elsewhere. I did not use them in my teaching or research.

I understand that there is controversy regarding a video Coursera course that she taught in which it is alleged that she showed, mentioned or identified the bone fragments. I have no knowledge of this as I was not involved in the course and have not seen it.

I recall that, at a time before I retired in 2015, Dr. Monge informed me that she had attempted to reach out to members of the Africa group to obtain DNA samples to see whether that could inform the study of the bones. She may also have asked whether the family wanted the remains, but I am unclear about that. Absent additional information, I am unable to date when this happened with any more precision. I did not participate in Dr. Monge's reach out. I believe, however, that she told me that she did not hear back from the family members or that the family members would not participate.

On April 18, 2021, Dr. Monge came to my home and gave me a small box containing the bone fragments. She was upset and explained that there was a controversy at Penn regarding them. I did not understand why they were being given to me, but I received the box, as an accommodation to a longstanding and upset colleague. Within days, I received a call from the Penn Museum that the remains were going to be picked up from me and provided to a funeral home. That happened on April 30.

### Reflection

Throughout my career, I've handled the remains and investigated the deaths of people from many backgrounds, always with care and dignity. But anthropologists have

sometimes historically not treated Black, Brown, and Native bodies with respect. We as a society are finally confronting the systemic racism that has pervaded academia and anthropology, in particular. I have long supported these efforts at reform. For example, while at Penn, I – and Dr. Monge -- have helped with the repatriation of hundreds of skeletal remains from Penn back to the communities from which they were stolen, including some remains obtained by the 19th century white supremacist Samuel Morton.

 I believe, however, there is much more work to be done. The field of anthropology must confront and reckon with its racist past. Universities and museums around the globe must acknowledge their institutional racism and the harm done to communities of color.

EXHIBIT 16

**From:** Malcolm Burnley ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Re: Reached Consuewe a
**Date:** December 9, 2014 at 12:47 PM
**To:** Janet Monge ▮▮▮▮▮▮▮▮▮▮▮

MB

Lunch at noon on friday sounds great. I'll be there.  )

On Dec 7, 2014, at 3 56 PM, Janet Monge wrote

> How about noon and lunch.....
>
> Janet Monge
> ▮▮▮▮▮▮▮▮
> Penn Museum of Archaeology and Anthropology
> University of Pennsylvania
> and
> Adj. Prof. Anthropology
> University of Pennsylvania
> and
> Visiting Professor of Anthropology, Princeton University
>
> On Dec 7, 2014, at 3 54 PM, Malcolm Burnley ▮▮▮▮▮▮▮▮▮▮▮▮ » wrote
>
> Perhaps I didn't take the right approach and should've suggested a sit-down right off the bat. I'd love to discuss. Would Friday be a good time for you? I should not be in the office at all, so will be very flexible.
>
> ───────────────────────────────
>
> **From:** Janet Monge <▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
> **Sent:** Sunday  December 7  2014 1:42 PM
> **To:** Malcolm Burnley
> **Cc:** Janet Monge
> **Subject:** Re: Reached Consuewella
>
> we need to sit down and discuss Malcolm.....
> Maybe arrange a meeting with Ramona and Consuewella?  As difficult as this sounds.....
> I think that if you could come in on friday, we could strategize.  This seems l ke a horrible conversation....
>
> Janet Monge
> ▮▮▮▮▮▮▮▮▮
> Penn Museum of Archaeology and Anthropology
> University of Pennsylvania
> and
> Adj. Prof. Anthropology
> University of Pennsylvania
> and
> Visiting Professor of Anthropology, Princeton University
>
>
>
> On Dec 7, 2014, at 1:33 PM, Malcolm Burnley <▮▮▮▮▮▮▮▮▮▮▮▮▮▮> wrote:
>
> Janet, I miss seeing you, too. Maybe I can come this Friday and see you for a bit?
>
> My conversation with Consuewella did not go well. I'm extremely bummed but not willing to give up on this.
>
> The conversation began with her swearing at me and telling me that "unless I can bring her daughter back, I need to stop fucking with her." Every time I would speak, she'd either interrupt me or stop me, then confer with someone else she had on speaker phone (a different phone I guess) about what to say next. I found out that this other person was Ramona Africa, late in the conversation. After trying to let her say her peace for 10 minutes, I spoke over Conswuella—telling her that the city did an injustice on that day, and the only way I could possibly find out about bringing her daughter back, would require her participation.
>
> She seemed to consider it for a moment, and then started swearing at me again. She said that Ramona would call me (she hasn't) and ta k more. It really sounds l ke she's still part of MOVE and is loopy.
>
> I don't know how to proceed. I can get Ramona's phone and email address and try her this week. Perhaps she'd be wiling to ta k reasonably about the matter, but I doubt it.
>
> As terrible as this sounds, I wonder if I could get Conswuella's DNA somehow without her consent? That's highly unethical, I know, but I'll do everything that I can to prove this. It's an important piece of history and the city shouldn't be able to have covered this up for so long.
>
> Let me know what you think.
>
> -Malcolm
>
> **From:** Janet Monge <▮▮▮▮▮▮▮▮▮▮▮▮>

Sent: Wednesday, December 3, 2014 7:48 AM
To: Malcolm Burnley
Cc: Janet Monge
Subject: Re: Reached Consuewella

It is always so great to hear from you Malcolm.
Did Consuewella answer the phone yesterday?  I am so so curious....
I hope you are healthy and healthy Malcolm.  We miss seeing you at Penn.
JMo

Janet Monge
███████████████
University of Pennsylvania Museum/Anthropology
3260 South Street
Phila., PA 19104


On Dec 1, 2014, at 4:35 PM, Malcolm Burnley <████████████████> wrote:

Janet,

I finally just got Consuewella on the phone. She nearly hung up on me when I mentioned her daughter's name. But she told me to call back tomorrow at 4pm.

I had preplanned what I wanted to say when I called in the past, but I wasn't expecting her, so I kind of stumbled on my words. I managed to convey that the city might've gotten something wrong about her daughter's remains. I'm praying that she'll speak tomorrow, as she said.

Wanted to give you the update. Might be the break we need.

-Malcolm

EXHIBIT 17

**From:** Malcolm Burnley ███████████████
**Subject:** Re: Schedu e next week?
**Date:** December 29, 2014 at 8:48 AM
**To:** Janet Monge ███████████████

MB

H  Janet,

I have to take a ra n check on tomorrow. My apo og es. Any chance you cou d do Wednesday?

