EXHIBIT B

## <u>SUPPLEMENTAL REPORT TO "THE ODYSSEY OF THE MOVE REMAINS"</u>

**September 12, 2022**

### <u>BACKGROUND</u>

In April of 2021, the University of Pennsylvania (the "University") retained the Tucker Law Group ("TLG") to conduct an independent investigation into the circumstances under which the unidentified remains of one or more of the MOVE organization children killed by the City of Philadelphia (the "City") on May 13, 1985 on Osage Avenue came to be stored for 36 years at the University of Pennsylvania Museum of Archaeology and Anthropology ("Museum"). The remains, which consisted of several bone fragments, were apparently taken to the Museum in the Fall of 1986 by Dr. Alan Mann, an anthropology professor at the University, who was retained by the City of Philadelphia's Medical Examiner's Office ("MEO") to assist in the identification of the remains. Dr. Janet Monge, who was a graduate assistant at the time, assisted Mann in his effort. After the remains were taken to the Museum, Mann made no further efforts to identify them or return them to the City. Mann and Monge never notified anyone at the University or the Museum that the remains were at the Museum.

Mann left the University in 2001 to join the faculty at Princeton University. The remains were left at the Museum in the custody of Monge who, at that point, was an Associate Curator at the Museum. In February of 2019, Monge used three bone fragments as a demonstrative exhibit in a Princeton University online course that she taught. TLG's investigation found that these remains were also exhibited by Monge on several other occasions, including in 2015 during a Museum donors meeting. The existence of the remains at the Museum and their exhibition by Monge became a matter of public controversy in the Spring of 2021.

Shortly after the controversy over the display of the remains arose, on May 14, 2021, the City disclosed that the MEO still possessed unidentified remains of other MOVE

victims.[1] The City then retained the Dechert law firm "to conduct an independent investigation regarding the City's possession of human remains from" the MOVE bombing.[2] The City also retained Montgomery, McCracken, Walker, and Rhoads ("MMWR") to co-investigate with Dechert LLP and "serve as the liaisons to family members of the victims of the City's bombing of the MOVE house…"[3] Finally, Princeton University retained Ballard Spahr to investigate the display of the remains on one of its online platforms.[4] On July 2, 2021, as a part of its reconciliation with living mothers of the children who were killed in the MOVE bombing, the Museum returned all known MOVE remains in its possession to the mothers. On August 2, 2022, the City returned remains thought to be of Katricia Dotson and Zanetta Dotson to a family member.[5]

## THE UNRESOLVED DISPUTE OVER THE NUMBER OF REMAINS

### I.

On August 20, 2021, TLG issued its report entitled "The Odyssey of the MOVE Remains."[6] Two of the findings and conclusions related to the identity of the remains at the Museum and the question of whether the remains were those of one or two of the MOVE children, specifically Delisha Orr and Katricia Dotson. Although TLG addressed

---

[1] "Philly Says It Found the Remains of the MOVE Bombing Victims It Thought It Had Cremated and Discarded." *Philadelphia Inquirer*, May 14, 2021.  https://www.inquirer.com/news/thomas-farley-philadelphia-health-commissioner-move-bombing-20210514.html?outputType=amp

[2] "Dechert Completes Pro Bono Investigation into City of Philadelphia's Possession of Human Remains from 1985 MOVE Bombing."  https://www.dechert.com/knowledge/news/2022/6/dechert-completes-pro-bono-investigation-into-city-of-philadelph.html

[3] *MMWR Report, p. 1.*

[4] "Investigative Report Regarding Princeton University's Role in the Handling of Victim Remains from the 1985 MOVE Bombing in Philadelphia,"  https://www.princeton.edu/sites/default/files/documents/2021/08/2021-08-30-FINAL-MOVE-REPORT.pdf

[5] "Brother is Given MOVE Remains." *Philadelphia Inquirer*, August 3, 2022. https://eedition.inquirer.com/infinity/article_popover_share.aspx?guid=acdeed89-53bc-4fce-88f3-f44c6008d559

[6] "*The Odyssey of the MOVE Remains*" https://urldefense.com/v3/__https://www.penn.museum/towards-respectful-resolution/__;!!IBzWLUs!DNg00pWc9wuyfaitRO8rox3T3azFOEJ1U95W3-ykNq69Jdv2w-MZIQmeve94VzmQsFU0nuye$

these questions in the Report, TLG concluded that resolving them was a secondary goal of the investigation because TLG's principal charge was to "examine the ethical and legal propriety of the custody and display of **any** MOVE remains, identified or not" at the Museum.[7]

