IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JANET MONGE,** | : | |
| | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| **UNIVERSITY OF PENNSYLVANIA** *et al.*, | : | |
| | : | **NO. 2:22-cv-2942-MRP** |
| Defendants. | : | |

<u>**MEMORANDUM**</u>

**Perez, J.**                                                                                                                                  **July 30, 2025**

The Court is well-acquainted with this defamation action. Currently pending is Defendant Hyperallergic Media's ("Hyperallergic") motion for judgment on the pleadings. This motion follows the Court's denial of Hyperallergic's motion to dismiss the second amended complaint and motion for reconsideration. In moving for reconsideration, Hyperallergic asked this Court to consider a report (the "Tucker Report") that was neither attached to the motion to dismiss nor the motion for reconsideration. Since then, Hyperallergic has filed an answer to the second amended complaint, to which the Tucker Report was attached as an exhibit. Now, Hyperallergic asks the Court to consider the Tucker Report again—this time in determining its motion for judgment on the pleadings. For the reasons that follow, the Court will consider the Tucker Report and deny the motion for judgment on the pleadings.

**I.      BACKGROUND**[1]

---

[1] An extensive overview of this matter's factual and procedural background can be found in the Court's previous memorandum opinions. *See* ECF Nos. 173 & 197.

Dr. Monge contends that the Hyperallergic article "falsely blames [her] for a racially motivated investigation of the bone fragments" by stating that "Consuella [sic] did not consent to Monge's continued use of her daughter's remains for research. Even after those objections, Monge used Tree Africa's remains for teaching." ECF 133 at ¶ 142(j).

Hyperallergic refers to the Tucker Report as support for the challenged statement. The University of Pennsylvania retained the Tucker Law Group to investigate the circumstances under which the bone fragment remains came to be used in Dr. Monge's Coursera course. ECF 237-3 at 3. Its findings were documented in the Tucker Report. Titled "The Odyssey of the MOVE Remains, Report of the Independent Investigation into the Demonstrative Display of MOVE Remains at the Penn Museum and Princeton University," the Tucker Report included the following findings:

> During the years that the remains were at the Museum, Monge stated that she made several efforts to communicate with MOVE members to enlist their help in identifying the B-1 remains and, if they did belong to Katricia, return them to her mother, Consuewella Africa. . . . Ramona Africa initially agreed to meet with Monge at the Museum. When Ramona Africa came to the Museum, Monge told her that they had custody of the B-1 remains since 1986 and that she believed that they were misidentified. Monge also asked Ramona African if she could provide them any information that would help Monge identify the remains. Ramona Africa stated that she would not help.
>
> In 2014, Monge sought the assistance of Malcolm Burnley, a writer for *Philadelphia Magazine*, in contacting Consuewella Africa, the mother of two of the children who died in the fire: Zanetta Dotson Africa and Katricia Dotson Africa. Monge stated that she did not feel comfortable contacting MOVE members herself, both because of what she perceived to be MOVE's aggressive public image, and because as a white woman, she did not have the lived experiences to be able to relate to MOVE's experience. Monge enlisted Burnley because she thought that, as a Black man, Consuewella and other MOVE members might be more willing to speak to him. Emails from Burnley to Monge from the Fall of 2014 state that he called Consuewella Africa on multiple occasions but was not able to reach her until December of 2014. Once Burnley reached Consuewella, he said she agreed to a phone call which took place in early December of 2014. Burnley sent Monge an email on December 7, 2014, detailing his conversation:

> "My conversation with Consuewella did not go well. I'm extremely bummed but not willing to give up on this. The conversation began with her swearing at me and telling me that 'unless I can bring her daughter back, I need to stop fucking with her.' Every time I would speak, she'd either interrupt me or stop me, then confer with someone else she had on speaker phone (a different phone I guess) about what to say next. I found out that this other person was Ramona Africa, late in the conversation. After trying to let her say her peace for 10 minutes, I spoke over Consuewella—telling her that the city did an injustice on that day, and the only way I could possibly find out about bringing her daughter back, would require her participation. She seemed to consider it for a moment, and then started swearing at me again. She said that Ramona would call me (she hasn't) and talk more. It really sounds like she's still part of MOVE and is loopy. I don't know how to proceed. I can get Ramona's phone and email address and try her this week. Perhaps she'd be willing to talk reasonably about the matter, but I doubt it. As terrible as this sounds, I wonder if I could get Consuewella's DNA somehow without her consent? That's highly unethical, I know, but I'll do everything that I can to prove this. It's an important piece of history and the city shouldn't be able to have covered this up for so long. Let me know what you think."

