**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JANET MONGE,** | : | **CIVIL ACTION** |
| | : | |
| Plaintiff, | : | |
| | : | |
| **v.** | : | |
| | : | **NO. 22-2942** |
| **UNIVERSITY OF PENNSYLVANIA, *et al.*,** | : | |
| | : | |
| Defendants. | : | |

**Perez, J.** **November 25, 2026**

**MEMORANDUM**

For centuries, scientists used the bodies of Black people without their consent—from conducting research on their living cells[1] to studying and displaying their remains after their deaths.[2] Many institutions have begun the work of repatriating or burying those remains.[3] In Philadelphia, that scientific history intersects with the City's long and fractured relationship with its Black residents.[4] This fraught history is not confined to the distant past, nor is the Pennsylvania Museum of Archaeology and Anthropology ("Penn Museum") a stranger to the controversy.

[1] *See* Rebecca Skloot, *The Immortal Life of Henrietta Lacks* (2010).

[2] *See* Daina Ramey Berry, *The Price for Their Pound of Flesh: The Value of the Enslaved, from Womb to the Grave, in the Building of a Nation* (2017); *see also* Daina Ramey Berry, *Beyond the Slave Trade, the Cadaver Trade*, N.Y. Times, Feb. 3, 2018, https://www.nytimes.com/2018/02/03/opinion/sunday/cadavers-slavery-medical-schools.html.

[3] *See, e.g.*, Penn Museum, *Morton Cranial Collection*, https://www.penn.museum/about/statements-and-policies/morton-cranial-collection (last updated June 20, 2025); Tesfaye Negussie, *Remains of 19 Black Americans Returned to New Orleans Nearly 50 Years Later*, Good Morning America, May 31, 2025, https://www.goodmorningamerica.com/news/story/remains-19-black-americans-returned-new-orleans-150-122343834.

[4] *See* City Controller Rebecca Rhynhart, *Mapping the Impact of Structural Racism in Philadelphia* at 2–3, Jan. 2020, https://controller.phila.gov/wp-content/uploads/2020/01/redlining_report-1.pdf; *see also* Larry Santucci, *How Prevalent Were Racially Restrictive Covenants in 20th Century Philadelphia? A New Spatial Data Set Provides Answers*, Fed. Reserve Bank of Phila. Consumer Fin. Inst., Nov. 2019; Holly Otterbein, *Philly Is the 4th Most Segregated Big City in the Country*, Philadelphia Magazine, Sept. 22, 2015, https://www.phillymag.com/citified/2015/09/22/philadelphia-segregated-big-city/; *see also* Deidre McPhillips, *How Racially and Ethnically Diverse Is Your City?*, U.S. News, Jan. 22, 2020, https://www.usnews.com/news/cities/articles/2020-01-22/measuring-racial-and-ethnic-diversity-in-americas-cities.

In the early 19th century, the University of Pennsylvania employed a Philadelphia scientist named Dr. Samuel Morton, who obtained the skulls of poor African Americans and enslaved people, mostly from grave robbers.[5] Morton, sometimes described as the "Father of Scientific Racism," and referred to by Dr. Janet Monge as a "flaming racist," used the collection to support his theories of white supremacy.[6]

In 2020, the murder of George Floyd and the Black Lives Matter movement thrust this country's history of racism to the forefront of the national conversation. That conversation extended to the treatment of human remains by educational institutions and museums. In the spring of 2021, the Penn Museum faced widespread public criticism for its retention of the Morton collection, prompting a public apology and efforts to repatriate the remains.[7] Just weeks later, the Penn Museum again faced condemnation—this time, for its retention of the remains of young victims of the City's 1985 bombing of the MOVE organization's home.

The MOVE organization was founded in 1972 by John Africa.[8] Members of the organization adopted the last name "Africa," rejected modern technology, science, and government authority, and lived communally in neighborhoods in West Philadelphia.[9] The group loudly advocated for racial justice and, at times, clashed with its neighbors and the Philadelphia police.[10]

---

[5] Peter Crimmins, *Penn Museum Apologizes for 'Unethical Possession Of Human Remains'*, NPR, Apr. 27, 2021, https://www.npr.org/2021/04/27/988972736/penn-museum-apologizes-for-unethical-possession-of-human-remains.

[6] *Id.*

[7] *See* Jill DiSanto, *Museum Announces the Repatriation of the Morton Cranial Collection*, Penn Museum, Apr. 12, 2021, https://www.penn.museum/documents/pressroom/MortonCollectionRepatriation-Press%20release.pdf.

[8] Beverly C. Tomek, *MOVE*, Encyclopedia of Greater Phila., 2017, https://philadelphiaencyclopedia.org/essays/move/ (last visited Nov. 23, 2026).

[9] *Id.*

[10] *Id.*

In 1978, then-Philadelphia Mayor Frank Rizzo ordered an attack on MOVE's Philadelphia home in an effort to evict them.[11] There was a month-long standoff that culminated in a shootout, the death of a Philadelphia police officer, and the imprisonment of nine MOVE members.[12] After the original MOVE home was demolished by the city, the group relocated to 6221 Osage Avenue, a row home in the Cobbs Creek neighborhood of West Philadelphia, where the members continued to live communally.[13] Following further clashes with their new neighbors and complaints about sanitary conditions and health risks, then-District Attorney Edward Rendell issued arrest warrants.[14] When police went to the MOVE home to execute the warrants, members refused to respond or send the children outside.[15] Philadelphia's first Black mayor, Wilson Goode, approved the Police Commissioner's use of military-grade weapons, and police fired more than 10,000 rounds of ammunition inside before eventually dropping a bomb on the row home.[16] Rather than fight the resulting fire, officials let it burn, destroying more than 60 homes in the neighborhood, leaving more than 250 Philadelphians homeless, and killing eleven MOVE members, five of whom were children.[17]

The explosion and fire were so destructive that for some of the victims, all that was left were bones. With the help of forensic anthropologists and a city-created MOVE commission, the medical examiner eventually identified certain remains as belonging to 14-year-old Katricia

---

[11] *See* Ali Rogin, Cameron Lawson, Mike Fritz, *The Largely Forgotten History of Philadelphia's Police Bombing of Black Organization MOVE*, PBS News, May 17, 2025, https://www.pbs.org/newshour/show/the-largely-forgotten-history-of-philadelphias-police-bombing-of-black-organization-move.

[12] *Id.*

[13] Tomek, *supra* note 7.

[14] *Id.*

[15] *Id.*

[16] Rogin, et al., *supra* note 11.

[17] Tomek, *supra* note 7.

Dotson, also known as Tree Africa, and 13-year-old Delisha Africa.[18] However, not all forensic anthropologists agreed that the age of the remains matched the children. Questions also remained as to whether others, including individuals unaffiliated with MOVE, had been killed in the bombing. Nevertheless, the Africa family accepted the identifications and held funeral services, believing they were burying the remains of their children.

However, unbeknownst to the Africa family, the medical examiner did not return all the victims' remains. Instead, the medical examiner sent some to forensic anthropologists at the Penn Museum for continued analysis. In 1986, Dr. Alan Mann and his then-doctoral student Janet Monge received the remains and continued to study them. Dr. Mann completed a report on his examination and submitted it to the medical examiner's office. He did not return the remains then, instead keeping them in a cardboard box in his office at the Penn Museum for more than fifteen years. When Dr. Mann left the Penn Museum, Dr. Monge took responsibility for the MOVE victims' remains, storing them in a file cabinet in her own office, except while working with them, until April 2021.

Beyond merely storing the remains, Dr. Monge used them to teach a free, publicly available online course on forensic anthropology in 2020. In her course, she discussed the MOVE bombing and its effect on the Africa family and the West Philadelphia community; she highlighted the political and social import of forensic anthropology; and she displayed what had been identified by the medical examiner as Katricia Dotson's pelvis and femur bone to demonstrate how to determine a deceased individual's age.

---

[18] The MOVE organization uses the name Tree Africa in its petition for the return of her remains to the Africa family. *See* ECF No. 285-153. The parties use the name Katricia Dotson. For this Memorandum, the Court will use the same name as the parties.

In April of 2021, a former Penn student and reporter published a story on the use of the remains, and a media storm ignited. Numerous articles in local and national publications condemned the Penn Museum for keeping Katricia Dotson's remains and criticized Dr. Monge for using the remains as teaching tools without the Africa family's knowledge or consent. The Africa family was outraged, with the revelations that their family's bones were kept and displayed without their knowledge re-opening the 40-year-old wounds.

Within less than a week, the President and Provost of the University of Pennsylvania issued a public apology, acknowledging that keeping the remains at the Penn Museum for four decades was "insensitive, unprofessional, and unacceptable."[19] Graduate students in the University's Department of Anthropology refused to serve as teaching assistants for any future courses taught by Dr. Monge. The Department of Anthropology arranged for another faculty member to teach her upcoming course and, upon the expiration of Dr. Monge's contract, voted not to renew her adjunct appointment.

The public controversy over the retention and use of the remains gave rise to this defamation action. Dr. Monge sued numerous media organizations, journalists, scientific organizations, and the University and members of its faculty. Following extensive motions practice and voluntary dismissals, the only remaining defendants are the Trustees of the University of Pennsylvania ("Penn"), Amy Gutmann, Wendell Pritchett (collectively, Penn, Gutmann, and Pritchett are referred to as "Penn Defendants" herein), Kathleen Morrison, and Paul Mitchell. All remaining defendants move for summary judgment.

The controversy underlying this litigation raises difficult questions about the treatment of human remains and the responsibilities of the institutions and individuals entrusted with them.

[19] ECF No. 285-108.

However, the question before this Court is a narrower one: whether Defendants may be held liable for defamation. A defamation plaintiff cannot simply point the finger at anyone she perceives has harmed her reputation. Constitutional protections compel careful consideration of the elements of a defamation claim. The First Amendment protects individuals' freedom of speech, and it absolutely protects opinions when the speaker discloses the facts upon which their opinion is based. Thus, the plaintiff must provide evidence of factual statements, express or implied, that are capable of being proven false. The First Amendment additionally requires evidence of fault, meaning at least negligence or, for public figures, a heightened burden of actual malice. Finally, a defamation plaintiff must bring her claims within one year after discovering allegedly defamatory statements were made in private.

Dr. Monge has not produced evidence sufficient to establish a false statement of fact or, with respect to the Penn Defendants' statement, even negligence. Her claims against Dr. Mitchell are also untimely. For these reasons, and the reasons discussed herein, Defendants' motions for summary judgment are granted.

## I. Background

### A. The Parties

In April of 2021, Plaintiff Janet Monge held positions of Keeper and Associate Curator at the Penn Museum. Stmt. Undisp. Fact Supp. Mitchell Mot. Summ. J. ("Mitchell SOF"), ECF No. 287 ¶ 15. Dr. Monge also taught classes in Penn's Department of Anthropology, and she performed forensic consulting work for the Philadelphia Medical Examiner's Office ("MEO"). *Id.* ¶¶ 16–17.