Ramona ema ed me back w th one  ne, "No, I w   not ta k to you." I guess I   have to try to find the unc e now.

Very d sappo nt ng.

Sent from my  Phone

On Dec 22, 2014, at 11:32 AM, "Janet Monge" <███████████████> wrote:

Hey Ma co m.  I have to cance  for tomorrow….so sorry about th s.  It  ooks   ke I m ght have to go to Pr nceton.  Do you th nk we cou d met up on tuesday December 30?
JMo

Janet Monge
███████████████
University of Pennsylvania Museum/Anthropology
3260 South Street
Phila., PA 19104

On Dec 18, 2014, at 12:01 PM, Ma co m Burn ey <███████████████> wrote:

Tuesday sounds wonderfu . And thank you—I m exc ted about both stor es. I   te  you more when we see each other.

How are you fee  ng?

-Ma co m
On Dec 18, 2014, at 11:32 AM, Janet Monge wrote:

Hey Ma co m.  YES.  Maybe we can met up on tuesday.  But you are r ght…..progress w   be s ow on th s one.  Thanks for the update and rea  y happy to read about your feature stor es!  That  s GRAND.  JMo

Janet Monge
███████████████
University of Pennsylvania Museum/Anthropology
3260 South Street
Phila., PA 19104

On Dec 18, 2014, at 11:20 AM, Ma co m Burn ey <███████████████> wrote:

Janet,

How are you fee  ng? Any better (I hope!)?

I ve tr ed Conswue  a a few t mes th s week and no answer. I d d not  eave a message  ntent ona  y. I ve a so reached out to the reporter who wrote Ph  y Mag's story on B rd e Afr ca, so that he can g ve me Ramona s contact  nfo.

I got some good news ear er th s week  n that I ve got a coup e feature stor es  ned up for January. Exc t ng news, wh ch had me busy on Monday and Tuesday. So I m sorry I don t have further to report on our p ece—wh ch I m gett ng back to today.

Are you around next week to meet for  unch? I cou d st    come tomorrow, a though there m ght not be much progress for a few days.

Ta k soon,
Ma co m

EXHIBIT 18

COURSERA.

General Outline.
The course is divided into 6 topical units.  Within each unit, there are 4 segments (videos showing Janet Monge talking to slides).  4 of the units contain student videos (showing bones/ mummies).
All segments with slides were filmed in the McGraw Center Studio at Princeton University.  All student videos were filmed in Room 190, Penn Museum.
At the end if each UNIT, there is an examination.  There are readings for each UNIT.
Each Unit has a summary at the beginning of the Unit to let the students know what is covered in that Unit.

| | 1 | PERSONHOOD |
|---|---|---|
| S1 | | Losing Personhood: MOVE. A case study |
| S2 | | Restoring personhood |
| S3 | | Tools of the trade |
| S4 | | Compared to what? Introduction to forensic data |
| | 2 | BONES AND TEETH |
| S1 | | Teeth - the basics |
| S2 | | How teeth grow and develop |
| S3 | | Bone - the basics |
| S4 | | How bones grow and develop |
| | 3 | FORENSIC ANTHROPOLOGY TOOK KIT |
| S1 | | Is this forensically interesting? |
| S2 | | Recovery process and case studies (Holmes and Duffy's Cut) |
| S3 | | Morphological sex |
| S4 | | Aging and comparative standards |
| | 4 | ASSESSING GROWTH AND ADULTHOOD |
| S1 | | What is a growth standard? |
| S2 | | Stages of growth |
| S3 | | Dental and hand/wrist standards |
| S4 | | Do we need new growth standards? |

| | |
|---|---|
| 5 AGING TEETH | |
| S1 | Dental, skeletal and chronological age |
| S2 | Assessment of dental age |
| S3 | Staging of individula teeth |
| S4 | Development of standards - Moorrees method |
| 6 GROWING UP AND GROWING OLD | |
| S1 | Applying hand/wrist x-ray standards |
| S2 | Aging adult skulls |
| S3 | Aging adult pelves and teeth |
| S4 | Trauma and markers of occupational stress |

UNIT 1

Video showing the application of forensic tools of skeletal aging and the identification of morphological sexing.

Unit 1 frames the discussion within forensic anthropology using a case study of the MOVE organization.  The human remains are burned.  This is more than just a forensic anthropology case study.  There are very serious issues of social and political consequences of the event that led up to the assault on a neighborhood in Philadelphia and its outcome in a confrontation with law enforcement agencies.


VICE NEWS PODCAST:
https://www.youtube.com/watch?v=cWifLtv06HU

Philadelphia Inquirer
https://www.youtube.com/watch?v=widNelzBSQI


Interviews with surviving MOVE members, Ramona Africa and Michael Ward (Birdie Africa) and various people involved in the incident.  This video gives various viewpoints on the confrontation and aftermath.  It also shows the political and social context of a forensic case of this magnitude.

UNIT 2

This Unit introduces the structure, microstructure and function of bones and teeth. This is part of the basic "toolkit" for forensic anthropologists because bone and tooth growth and maintenance is critical to an understanding of techniques that are used often in forensics, most importantly in assigning age at death of unknown remains.

Topics covered include:
-identification of parts of bone and tooth
-how these parts form/change beginning in the fetus, though growth and development, to adulthood
-how bone and tooth accommodates change in the adult body
-what are the cells that produce bone and tooth and how do these maintain the structural components of bone and tooth

Once you understand these processes of growth and maintenance, many of the techniques applied in forensic anthropology covered in subsequent units will be much clearer. The quiz questions in this unit will test your basic knowledge of the human skeleton.

UNIT 3

Timeline: mummy science
https://www.youtube.com/watch?v=KNv_IxtiULU

This video (about 50 minutes long) is about the analysis of 3,000 year old well preserved Egyptian mummy using many state of the art scientific techniques. Many of these techniques are applied in modern forensic cases.

The video is really about restoring personhood to a mummified individual. Here you can see the application of:
x-ray and CT scan analysis
various chemical tests on the residues and proteins extracted from the mummy
forensic art
forensic archaeology
paleopathology and causes of death
problems assigning morphological sex.