Although TLG concluded that Drs. Mann and Monge's conduct with regard to the remains at the Museum did not violate any Museum policies, was not illegal and did not violate any specific anthropological ethical principles, TLG determined that:

> Dr. Mann's retention of the remains from 1985 to 2001 after he was unable to identify them, and his failure to return them to the MEO, demonstrated extremely poor judgement, and a gross insensitivity to the human dignity as well as the social and political implications of his conduct. [8]

> Dr. Monge's retention of the remains from 2001 to 2021 and their use in the Princeton Online video course demonstrated, at a minimum, extremely poor judgement and gross insensitivity to the human dignity and social and political implications of her conduct. [9]

TLG's Report noted that after the Bombing of Osage Avenue, a dispute arose between the Medical Examiner's Office and the MOVE Commission's experts over the identity of two sets of remains of MOVE children. The Commission's experts concluded that they were the remains of Katricia Africa and Delisha Africa, but the Medical Examiner's Office disagreed with those findings.[10]

TLG met with Monge and interviewed her several times regarding her possession, display and handling of MOVE remains. TLG also met with several other persons and reviewed hundreds of pages of Museum records and photographs, MOVE Commission archives, and documents provided by the City purporting to be the City's entire MOVE file, and found:

> There is no **credible evidence** that Mann also took the remains that the Commission concluded were those of Delisha. Mann and Monge did not believe

---

[7] *Odyssey*, p. 4

[8] *Odyssey*, p. 7. Mann refused TLG's request for an interview.

[9] *Odyssey*, p. 8

[10] *Odyssey*, p. 7

that the remains taken to the Museum could be conclusively identified as those of Katricia Africa.[11] (Emphasis added)

We reached that conclusion because, apart from the documentary evidence that we reviewed, which was inconclusive, the other evidence suggesting that a second set of remains (Body G) was also at the Museum consisted primarily of the statements of Paul Wolff Mitchell who claimed to have observed what he believed to be two sets of remains.[12] The remains that he claims to have observed were not labeled, and he admitted that he did not know what they were. Another purported witness was an undergraduate student who wrote a senior paper on the MOVE remains, which included an image of a skull fragment that was labeled G1. Neither Monge, who was the advisor on the paper, nor the student could provide a satisfactory explanation as to why the image was included or where it was located at the time of our investigation. In addition, TLG, Monge and Museum personnel conducted several exhaustive and unsuccessful searches in the Museum to determine the location of the skull fragment and to determine whether there were other remains that might belong to Body G. Monge provided TLG with no additional information that would have assisted TLG in determining whether Body G remains had ever been in the Museum.

## II.

The issue of whether two sets of remains were ever housed at the Museum resurfaced recently because of MMWR's Report. As we have seen, MMWR was retained to represent the interests of some MOVE members and that perspective animates its

---

[11] *Odyssey, p. 7.* Ballard Spahr reached a similar conclusion. In discussing a September 23, 1986 receipt Monge signed for MOVE remains, Ballard Spahr stated, "We conclude that this receipt covered the MOVE victim Remains, i.e., the femur and pelvis fragments. Dr. Monge confirmed that the receipt pertained to the B-1 remains (the MOVE Victim Remains) only. Drs. Mann and Monge also both stated that the Medical Examiner's Office did not provide them with any other remains for continued evaluation." *Ballard Report, p. 28.*

[12] Mitchell, a graduate student, and research assistant in Anthropology at the University, was a former mentee of Monge's who had a personal and professional dispute with her. As we detailed in our Report, we found that this entire controversy was orchestrated by Mitchell who admitted during his interview with us that he had a personal grudge against Monge. He also told us and the Museum's director that Monge was incompetent and admitted to us that he wanted her job. *Odyssey, pp. 51-55*

Report. MMWR had the benefit of some additional information that was not available to TLG and questioned TLG's conclusion that there was no credible evidence that two sets of remains were ever housed at the Museum.[13] Consequently, the University requested that TLG review MMWR's Report and supplement its findings if appropriate. We have done so and reaffirm our initial finding that **there is no credible factual or scientific evidence** that the Museum possessed the remains of a second MOVE child named Delisha, referred to as Body G.