*Id.* at 63-65.

The Tucker Report continued:

Burnley emailed Monge again on December 29, 2014, advising that he exchanged emails with Ramona Africa. He said, "Ramona emailed me back with one line, 'No, I will not talk to you.' I guess I'll have to try the uncle now. Very disappointing." Monge stated that she was focused and dedicated in determining the identity of the B-1 remains so that she could have the remains returned to the appropriate relative, if possible. To that end, emails from January to March 2019 document Monge and Burnley's plans to "stakeout" Consuewella Africa's home in order to obtain a DNA sample from her trash. Monge said they decided against going through Consuewella Africa's trash because they thought it was unethical.

*Id.* at 65.

Exhibit 14 of the Tucker Report is a statement from Dr. Monge that provides:

Work continued on these remains until 2019 when we failed to make a morphological association with Katricia. During this time period, several attempts were made to contact the Africa family including contact with the mother of Katricia, Consuela Dotson Africa to request a DNA sample. (First attempt in 1995 with Ramona Africa at a meeting at the Penn Museum; *subsequent attempts from 2014 onward are attached here as e-mail correspondence between Malcolm Burnley, research journalist and myself*). The requests were not answered or answered in the negative.

*Id.* at 165 (italics in original).

Finally, the Tucker Report states that "Dr. Monge did not inform MOVE family members of and obtain their consent to use the remains in the Princeton Online video course." *Id.* at 8.

## II.    LEGAL STANDARD

"A motion for judgment on the pleadings will be granted, pursuant to Fed. R. Civ. P. 12(c), if, on the basis of the pleadings, the movant is entitled to judgment as a matter of law." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262 (3d Cir. 2008). The standards governing Rule 12(c) and Rule 12(b)(6) motions are the same. *See id.* Like a Rule 12(b)(6) motion, courts may consider the pleadings and their attachments in deciding a Rule 12(c) motion. *NCMIC Ins. Co. v. Walcott*, 46 F. Supp. 3d 584, 586 (E.D. Pa. 2014).

## III.    DISCUSSION

First, the Court notes that it may consider the Tucker Report now that it is attached to the answer. *Foreman v. Lowe*, No. 3:CV-06-0580, 2008 WL 2073990, at *2 (M.D. Pa. May 13, 2008) ("[I]n ruling on a motion for judgment on the pleadings, the Court may review the answer to the complaint and any attachments.").

This Court has already discussed the law governing defamation by implication claims in its previous opinion. *See* ECF 197. Even considering the Tucker Report, the conclusion remains the same: Dr. Monge has plausibly stated a defamation by implication claim against Hyperallergic. As Hyperallergic acknowledged, "[t]he central question is whether Hyperallergic's statements imply an undisclosed fact that Consuewella told Plaintiff not to use the bone fragments for research." ECF 247 at 6. The Tucker Report discusses Dr. Monge, through Malcolm Burnley, contacting the MOVE family for assistance in identifying the bone fragment remains. On several instances, these "requests were not answered or answered in the negative." ECF 237-3 at 165. The challenged Hyperallergic statement implies the undisclosed fact that Consuewella told Dr. Monge

not to use the bone fragments for research, but neither the Tucker Report nor the second amended complaint disclose that fact. The Tucker Report does not state that Dr. Monge requested to use the bone fragment remains for research and the MOVE family objected to that request. Instead, it states that "Dr. Monge did not inform MOVE family members of and obtain their consent to use the remains in the Princeton Online video course." ECF 237-3 at 8. Construing the pleadings in the light most favorable to Dr. Monge, the Court holds, just as it did before, that the challenged statement is capable of defamatory meaning.

## IV.   CONCLUSION

For the foregoing reasons, Hyperallergic Media's motion for judgment on the pleadings is denied. An appropriate order follows.