Defendant Paul Mitchell received his bachelor's and master's degrees in anthropology from Penn in 2013 and 2014, respectively. *Id.* ¶ 19. Dr. Monge served as an undergraduate academic and thesis advisor to Dr. Mitchell. *Id.* ¶ 21. In April 2021, Dr. Mitchell was pursuing his doctoral degree in anthropology at Penn, which he completed in 2022. *Id.* ¶ 20. In 2019, Dr. Monge

accused Dr. Mitchell of certain malfeasance with respect to removing remains from the museum on several occasions. On May 13 and May 22, 2019, Dr. Monge complained to Penn about Dr. Mitchell's alleged theft of lab notebooks and threatening behavior toward Dr. Monge and others. ECF No. 285-14 at 11–12. On August 2, 2019, Dr. Monge revoked Dr. Mitchell's electronic access to certain rooms, determining he had taken bones from the lab. *Id.* Between May 30 and December 14, 2021, Dr. Monge additionally reported Dr. Mitchell's entry into spaces he was not permitted to be and thefts of laser scans and Dr. Monge's anthropology office files. *Id.*

In April 2021, Defendant Wendell Pritchett was the Provost of the University. Penn Defendants' Stmt. Undisp. Fact Supp. Mot. Summ. J. ("Penn SOF"), ECF No. 286 ¶ 12. During the same time period, Defendant Amy Gutmann was the University's President. *Id.* ¶ 79.

### B. The MOVE Bombing and the Human Remains

On May 13, 1985, Philadelphia police dropped an explosive device on the MOVE home, a West Philadelphia row home that was connected to its neighbors. Mitchell SOF ¶¶ 22–23. The explosive device caused the MOVE residence to catch fire, and because officials chose not to fight the fire, it destroyed 60 homes in the neighborhood. *Id.*; *see also* Tomek, *supra* note 7. The bombing and fire killed eleven MOVE members, including children. *Id.* ¶ 24. The fire and the city's removal of debris complicated the recovery and identification of human remains from the site. *Id.* ¶ 25. Within days of the bombing, the MEO asked Dr. Alan Mann, a Penn anthropology professor, to assist in identifying remains recovered from the site. *Id.* ¶ 26. Dr. Mann asked Dr. Monge, who was then his doctoral student, to assist him. *Id.* ¶ 27. During the investigation, certain remains were designated body "B-1," and others were designated "Body G." *Id.* ¶¶ 29–30. Forensic investigators concluded the B-1 remains belonged to Katricia Dotson. *Id.* ¶ 31. Dr. Mann and Dr. Monge disagreed with the MEO's identification of the B-1 remains, arguing that their characteristics were inconsistent with Katricia Dotson's age. *Id.* ¶ 33. Nevertheless, the MEO

issued a Postmortem Report stating the B-1 remains were "identified as Katricia Dotson by Dr. Hameli – Consultant to the [MOVE Commission]." Penn SOF ¶ 58 (alteration in original). On July 18, 1985, the MEO signed a Certificate of Death asserting the same. *Id.* ¶ 59. On November 14, 1985, the MEO then "released [the remains] to the next of kin based solely on the identification made by the consultants to the Philadelphia Move Commission." ECF No. 285-43; Penn SOF ¶ 60. The following day, the MEO issued a report stating he believed "the families are well aware of the difficulties [the MEO has] had in establishing identification. They have made it quite clear that they believe that the MOVE Commission's identifications are valid and have indicated verbally that they are quite willing to accept the MOVE Commission pathologist's conclusions." ECF No. 285-35; Penn SOF ¶ 61. On November 16, 1985, the MEO issued letters to Consuewella Dotson (mother of Katricia Africa) Nathaniel Galloway (father of Katricia Africa), Delbert Orr (father of Delisha Africa), and Janet Holloway (mother of Delisha Africa) that Katricia and Delisha had been "identified by the Philadelphia Special Investigation Commission's Consultants as one of the victims in the MOVE house fire on Osage [A]venue." Penn SOF ¶ 62. The letters then instructed the families that they could claim the bodies through a lawyer or funeral director. Penn SOF ¶ 62.

Thereafter, in 1985, the Africa family held a funeral for Katricia Dotson and Delisha Africa and buried what they believed to be their remains. Mitchell SOF ¶ 39. However, on September 23, 1986, the MEO sent Dr. Mann B-1 remains. *Id.* ¶ 34. Dr. Monge signed for the delivery, and the remains were housed in the Penn Museum until 2021. ECF No. 285-45; Penn SOF ¶ 64; Mitchell SOF ¶ 34. Dr. Monge contends that the identification of the B-1 remains was contested, and the bones were retained for continued analysis. Mitchell SOF ¶ 39 (Pl.'s Resp.). After Dr. Mann left Penn for Princeton University in 2001, Dr. Monge assumed responsibility for storing the B-1 remains but made no attempts to identify them after 2015. *Id.* ¶¶ 40, 42; *see also* Penn SOF ¶¶ 70–

71. Nor did Dr. Monge contact any MOVE family members regarding identification of the B-1 remains in the last 15 years. Mitchell SOF ¶ 48. Between 2001 and 2021, Dr. Monge transported the B-1 remains to Princeton on several occasions. Mitchell SOF ¶ 41; Penn SOF ¶ 72.

Dr. Monge never obtained formal permission from the Africa family or the MEO to use the MOVE remains for teaching, student research, museum demonstrations, or public display. Penn SOF ¶ 32. Nevertheless, in January 2019, Dr. Monge filmed a Coursera course through Princeton University, titled "Real Bones: Adventures in Forensic Anthropology." Mitchell SOF ¶ 54; Penn SOF ¶ 18. "Coursera is an online platform that works with universities and other academic and professional organizations to create online courses and certificate programs in a wide array of subjects." Mitchell SOF ¶ 55; ECF No. 133 ¶ 110. Interested individuals may create an account, with or without an affiliation with a university. *See* Penn SOF ¶ 18. Dr. Monge's Coursera course was posted online, could be located through a Google search, and was free to anyone with a Coursera account. *Id.* Dr. Monge designed the course to reach audiences worldwide, particularly international forensic practitioners who lacked access to training in the field. *Id.* ¶ 19.

In the Coursera course video, Dr. Monge discussed remains associated with the MOVE bombings and her work with those remains. Mitchell SOF ¶ 56; *see also* ECF Nos. 285-20, -21, -22. Dr. Monge displayed portions of the B-1 remains and used them to discuss forensic assessment of age. Mitchell SOF ¶¶ 57–58; ECF No. 285-22. She described one of the bones as "juicy," which she avers is an anthropological term of art describing the preserved, recently deceased status of remains. Penn SOF ¶ 26; ECF No. 285-22. As of April 19, 2021, over 4,500 people had enrolled in the course and over 1,000 viewers specifically watched the portion where Dr. Monge demonstrated the MOVE remains. Penn SOF ¶ 29.

In late March 2021, Maya Kassutto, a writer and Penn graduate, contacted Dr. Mitchell, with whom she had a romantic relationship that had ended in 2019, about a story she intended to write about the MOVE remains at the Penn Museum. Mitchell SOF ¶ 75; ECF No. 285-7 at 9–10. After learning Kassutto did not intend to contact Dr. Monge or the Penn Museum for comment until shortly before publication, Dr. Mitchell contacted Dr. Deborah Thomas, a professor in Penn's anthropology department, to discuss his concerns. Mitchell SOF ¶¶ 76, 78. Dr. Thomas arranged a meeting with Dr. Mitchell, Penn Museum Director Chris Woods, Department of Anthropology Chair Kathleen Morrison, and Penn Museum Deputy Director Stephen Tinney. *Id.* ¶ 85.

On April 16, 2021, they met on Zoom. *Id.* ¶ 100. At her deposition, Dr. Morrison testified that "at that meeting, Paul Mitchell told us about the Coursera course video and that there were remains from the MOVE bombing at the Museum." ECF No. 285-6 at 8. She further testified that Dr. Mitchell "said that there would be some media coverage coming, and he didn't want [Dr. Monge] in particular to be blind sided by it, or [Dr. Woods], who was brand new on the job." *Id.* at 9. Dr. Woods testified that at the meeting, he first learned about the MOVE remains in the Museum and the forthcoming article about them. ECF No. 285-5 at 8. He recalled that "the thrust of that [half-hour] meeting . . . was centered around the MOVE remains in the Museum and basically educating me about what the MOVE situation was." *Id.* at 9–10. He further stated his "recollection is that this had nothing to do with [Dr. Monge] or Maya Kassutto . . . . It had everything to do with background on what MOVE was, the bombing, the presence of the MOVE remains, and that there was a forthcoming article." *Id.* at 19.

On April 16 and 17, 2021, Dr. Mitchell sent follow-up emails. Mitchell SOF ¶¶ 116–120. On April 16, he described several unaccessioned bones in the museum that should not have been there. *See* ECF No. 285-63. Dr. Mitchell explained that he noticed the remains of HH Holmes on

a cart in the physical anthropology lab after the remains were supposed to be reburied. *Id.* After another student pointed out they appeared to be the bones of HH Holmes, Dr. Monge moved them to another room. *Id.* Dr. Mitchell wrote that in the fall of 2017, he asked Dr. Monge about the bones, and she told him to "not put [his] nose where it doesn't belong." *Id.* Dr. Mitchell later found that Dr. Monge had put the bones in a tray of other bones used as a "teaching collection." *Id.* Dr. Mitchell felt that practice was egregious, so he put the bones in bags and placed them on a shelf, hoping to address the issue at a later time. *Id.*

On April 17, Dr. Mitchell wrote to Drs. Tinney, Woods, Thomas, and Morrison with additional information after watching the Coursera series in full. ECF No. 285-65 at 8. He stated there was another bone from the MOVE bombing that Dr. Monge had shown him but did not use in the Coursera course. *Id.* He stated that it "seem[ed] possible" that the right femur and pelvic bones used in the Coursera video did not belong to the same individual. *Id.* at 9. He further described newspaper articles available online as representing that Drs. Mann and Monge disputed the age of the remains identified as Katricia Dotson Africa's and asserted that "[s]eemingly, the bones that [Dr. Monge] is showing in the Coursera are those bones which were supposed . . . to belong to Katricia Africa." *Id.* at 9–10. Those remains were supposed to have been returned to the Africa family at some point before the burial. *Id.* at 10. Dr. Mitchell asserted that "[i]t seems likely that, if [Dr. Monge's] ascription of these bones to MOVE is correct, that the medical examiner did not release all the remains of Katricia to [her family] . . . ." *Id.* He summarized that "it seems most plausible that Mann retained – for unclear reasons – the pelvic bones at the center of the controversy through late 1985 and into January 1986. These bones were recognized by the MOVE Commission to belong to Katricia Dotson Africa and were supposed to have been released for

burial to her family in late 1985. The only apparent 'holdout' expert in recognizing these bones as belonging to Katricia was Mann." *Id.* at 10–11.