Introduced in this Unit are:
What are growth standards
Are these population specific standards?
Patterns of health and disease in bone and tooth.
Forensic dentistry - pathology - tooth abscess and bone resorption.
Issues associated with the identification of morpological sex.

UNIT 5

NO "FORENSIC ANTHROPOLOGIST AT WORK" segment for this Unit

 Youtube videos

https://www.youtube.com/watch?v=y12JxtIFERo

There are many speciality areas in forensics.  This video focusses on Forensic Odontology (also called Forensic Dentistry).  In general, these specialists are dentists that take on the special project of working with law enforcement to identify individuals in medical/legal cases.  Many of the techniques will be familiar to you after you finish this Unit.  There is a short segment in the video about bite marks, showing the differences between human and animal marks left on human flesh.


OVERVIEW OF UNIT 5

Unit 5 covers:
 The basics of the identification of individual teeth in the human jaws (maxilla and mandible) including all of the tooth types:  Incisors, Canines, Premolars and Molars.
 A discussion of "growth standards".  Growth standards are used to give an age at death in forensic cases.
 How to read a dental x-rays and stage the degree of development of individual teeth.
 A comparison of 2 different growth standards (Demirjian and Moorrees) developed in the middle of the 20thC.
 Are new growth standards necessary for modern forensic cases?

UNIT 6

This Unit Video 1 completes the discussion of the use of "standards" applied to forensic cases where the recovered remains include those of young individuals.  The emphasis in this Unit is on the use of Hand/Wrist x-rays for the assessment of age-at-death of those remains.

No forensic course is complete without a discussion of the aging of adult individuals.  Unlike in aging of young individuals, adult individuals can only be assessed in very broad categories like young, middle and older adult.

Finally, this unit explores the use of forensic techniques to determine if the person in life experienced any episodes of trauma.  Trauma forensically is determined to be before death (antemortem trauma with bone healing), perimortem (occurring around the time of death with little or no evidence of healing) or postmortem (breakage or distortion of bone or other tissues that occurred after the death of the individual).

https://www.youtube.com/watch?v=3zqZPujAPuc

TED talk by Fredy Peccerelli on the genocide and recovery of information on genocidal acts committed in Guatamala.   The analysis of trauma is included in this video as are discussions of aging and sexing of the skeletons.  In addition, DNA recovery and comparison to living community members is a large part of this story.  In his TED talk Peccerelli adeptly describes all of the political and social issues associated with the identification of genocidal acts.

https://www.youtube.com/watch?v=mfi6gOX0Nf4

Finding and identifying the remains of Richard III.  It begins with an excavation in a parking lot to the eventual process returning personhood to the remains.  From excavation to analysis, the excavation team steps through the process including a detailed description of the sampling and analysis of ancient DNA.

STUDENT VIDEOS at the PENN MUSEUM

Segment 1

STUDENT:

████████

MA, 2017,  Egyptology, Department of Near Eastern Language and Civilization, University of Pennsylvania.
Intern:  Penn Museum, Physical Anthropology Section

TITLE:  Aging, dentition, gross morphology
████████████ (M.A. 2019 Egyptology, Department of Near Eastern Languages and Civilization, University of Pennsylvania. ██████is also a research intern in the Physical Anthropology Section of the Penn Museum) is doing a preliminary analysis of a series of lower jaws from young individuals.  This segment is on the analysis of whole bone/tooth without the advantage of x-rays or CT scans to show the degree of development of each tooth crown and root.  Instead, ██████████ is looking at the eruption of the teeth, and where possible when a tooth in the crypt is visible, at the degree of development of the rooting system.  Most of these jaws show a mixed dentition with both primary and permanent teeth in place or in the process of erupting.  From this initial inspection, he is able to give a good estimate of the age at death of the individuals.  Within this sequence, we take a first look at an adult dentition showing various types of dental disease including cavities and tooth loss due to infection.

Segment 2
STUDENT:

████████

BA candidate 2020, Department of Anthropology, University of Pennsylvania.

TITLE:  Mummy and personhood
███████ (BA Candidate Anthropology, expected degree 2020, University of Pennsylvania), experiences mummified remains for the first time.  She discusses body position, in this case a folded fetal position (if a person is buried in this position but with the head upright, then the position is called the "ready" position) and what it is like to bury a body.  Then she moves on to discuss what can be learned on the morphological sex of the mummified person - she is morphologically female.  Finally, ████████ estimates the age of the individual based on the full adult dentition.  An X-Ray or a CT scan of this individual would allow a more detailed analysis of the skull and pelvis for the assessment of morphological sex and yield more detailed information on the dentition and, in this case, perhaps for the assessment of dental disease.


Segment 3
STUDENT:
███████

BA, 2019, Department of Anthropology, University of Pennsylvania
Intern:  Penn Museum, Physical Anthropology Section

TITLE:  MOVE - an analysis of the remains
███████ (2019 BA Anthropology, University of Pennsylvania) works towards the identification of morphological sex and age at death of one of the MOVE remains.  Unfortunately, the only skeletal parts of this person recovered from the burned building were a top part of a femur bone and one side (innominate) of the pelvis.  ████ goes over the process of how age was assessed using growth plates and growth features of both of these bones.  Her final assessment is that this individual was a morphological female and that she died in the fire at at least 18 to 20 years of age.

Segment 4
STUDENT:
███████

BA, 2019, Departments of Anthropology and Environmental Science, University of Pennsylvania
Intern:  Penn Museum, Physical Anthropology Section

TITLE:  Trauma - old, new, healing
███████ looks at several examples of cranial trauma in humans.  Purposeful actions, like trephination, a type of both ancient and modern skull surgery, and subsequent healing, are described.  She also discusses perimortem trauma on the skulls of individuals who were killed in a conflict.  Unlike the trephinated skull there is no sign of bone healing.  Additionally, the bone displays plastic distortion indicating that the wounds were sustained while the individual was alive or just recently dead - thus perimortem.

EXAMPLE OF ONE OF THE QUIZES.