While MMWR appears to dispute TLG's basic finding that there was no credible evidence that two sets of remains were ever housed at the Museum, it conceded that it could not refute that conclusion, despite having access to the additional information that TLG did not have:

> While our investigative efforts ***have not resulted in a definitive answer,*** we disagree [with TLG's finding] that the weight of the evidence clearly establishes that Drs. Mann and Monge did not receive any remains associated with Body G."[14] (Emphasis added), and,

> Although we regret ***we cannot provide a definitive answer with respect to this question*** and recognize that discussion may only cause increased uncertainty and speculation, we believed we needed to be as transparent and open about what our investigation revealed as possible.[15]

As we have seen, in reaching its conclusion, MMWR relied upon information that neither Monge nor the City provided to TLG. Specifically, MMWR relied upon a second photograph from Monge of a bone fragment that she purports to be the Body G occipital bone and a photograph that Monge kept of a shipping box that was used by the MEO to send certain of the remains to the Smithsonian Institute for evaluation. Inexplicably and despite numerous interviews, meetings and requests for documents and information, Monge failed to provide this information to TLG during or after its investigation.[16]

---

[13] *MMWR, p. 19*
[14] *MMWR, p.19*
[15] *MMWR, p. 33*

[16] When TLG learned of the information Monge failed to provide, TLG contacted Monge and her attorney. TLG requested all materials Monge had pertaining to her and Mann's investigation of the MOVE remains and requested another interview with Monge. Monge did not provide any additional documentation to TLG and, through her attorney,

MMWR also relied upon documents from 1986 regarding the exchange of MOVE remains between the MEO, the Smithsonian Museum and Drs. Monge and Mann, and slides of bone fragments. Despite TLG's specific requests during the investigation for this type of information, documents and photographs, the City failed to provide this information. TLG only learned of the withheld information through MMWR's Report.

In reaching its conclusion, MMWR places the greatest reliance on statements from Mitchell and two of his friends who admitted to having only vague recollections of having seen two sets of bone fragments at the Museum, which Mitchell told them were MOVE bones. Mitchell told MMWR that "there were no labels on the box or bones themselves, and he did not know what they were."[17] He stated that Monge told him they were MOVE bones. As to Mitchell's friends, they would not allow MMWR to disclose their identities on the record and "cautioned that *they could not fully rely on their memory* given the time that has passed and all of the things they have heard and read about the MOVE victims remains since April 2021."[18]

Although MMWR's Report did not identify the other two purported witnesses other than Mitchell, TLG sought interviews with those same persons who Mitchell identified as having seen the MOVE remains, but they did not respond to our inquiries, Notably, the witnesses that MMWR interviewed who claimed to recall seeing a second set of remains did so with "*varying degrees of confidence*."[19] TLG has concluded that the statements of Mitchell and the "unidentified" witnesses lacked credibility and should not have been the basis for MMWR's conclusions. This is especially so given that MMWR could not provide a "definitive answer" to this question even after relying on that information.

---

refused to allow TLG to interview her again. Monge's initial failure to provide the requested documentation to TLG and her subsequent refusals to provide the documentation and supplemental interview with TLG cause us to question the credibility of other statements she made to TLG during our initial investigation. Nevertheless, our conclusions have not changed because TLG has utilized objective information to verify material aspects of its conclusions.

[17] *MMWR, p. 29*
[18] *MMWR, p. 30*
[19] *MMWR, p. 20*

### III.

The additional information that MMWR reviewed included documents regarding the exchange of MOVE remains between the MEO, the Smithsonian Museum and Drs. Mann and Monge.  One of the documents is a letter from Dr. Segal of the MEO, dated March 6, 1986, to Ms. Stephanie DaMadio, an anthropologist at the Smithsonian Museum, advising that he was sending her skeletal material on the "'Move' case B-1 and G."[20] Another document is a September 17, 1986 Smithsonian Museum shipping invoice from Ms. DaMadio to Dr. Segal, which states, "One box containing human skeletal remains from Philadelphia, PA Medical Examiner's Office."[21]  A "Memo to File," which is dated September 23, 1986 and appears to be from the MEO, states, "Bones arrived by mail from the Smithsonian and will be turned over to Allan Mann for his continued evaluation under an attached receipt.[22]  Below the Memo to File is a receipt from the MEO, dated September 23, 1986 and signed by Monge.[23]  It states, "Various bones for anthropologic examination."  MMWR also reviewed the photograph, which Monge provided to MMWR, of the box that contained the MOVE remains that Dr. Segal gave her.[24]  The box is dated September 22, 1986.  MMWR concedes that this information is inconclusive, stating:

> … Neither Dr. Segal's "Memo to File," confirming his receipt of that box on September 23, 1986 nor the accompanying receipt provide a specific inventory of which remains were in that box and ultimately transferred to Drs. Mann and Monge later that day.  For these reasons, from the archival records alone, **it is impossible to determine what,** if any remains associated with Body G were in the box picked up from the MEO....[25]

MMWR also sought to prove that the Body G remains were at the Museum by comparing the x-ray picture in the undergraduate student's paper that was labeled G1