Following the April 16 meeting and follow-up emails, Dr. Mitchell reviewed historical and archival materials concerning the history, identification, transfer, and custody of the MOVE remains. Mitchell SOF ¶ 132. He prepared a draft report and a later final report, which was completed on April 25, 2021, and shared with individuals at Penn. *Id.* ¶ 136. In his final report, Dr. Mitchell reproduced Dr. Hameli's conclusion "verbatim." *Id.* ¶ 192. The Court has already determined the statements in Dr. Mitchell's report cannot form the basis of Dr. Monge's defamation claim because they are substantially true. ECF No. 208.

In the days following the April 16 meeting, Dr. Woods independently investigated the situation surrounding the MOVE remains at the Penn Museum. *See* Penn SOF ¶ 9. Dr. Woods reviewed multiple reports, including Dr. Mitchell's, independently researched and confirmed information he was given, spoke extensively with Dr. Monge and other individuals at the museum, and had multiple colleagues further verify the information. *Id.* ¶¶ 10, 15, 34, 35–42, 45.[20]

Dr. Woods then sent Dr. Mitchell's report to Dr. Pritchett, confirming that he personally verified all the information it contained. Penn SOF ¶ 47. He also provided Dr. Pritchett with Dr. Monge's written account of how and why the remains were in her possession. *Id.* ¶ 79. "In the last two weeks of April 2021, Drs. Woods and Pritchett were in 'constant communication' about what

[20] Penn SOF ¶¶ 10 ("At the request of Dr. Woods, Dr. Tinney called Plaintiff on Sunday, April 18."), 15 ("Various individuals from the Museum and Anthropology Department reviewed the relevant portions of Plaintiff's Coursera course."), 34 ("Dr. Woods [testified that he] took it upon himself to 'verify all of the information that was given to [him] from everyone." (second alteration in original)), 35 ("Plaintiff was Dr. Woods' 'principal, first touch point with all of this information.'"), 36–37 (describing written accounts Dr. Monge sent to Drs. Tinney and Woods and other Penn Museum officials), 38–40 (describing multiple phone calls with Dr. Monge to discuss the issue), 41 (confirming that Dr. Woods independently researched and checked reports), 42 (Dr. Woods testified he spoke with colleagues at the museum with relevant information), 45 (describing Professor Kathleen Brown's independent examination of information underlying Dr. Mitchell's report).

Dr. Woods was learning about the MOVE bombing and the retention of the MOVE remains at the Penn Museum." *Id.* ¶ 75.

As of April 18, 2021, Dr. Monge was aware that reporters were seeking information about the MOVE remains. Mitchell SOF ¶ 146. She had been contacted by Penn personnel about the anticipated reporting. *Id.* ¶ 145. She "extensively" discussed the MOVE remains in the Penn Museum with Dr. Woods, *id.* ¶ 148, and the two "were in constant contact during this time." ECF No. 285-5 at 29. On April 18, 2021, at Dr. Tinney's instruction, Dr. Monge drove the B-1 remains to Dr. Mann in Princeton. Mitchell SOF ¶¶ 43–44, 147.

### C. The 2021 Media Reports and the University's Response

The first article concerning the Penn Museum's keeping of the MOVE remains and Dr. Monge's use of them in the Coursera course was published on April 21, 2021, by Maya Kassutto in *Billy Penn*. *See* ECF No. 133-1 at 2. The article was titled "Remains of children killed in MOVE bombing sat in a box at Penn Museum for decades." *Id.* The *Billy Penn* article discusses Dr. Monge's use of the remains as teaching materials in the Coursera course. *Id.* at 4. It highlights that the dispute as to the age of the victim resurfaced in the course, where Dr. Monge and her student "prod the bones" and "impersonally debate the ages of the people to whom they once belonged." *Id.* at 7.

The same day, Abdul-Aliy Muhammad published an opinion piece in the *Philadelphia Inquirer* titled "Penn Museum owes reparations for previously holding remains of a MOVE bombing victim." *Id.* at 10. The article asserts that the Penn Museum had not addressed Philadelphia's Black communities for holding remains from a MOVE bombing victim and that it "continues [its] reckoning with past practices and human remains." *Id.* at 14. It additionally states that the Africa family demanded the Penn Museum fire Dr. Monge and issue a public apology. *Id.* at 15.

The story gained traction, with numerous other articles following, including in *The Daily Mail*, *The New York Times*, and *The New Yorker*. Penn SOF ¶ 92; *see also* ECF No. 133-1 at 19 (April 23, 2021, Daily mail article identifying Dr. Monge, stating she had been condemned for using the MOVE remains without the Africa family's consent, and describing her lecture as a "highly-rated free course" where she held the MOVE remains and called them "juicy"), 40 (April 23, 2021, article in the Guardian identifying Dr. Monge and discussing her use of the MOVE remains in the Coursera course), 50 (April 23, 2021, New York Post article discussing the same), 63 (April 24, 2021, New York Times article discussing the same).

On Friday, April 23, 2021, members of the Africa family circulated a public petition demanding the return of the MOVE remains and announcing a protest at the Penn Museum to take place on April 28, 2021. Penn SOF ¶ 93; ECF No. 285-153. The petition stated:

> After decades of enduring state murder, police terrorism, and the political imprisonment of our family members, it has come to the attention of The MOVE Family that Penn Museum and Princeton University have held hostage the remains of our children, Tree Africa and Delisha Africa, without our knowledge or consent. . . . After believing that we buried our beloved children in 1985, it is now clear that the remains of Tree Africa and Delisha Africa were unethically obtained and kept by Penn faculty members, who are forensic anthropologists. Not only were our children abused and mistreated, bombed and burned by the police, now we find out that they have not been allowed to rest in peace.

*Id.* at 1–2. The petition collected 12,528 signatures. *Id.* at 1. On Monday, April 26, 2021, at approximately 7:20 a.m., Dr. Woods informed Dr. Pritchett that the Africa family planned to hold a press conference later that morning. Penn SOF ¶ 95. The press conference was livestreamed. Penn SOF ¶ 96. Janine Africa[21] described her reaction to learning that the Penn Museum held the remains of her family:

[21] The record is not fully developed with respect to Janine Africa's relationship to Katricia or Delisha Africa. However, publicly available news reports indicate she was one of the nine MOVE members who was sentenced in the 1978 shooting of the Philadelphia police officer described in the introduction of this Memorandum and that she also lost a

> And then I see a news article of them saying, not only did they kill my children, kill my sisters and brothers, but they have desecrated what they say are their remains - defiled them, and had them hidden away on exhibit, as a learning tool for their students. That is the most disrespectful, hateful thing to do to anybody, but especially children, and this what MOVE is talking about, why we don't trust this system, why we are so angry at this system."

*Id.* ¶ 96. Other MOVE members, including Delisha Africa's mother, expressed their distress over learning that the Africa family learned through a newspaper that their children's remains were used in the Coursera course and that they "never knew anything about the remains of our family." *Id.* ¶¶ 97–99.

On April 26, 2021, Dr. Pritchett and Dr. Gutmann issued the following statement:

> We were profoundly disturbed to learn this past week that human remains, provided to a faculty member by the medical examiner many decades ago in an effort to identify a victim from the 1985 bombing of the MOVE house, had been kept at the Penn Museum for much of that time. Simply said, this was insensitive, unprofessional, and unacceptable.
>
> An official apology has been extended to the Africa family by the Museum and the University, and the Museum is currently working to return the remains to the family. In our judgment, it is imperative that we bring in an outside investigator who can examine how this unfolded and provide us with a complete report on what transpired. To this end, we have hired attorneys Joe Tucker and Carl Singley of the Tucker Law Group to investigate how the remains came into the possession of the Museum and what transpired with them for nearly four decades. We will share this report with the community and use its findings to help us ensure that nothing of this nature is repeated in the future.

*Id.* ¶ 100; ECF No. 185-108 (the "Penn Statement").

Dr. Gutmann and Dr. Pritchett both testified that, based on what Dr. Woods conveyed to them, they understood at the time that the Africa family believed the remains belonged to their

---

child in the MOVE bombing. Tom MacDonald, *Two of the 'MOVE 9' Speak Days after Serving Four Decades in Prison*, WHYY, May 30, 2019, https://whyy.org/articles/two-of-the-move-9-speak-days-after-serving-four-decades-in-prison/; Krystal Strong, *A Requiem for Delisha and Tree Africa*, Anthropology News, Oct. 25, 2021, https://www.anthropology-news.org/articles/a-requiem-for-delisha-and-tree-africa/.

family members and that keeping the bones at the Penn Museum for 35 years was insensitive, unprofessional, and unacceptable. Penn SOF ¶¶ 113, 114. Dr. Morrison did not draft the Penn Statement, review it before publication, or speak to Drs. Gutmann and Pritchett before it was published. *Id.* ¶¶ 119–20.

On April 27, 2021, graduate students in the Department of Anthropology circulated a letter stating they would refuse to serve as teaching assistants for Dr. Monge's courses, including an undergraduate lecture course she was scheduled to teach the next semester. *Id.* ¶ 134. Drs. Woods and Morrison additionally received many emails from undergraduate and graduate students, faculty, alumni, and members of the public, expressing their views regarding Dr. Monge's retention and public use of the MOVE remains. *Id.* ¶ 135. Thereafter, Dr. Morrison, as Anthropology Department Chair, arranged for another faculty member to teach Dr. Monge's fall course. *Id.* ¶ 136. On July 1, 2021, Dr. Monge's appointment as an adjunct faculty member expired. *Id.* ¶ 137. On September 8, 2021, the standing faculty of the anthropology department voted not to renew Dr. Monge's adjunct appointment. *Id.* ¶ 139.

However, Dr. Morrison advocated that Dr. Monge be allowed to continue working individually with undergraduate and graduate students and that the School of Arts and Sciences continue to contribute towards Dr. Monge's salary. *Id.* ¶¶ 142, 144. The Dean ultimately agreed that Dr. Monge could continue supervising research and advising students who wished to work with her. *Id.* ¶ 143. On September 20, 2021, Dr. Woods offered Dr. Monge a new two-year contract at the Penn Museum, which she held until it expired in July 2023. *Id.* ¶ 148. Dr. Monge characterizes this contract as "a diminished role, in poor conditions," without record support. *Id.* (Pl.'s Resp.).

**D. Dr. Monge's Remaining Claims**

Dr. Monge initiated this action in the Philadelphia Court of Common Pleas on April 20, 2022. *See* Not. Removal ¶ 1 & Ex. A, ECF No. 1. Defendants removed to this Court on July 27, 2022. ECF No. 1. Following extensive motions practice and voluntary dismissals, the remaining defendants in this case are Penn, Dr. Pritchett, Dr. Gutmann (together, "Penn Defendants"), Dr. Morrison, and Dr. Mitchell.