Morphological sex in forensic anthropology cases:
is assessed using both the skull and pelvis
cannot be accurately assessed
can be assessed in both children and adults
can be assessed only in adults using the pelvis
none of the above
ANSWER:  A

2.  The "body" position of human remains:
is rarely useful in a forensic investigation
is important in the recognition of a case that is forensically significance
is never part of forensic investigation
is usually in the form of an extended (face upwards, arms to the side, legs straight) burial
is only important if the remains have been buried
ANSWER:  B

3.  Hypoplasia:
is present in the teeth and in the long bones of the skeleton
is the same as dental calculus
is a line of arrested growth during infant and child enamel formation
always results in the premature loss of teeth
is viewed radiographically (with X-Rays)
ANSWER:  C

4.  Which of these statements is true:
human and other mammal bones are morphologically identical to each other
raccoons and dogs often find and retrieve human remains from unihabited areas
all forensic anthropologists can recognize and identify even small fragments of bone
a clandestine burial can be identified based on changes to the vegetation and soil
a and d
c and d
ANSWER:  F

5.  Morphological sex in the skull:
is expressed in a range from super-female to super-male
is expressed in the degree of development of the muscle attachment areas
is expressed in features of the chin ranging from round to flat
is the second best area for the assessment of sex in the skeleton
all of the above except c
a and b
ANSWER E

EXHIBIT 19

LAW OFFICES

# SCHNADER, HARRISON, SEGAL & LEWIS

SUITE 3600

1600 MARKET STREET

PHILADELPHIA, PENNSYLVANIA 19103

215-751-2000 · TELECOPIER: 215-751-2205

TELEX: 83-4280 · CABLE: WALEW

SUITE 3100
750 THIRD AVENUE
NEW YORK, NEW YORK 10017
212-986-5220

SUITE 1000
1111 NINETEENTH STREET, N. W.
WASHINGTON, D. C. 20036
202-463-2900

DIRECT DIAL NUMBER
(215) 751-2534

June 24, 1985

Marvin E. Aronson, M.D.
Medical Examiner
City of Philadelphia
321 University Avenue
Philadelphia, PA   19104

This material comes from the holdings of:
TEMPLE UNIVERSITY LIBRARIES/CHARLES LIBRARY
SPECIAL COLLECTIONS RESEARCH CENTER
1900 N. 13th St.
PHILADELPHIA PA 19122
NOTICE: This material may be protected by copyright law (Title 17, U.S. Code).

Re:  Philadelphia Special Investigation Commission

Dear Dr. Aronson:

I am Chairman of the Philadelphia Special Investigation Commission. As a part of our investigation, we intend to request that a forensic pathologist review the findings of your office concerning the remains found in and around the MOVE house on Osage Avenue. Therefore, I request that you not release or otherwise dispose of any of the remains currently in your custody and that you provide to us at your earliest convenience all records relating to the examination of the remains, including any rough notes, photographs, summaries or other material which exists as a result of your examination of these remains.

If you have any questions with regard to the above, please contact either myself or William B. Lytton, Esq., Staff Director and Counsel to the Commission at (215) 751-2611.

Very truly yours,

William H Brown III

William H. Brown, III
Chairman
Philadelphia Special
Investigation Commission

WBL/moc    Copy 20-1

Hand Delivered

3 - 1 - 2

EXHIBIT 20

3980 Dunn Road
Huntingtown, Maryland
20639

*cc: WHB II file*
*WBL*
*Terry S.*

December 28, 1985

Mr. William Lytton, Staff Director
Philadelphia Special Investigation Commission
P.O. Box No. 59209
Philadelphia, Pennsylvania    19102-9209

Dear Mr. Lytton:

The end of 1985 is drawing very close, and I would like to get my finances straightened our for my annual accounting. To date, I have submitted statements to you for each month I have been working on the MOVE cases, yet my records do not show any receipt of payment for any month other than July. I would very much appreciate your reviewing my statements and paying them as soon as possible. They represent a considerable outlay on my part in time and expenses.

I have submitted a supplemental report to Dr. Hameli that covers my re-examination of MOVE bodies "B-1" and "G." That examination was done in Dr. Segal's office in the Office of the Medical Examiner of Philadelphia Dec. 3, 1985 by Dr. Hameli and myself. As a result of that re-examination, I have not changed my opinion materially concerning the ages of those bodies, the comments made by the medical examiner and his anthropologist in the Philadelphia papers notwithstanding. My reasons for making the age estimates that I did are explained and documented in the supplemental report. Dr. Hameli will be submitting it in the near future.

Prompt payment of my statements will be appreciated. If I can be of further service to you or the Commission, please do not hesitate to call upon me.

Sincerely,

Ellis R. Kerley, Ph.D
Forensic Anthropologist

*Rec'd. 1/2/86*

3-2-23

EXHIBIT 21

CC: *Commissioners*
WBL, HGM, EDM

**CITY OF PHILADELPHIA**

DEPARTMENT OF PUBLIC HEALTH
OFFICE OF THE MEDICAL EXAMINER
321 University Avenue
Philadelphia, Pa. 19104

STUART H. SHAPIRO, M.D., M.P.H.
Health Commissioner

MARVIN E. ARONSON, M.D.
Medical Examiner

This material comes from the holdings of:
TEMPLE UNIVERSITY LIBRARIES/CHARLES LIBRARY
SPECIAL COLLECTIONS RESEARCH CENTER
1900 N. 13th St.
PHILADELPHIA PA 19122
NOTICE: This material may be protected by copyright law (Title 17, U.S. Code).

January 23, 1986

William Lytton, Esquire
Philadelphia Special Investigation Commission
P. O. Box No. 59209
Philadelphia, PA  19102

Dear Mr. Lytton:

I have received the report from Dr. Judy Suchey, the Forensic Anthropologist Dr. Hameli asked to examine the remains of MOVE victim designated B-1. In her opinion the age is between 12 and 17 years which is in agreement with Dr. Kerley and strongly supports Dr. Hameli's conclusions. It would be unreasonable for me to reject these findings in light of the evidence available at this time.

I have no reports, correspondence or memoranda from the Anthropologists who examined the material except for the report of Dr. Mann which is already in your possession.