---

[20] March 6, 1986 Letter from Dr. Segal to Ms. DaMadio.
[21] September 17, 1986 Shipping Invoice.
[22] September 23, 1986 Memo to File.
[23] September 23, 1986 Receipt.
[24] *MMWR, p. 23*
[25] *MMWR, p. 23*

and the one photograph that Monge provided to MMWR, to the slides in the City's archives. Although MMWR recognized that it needed to consult a biological anthropologist to resolve this question, for reasons not stated in its report, MMWR failed to do so and instead stated: "[W]e were unable to retain any independent experts to perform these comparisons prior to the completion of this Report."[26]

When TLG learned of the existence of the slides in the City's archives, TLG again requested that the City make available its complete MOVE file, including the previously withheld slides. After receiving this additional information, TLG retained Dr. Ann Ross, a forensic anthropologist and professor at North Carolina State University, who specializes in cranial and post-cranial variation. We asked Dr. Ross to opine on the identity of the various slides and photographs and to determine if the images taken by the student, the Body G slides not previously provided to TLG by the City and the photograph withheld by Monge were of the same person.[27]

Dr. Ross concluded that the City's slides (those of Body G) were all of the same individual, a child of approximately 9.5 years.  She also concluded that **the images taken by the student were not of Body G.** In fact, Dr. Ross, concluded that  the student's x-rays were of an adult and therefore could not have been the remains of a MOVE child.  Dr. Ross also concluded that Monge's photograph was dissimilar to the City's Body G slides. Dr. Ross' conclusions, therefore, support TLG's initial findings that the Museum was not in possession of Body G remains, and that the student's photographs relied upon by Mitchell and others as proof that the Museum possessed a second set of remains is plainly wrong. Further, the occipital bone in Monge's photograph is not that of Body G, according to Dr. Ross. Consequently, MMWR's disagreement with TLG's conclusion about the weight of the evidence is not supported by the factual or scientific record.

TLG reconfirms its initial conclusion that the weight of the evidence that we reviewed clearly establishes that Mann and Monge did not receive the occipital bone or

---

[26] *MMWR, p. 33*
[27] See Attached Opinion

any other bone fragments of Body G from the MEO and only one set of remains was ever housed at the Museum.



**North Carolina Human Identification and Forensic Analysis Laboratory**

North Carolina is a land-grant university and a constituent institution of The University of North Carolina

Campus Box 7617
Raleigh, NC 27695
Office Tel. 919.515.3122
Lab Tel. 919.515.9009



**Consultation Requested (Tucker Law Group) -MOVE Remains**

Seeking an expert opinion on whether radiographs taken in 2018 reflect the same individual on the 35 mm slides. Ms. Raashida Fleetwood of Tucker Law Group provided 15 images of the scanned 35 mm slides, 4 radiographic images, and one image in .pdf format were provided for comparison.

**Observations:**

1. The scanned 35 mm slides are consistent with the same individual, a juvenile approximately 9.5 years of age according to mandibular dental development (Figure 1).



Figure 1. The radiographic image shows that the first right mandibular molar erupted, and the second mandibular molar has a developed crown.

9

2. Figure 2a shows the foramen magnum does not have the first cervical vertebra articulated and 2b shows a radiograph of the posterior cranium and base with an articulated first vertebra.



The first cervical vertebra is not fused

a



The first cervical vertebra fused to the foramen magnum

Figure 2a shows that the first cervical vertebra (C1) is not fused to the foramen magnum and 2b shows C1 to be fused to the foramen magnum.

3. Figure 3 is a radiograph of a right scapula, and first through the third vertebrae. Based on epiphyseal fusion the individual is an adult. The presence of C1 also indicates that it is not the same individual as depicted in Figure 2b.

| C2 | | C3 |



scapula

C1

Figure 3. Radiograph depicting a right scapula and the first through third cervical vertebrae.

4.  The orientation of the .pdf image (slide 34 [97]; Figure 4) does not allow for a direct comparison of Figure 1 or Figure 2a. Figure 4 is not consistent with the individual in Figure 2a based on the inconsistency with the fused first cervical vertebra.

11



Figure 4. View of the foramen magnum.

**Summary of Conclusions:** The individual depicted in the 16  images scanned from the 35 mm slides is consistent with the same individual, a child of approximately 9.5 years old. The remains depicted in Figure 2b and Figure 3 are not consistent with the same individual  as the first cervical vertebra is fused to the foramen magnum and fragmentary in the individual in Figure 2a and there is a disarticulated first cervical vertebra in Figure 3. The remains depicted in Figure 3 are not consistent with the remains from the scanned 35 mm slides as they represent an adult.

Ann H. Ross, Ph.D., D-ABFA
Professor, Biological Sciences
8/31/2022

12