Dr. Monge's remaining claims against Penn Defendants are: (1) defamation; (2) defamation by implication; (3) false light; and (4) civil aiding and abetting. Dr. Monge's remaining claims against Dr. Mitchell are: (1) defamation; (2) defamation by implication; and (3) civil aiding and abetting. Dr. Monge's only claim against Dr. Morrison is civil aiding and abetting.

## II. Legal Standards

**A. Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.* Once the defendant establishes an absence of a genuine dispute, the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The plaintiff must point to "specific facts showing that there is a *genuine issue for trial*." *Id.* (quoting Fed. R. Civ. P. 56(e)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**B. Defamation**

Defamation is a state cause of action, so this Court will apply Pennsylvania law. *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020). Under Pennsylvania law, to prevail on a defamation claim, a plaintiff must prove: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) the statement was about the plaintiff; (4) recipients would understand it as defamatory; (5) recipients would understand it to be about the plaintiff; (6) the publication harmed the plaintiff; and (7) the defendant abused a conditional privilege to make the statement. *McCafferty*, 955 F.3d at 357; 42 Pa. Cons. Stat. § 8343(a). The plaintiff must also prove fault: a private figure must prove the defendant published the defamatory statement negligently, while a public figure must prove actual malice. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *Wang v. Univ. of Pittsburgh*, 181 F.4th 301, 313 (3d Cir. 2026); *Pacitti v. Durr*, 310 F. App'x 526, 528 (3d Cir. 2009) (not precedential) (citing *Am. Future Sys., Inc. v. BBB of E. Pa.*, 923 A.2d 389, 400 (Pa. 2007)).

**C. False Light**

Pennsylvania has adopted the Restatement (Second) of Torts § 652E's definition of false light. *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014). A defendant may be liable for publishing material that "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." *Id.* (cleaned up). A plaintiff may prevail where a "literally true" publication amounts to a "discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light." *Id.* (quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1189 (Pa. Super. Ct. 1988) (en banc)). Falsity carries the same meaning as a defamation claim. *Id.* at 137; *Hill v. Cosby*, 665 F. App'x 169, 177 (3d Cir. 2016) (affirming dismissal of false light claim where statements were not defamatory in nature and applying same analysis for defamation and false light).

**D. Civil Aiding and Abetting**

To prevail on an aiding-and-abetting claim, Dr. Monge must prove (1) the commission of an underlying tort; (2) actual knowledge of another's intent to commit the underlying tort; and (3) knowing and substantial assistance or encouragement to another in accomplishing the tortious result, and (4) her own conduct constituted a breach of duty. *Koken v. Steinberg*, 825 A.2d 723, 731 (Pa. Commw. Ct. 2003); *see also* Restatement (Second) of Torts § 876; *Marion v. Bryn Mawr Trust Co.*, 288 A.3d 76, 79–80 (Pa. 2023) (recognizing claim for aiding and abetting fraud and applying Restatement's scienter standard); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000) ("Aiding and abetting civil conspiracy claims require an underlying tort cause of action."). To prove actual knowledge, a plaintiff may rely on circumstantial evidence, and she need not show the defendant understood the full legal significance of the facts. *Marion*, 288 A.3d at 91. Rather, it is enough to show "the defendant was aware of facts that made the primary conduct wrongful." *Id.* (citation omitted).

**III. Dr. Monge Is a Limited-Purpose Public Figure.**

The Court first examines whether Dr. Monge is a limited-purpose public figure or a private figure because that determination bears on the outcome of all Defendants' motions. A private-figure defamation plaintiff must prove a defendant failed to exercise reasonable care in ascertaining the truth of the statement before publishing it—in other words, that the defendant acted negligently. *Am. Future Sys.*, 923 A.2d at 400. A public-figure defamation plaintiff bears a higher burden. She "must prove by clear and convincing evidence the defendant defamed him with 'actual malice.'" *Ralston v. Garabedian*, 676 F. Supp. 3d 325, 349 (E.D. Pa. 2021). Whether a plaintiff is a public figure is a question of law for the trial court to decide. *Id.* at 350. A person may become a limited-purpose public figure by voluntarily injecting herself or being drawn into a particular public controversy. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). To evaluate

whether an individual is a limited-purpose public figure, courts look to "(1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of plaintiff's involvement in that controversy." *Ralston*, 676 F. Supp. 3d at 350.

First, "a public controversy must be a real dispute, the outcome of which affects the general public or some segment of it . . . . [T]o be 'public,' the dispute must affect more than its immediate participants." *Amor v. Conover*, 635 F. Supp. 3d 363, 368 (E.D. Pa. 2022) (quoting *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1083 (3d Cir. 1985)).

Second, a limited-purpose public figure is one who has "thrust [herself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 939 (3d Cir. 1990) (citation omitted) (finding corporations that "acted primarily to generate revenue by influencing customers, not to resolve 'the issues involved,'" were not limited-purpose public figures, despite public advertising). Courts look to "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1078 (3d Cir. 1988) (quoting *Gertz*, 418 U.S. at 352). It is of no moment whether the individual desired or sought the attention, so long as she undertook "a course of conduct that invites attention." *McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3d Cir. 1985). "In short, a limited public figure must undertake action that indicates that he has assumed the risk of public attention." *Paydhealth, LLC v. Holcombe*, No. 24-00259, 2024 WL 3403125, at *3 (E.D. Pa. July 11, 2024) (cleaned up).

The parties do not dispute that the MOVE bombing and the subsequent handling of the remains involve public controversy. The city's bombing and excavation of a residential neighborhood certainly affects the general public. Dr. Monge, herself, describes the MOVE bombing as "one of the most horrific examples of excessive force found in American history."

ECF No. 133 ¶ 3. The city's subsequent engagement of university researchers to identify the remains and those researchers' handling of the remains also affects more than just the members of the Africa family. In Dr. Monge's own words, all forensic anthropology cases, including the MOVE case, have a "very strong social and political consequence." Ex. 20 at 2:24–2:35.

Dr. Monge argues, however, that she did not thrust herself into the public controversy; rather, Defendants did so by manufacturing the public controversy over Dr. Monge's handling of the MOVE remains. ECF No. 294 at 12. The Honorable Judge Pratter previously found that Dr. Monge became a limited public figure in 2019 when she published her Coursera course. ECF No. 124 at 13. After this case was reassigned, this Court reconsidered that decision, explaining that "the true reach of the course, along with any other actions Dr. Monge may have taken in the public sphere regarding the MOVE bombing, [were] largely unknown at [that] point." ECF No. 197 at 6. The record is now complete.

To determine whether Dr. Monge thrust herself into the public controversy, the Court must carefully identify "the particular controversy giving rise to the defamation." *See Gertz*, 418 U.S. at 352 ("reduc[ing] the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation"); *see also Jones v. Kleinman*, No. 24-cv-10750, 2026 WL 1470538, at *14 (D.N.J. May 26, 2026) ("The court must exercise care in identifying the public controversy, as the scope of the controversy will outline the limited range of issues for which a plaintiff will qualify as a limited-purpose public figure."). "A controversy is a specific question or real issue being discussed at the time of the defamatory statement." *Elliott v. Donegan*, 469 F. Supp. 3d 40, 50 (E.D.N.Y. 2020). Here, the public controversy encompasses the MOVE bombing and subsequent forensic examination of the MOVE remains, the difficulty of their identification, and of course, Dr.

Monge's later use of those remains in her Coursera course. The Court, therefore, examines the record to understand the nature and extent of Dr. Monge's participation in that particular controversy, *Schiavone Const. Co.*, 847 F.2d at 1078, and to determine whether she "assumed the risk of public attention," *Paydhealth, LLC*, 2024 WL 3403125, at *3 (cleaned up). She did.

**A. Dr. Monge's Participation in the Public Controversy**

Most of the initial publications discussing Dr. Monge's work with the MOVE remains were published in the 1980s, when she worked with Dr. Mann to identify the remains.[22] In those articles, Dr. Monge is quoted only once, though her work with Dr. Mann is more generally described.[23]

In interrogatory responses, Dr. Monge explicitly denied posting online or communicating with any news or media sources, and her curriculum vitae reflects no academic publications centered on the MOVE remains. *See* ECF Nos. 285-14, 285-165. She "believes she may have co-taught a small class of maybe 5 students at Princeton" involving the MOVE remains. ECF No. 285-14 at 17.

On July 30, 2014, *Philadelphia Magazine* published a "Best of Philly Snapshot" highlighting Dr. Monge as the "Best Museum Curator." ECF No. 285-50. The article mentions how Dr. Monge's "rarified dexterity as an anthropologist" began when she was hired to analyze the MOVE bombing victims. *Id.* at 3. It explains that she disagreed with the city's special

---

[22] *See* Penn SOF ¶ 210; ECF Nos. 285-41 (December 6, 1985 Philadelphia Inquirer Article), -28 (May 20, 1985 Philadelphia Inquirer Article), -31 (July 8, 1985 New York Times Article), -29 (May 21, 1985 Philadelphia Inquirer Article), -39 (November 21, 1985 Philadelphia Inquirer article), -41 (December 6, 1985 Philadelphia Inquirer Article).

[23] *See, e.g.*, ECF Nos. 285-28 (describing Dr. Mann and Dr. Monge's work together and their identification and aging of bones), -31 (describing the process of sorting, identifying, and labeling remains), -29 (stating Drs. Mann and Monge's conclusions of the age of the MOVE victims), -39 (explaining Dr. Mann's disagreement with city commissioner and mentioning only that he and his assistant Dr. Monge were paid $75 per day for their work), -41 (quoting Dr. Monge as stating they were very upset that the medical examiners examined the remains without her and Dr. Mann).

commission and quotes her saying "[f]orensics is always political," and "[i]f you don't charge the shit out of people, they think you're not good." *Id.*

Dr. Monge's Coursera course was professionally filmed and was available online between August 2020 and April 23, 2021. Penn SOF ¶ 17. The Coursera course could be located through a Google search and was offered free of charge to anyone with a Coursera account, whether or not affiliated with Princeton. *Id.* ¶ 18. Records show 4,556 "Total Learners," 473 "Course Completers," and 2,684 "Active Learners (All Time)." ECF No. 285-26. As of April 19, 2021, over 1,000 viewers specifically watched the portion of the course where Dr. Monge demonstrated the MOVE remains. Penn SOF ¶ 29. In the course, Dr. Monge explains the history of the MOVE bombing, and she describes the role of anthropologists as restoring identity to those who have lost personhood. ECF No. 285-20 at 1:15–1:50. She highlights the "very strong social and political consequence" of all forensic anthropology cases. ECF No. 285-20 at 2:24–2:35.