Sincerely yours,

Robert J. Segal, M.D.
Assistant Medical Examiner

RJS/ch
cc: Dr. Ali Hameli
    Dr. Stuart Shapiro
    Dr. Robert Catherman

RECEIVED

JAN 24 1986

3-1-24

EXHIBIT 22

# PHILADELPHIA SPECIAL INVESTIGATION COMMISSION
P. O. BOX NO. 59209
PHILADELPHIA, PA  19102-9209

TELEPHONE NUMBER
(215) 751-2610

WILLIAM H. BROWN III, ESQUIRE
CHAIRMAN

CHARLES W. BOWSER, ESQUIRE
REVEREND AUDREY F. BRONSON
JULIA CHINN
M. TODD COOKE
REVEREND MONSIGNOR EDWARD P. CULLEN
HONORABLE BRUCE W. KAUFFMAN
CHARISSE R. LILLIE, ESQUIRE
HENRY W. RUTH, JR., ESQUIRE
REVEREND PAUL MATTHEWS WASHINGTON
NEIL J. WELCH

WILLIAM B. LYTTON, ESQUIRE
STAFF DIRECTOR, AND COUNSEL

DEAN CARL E. SINGLEY
SPECIAL COUNSEL

December 4, 1985

Robert J. Segal, M.D.
Assistant Medical Examiner
City of Philadelphia
Department of Public Health
321 University Avenue
Philadelphia, PA   19104

This material comes from the holdings of:
TEMPLE UNIVERSITY LIBRARIES/CHARLES LIBRARY
SPECIAL COLLECTIONS RESEARCH CENTER
1900 N. 13th St.
PHILADELPHIA PA 19122
NOTICE: This material may be protected by copyright law (Title 17, U.S. Code).

Dear Dr. Segal:

I was advised by Dr. Ali Hameli on December 4, 1985 that he has concluded his examination of all of the remains currently at the Medical Examiner's Office that related to the MOVE confrontation on May 13, 1985. Dr. Hameli has advised me that the remains may now be released by the Medical Examiner's Office.  Consequently, the Philadelphia Special Investigation Commission no longer requires that these remains be retained by your Office and please feel free to release them in accordance with normal procedures.

Very truly yours,

William B. Lytton
Staff Director and Counsel

DICTATED BUT NOT READ
BY MR. LYTTON

/moc

cc:  Stuart H. Shapiro, M.D.

bcc:  William H. Brown III
      H. Graham McDonald

3-1-16

EXHIBIT 23

Philadelphia, Pa. *12 - 9* 19 *85*

*Medical Exam* Hospital

Please deliver the body, effects and clothing of

*Katrica J. Dotson*

## To HANKINS FUNERAL HOME, INC.

4075 Haverford Ave.          EVergreen 2-5656

Order of *Mr. Nathaniel James Dudley*

Address *415 Manton St*

B-1

| ORDER TO RELEASE BODY | CITY OF PHILADELPHIA<br>**DEPARTMENT OF PUBLIC HEALTH**<br>OFFICE OF THE MEDICAL EXAMINER | MEDICAL EXAMINER'S CASE NO.<br>2599-85 |
|---|---|---|

TO

☑ Med. Ex. Off.    ☐ Hospital *(Name)*

DATE 12/9/85

PLEASE DELIVER TO *(Funeral Director)*
*Lessor Hankins*

NAME OF DECEDENT
*Patricia J. Dotson*

RELEASE ONLY AFTER COMPLETION OF
POSTMORTEM EXAMINATION AND ☐ Fingerprints ☐ Photographs

M.E. INVESTIGATOR *(Signature)*
*W P Gilbe*

55-X-495 (Rev. 9/68)

---

☐ O.M.E. Photos; Compl. by _____
☐ Police Photos; Compl. by _____

☐ Fingerprints; Completed by _____
☐ Other per _____
☐ Hold Terminated by _____

*Gilbert*

**CLOTHING**

| ☐ Hat or Cap | ☐ Coat | ☐ Belt | ☐ Dress | ☐ Girdle | ☐ Pajamas | ☐ Held as Evidence |
| ☐ Overcoat | ☐ Trousers | ☐ Hosiery | ☐ Blouse | ☐ Brassiere | ☐ Baby Clothes | |
| ☐ Sweater | ☐ Shirt | ☐ Shoes | ☐ Skirt | ☐ Nightgown | ☐ Blanket | ☐ Destroyed for Sanitary Purposes |
| ☐ Jacket | ☐ Tie | ☐ Underclothes | ☐ Slip | ☐ Bathrobe | ☐ No Clothes | |

OTHER ITEMS DELIVERED WITH BODY *(List)*

| DECEDENT AND ABOVE ITEMS RELEASED TO<br>UNDERTAKER BY *(Signature of Morgue Attendant)*<br>*S Folb* | DECEDENT AND ABOVE ITEMS RECEIVED BY<br>*(Signature of Undertaker)*<br>*Freeman Hankins* | DATE 12-14-85<br>TIME 9 30   A.M. P.M. |
|---|---|---|

55-X-647 (Rev. 6/71)

**FILE**

EXHIBIT 24

Philadelphia, Pa. _Sept 12_ 19 _86_

**Hospital**

Medical Examiner

**Please deliver the body, effects and clothing of**

Delicia Africa

## To HANKINS FUNERAL HOME, INC.

**4075 Haverford Ave.**          **EVergreen 2-5656**

**Order of** _Gerald Ford (oprmn)_

**Address** _919 N 42ND St._

| ORDER TO RELEASE BODY | CITY OF PHILADELPHIA<br>**DEPARTMENT OF PUBLIC HEALTH**<br>OFFICE OF THE MEDICAL EXAMINER | MEDICAL EXAMINER'S CASE NO.<br>2492-85 |
|---|---|---|

TO
☒ Med. Ex. Off.   ☐ Hospital *(Name)*

DATE  9/19/86

PLEASE DELIVER TO *(Funeral Director)*   Hawkins

NAME OF DECEDENT   Delisha AFRICA

RELEASE ONLY AFTER COMPLETION OF
POSTMORTEM EXAMINATION AND ☐ Fingerprints ☐ Photographs

M.E. INVESTIGATOR *(Signature)*   Luther A. Cassit

55-X-495 (Rev. 9/68)

---

☐ O.M.E. Photos; Compl. by _____
☐ Police Photos; Compl. by _____

☐ Fingerprints; Completed by _____
☐ Other per _____
☐ Hold Terminated by _____

*Luther Cassit*

**CLOTHING**

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Hat or Cap | ☐ Coat | ☐ Belt | ☐ Dress | ☐ Girdle | ☐ Pajamas | ☐ Held as Evidence |
| ☐ Overcoat | ☐ Trousers | ☐ Hosiery | ☐ Blouse | ☐ Brassiere | ☐ Baby Clothes | |
| ☐ Sweater | ☐ Shirt | ☐ Shoes | ☐ Skirt | ☐ Nightgown | ☐ Blanket | ☐ Destroyed for Sanitary Purposes |
| ☐ Jacket | ☐ Tie | ☐ Underclothes | ☐ Slip | ☐ Bathrobe | ☐ No Clothes | |