Dr. Monge also has a Wikipedia page, which first surfaced around 2017. ECF No. 287 ¶ 72. In 2020, it stated that Dr. Monge "was hired to analyze the burned remains of the MOVE-bombing victims" and that she disagreed with the city's special commission on the identity of some of the remains. ECF No. 285-58. She also has an IMDb page showing she appeared in two TV series and one TV movie. ECF No. 285-166. The TV and movie appearances do not relate to the MOVE remains.

**B. Examples of Limited-Purpose Public Figures**

*Hutchinson v. Proxmire* involved a research director and professor who had received federal funds for his research. 443 U.S. 111, 134–35 (1979). After a U.S. Senator publicly criticized the research as an "egregious example[] of wasteful government spending." *Id.* at 114. Though brought into the conversation of government spending by the senator's criticism, the researcher had not "thrust himself or his views" into the controversy involving general public expenditures

"to influence others." *Id.* at 135. Nor did he have "the regular and continuing access to the media that is one of the accouterments of having become a public figure." *Id.* at 136. He could not, therefore, be a limited-purpose public figure for that controversy.

By contrast, *Marcone v. Penthouse International Magazine for Men* found an attorney who had participated in a drug conspiracy with his notorious clients had rendered himself a limited-purpose public figure. 754 F.2d at 1086. The Third Circuit looked to the relevant factors as a whole and concluded that "Marcone's voluntary connection with motorcycle gangs—including his meetings at the Castle with Frey and his occasional weekend trips with them—in conjunction with the intense media attention he engendered [was] sufficient to render Marcone a public figure for the limited-purpose of his connection with illicit drug trafficking." *Id.* The court acknowledged the case was a close call, however, explaining that where "the snowballing of media attention . . . transform[s] an unknown individual into a virtual celebrity almost overnight," he does not necessarily reach public figure status. *Id.*

Other cases have illustrated this rule, showing that an individual cannot become a limited-purpose public figure through the defamation alone, even if the acts they are alleged to have taken would invite public comment. *Ralston*, 676 F. Supp. 3d at 358. *Ralston* identified a common theme in cases finding individuals had become limited-purpose public figures: "the plaintiffs voluntarily involved themselves in an *active* public controversy *before* the defendant defamed them." *Id.* at 357. "[B]y stepping into the public light for purposes of the controversy," those plaintiffs "assumed the risk of publicity in their communities." *Id.* In *Ralston*, a teacher was thrust into the public eye by allegedly false allegations of sexual abuse. *Id.* at 356. Although there was public controversy surrounding historical allegations of abuse, the teacher "took no action related to the controversy which itself invited public comment." *Id.* The court recognized that, "[o]f course, the alleged action

of sexually abusing [a student] would invite public comment. But a defamation plaintiff cannot transform into a public figure simply because of the alleged defamation." *Id.* at 356.

### C. Dr. Monge Thrust Herself into the Public Controversy Surrounding the MOVE Remains.

Like *Marcone*, this case is a close call. Dr. Monge's mere participation in the forensic examination of the MOVE remains in the 1980s does not constitute a voluntary step into the public controversy. *See McDowell*, 769 F.2d at 949 ("[M]erely working on government contracts, like merely receiving research grants, should not transform a person into a limited purpose public figure."). In the 1980s, Dr. Monge was a doctoral student, assisting her professor mostly in the background. She published no articles or reports on the work she did with Dr. Mann and made only one comment to a reporter that she and Dr. Mann were upset that the medical examiner conducted an examination without them. A doctoral student who works on a notorious case as part of her studies does not become a limited-purpose public figure by virtue of her scientific work alone. *See Marcone*, 754 F.2d at 1085 ("Legal representation of a client, by itself, does not establish an individual as a public figure. To hold otherwise would place an undue burden on attorneys who represent famous or notorious clients.").

However, after the forensic examinations of the 1980s concluded, Dr. Monge did not cease her work with the remains or cease her public comment on the MOVE bombing and subsequent forensic examinations. She spoke of them in a *Philadelphia Magazine* article praising her scientific career. She then created a free online course that reached thousands, in which she chose to discuss the MOVE bombing, her later work on the remains, and the social and political consequences of forensic anthropology. Against the backdrop of her discussion of the MOVE bombing and its effect on the Philadelphia community, Dr. Monge further chose to display the remains of a MOVE victim and describe their various scientifically significant characteristics. This was not a course available

only to Princeton students or only to a limited sector of the scientific community. Indeed, it was designed to be viewed "all over the world." ECF No. 285-93 (capitalization removed); *see also* ECF No. 285-1 at 12 ("[I]t was a free class that was offered for instruction in forensic anthropology to, especially folks outside the United States, that were working in forensics but had no training in forensics.").

By choosing to display and discuss the remains of a victim of a notorious event, by commenting on the social and political significance of her work, and by doing so on a platform designed to reach a large audience, Dr. Monge thrust herself into this public controversy. This finding is further supported by the fact that before any of the alleged defamatory statements were made, including those that were dismissed from this action, Dr. Monge's work with the MOVE remains was discussed in a *Philadelphia Magazine* article and on her Wikipedia page. Her forensic anthropology work on this particular case was thus in the public eye before she created the Coursera course. It is further supported by Dr. Monge's very decision to use the MOVE remains as a case study in the Coursera course, rather than any other remains in Penn's collection. The public controversy surrounding the remains was clearly a motivating factor for that choice. For these reasons, the Court finds Dr. Monge is a limited-purpose public figure and must establish actual malice.

## IV. Dr. Monge's Defamation, Defamation by Implication, and False Light Claims against Penn Defendants Fail as a Matter of Law.

Dr. Monge's defamation, defamation by implication, and false light claims are based on the Penn Statement's description of the situation with the MOVE remains as "insensitive, unprofessional, and unacceptable." *See* ECF No. 294 at 9–10. Penn Defendants argue (1) the statement is not defamatory because it is a protected opinion based on disclosed facts; (2) the statement is not "of and concerning" Dr. Monge; (3) Dr. Monge cannot establish the requisite level

of fault; and (4) Dr. Monge cannot establish falsity. First, Dr. Monge concedes that the Penn Statement regarding sensitivity and professionalism is an expression of opinion but contends that it implies the existence of undisclosed facts. *Id.*; *see also id.* at 14–15 (asserting a similar argument with respect to her defamation by implication claim). Second, she argues that, although the statement does not name her, it is nonetheless "of and concerning her." *Id.* at 12. Third, Dr. Monge argues she is a private figure, so she need only establish Penn Defendants acted negligently, but even if she were a limited-purpose public figure, Dr. Monge contends the record supports a finding of actual malice. *Id.* at 12–13. Finally, Dr. Monge asserts that, whether the implication of the Penn Statement was false is a question for the jury. The Court takes these arguments in turn.

### A. Whether the Penn Statement Is "Of and Concerning" Dr. Monge Is a Question for the Jury.

Penn Defendants argue the Penn Statement is not "of and concerning" Dr. Monge. ECF no. 290 at 16. According to Dr. Monge, due to the widely disseminated media reports naming her as Penn faculty and criticizing her Coursera course, readers would have linked her to the Penn Statement. ECF No. 294 at 10–11. The Court agrees with Dr. Monge that a reasonable jury could find as such.

A defamation plaintiff must prove the defamatory communication "may reasonably be understood as referring" to her. *Zerpol Corp. v. DMP Corp.*, 561 F. Supp. 404, 410 (E.D. Pa. 1983) (citing *Farrell v. Triangle Pubs., Inc.*, 159 A.2d 734 (Pa. 1960)). It is not enough for Dr. Monge herself to "understand[] the communication to be about [her]." *Id.* Nor is it material that Penn Defendants did not intend the statement to apply to Dr. Monge. *Id.* (citing *Purcell v. Westinghouse Broadcasting Co.*, 191 A.2d 662, 669 (Pa. 1963)) ("[I]f one hurls defamatory epithets in a manner to strike one to whom they seem, because of fortuitous circumstances, peculiarly to fit, he is liable as much as if he had aimed his remarks precisely at that person."). To determine whether the Penn

Statement may reasonably be understood to refer to Dr. Monge, the Court must look to the circumstances surrounding its publication. *Id.* at 412. The Restatement (Second) of Torts describes the applicable standard as follows:

> It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody. . . . If the applicability of the defamatory matter to the plaintiff depends upon extrinsic circumstances, it must appear that some person who saw or read it was familiar with the circumstances and reasonably believed that it referred to the plaintiff.

Restatement (Second) of Torts § 564 cmt. b (1977).

It is true that the Penn Statement itself does not name Dr. Monge or specifically identify her. Both Drs. Gutmann and Pritchett testified that they were not referring to Dr. Monge; rather, the only reference to an individual is to the faculty member who received the remains. At the time the remains were received, Dr. Mann was the only faculty member because Dr. Monge was still a doctoral student. Penn Defendants argue that, rather than call out Dr. Monge or any individual specifically, the Penn Statement instead "addressed an institutional failure: human remains recovered from the MOVE bombing had been at the Penn Museum for much of the prior 35 years." ECF No. 290 at 16. The Court agrees that Penn Defendants' reading of the Penn Statement is accurate and recognizes that the statement is carefully crafted to avoid any reference to Dr. Monge. However, Penn Defendants' intent to refer only to Dr. Mann does not end the analysis. The question is what an average reader may have understood. *See Zerpol Corp.*, 561 F. Supp. at 410; *Cheney v. Daily News L.P.*, 654 F. App'x 578, 582 (3d Cir. 2016). That question must be answered by examining the surrounding circumstances of the statement's publication. *Zerpol Corp.*, 561 F. Supp. at 412.

Before Penn Defendants issued their statement on April 26, 2021, numerous articles had already been published about the use of the MOVE remains. *See* ECF No. 294 at 11 n.3; ECF No. 133-1. The story gained significant traction and was told in national publications, including *The Guardian*, *The New York Post*, and *the New York Times*. ECF No. 133-1. Those articles named Dr. Monge and described her use of the MOVE remains in her Coursera course, and they linked Dr. Monge's use of the remains with Penn's keeping of them for nearly four decades. *Id.* Additionally, the day after the Penn Statement was published, a group of graduate students circulated their own statement, expressing their anger with Dr. Monge's use of the remains in the Coursera course, urging Penn to remove her from all teaching responsibilities, and refusing to provide teaching assistance in her classes. ECF No. 116. Dr. Monge testified at her deposition that, starting right away with the *Billy Penn* piece, she began receiving threatening phone calls and emails. ECF No. 294-5 at 57. The threats intensified as the story gained momentum, and Dr. Monge suffered severe anxiety and stress as a result. *See id.*

Viewed in this context and construing the evidence in the light most favorable to Dr. Monge, a reasonable jury could find an average reader reasonably understood the statement to refer to Dr. Monge. Dr. Monge has, therefore, met her burden with respect to this element of her defamation claims against Penn Defendants.