OTHER ITEMS DELIVERED WITH BODY *(List)*

| DECEDENT AND ABOVE ITEMS RELEASED TO<br>UNDERTAKER BY *(Signature of Morgue Attendant)* | DECEDENT AND ABOVE ITEMS RECEIVED BY<br>*(Signature of Undertaker)*   *Freeman Hawkins* | DATE  9/22/86 |
|---|---|---|
| | | TIME  9:25  ☐ A.M. ☐ P.M. |

55-X-647 (Rev. 6/71)

**FILE**

EXHIBIT 25

Memorandum

To: Provost Wendell Pritchett, University of Pennsylvania

From: **Dr. Michelle Glantz** (C'90, Gr'99), Professor and Chair, Department of Anthropology and Geography, Interim Chair, Department of Ethnic Studies, Colorado State University;
**Dr. Sheela Athreya** (G'96), Associate Professor and Chancellor's Edges Fellow, Department of Anthropology, Texas A&M University;
**Dr. Jane Kauer** (C'88, Gr'02), Assistant to the Physical Anthropology Section Lead, Penn Museum;
**Dr. Melissa Murphy** (HC'94, Gr'04), Associate Professor and Interim Chair, Department of Anthropology, University of Wyoming;
**Dr. Emily Renscher** (BMC'96, Gr'07),
**Dr. Pamela L. Geller** (C'96, Gr'04), Associate Professor, Department of Anthropology, University of Miami
**Dr. Alexis T. Boutin** (Gr'08), Professor and Chair, Department of Anthropology, Sonoma State University
**Dr. Briana Pobiner** (BMC '97), Research Scientist and Educator, Department of Anthropology, National Museum of Natural History, Smithsonian Institution

Re: The Samuel G. Morton Crania Collection and its steward, Dr. Janet Monge

Date: September 9, 2020

<u>Overview</u>

The intention of this letter is to alert you to a growing and damaging misrepresentation of how the Penn Museum approaches the curation of the Samuel G. Morton Crania Collection (links below) and the potential for an inexcusable scapegoating of its steward, Dr. Janet Monge (Gr'91). We are reaching out to you with urgency **to caution against any new policy decisions about the collection based on recent media and to advocate for Dr. Monge and her management of the collection.** We are deeply concerned that descriptions in the media have been fueled by individuals on the Penn campus with careerist motivations and/or without sufficient knowledge of the history of the debate. Now, this unvetted commentary is positioned to inform policy changes that are misguided about what to do with the collection. Particularly troubling is the notion that the collection and those who have worked with it should be 'cancelled.'

<u>Why our voices need to be considered</u>

As alumni, we collectively hold eleven degrees from Penn, two from Bryn Mawr College, one from Haverford College, and six PhDs conferred by the School of Arts and Sciences and the Department of Anthropology. We have in common the Penn perspective on biological

anthropology that we attribute to the significant and positive years-long mentorship of Dr. Monge, the current Curator in Charge of the Physical Anthropology Section at the Penn Museum as well as non-tenure track faculty in the Department of Anthropology.  In addition, all of us have worked with the Samuel G. Morton Collection in some capacity.  As professional mid-career anthropologists, we possess the disciplinary expertise needed to navigate the complex history of biological anthropology and its ethical challenges as well as NAGPRA (the Native American Graves Protection and Repatriation Act of 1990) policies and guidance.  **We draw on our collective experiences in the field and our knowledge of Dr. Monge's professionalism to provide you with context and perspective on the curation of the Samuel G. Morton Collection.**

Background to the current global crisis concerning human skeletal collections housed in western institutions

It is a painful reality that all scientific skeletal collections around the globe, Morton's included, are largely comprised of bodies from vulnerable and victimized communities.  We have published on the morally troublesome roots of anthropology and related topics throughout our careers (Glantz, 2019, Athreya and Ackermann 2019, Boutin 2019, Boutin et al., 2017, Long and Boutin, 2018; Murphy 2017a and b, Geller 2015, 2017, 2020, in prep; Geller and Stojanowski 2017, Renschler and Monge 2008).  Indeed, anthropology and archaeology as disciplines and museums such as Penn's would not exist today in their current forms, if not for their colonial roots. We are at a crossroads where, in the current social and political climate, it is easy to target every dimension of anthropology for its past appropriation of bodies and cultures. These criticisms are valid and serve as a call to action to improve the discipline and correct museum practices. At the same time, research institutions, like Penn, have provided the critical training materials for decades of students who today burnish the university's reputation by being among those anthropologists at the forefront of advocating for change in the management of such collections.

Thanks to Dr. Monge, we have spent our careers engaging in post-colonial critiques of anthropology and attendant museum policies to interrogate the role the discipline has played in the continuing objectification and exploitation of brown and Black bodies. We have seen how this interrogation requires collaboration with descendant communities impacted by the collection of their ancestors currently housed in institutions like the Penn Museum. But we also have seen individuals from outside of these communities try to hijack the narrative, to speak for brown and Black communities by leveraging the mantle of advocacy.  This represents a 21st century form of neo-colonialism.

One of the problems is that although NAGPRA lays out clear guidelines for Native American remains and cultural material, best practices related to historic Black and brown communities are not clear – and it is this discussion that is relevant to the management of the Morton Collection. As you can imagine, the merits of foregrounding a collaborative approach to resolving these

problems is populated by good and bad actors. The bad actors exploit the perceived opening as an opportunity to serve themselves and their careers.

**Our concern: We are aware of self-serving actors who have maneuvered their cause into a powerful but woefully ignorant narrative about the issues and personnel associated with the curation of the Morton Collection, and are using the conversation and cloak of allyship to further their own privilege and voice in the name of underrepresented peoples.**

**Our Plea to you: We call for a halt to any policy action or personnel changes until a fair consideration of our concerns can be addressed by an independent group of experts.**

<u>What we can attest to as former students of Dr. Monge</u>

During her tenure at Penn, Dr. Monge has raised thousands of dollars in donations to the museum from the community and Penn alumni. She has recruited most of the biological anthropology majors into the department through her well-regarded teaching and mentoring, and served on countless graduate committees. Her work with students has given rise to a new generation of highly successful biological anthropologists.  Dr. Monge also boasts a robust and unimpeachable research record, including two successfully funded NSF projects[1] related to museum collections and their use.