**B. The Penn Statement Is a Non-Actionable Statement of Opinion.**

Dr. Monge challenges the Penn Statement on the basis that it falsely accused her handling of the MOVE remains as "insensitive, unprofessional, and unacceptable." She concedes that those words are statements of opinion but maintains that they imply the existence of undisclosed facts. The Court disagrees.

"[A] defamatory statement is one that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with

him." *U.S. Healthcare, Inc.*, 898 F.2d at 923 (cleaned up). Statements that are substantially true are not actionable. *Graboff*, 744 F.3d at 136. However, a defendant may be held liable for his "literally accurate" statement if "the implication of the communication as a whole was false." *Id.* (cleaned up).

Only statements of fact, not expressions of opinion, are actionable. *McCafferty*, 955 F.3d at 357. An opinion is only capable of defamatory meaning if it can "reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (quotation marks omitted) (quoting *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001)). "[W]hen the opinion-holder discloses the factual basis for the idea," a listener can evaluate the soundness of his opinion, making it incapable of defamatory meaning. *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985). However, an opinion may imply "unstated facts for its basis," which may render it capable of defamatory meaning. *Id.* This is known as a "mixed opinion." *Rockwell v. Allegheny Health, Educ. & Rsch. Found.*, 19 F. Supp. 2d 401, 406 (E.D. Pa. 1998). To determine whether a statement implies defamatory facts, the Court must examine it in context. *Wang*, 181 F.4th at 310.

Here, the Penn Statement clearly discloses facts, which Dr. Monge admits are true: "human remains, provided to a faculty member by the medical examiner many decades ago . . . had been kept at Penn Museum" since 1986. ECF No. 108; *see also* ECF No. 286 (Pl.'s Resp.) (admitting the first sentence is factually accurate). It then links the opinion that "**this** was insensitive, unprofessional, and unacceptable" directly to those facts. ECF No. 108. There is simply no implication that any additional misconduct occurred with respect to the remains, other than that they were "kept at Penn Museum" for nearly forty years. *Id.*

Nevertheless, Dr. Monge contends this statement calls into question her fitness as a forensic anthropologist and that the opinion that the conduct was "insensitive, unprofessional, and unacceptable" implies the existence of undisclosed facts uniquely within her employer's knowledge. She relies on *Mzamane v. Winfrey* in support of her argument. There, Oprah Winfrey issued a statement that the head of a boarding school in South Africa would not be returning after allegations of sexual abuse by dorm parents were publicized. 693 F. Supp. 2d at 480–82. In the same comment, Winfrey stated that "any person that has caused harm to any of [the students] will no longer be allowed to work at this school" and stated she had "lost confidence in [the plaintiff's] ability to run this school." *Id.* at 480. Viewing the statement in context, the court found it "ascribe[d] conduct which would render her unfit for her profession as an educator." *Id.* at 481. Notably, Winfrey did not disclose the facts as to why she had "lost confidence" in the plaintiff. *Id.* The court explained, "the criticism of Plaintiff's job performance emanating from Winfrey, when received by the average listener, implies the existence of some undisclosed facts since it is reasonable to presume that Winfrey, as Plaintiff's superior, would be knowledgeable as to the substance of Plaintiff's job performance." *Id.* at 482.

*Mzamane* is distinguishable from this case in several ways. First, in *Mzamane*, an investigation was already underway, while here, the statement clearly announces an investigation was planned but had not taken place. Unlike Winfrey, a reader could not infer that Penn Defendants relied on undisclosed information from such an investigation. Second, unlike Penn Defendants, who stated the remains had been held at the Penn Museum for decades, then stated "this" was unprofessional, Oprah did not provide the basis for why she had "lost confidence" in the plaintiff. Rather, Oprah expressly stated that individuals who had harmed students could not remain and that she did not know what the plaintiff knew about the abuse allegations, but that she would be

terminated anyway. That was sufficient to raise an inference that there was more to the story. Not so here.[24]

Dr. Monge's false light claim requires the same showing of a defamatory statement. *Graboff*, 744 F.3d at 137; *Hill*, 665 F. App'x at 177. It, therefore, fails with her defamation claims.

**C. Dr. Monge Has Not Established Penn Defendants Acted with Negligence, Let Alone Actual Malice.**

Even if Dr. Monge had shown the Penn Statement was capable of defamatory meaning, she has not established the requisite showing of fault. No reasonable juror could conclude Penn Defendants failed to exercise reasonable care in ascertaining the truth of the statement before publishing it. In other words, Dr. Monge has not established negligence with respect to the Penn Statement, let alone the actual malice required by her status as a limited-purpose public figure.

Negligence is a lower standard than actual malice. In the context of a defamation claim, it means only a failure to exercise reasonable care in ascertaining the truth of the statement before publishing it. *Am. Future Sys.*, 923 A.2d at 400; *see also Rutt v. Bethlehems' Glob. Pub. Co.*, 484 A.2d 72, 83 (Pa. Super. Ct. 1984) ("[A] private figure defamation plaintiff, seeking compensation for harm inflicted as a result of the publication of defamatory matter, must prove that the defamatory matter was published with 'want of reasonable care and diligence to ascertain the truth' or, in the vernacular, with negligence.").

---

[24] The line of cases supporting *Mzamane*'s reasoning are also distinguishable. In *Roffman v. Trump*, for example, Donald Trump wrote a letter to the employer of an investment analyst who had stated his casino would not succeed. 754 F. Supp. 411 (E.D. Pa. 1990). Trump then made several statements reported in publications, including that the plaintiff was a disgrace to his profession, was not a very good analyst, was an "unguided missile," and was "a man of little talent" who "was dismissed or was about to be dismissed six months ago, and I saved his job." *Id.* at 413–14. Trump argued that these were non-actionable statements of opinion. The court disagreed, stating that "[a] reasonable recipient of these communications would almost certainly infer that Trump based on his assessment of [the plaintiff's] abilities on some undisclosed additional information; there can be little doubt that a person who hears someone criticizing another's job performance would presume that the person doling out the disparaging comments possessed knowledge of some facts on which to base the criticism." *Id.* at 419. Crucially, however, Trump disclosed no facts with his opinions. As explained above, that is not the case here.

Penn Defendants exercised at least reasonable care, meaning Dr. Monge could not establish actual malice. Dr. Monge points to no evidence to the contrary. She asserts only that a jury could infer that Penn Defendants were reckless in relying on Dr. Mitchell's allegations, given his tenuous relationship with Dr. Monge. *See* ECF No. 294 at 12–13. However, Penn Defendants did not rely solely on Dr. Mitchell's allegations. They relied on Dr. Woods's independent, thorough investigation, and his assurances that he personally researched and checked all reports he was provided and passed on to Dr. Pritchett and Dr. Gutmann. *See, e.g.*, Penn SOF ¶¶ 9 ("Upon receiving Dr. Mitchell's email with this additional information, Dr. Woods 'carefully went through the information in it.'"), 85 ("Neither Dr. Pritchett nor Dr. Gutmann ever spoke with Dr. Mitchell concerning the MOVE remains."), 75–91 (describing the information Dr. Woods and Dr. Monge provided to Penn Defendants before they issued the Penn Statement); ECF No. 285-5 at 25 ("I was very sure to . . . verify and to check all information that Paul Mitchell, who was somebody I did not know before meeting him on that day, that this information was true. . . . I would never simply take this information and take it as the gospel. It's my job to verify it.").

Dr. Woods's investigation involved reviewing multiple reports, researching and confirming information himself, speaking with Dr. Monge and other individuals at the museum with relevant information, and having multiple colleagues verify the information.[25] Penn SOF ¶¶ 10, 15, 34–42, 45. Dr. Woods then sent Dr. Mitchell's report to Dr. Pritchett, confirming that he personally verified and checked all the information it contained first. *Id.* ¶ 47. "In the last two weeks of April 2021, Drs. Woods and Pritchett were in 'constant communication' about what Dr. Woods was learning

[25] Dr. Woods's investigation before informing Penn Defendants of the anticipated reporting and keeping of the MOVE remains at the Penn Museum is distinct from the later investigation referenced in the Penn Statement. Penn Defendants did not have a duty to hire an outside firm to uncover any additional information into the handling of the remains where their statement was specifically limited to the keeping of the remains at the Penn Museum for nearly four decades. They carefully limited their comment to the information available to them at the time and implied no further malfeasance by anyone at the Penn Museum, including Dr. Monge.

about the MOVE bombing and the retention of the MOVE remains at the Penn Museum." *Id.* ¶ 75. Only after that investigation was conducted and the information conveyed to Drs. Pritchett and Gutmann, including Dr. Monge's own statement, did they issue the Penn Statement. *See id.* ¶¶ 75–80, 84.

Simply put, Penn Defendants had no reason to doubt Dr. Woods's investigation or Dr. Monge's own statements. They had no duty to do any further investigation beyond the extensive investigation Dr. Woods conducted. *See Crescenz v. Penguin Grp. (USA), Inc.*, 561 F. App'x 173, 177–80 (3d Cir. 2014) (holding that no reasonable jury could find author failed to exercise reasonable care where he relied on personal observations, interviews with subject's closest associates, corroborating documentary sources, and the subject himself before publishing). For this reason, even assuming Dr. Monge is a private figure, she has failed to establish the requisite level of fault with respect to the Penn Statement. Penn Defendants are entitled to summary judgment on both their defamation and false light claims on these additional grounds. *See id.*; *Graboff*, 744 F.3d at 136 (false light requires reckless disregard of falsity).

**D. Dr. Monge Has Not Pointed to Evidence Supporting a Finding of Falsity.**

The Court has found that the Penn Statement does not imply any undisclosed facts. For that reason, there are no facts which a jury could find true or false. However, assuming arguendo, Dr. Monge had established that the Penn Statement implied some undisclosed facts, the Court discusses whether she has established their falsity. Where, as here "the statement in question bears on a matter of public concern, . . . First Amendment concerns compel the plaintiff to prove, as an additional element, that the alleged defamatory statement is in fact false." *Kuwait & Gulf Link Transport Co. v. Doe*, 216 A.3d 1074, 1087 (Pa. Super. Ct. 2019). "Under Pennsylvania law, falsity is a critical element of a defamation claim." *Godlewski v. Kelly*, 348 A.3d 724 (Pa. Super. Ct. 2025) (unpublished table opinion). The Honorable Judge Pratter has already concluded that "the MOVE

bombing and its aftermath, including the retention of the remains of the victims of the bombing, are matters of public concern." ECF No. 124 at 5 (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). This Court agrees with that analysis. Accordingly, Dr. Monge must prove the statements made were false.