Dr. Monge has been at the forefront of conversations about the use and misuse of skeletal material in biological anthropology and the need for community engagement. **Importantly, long before any self-serving actors materialized, she had initiated and supervised the successful repatriation of hundreds of individuals.** All of us can attest to the fact that Dr. Monge uses the museum exhibitions[2] to educate students and the broader public about how science has been used to justify and naturalize racism and racial categories. In Dr. Monge, Penn has a fierce ally for what we understand to be strong and ethically-driven science.  It is exactly her success at doing this that helped produce the generation of scholars who drafted this memo to you.

Unfortunately, the initial *Daily Pennsylvanian* article did not research Dr. Monge's vanguard role in these conversations over the past 30 years, or credit her for the important work she has done. This incomplete but seductive narrative was picked up by other media outlets—a fresh bloodletting is always exciting fodder for news outlets.

---

[1] National Science Foundation grant: <u>Native Voices: Past and Present</u>" (2005-2008). This project gave Native American college students the opportunity to work on Penn Museum collections in partnership with other Penn undergraduate students.

[2] https://penntoday.upenn.edu/news/making-and-unmaking-race-morton-collection-human-crania-spotlight-penn-museum

The published accounts of the collection's management are poorly informed to say the least, and we fear her position at Penn is vulnerable because it is not tenure-track.

**Current critiques of museum holdings and management are important and justified, but NONE of them can be applied to Dr. Monge's curatorial oversight of Penn's human skeletal collections.** We have witnessed Dr. Monge's engagement with these issues over the last 30 years. All of us have first-hand knowledge of her work in advocating for a decolonizing process with the Morton Collection. Allowing outsiders to co-opt the process in the thin disguise of promoting an ethical high ground conveniently obscures their own complicity as participants in and beneficiaries of the colonial structures that support the institutions they seek to tear down. Dr. Monge embodies the best practices of curation as we can and will document in detail if asked. Her professional demeanor is inclusive, not obstructionist or opportunistic. She must not be scapegoated because of political expediency. Her long service to the university should be cherished and appreciated as a resource, and given the respect afforded to those with protected status in the university community.

<u>Concluding note</u>

We understand that changes are already in motion with regard to the Morton Collection and its management; if done reactively Penn loses the opportunity to signal its position on the right side of this cause long before it was brought to the attention of the media. It would be a grave mistake to damage the career and scapegoat a 30-year, devoted, thoughtful and productive member of Penn's faculty, instead of relying on her leadership, wisdom and voice regarding the collection she has helped catalogue, organize, repatriate, and use as an example of how biological anthropology should move forward on these matters in the 21st century.

Again, **we ask that you to halt any movement toward policy changes until a fair evaluation of the circumstances can take place.** We are certain that other renowned biological anthropologists will readily join our plea for fairness. If need be, we will pursue our unified position publicly.



## I.    Recent media coverage concerning Samuel G. Morton Collection

https://www.thedp.com/article/2020/06/penn-museum-samuel-morton-collection-repatriation-nagpra-skulls-racist-science

https://www.nytimes.com/2020/07/27/us/Penn-museum-slavery-skulls-Morton-cranial.html

https://www.inquirer.com/news/penn-museum-morton-enslaved-skulls-student-activists-20200727.html

https://www.art-critique.com/en/2020/07/penn-museum-to-return-skulls-held-in-the-morton-cranial-collection/

## II.    Bibliography

Athreya, S., & Ackermann, R. R. 2019. Colonialism and Narratives of Human Origin in Asia and Africa. In M. Porr & J. Matthews (Eds.), *Interrogating Human Origins: Decolonisation and the Deep Past*. London: Routledge. Chapter 6.

Boutin, Alexis T. 2019. Writing Bioarchaeological Stories to Right Past Wrongs. In *Bioarchaeologists Speak Out: Deep Time Perspectives on Contemporary Issues*. J.E. Buikstra, ed. Springer, pp. 283-303.

Boutin, Alexis T. Madison Long[*], Rudy A. Dinarte[±], Erica R. Thompson[±]. 2017. Building a Better Bioarchaeology Through Community Collaboration. *Bioarchaeology International* 1(3-4): 191-204.

Geller, Pamela L. In prep. *Your Obedient Servant: The Socio-politics of the Samuel G. Morton Crania Collection*.

Geller, Pamela L. 2020. Building Nation, Becoming Object: The Biopolitics of the Samuel G. Morton Crania Collection. *Historical Archaeology* 54(1):52-70.

Geller, Pamela L. 2017. *The Bioarchaeology of Socio-Sexual Lives: Queering Common Sense about Sex, Gender, and Sexuality*. New York: Springer Press.

Geller, Pamela L. 2015. Hybrid Lives, Violent Deaths: Seminole Indians and the Samuel G. Morton Collection. In *Disturbing Bodies: Perspectives on Forensic Anthropology*, edited by Z. Crossland and R. Joyce, pp. 137-56. Santa Fe, NM: SAR Press.

6

Geller, Pamela L., and Christopher M. Stojanowski. 2017. The Vanishing Black Indian: Revisiting Craniometry and Historic Collections. *American Journal of Physical Anthropology* 162(2):267-84.

Glantz, Michelle M. 2019. Hegemony and the Central Asian Paleolithic record: perspectives on Pleistocene landscapes and morphological mosaicism, In: *Evaluating Evidence in Biological Anthropology: the Strange and the Familiar (Vol. 83)*, (C.Willermet and S-H Lee, eds.) Cambridge University Press.

Long, Madison and Alexis T. Boutin. 2018. A Skull's Tale: From Middle Bronze Age Subject to Teaching Collection 'Object'. In *Bioarchaeological Analyses and Bodies: New Ways of Knowing Anatomical and Archaeological Skeletal Collections*. P.K. Stone, ed. Springer International Publishing AG, pp. 213-230.