The Court reiterates that the statement that the retention of the MOVE remains was "insensitive, unprofessional, and unacceptable" is a statement of opinion that cannot be proven false. Indeed, in Dr. Monge's own words, one cannot speak to another's world views on sensitivity. *See* Penn SOF ¶ 110. Nor does Dr. Monge identify any facts that were not disclosed in the Penn Statement that she contends were false. Rather, she asserts only that the "Tucker Law Group investigation found that [Dr. Monge] 'did not violate any specific professional, ethical or legal standards,' . . . and that the anthropologists it consulted 'could identify no specific professional ethical standards that were applicable.'" ECF No. 294 at 14. She asserts the "gist" of the Penn Statement was that Dr. Monge committed professional misconduct, which a jury relying on the Tucker Report could find false. *Id.* In reply, Penn Defendants assert the Tucker Report is inadmissible hearsay and cannot be treated as an expert report. ECF No. 297 at 2–3 n.1. The Court agrees.[26] Dr. Monge has pointed to no evidence that would be admissible at trial to show her retention and use of the MOVE remains, without the family's consent, was "sensitive, professional, or acceptable." Even if the Tucker Report were admissible, it merely shows the investigating lawyers' opinions, which may be different from the implication Dr. Monge ascribes to the Penn Statement, but are no more capable of being proven true or false. *See Wang*, 181 F.4th at 311.

---

[26] Although hearsay statements may be considered at summary judgment if the proponent shows they are capable of being presented in an admissible form, Dr. Monge has not made that showing. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial and may not be considered for purposes of summary judgment."); *see also Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 596 (E.D. Pa. 2020) (declining to consider hearsay testimony at summary judgment where proponent did not show the hearsay statement was capable of being presented in an admissible form.").

## V. Dr. Monge's Defamation and Defamation by Implication Claims against Dr. Mitchell Fail as a Matter of Law.

Dr. Mitchell asserts (1) Dr. Monge's defamation and defamation by implication claims are time-barred; (2) Dr. Mitchell's statements to Dr. Woods are not defamatory; (3) Dr. Monge cannot establish actual malice or negligence; and (4) Dr. Mitchell's communications to Dr. Woods are protected by a conditional privilege.

### A. Dr. Monge's Claims against Dr. Mitchell Are Time-Barred.

Under Pennsylvania law, a defamation claim, including defamation by implication, is subject to a one-year statute of limitations. 42 Pa. Cons. Stat. § 5523(1). For widely disseminated statements, the statute begins to run on the date of publication. *P&I Ins. Servs., LLC v. Risk Averse Ins., LLC*, No. 20-5910, 2022 WL 103135, at *6 (E.D. Pa. Jan. 11, 2022). However, for communications that are published in private such that a plaintiff could not be expected to know of them, the discovery rule may apply. *Id.* When the discovery rule applies, "the statute is tolled, and does not begin to run until the injured party discovers or reasonably should discover that [s]he has been injured and that [her] injury has been caused by another party's conduct." *Fine v. Checcio*, 870 A.2d 850, 859 (Pa. 2005). Generally, a jury must decide "whether a party was able, in the exercise of reasonable diligence, to know of [her] injury and its cause." *Id.* at 858. "Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law." *Id.* at 858–59.

Dr. Monge's defamation claims against Dr. Mitchell are based on statements Dr. Mitchell made in the April 16, 2021 meeting and in his follow-up emails on April 16 and 17, 2021.[27] On

[27] Although Dr. Monge asserts her defamation by implication claim rests on the implications contained in Dr. Mitchell's April 25, 2021 report, the Court has already found the report cannot support a defamation claim because it is substantially true. ECF No. 208. The Court limited Dr. Monge's defamation claim against Dr. Mitchell to "only the

April 18, 2021, Dr. Tinney called Dr. Monge and spoke to her about the anticipated articles. *See* ECF No. 285-66 at 1. Dr. Monge testified that she found out Dr. Mitchell was making statements about her handling of the MOVE remains "a couple days before" April 21, 2021. Mitchell SOF ¶ 144. Dr. Woods testified to discussing the contents of Dr. Mitchell's emails, specifically the MOVE remains, extensively with Dr. Monge. Mitchell SOF ¶ 148; ECF No. 285-5 at 53–54. Additionally, on April 19, 2021, Dr. Monge received an email from a Princeton University employee, forwarding a complaint from a student named Jake. *See* ECF No. 285-75. Jake asserted that Dr. Monge's use of the MOVE remains is "harmful and shameful behavior, and completely inappropriate," and asked that the Coursera course be taken down. *Id.* at 2. That day, Dr. Monge replied to the email, stating she already knew about the issue and that the "Penn Museum has been notified as well because of 2 graduate students in Anthropology – one is Jake and the other is Paul Mitchell." ECF No. 285-75 at 1. Dr. Monge also forwarded the email to Drs. Woods and Tinney, stating "So, now we know that it was Paul Mitchell who instigated this – through this Jake person also a graduate student in Anthropology . . . . Moreover, that they are feeding information to the person writing the Inquirer op-ed." ECF No. 285-76 at 1. Dr. Mitchell argues this establishes Plaintiff was aware of the alleged defamatory statements as early as April 19, 2021, meaning she missed the limitations period by one day. *See* ECF No. 288-1. The Court agrees.

Dr. Monge responds that her comment that Dr. Mitchell "instigated this" "reflected only a general awareness that he was driving a narrative," but "[s]he did not know the precise wording of

---

statements made to Dr. Woods." *Id.* The Court further allowed Dr. Monge's defamation by implication claim to proceed against Dr. Mitchell, explaining that "the statements to Dr. Woods 'could fairly and reasonably be construed to have the meaning imputed in the innuendo'—namely that Dr. Monge is unethical and her work cannot be trusted." *Id.* Dr. Monge asserts that the Court's ruling does not foreclose her claims against Dr. Mitchell, "which proceed based upon the *implications* of the statements in [his] report, as well as Dr. Mitchell's separate communications with administrators from the University of Pennsylvania and/or the Penn Museum." Mitchell SOF ¶ 141 (Pl.'s Resp.). Given the Court's ruling on the motion to dismiss, Plaintiff is incorrect.

that narrative, who that narrative was being communicated to, or how it might cause her harm." ECF No. 295 at 9. According to Dr. Monge, a jury should decide whether she knew or, through reasonable diligence, could have known the content of the private statements within the limitations period. *Id.* Dr. Monge's argument misses the mark.

The Pennsylvania Supreme Court "has long held that there are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000). In analyzing applicability of the discovery rule, "[t]he relevant inquiry is not whether a plaintiff has sufficient information to prepare a complaint, but whether plaintiff knew of the injury and the cause thereof." *Gallucci v. Phillips & Jacobs, Inc.*, 614 A.2d 284, 288 (Pa. Super. Ct. 1992). Upon learning of the injury and its cause, a plaintiff has "the duty to apprise [herself] of the necessary facts and pursue legal recourse within the statute of limitations." *Id.* at 289; *see also Rizzo v. Nutanix, Inc.*, No. 20-5140, 2021 WL 1214504, at *3 (E.D. Pa. Mar. 31, 2021) (explaining that a plaintiff cannot "take advantage of tolling by claiming he lacked information regarding the 'specific content' of the defamatory statement, if he knew of the injury and its cause.").

Here, by her own admission, Dr. Monge was aware of Dr. Mitchell's involvement in "feeding information" to the reporter writing the *Inquirer* op-ed no later than April 19, 2021, and she was aware of Dr. Mitchell's communications with Penn. ECF No. 285-76 at 1. The key issue here is whether she knew of the injury and its cause by April 19, 2021, such that she could pursue legal recourse within the next year. *See Gallucci*, 614 A.2d at 288–89 (rejecting argument that appellants' lack of sufficient information to prepare a defamation complaint, specifically knowledge of the specific content of the defamatory statements, tolled the statute of limitations

where they knew of the injury and cause). Though Dr. Monge may not have known the specifics of Dr. Mitchell's statements made in private, she was aware that articles were forthcoming, that Penn was investigating the use and keeping of the MOVE remains, and that there were negative responses to the information raised with the University's administration. Her email correspondence additionally shows that at least by April 19, 2021, she was aware that Dr. Mitchell was "feeding information" to reporters, that he "instigated this," and that he notified the Penn Museum of the issue. Even applying the discovery rule, the statute would begin to run on April 19, 2021, and Dr. Monge's deadline to file claims against Dr. Mitchell was April 19, 2022. She missed that deadline by one day.

This outcome seems harsh; however, the Court is constrained by the statute of limitations, which must be strictly enforced. *See Mosel v. Hills Dep't Store, Inc.*, 789 F.2d 251, 253 (3d Cir. 1986) (holding that in a Title VII case, "the court cannot extend the limitations period by even one day" unless equitable tolling applies); *see also Epstein v. Susquehanna River Basin Comm'n*, No. 08-CV-00419, 2008 WL 2370158, at *6 (M.D. Pa. June 9, 2008) (dismissing petition for judicial review that was filed one day late). Dr. Monge's defamation and defamation by implication claims against Dr. Mitchell are, thus, time barred.

**B. Dr. Monge Has Identified No Actionable Statement.**

Even if Dr. Monge had filed her complaint against Dr. Mitchell on time, she has identified no false, factual statements by Dr. Mitchell. Dr. Monge is unable to testify as to the exact contents of the statements Dr. Mitchell made to Dr. Woods. Mitchell SOF ¶ 167. However, she identifies five alleged statements she contends Dr. Mitchell made, either explicitly or implicitly:

> (1) Dr. Monge illegally held the unidentified MOVE remains; (2) Dr. Monge never contacted the MOVE members to help identify the unidentified MOVE remains; (3) Dr. Monge used the unidentified MOVE remains as "props"; (4) The BI remains

> were definitely identified as Katricia Do[t]son; (5) Dr. Monge disrespectfully handled the unidentified MOVE remains.

Mitchell SOF ¶ 174. The Court takes each in turn.

*(1) "Dr. Monge illegally held the unidentified MOVE remains."*

Dr. Monge points to no record evidence that Dr. Mitchell ever stated she illegally held the MOVE remains. She points to two pieces of testimony concerning Dr. Mitchell's statements: "Dr. Woods testified that Mitchell's statements concerned 'human remains, including MOVE remains in the Penn Museum,'' and "Dr. Monge testified that Mitchell's communications conveyed that she was incompetent in doing [her] job." ECF No. 295 at 9–10 (first citing Mitchell SOF ¶ 148, and then citing Monge Dep., ECF No. 295-6 at 5). Neither of these necessarily raise an inference that any defamatory statement was made, whether it be factually false or containing a false implication.

Dr. Monge next asserts that whether she can recite Dr. Mitchell's exact words "is immaterial, because her claims rest on the defamatory meaning his communications reasonably conveyed." *Id.* at 10. Dr. Monge is correct that a communication may be actionable, even if literally true, where "the implication of the communication as a whole was false." *Graboff*, 744 F.3d at 136 (quoting *Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. Ct. 1982)). However, Dr. Monge does not identify any false statements or explain how any of Dr. Mitchell's statements implied her keeping or handling of the remains was "illegal." She fails to connect any evidence before the Court, beyond her own speculation, to the meaning imputed in the innuendo. *Sarkees v. Warner-W. Corp.*, 37 A.2d 544, 546 (Pa. 1944) ("It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury.").