Murphy, M.S. and H. Klaus (editors). *2017a. Colonized Bodies, Worlds Transformed. Toward a Global Bioarchaeology of Contact and Colonialism.* Gainesville: University Press of Florida

Murphy, M.S. and H. Klaus. 2017b. Transcending conquest: Bioarchaeological perspectives on conquest and culture contact for the twenty-first century. In *Colonized Bodies, Worlds Transformed. Toward a Global Bioarchaeology of Contact and Colonialism,* edited by M.S. Murphy and H. Klaus, pp. 1-39. Gainesville: University Press of Florida.

Renschler, E. and J. Monge (2008). The Samuel George Morton Cranial Collection: Historical Significance and New Research. *Expedition* **50**(3): 30-38.

EXHIBIT 26

**MORTON COLLECTION/MOVE REMAINS PUBLIC CONTROVERSY TIMELINE**

**10/4/18:**  "A New Take on the 19th- Century Skull collection of Samuel Morton" *Science Daily,* Paul Mitchell

**5/2019:**  Monge – Mitchell argument over Morton Collection, Mitchell barred from access to collection, however he continued to have access until August of 2019

**7/12/19:**  "As Repatriation Debate Continues, the University of Pennsylvania Has a Role to Play" *Philadelphia Inquirer,* Abdul-Aily Muhammad

**7/29/20:**  "Penn Museum to Relocate Skull Collection of Enslaved People" *New York Times,* Johnny Diaz

"Penn Museum to Repatriate Skulls of Enslaved People Held in the Morton Cranial Collection" *Art Critique*, Katherine Keener

**8/20**  Penn Museum forms **Morton Collection Committee** to determine "next steps towards repatriation or reburial of the crania of enslaved individuals within this Collection." The Committee proposed a "NAGPR informed infrastructure and process that would inform the repatriation or reburial of the enslaved and Black individuals in the Collection."

**9/9/20**:  Letter to Provost Pritchett from six women anthropologists expressing their concerns that the Morton Collection public controversy was being used to "scapegoat" Janet Monge, Exhibit 25.

**12/8/20:**  Tinney held meeting to discuss Mitchell's claim that certain skulls in the Morton Collection were of Blacks from Philadelphia.

**1/21/21:**  Penn Museum announces the hiring of Christopher Woods as the new executive director

**2/9/21**  Mitchell tells Monge during a two-hour telephone conversation that the remains of 14 Blacks in the Morton Collection had been robbed from graves located at the old  Philadelphia Alms House and Potter's Field that are currently partially covered by Franklin Field.

**2/15/21:**  "Black Philadelphians in the Samuel Morton Cranial Collection" *Penn Program on Race, Science and Society,* Paul Mitchell

| | |
|---|---|
| **2/16/21:** | "Some Skulls in Penn Museum Collection May Be the Remains of Enslaved People from a Nearby Burial Ground" *Philadelphia Inquirer*, Steven Salisbury |
| **4/1/21:** | Christopher Woods started as Penn Museum Director |
| **4/5/21:** | "It Past Time for Penn Museum to Repatriate the Morton Skull Collection" *Philadelphia Inquirer,* Abdul-Aily Muhammad |
| **4/7/21:** | "Activists Renew Calls for Penn Museum to Repatriate Skulls of Enslaved People" *Hyperallergic*, Hakim Bishara |
| **4/8/21:** | Morton Collection Committee issues report of process for repatriation and burial of certain remains. |
| **4/12/21:** | Woods announced plans to deaccession the skulls in the Morton Cranial Collection |
| **4/13/21** | "Penn Museum Announces Recommendations for Repatriation of Human Skulls" *The Art Newspaper*, Gabriela Angeleti |
| **4/14/21** | "Penn Museum to Repatriate Skulls of Black Americans and Slaves from Cuba" *Philadelphia Tribune*, Peter Crimmins, WHYY, |
| **4/16/21** | "How a Museum's Skull Collection Sparked a Racial Reckoning." *Forbes Magazine*, Kelleher |
| **4/16/2**1: | Paul Mitchell met with Christopher Woods to discuss his concerns about the Morton Collection and the MOVE remains at the Museum |
| | Maya Kassutto contacts a Museum employee to "fact check" an article that she is writing on the MOVE remains. |
| **4/18/21** | Jake Nussbaum, an anthropology graduate student, sends Princeton an email regarding the Coursera course. |
| **4/21/21** | "Penn Owes Reparations for Previously Holding Remains of a MOVE Bombing Victim." Phila*delphia Inquirer*, Abdul-Aily Muhammad |
| | "Remains of Children Killed in MOVE Bombing Sat in a Box at Penn Museum for Decades" *Billy Penn Newsletter*, Maya Kassutto |

**4/22/21**    "Racism Has No Place in Our Museum" Statement of Penn Museum on Morton Collection

**4/23/21**    Mitchell publicly circulates a document claiming that the remains of two MOVE children were at the Penn Museum.

"Penn Museum Kept Remains of MOVE Bombing Victim: Now, Activists Call for Curator's Firing "*Hyperallergic,* Hakim Bishara

**4/26/21**    "Penn Museum apologizes…." *Philadelphia Inquirer*, Vinny Vella, and Mensa Dean

*American Association of Anthropologist*s condemns treatment of the remains.

**4/27/21**    "Princeton Apologizes for the Handling of the MOVE remains" *Princetonian*

"MOVE Members Mourn Their Children's Lives as Penn Museum Apologizes for Storing Remains" *Billy Penn Newsletter*, Maya Kussutto

**4/28/21**    "Toward a Respectful Resolution…" First Penn Museum Statement, on MOVE remains, Pritchett, and Woods

Abdul-Aily Muhammed and 100 protesters march at Penn Museum over MOVE remains

**4/29/21:**    "Penn, Princeton Apologize for Treatment of Bombing Victims Remains" *Inside Higher Education*, Colleen Flaherty

**5/4/21**    "Toward a Respectful Resolution Apology to the Africa Family" Updated Penn Museum Statement, Pritchett, and Woods.

**5/9/21**    "Laying Questions to Rest: Treatment of MOVE Remains Probe" *Philadelphia Inquirer*, Abdul-Aily Muhammad

**5/10/21**    "As Philly Reckons with MOVE Remains, Anthropologists Must Confront Our Role" *Philadelphia Inquirer*, Tisa Loewen

**5/16/21**    "Saying Her Name" *The New Yorker*, Heather Thompson

**7/2/21**    MOVE remains returned to MOVE members