Dr. Monge's speculative, unsupported belief that something Dr. Mitchell may have said imputed illegality onto her actions cannot sustain her defamation claim.

*(2) "Dr. Monge never contacted the MOVE members to help identify the unidentified MOVE Remains;" and (3) "Dr. Monge used the unidentified MOVE remains as 'props.'"*

Likewise, Dr. Monge identifies no evidence that Dr. Mitchell ever stated she did not contact the MOVE members to help identify the remains. Nor does she identify any evidence that Dr. Mitchell stated she used the remains as "props." That statement was made by Maya Kassutto in the *Billy Penn* article. Dr. Mitchell cannot be held liable for someone else's allegedly defamatory statement, but even if he could, the Court has already found the statement that she used the remains as "props" to be substantially true and, thus, not actionable. *See* ECF No. 124 at 6 (Pratter, J.) ("Finally, it is true that Dr. Monge 'used the remains of a black girl as "props."' . . . Dr. Monge admits that she displayed the remains during her Coursera course, compared the remains to other bone fragments, and explained how forensic techniques could be used to determine the age of such remains.").

*(4) "The B-1 Remains were definitely identified as Katricia Dotson."*

Like the above, this statement is substantially true. In 1986, Dr. Hameli, the lead pathologist associated with the MOVE commission, concluded that the B-1 remains were those of Katricia Dotson. Mitchell SOF ¶¶ 190–91, 193. Although she and Dr. Mann disagreed with that conclusion, this Court has already found this to be substantially true. ECF No. 208 at 2 n.1 (holding that "Dr. Monge admits that Dr. Hameli concluded that the bones belonged to Katricia Africa"); ECF No. 205 at 3 n.1 ("Because Dr. Monge admits that Dr. Hameli identified the remains as belonging to 14-year-old Katricia Africa, the statements are substantially true."); *see also* ECF No. 124 at 6 (Judge Pratter finding that the Billy Penn article stating the unidentified remains were those of Katricia Dotson "is at least substantially true based on Dr. Hameli's conclusion.").

(5) *"Dr. Monge disrespectfully handled the unidentified MOVE remains."*

Finally, Dr. Monge has produced no evidence that Dr. Mitchell stated she disrespectfully handled the remains. To the extent she relies on defamation by implication, that claim also fails. Dr. Monge does not identify any false, undisclosed facts upon which Dr. Mitchell may have based his opinion that her handling of the remains was "disrespectful." Nor do the parties point to any evidence of the specific contents of discussions in the April 16, 2021 Zoom meeting. However, there is evidence that Dr. Mitchell disclosed his knowledge of the issue stemmed from the Coursera course. *See* ECF No. 285-6 at 8 (Morrison testifying that "at that meeting, Paul Mitchell told us about the Coursera course video and that there were remains from the MOVE bombing at the Museum."). When he followed up by email, Dr. Mitchell again discussed the Coursera series and included representative clips. ECF No. 285-65 at 8–9. The record shows Dr. Mitchell disclosed the facts upon which he based his opinion.[28]

Again, Dr. Monge is correct that a statement can be actionable if its overall implication is that she is unfit for the proper conduct of her profession. *See* ECF No. 295 at 11 (quoting *Mzamane*, 693 F. Supp. 2d at 481). However, the implication must be a reasonable interpretation of the statement. *See Sarkees*, 27 A.2d at 546. Absent some link between the evidence of Dr. Mitchell's statements and a reasonable defamatory construction, there is no dispute for a jury to decide.

For these reasons, Dr. Monge's defamation and defamation by implication claims against Dr. Mitchell would fail, even if timely.

---

[28] Dr. Monge does not assert that any factual statements Dr. Mitchell made in his follow-up emails were false.

**C. Whether Dr. Mitchell Acted with Actual Malice Would Be a Jury Question.**

Assuming, arguendo, Dr. Monge had established some actionable defamatory statements, whether Dr. Mitchell published them at the April 16, 2021 Zoom meeting with actual malice would be a question for the jury.

To prove actual malice, a plaintiff must show the speaker published the defamatory statement knowing it was false or with reckless disregard as to whether it was true. *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 89 (3d Cir. 2013). "Recklessness is shown by demonstrating that the defendant in fact entertained serious doubts as to the truth of the statement or that the defendant had a subjective awareness of probable falsity." *Id.* (cleaned up). The standard is subjective, meaning it is based on the speaker's "actual state of mind." *Id.* (citation omitted).

For claims involving defamation by implication, which involves the implication of undisclosed defamatory facts, a plaintiff "must show something beyond knowledge of, or recklessness in regard to, the *falsity* of the statement's defamatory meaning." *Id.* at 90. She "must show something that establishes defendants' intent to communicate the defamatory meaning." *Id.* This can be satisfied with a showing of intent or reckless disregard for the statement's defamatory meaning. *Id.* at 90–91. However, mere knowledge of a defamatory meaning is insufficient where the statement is also capable of a non-defamatory meaning. *Id.* at 91. The speaker must know the defamatory meaning is likely, not just possible, and disregard that risk. *Id.* at 91–92.

Absent a statement capable of defamatory meaning, there can be no finding of a reckless disregard of that meaning. However, this section assumes Dr. Mitchell made some statements capable of defamatory meaning for argument's sake. Dr. Mitchell argues he "undertook extensive efforts to ascertain the truth regarding Plaintiff's retention and use of the MOVE remains." ECF No. 288-1 at 23. However, the efforts he describes occurred *after* the April 16, 2021 Zoom meeting, where the allegedly defamatory statements were made.

Furthermore, although actual malice does not refer to "ill will" or "motive arising from spite," there is evidence in the record of a deterioration of Dr. Mitchell's relationship with Dr. Monge. She reported him for theft in the lab, revoked his access, and reported him for threatening behavior. This background would lend support to a jury finding that Dr. Mitchell acted with reckless disregard as to the defamatory meaning of his communications. For this reason, had Dr. Monge produced evidence of statements capable of defamatory meaning, the evidence of actual malice would be sufficient to go to a jury.[29]

**VI. Dr. Monge's Aiding and Abetting Claims Fail with the Underlying Tort.**

All Defendants move for summary judgment on Dr. Monge's aiding and abetting claims. To prevail on an aiding-and-abetting claim, Dr. Monge must prove (1) the commission of an underlying tort; (2) actual knowledge of another's intent to commit the underlying tort; and (3) knowing and substantial assistance or encouragement to another in accomplishing the tortious result, and (4) her own conduct constituted a breach of duty. *Koken*, 825 A.2d at 731; *see also* Restatement (Second) of Torts § 876; *Marion*, 288 A.3d at 79; *Allegheny Gen. Hosp.*, 228 F.3d at 446 (3d Cir. 2000).

Dr. Monge cannot base an aiding and abetting claim upon a tort that she cannot establish occurred. *Allegheny Gen. Hosp.*, 228 F.3d at 446. Nor can she base an aiding and abetting claim upon a tort that is barred by the statute of limitations. *See Woodward v. Nudy*, No. 24-1367, 2025

[29] For the same reasons, the Court also finds that whether Dr. Mitchell's statements were made negligently is a jury question. As additional grounds for summary judgment, Dr. Mitchell asserts his communications are protected by a conditional privilege. A conditional privilege would apply. *See Weinik v. Temple Univ. of Commw. Sys. of Higher Educ.*, No. 19-3503, 2024 WL 2277833, at *30 (E.D. Pa. May 20, 2024) (explaining a defendant invoking a conditional privilege must show "(1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is involved; or (3) a recognized interest of the public is involved"). However, if a jury were to find Dr. Mitchell was negligent when he published his statements at the meeting, it could also find he abused the conditional privilege. *See Pacitti*, 310 F. App'x at 528 (citing *Banas v. Matthews Int'l Corp.*, 502 A.2d 637, 638–39 (Pa. 1985)); *see also Am. Future Sys.*, 923 A.2d at 397–98. Accordingly, although the Court need not reach the issue to grant Dr. Mitchell's motion, it finds that summary judgment would be inappropriate on the questions of negligence and conditional privilege.

WL 662802, at *5 (E.D. Pa. Feb. 28, 2025) (noting that "civil conspiracy is 'not independently actionable,' but must be tied to an underlying tort," and dismissing conspiracy claim where underlying conversion claim was time-barred); *see also Curbison v. U.S. Gov't of New Jersey*, 242 F. App'x 806, 810 (3d Cir. 2007) (dismissing derivative conspiracy claim where underlying tort claim was time-barred). All defendants are, therefore, entitled to summary judgment on Dr. Monge's aiding and abetting claims.

Finally, with respect to the aiding and abetting claim against Dr. Morrison, Dr. Monge has not pointed to evidence that Dr. Morrison had any knowledge of Penn Defendants' or Dr. Mitchell's allegedly defamatory statements before they were made or that she knowingly gave substantial assistance or encouragement to them in making those statements.

To prevail on an aiding and abetting claim, a plaintiff must prove the defendant had "actual knowledge" of the commission of an underlying tort. *Marion*, 288 A.3d at 90. Dr. Monge identifies no evidence that Dr. Morrison knew Penn Defendants would be issuing a statement or knew what its contents would be. The record, in fact, shows the opposite. *See* Penn SOF ¶¶ 119–20 ("Dr. Morrison did not speak to Drs. Gutmann and Pritchett about the April 26 statement before its publication. . . . Dr. Morrison did not draft the April 26 statement, nor did she review the statement prior to publication."). Nor is there any evidence that Dr. Morrison knew Dr. Mitchell would defame Dr. Monge in the April 16, 2021 meeting. Merely attending the meeting and listening to what Dr. Mitchell had to say—defamatory or not—does not constitute actual knowledge of the commission of a tort. Dr. Monge asserts the question of knowledge must be reserved for the jury, but that is only true where there is some evidence from which a jury could find in her favor. Here, there is none.

Dr. Monge also fails to identify any evidence from which a jury could infer Dr. Morrison provided substantial assistance to Dr. Mitchell or Penn Defendants. Dr. Monge highlights Dr. Morrison's position as Department Chair and her later acts of arranging another faculty member to teach the Fall 2021 anthropology course and participating in the process resulting in the non-renewal of Dr. Monge's contract. However, none of that is the basis for an underlying tort. Dr. Monge points to no conduct demonstrating Dr. Morrison's involvement in the issuance of any allegedly defamatory statements. Dr. Morrison is therefore entitled to summary judgment on these independent grounds.

## VII. Conclusion

For the foregoing reasons, Defendants' motions for summary judgment are granted. An appropriate Order follows.